**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email:    aapton@zlk.com
Email: amccall@zlk.com
75 Broadway, Suite 202
San Francisco, CA 94111
Telephone: (415) 373-1671

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUANTUMSCAPE SECURITIES CLASS ACTION LITIGATION | Case No. 3:21-CV-00058-WHO<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date: December 8, 2021<br>Time: 2:00 p.m.<br>Courtroom: 2<br>Honorable William H. Orrick |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

    A.    QuantumScape and Solid-State Batteries .................................................. 2

    B.    Defendants "Go Public" Amidst Claims of Solving the Solid-State Puzzle. ............ 4

    C.    Defendants' Claims were Materially False and Misleading. .................................... 6

LEGAL STANDARDS ......................................................................................................... 8

ARGUMENT .......................................................................................................................... 9

    I.    DEFENDANTS VIOLATED SECTION 10(B) AND RULE 10B-5. ................................... 9

    A.    The Complaint Adequately Pleads False Statements.................................................. 9

    B.    Plaintiff Adequately Alleges Scienter against Defendants' Because of their Public Statements, Access to Information, and the Prominence of the Information. ......... 18

    C.    Dr. Morin and Scorpion Capital Revealed that QuantumScape Used "Compromised" Testing and Overstated Its Data. .......................................................................... 22

    II.    DEFENDANTS VIOLATED SECTION 20(a). ........................................................ 24

CONCLUSION........................................................................................................................ 24

## **TABLE OF AUTHORITIES**

**Cases**

*In re Allied Nev. Gold Corp. Sec. Litig.*,
  743 F. App'x 887 (9th Cir. 2018) ................................................................................. 18

*In re Apple Computer, Inc., Sec. Litig.*,
  2003 WL 26111982 (N.D. Cal. Aug. 13, 2003) ........................................................... 16

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ............................................................... 20

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) ....................................................................... 18

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ........................................................................... 11, 16, 17

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ............................................................................... passim

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ................................................................... 10, 22, 23, 24

*Browning v. Amyris, Inc.*,
  No. 13-CV-02209-WHO, 2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ................... 15

*In re Daou Sys.*,
  411 F.3d 1006 (9th Cir. 2005) ..................................................................................... 21

*Edenbrook Cap., LLC v. RhythmOne Plc*,
  2019 WL 1791419 (N.D. Cal. Apr. 24, 2019) ............................................................. 14

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ..................................................................................... 24

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ........................................................................... 9

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ............................................................. 22

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ..................................................................................... 15

*Howard v. Everex Sys.*,
  228 F.3d 1057 (9th Cir. 2000) ............................................................................... 21, 24

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................... passim

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ........................................................................................ 16

*Maiman v. Talbott*,
  2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ............................................................. 18

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ........................................................................................ 15

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ....................................................................................................... 14

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ........................................................................................ 24

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) .......................................................................... 21

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ................................................................................... passim

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ...................................................................................... 20

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ............................................................................ 11, 16

*In re Portal Software, Inc. Sec. Litig.*,
  2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ............................................................. 21

*In re Quality Sys.*,
  865 F.3d 1130 (9th Cir. 2017) ...................................................................................... 15

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ................................................................................... 14, 20

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ................................................................................... 18, 19

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ..................................................................................... 9, 14

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ...................................................................................... 16

*In re STEC Inc. Sec. Litig.,*
  2011 WL 2669217 (C.D. Cal. June 17, 2011) .............................................................. 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................... 18, 20, 22

*In re Tesla Sec. Litig.*,
   477 F. Supp. 3d 903 (N.D. Cal. 2020)...................................................................................... 12

*Usher v. City of Los Angeles*,
   828 F.2d 556 (9th Cir. 1987) ............................................................................................... 9

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) .................................................................................................... 9, 12

*Webb v. SolarCity Corp.*,
   884 F.3d 844 (9th Cir. 2018) .............................................................................................. 21

*Westley v. Oclaro, Inc.*,
   897 F. Supp. 2d 902 (N.D. Cal. 2012)................................................................................ 16

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) ............................................................................................ 20

*Zaghian v. Farrell*,
   675 F. App'x 718 (9th Cir. 2017)................................................................................... 16, 20

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .............................................................................................. 21

**Statutes**

15 U.S.C. § 78j(b) ................................................................................................................... 8

15 U.S.C. § 78t........................................................................................................................ 8

15 U.S.C. § 78u-4(e)(1) ......................................................................................................... 10

15 U.S.C. § 78u-5(I) .............................................................................................................. 15

17 C.F.R. § 240.10b-5.............................................................................................................. 8

**PRELIMINARY STATEMENT**

In Silicon Valley, "fake it, until you make it" has long been a way of doing business. As a competitor in the decades-long race to develop the first reliable solid-state battery to replace lithium-ion batteries, Defendants QuantumScape Corporation, Jagdeep Singh, Kevin Hettrich, and Timothy Holme claimed that they solved the "solid-state" puzzle by developing a cell that could resist deterioration and outperform conventional lithium-ion batteries. They had no real-world data, or even a conventionally sized product, to support their claims and so resorted to carefully manipulated laboratory performance data with "compromised" tests that evaluated their batteries under ideal, pristine conditions. They used this data and a slick presentation to raise billions of dollars from investors in the hope that their technology would ultimately catch up with their promises. Investors, however, were unaware that QuantumScape's solid-state technology was not yet as represented until reports surfaced in the news from industry experts and researchers. By this point though, it was already too late for most investors to recover their investments. QuantumScape had already gone public through a "SPAC" offering and experienced a meteoric rise in its stock price only to plummet once news of its spurious testing data surfaced.

Solid-state batteries have a similar structure to lithium-ion batteries but do away with the liquid electrolyte and replaces it with a solid electrolyte and separator. The potential benefits of removing the liquid from batteries has been known since the mid-1970s. However, no company has been able to manufacture a solid-state battery because lithium quickly develops dendrites. Dendrites are needle-like metallic growths and deposits of lithium metal that resemble a tree, roots, or a fungus. Dendrites cause battery failure and even fatal hazards. Many companies have claimed to solve these issues, only for it to be revealed that their data was overstated. Defendants acknowledged this, explaining that most solid-state batteries "only work under severely compromised test conditions and the main compromises that people use are either very low current densities, which ends up not being useful for real applications like driving a car, or the cycle efforts are being very short [pulse tests] or the cells can only work at an elevated temperature or they require excess lithium, which lowers the energy density of the cell." Defendants claimed that "[t]hese are the problems that QuantumScape has addressed." However, despite Defendants affirmative representations to the

contrary, they used the same compromises they warned of, including elevated temperatures and pulse tests to manipulate its data.

