UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

IN RE:  QUANTUMSCAPE          )   No. C 21-00058-WHO
SECURITIES CLASS ACTION       )
LITIGATION                    )
_____)

                                   San Francisco, California
                                   Wednesday, December 8, 2021

 TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
          RECORDING 2:14 - 2:52 = 38 MINUTES

APPEARANCES:

For Plaintiff:
                         Levi & Korsinsky, LLP
                         75 Broadway, Suite 202
                         San Francisco, California
                            94111
                    BY:  ADAM C. MCCALL, ESQ.

                         Levi & Korsinsky, LLP
                         1101 30th Street NW, Suite 115
                         Washington, D.C. 20007
                    BY:  NICHOLAS I. PORRITT, ESQ.

For Defendant:
                         Wilson, Sonsini, Goodrich
                           & Rosati
                         650 Page Mill Road
                         Palo Alto, California 94304
                    BY:  REBECCA L. EPSTEIN, ESQ.
                         IGNACIO E. SALCEDA, ESQ.

Transcribed by:          Echo Reporting, Inc.
                         Contracted Court Reporter/
                         Transcriber
                         echoreporting@yahoo.com

*Echo Reporting, Inc.*

2

Wednesday, December 8, 2021                              2:14 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  This is Case Number 21-58, Malriat versus QuantumScape Corporation.

Counsel, if you would, please state your appearance for the record.

MR. PORRITT:  Good afternoon, your Honor. Nicholas Porritt of Levi and Korsinsky on behalf of the Plaintiffs, and with me is Adam McCall.

THE COURT:  Great.  Good afternoon.

MR. SALCEDA:  Good afternoon, your Honor.  Ignacio Salceda, Wilson Sonsini Goodrich and Rosati, on behalf of Defendants.

THE COURT:  Great.

MS. EPSTEIN:  Good afternoon, your Honor.  Rebecca from Wilson Sonsini Goodrich and Rosati, on behalf of the Defendants.

THE COURT: Excellent.  Okay.  Good afternoon to -- to everybody.  So, Mr. Salceda, I put your office to a lot of work in the last day and a half, which I appreciate, and the -- and I want to focus on that in a moment.

I will tell you that if I was not paying any attention to what you filed, I would be largely granting the motion to dismiss -- or largely denying, I'm sorry, the motion to

dismiss. I would sustain statement 19 which -- because it's part forward-looking and part puffery.

But, just to give you a sense of what I'm -- what I had been thinking, for pleading purposes, I would accept the Warren article and the Scorpion Capital report as true. I recognize the credibility issues, and I discount the opinions there, but the facts -- Warren's (phonetic) facts include tests performed at high pressure, aspects of the batteries not being better than conventional ones, cost savings coming only from the elimination of low-cost components. The Scorpion report interviewed nine former employees, had four experts confirm what they had to say. So, I think all of that would compare favorably to the B of I Holding case where the Ninth Circuit allowed the claims to go forward.

The -- with respect -- I don't think the forward-looking -- the Safe Harbor arguments for forward-looking were persuasive. A lot of the statements I think focus on the present, not the future, and some sound in the future but rely on facts in the present that describe the current technology. And, again, the opinion -- the notion that many of these statements were opinions, I think most of them stated facts. Some of them which sounded like opinions stated facts, and other ones didn't actually sound like opinions to me, and I don't think puffery was -- was a good

4

explanation for the statements.

But, the -- but I didn't -- and I'm going to start with the facts, and I'm going to actually start with Mr. Porritt and ask him why the facts as cited by the Defendant today don't cure the representations that were made.

MR. PORRITT:  Well, thank you, your Honor.  And appreciate you asking for this additional information from -- from Defendants and would state that we -- you know, we got this approximately two and a half hours ago.  So -- and it's 20 pages long single spaced.  So, we've done our best to analyze it in the time we have available to us.  So -- and, if your Honor is moved by it, we -- we would request an opportunity to respond to it in rather more thoughtful and with a bit more time.

