UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE QUANTUMSCAPE SECURITIES
CLASS ACTION LITIGATION

Case No.  3:21-cv-00058-WHO

**ORDER ON MOTION TO DISMISS**

Re: Dkt. No. 137

The plaintiffs in this putative securities class action allege that defendants QuantumScape Corporation, Jagdeep Singh, Timothy Holme, and Kevin Hettrich (collectively, "QuantumScape") misled investors about the progress and effectiveness of their "solid-state batteries."  Solid-state batteries are an aspiring competitor to conventional lithium-ion batteries for use in electric vehicles.  They have never been successfully commercialized due, in part, to a well-known set of challenges.  The defendants repeatedly represented that their batteries had overcome those challenges and were comparable to or outperformed the conventional batteries on the market. According to the plaintiffs, those representations were false; they allege that the defendants' batteries still faced the same challenges, the tests used by the defendants were "compromised" to make the performance look more promising than it was, and the batteries performed meaningfully worse than lithium-ion ones.  This purported truth was revealed to the market in two publications that allegedly caused QuantumScape's share price to fall.

QuantumScape moves to dismiss, arguing that none of its statements were false or misleading, some of them are protected by the safe harbor of the Private Securities Litigation Reform Act ("PSLRA"), some are opinions or corporate puffery, there are not adequate allegations of scienter, and that the two corrective disclosures cannot reasonably be relied on.

Many of QuantumScape's arguments are not without some force, but even under the heightened pleading requirements of the PSLRA the allegations are largely sufficient to state a claim.  The motion to dismiss is denied except as it relates to one specific challenged statement.

<div align="center">BACKGROUND</div>

## I.    FACTUAL BACKGROUND

### A.  Lithium-Ion Batteries

Lithium-ion batteries are the conventional and widespread battery technology in use today in most rechargeable devices.  Amended Complaint ("Compl.") ¶¶ 36–37.  To keep the batteries' "cathodes" and "anodes"—the parts of the battery that the lithium ions flow to and from to create charge—apart, lithium-ion batteries use a liquid separator.  *Id.* ¶ 39.  The flow of lithium ions from anode to cathode creates electrical power; the flow from cathode to anode completes the cycle, building back up the battery's potential.  *Id.* ¶¶ 39–40.

Today, lithium-ion batteries are used in electrical automobiles; those vehicles have reached ranges of more than 310 miles of charge and some go as far as 620 miles on one charge.  *Id.* ¶¶ 48, 54.  "Many" batteries will reach more than 80% capacity in less than 40 minutes, and at least one type reaches it in six minutes.  *Id.* ¶¶ 49–51.

### B.  Solid-State Batteries

This case is about solid-state batteries, an aspiring competitor to lithium-ion batteries.  Unlike lithium-ion batteries, solid-state batteries use a solid separator (such as glass or ceramics) between the anode and cathode, not a liquid one.  *Id.* ¶ 56.  Otherwise, the structure of the two types is "quite similar."  *Id.*  According to the plaintiffs, solid-state batteries "have the potential to be safer and more durable over the long run."  *Id.* ¶ 57.  The liquid in lithium-ion batteries is flammable and heat or fire within the battery can be "dangerous and toxic."  *Id.*  Because solid-state batteries lack the liquid, they do not have the same risk.  *Id.*

The plaintiffs allege that solid-state batteries have faced a historical set of challenges preventing commercial use.  The leading one is the formation of "dendrites."  *Id.* ¶ 60.  Dendrites are "needle-like metallic growths and deposits of lithium metal that resemble a tree, roots, or a fungus."  *Id.* ¶ 61.  Lithium tends to develop these dendrites.  *Id.* ¶ 60.  Once a dendrite exists, it

<div style="text-align:center; writing-mode:vertical-rl;">United States District Court<br>Northern District of California</div>

grows and will short the battery. *Id.* ¶ 61. It has been a challenge for the industry to find solid

separators that—unlike liquid ones—both allow the ions to flow and prevent dendrite formation.

*Id.* ¶ 62. Other historical challenges are that the batteries have a long charge time, a short lifespan,

are not as energy dense, do not operate well in low temperatures, and can be unsafe. *Id.* ¶ 81. The

plaintiffs claim that the industry has had a number of "frauds and flops" purporting to solve this

problem when they have not. *Id.* ¶ 67. This aside, it is difficult to scale batteries from a single cell

to the full battery pack needed for real-world applications. *Id.* ¶ 70.

### C. Compromised Testing

Among the "frauds," the plaintiffs allege, are those who use "compromised test

conditions" to manipulate what their data show about solid-state batteries. *Id.* ¶ 68. One common

manipulation is using an anode of carbon-silicone, not the standard lithium metal, which is a less

desirable material to use in terms of energy density, charging speed, safety, cost, and charge life.

*Id.* ¶ 68a. Another is elevating the temperature of the batteries. *Id.* ¶ 68c. At elevated

temperatures, lithium metal is less likely to form dendrites and the conductivity is increased,

making the batteries appear more successful. *Id.* But those high temperatures, the plaintiffs

allege, will not exist in the real world. *Id.* A third manipulation is to use cells that will not have

enough cycles—ions flowing from anode to cathode and back—to be used in the real world. *Id.*

Yet another is to use "pulse tests," in which a series of charges and discharges are used instead of

a "direct current charging." *Id.* ¶ 68f. While this helps prevent dendrite formation, it can lead to

cells overheating and is not how they work in practice. *Id.* And finally, some will use small

battery cells in which it is easier to prevent dendrites but that are not useful for real-world

applications. *Id.* ¶ 68g.

### D. QuantumScape

QuantumScape was founded in 2010 and makes a solid-state battery for use in electric

vehicles. *Id.* ¶ 32. During all relevant times, Singh was its CEO, Holme was its co-founder and

chief technology officer, and Hettrich was its chief financial officer. *Id.* ¶¶ 23–25. The plaintiffs

allege that QuantumScape purported to solve the "solid-state battery puzzle" by making a battery

that was as good or better than liquid ones, was stable, and resisted dendrite formation. *Id.* ¶ 72.

United States District Court
Northern District of California

3

Importantly—as discussed in more detail later—the plaintiffs claim that QuantumScape stated that it did so without using compromised test conditions.  *Id.*  QuantumScape's battery is special, they allege, because it uses no "traditional anode"; instead, the anode is formed "in situ" when the charge occurs as the ions flow through and into the separator, creating a layer of metallic lithium.  *Id.* ¶ 74.  QuantumScape's cell is supposed to be stacked with roughly 100 others to make a "full cell" that then will be put with hundreds of *those* to make the full battery.  *Id.* ¶ 73.  As more cells are added, the more separators are needed and the higher likelihood of problems there is.  *Id.*  QuantumScape allegedly has not tested a full cell, only up to four layers.  *Id.*

The plaintiffs allege that QuantumScape claimed that its batteries addressed a number of issues with lithium-ion batteries, including being more energy dense, having faster charging, having a longer life cycle, being safer, and being less expensive.  *Id.* ¶ 75.  QuantumScape claimed that its battery can be charged to 80% capacity in roughly 15 minutes and last 800 cycles.  *Id.* ¶ 76.