Defendants argue that none of their statements or omissions was misleading and, in any event, their statements were inactionable because they were forward-looking statements with meaningful cautionary language, pure opinions, or immaterial to investors. However, Defendants selectively quote and miscategorized Plaintiff's properly pleaded allegations. When viewed in the light most favorable to Plaintiff these arguments must fail.

Defendants also improperly insert their own narrative of facts in order to discredit and misconstrue the well-pleaded allegations of the Complaint. For example, Defendants attempt to discredit Dr. Morin and Scorpion Capital because, according to Defendants, these sources are "biased" and "conflicted," and their reports based on purely public information. This is false. Dr. Morin and Scorpion Capital revealed new important information about QuantumScape's testing methods and claims. Dr. Morin used his experience and expertise to issue his findings. Scorpion Capital, for its part, interviewed a number of experts and witnesses whose views were not previously public and who were "reliable sources of information with respect to Quantum[S]cape." They substantiated the claim that the report was made in "good faith."

Finally, Defendants argue that Plaintiff's allegations are simply scientific debate, not proper for the Court to adjudicate. However, the issues raised by Plaintiff in his Complaint deal with the accuracy of Defendants' statements, which is squarely in the realm of justiciability. When taken as true with all reasonable inferences construed in Plaintiff's favor, the Complaint shows that Defendants knowingly made material misrepresentations or omissions relating to QuantumScape's solid-state battery prototype and investors suffered substantial losses as the truth was revealed. Thus, the Court should deny Defendants' Motion in its entirety.

## STATEMENT OF FACTS

### A.    QuantumScape and Solid-State Batteries.

QuantumScape was co-founded in 2010 by Defendants Singh and Holme, and Defendant Hettrich has been an employee of QuantumScape since January 2012. ¶¶32, 23-25. While over 10 years old, QuantumScape is a pre-revenue company with its entire success dependent on a single

product, its "solid-state" battery prototype that is to be used in electric vehicles ("EVs"). ¶36. QuantumScape's prototype consists of a thin single-layer cell that will ultimately be stacked about 100 times to form a full battery cell that is about the size of a deck of cards. ¶73. Powering an EV will require hundreds of those deck sized cells resulting in hundreds of thousands of battery layers. ¶73. However, when the Class Period started, QuantumScape had only tested a single layer cell, well short of the 100 needed to form even a single full cell. ¶73.

Conventional lithium-ion is the most efficient battery technology available. ¶38. A lithium-ion battery uses lithium-ions as a key component of its electrochemistry and uses a separator with liquid electrolyte solution that keeps the cathode and anode apart. ¶39. EVs today use conventional lithium-ion batteries as they have a very high voltage and charge storage and surpass older batteries in terms of quality, output, half-life, and cost. ¶¶38, 47. Lithium-ion technology has advanced enormously in the past five years. ¶48. In EVs, lithium-ion batteries are capable of ranges of 500 km (over 310 miles) and fast charging to 80% capacity in 15 minutes. ¶¶48, 50, 51, 54.

Solid-state batteries have a similar structure to lithium-ion batteries, but replaces the liquid electrolyte with a solid electrolyte and separator. ¶56. The potential benefits of removing the liquid from batteries include better energy density, charging capabilities, cycle life, safety, and cost compared to the traditional lithium-ion batteries. ¶¶56-57, 60. Notwithstanding, a number of technological and logistical obstacles have prevented the development of solid-state batteries. One of the most basic obstacles to date has been the formation of "dendrites," needle-like metallic growths and deposits of lithium metal that resemble a tree, roots, or a fungus. ¶¶60, 61. Once a dendrite develops, it quickly grows out of control, punctures the separator, and causes the battery to short and fail. ¶61. QuantumScape's CEO describes dendrites as a "monster that's lurking" and that "with enough cycles it will just burst out" like "that monster in Alien in the '80's…." ¶61.

Finding a separator material that allows lithium-ions to flow freely between electrodes while blocking dendrites has been by far the biggest challenge to solid-state battery technology. ¶62. Even if a company were to find a way to create a solid-state battery that resists dendrites, it is essential that a solid-state battery outperform conventional lithium-ion to gain market share. ¶58. Therefore, to be functionally and commercially viable, any solid-state battery needs to: (i) have lithium-ion

conductivity similar or better than conventional lithium-ion batteries; (ii) be chemically and electrochemically stable to lithium metal; and most importantly (iii) resist the formation of lithium-metal dendrites. ¶65. Many companies have claimed to solve these issues, only for it to be revealed that their data was overstated. ¶67. As stated by Professor Stan Whittingham, the coinventor of the lithium-ion battery, "[t]he efforts in solving electrolytes is increasing fast, it looks very encouraging but one has to be very, very careful because there's much more hype in the literature than there is meat." ¶67. This is because companies often use compromised test conditions in order to manipulate their data and overstate their results. ¶68.

Compromised test conditions can take many forms. Most commonly, they will involve tests conducted at elevated temperatures in order to manipulate test results and data; at elevated temperatures lithium metal is softer and less likely to form dendrites. ¶68. Additionally, high temperatures increase the conductivity of materials like polymers and sulfides and reduce the resistivity of cathode coatings, resulting in faster charge and better performance. ¶68. Companies also use "pulse tests" to create the impression that a battery can resist dendrites. ¶68. Pulse tests involve a series of constant current charges and discharges as opposed to testing cells using solely direct current charging. ¶68. Pulse charging interrupts the direct current charging with periods of relaxation and discharge pulses. ¶68. This interruption prevents the steep concentration of positive lithium-ion gradients that form dendrite tips during charging that would lead to the cell overheating and other potentially adverse events. ¶68.

Another way to prevent dendrite formation is to use small commercially irrelevant battery cells with no useful power capacity. ¶68. This is because the smaller the cell and surface area, the easier it is to prevent dendrites. ¶68. Additionally, even if a company can show that a sample cell can resist dendrites, scaling a battery from a subunit of a single cell to a full cell and eventually to a full battery pack can create a lot of problems. ¶71. When batteries are made in small batches, it is easier to eliminate defects that result in larger quantities. ¶71. Even though a material may look promising at the small scale, in the scale-up these defects often become a bigger problem. ¶71.