But, in essence, we don't think -- this just provides more -- while it's lengthy, you know, I don't think it provides any more sort of detail or addresses any of the Court's concerns that are in the complaint or that are raised by the Warren article or the Scorpion report.  They don't address the fundamental flaws in the approach and the presentation of -- by QuantumScape of the status of its product, which is that it's a far more -- you know, rather than being a settled scientific product, you know, scientific development is being done and what's left is just execution on engineering and production, in fact, it has

huge scientific flaws in it.  And the split presentation that has been rolled out by the company is a result of the exact sort of, you know, tricks and shell game presentations that it accuses some of its rivals of doing.  So, I think that is fundamentally the heart of the case and what was exposed I think by the Warren article and later in great detail by the Scorpion analysis, and I don't think any of this, just piling on more details cut and pasted out of these transcripts and lengthy SEC filings addresses the fundamental problems of either the Warren or the Scorpion Capital article.

So, I can go -- try and go sort of a little more detail addressing some of the -- some of the specific points.  I'm not sure I can address every single one of the -- I think it's 40 or so pieces of statements here, but I can -- I can address individual ones, your Honor, if I might.  That's our initial reaction.

THE COURT:  Mr. Porritt, what -- with respect to, say, the information that was disclosed with respect to testing -- and I -- I've had the same opportunity that you have to -- to look at it, and I forced this quickly on the Defendants in the first place.  The -- but -- and you have a much more informed view through your own lens of, say, the testing information.  Does that -- does the disclosure of that as you've read it and the citations that were filed

6

impact the represent -- or what you've referred to as misrepresentation that were made in any way?

MR. PORRITT:  No, your Honor.  And to -- we never -- it was never alleged that the testing results were -- were false.  It was more the manner in which they were presented as much as anything and the presentation that they were -- in some ways, it's best demonstrated by the chart we included.  I think it's in -- it's in paragraph 113 of our complaint, which is the cherry picking -- while presenting themselves as being straight shooters and presenting a very -- they called it uncompromised testing, real world testing, the testing and the charts that they put forward are all with varying different conditions, some of them completely unrealistic, not comparing commercial product versus a product that's plainly uncommercial.  And if you look at what -- if you compared like for like, like a -- their product versus what was even the -- the cutting edge two or three years ago in terms of the commission with the Moen batteries, they -- their callout doesn't compare nearly as well.  So they don't choose to present that data, all of which is obscured from investors.

So, you know, some of this -- some of the things that they identify in this recent submission were in -- on the chart, but they don't -- on a slide deck that was initially presented by the company.  All they do is simply rephrase,

repackage that into a bullet point list.  So it provides nothing new, no additional data I believe than what was contained in the complaint, what was discussed in the initial briefing.

THE COURT:  All right.  So, Mr. Salceda, let's start there, and then you can move into any argument that you -- you were initially planning to make.

MR. SALCEDA:  Thank you very much, your Honor, and thank you for the attention that you've given this and will give it in the future, because I think that your Honor has zeroed in on the key issue.  And in your discussion with Mr. Porritt, I think you have surfaced the key admission from claims.

The issue is whether there was any false statement.  We can get into scienter and puffery and loss causation, but I want to focus on falsity.  And Mr. Porritt, in response to your questions, just said "It was never alleged that the testing results were false.  And that's -- he's right.  The complaint never alleges that any of the testing results were false.  It never alleges that the numbers that are in the QuantumScape presentations and disclosures were not a reflection of what was the product of the past that QuantumScape conducted and was -- and was disclosed.

There's no allegation that the -- again, it was never alleged that the testing results were false.  So, what is

this case about?  They don't say that the results were false.  It's a matter of, well, they conducted unrealistic tests, Mr. Porritt, or that they're not real-life tests. That's not a basis to allege falsity, and that's important here because that goes to the heart of the case, as your Honor, rightfully asked us to -- to do work over the last 36 hours.  And, also, it fits exactly on point with the Ninth Circuit's decision in Rigel Pharmaceuticals.  In that case, Plaintiffs alleged that challenge to the methodologies and the conclusions that a pharma company reached when it -- based on its clinical trials.  It never challenged the test results in the sense that it didn't say that the numbers were cooked.  Okay.