### E.  Alleged Misrepresentations

In the Complaint, the plaintiffs represent that the "alleged materially false and misleading statements and omissions are bolded and italicized" in a certain section.  Compl. at 44 n.10.  Based on this, QuantumScape brought together the allegedly misleading statements at issue into a single chart.  *See* Dkt. No. 37-1.  In their brief, however, the plaintiffs state that the chart omits misrepresentations, using the example of a slide presentation attached to the Complaint.  *See* Opposition to the Motion to Dismiss ("Oppo.") [Dkt. No. 139] 15 n.3.  The plaintiffs were required to plead the misrepresentations with particularity, so they are limited to those they disclosed as misrepresentations in footnote 10 of their Complaint.

The allegedly misleading statements were as follows.  In a November 27, 2020, television interview, Singh said:

- Statement 1: "The time between now and first revenue is really spent doing two things. One is ramping up production. Batteries take time to build and scale up. And two is to do the final automotive qualification process, which also takes some time."

- Statement 2: "Well, what we are confident about is that the fundamental science risk is behind us."

4

In a press release that same day, QuantumScape said:

- Statement 3: "Through its elegant "anode-less" design, QuantumScape's solid-state lithium-metal batteries are designed to be safer, and to deliver greater range, faster charge times and improved cycle life, than today's conventional lithium-ion battery technology."

At a showcase of the technology on December 8, 2020, Singh said:

- Statement 4: "Okay, so the quick summary is if you have a material that doesn't have the fundamental entitlement to serve as a solid-state separator, you can still make batteries out of that material but they only work under severely compromised test conditions and the main compromises that people use are either very low current densities, which ends up not being useful for real applications like driving a car, or the cycle efforts are being very short or the cells can only work at an elevated temperature or they require excess lithium, which lowers the energy density of the cell. These are the problems that QuantumScape has addressed."

- Statement 5:  "[T]he solid-state separator already prevents dendrites, so there's no reason to slow down the rate of charge. You can start charging it at a really high rate and continue charging it at that really high rate until it gets all the way up to 80 percent in less than 15 minutes. This is not only better than any of the solid-state technology, but it's better than you can achieve with conventional lithium-ion batteries, which always have to manage this potential dendriting issue at higher rates of charge."

- Statement 6: "They are not sort of a compromised test conditions."

- Statement 7: "So this really demonstrates that this technology is in fact ready for commercial deployment as soon as we can scale up production and make multilayer versions of these cells."

- Statement 8: "[T]he data we presented today makes clear that the QuantumScape technology can address the fundamental issues."

In a Form 8-K Press Release filed with the Securities and Exchange Commission ("SEC") on

December 8, 2020, QuantumScape said:

- Statement 9: It "has released performance data demonstrating that its technology addresses fundamental issues holding back widespread adoption of high-energy density solid-state batteries, including charge time (current density), cycle life, safety, and operating temperature."

- Statement 10: "QuantumScape's solid-state battery is designed to enable up to 80% longer range compared to today's lithium-ion batteries. Previous attempts to create a solid-state separator capable of working with lithium metal at high rates of power generally required compromising other aspects of the cell (cycle life, operating temperature, safety, cathode loading, or excess lithium in the anode)."

- Statement 11: "QuantumScape's newly-released results, based on testing of single layer battery cells, show its solid-state separators are capable of working at very

high rates of power, enabling a 15-minute charge to 80% capacity, faster than either conventional battery or alternative solid-state approaches are capable of delivering."

- Statement 12: "Unlike conventional lithium-ion batteries or some other solid-state designs, this architecture delivers high energy density while enabling lower material costs and simplified manufacturing."

- Statement 13: "In addition to eliminating the carbon or carbon/silicon anode, QuantumScape's solid-state design further increases energy density because it uses no excess lithium on the anode."

- Statement 14: "QuantumScape's solid-state separator is noncombustible and isolates the anode from the cathode even at very high temperatures — much higher than conventional organic separators used in lithium-ion batteries."

In its Form S-1 filed on December 17, 2020, QuantumScape said:

- Statement 15: "In addition, we believe our battery technology may provide significant improvements in energy density compared to today's conventional lithium-ion batteries, as shown in the figure below."

- Statement 16: "Our latest single layer prototype cells have been tested to over 800 cycles (under stringent test conditions, including 100% depth-of-discharge cycles at one-hour charge and discharge rates at 30 degrees Celsius with commercial-loading cathodes) while still retaining over 80% of the cells' discharge capacity."

- Statement 17: "Our battery technology, and specifically our solid-state separator material, has been tested to demonstrate the ability to charge to approximately 80% in 15 minutes, faster than commonly used high-energy EV batteries on the market."

- Statement 18: "Our battery technology eliminates the anode host material and the associated manufacturing costs, providing a structural cost advantage compared to traditional lithium-ion batteries."

In a television interview on January 4, 2021, Singh said:

- Statement 19: "We have something that has never been shown to the world before, a solid-state system that delivers levels of performance that are really record breaking not only in comparison to other solid-state efforts, but even in comparison to conventional lithium-ion technology. So if we can get this into the market, which is the task we are currently focused on, ramping up production and making these multilayer cells."

In an article on LinkedIn published on January 15, 2021, Holme wrote:

- Statement 20: "We believe that safety in our cell will be improved relative to lithium-ion because we have replaced the combustible polymer separator with a nonoxidizable (i.e., non-combustible) separator that is thermally stable to much higher temperatures than polymers, so it will act as a more effective barrier between anode and cathode."

- Statement 21: "What makes QuantumScape's performance data interesting is not just that it shows over 1,000 cycles with good capacity retention, but that it does so under commercially-relevant conditions, including high current density, close-toroom temperature, full depth of discharge, modest pressure, zero excess lithium, and commercially-relevant area and cathode loading."

In its 2020 fourth quarter shareholder letter on February 16, 2021, QuantumScape wrote:

- Statement 22: "The lithium-metal anode enables higher energy density than is possible with conventional anodes (as high as 1,000 Wh/L compared with approximately 711 Wh/L for conventional cells used in today's best-selling EVs), enabling longer driving range, while simultaneously delivering high rates of power (for fast charge), long cycle life, and improved safety, addressing the fundamental issues holding back widespread adoption of battery electric vehicles."