**B.** **Defendants "Go Public" Amidst Claims of Solving the Solid-State Puzzle.**

Despite having no viable product and no projected revenue until at least 2024 (¶311), QuantumScape was able to go public on November 25, 2020 at a $3.3 billion enterprise value by taking advantage of the momentum in EV sales and the increased usage of special purpose acquisition companies (SPACs). ¶33. Just two days later, on November 27, 2020, Defendant Singh appeared on CNBC telling investors that QuantumScape had solved the solid-state puzzle, indicating that the "fundamental science risk" (*i.e.*, dendrite formation) related to solid-state batteries was resolved and, as a result, QuantumScape was ready to "ramp[] up production" and move on to the "final automotive qualification process." ¶160. The same day, QuantumScape issued a press release stating its "solid-state lithium-metal batteries are designed to be safer, and to deliver greater range, faster charge times and improved cycle life, than today's lithium-ion battery technology." ¶161.

In support of its claims that it had solved the solid-state puzzle, QuantumScape announced that it would release, for the first time in its history, data relating to the testing of its prototype. ¶166. On December 8, 2020, two weeks after going public, QuantumScape held a presentation and issued a press release, releasing results, data, and specifications from its internal testing that purported to show that "the QuantumScape technology, the solid-state separator already prevents dendrites" (¶190), is capable of a "a 15-minute charge, which you cannot do with conventional batteries" (¶¶88, 190), can last 800 cycles and hundreds of thousands of miles (¶207), can operate at a wide range of temperatures (¶224), and that its battery was safer, had better energy density, and performed as well, if not better than conventional lithium-ion batteries (¶176). In pertinent part, QuantumScape claimed that the data demonstrated that "its technology addresses fundamental issues holding back widespread adoption of high-energy density solid-state batteries, including charge time (current density), cycle life, safety, and operating temperature" (¶224) and that "the data makes clear that the QuantumScape technology can address the fundamental issues" (¶222) that had previously stymied the solid-state industry.

Importantly, Defendants claimed they were able to achieve these "record breaking" (¶247) results without using any of the compromised test conditions described above. At the December 8, 2020 conference, Singh stated that QuantumScape conducted its tests under "real world conditions", "not sort of [] compromised conditions" associated with solid state batteries. ¶208. Singh explained

that most solid-state batteries "only work under severely compromised test conditions and the main compromises that people use are either very low current densities, which ends up not being useful for real applications like driving a car, or the cycle efforts are being very short [pulse tests] or the cells can only work at an elevated temperature or they require excess lithium, which lowers the energy density of the cell. These are the problems that QuantumScape has addressed." ¶184. QuantumScape claimed further that "[t]he hardest part about making a working solid-state battery is the need to simultaneously meet the requirements of high energy density (1,000 Wh/L), fast charge (i.e., high current density), long cycle life (greater than 800 cycles), and wide temperature-range operation. This data shows QuantumScape's cells meet all of these requirements, something that has never before been reported." ¶224.

Additionally, on January 4, 2021, Singh further reiterated that QuantumScape had solved the solid-state puzzle, stating "We have something that has never been shown to the world before, a solid-state system that delivers levels of performance that are really record breaking not only in comparison to other solid-state efforts, but even in comparison to conventional lithium-ion technology." ¶247. Then, on February 25, 2021, Singh stated that QuantumScape had published "record breaking results" and that "[f]or the first time in 45 years, [QuantumScape] was able to show a solid-state cell that was capable of performing under uncompromised test conditions . . . unelevated temperatures." ¶294.

## C.      Defendants' Claims were Materially False and Misleading.

Contrary to their far-reaching claims, Defendants omitted that QuantumScape used the same compromised conditions that they had warned were used in other solid-state battery results, including elevated temperatures and pulse tests to resist dendrites. For example, Defendants claimed to have solved the dendrite problem because its prototype "resists dendrites" (¶197, Slide 18). However, their Defendants conducted their test at an elevated temperature of 45°C (113 °F) and used a functionally irrelevant Li / Li symmetric cell. ¶¶98, 117, 154. As dendrites get softer and less problematic at high temperatures, they are easier to control in small batteries. ¶154. Defendants explicitly told investors that one of the "main compromises" companies often use is elevated heat to

show better results. ¶184. Despite claiming to not use manipulated tests, that is exactly what QuantumScape did here.

Former employees confirm that QuantumScape used compromised tests to "resist dendrites" including the use of elevated temperatures and clinically irrelevant Li / Li sized cells. ¶117. A former research and development employee of QuantumScape stated: "What they're testing is a single-layer lithium anode battery at 45C, and that's important because 45C is not room temperature. As you can guess, there are some benefits to going higher in the temperature." ¶125. Similarly, a solid-state expert indicated that "Lithium's melting point is like 180°C, but if you're a material scientist, you think of everything in terms of Kelvin and what fraction of the melting temperature you're at in Kelvin. So, by that temperature, you're a pretty high fraction of the melting point. If you're at the melting point, you can't make a dendrite." ¶126. Another former employee indicated, "If you want to say you have solved the dendrites problem, you have to show you solved the problem in a real product, in a multiple-layer battery. It's just a single layer . . . I don't believe that they have solved dendrite formation in a real battery." ¶118.

QuantumScape also manipulated their tests when examining battery cycle capabilities. Specifically, Defendants cycled less than the full 180 mAh/g capacity of the cathode and failed to introduce an open circuit hold pause before discharging to look for soft (dendritic) shorts. ¶155. By failing to do so, Defendants managed to artificially prevent dendrite formation and growth. ¶155. Pulse testing manipulates the data because "lithium has a low melting temperature, and pulsing creates electrical resistance that heats the lithium, which causes dendrites to smooth out in the rest period between pulses which 'is not how batteries are operated in the field.'" ¶119. "Anyone can 'prevent' dendrites with pulsing but it's not how batteries operate in the real world." ¶119. A former research and development employee at QuantumScape indicated that "This test is a pulse test. You can tell that because the bottom green axis—they've got two normalized axes on the bottom." ¶121. According to the employee, using a pulse test "is not a good way to judge that you've killed the dendrite problem [laughs] for the simple reason that if you have this in a large vehicle-size battery, a true commercial-size battery, and you really did want to charge the entire battery, not just a little bit of charging, which are these tiny steps, you'd want to charge the whole battery at a current. That's

how you would prove this isn't a dendrite." ¶121. A second former research and development employee indicated that: "That pulse step is so short that it's only taking a few minutes, and it's only depositing a fraction of a micron of lithium. You would have to hold that pulse for the full 15 minutes to prove that it didn't have a short, and you'd have to do that on the device again and again to find out when Volkswagen should void the warranty. That's the real dendrite test. . . . Maybe this impresses people by saying that you've killed the dendrite problem, but the real proof is doing the test hundreds and hundreds of thousands of times. This is a tiny bit of current on cells for a little bit of time." ¶122.