        There was a Securities class action filed.  Judge White dismissed the complaint.  On appeal, the Ninth Circuit affirmed, and in a very detailed decision which we cite in our papers -- and, notably, the Plaintiffs never touch on their opposition.  The Ninth Circuit in great detail examined the allegations there and the case law arising out of test results, and they tend to be clinical trial results, but the analogy is the same here.  These are scientific test results.  And in Rigel Pharmaceuticals, the Plaintiffs said, We are not challenging the test results.  We are saying that the -- that the tests were unrealistic because the Defendants didn't use the right methodology.  And, in that

9

instance, they said that the statistical model should have been calculated differently and that the Defendants should have used two different methods, not the ones that were disclosed.  There was no issue about the disclosures.  They were disclosed.

And, so, what the Plaintiffs in that case said is, No, you -- you didn't use the right methodology.  That's exactly what Plaintiffs are saying here.  They're saying, Well, the tests are unrealistic.  Well, that's their opinion.  That may be Mr. Warren's opinion or Scorpion's opinion or anybody's opinion, but that's their opinion.

Similarly, this report says, Oh, the tests weren't like real-life tests.  Well, remember, these aren't one-cell tests.  The company has been abundantly clear that it needs to ultimately scale up to dozens of these and then be able to manufacture them, manufacture them in volume, test them.  And, ultimately, if everything goes well, it won't be until 2024 or 2025 that Volkswagens are going to be rolling off the assembly lines with QuantumScape batteries, but that's years away.  The company has made that very clear.

And, so, if you -- here, Plaintiff's allegation is exactly what Rigel Pharmaceutical said is not enough, and in that case, the Court relied on a number of cases, some of which we cited in our papers, most notably, Judge Patel's decision in the Sciette Patents v. Sciettes Nova (phonetic)

10

case, where the Court held that the fact that plaintiffs disagreed with Defendants about the import of clinical trial data did not make defendants' summaries of that study data false and misleading.  Again, notably, we cited Padnis (phonetic) in our papers.  The Plaintiffs chose to ignore it, and it's not surprising, because the holdings are on point.  And, again, I credit my friend Mr. Porritt, for his clarity and because he accurately reflects what his complaint does not allege.  The complaint does not allege that any of the statements about the tests were false.  It's just a matter of, well, the conclusions that Defendants draw or they should have run different rests or Mr. Warren -- Scorpion thinks that they should run different tests which would be more conducive, in their view, to an appropriate test.  That's not a question of falsity.  That's an opinion.  And, when you get to opinion statements and saying that Defendant's opinions are unfounded because the data is based on tests that we don't believe are appropriate tests or real-world tests, then you have to get into the question of how you get -- how do you challenge an opinion statement, your Honor.  And the Supreme Court in the Omnicare case and the Ninth Circuit in Align have been very clear as to what needs to happen in order for an opinion statement to be actionable.  And the Supreme Court was dealing with a Section 11 case.  Align was dealing with a 10b case, but the

11

Ninth Circuit in Align applied the omnicare test to 10b, and here what it did is it explained that there are three ways. For example, the first way is the Defendants didn't genuinely believe their statements.  There's no allegation that the Defendants didn't believe their statements. There's no fact to do that, and it would be hard for them to allege that because -- and I'll get to scienter in a moment -- Defendant's conduct has been entirely consistent with what they've represented to the market.

The final prong of the Omnicare/Align test deals with omissions, and here's the key thing.  They don't allege that key information was, in fact, omitted.  As you saw from our submission this morning and from the voluminous record of the company's disclosures about its tests, the company has laid out its tests and the results, that Plaintiffs or others might think, well, those -- we don't disagree with your conclusions.  That's not a basis to challenge the statements.  That's not a basis to allege falsity, and that's certainly not a basis to allege scienter.

And let me get to -- to scienter in a moment, but let's talk about the former employees and the Volkswagen employees that are cited in Scorpion.  The Plaintiffs don't have any of their own witnesses, not a single one.  Unlike in almost every securities case that your Honor has seen, there are no CW allegations where the Plaintiffs have actually

12

interviewed somebody and have gotten information.