In QuantumScape's 2020 fourth quarter earnings call, a questioner asked and Singh responded:

- Statement 23: Q: "[W]hat makes you feel like you'll have a sustainable cost advantage over the rest of the industry?" A: "[]As a result, given we believe our separator will be in the same order of magnitude and cost as conventional separators, we expect that the quantitative approach, what should be lower cost than conventional ion cells at any given manufacturing scale."

In a February 17, 2021, television interview, Singh said:

- Statement 24: "One of the reasons why we went public last year – it was precisely because we thought most of the science -- most of the chemistry risk is behind us."

In its Form 10-K filed with the SEC on February 23, 2021, QuantumScape wrote:

- Statement 25: "Our battery technology, and specifically our solid-state separator material, has been tested to demonstrate the ability to charge to approximately 80% in 15 minutes, significantly faster than commonly used high-energy EV batteries on the market."

- Statement 26: "Our battery technology eliminates the anode host material and the associated manufacturing costs, providing a structural cost advantage compared to traditional lithium-ion batteries."

In an interview on February 25, 2021, Singh said:

- Statement 27: "For the first time in 45 years, someone was able to show a solid-state cell that was capable of performing under uncompromised test conditions— high rates of power—long cycle lives—unelevated temperatures."

In short, QuantumScape and its officers made a series of claims about their solid-state batteries to the effect that the batteries (1) did not form dendrites, (2) had greater range than convention lithium-ion ones, (3) charged faster than conventional lithium-ion ones, (4) had better life cycles than conventional lithium ion ones, (5) were tested using uncompromised tests in real-

world conditions, (6) were ready for commercial use as soon as they could be scaled up, (7) would

cost less than conventional lithium-ion ones, (8) were safer than conventional lithium-ion ones due

to the solid separator, and (9) were more energy dense than conventional lithium-ion ones.  And

they represented that the "fundamental science risk" was "behind them" and the "fundamental

issues" were "addressed."

### F.  The Seeking Alpha Article

On January 4, 2021, the online publication Seeking Alpha published an article by Dr. Brian

Morin titled, "QuantumScape's Solid State Batteries Have Significant Technical Hurdles To

Overcome."  Compl. ¶ 97.  Morin, who has a Ph.D. in material physics, is director and vice

president of the "National Alliance for Advanced Technology Batteries."  *Id.*  He reviewed the

December 8, 2020, showcase and concluded that QuantumScape had some successes but had

"overstated" certain others.  *Id.* ¶ 98.  He wrote that many attributes were "much better" than past

solid-state batteries but are "completely unacceptable for real world field electric vehicle

performance."  *Id.*  He said the battery would only last for 75,00 miles of "aggressive driving" and

that the tests were "likely performed at high pressure."  He wrote that the number of cycles was

"not better" than current vehicles.  There would, he said, be a loss of range in cold months and that

running the tests at a few degrees lower would have made them "significantly worse."  And he

wrote that, based on the data at -10 degrees Celsius (that is, at a low temperature), it would only

charge 5 percent, not 80 percent, in fifteen minutes.  *Id.*

Morin also stated that the batteries faced other challenges "not mention[ed]" in the

showcase.  QuantumScape had been unable to make multi-layer cells.  Cracks may form in the

separator in rough conditions, allowing dendrite formation.  Their anode was "much more

flammable and energetic burning" than traditional ones; if exposed to oxygen or water it would

"likely ignite."  Despite QuantumScape's claims of lower cost, it only eliminated one

component—the not-very-expensive graphite—so Morin  did not expect it to save significant

money at scale.  As the plaintiffs interpret it, Morin "revealed to investors that QuantumScape had

overstated a number of data points, including (i) power, (ii) range, (iii) low temperature operation,

(iv) low temperature life, and (v) energy density, and omitted materially information related to (vi)

dendrites, (vii) safety and (viii) cost." *Id.* ¶ 99.

The plaintiffs allege that, while QuantumScape stock had been at $84.45 on December 31, 2020, it was $49.96 (on "unusually heavy volume") by the close on January 4 when the article was published. *Id.* ¶105. According to plaintiffs, the defendants continued to make alleged misrepresentations after the article was published. *See supra* Section I.E.

### G.  The Scorpion Capital Report

On April 15, 2021, a firm called Scorpion Capital published a report entitled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look Like Amateurs*." *Id.* ¶ 112. According to that report, QuantumScape's testing *was* compromised, including by using too-small cells, too-high temperatures, and pulse tests. *Id.* ¶¶ 112, 115, 117, 119. The result, according to the report, is that many of QuantumScape's claims were false, including that the batteries resisted dendrites, performed well in low temperatures, reached 80 percent charge in 15 minutes, and had long life. *Id.* ¶ 112. The report interviewed former QuantumScape employees and several experts. *See, e.g.*, *id.* ¶¶ 113, 116, 117. The tests, some of them said, were not performed in a "real product" or "real cell," but instead on one that would not work in the real-world designed to maximize the results. *Id.* ¶¶ 117–18. Former employees described the tests as not representative of the real world. *Id.* And experts described them with terms like "cheating." *Id.* ¶ 120. Additionally, the report described instances in which the presentations simply misrepresented the data. For instance, Singh described the technology as operating at "room temperature" but actually used data running it at 45 degrees Celsius and not disclosing the size of the cell. *Id.* ¶ 124.

After the report was published, QuantumScape's stock price declined by 12.24 percent on "unusually heavy trading volume." *Id.* ¶ 144.

## II.  PROCEDURAL BACKGROUND

A number of plaintiffs filed suit in this district in early January 2021, just after the Seeking Alpha article was published. I consolidated all of the cases under the Private Securities Litigation Reform Act ("PSLRA") and appointed investor Frank Fish as lead plaintiff. *See* Dkt. No. 115; *see also* Dkt. No. 120 (consolidating another case and declining to revisit lead plaintiff appointment).

Pursuant to the parties' schedule, Fish filed the operative complaint on June 21, 2021.  It alleges a class period from November 27, 2020, to April 14, 2021.  Compl. ¶ 351.  QuantumScape moved to dismiss the complaint in August 2021.  *See* Motion to Dismiss ("Mot.") [Dkt. No. 137].  I held a hearing on the motion on December 8, 2021.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Under the PSLRA, securities fraud claims must "plead with particularity both falsity and scienter."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  This is the same standard under Federal Rule of Civil Procedure 9(b). With respect to falsity, "the complaint must specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B).  With respect to scienter, "the complaint shall, with respect to each act or omission alleged ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  "[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the

United States District Court  
Northern District of California

same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citation and internal quotation marks omitted).

"To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quotation marks and citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (citation omitted). Accordingly, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences. *Id.* at 324. "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23.

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

To plead a violation of the securities laws[1], a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)).

**I.    ACTIONABLE MISREPRESENTATIONS**

QuantumScape argues that, for various reasons, the complaint fails to plead any misrepresentation that is actionable under the securities laws.