Defendants also misrepresent the current state of lithium-ion technology in order to make it appear that its battery is superior to lithium-ion. For example, QuantumScape represents that lithium-ion batteries can only charge 80% in about 40 mins (¶189, Slide 17). However, many lithium-ion cell designs will achieve 80% capacity in less than 40 minutes. Enevate's NCM/C-Si cell will deliver 80% capacity in less than 6 minutes. ¶49. According to the National Academy of Sciences, lithium-ion batteries were capable of 80% charge in 15 minutes in 2018. ¶152. In another 2018 article published by Electrochemistry Communication, it was again shown that lithium-ion was able to achieve 80% capacity at a 4C (15 minute) charge rate. ¶152. Additionally, Tesla's Model 3 can rapid-charge to 100% in just 22 minutes. ¶54.

In addition to charging capabilities, Defendants misrepresented the performance capabilities of lithium-ion cells. Defendants claimed that QuantumScape's solid-state technology was capable of 135 mAh/g at 0°C, while depicting lithium-ion at around 60 mAh/g at -25°C to create the appearance that its technology was again superior relative to conventional lithium-ion. ¶212. In reality, 135 mAh/g is vastly inferior to that of many lithium-ion cells. For example, Grepow's battery is capable of 162 mAh/g at -10°C. ¶52. Innovative Battery Technology also shows lithium-ion cells delivering 96% of room temperature C/5 capacity at 0°C, translating to 173 mAh/g. ¶53.

## LEGAL STANDARDS

Plaintiff alleges securities fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. Plaintiff also alleges liability under Section 20(a) of the Exchange Act, 15 U.S.C. §78t. For securities fraud claims, "Rule 9

imposes a heightened pleading requirement, which requires that a party state with particularity the circumstances constituting fraud" and the PSLRA "requir[es] that the complaint . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). The PSLRA also requires that "the allegations give rise to a strong inference that the defendant acted with the required state of mind." *Id*. (quotations omitted). While the PSLRA sets a higher pleading standard, courts should be wary against "rais[ing] the bar of the PSLRA any higher than that which is required." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003). On a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Evanston Police Pens. Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 591 (N.D. Cal. 2019) (*quoting Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)).

## ARGUMENT

### I.      DEFENDANTS VIOLATED SECTION 10(B) AND RULE 10B-5.

#### A.  The Complaint Adequately Pleads False Statements.

"[A] statement is misleading if it would give a reasonable investor the create an impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 985 (9th Cir. 2008) (quotations omitted). This may be alleged "when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "[A] misleading statement will not always lose its deceptive edge simply by joinder with others that are true. . . ." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).

##### 1.  The Court Must Accept as True Plaintiff's Well-Pleaded Allegations, including the Dr. Morin and Scorpion Capital Reports.

Plaintiff relies on his own interviews with experts, QuantumScape's public statements and filings, and public information to allege with specificity exactly why and how QuantumScape used compromised tests to manipulate its data throughout the Class Period. *See* CAC, at 1. Defendants argue that the Court should not credit Dr. Morin's *Seeking Alpha* report because "he has no personal

knowledge of the facts on which he bases his conclusion" and, therefore, his report does not include any "true facts". MTD at 11. This is false. Dr. Morin serves as Director and Vice President of the National Alliance for Advanced Technology Batteries, has a Ph.D. in materials physics from the Ohio State University, and has authored over 250 global patent applications on subjects including molecular magnets, plastics additives, textiles, advanced fibers, textiles and lithium-ion batteries. ¶97. Dr. Morin disclosed that he has no financial interest in QuantumScape. ¶97. Dr. Morin used his experience in the battery field to apply his technical analysis of the results and determine the tests used by Defendants were compromised and that the results were overstated. ¶98. Accordingly, Dr. Morin's work in the solid-state field supports the fact that Dr. Morin is a "knowledgeable" third party who used his expertise to show that "some aspect of the defendant's prior statements [were] false or misleading." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) ("A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market'" (*citing* 15 U.S.C. § 78u-4(e)(1)), and can "come from ***any source***, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." (emphasis added)).

Similarly, the Scorpion Capital Report relied on a number of experts and former employees of QuantumScape that it indicates are "reliable sources of information with respect to Quantum[S]cape." CAC Ex. C at 2; *see also* ¶¶121-22, 125, 128, 130 (witnesses worked at QuantumScape in the research and development department). Further, while they reserved the right to "paraphrase[], truncate[], and/or summarize[]" the statements, Scorpion Capital affirms that its "opinions are held in good faith," and are based on "the public information, sources, the interviewed individuals, and social media posts cited in this report." CAC Ex. C at 2. While Defendants take issue with the sources cited in the Scorpion Capital report arguing that the former employees' "role and level of seniority, when they were last employed, whether (or how) they are familiar with the Company's technology or testing of its single-layer prototype, and with whom they interacted, are not stated" (MTD at 12), Plaintiff does not rely on the Scorpion Capital report to demonstrate Defendants' state of mind, *i.e.*, scienter. Instead, to show falsity, the former employees and experts need only be "knowledgeable." *See BofI*, 977 F.3d at 790.

**2. Defendants Concealed QuantumScape's "Compromised" Testing Conditions.**

Defendants warned investors that other solid-state companies used compromised test conditions (¶184) while affirmatively representing that QuantumScape "was able to show a solid-state cell that was capable of performing under uncompromised test conditions—high rates of power—long cycle lives—unelevated temperatures." ¶294; *see also* ¶¶184, 208, 224, 264[1], 294. Unbeknownst to investors, Defendants were using the same trickery it warned of, including elevated temperatures and pulse tests, to manipulate its data. ¶¶98, 100, 112, 117, 154. By affirmatively representing to investors that QuantumScape did not use compromised test conditions used by other solid-state companies while using those same compromises (¶¶98, 100, 112), Defendants materially misled investors. *See Khoja*, 899 F.3d at 1008 (statement is false "when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time."); *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794-96 (9th Cir. 2017) (finding that plaintiff pled falsity where defendants said a drug had "gone through all of the FDA clearance process," but it had not received FDA clearance).

Additionally, Defendants' statements that the "science risk" was "behind" them and QuantumScape's batteries "resist dendrites" were materially false and misleading. The "fundamental science risk" for solid-state batteries at this point related to the solid-state separator and its ability to prevent dendrite formation, energy density under real-world conditions, and recharge capacity. QuantumScape had not overcome these obstacles. ¶¶60-65, 163, 210, 233, 249, 281. To the contrary, QuantumScape achieved these results using manipulated tests, including elevated temperatures and pulse tests that did not reflect real-world conditions. ¶¶98, 100, 112, 117, 154. Without these conditions, QuantumScape's battery would not "resist dendrites." *See Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) ("companies mislead investors when they tout their products' capabilities but fail to disclose significant flaws that undercut those

---

[1] Defendants indicate that the Timothy Holme article was published on January 14, 2021. ECF 137-1, n. 2. However, the article was published between 12AM and 2:59AM ET on January 15, 2021. Therefore, Plaintiff correctly refers to it as the January 15, 2021 article.

capabilities."); *Khoja*, 899 F.3d at 1009 ("Once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."); *Berson*, 527 F.3d at 987 ("But learning that stop-work orders *might* be issued is quite different from knowing they were in fact issued. One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently.").