Here, they're relying entirely on the Scorpion report. But, clinically, the Scorpion report does not contain sufficient facts to satisfy the Ninth Circuit's test in Zucco for reliance on confidential witnesses.

For example, these former employees, they're not described with enough sense to see if -- what their jobs were.  In fact, we don't even know when they left.  This company's been around for 10 years.  We don't know if they left a month before the class period ended, six months, a year, two years, three years.  And, over that time, obviously, the company has been working on its -- developing its prototype.

So, none of the allegations based on the Scorpion supposed former employees can be credited because they don't satisfy the Zucco.  And we cited cases -- I think it's the Diaz case out of the Central District, which was affirmed by the Ninth Circuit -- where the Court applied the Zucco test to former employee allegations in a short-sell report.  So Plaintiffs --

THE COURT:  Mr. Salceda, do you think I should just disregard the fact that the four experts confirmed the -- the views of those five employees and that they are consistent with the Warren article?

MR. SALCEDA:  Well, two things.  First, the

13

experts -- and we discussed why the experts are not sufficient, for a couple of reasons.  First, again, the experts are given -- the ones that are -- the two that are named, one is misstated, and the other said he is guessing.  They're speculating.  And anyone is entitled to have an opinion.  You know, and these experts that apparently were contacted, they have opinions, but I do think they should be disregarded for a number of reasons, one, and critically, Scorpion specifically says in its very extensive disclaimers that it felt free to take certain things and ignore other things.  And it specifically says it felt free to ignore positive information that it received.

So, yes, these things can be disregarded because these are not faithful representations of what the experts say.  But, even if you were to consider them, it's these experts' opinions, and they're entitled to them.  Mr. Warren, he's a competitor.  So he obviously has much skin in the game, and he may have a view as to the right path for battery technology in the EV space.  He is entitled to that and, you know, good luck to him and his company.  But that doesn't mean that QuantumScape's statements are false.

Once more, I think you need to look at a key aspect, which is typically discussed in the context of loss causation, but here it has significance for purposes of falsity.  The company has never taken back any of its

14

statements.  It's not like a situation where a company has put out financial statements and then has to restate them.  Okay.  Well, they were wrong.  It's not like a situation where a company was given guidance and comes up short of guidance.  It's not like a situation where a company has said, Oh, we're going to ship the next version of the software in Q3 of 2020 and, in fact, it slips.

The company has been very clear it will not have commercializable product until 2024 or 2025.  the test results that it has disclosed are based on very preliminary prototypes, and it's made that abundantly clear.  And if you look at the discussion that we cited -- that we submitted today or any of the company's statements, it has said repeatedly these are one-cell prototypes.  We do not have a battery that we can put in a car today.  It says that repeatedly, and we will not have one for years.

That's not changed.  It's not like suddenly the company has said, oh, we will -- you know, it won't be 2024, 2025.  It will be 2030 or never or whatever it is.  So there's no corrective disclosure.  It's just the opinion of Warren and the short seller, Scorpion.  That's what you've got.  And so there is no sense that the Plaintiffs can show the falsity of any statement.  And I -- and I return back to Mr. Porritt's statement that they're not challenging the test results.  They're challenging the interpretation and the

15

portrayal and the conclusions.  That's not enough to show falsity.

Let me pivot quickly to scienter because your Honor has been very patient with me, and I'll be quiet.  What are the allegations of scienter?

First, supposed motive.  They claim, oh, they need it to raise money.  Well, that's not enough.  The Ninth Circuit in Rigel -- a lot of other cases, but the Ninth Circuit in Rigel specifically said that and said, No, that's an ordinary corporate motive.  You can't say that they -- they wanted to raise money.