**A.  False or Misleading**

I first address whether the plaintiffs have adequately alleged that the challenged statements are false or misleading. The analysis of Statement 1 is addressed separately below because it intertwines with the safe-harbor analysis. *See infra* Section I.B. The parties group the remaining statements into two groups (though there is some overlap and relation between them), so I do as well: (1) statements about QuantumScape's testing conditions and having solved the "fundamental risks" or "fundamental science risks" of solid-state batteries such that the batteries were ready for commercialization and (2) comparisons of the solid-state batteries to lithium-ion batteries or "conventional batteries" already on the market.

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). And "[e]ven if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. When it comes to affirmative representations, "to properly allege falsity, a securities fraud complaint must now specify each statement alleged to have been

---

[1] The plaintiffs bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5, which implements the former. The parties agree that both claims rise or fall together according to the standards laid out in this Order. *See* Mot. 25; Opposition to the Mot. [Dkt. No. 139] 24; *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (internal quotation marks, citation, and alteration omitted). When it comes to omissions, the "omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The securities laws "do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal quotation marks, citation, and alteration omitted). "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (internal quotation marks, citations, and alteration omitted).

### i. Whether to Credit the Seeking Alpha Article and Scorpion Capital Report

QuantumScape argues that, as an initial matter, the Seeking Alpha article and Scorpion Capital report cannot be relied on to show falsity (or loss causation, addressed below). Mot. 10–11. Because that is so, QuantumScape says, there is no evidence that anything it represented was false or misleading. On the Seeking Alpha article, it argues that Morin is the CEO of a company marketing its own lithium-ion battery technology, creating a conflict of interest. *Id.* 10. And it argues that Morin is only expressing his own opinions, not facts. *Id.* 10–11. On the Scorpion Capital report, QuantumScape argues that Scorpion Capital is a short-seller of QuantumScape's stock. *Id.* 11. It also argues that the report relies entirely on anonymous former employees and experts and, so, should not be credited. *Id.* 11–13.[2]

_____

[2] QuantumScape also argues that there are two other reasons that Morin is not credible, but they are unpersuasive. *See* Mot. 10. It argues that Morin is long on Tesla stock and Tesla uses lithium-ion batteries. I do not see (and QuantumScape never elaborates) why that should matter. There is no allegation Tesla is a *competitor* of QuantumScape, just that it *buys* a competing produce that is, at present, the only option on the market. Second, QuantumScape argues that Morin was paid by Seeking Alpha for his article. But there is no evidence that he was paid to reach the conclusions

United States District Court
Northern District of California

1    If it is true that Morin is CEO of a competing company, that certainly would diminish his

2    credibility, but I cannot say it does so to such an extent as to require dismissing his findings at the

3    pleadings stage.  QuantumScape has pointed to no case in which that sort of motive *alone* was

4    sufficient to discredit otherwise adequate allegations.  Nor is it true that Morin's article is devoid

5    of "true facts."  *See Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-CV-01795-WHO, 2016

6    WL 4585753, at *4 (N.D. Cal. Sept. 2, 2016) (holding that plaintiffs must plead that corrective

7    disclosures reveal "'true facts' rather than a mere opinion").  It is true that Morin does render

8    several opinions in the article.  But it is also littered with factual assertions that purport to show

9    that QuantumScape's own factual assertions are incorrect.  For example, Morin stated that the tests

10   were performed at high pressure (which was not revealed), that various aspects of the batteries

11   were (contrary to QuantumScape's claims) not better than conventional batteries, and that

12   QuantumScape's costs savings only came from the elimination of one low-cost component.  *See*

13   Compl. ¶ 97.

14   Likewise, that Scorpion Capital was allegedly short on QuantumScape may raise serious

15   credibility issues for a factfinder.  But QuantumScape overstates the caselaw by arguing that it

16   makes the report's conclusions "inherently unreliable."  Mot. 11.  All of its cited cases discuss

17   short-sellers but did so as part of a broader contextual analysis, not as a bright-line rule of

18   exclusion.  *See In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004, at *10

19   (N.D. Cal. July 13, 2020); *In re Intrexon Corp. Sec. Litig.*, No. 16-CV-02398-RS, 2017 WL

20   732952, at *5, *7 (N.D. Cal. Feb. 24, 2017); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F.

21   Supp. 2d 561, 577 (S.D.N.Y. 2012).  Those cases, in fact, are concerned with the nature of the

22   revelation more than it coming from a short-seller.  *See, e.g.*, *Intrexon*, 2017 WL 732952, at *7

23   (holding that the "*mere repackaging of already-public information* by an analyst or short-seller" is

24   insufficient (emphasis added)).

25   The substance of the report shows that it is sufficient to survive a challenge at the

26   pleadings stage.  Investors need not only have relied on the say-so of the short seller because the

27

28   _____

he did, as opposed to merely offering his expert opinion.

report interviewed nine former QuantumScape employees about QuantumScape's testing and four experts about its conclusions.  *See* Compl. ¶¶ 112–24.  It is true that most of the experts and all of the former employees are unidentified by name.  But they need not be today:  "Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false."  *Zucco*, 552 F.3d at 995 (internal quotation marks and citation omitted).  And even if this rule did not apply, the court then examines whether the complaint "provide[s] an adequate basis for determining that the witnesses in question have personal knowledge of the events they report."  *Id.*  To do so, the court looks to "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  *Id.*  Here, what the unidentified employees report is supported both by public information in the Scorpion Capital report and by what the experts stated.  Additionally, it coheres with what Morin found in his earlier report.  Many of the employees are described as former "research and development" employees, which plausibly means they would know about the internal details of QuantumScape's testing.  *See* Compl. ¶¶ 117–24.  And there are nine such employees total, who present overlapping and corroborative information.

On the whole, it is plausible that reasonable investors would have relied on both publications and the plaintiffs have adequately alleged that each publication has the minimum indicia of reliability to make is past the pleadings stage.  Indeed, these corrective disclosures are more robust than one that the Ninth Circuit recently approved.  There, the disclosure was the allegations in a lawsuit of a single employee (described as a "midlevel auditor") about alleged financial malfeasance.  *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 788, 793–94 (9th Cir. 2020).  Just as that auditor allegedly personally encountered the financial issues, *see id.* at 788–89, these nine employees claim to personally have encountered flaws in QuantumScape's testing—and here, many of their claims are reinforced by experts.

ii.  **Testing, "Fundamental Risks," and Readiness for Commercialization**

One group of challenged statements represent that the solid-state batteries were tested with "uncompromised" conditions or were tested in various real-world conditions; that, based on those results, QuantumScape had solved the historical challenges associated with the batteries; and that, consequently, the batteries were ready for broader commercialization provided that they could be scaled up and layered.