Defendants do not contest that QuantumScape used elevated temperatures to prevent dendrites, but instead argue that these statements cannot be misleading because Defendants disclosed the test conditions they used. MTD at 13-14. Defendants affirmatively represented that the conditions were not compromised when they were; accordingly, the disclosure of tests conditions were insufficient to reduce the risk of misleading investors to "nil" especially where it would take an expert to know that the test conditions were compromised. *Virginia Bankshares*, 501 U.S. at 1097 ("not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."); *In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 922 (N.D. Cal. 2020) ("Even a literally true statement 'can be misleading and thus actionable under the securities laws.'"). Plaintiff does not argue that Defendants should have used different testing conditions, but that Defendants failed to adequately disclose, and affirmatively represented to the contrary, that those conditions were "compromised."

### 3. QuantumScape Compared Its Battery Technology to Conventional Lithium-ion in a False Light.

Defendants also used the manipulated data to portray its prototype as more capable (better charging and energy density), cheaper, and safer than conventional lithium-ion.[2] However, as shown

---

[2] For example, Defendants stated, "it gets all the way up to 80 percent in less than 15 minutes . . . it's better than you can achieve with conventional lithium-ion batteries" (¶190); "is designed to enable up to 80% longer range compared to today's lithium-ion batteries" (¶224); "enabling a 15-minute charge to 80% capacity, faster than . . . conventional battery" (¶¶224, 271); "Unlike conventional lithium-ion batteries . . . this architecture delivers high energy density while enabling lower material costs and simplified manufacturing." (¶224); "much higher than conventional organic separators used in lithium-ion batteries." (¶224); "may provide significant improvements in energy

above, QuantumScape used manipulated data and outdated literature to portray its solid-state technology as better off and more developed than it truly was. ¶¶49, 52, 53, 54, 152. In particular, Defendants claimed that QuantumScape's battery will be "cheaper" and have lower "costs" than lithium-ion due to it not having traditional anode material. ¶¶176, 224, 240, 287, 275. Contrary to this claim, Defendants omit a number of factors that will actually make QuantumScape's battery more expensive. ¶¶98, 149. This includes the high cost solid electrolyte material, the high processing cost to make the solid electrolyte into a separator sheet, the high cost of creating a clean current collector that will succeed in plating lithium uniformly on first charge, the cost of sealing around each positive electrode to prevent the liquid gel electrolyte from accessing the negative electrode, the high cost and complexity of managing the large volume changes between the charged and discharged states, and the cost to stack thousands of small cells to form a battery which results in 1,000 times the cost. ¶¶98, 149.

Defendants also misrepresent the safety of its battery compared to lithium-ion, stating that its solid-state separator is non-flammable and non-combustible. ¶¶171, 176, 217, 218, 224, 240, 260, 270, 287. However, QuantumScape uses a solid lithium anode, a considerably more volatile and reactive compound than graphite. ¶150. QuantumScape also uses the same thermally unstable cathode found in lithium-ion cells. ¶150. However, while conventional batteries use mechanically strong separators (high puncture strength) as these have been found to prevent internal short circuits, Defendants omit the relevant data as to the mechanical properties of the QuantumScape separators. ¶150.

Accordingly, Defendants are liable for its statements comparing its prototype to conventional lithium-ion because "once [QuantumScape] chose to tout [its capabilities compared to lithium-ion], they were bound to do so in a manner that wouldn't mislead investors." *See Schueneman*, 840 F.3d

---

density compared to today's conventional lithium-ion batteries" (¶¶237, 283); "ability to charge to approximately 80% in 15 minutes, faster than commonly used high-energy EV batteries on the market." (¶¶240, 287); "providing a structural cost advantage compared to traditional lithium-ion batteries."; "safety in our cell will be improved relative to lithium-ion" (¶¶240, 287); "The lithium-metal anode enables higher energy density than is possible with conventional anodes (as high as 1,000 Wh/L compared with approximately 711 Wh/L for conventional cells used in today's best-selling EVs)" (¶270); "what should be lower cost than conventional ion cells" (¶275).

at 707-08 (*quoting Berson*, 527 F.3d at 987); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011) (duty to disclose triggered by choosing to make statements that can mislead investors); *Khoja*, 899 F.3d at 1009; *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) (omission of contrary internally available information rendered statement misleading and actionable).

Defendants argue that their statements solely compared QuantumScape's prototype to what "are in EVs today." MTD at 17. The majority of Defendants' statements simply compare QuantumScape's charging capabilities to "conventional lithium-ion." Therefore, a reasonable investor could interpret this to mean current convention lithium-ion technology, not just what is currently in EVs on the road. *See Berson,* 527 F.3d at 985-87 (finding that where there were multiple interpretations, the court could not say that as a matter of law that the statement was not misleading at the motion to dismiss stage); *Edenbrook Cap., LLC v. RhythmOne Plc*, No. 19-CV-00615-WHO, 2019 WL 1791419, at *7 (N.D. Cal. Apr. 24, 2019) (While defendants' "interpretation of its statements is plausible, it is not the only, or even most likely, interpretation to be gleaned from its statements on share conversion"). Even if the Court does consider the statements as EVs on the road, the statements were still materially false and misleading. This is because QuantumScape fails to disclose how long it would take to charge a full working QuantumScape battery pack, instead only using the time it takes to charge its small prototype. To fuel an EV on the market, QuantumScape will admittedly need hundreds of thousands of its cells. Therefore, representing that QuantumScape's single-layer pouch cell was better than a full-size working EV battery was materially false and misleading.

### 4.   The PSLRA Safe-Harbor Does Not Shield Defendants from Liability.

Defendants mischaracterize many of the false statements as protected forward-looking statements. A defendant is not liable for a forward-looking statement when it is "identified" as such ***and*** is accompanied "by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Am. W. Holding Corp.*, 320 F.3d at 936. However, many of Defendants' statements are not "identified" as

forward-looking and, in any event, relate to "current or past facts" of QuantumScape's prototype.[3] *In re Quality Sys.*, 865 F.3d 1130, 1142 (9th Cir. 2017) ("Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement."); *see Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."). Therefore, these statements are not protected.