The need for additional capital.  Not so.  The company started the class period with, oh, a billion dollars of cash, and Plaintiff's slight of hand was, Oh, they had expenses of a billion dollars in 2020.  In fact, they had -- but then say, but they were really operating expenses of $81,000,000.  So the company had plenty of cash.  It wasn't in desperate need of cash.  And so the allegations based on, Well, you wanted to conduct an offering and the company conducted an offering are insufficient.  The Ninth Circuit in Rigel makes that clear where there was an offering and the Court said that's not enough, that's not a basis.

Stock sales.  There are no stock sales.  There were two sales for purposes of tax.  Uncle Sam got the money.  The individuals did not -- Uncle Sam and Sacramento.  But, in

16

any event, let us look at that because it's a significant issue.

Mr. Singh owned 32,000,000 shares of stock in this company he founded.  Doctor Blome owned 14.9 million shares. If they wanted to engage in fraud, number one, they certainly didn't benefit from it.  Number two, they've -- any changes in the stock price -- and the stock has been extraordinarily volatile, and it did drop several times during the class period for various reasons, but that doesn't matter.  They're the ones who lost the most money. I mean, Mr. Singh has 32,000,000 shares.  How much money did he make selling shares?  Zero.  Doctor Blome has 14.9 million shares.  How much money did he get selling shares? Zero.  Those are significant facts that -- that cut against any inference of scienter, and the Court under the Tellabs case, has to consider both positive and negative or incriminating and exonerating influences -- inferences.  All of those are key exonerating ones.  They undercut any inference of scienter.

The former employees that are signed, they don't help either.  In fact, Plaintiff has another concession which is about the Scorpion report on page 10 of their opposition:

"Plaintiff does not rely on the Scorpion Capital report to demonstrate Defendant's state of mind, i.e.,

scienter."

Okay.  But, even if that weren't the case, there's no allegation that, in fact, the numbers were wrong.  There's speculation "I don't see how they can get to that."  When I left sometime many years ago, the former employee we don't know -- the former employee said, Oh, they weren't anywhere near where they are now.  Okay.  That doesn't say anything about where the company was when it made these statements in December and in the following several months.

In addition, Plaintiffs make a point about sort of the -- the company's -- Scorpion does -- of the company's relationship with Volkswagen.  Apparently, Scorpion claims to have taught two of the many thousands of employees Volkswagen has.  They are not identified.  They -- apparently, they work in batteries, but who knows, because they're not identified with sufficient specificity for Zucco purposes.  But, again, they're in no position, at least based on what we have in front of us in the record to show what Volkswagen actually believes.  And, in fact, Volkswagen's entire course of conduct is entirely contrary to what these supposed Volkswagen employees said.  Volkswagen owns over 20 percent of QuantumScape's stock.  And, in fact, Volkswagen in April wrote another $100,000,000 check to Volkswagen -- to -- to QuantumScape.  So, again, their speculation about how Volkswagen may not know what

18

it's doing, that the CEO of Volkswagen feels a lot of pressure, that has nothing with showing that any statement was false, let alone made with scienter.  That's just their speculation as to what Volkswagen's view is and what information QuantumScape has provided Volkswagen.  They don't allege that they're in that information stream.  And so, when you look at this, they don't allege that any of the data was false.  They don't allege that the Defendants believe the data was false, and they're left with challenging the Defendants' conclusions and -- and beliefs, and that's not enough.

THE COURT:  I've heard that.  So, tell me -- tell me this.  Do you -- is it your assertion that the citations that you provided us with today at noon cover all of the challenged statements that -- that the Plaintiffs are relying on?

MR. SALCEDA:  Well, to the extent that Plaintiffs are challenging the company's statements, I'm happy to go through them in our chart.  But, to the extent that the Plaintiffs are challenging the -- the underlying assumption is that somehow it's enough for them to challenge the methodology and conclusions, and we've talked about the Rigel case, which is directly on point.  But I think, yes, certainly all of the statements that they challenge based on what the company said -- and I think it addresses it.  Now,

19

to the extent that they're challenging by and large most of the -- their statements because we saw from this report, they're not challenging the company's test results.  They're challenging the company's --

THE COURT:  I -- don't -- I was asking a --

MR. SALCEDA:  That's the underlying questions.