QuantumScape argues that these statements are not actionable because, "[w]hile Plaintiff is free to disagree with QuantumScape's testing methodologies and conditions, he cannot dispute that they were accurately disclosed."  Mot. 13 (citations omitted).  It argues that, as a result, there was no misrepresentation about the actual methodology and its statements about testing were all interpretations of the data.  *See id.* 13–14.  The plaintiffs reply that "Defendants affirmatively represented that the conditions were not compromised when they were; accordingly, the disclosure of tests conditions were insufficient to reduce the risk of misleading investors to 'nil' especially where it would take an expert to know that the test conditions were compromised."  Opposition to the Mot. ("Oppo.") [Dkt. No. 139] 12.

Several days before the hearing on this motion, I requested that QuantumScape file "a document that includes a complete list of citations to all portions of the record it relies on to argue that its testing methodology, conditions, and data were adequately disclosed."  Dkt. No. 144.  It did so.  *See* Filing of Citations ("Disclosures") [Dkt. No. 146].  The bulk of the purported disclosures come from the showcase event at which many of the alleged misrepresentations occurred and appear either on slides from that event or were said by speakers.  *See supra* Background, Section I.E. (misrepresentations at showcase); *see* Disclosures (discussing slides); Dkt. No. 131-2 (slide deck).  The other purported disclosures were made in a LinkedIn post by Holme that referenced the slides, Dkt. No. 137-5, Ex. 13; two Form 8-K disclosures filed with the SEC that predominately discussed the showcase and the testing results underlying it, Dkt. Nos. 137-4, Ex. 8, 137-5, Ex. 14; a Form S-1 filed with the SEC that QuantumScape relies on for three disclosures about battery life, charging capability, and safety, Dkt. No. 137-4, Ex. 9 at 52–53; and an earnings call that QuantumScape relies on for three disclosures about charging rates, test

conditions, and stacking cells, Dkt. No. 137-5, Ex. 15. Turning to the substance of the disclosures, QuantumScape argues that it disclosed the precise technical parameters of the testing it performed. *See* Mot. 13–14; *see, e.g.*, Disclosures at 1 (fast charging testing), 2 (testing for dendrites). And it argues that it disclosed (1) that it needed to scale up the layers; (2) how energy dense its batteries could be; (3) how fast the batteries could charge and their lifespan under various conditions; (4) the temperatures at and conditions under which dendrite testing was performed; and (5) more broadly, the temperatures at which all tests were performed. *See* Mot. 14–17 (collecting citations).

The disclosures of underlying testing data and the results of those tests as they related to individual characteristics (e.g., charge speed or energy density) were certainly extensive and may well weaken or even defeat the plaintiffs' case at a later stage when a factfinder can weigh them contextually. For now, however, I cannot conclude that "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ" about whether the overall statements were misleading. *Fecht*, 70 F.3d at 1081. All of the disclosures that QuantumScape cites reveal particular information, such as discrete testing conditions. *See generally* Disclosures. But the allegedly misleading statements make broader, more categorical statements. The defendants made statements to the effect that while other companies had used "compromised" testing conditions, they had not, so their batteries were better suited for real-world conditions. *See, e.g.*, Statement 4 ("[I]f you have a material that doesn't have the fundamental entitlement to serve as a solid-state separator, you can still make batteries out of that material but they only work under severely compromised test conditions . . . . These are the problems that QuantumScape has addressed."); Statement 6 ("They are not sort of a compromised test conditions."); Statement 21 (representing that its "performance data" showed that the batteries performed "under commercially-relevant conditions"). The defendants made statements to the effect that, based on their testing, the standard challenges facing previous solid-state battery development efforts were solved or behind them. *See, e.g.*, Statement 2 ("Well, what we are confident about is that the fundamental science risk is behind us."); Statement 8 ("[T]he data we presented today makes clear that the QuantumScape technology can address the fundamental issues."). And the result of this, said the defendants, was that their batteries were ready for commercialization with the only barriers being

scaling production and layering cells.  *See, e.g.*, Statement 7 ("So this really demonstrates that this technology is in fact ready for commercial deployment as soon as we can scale up production and make multilayer versions of these cells.").

I cannot definitively say that these more categorical statements would be rendered entirely non-misleading by the far more technical and narrow disclosures that QuantumScape relies on. First, it is reasonable to think that investors were entitled to rely on the unequivocal representation that testing results were not "compromised."  The complaint alleges that, in this industry, "compromised" testing conditions were a well-known phenomenon and, indeed, the defendants' own statements signal this too.  *See, e.g.*, Compl. ¶ 68; Statement 4.  If a reasonable investor heard, on the one hand, the unambiguous statements that other companies had used compromised conditions but QuantumScape did not and, on the other hand, the hyper-technical details of the testing performed, I cannot say that the "mixture" of this information would "discredit the [allegedly misleading statement] so obviously that the risk of real deception *drops to nil*." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (emphasis added).

Similarly, it is reasonable to think that investors were entitled to rely on the unequivocal representation that the fundamental risks facing solid-state batteries were addressed by QuantumScape's technology.  Again, the complaint alleges that, in this industry, there is an established set of standard, historical, or fundamental risks that have held back solid-state batteries and (again) the defendants' own statements signal this too.  *See, e.g.*, Compl. ¶¶ 5, 7, 72, 163; Statement 9.  The case for a reasonable investor being misled on this basis is even clearer than the one above because, even if every last detail of the parameters of every last test were disclosed, investors would still be at the mercy of QuantumScape's superior knowledge of the stage of development its batteries were at.  If the allegations in the Seeking Alpha article and Scorpion Capital Report are true—which I take them to be at this posture—then QuantumScape's representations directly contradicted what it knew at the time about the fundamental risks. According to them, QuantumScape's batteries were *not* dendrite resistant under normal conditions, its cycle life was lower than reported, it was not safer (indeed, it may have been more dangerous), and it was not as energy dense.  *See supra* Background, Sections I.F., I.G.  So, again, the overall

18

"mixture" of information presented does not lead me to think that the risk of deception is "nil."
*Virginia Bankshares*, 501 U.S. at 1097.

Finally, if this is all taken as true, it would mean that QuantumScape falsely stated that it
was ready for commercialization with the only remaining steps being ramping up production and
layering the cells.  QuantumScape responds that it explicitly warned that those two challenges still
lay before it.  *See, e.g.*, Mot. 5–6.  To that extent, I agree:  QuantumScape disclosed several times
(including in the challenged statements themselves) that larger production and stacking cells
needed to be done and were uncertain.  *See, e.g.*, Statement 7.  But that does not defeat the
plaintiffs' claims because their theory is that it was misleading to suggest that the *only* major steps
in battery development that remaining were production increases and stacking.