Additionally, in the context of the PSLRA safe harbor, the term "forward-looking" means "any statement regarding (1) ***financial*** projections, (2) ***plans*** and ***objectives*** of management for future operations, (3) future ***economic*** performance, or (4) the assumptions 'underlying or related to' any of these issues." *Am. W. Holding Corp.*, 320 F.3d at 936 (quoting 15 U.S.C. §78u-5(I)). The company's "expectations" (MTD at 7) about its battery prototype are not protected forward-looking statements. Similarly, "projections" are only forward-looking when they are "financial projections." *See* MTD at 7 (citing *Browning v. Amyris, Inc.*, No. 13-CV-02209-WHO, 2014 WL 1285175, at *12 (N.D. Cal. Mar. 24, 2014) ("'Forward-looking statements' are statements containing projections of financial items"); *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) ("behind us" forward-looking "because of two anticipated improvements in business conditions is a prediction of ***economic performance***.")). Defendants' statements do not concern financial projections or economic performance.

To the extent the statements are actually identified as forward-looking, the statements include references to current or past facts, do not relate to a protected category, and were not accompanied by "meaningful" cautionary statements that conveyed "substantive information about factors that realistically could cause results to differ materially from those projected." *In re STEC Inc. Sec. Litig.*,

---

[3] Defendants attach to their MTD a chart of misrepresentations. ECF 137-1. However, this chart omits a number of Plaintiff's misrepresentations, including but not limited to the presentation attached to the CAC as Ex. B. For ease, Plaintiff will respond to Defendants' arguments using their numbered misrepresentations. *See* Statement 8 (not identified as forward-looking describing what its technology currently "can address"), 11 (not identified as forward-looking describing what "conventional battery" is currently "capable of delivering"), 12 (not identified as forward-looking stating what the "architecture" currently does).

2011 WL 2669217, at *9 (C.D. Cal. June 17, 2011) (quotations omitted); *see also LifeLock*, 780 F. App'x at 484 (warnings insufficient as they "did not 'counterbalance [the] misleading impression created by [the initial misrepresentations]'") (citation omitted); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 919-20 (N.D. Cal. 2012) ("The cautionary warning ought to be precise" and "relate directly to" the misleading aspect of the challenged statement). Defendants argue that they made cautionary statements about "[t]he Significant Work Ahead," "Scaling," "Separators," "Cost," and "Competition." MTD at 5-6. However, these are "generic," "boilerplate" warnings that do not apply to the misrepresentations and could apply to any solid-state battery company. The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted simply from cautionary language alone. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005) (reversing district court dismissal under bespeaks caution doctrine). To constitute meaningful cautionary language, a disclaimer must "sufficiently address *the harm that resulted.*" *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (reversing dismissal). Risk warnings must be clear enough that "'reasonable minds' could not disagree that the challenged statements were not misleading." *Atossa Genetics*, 868 F.3d at 798. The "warnings" Defendants cite here do not come close to meeting this standard, and tell investors nothing about the actual, highly material facts then-existing, and their likely material impact on QuantumScape. *See In re Apple Computer, Inc., Sec. Litig.*, No. C-01-3667 CW, 2003 WL 26111982, at *2 (N.D. Cal. Aug. 13, 2003) (referring to SEC filings generally for cautionary language does not sufficiently place investors on notice of risks).

Additionally, Defendants' warnings about competition with lithium-ion batteries do not protect them because, at the time, QuantumScape was already behind current lithium-ion technology. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), aff'd, 563 U.S. 27 (2011) (a risk statement is materially misleading if it "speaks about the risks . . . in the abstract, with no indication that the risk 'may already have come to fruition."); *Berson*, 527 F.3d at 986 (finding warning misleading when it "speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition.").

**5.   Defendants are Liable for Statements of Opinion Because they Knew Facts Undermining their Statements' Accuracy.**

Defendants allege that whether the "fundamental science risk" is behind them and that the tests were not run under "compromised" conditions are opinion statements (Statements 6, 27). MTD at 8 n.9.[4] However, these statements are verifiable facts. For example, QuantumScape was only able to achieve dendrite resistance at elevated temperatures and using compromised tests that did not reflect real-world conditions. Therefore, whether the "science risk" was behind them is a verifiable fact, not an opinion; either the material did or did not resist dendrites in real world conditions. Additionally, Defendants identified the compromised test conditions that other solid-state companies used (¶¶68, 294); therefore, whether Defendants also used these specific test conditions is not an opinion, but a verifiable fact. Further, even if they are statements of opinion, a statement of opinion is still misleading, even if genuinely believed, if the "statement . . . omit[s] material facts about the defendant's inquiry into or knowledge concerning a statement of opinion." *Atossa Genetics*, 868 F.3d at 802. Here, Defendants were aware of the compromised test conditions used, but omitted the fact that the data released was manipulated. These facts would "conflict with what a reasonable investor would take from the statement[s]." *Id*.

Similarly, Defendants' arguments relating to "puffery" are unavailing. Defendants cherry-pick certain phrases like "a super exiting result" (which Plaintiff does not challenge) to argue that the entire statement is puffery. MTD at 9-10. However, when read in context, the statement as a whole is unquestionably material given QuantumScape's efforts to reach commercial deployment and generate revenue. Similarly, the fact that Defendants repeatedly discussed "charge time (current

---

[4] Many of the other statements Defendants categorize as opinions similarly allege verifiable facts. *See* Statement 5A (whether "the solid-state separator already prevents dendrites" can be verified), 8, 9 (Defendants point to the specific fundamental issues that can be verified), 12 (costs can be verified), 13 (energy density increase can be verified), 14 (higher temperatures can be verified), 17, 25 (charge speed can be verified), 19 (performance compared to conventional lithium-ion can be verified), 21 (statement lists out the commercially relevant conditions, "including high current density, close-to-room temperature, full depth of discharge, modest pressure, zero excess lithium, and commercially-relevant area and cathode loading" which can be verified), 22 (higher energy density can be verified), 27 (Defendants list the specific "uncompromised test conditions—high rates of power—long cycle lives—unelevated temperatures" which can be verified).

density), cycle life, safety, and operating temperature" shows that these are material facts that an investor would consider, especially given that no solid-state battery solved these obstacles. *See Am. W. Holding*, 320 F.3d at 934 ("materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information."); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (materiality of statement was "illustrated by the frequency with which Defendants emphasized" it in "press releases and other public statements").[5]

## B. Plaintiff Adequately Alleges Scienter against Defendants' Because of their Public Statements, Access to Information, and the Prominence of the Information.