THE COURT:  Mr. Salceda, wait for me.

MR. SALCEDA:  I'm sorry.

THE COURT:  That's okay.  I was just trying to get a short direct answer because you've made that -- you've made the arguments, and I understand them.  I just want to make sure that I understand your position with respect to the document that you filed today.  You -- you think that it covers all of the statements that the Plaintiffs are relying on for this -- on their complaint, is that right?

MR. SALCEDA:  I think it does.  If I may -- if I may cabin that in a couple of ways.  One is a number of these statements are -- are, in fact, either forward looking or statements of fact about, for example, that things take time and whatnot.  But, in terms of the company -- and -- and some are -- like were super excited.  That's meaningless puffery.  But, in terms of what the company has disclosed, it's laid it all out there, and I'm happy to rest on what the company has said.  I don't think -- I think it addresses it because it addresses the point of fundamental challenge,

20

which is, as a legal matter, because they're not challenging the data, under Rigel, if the data is disclosed, the second guessing is not enough.

THE COURT:  Okay.

MR. SALCEDA:  And I think Rigel -- and I'd urge your Honor to read it.  And also, Judge Patel's decision in Sciettes Nova on which Rigel relies.  But Rigel is very detailed about this.

THE COURT:  All right.  Thank you.

Mr. Porritt?

MR. PORRITT:  Thank you, your Honor.  Just checking I'm unmuted.  Yes, I am.  So, your Honor, I don't think the Defendants in Rigel -- I don't think the clinical trial pharma cases are particularly relevant, with all due respect to my friend, Mr. Salceda's, eloquent argument to the contrary.

So, the Defendants in -- in Rigel did not say that they had solved the scientific problems.  They did not say that the chemistry risk is now behind them.  They did not say -- I'll refer you to the statement from the Defendant Singh in paragraph 208 of our complaint, your Honor, with a very -- he says:

"This technology is, in fact, ready
for commercial deployment as soon as we
can scale up production and make

21

multilayer versions of these cells."

So, that's a very different picture.  I mean, that is what the Defendants actually said rather than what Mr. Salceda now wishes they had said, which is that, This is all very tentative.  We are miles away from being anywhere near production.  This is all to say a very basic prototype.  That is not exactly -- that is exactly 180 degrees different from what his clients were saying at the time and which was later exposed by Mr. Warren in his report, by the experts consulting the Scorpion Capital report, confirmed by the former employees, and also confirmed by technical allegations in our complaint which Defendants don't quibble with, which we also provided -- and I'm not breaching any state secret -- through consultation with our own experts.

So, there -- while the bottom line or the technical readout results are -- I mean, we don't -- we don't say that the -- that those results were not reached by the batteries under the conditions of that particular test.  The nature of those tests and the -- and the meaning of those tests was clearly misrepresented by Defendants here.  And the fact that you may have technically true statements that are essentially incomplete or mischaracterized, it's well established under Ninth Circuit authority can be the basis for a securities fraud claim.  It's not enough simply just to -- to say -- to give half truths, technically true half

truths and then sort of cross your fingers behind your back.

So, we would submit that that's really what is going on here.  So -- and we also -- the -- we don't have Defendants in Rigel or those pharmaceutical trials, which is not really relevant, talking about how we -- we have -- whereas other companies or other products have used compromised testing conditions, we have not done so when they've done exactly the same as what they accuse their -- their competitors of doing.

So, with all due respect to the hard work put in by the Wilson Sonsini team over the last two or three days, we would submit that this, while impressive in terms of volume, does not provide any additional detail that rebuts any of the allegations in the complaint or discussed in the briefing, your Honor.  And I will answer any further questions you have at this point.

I don't proposes to address -- I think that -- your Honor, I think the question of scienter and lost causation is adequately addressed in the briefing, your Honor.  I don't think -- as you know, the absence of stock sales by the individuals is not dispositive, as we've cited to the authority of that effect.  I think it's very clear at this point we have a startup company raising money that they have a very keen motivation and incentive to -- to mislead about the performance of their product.  We believe that's what's

done here.  And what's important here is, more importantly, the facts that were alleged, integral details, as in -- and the facts that this is a -- this is the only product that the company has, and it's clear the CEO and the other Defendants have demonstrated that they're heavily involved in the development of this product and know all the test results and know the industry.  And so they know how they're misrepresenting these results to -- in the slide deck and in other representations and interviews.