QuantumScape relies heavily on *In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
697 F.3d 869 (9th Cir. 2012), to show that these alleged misrepresentations are not actionable.  In
the portion of that decision that QuantumScape relies on, the defendant corporation reported the
results of a clinical trial of an arthritis drug.  *Id.* at 871; *see also* December 8, 2021 Hearing
Transcript [Dkt. No. 149] at 8:7–13 (counsel relying on this portion of *Rigel*).  The company
reported the "top-line" results of its trial, stating that the drug had "statistically significant results
in treating" the disease.  *Rigel*, 697 F.3d at 872.  It then reported "efficacy results," which revealed
the difference between test subjects who took a placebo and the drug at various concentrations.  *Id.*
There, the plaintiff argued that the efficacy results were false or misleading.  *Id.* at 877.  The Ninth
Circuit explained that "[i]t is apparent from the complaint that Plaintiff's allegations of 'falsity'
were based on its contention that Defendants should have used a particular statistical
methodology, which it described in the complaint."  *Id.*  That was not an actionable theory, the
court held:

> Plaintiff did not allege that Defendants inaccurately reported the results of their own
> statistical analysis. Plaintiff also did not allege that Defendants had chosen or changed
> their statistical methodology after seeing the unblinded raw data from the clinical trial.
> Instead, Plaintiff challenged Defendants' reported statistical results by alleging that
> Defendants should have used Plaintiff's chosen statistical methodology, including
> calculating separate p-values for the United States and Mexico and combining those results
> using "Fisher's method," and using "Tukey's Studentized Range test."

19

1    *Id.* The plaintiff claimed that, if that methodology had been used, the p-values of the studies

2    would have shown that the drug's effects were not statistically significant. *Id.* There could be no

3    securities violation, the court explained, because "Plaintiff's allegations of 'falsity' essentially are

4    disagreements with the statistical methodology adopted." *Id.* at 878.

5          Though the comparison to *Rigel* is not baseless, that case does not compel dismissal. The

6    plaintiffs here do not merely allege that QuantumScape should have used a different methodology

7    for its studies. They argue that the studies were represented to be one thing (uncompromised)

8    when they were in fact another (compromised) that required experts (and in some cases, insiders)

9    to accurately comprehend. Indeed, the plaintiffs allege that QuantumScape purposefully designed

10   its studies in such a way as to make the batteries look like they functioned well under real-world

11   conditions when they did not. The plaintiffs, therefore, allege that what was misleading is "not

12   merely the difference between two permissible judgments, but rather the result of a falsehood."

13   *Id.* at 877. A more analogous situation would be if the *Rigel* defendant had told the market it used

14   one method when it in fact used another and the difference could only be determined by the

15   combination of experts and confidential informants.

16                    **iii.   Comparisons to Lithium-Ion and Conventional Batteries**

17         The other group of statements represented that QuantumScape's solid-state batteries were

18   either as good as or better than the conventional lithium-ion batteries being used in electric

19   vehicles commercially in various measures. Again, if the Seeking Alpha and Scorpion Capital

20   Reports are credited, that is false or misleading. According to those reports, the reality was that

21   QuantumScape overstated the objective capabilities of its batteries or reported them only from

22   compromised tests. They report that, in reality, the QuantumScape batteries were not better

23   than—and often were much worse than—conventional batteries. Much of the reason these

24   statements are actionable also depends on the preceding analysis because the comparisons to

25   conventional batteries are alleged to be misleading, in part, due to the presentation of the allegedly

26   compromised testing data.

27         **B.  Safe Harbor**

28         QuantumScape argues that most of the statements at issue are shielded from liability by the

United States District Court
Northern District of California

20

PSLRA's safe-harbor.  Most are not truly forward-looking and are disqualified on that basis alone. One statement is divisible, and one part of it is forward-looking; I do not interpret the plaintiffs to challenge that part and it is, in any event, not misleading.  And one statement is forward-looking but does not meet the other statutory requirements.

The safe-harbor provision exempts certain "forward-looking" statements from liability. *See* 15 U.S.C. § 78u-5(c).  The safe-harbor applies to (1) "forward-looking statements that are identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" and (2) forward-looking statements that were not "made with actual knowledge . . . that the statement was false or misleading."  Id. §§ 78u-5(c)(1)(A)(i), (c)(1)(B).   A forward-looking statement is:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the [SEC].

*Id.* § 78u-5(i)(1).

### i. Forward-Looking

The parties' analysis groups many of the statements into various configurations.  Because this issue turns on particular language, I will address them statement by statement.

The following statements are not forward-looking.  Statement 2 states that the "fundamental science risk is behind us," which is a statement both about what has happened before and about the current state of affairs.  Statement 3 describes the batteries compared to conventional technology; it says nothing about the future.  Statement 8 says that the data presented

United States District Court
Northern District of California

United States District Court
Northern District of California

show how QuantumScape "can address" fundamental issues.  Even though the phrase "can address" might, in a certain light, seem to discuss the future, the statement in context is most reasonably understood to be a reflection of what specific data about the past show.  Statement 10, again, compares solid-state to lithium-ion batteries and discusses "previous attempts" at creating solid-state batteries.  Statements 11, 12, 18, and 26 do the same thing, describing the battery and comparing its charging speed, energy density, cost, and cost (respectively) to lithium-ion. Statement 24 explains that they believed the "chemistry risk" was behind them and that is why QuantumScape went public.  It is focused on the past twice-over: on the reasons for doing public and describing the technology that they developed.

One group of statements may appear to have language that contemplates the future but in fact simply describe the present technology.  I begin with one example in more detail then discuss others to which the same reasoning applies.  Statement 23 may seem to be forward-looking because it responds to a question about QuantumScape's future sustainability advantage over the rest of the industry and Singh states that they "expect" that their approach "should" lead to lower cost.  But, in reality, the statement "contains an express or implied concrete assertion concerning a specific current or past fact" and to that extent is not protected.  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (internal quotation marks and citation omitted).  Just as statements about current sales and performance are not protected even when coupled with future statements, *see id.* at 1191–92, this statement describes the current state of QuantumScape's technology and why it makes it cheaper than lithium-ion.  Several others do too.  Even though Statements 7 says that technology is "ready for commercial deployment as soon as we can scale up production," that is really a statement about the present: Singh was communicating the current state of the technology.  While Statement 15 says the technology "may provide" certain benefits, it again is comparing its energy density to lithium-ion in substance.  Statement 20 does the same thing when it comes to safety; even though it uses the language "will be improved," it is most naturally read to describe the present.

Statement 19 has one part that is forward-looking and one part that is not.  To the extent the statement says, "if we can get this into the market, which is the task we are currently focused

22

on," that is forward-looking.  But the preceding sentence simply compares the product to conventional lithium-ion.  The two thoughts are also logically distinct, so the statement may be broken up.  I do not take the plaintiffs to challenge only the former statement as misrepresentative.  But if they do, it is not false or misleading under the plaintiffs' theory.  That QuantumScape's *focus* was on getting the product to market can still be completely true even if tests were compromised and it misrepresented the state of its technology.  That portion of the statement alone is not actionable on that basis.