The relevant inquiry in considering scienter is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original). The inference "need not be irrefutable … or even the most plausible." *Id.* at 324. An inference of scienter is "strong," and a motion to dismiss must be denied, where "a reasonable person would deem [it]… cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* "[A] tie goes to the Plaintiff." *Maiman v. Talbott*, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010) (quotations omitted). Scienter may be pled, as was done here, by alleging facts showing defendants had actual knowledge of, or access to, information contradicting the challenged statements, or were in a position where it would be "absurd" to suggest they did not know the undisclosed facts. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008). "Where, as here, falsity and scienter are strongly inferred from the same set of facts, we may incorporate the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry, asking whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors." *In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x 887, 887 (9th Cir. 2018) (*quotations omitted*).

---

[5] The remaining challenged puffery statements are similarly material to investors. *See* Statement 16 (whether the prototype runs under uncompromised test conditions is material), 19 ("record breaking" not alleged to be false), 25 (prototype's ability to charge faster than lithium-ion is material).

Plaintiff's allegations provide a compelling inference of scienter against Defendants. The solid-state prototype is QuantumScape's sole product and has been in development for over 11 years. ¶¶299, 300. Defendants Singh and Holme are co-founders of the company and Defendant Hettrich has been an employee of QuantumScape since January 2012. ¶300. Accordingly, Defendants knew the testing conditions surrounding its prototype and how to manipulate the data. ¶303. As stated by Singh on November 27, 2020, "we obviously understand our technology well. We know the process that involved making it." ¶¶299, 328. Holme stated that from 2010 to 2015 *alone*, the company ran "millions of tests" on different materials. ¶302. Singh stated, "After you see every flavor of material you've tried still form dendrites, it kind of affects you." ¶302. "Honestly, there was a time when I was getting depressed. I was like, 'Dendrites may be just one of those problems that you cannot solve.'" ¶302. Accordingly, Defendants were intimately involved in the testing of its prototype and the problems needed to overcome, as this was the sole product and path to revenue. ¶310. Therefore, Defendants either knew or were deliberately reckless in making the false statements. *See*, *e.g.*, *Berson,* 527 F.3d at 989 ("facts were prominent enough that it would be 'absurd to suggest' that top management was unaware of them."); *Killinger*, 542 F.3d at 786 (holding that scienter can be inferred under the core operations doctrine "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter"); *Am. W. Holding*, 320 F.3d at 943 n. 21 (The company's maintenance problems, and the government's investigation into them, were so important to the company that it was "absurd to suggest that the Board of Directors would not discuss" them.).

Defendants also knew about compromised tests used to manipulate data, repeatedly acknowledging certain "compromises" that solid-state companies used in order to achieve favorable results, including "elevated temperatures or pressures" during testing. ¶184 (most solid-state batteries "only work under severely compromised test conditions . . . [t]hese are the problems that QuantumScape has addressed."); ¶208 (test were run under "real world conditions," "not sort of [] compromised conditions" associated with solid state batteries); ¶294 ("For the first time in 45 years, someone was able to show a solid-state cell that was capable of performing under uncompromised test conditions—high rates of power—long cycle lives—unelevated temperatures."). This further

indicates that Defendants knew that their statements were materially false or misleading. *See Zaghian*, 675 F. App'x at 721 ("strong inference of scienter" where defendants discussed "confidence" in product while in possession of contradictory information); *Reese*, 747 F.3d at 570-72 (drawing inference of scienter from defendants' positions within company, temporal proximity between wrongdoing and public statements, and defendants' apparent access to information); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (inference of scienter where defendants held to have known truth based on access to sales information in corporate database).

Additionally, contrary to Defendants' arguments (MTD at 21), Plaintiff is not required to plead motive to succeed in his claim. *See Tellabs,* 551 U.S. at 325 ("motive can be a relevant consideration," but "the absence of a motive allegation is not fatal."); *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 6482014, at *13 (N.D. Cal. Nov. 4, 2020) ("plaintiff's lack of allegations regarding motive do not defeat an inference of scienter under a holistic analysis."). Nevertheless, Defendants had just taken QuantumScape public, had never before released results, and had no viable product or revenue. ¶¶36, 311. Just weeks after publishing its manipulated data on December 17, 2020, registered for resale 305,114,065 shares of QuantumScape Class A common stock, with at least 60 million shares that were not subject to a "lock up" agreement, and another 6,650,000 warrants to purchase shares of QuantumScape Class A common stock. ¶314. Then, on March 25, 2021, the Company announced a secondary offering of 10,400,000 shares, which brough in gross proceeds of $478.4 million. ¶315.

Given the fact that QuantumScape was running through $1.1 billion during 2020 alone, QuantumScape was desperate to conduct additional offerings to obtain much needed capital to continue its operations. ¶316. It took Defendants 10 years and over $300 million dollars just to release preliminary data, and even by Defendants' aggressive projections, were not going to be ready for commercial development until at the earliest 2024. ¶317. Therefore, Defendants' motive to raise capital goes beyond just routine corporate objectives. *See WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th Cir. 2011), *abrogated on other grounds* (allegation that company "needed continued infusion of investment capital" supported finding of scienter as against

founders of company); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028 (N.D. Cal. 2020) (proximity of false statements to offering and the "needed financing to continue operations" supported the inference that defendants made false statements with fraudulent intent); *see also Howard v. Everex Sys.*, 228 F.3d 1057, 1064-65 (9th Cir. 2000) (executives' recognition of inadequate cash flow and need for additional funding created potential for motivation); *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (though insufficient standing alone, allegation of motivation to inflate stock price "in order to conduct a successful secondary public offering and obtain much-needed operating capital" was "motive evidence . . . stronger than the generic 'desire to raise capital' which can be attributed to every company").

Furthermore, Defendants misplace reliance on the argument that Defendants' stock sales were made pursuant to 10b5-1 trading plans. MTD at 21-22. Trading plans are not dispositive, particularly in cases like this where the motive of Defendants does not entirely depend on the timing of the sales, but on the existence of any sales at all. *See*, *e.g.*, *McKesson Corp.*, 411 F. Supp. 3d at 605 n.3 (10b5-1 plans do not negate inference of scienter (citing *Khoja*, 899 F.3d at 999)).