THE COURT:  Mr. Porritt, how do you respond to the argument regarding your reliance not on insider but on the Warren article and the Scorpion Capital report?

MR. PORRITT:  I mean, I think they are totally -- it's interesting that Defendants, having spent decades attacking the use of confidential witnesses as unreliable and cherry picked and misrepresented in complaints by Plaintiff's firms based on their own private investigations, suddenly, when you have a complaint that's based upon detailed industry analysis and criticism of their client's positions and representations supported by experts, that it's all corroborated, that it's also corroborated by detailed allegations in the complaint, suddenly, the absence of a confidential witness is fatal.  And, you know, we -- that's -- that's now confidential witnesses are now compulsory.  If you don't have a confidential witness, then

24

that  somehow indicates that your complaints or your allegations are weak.

I think the Court I think accurately captures that you need to address the allegations as alleged completely in the complaint.  So you take the allegations that are based on the Scorpion Capital report, you take the other allegations in the complaint based on data which we cite technical studies, talking about lithium-ion battery technology and research, and you should -- when the allegations by Mr. Warren in his article and by the Scorpion Capital, you know, are all consistent with the other exterior data -- external data, I think the Court is entitled to rely on them.  And, of course, as we're at the motion to dismiss stage, we're entitled to have our version of the facts accepted as true, well-pleaded statement of facts as -- accepted as true what I call it.

And, so, a competing narrative forwarded by Defendants and I think all the discussion about what Volkswagen may or may not be doing behind the scenes is all a matter for discovery and a matter for trial, even if it's even relevant at that stage, but it's not a matter to be considered by the Court here on the motion to dismiss.

THE COURT:  All right.  Thank you, Mr. Porritt. Mr. Salceda, I'll give you the last word here.

MR. SALCEDA:  Well, thank you very much, your

Honor, and thank you for your attention and your patience on this.

I want to get to something that Mr. Porritt said about, Well, the biotech cases are different because they didn't say that they resolved a fundamental issue.  That's not what Rigel had, and it's interesting.  If we just go back to the Ninth Circuit's opinion in Rigel, there the company said that the Dedroget (phonetic) had "demonstrated statistically significant results."  And there are a number of quotes both in that decision and in Judge White's underlying -- the greater excerpts of the statements in Judge White's underlying case at the District Court saying that they're very pleased about the highly statistically significant results.

So, in fact, it -- there was a statement about the meaning of the trial and also the methodology, right, because statistically significant is compared to the methodology.  It's on point.  There's a reason why they didn't address it in their opposition.

So, I -- I would urge the Court to consider Rigel because Rigel and its -- and the cases it cites, some of the cases, that rely on it make very clear that it's not enough to say, well, others would interpret the data differently. No matter how many letters they have after their name, the Plaintiffs can't create falsity out of undisputed statements

26

of fact, and here they don't dispute the clinical -- the -- not the clinical trial, the trial results that the company disclosed.  It's just like in these biotech cases.

Unless your Honor has any further questions, I'm happy to submit.

THE COURT:  Great.  All right.  So, thank you for your argument, and thank you for -- Mr. Salceda, for the -- and I probably don't have to thank you, but I have to thank other people in your firm for your patience.  So, I will -- I will look at those.  I promise you that I will read Rigel again, because any time somebody mentions a case more than five times in an argument, I think it must be important enough to -- to pay close attention to.  So I will.  And -- and then I will try to get an order out in a reasonably -- as reasonably quickly as I can.

So, thank you all for your argument, and happy holidays to you.

MR. PORRITT:  Thank you, your Honor.

MR. SALCEDA:  Thank you very much, your Honor.

THE COURT:  Thank you.

(Proceedings concluded at 2:52 p.m.)

27

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Monday, December 13, 2021