Statement 1 *is* forward-looking.  It expressly contemplates QuantumScape's plans "between now and first revenue."  *See id.* (holding plans for producing cars to be forward-looking).  I therefore address whether it qualifies under the two prongs of the safe-harbor.

### ii.  Cautionary Language

To be adequate under the cautionary-language prong, the caution must "discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil."  *Virginia Bankshares*, 501 U.S. at 1097.  As a result, it must "precise[ly]" and "directly address" the alleged misrepresentations.  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (citing *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996)).

Here, Statement 1 says that between that time and "first revenue," QuantumScape would be doing two things: "ramping up production," including with scaling, and "the final automotive qualification process."  On the plaintiffs' reading, this statement is misrepresentative because QuantumScape in reality had not achieved workable batteries, so there was significantly more to do than increasing production and getting approval.  The cautionary language that QuantumScape points to about the work ahead, however, does not address that alleged misrepresentation with any particularity.  QuantumScape points to the following cautions:

- "Just to be clear, this test was run on our single-layer pouch cell so we didn't actually put these cells into real cars, we don't have production cells yet."
- "[T]here is much work ahead of us" and "making a multilayer cell takes time even after one has working single-layer cells meeting performance specifications."
- QuantumScape does not expect its cells to be in EVs "until 2024, and may occur later,"

and it "may encounter substantial delays in the design . . . of [its] solid-state battery cells, which could prevent [it] from commercializing any products it determines to develop on a timely basis, if at all."

*See* Mot. 4 (collecting cautions on this topic).  The first two statements are cautions about layering being required.  But that caution is addressed in the text of the alleged misrepresentation itself; the plaintiffs allege it is misleading because of all else that it omits.  The last statement speaks at a high level of generality about unspecified "delays"; it does not adequately warn investors that QuantumScape in fact did not (allegedly) have a battery that would function as promised.

### iii.  Actual Knowledge

Statement 1 is also not protected under the actual-knowledge prong.  For the reasons explained below in my discussion of scienter, the plaintiffs have adequately alleged that Singh knew about the state of testing and development of batteries.  *See infra* Section II.  Assuming that is true, and assuming it is true that Statement 1 is therefore false, Singh is plausibly alleged to have actual knowledge that he was making a false or misleading statement.

### C.  Opinion

QuantumScape argues that many of the statements are non-actionable opinions.  As I explain, the statements are either not opinions at all or the plaintiffs only challenge factual statements communicated in the course of the opinion (or a statement I assume for the sake of argument is an opinion).[3]

In the context of the securities laws, "[a] fact is a thing done or existing or an actual happening.  An opinion is a belief, a view, or a sentiment which the mind forms of persons or things.  Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (internal quotation marks, citations, and alterations omitted).  In this Circuit, there are "three different standards for pleading

---

[3] QuantumScape challenges Statement 19 on this ground.  Because I find that statement not actionable on other grounds, I do not address it on this one.  *See supra* Section I.B.i. (dismissing part of the statement as not misleading); *infra* Section I.D. (dismissing other part as puffery).

United States District Court
Northern District of California

falsity of opinion statements." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017). First, when a plaintiff argues there are material misrepresentations, she must "allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue." *Id.* at 616 (internal quotation marks and citation omitted). Second, when a plaintiff "relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue." *Id.* (internal quotation marks and citation omitted). The third theory relates to omissions, which are not relevant to this analysis.

One set of statements that QuantumScape challenges are not opinions under *Omnicare*. Statement 4 states that certain specified problems (like short cycles) are, as a factual matter, problems QuantumScape "has addressed." Statement 6 states that the test conditions are, as a factual matter, not "compromised." Statement 7 states that the batteries are "in fact" ready for commercial development (provided they can be scaled and layered). Statement 8 states that the data "make clear" that, as a factual matter, QuantumScape "can address" the fundamental issues. Statement 9 states that QuantumScape "has released" data demonstrating, as a factual matter, that it addressed the fundamental issues. Statement 12 states that QuantumScape's batteries have high energy density but low cost compared, as a factual matter, to conventional batteries. Statement 13 states that the batteries use, as a factual matter, no excess lithium. Statement 14 states that QuantumScape's separator functions at "much higher" temperatures, as a factual matter, than lithium-ion ones. Statement 16 states that QuantumScape's cells have, as a factual matter, been tested over 800 cycles under specified conditions and retained more than 80 percent charge capacity. Statement 17 states that their batteries were, as a factual matter, tested to charge to 80 percent in 15 minutes which was faster than commonly used lithium-ion batteries in electric vehicles. Statement 22 states that QuantumScape's anode design enables, as a factual matter, higher energy density than conventional ones. Statement 25 states that testing showed, as a factual matter, that QuantumScape batteries were faster than the conventional ones on the market. Statement 27 states that QuantumScape was able to show a solid-state battery "capable of performing under uncompromised test conditions," as a factual matter.

1      None of these statements use opinion-qualifying language such as "I think" or "I believe."

2  All express "certainty" about an existing thing or occurrence.  *See Omnicare*, 575 U.S. at 183.

3      A second group of statements are either opinions or I will assume they are for present

4  purposes.  Nonetheless, the plaintiffs challenge "a statement of fact contained within" them that

5  they allege is "materially misleading."  *Dearborn*, 856 F.3d at 616.  To be successful, the plaintiffs

6  must "allege that the supporting fact the speaker supplied is untrue."  *Id.*

7      I assume (without deciding) that Statement 2 is an opinion because Singh stated "we are

8  confident" about what he said.  But it is actionable because Singh stated the supporting fact that

9  the "fundamental science risk" was behind them—an assertion capable of being proven true or

10  false.  Statement 15 is an opinion because QuantumScape wrote that "we believe" what follows.

11  But it contains the supporting factual assertion that a "figure below" displaying data showed the

12  technology "may provide significant improvements in energy density" over conventional lithium-

13  ion batteries.  Statement 20 is an opinion because Holme stated that "we believe" what follows.

14  But it contains the supporting factual assertion that the safety in its batteries will be better than that

15  in lithium-ion and explains the reasons in some detail.  I assume that Statement 21 is an opinion

16  because Holme begins the sentence by describing things that make certain data "interesting."  But

17  he includes, and the plaintiffs challenge, the supporting factual assertion that the batteries

18  performed as they did under "commercially-relevant conditions," which he spells out.  I assume

19  that Statement 23 is an opinion because it is in response to the question "what makes you feel like

20  you'll have a sustainable advantage over the rest of the industry?"  Singh's response, however,

21  includes the factual assertion that they anticipate their batteries being lower cost than conventional

22  lithium-ion.  I assume Statement 24 is an opinion because Singh states that one of the reasons that

23  QuantumScape went public was it "thought" certain things.  But the statement includes the

24  supporting fact that most of the "chemistry risk" was behind them.

25      **D.  Optimism and Puffery**

26      QuantumScape challenges a last group of statements as unactionable puffery.  Most are

27  not; one is.

28      Under the securities laws, "[s]tatements of mere corporate puffery, vague statements of

United States District Court
Northern District of California

optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because

professional investors, and most amateur investors as well, know how to devalue the optimism of

corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060

(9th Cir. 2014) (internal quotation marks and citation omitted). "A statement is considered

puffery if the claim is extremely unlikely to induce . . . reliance. Ultimately, the difference

between a statement of fact and mere puffery rests in the specificity or generality of the claim."

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008).

The following statements are not puffery. Statement 7 states that the batteries are "in fact"

ready for "commercial deployment," provided they can be scaled and layered. That is a concrete

statement about the batteries' stage in development and contains specific caveats. Statement 9

states that QuantumScape's data shows that it has addressed the "fundamental issues" and lists

them. As explained above, *supra* Section I.A.ii., these "fundamental" issues are pleaded (and

admitted by QuantumScape) to be well-established, so the statement is a concrete representation of

specific technical barriers that have been overcome. Statement 16 describes in detail testing that

has been performed and its conditions and outcomes; it would be difficult to make it more

specific. Statement 25 states that the batteries charge to 80 percent in 15 minutes, which is

"significantly faster" than conventional ones. Presumably, QuantumScape takes issue with the

"significantly faster" language. But that language does not stand alone: it is tied to a specific time

figure and is compared to conventional batteries.

The surviving part of Statement 19, however, is puffery. *See supra* Section I.B.i.

(dismissing part of the statement on other grounds). The remaining part states that the solid-state

batteries are "record-breaking" in comparison to conventional lithium-ion. Whether something is

"record-breaking" might be non-puffery if there were an actual record at issue. But here, the

plaintiffs do not point to one. Without that, calling something "record-breaking" is just

standardless corporate hype that no reasonable investor would credit.

**E. Conclusion**

Statement 19 is not actionable and the motion to dismiss is granted to that narrow extent.

The other statements that QuantumScape challenges are (respectively) plausibly false or

27

misleading, not protected by the safe harbor, and not opinions or puffery.

## II.     SCIENTER

QuantumScape argues that the plaintiffs have failed to adequately plead scienter.  Under the PSLRA, plaintiffs must plead facts that create a "strong inference" of the defendant's scienter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007).  The inference need not be "even the most plausible of competing inferences," but it must be "cogent and compelling."  *Id.* (internal quotation marks and citations omitted).  Scienter is a mental state that covers "intent to deceive, manipulate, or defraud," and "deliberate recklessness."  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal quotation marks and citations omitted). "Deliberate recklessness," in turn, means "more than mere recklessness or a motive to commit fraud"; it is instead "an extreme departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id.* (internal quotation marks and citations omitted).

Here, as in many cases, "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  As a result, most of the facts that lead to a strong inference of scienter are the same that show falsity.  *See id.*  On the plaintiffs' theory—and taking as true the allegations in the Seeking Alpha article and Scorpion Capital report—the defendants must at least have intended to deceive investors.  The reason is that the statements that the defendants made over and over were, according to the plaintiffs' allegations, verifiable falsehoods.  QuantumScape insisted many times, for instance, that it used uncompromised testing conditions.  According to the disclosures, however, it used compromised testing conditions and reported that data.  If that is true, the defendants must have known they were not reporting the truth—there is no middle ground between the two positions.  The most cogent inference that can be drawn, therefore, is that the defendants acted with scienter.

QuantumScape appears to argue that the plaintiffs rely only on the defendants' positions as executive which, according to it, is insufficient to impute knowledge.  Reply ISO Mot. ("Reply") [Dkt. No. 142] 12.  That is incorrect.  This is not a case in which the purported knowledge depends

only on "corporate management's general awareness of the day-to-day workings of the company's business." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008). Instead, the individual defendants personally reported facts about the company that are alleged to be completely at odds with reality.

The Supreme Court has also explained that "motive can be a relevant consideration" when analyzing scienter pleading. *Tellabs*, 551 U.S. at 325. Here, QuantumScape had spent a decade developing its product and it went public just before the class period. Compl. ¶¶ 36, 311, 316. During the period of the alleged misrepresentations, QuantumScape raised hundreds of millions of dollars—more than it had spent during it previous decade of existence. *See id.*; *see also id.* ¶ 317. It therefore plausibly had a financial incentive to represent that its batteries were farther along and less risky than they actually were. At the least, the motive helps support the inference of scienter.[4]

QuantumScape responds that the theory of scienter is implausible: "Plaintiff illogically suggests that Defendants intended to pull a fast one by manipulating the test results and their means of doing so was through a public presentation of their testing methodology so comprehensive that it exposed their very fraud." Reply 14. But understanding the alleged falsity, according to the plaintiffs, took the analysis of experts and the reports of confidential insiders. For this reason and the reasons explained above in the section on falsity, *see supra* Section I.A., I cannot conclude at this early stage that the defendants did (or intended to) reveal all of the pertinent information underlying their test results.

III.    **LOSS CAUSATION**

Under the PSLRA, a plaintiff must show "loss causation." That is, they must show a "causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citation omitted). The misrepresentation need not be the "sole" cause of the loss, but it must be a "substantial" one. *See id.* Typically, loss causation is

---

[4] The plaintiffs rely on several other allegations to support their scienter argument and QuantumScape disputes them. I find the falsity allegations (primarily) and the alleged motive (secondarily) to be sufficient on their own, so I do not address the plaintiffs' other assertions.

United States District Court
Northern District of California

shown through "corrective disclosures" that reveal the truth to the market and "cause[] the company's stock price to drop and investors to lose money." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016)

Here, the plaintiffs have adequately alleged loss causation. The Morin article in Seeking Alpha and the report from Scorpion Capital both revealed to the market what QuantumScape allegedly misrepresented: that its tests were compromised, its results misleading, and its product not at the stage of development presented. *See supra* Background, Sections I.F., I.G. Immediately after both were published, QuantumScape's stock price plummeted. *See id.* As the Ninth Circuit has explained, "[t]hat a stock price drop comes immediately after the revelation of fraud can help to rule out alternative causes." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018). So it is here. It is plausible that the Seeking Alpha article and Scorpion Capital report caused the stock price drop due to their timing; taking as true the allegations, that means that the revelation of alleged fraud was at least a substantial cause of the loss of value.

QuantumScape responds that the articles should not be credited, an argument I reject for the reasons explained above. *See supra* Section I.A.i.

## CONCLUSION

The motion to dismiss is DENIED except to the extent stated above.

**IT IS SO ORDERED.**

Dated: January 14, 2022

William H. Orrick
United States District Judge