Lastly, although Plaintiff is not required to rely on confidential witnesses to adequately allege a claim, the former employees (FE's) in the Scorpion Capital Report add to the inference of scienter given the additional facts alleged in the complaint. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) ("Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." (quotations omitted)). Further, the FE's can be relied upon given the "corroborative nature of the other facts alleged (including from other sources)" and "the coherence and plausibility of the allegations." *Id.* (citing *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005)). The fact that the FE's may have been at QuantumScape prior to the Class Period is not dispositive. *See Webb v. SolarCity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) (pre-class period statements from confidential witnesses can confirm class period events). Accordingly, the FE's add to the holistic inference of scienter. *See Berson*, 527 F.3d at 985 (finding it "entirely plausible" that confidential witnesses who were not in a position to "see the stop-work orders firsthand because they were engineers or technical editors

rather than managers" still "would know, or could reasonably deduce" that the company had suffered setbacks); *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018) (corroboration supports reliability).

Plaintiff's theory is simple and compelling, Defendants released manipulated data in order to quiet the skeptics, purport to win the solid-state battery race, and generate interest in subsequent offerings to continue its operations. Given the allegations of the complaint, the inference created by Defendants' knowledge of the manipulated data and their motives to conceal it is "at least as compelling" as any other inference available from the facts alleged. *Tellabs*, 551 U.S. at 324.

**C. Dr. Morin and Scorpion Capital Revealed that QuantumScape Used "Compromised" Testing and Overstated Its Data.**

With regard to loss causation, "Rule 9(b)'s particularity requirement usually adds little to the plaintiff's burden." *BofI*, 977 F.3d at 794. "[E]ven under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact." *Id*. (*quoting Berson*, 527 F.3d at 989-90). In *BofI Holding*, the Ninth Circuit offered guidance on what constitutes a corrective disclosure, explaining that "a corrective disclosure need not consist of an admission of fraud by the defendant"; instead, it may "come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *Id*. at 790. A corrective disclosure "is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Id*. The court noted that "short of an admission by the defendant or a formal finding of fraud—neither of which is required—any corrective disclosure will necessarily take the form of contestable allegations of wrongdoing." *Id*. (citations omitted).

On January 4, 2021, prior to the market opening, *Seeking Alpha* published a research report by Dr. Brian Morin titled "*QuantumScape's Solid State Batteries Have Significant Technical Hurdles To Overcome*." ¶336. Dr. Morin revealed to investors that QuantumScape had overstated a number of data points, including (i) power, (ii) range, (iii) low temperature operation, (iv) low temperature life, and (v) energy density, and omitted materially information related to (vi) dendrites, (vii) safety and (viii) cost. ¶¶98-99. In pertinent part, Dr. Morin revealed to the market that

QuantumScape used manipulated tests to achieve its data including: elevated temperatures during charging to prevent dendrites, lower energy density, higher costs, and that QuantumScape's prototype does not perform as well as lithium-ion today. ¶¶98, 100. As a direct result, QuantumScape's stock plummeted from a close of $84.45 on December 31, 2020 (the previous trading day), to a close of $49.96 on January 4, 2021, a decline of 40.84%. ¶¶105, 338.

On April 15, 2021, a research firm called Scorpion Capital published a 188-page report, titled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look Like Amateurs*." ¶339. Scorpion Capital revealed to the market that QuantumScape had used a number of compromises during its testing, including cell size, elevated temperatures, and "pulse tests" to promote and publish, in pertinent part, that QuantumScape's battery resists dendrites, can fast charge to 80% in under 15 minutes, and has long battery life to 1000+ charge/discharge cycles. ¶339. When the Scorpion Capital Report was published on April 15, 2021 and the true nature of QuantumScape's battery technology was revealed to the market, QuantumScape's stock price plummeted from a close of $40.85 on April 14, 2021, to a close of $35.85 on April 15, 2021, a decline of 12.24%. ¶340.

Defendants argue that "the reports are not corrective disclosures because each explicitly states that it was based on public information." MTD at 25. This is not true. Scorpion Capital interviewed a number of experts and witnesses that were not previously public and are "reliable sources of information with respect to Quantum[S]cape." CAC Ex. C at 2. Additionally, nowhere in Dr. Morin's report does it indicate that his opinion is based on "public information"; instead, Dr. Morin used his expertise to issue his findings. Ex. 11 at 6; ¶337. Unlike the cases cited by Defendants, the reports here were not based entirely on public information, and to the extent they did rely on public information it "does not, on its own, preclude them from qualifying as corrective disclosures." *BofI,* 977 F.3d at 797.

Next, Defendants argue that *BofI* held that "biased speculation does not constitute a corrective disclosure." MTD at 25. However, that is not what *BofI* states. The Ninth Circuit stated that investors took information with a "grain of salt" where "[t]he posts were authored by **anonymous** short-sellers who **had a financial incentive to convince others to sell**, **and** the posts

included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in this article.'" *BofI,* 977 F.3d at 797 (emphasis added). Unlike *BofI,* the authors here are not anonymous and the Scorpion Capital report actually states that its report is made in "good faith" and that the experts "are reliable sources of information with respect to Quantum[S]cape." Ex. C at 2. Further, despite Defendants' attempt to cast Dr. Morin as "conflicted" (MTD at 3, 24), Dr. Morin expressly states he has "no business relationship with any company whose stock is mentioned in this article." *Id.*[6]

Additionally, the fact that QuantumScape's stock materially dropped after the publication of the reports is sufficient to establish loss causation. *See*, *e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("That a stock price drop comes immediately *after* the revelation of fraud can help to rule out alternative causes"). As the reports "reveal[ed] new facts that, taken as true, render[ed] some aspect of the defendant's prior statements false or misleading" (*BofI,* 977 F.3d at 790), Plaintiff's allegations "give the [D]efendant[s] notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *Id.* at 794.

## II.    DEFENDANTS VIOLATED SECTION 20(a).

As Plaintiff has stated a Section 10(b) against Defendants, Plaintiff's Section 20(a) claim should be upheld as well. *See Howard*, 228 F.3d at 1065.

## <u>CONCLUSION</u>

Defendants' motion should be denied in its entirety. Alternatively, Plaintiff requests leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated: October 19, 2021                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

 */s/ Adam M. Apton*                          .
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email:  aapton@zlk.com

---

[6] Defendants also cite a number of cases that purport to show that "government investigations are not corrective" (MTD at 24). Plaintiff has not alleged a government investigation and *BofI* states that "[a] corrective disclosure can instead come from ***any source***." *Id*. at 786 (emphasis added).

24

Email: amccall@zlk.com
75 Broadway, Suite 202
San Francisco, CA 94111
Telephone: (415) 373-1671

-and-

Nicholas I. Porritt
**LEVI & KORSINSKY, LLP**
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel:     (202) 524-4290
Email: nporritt@zlk.com
(*admitted pro hac vice*)

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

Case No. 3:21-CV-00058-WHO
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS