IGNACIO E. SALCEDA, State Bar No. 164017
DALE BISH, State Bar No. 235390
REBECCA L. EPSTEIN, State Bar No. 168226
ANDREW FRANTELA, State Bar No. 325278
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:   (650) 493-9300
Facsimile:   (650) 565-5100
Email:       isalceda@wsgr.com
             dbish@wsgr.com
             bepstein@wsgr.com
             afrantela@wsgr.com

*Attorneys for Defendants QuantumScape
Corporation, Jagdeep Singh, Timothy
Holme, and Kevin Hettrich*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUANTUMSCAPE SECURITIES CLASS ACTION LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No.: 3:21-CV-00058-WHO

**OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY THE CLASS, APPOINT CLASS REPRESENTATIVES AND APPOINT CLASS COUNSEL**

Hearing Date: December 14, 2022
Time: 2:00 p.m.
Courtroom: 2
Before: Hon. William H. Orrick

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES ........................................................................................... 1

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    A.    QuantumScape's Technology and Promising Early Test Results ........................... 2

    B.    QuantumScape's Debut In the Public Markets And Volatile Early Trading .......... 3

    C.    QuantumScape Has Continued to Validate and Scale Its Early Results ................. 5

    D.    Plaintiffs' Underlying Case Theory ........................................................................ 5

    E.    Plaintiffs' Motion for Class Certification............................................................... 6

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

I.    THE PROPOSED CLASS SHOULD NOT BE CERTIFIED BECAUSE IT DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(b)(3) ............................. 8

    A.    Plaintiffs Are Not Entitled to a Presumption of Classwide Reliance ...................... 8

        1.    The Cain Report Fails to Demonstrate the Market for QuantumScape Shares Was Efficient Throughout the Class Period ........... 9

        2.    Plaintiffs Ignore the Substantial Evidence that the Market for QuantumScape Was Inefficient at Critical Stages of the Class Period ...................................................................................................... 12

            a)    Plaintiffs Ignore the Glaring Indicia of an Inefficient Market ....................................................................................... 13

            b)    QuantumScape's Stock Was Subject to a Short Squeeze ............. 15

            c)    QuantumScape's Stock Options Experienced Numerous "Put-Call Parity Violations" in Late 2020 and Early 2021 ........... 17

        3.    The Remaining *Cammer* and *Krogman* Factors Do Not Establish, Address, Or Rebut These Indicia of an Inefficient Market ....................... 18

    B.    Plaintiffs Have Failed to Articulate a Classwide Damages Methodology that Is Consistent with Their Theory of Liability................................................... 19

II.    THE PROPOSED CLASS SHOULD NOT BE CERTIFIED BECAUSE IT DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(a) ................................. 22

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberghetti v. Corbis Corp.*,
263 F.R.D. 571 (C.D. Cal. 2010), *aff'd*,
476 F. App'x 154 (9th Cir. 2021).................................................................................22

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988) ................................................................................... 6, 8, 17

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999).....................................................................................9

*Bodner v. Oreck Direct, LLC*,
2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) .........................................................25

*In re Bofl Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020), *cert. denied*,
142 S. Ct. 71 (2021) ..................................................................................................21

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 2937483 (N.D. Cal. May 20, 2016) .........................................................20

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 4585753 (N.D. Cal. Sept. 2, 2016)...........................................................21

*In re BP P.L.C. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ...........................................................19

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ........................................................................*passim*

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2022 WL 1459567 (N.D. Cal. May 9, 2022), *appeal docketed*,
No. 22-80048 (9th Cir. May 23, 2022) ............................................................... 13, 22

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...............................................................................................*passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ..............................................................................17

*Di Donato v. Insys Therapeutics, Inc.*,
333 F.R.D. 427 (D. Ariz. 2019) ................................................................................11

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (9th Cir. 2005)......................................................................................20

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014)...............................................................................21

*Goldman Sachs Grp., Inc. v Arkansas Teacher Ret. Sys.*,
141 S. Ct. 1951 (2021) ............................................................................................ 8, 9

*Griffin v. GK Intelligent Sys., Inc.*,
    196 F.R.D. 298 (S.D. Tex. 2000) ..................................................................................... 8, 11

*Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*),
    573 U.S. 258 (2014) ..................................................................................................... 7, 8

*Hughes v. Ester C Co.*,
    317 F.R.D. 333 (E.D.N.Y. 2016) ......................................................................................... 22

*In re Intrexon Corp. Sec. Litig.*,
    2017 WL 732952 (N.D. Cal. Feb. 24, 2017)...................................................................... 20

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133 (N.D. Tex. 2014) .............................................................................. 23, 24

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................... 8, 9, 18

*Lortiz v. Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015) .................................................................. 19

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012)................................................................................................ 7

*Meyer v. Paradigm Med. Indus.*,
    225 F.R.D. 678 (D. Utah 2004).......................................................................................... 25

*Miller v. Thane Int'l, Inc.*,
    615 F.3d 1095 (9th Cir. 2010).............................................................................................. 9

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022)............................................................................................... 20

*In re Network Associates, Inc. Sec. Litig.*,
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) .............................................................................. 23

*O'Neil v. Appel*,
    165 F.R.D. 479 (W.D. Mich. 1995) .................................................................................. 18

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018), *appeal docketed*,
    No. 20-4082 (6th Cir. Oct. 13, 2020) .................................................................................. 8

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    993 F.3d 774 (9th Cir. 2021), *aff'd*,
    31 F.4th 651 (9th Cir. 2022), *petition for cert. filed*,
    No. 22-131 (U.S. Aug. 10, 2022) ........................................................................................ 7

*In re PolyMedica Corp. Sec. Litig.*,
    453 F. Supp. 2d 260 (D. Mass. 2006) ................................................................ 11, 12, 15, 17

*Pryor v. Aerotek Scientific, LLC*,
    278 F.R.D. 516 (C.D. Cal. 2011) ....................................................................................... 22

*Ravens v. Iftikar*,
    174 F.R.D. 651 (N.D. Cal. 1997) ...................................................................................... 23

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2021).............................................................................. 7, 25

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005)..................................................................................... 9

*Vaquero v. Ashley Furniture Indus., Inc.*,
    824 F.3d 1150 (9th Cir. 2016).................................................................................. 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................................ 7

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001).................................................................................. 7

**Statutes**

PSLRA ............................................................................................................. 23, 24, 25

**Rules**

Fed. R. Civ. P. 23 ........................................................................................*passim*

**Legislative Materials**

H.R. Rep. No. 104-369 (1995) ............................................................................... 23

S. Rep. No. 104-98 (1995) ..................................................................................... 23

**Other Authorities**

Al Root, *EV Stock QuantumScape Rockets Another 26%. It Doesn't Seem to Make Sense*,
    Barron's Online, Dec. 22, 2020.............................................................................. 14

Al Root, *Sell This EV Battery Startup's Stock Because 'Significant Barriers' Remain*,
    Barron's Online, Nov. 30, 2020 .............................................................................. 14

Eugene Fama, *Efficient Capital Markets: II*,
    46 J. Fin. 1575 (1991) ........................................................................................ 9, 12

*EV Stock QuantumScape Rocketed Almost 30%. It Doesn't Seem to Make Sense*,
    Wall Street Reporter, Dec. 22, 2020 ....................................................................... 14

Hans R. Stoll, *The Relationship Between Put and Call Option Prices*,
    24 J. Fin. 801 (1969) .............................................................................................. 17

Pedro A. C. Saffi & Kari Sigurdsson, *Price Efficiency and Short Selling*,
    24 Rev. Fin. Studies 821 (2011)............................................................................. 16

Scott Squires, *Going Long on Shorts*,
    68 U. Miami L. Rev. 821 (2014)............................................................................ 15

Victoria Chiu & Moin A. Yahya, *The Meme Stock Paradox*,
    3 Corp. & Bus. L.J. 51 (2022)................................................................................ 14

**STATEMENT OF THE ISSUES**

1.    Have Plaintiffs failed to show that QuantumScape common stock and options traded in efficient markets throughout the proposed class period, thereby failing to meet their burden to invoke the fraud on the market presumption of reliance?

2.    Have Plaintiffs failed to articulate a class-wide damages methodology consistent with their theory of liability?

3.    Are Plaintiffs inadequate class representatives under Rule 23(a)?

**INTRODUCTION**

In the weeks following QuantumScape Corporation's debut as a public company, its stock price was among the most volatile and erratic in the public markets, increasing more than 400% in a single month, including a 135% increase in eight days with no company announcements or significant news coverage and while the only analyst covering the company maintained an underperform/sell rating on the company. The Wall Street Journal noted "the stock's meteoric ascent has been hard to explain." Plaintiffs' own expert struggles to explain it either.

At the certification stage, Plaintiffs bear the burden of proving they meet all four prerequisites of Rule 23(a) and, for a damages claim, that common issues predominate under Rule 23(b). Because individual questions of reliance would generally predominate in a securities case, Plaintiffs must instead demonstrate the fraud-on-the-market presumption applies. To do so, Plaintiffs must establish that QuantumScape's stock and options traded in efficient markets throughout the entire class period. As discussed below, Plaintiffs have failed to do so.

Rather than grapple with the glaring indicia of an inefficient market during the critical period in this case, Plaintiffs' expert (Dr. Matthew Cain) conducted an "event study" that focuses on the year *after* the proposed Class Period. Moreover, Dr. Cain used arbitrary definitions of "News Days" without determining whether the information reported was actually new or value-relevant. Even then, this study concludes only that QuantumScape's stock was more volatile on "News Days" than it was on "Least News Days" and certainly does not meet the rigorous criteria necessary to demonstrate an efficient market.

Dr. Cain likewise offers misleading testimony on the other "factors" he considered. For

example, Dr. Cain says there was "significant analyst coverage" when, in fact, there was only *one* analyst covering QuantumScape during the critical period for this case and minimal coverage throughout the Class Period. And Dr. Cain incorrectly assumes that *if* QuantumScape's stock was efficient, then any alleged misrepresentations or omissions were included in the options pricing as well. That is wrong. Indeed, Dr. Cain ignores evidence that the price of the stock and the price of call and put options were in violation of the put-call parity relationship, which undermines finding market efficiency altogether. Dr. Cain is, however, correct that the company was not eligible for S-3 filings, which cuts against market efficiency. Thus, Dr. Cain's opinions and analysis are insufficient to demonstrate there was an efficient market for QuantumScape stock throughout the entire Class Period and Plaintiffs have not otherwise met their burden to do so.

In addition, the Motion should be denied for other reasons. For example, neither Plaintiffs nor their expert can identify any statement that is allegedly false or misleading, let alone a "corrective disclosure" that actually corrects one of the company's prior statements. Without a legally-sufficient corrective disclosure, Plaintiffs' proposed damages model falls by the wayside and the class cannot be certified under *Comcast v. Behrend*.

Finally, none of the named plaintiffs are adequate class representatives. Rather than remaining informed and engaged, to ensure Class Counsel is pursuing a proper claim in good faith, each of the individual plaintiffs testified that they do not understand the claims or defenses in this case. For example, although they are challenging the company's December 2020 test results as false and misleading, none of the plaintiffs were aware that those results have been twice verified by third-parties, including an independent laboratory, or that there is an independent (and benign) explanation for the stock's decline in early 2021. Rather, the named plaintiffs are simply deferring to counsel to direct the litigation, and are thus are inadequate class representatives under Rule 23.

The Motion should be denied.

## BACKGROUND

### A.    QuantumScape's Technology and Promising Early Test Results

Since it was formed in 2010, QuantumScape has focused exclusively on developing solid state batteries and designing a scalable manufacturing process to commercialize its battery

technology for the automotive industry. Ex. A at 1.[1] QuantumScape funded its early research and development work by raising hundreds of millions in private investment dollars from Silicon Valley's preeminent investors as well as from its largest shareholder, Volkswagen. Ex. B at 2.

In late 2020, QuantumScape publicly unveiled its battery design along with test results from its "single-layer" cell prototypes. Ex. B at 2. At the core of its technology is a solid-state electrolyte and ceramic separator which allows lithium ions to pass back and forth while also suppressing the formation of dendrites. Ex. C at 2-4. It took the company five years to find the right material to use for the separator and an additional five years to develop the right composition and manufacturing process. *Id*. at 4; Ex. B at 4-5.

With respect to the test results on the single-layer prototype, the company highlighted its rate of charge (80% in 15 minutes), density (1,000 watt hours per liter) and battery life (80% capacity retention over 800 charging cycles). Ex. D at 10-11, 16, 19. Consistent with QuantumScape's own explanations and disclosures (*see, e.g.*, *id.* at 1), industry experts and media reports were quick to point out the limitations of these early tests—and the significant challenges associated with large-scale manufacturing ahead. Ex. B at 5-6; Ex. C at 4-6.

**B.    QuantumScape's Debut In the Public Markets And Volatile Early Trading**

On November 25, 2020, QuantumScape completed a previously-announced business combination with Kensington Capital Acquisition Corp. ("Kensington"), a special purpose acquisition company (or "SPAC"). Ex. A at 1. On November 27, 2020, the next trading day after the de-SPAC transaction, the market for trading in QuantumScape's stock opened at $24.80 per share. The combination raised $680 million in net proceeds, including $500 million from fully committed PIPE funds. *Id.*

The $500 million of PIPE funds are especially important for purposes of this case. These "Private Investment in Public Equity" funds were committed by private investors who purchased their shares for $10 per share. These shares would only be able to trade after the company's S-1 Registration Statement was declared effective by the SEC, which occurred on December 31, 2020.

---

[1] "Ex." refers to exhibits to the contemporaneously filed Declaration of Andrew Frantela.

In the five weeks between the closing of the de-SPAC transaction and the Registration Statement's effectiveness date, trading in QuantumScape was volatile, explosive, and difficult to explain, even to seasoned analysts. For example, on November 30, 2020, the *only* analyst covering the company's stock (Mark Newman at Bernstein) issued an "underperform" rating with a target price of $28 per share (the last closing price was $37), citing "the significant hurdles to commercialization ahead." Ex. E at 1-2. Notwithstanding a negative rating from its sole coverage analyst—which is highly unusual—the stock price nevertheless *increased* 27% to close at $47.

Between December 14, 2020 and December 22, 2020—despite no new information or announcements by or about the company—the price for QuantumScape stock increased from $56.10 to $131.67, representing a 135% increase in just eight days and a 460% increase since trading began on November 27. The *Wall Street Journal* noted that this "meteoric ascent has been hard to explain." Ex. F at 1. Plaintiffs' own expert, Dr. Cain, likewise has no explanation for this dramatic run-up. Ex. G ("Cain Dep.") at 172:8-173:1. He is not aware of any significant news, company announcement, or product development that would explain the increase, but speculates that investors may have "revis[ed] their valuations [or] expectations" for the company, changed their views on the potential scope of the product market and size of potential customer base, or that maybe "the availability of raw materials, minerals, chemicals, things that might be in limited supply revising their expectations about the availability of inputs to the production process" were the issue. *Id.* at 174:18-175:8.

On December 31, 2020, the SEC declared effective the Registration Statement at the close of regular trading, thus opening the door for PIPE investors to sell their shares on the next trading day, i.e., January 4, 2021. The anticipation and sudden availability of 50 million shares, which could be sold at six times the cost of the PIPE shares, put tremendous downward pressure on the company's stock. By the end of trading on January 4, QuantumScape's share price was back down to $49.96. Over the next few months, the stock price remained volatile—often reacting to no news—but gradually began to stabilize and more analysts began issuing coverage reports.

Although Plaintiffs' expert is unable to explain the behavior of QuantumScape's share price in December 2020, Defendants' expert, Dr. Terrence Hendershott, has done the analysis and

notes a combination of factors resulted in substantial constraints to short-selling, including astronomically high borrowing rates and low supply of shares to cover. Declaration of Terrence Hendershott, Ex. A ("Hendershott Rep.") ¶ 50. It is well-documented (including in articles co-authored by Dr. Cain) that constraints on short-selling and opportunities for arbitrage distort trading markets and render them inefficient. *See* Ex. H ("GameStop Report") ¶ 72.

### C.    QuantumScape Has Continued to Validate and Scale Its Early Results

Since its public-market debut (and erratic beginning to trading), QuantumScape has continued to validate its early test results and has begun scaling its manufacturing process. Ex. I at 3; Ex. J at 1. In March 2021, the company announced that Volkswagen had successfully tested QuantumScape's cells in Volkswagen's own labs in Germany and had therefore invested an additional $100 million into the company. Ex. K at 1. Then, in October 2021, the company announced that an independent third party, Mobile Power Solutions, performed its own tests on QuantumScape's single-layer cells and its findings were consistent with QuantumScape's December 2020 test results. Ex. L at 1.

In parallel, QuantumScape successfully assembled and tested *multi-layer* cells. In February 2021, the company released the results from tests on 4-layer cells (Ex. M at 2-4); in November 2021, 10-layer cells (Ex. J at 1); and by August 2022, the company released results on a 24-layer cell. Ex. N at 2-3. These announcements stand in stark contrast to the predictions made by naysayers (including the alleged "corrective disclosures" at the heart of Plaintiffs' case) who did not believe the company would be able to replicate its single-layer results on multi-layer cells. Ex. O at 3 (suggesting QuantumScape cannot assemble multi-layer cells); Ex. P. The naysayers were wrong. Moreover, in November 2021, QuantumScape began construction on a pre-pilot facility in San Jose that will enable scaling its manufacturing process in early 2023. Ex. Q.

### D.    Plaintiffs' Underlying Case Theory

The claims in this case were filed immediately following the decline in QuantumScape stock in early January 2021. Since then, Plaintiffs have twice amended the complaint, but none of them have ever acknowledged the well-documented reason for the stock decline (the sudden availability of the PIPE shares) or that the challenged test results have been subsequently validated

by third parties. Rather, Plaintiffs continue to press a securities fraud claim against Defendants on the theory that the company's test results, which were announced in December 2020, somehow misled investors until a blog post on Seeking Alpha and a short seller report revealed the truth. Despite litigating this case for 18 months, it is unclear whether Plaintiffs are suggesting that the December 2020 test results were phony (they were not), whether the testing parameters were not disclosed (they were), or whether the company failed to identify the future risks associated with commercializing the technology (it did). When asked to provide the basis for their allegations in response to interrogatories, Plaintiffs refused to do so on the grounds that it would be "premature" to identify the basis for their allegations. Exs. R, S, T (responses to Interrogatory No. 5).

In their depositions, not one of the putative class representatives could identify any statement that is supposedly false or misleading. Ex. U ("Fish Dep.") at 39:7-15; Ex. V ("Cranny Dep.") at 51:1-7; Ex. W ("Stark Dep.") 34:6-15, 98:5-14. None of them—or their expert—could explain what information was supposedly "new" or "corrective" in the Seeking Alpha blog post or the short-seller report. Fish Dep. 32:25-33:12, 68:12-23; Cranny Dep. 130:14-20, 140:10-25; Stark Dep. 76:20-77:24, 152:19-153:4; Cain Dep. 79:22-80:2, 82:5-11. None of the Plaintiffs were aware that the challenged test results had been subsequently verified by Volkswagen *and* an independent third-party. Fish Dep. 141:14-17, 152:10-22; Stark Dep. 128:18-22, 137:8-15; Cranny Dep. 117:12-20, 145:8-25, 182:10-17. None of them had been told that the stock drop in early 2021 is likely explained by the sudden availability of millions of shares held by PIPE investors. Fish Dep. 129:16-130:1; Stark Dep. 147:6-20. Instead, each of the putative class representatives explained they were deferring to counsel to pursue the claims and understand the facts, rather than question or understand the validity of the merits. Fish Dep. 131:20-132:7; Stark Dep. 147:22-148:18.

E.      **Plaintiffs' Motion for Class Certification**

Plaintiffs are moving for certification of a class of persons or entities that purchased or otherwise acquired QuantumScape securities between November 27, 2020 and April 14, 2021. In doing so, Plaintiffs are relying on a "presumption of classwide reliance" that depends on the Court finding the shares for QuantumScape were trading in an "efficient market" throughout the entire class period. Mot. at 14 (citing *Basic Inc.* v. *Levinson*, 485 U.S. 224, 241-42 (1988)).

# LEGAL STANDARD

A party seeking to certify a class bears the burden of proof in demonstrating that it has satisfied all four prerequisites of Rule 23(a) and that their action falls within one of the three types of actions permitted under Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). A proposed class must satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements. *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 349 (2011).

Plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 275 (2014); *see also Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021) ("The party seeking class certification has the burden of affirmatively demonstrating that the class meets the requirements of Rule 23." (citation omitted)). Because they seek to certify a proposed class under Rule 23(b)(3), Plaintiffs must also satisfy with evidence that common questions of law or fact common predominate over any such questions affecting only individual members.

It is often necessary for courts "to probe behind the pleadings before coming to rest on the certification question" because "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). This "rigorous analysis" will frequently entail "overlap with the merits of the plaintiff's underlying claim" because the "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id*. at 27-28 (citation omitted); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Courts "must find by a preponderance of the evidence that the plaintiff has established predominance under Rule 23(b)(3)." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 784 (9th Cir. 2021), *aff'd*, 31 F.4th 651 (9th Cir. 2022), *petition for cert. filed*, No. 22-131 (U.S. Aug. 10, 2022).

## ARGUMENT

**I.    THE PROPOSED CLASS SHOULD NOT BE CERTIFIED BECAUSE IT DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(b)(3)**

### A.    Plaintiffs Are Not Entitled to a Presumption of Classwide Reliance

"Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." *Halliburton II*, 573 U.S. at 263. Plaintiffs argue they can avoid having to establish reliance on an individual basis by invoking the fraud-on-the-market theory under *Basic*, 485 U.S. at 248-50. This theory is based "on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Id.* at 241-42 (citation omitted). But Plaintiffs have failed to demonstrate they are entitled to this presumption because they have not shown the market for QuantumScape's stock was efficient throughout the proposed class period. *See, e.g.*, *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000) (denying class certification in part because the market was inefficient during the initial part of the proposed class period); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at \*4 (N.D. Ohio Aug. 14, 2018) (denying class certification and finding that the plaintiff's expert's method failed to demonstrate market efficiency due to insufficient dates used within the class period), *appeal docketed*, No. 20-4082 (6th Cir. Oct. 13, 2020). Without the presumption, each plaintiff bears the burden of directly proving that they relied on the misrepresentation or omission, which will generally "defeat predominance and 'preclude certification' of a securities-fraud class action." *Goldman Sachs Grp., Inc. v Arkansas Teacher Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021) (citation omitted).

Attempting to establish market efficiency, Plaintiffs argue that this case meets all of the so-called "*Cammer* Factors" as well as the additional "*Krogman* Factors." *See* Mot. at 16-20 (citing *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989);[2] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D.

---

[2] The five *Cammer* factors examine whether: (1) the security's weekly trading volume is high; (2) analysts regularly follow and report on the stock; (3) there are market makers or arbitrageurs for the stock; (4) the company is eligible to file a Form S-3 with the SEC; and (5) empirical facts show

Tex. 2001)). Although the Ninth Circuit has never adopted either *Cammer* or *Krogman* as an applicable test for market efficiency, it has noted there is a "high bar" and a "rigorous standard" that courts must carefully analyze given the potential impact to the litigation of certifying a class. *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 320, 322 (5th Cir. 2005) ("Because this inquiry can prove decisive for class certification, and because, given the realities of litigation costs, certification can compel settlements without trial, courts have frequently applied rigorous, though preliminary, standards of proof to the market efficiency determination."); *Binder v. Gillespie*, 184 F.3d 1059, 1064-65 (9th Cir. 1999) (affirming the district court's decertification of a class after finding an inefficient market and noting "an absence of Ninth Circuit case law defining an efficient market." (citation omitted)).

As the proponents of class certification, Plaintiffs bear the burden of establishing market efficiency. *Goldman Sachs*, 141 S. Ct. at 1959. Plaintiffs have attempted to meet that burden through an expert report submitted by Dr. Cain. Mot. at 15-16. As discussed below, Dr. Cain's report is based on a flawed methodology that results in unreliable conclusions and purposefully ignores the glaring indicia of market inefficiency to reach a predetermined conclusion.

1.      **The Cain Report Fails to Demonstrate the Market for QuantumScape Shares Was Efficient Throughout the Class Period**

At its core, Dr. Cain's report relies on an "event study" to draw a causal relationship between new information and price impact on QuantumScape stock. *See* Cain Rep. ¶¶ 10, 46-62, Exs. 4-7. Fundamentally, the purpose of event studies is to determine whether, on average, "stock prices seem to adjust within a day to event announcements." Eugene Fama, *Efficient Capital Markets: II*, 46 J. Fin. 1575, 1601, 1607 (1991). Dr. Cain explains this "cause and effect" analysis, embodied in the fifth *Cammer* factor, is considered "the most important" and "represents a significant indication of market efficiency." Cain Dep. 125:21-126:8; Cain Rep. ¶ 46.

a cause and effect relationship between unexpected corporate news and immediate responses in the stock price. *Cammer*, 711 F. Supp. at 1286-87.

Although it is the critical piece of his analysis, Dr. Cain has not actually tested whether QuantumScape's stock quickly and fully responded to new information. Rather, Dr. Cain used an inapposite methodology that is fundamentally flawed and unreliable on several grounds. *First*, Dr. Cain primarily studied dates that are outside of the Class Period and are therefore irrelevant to Plaintiffs' claims. The proposed Class Period is November 27, 2020 through April 14, 2021. Thus, the critical question for the Court is whether the market for QuantumScape stock was efficient and quickly impounding all new public information into the stock price throughout these specific four and half months. But Dr. Cain primarily tested dates *after* the Class Period, including dates as late as April 2022.[3] Indeed, only one of the so-called "Least News Days" fell within the Class Period, and even that date fell on the very last day, i.e., April 14, 2021. *See* Hendershott Rep. ¶ 38. Dr. Cain was unaware of this key fact until his deposition. When asked if he was "surprised" that this was the case, Dr. Cain said "I don't know" but agreed at least a "handful" of these days would have fallen within the Class Period. *See* Cain Dep. 140:21-141:4, 159:22-160:5. Conversely, only four of the twelve "News Days" and "Product Development Days" fell within the Class Period. *See* Hendershott Rep. ¶ 38. By testing dates outside of the Class Period, Dr. Cain's study provides no help to the Court in conducting "rigorous analysis" to determine if the stock was efficient *during the Class Period*.

While Plaintiffs might respond that this is a harmless error because Dr. Cain was testing a period of several years, inclusive of the Class Period, Dr. Cain acknowledges that a stock could be efficient at some times and inefficient at others. Cain Dep. 180:20-23 ("Q. Is it possible for the -- a market for a company's stock to be efficient at some point in time, and inefficient at other points in time? A. Yes."). This is a fatal mistake because there is substantial evidence demonstrating the market for QuantumScape's stock *was inefficient* during critical portions of the Class Period, including during the stock price increase in December 2020 and subsequent decline in January 2021 that is the heart of Plaintiffs' case. SAC ¶¶ 2, 9-10, 99-108, 148, 338-341.

---

[3] Dr. Cain's analysis in Exhibit 10 of his report is similarly misleading because he uses June 30, 2021 as the final date in his determination of "public float," more than two months after the Class Period ended. The first date he includes is December 31, 2020, but does not account for the earlier month when the PIPE shares were restricted. At best, this is a misleading calculation.

If the market was inefficient between November 27, 2020 and January 4, 2021, then Plaintiffs cannot rely on a fraud-on-the-market presumption for the vast majority of the challenged statements or the January 2021 decline and class certification would be inappropriate. *Griffin*, 196 F.R.D. at 304. Because Dr. Cain's analysis does not reliably establish market efficiency throughout the proposed Class Period, Plaintiffs have not met their burden for class certification.

*Second*, Dr. Cain's methodology is flawed because he did not purport to measure all of the relevant dates during the Class Period. In *PolyMedica*, the court explained that "[t]o approach usefulness, an analysis should statistically compare all news days with all non-news days." *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006). Likewise, in the unpublished *Di Donato* case repeatedly cited by Plaintiffs, the court declined to find "statistical significance" or "persuasive meaningful significance" where plaintiffs' expert attempted to supplement four news days from the Class Period with 11 additional news days from outside the Class Period. *See Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 440-41 (D. Ariz. 2019).

*Third*, Dr. Cain's event study is unreliable because his methodology for selecting "Product Development Dates" and "News Days" lacked any meaningful rigor. For example, Dr. Cain used November 27, 2020 as a "Product Development Date" when the only "news" from that date was the completion of the previously-announced transaction with Kensington. *See* Hendershott Rep. ¶ 39. Completing a previously-announced transaction is hardly the kind of "non-financial updates about progress towards development of key products" that Dr. Cain says "represents the most value-relevant source of company-specific information for investors." Cain Rep. ¶ 48. Excluding that date alone flips Dr. Cain's analysis on its head. Hendershott Rep. ¶ 40, Exs. 4A, 4B. At minimum, Dr. Cain should have developed qualitatively defensible criteria to determine whether the market was receiving value-relevant information on the event dates he was studying.

*Finally*, the entire premise of Dr. Cain's study is of dubious relevance. Comparing news days to least-news days is, at best, a threshold test, because it does not actually determine whether the market for a security is efficient. Hendershott Rep. ¶ 37. Instead, this rudimentary analysis asks only if a security is more *volatile* on news days, not if the stock price rapidly and fully reflects new

information. *Id.* It is well-established that such tests "give no help on the central issue of whether the variation in expected returns is rational." Fama, 46 J. Fin. at 1586.

This shortcoming is not merely academic. To satisfy the *Cammer* analysis, a valid study must demonstrate that the stock reacted positively to positive news and negatively to negative news. *See* Hendershott Rep. ¶ 43. Thus, a proper event study must address "the myriad variables other than news that might explain the movements in [the company's] stock . . . . It is not sufficient simply to report movement on significant news days." *PolyMedica*, 453 F. Supp. 2d at 270.

Dr. Cain's event study does not purport to measure whether QuantumScape stock moved in the expected direction, let alone within the expected magnitude in response to new information. *See* Cain Dep. 134:9-137:10; Hendershott Rep. ¶¶ 43-44. In fact, Dr. Cain's rudimentary analysis can actually conflate data that indicates market inefficiency with data that shows market efficiency. *See id.* ¶ 43 (explaining that "[e]ither an outsized statistically significant stock price reaction in the direction of news or a statistically significant stock price reaction in the direction *opposite* of news (e.g., a large price increase following negative, value-relevant information) would contradict a finding of market efficiency, but would be flagged as evidence of market efficiency" in Dr. Cain's analysis).

For all of the reasons above, Dr. Cain's analysis is nothing more than a results-oriented methodology that does nothing to establish market efficiency with anything resembling scientific certainty. It should be disregarded in its entirety.

### 2. Plaintiffs Ignore the Substantial Evidence that the Market for QuantumScape Was Inefficient at Critical Stages of the Class Period

In addition to failing to establish an efficient market through a proper event study, Plaintiffs have failed to acknowledge, let alone address, the substantial evidence suggesting that the market for QuantumScape was *inefficient* for significant and substantively critical portions of the Class Period. Had they done so, Plaintiffs would have had to address several glaring issues, including an obvious "short squeeze" and repeated violations of "put-call parity" each of which are counter-indicative of efficient markets.

### a)        Plaintiffs Ignore the Glaring Indicia of an Inefficient Market

A cursory review of the market for QuantumScape stock reveals several glaring indicia of *inefficiency* in late 2020 and early 2021. *First*, there was virtually no analyst coverage for QuantumScape securities during the critical November 27, 2020 to January 2021 period and only minimal coverage during the remainder of the alleged Class Period. On November 30, 2020, Bernstein initiated coverage with a rare "underperform" or "sell" rating and a target price of $28, 30% *below* the last closing price. *See* Ex. E at 1; Ex. X at 1. Bernstein was the *only* analyst covering QuantumScape during the critical part of the Class Period (when almost all the challenged statements were made), and Plaintiffs offer no evidence of analyst commentary supporting their speculation that the January 2021 Seeking Alpha blog post—that is at the heart of their case—was important to QuantumScape investors. In February 2021, Bernstein dropped coverage altogether, and Goldman Sachs initiated coverage of QuantumScape with a "neutral" rating, Morgan Stanley with an "overweight" rating. Finally, in March 2021, Baird and Cowen initiated coverage with a "neutral" and "outperform" rating respectively, bringing the total number of analysts to four in the final month of the Class Period. In contrast to this anemic coverage, the *Oracle* decision cited repeatedly by Plaintiffs found an efficient market where there were 31 analysts covering Oracle throughout the class period. *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *6 (N.D. Cal. May 9, 2022), *appeal docketed*, No. 22-80048 (9th Cir. May 23, 2022).

With some hubris, Dr. Cain characterizes the virtually non-existent analyst coverage of QuantumScape as "substantial" throughout the Class Period. Cain Rep. ¶ 34. To generate analysts where none exist, Cain lists "GlobalData" as an analyst. *Id.* Ex. 3. But in his deposition, Cain admits that he is "not particularly familiar" with GlobalData and acknowledges they do not provide the kinds of analysis, forecasts, or recommendations that would meet his definition of an analyst. *See* Cain Dep. 165:9-167:17; Cain Rep. ¶ 32. Similarly, Dr. Cain includes analysts who cover Volkswagen, such as Deutsche Bank, to claim they were also covering QuantumScape. *See id.* That is nonsense. *See* Hendershott Rep. ¶ 65.

*Second*, Plaintiffs do not acknowledge, let alone attempt to explain, the reasons behind the 460% increase in QuantumScape stock between November 27 and December 22, including the

134.7% increase between December 14 and December 22 when there was no new "value-relevant" information about the company. Hendershott Rep. ¶¶ 35, 53. The Wall Street Journal and other outlets were at a loss to explain this increase (Ex. F at 1-2; *EV Stock QuantumScape Rocketed Almost 30%. It Doesn't Seem to Make Sense*, Wall Street Reporter, Dec. 22, 2020; Al Root, *EV Stock QuantumScape Rockets Another 26%. It Doesn't Seem to Make Sense*, Barron's Online, Dec. 22, 2020) and Dr. Cain does not have an explanation either. *See* Cain Dep. 174:8-14 ("Q. Can you think of any other economic reason to explain the 135 percent increase during this time period? . . . [A.] Well, like I -- I said, I have not done an analysis; so I cannot really give an explanation of an analysis that I have not done."). Indeed, the frenzied increase of QuantumScape is reminiscent of a different stock that exhibited similar patterns during the same time period: GameStop.[4] Dr. Cain was part of an Academic Committee that explained how short-selling constraints can lead to an inefficient market and concluded GameStop securities were subject to a short squeeze because, in part, in January 2021, GameStop's stock traded up 131% over a two-week period despite the company releasing no major news. *See* GameStop Rep. ¶¶ 25, 72, 145. Rather than distinguish that analysis, Dr. Cain instead downplayed his role in drafting it. Cain Dep. 185:19-187:13.

*Third*, QuantumScape's stock price increased in response to negative information and decreased in response to positive information. For example, when Bernstein issued an "Underperform" rating, with a target price of $28 (a *negative* event), the stock price *increased* 27%. *See* Hendershott Rep. ¶ 44; Al Root, *Sell This EV Battery Startup's Stock Because 'Significant Barriers' Remain*, Barron's Online, Nov. 30, 2020 ("QuantumScape got its first Wall Street rating on Monday—a sell from Bernstein analyst Mark Newman. That is usually bad news for a stock, but the shares were climbing in early trading. . . . It was a surprising jump."). Conversely, on December 1, 2020, with no news, the stock decreased 24.6%. Again, Dr. Cain has no explanation for this counter-economic behavior and his model does not purport to assess

---

[4] GameStop's stock garnered significant publicity, notoriety, and regulatory attention as the world's first "meme stock," where online communities (such as Reddit, Twitter, and Facebook), hype up and purchase stock that is heavily-shorted and otherwise in decline to cause short sellers to cover their shares and lose money from the rising stock prices, which had nothing to do with the fundamentals of the underlying business or any new information. Victoria Chiu & Moin A. Yahya, *The Meme Stock Paradox*, 3 Corp. & Bus. L.J. 51, 61 (2022); Ex. Y § 1.

whether the market was quickly and fully impounding the value-relevant news. Cain Dep. 134:9-14, 135:16-19, 136:24-137:1-10; *see generally* Hendershott Rep. ¶¶ 43-44.

As discussed above, QuantumScape's stock price was not only erratic, but it repeatedly displayed the hallmarks of market *inefficiency* between November 27, 2020 and early January 2021. Plaintiffs ignore these indicia, and the root causes for them, altogether.

### b)    QuantumScape's Stock Was Subject to a Short Squeeze

One of the underlying factors giving rise to the erratic and inefficient market for QuantumScape's stock in late 2020 and early 2021 was the constraint on short selling. It is well-established that short sellers play a "significant role" in creating market efficiencies. *PolyMedica*, 453 F. Supp. 2d at 273. Short sellers often search out companies that are mispriced by "buying securities that are priced too low or selling securities that are priced too high given available public information." Hendershott Rep. ¶ 20. In some circumstances, there are constraints to short selling and, in those cases, stock prices "tend to underreact to negative information and overreact to positive information." *Id.* ¶ 48 (citing sources). In extreme cases, the "constraints" can turn into a full-fledged "short squeeze," which results in substantial market inefficiencies. *Id.* ¶ 51.

A short-squeeze can develop where, like here, a stock quickly moves higher and short sellers want to cover their short positions or are forced to do so, via margin calls. Scott Squires, *Going Long on Shorts*, 68 U. Miami L. Rev. 821, 827 (2014); *see also* GameStop Rep. ¶ 88 (explaining that GameStop short sellers were forced in a short squeeze to close their positions at "major, sometimes crippling, losses"). As these short sellers begin buying the stock (to cover themselves), the stock price rises even more, forcing even more short sellers to cover their positions. In other words, a short squeeze is a self-fueling cycle of stock price increases that is divorced from the fundamentals of the underlying company. Squires, 68 U. Miami L. Rev. at 828.

There are several conditions that fuel a short squeeze, including a rising stock price coupled with a limited supply of stock to cover the short sellers' positions, and high costs of borrowing. Hendershott Rep. ¶ 51. Each of those factors was present here.

*Low Supply of Shares to Cover*. When QuantumScape debuted following the de-SPAC transaction in late 2020, the vast majority of shares were subject to lockups or other trading

restrictions, and the 50 million shares held by PIPE investors were not tradable until after SEC effectiveness on December 31, 2020. Hendershott Rep. ¶ 52. When there is a limited number of available shares, short sellers are forced to pay more than they otherwise would to cover their positions, sometimes in response to a margin call by the lender. As Dr. Hendershott explains:

> An investor who buys a stock for $1,000 can lose at most $1,000. When an investor sells the same amount of stock short, the investor's potential losses are unlimited because the stock price can increase hundreds or thousands of percent. The short seller may also be required to close the position and repurchase the stock after a large stock price increase even when the short seller believes there are objective signs that the stock price will fall in the future. These costs and risks may make short sellers hesitant to open new short positions and may prevent the stock prices from reacting quickly and fully to news.

*Id.* ¶ 46. As a result, it is well-documented in the literature, including the report co-authored by Dr. Cain, that a limited lending supply is "associated with lower price efficiency." *See, e.g.*, GameStop Rep. ¶ 72 (citing Pedro A. C. Saffi & Kari Sigurdsson, *Price Efficiency and Short Selling*, 24 Rev. Fin. Studies 821, 822 (2011)).

*High Costs of Borrowing*. A "normal" rate of "borrowing fees" for short selling is around 0.30% per year. For example, in the Academic Committee's submission to the SEC, in which Dr. Cain participated, the authors explained that the median borrow rate for "a large subsection of NYSE-listed shares" is 0.38% and that a borrow rate of 6% would be "extraordinarily high." GameStop Rep. ¶ 62 n.134.

Here, the rate for borrowing QuantumScape shares debuted at an already-high 7.6% on November 25, 2020 before sky-rocketing to 109% on December 9, 2020 and peaking at 422.1% on December 21, 2020. Hendershott Rep. ¶ 54. In other words, by December 9, short sellers were paying more than $350,000 *per day* in stock borrowing fees. Ex. Z (S3 Partners, *Get Ready for a QuantumScape Short Squeeze* (Dec. 9, 2020)). As industry commentators explained at the time, the "primary reason for this anomaly"—the increase in borrowing fees—"is that the large majority of [QuantumScape] long shareholders are insiders. With so little stock in the hands of traditional stock lenders such as mutual funds, [exchange-traded funds], and hedge funds the overall [QuantumScape] stock lending pool is comparatively small and therefore a spike in short selling demand can have an outsized effect on stock borrow rates." *Id.* As additional shares entered the

market in early January, the borrowing rate began to decrease rapidly. Hendershott Rep. ¶ 54, Ex. 6B. By January 11, the borrow rate had fallen to 5.3% per year—still high by industry standards but within a more typical range for publicly-traded securities. GameStop Rep. ¶ 62 n.134.

The constraints on short-selling QuantumScape in late 2020 and into 2021 were not only obvious, they were extreme. Although Dr. Cain has acknowledged that such constraints are indicative of an inefficient market, he ignored them here to reach his conclusions based (as discussed above) on an inapposite event study and selective analysis of other factors.

### c) QuantumScape's Stock Options Experienced Numerous "Put-Call Parity Violations" in Late 2020 and Early 2021

The markets for QuantumScape stock options likewise displayed hallmarks of inefficiency. Put-call parity is the "relation between call option prices, put option prices, and stock prices that should hold" in an efficient market. *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 n.94 (C.D. Cal. 2009). Put-call parity suggests "that all information as to the direction of future stock price movements is impounded in the current price." Hans R. Stoll, *The Relationship Between Put and Call Option Prices*, 24 J. Fin. 801, 823 (1969). When there are "violations" of this parity, short sellers can earn a guaranteed profit through arbitrage opportunities, which is indicative of an *inefficient* market. *PolyMedica*, 453 F. Supp. 2d at 274-75.

QuantumScape's disparity is even more extreme than was the case in *PolyMedica*. Here, QuantumScape's options experienced "substantial put-call parity violations" between November 27, 2020 and January 4, 2021. Hendershott Rep. ¶ 81, Ex. 9. Between November 27, 2020 and January 4, 2021, QuantumScape's stock price was on average 22.5% higher than the "synthetic stock price." *Id.* ¶ 83, Ex. 10A. And 80.6% of Dr. Hendershott's observations each day during this time period violated put-call parity. Of those deviations, 100% showed the stock price was overvalued relative to the options price. *Id.* ¶ 82.

Dr. Cain ignores this hallmark of an inefficient market to reach his conclusions. Despite ambiguous statements in his report, *e.g.*, Cain Rep. ¶ 80, Dr. Cain confirmed in his deposition that he has not actually performed any analysis (Cain Dep. 106:19-107:1) or reached any opinion (*id.* at 105:18-106:14) as to whether QuantumScape's option series traded in efficient markets. Rather,

he *assumes* that *if* the market for QuantumScape's common stock was efficient, then the markets for all QuantumScape option series would be efficient as well. Cain Rep. ¶ 80, Cain Dep. 106:19-107:1. That is an erroneous assumption as market efficiency cannot simply be presumed for options markets. Hendershott Rep. ¶¶ 68-75. Because Plaintiffs failed to put forward *any* evidence that the markets for QuantumScape's options were efficient, they are not entitled to a presumption of classwide reliance under *Basic v. Levinson*.

### 3. The Remaining *Cammer* and *Krogman* Factors Do Not Establish, Address, Or Rebut These Indicia of an Inefficient Market

As discussed above, Dr. Cain ignored substantial evidence of market inefficiency for QuantumScape's stock in late 2020 and early 2021 and defends his opinion by pointing to other *Cammer* and *Krogman* factors. Cain Dep. 182:10-183:7. Even if the factors identified in those district court decisions were somehow dispositive—and they are not—they do not explain anything about the stock's behavior here. For example, Dr. Cain acknowledges QuantumScape was not S-3 eligible (one of the *Cammer* factors). Cain Rep. ¶ 45. Form S-3 is an abbreviated filing for companies that meet certain requirements, including that the company has filed reports with the SEC for the previous 12 consecutive months, which helps ensure there is an open and efficient market for the stock. *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1995). Because QuantumScape was a new registrant, the market was undoubtedly less efficient. *Id.* ("Although ineligibility [to file a Form S-3] does not automatically disqualify a company from a finding of an efficient market, this factor weighs heavily against a finding of efficiency.").

Similarly, as discussed above, there was not substantial analyst coverage. Hendershott Rep. ¶¶ 63-65. And just because a stock is traded on the NYSE—whether GameStop or QuantumScape—it is certainly possible for its shares to have inefficient prices, especially if there are constraints on short selling. *Id.* ¶¶ 51-55. Nor is it any surprise that high trading volume can accompany these tumultuous periods.

Moreover, to determine whether QuantumScape's trading volume, analyst coverage, market capitalization, bid-ask spread, and institutional ownership weigh in favor of finding market efficiency, Dr. Cain used data from a study that did not purport to assess market efficiency for any

of the firms studied, nor did it purport to discuss or analyze market efficiency in general. Hendershott Rep. ¶ 61. Rather, the study documented "effects on firm performance and investor interest after a complete loss of analyst coverage" and found that "analyst coverage adds value to a firm." *Id.* (citing MRK Study at 667). This is not a valid source for determining market efficiency of QuantumScape's stock.

None of these factors save Dr. Cain's inadequate and unreliable analysis that ignored substantial evidence of market inefficiency.

**B.    Plaintiffs Have Failed to Articulate a Classwide Damages Methodology that Is Consistent with Their Theory of Liability**

Plaintiffs are required to show a class-wide damages model consistent with their liability theory to satisfy the predominance requirement. *See Comcast*, 569 U.S. at 34-35. Absent an appropriate methodology for measuring damages on a class wide basis, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34. *Comcast*'s "unbreakable premise" is that "a model purporting to serve as evidence of damages . . . must measure only those damages attributable to [plaintiffs'] theory [of liability]. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. Although a full loss causation analysis is not required at the class certification stage, "[i]f the plaintiffs cannot prove that damages resulted from the defendant's conduct, then the plaintiffs cannot establish predominance." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016).

Here, Plaintiffs attempt to satisfy their burden at this stage by promising that Dr. Cain will be able to construct an event study to "measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations." Cain Rep. ¶ 84; Mot. at 21-22. But *Comcast* is not satisfied by "[s]imply invoking the event study methodology" without "provid[ing] the specifics of their proposed methodology." *In re BP P.L.C. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013); *see also Lortiz v. Exide Techs.*, 2015 WL 6790247, at *22-23 (C.D. Cal. July 21, 2015) (declining

to certify a damages class where plaintiffs' expert "describe[d] generally some techniques that he asserts can be used," but failed to tie his damages theory to plaintiffs' theory of liability).

Although he has yet to actually construct such a model, Dr. Cain agrees it will necessarily require at least one "corrective disclosure" (Cain Dep. 99:5-8) and admits that he has not done any analysis to determine whether there was, in fact, any actual corrective disclosures in this case (*id.* at 79:1-80:2). Moreover, Dr. Cain's method must be capable of distinguishing between losses following corrective disclosures and losses due to negative opinions or other general market factors. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (9th Cir. 2005); *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017) (no loss causation where the "corrective" opinion "does not 'reveal to the market something previously hidden or actively concealed'" but simply "collected and opined on already public information").

Plaintiffs identify two purported corrective disclosures: a Seeking Alpha blog post on January 4, 2021 and a short seller report on April 15, 2021. Cain Rep. ¶¶ 15-16. But Dr. Cain did not articulate any new information in these posts that "corrected" any statement by the company. Rather, both pieces merely reflect the authors' respective opinions (or thinly-veiled agendas) regarding QuantumScape's initial test results and its ability to overcome the well-known and disclosed challenges facing the company. For example, the Seeking Alpha post characterizes QuantumScape's "science" as "very good" but notes the single-layer "batteries are small and unproven" and that "[t]here are significant risks associated with solid state batteries that have not been overcome." Ex. O at 1. The facts, figures and risks described in the rest of the post were well-known long before January 4 because QuantumScape itself disclosed them, (Ex. D at 1), and therefore cannot be a corrective disclosure as a matter of law. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839-40 (9th Cir. 2022) (clarifying that for "a short-seller's report [to] satisfy the loss causation element," it must either "reveal new information to the market" or involve "extensive and tedious research" that potentially "pull[s] together disparate sources," and *not* written by a short-seller "who had a financial incentive to convince others to sell" (citations omitted)); *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) (explaining loss causation inadequate where alleged disclosures included information that was already publicly

available); *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at *6 (N.D. Cal. Sept. 2, 2016) ("[P]laintiffs do not adequately differentiate the 'disclosure' of the . . . campaign from the multiple other negative accusations contained within the [Report].").

The blogger then concludes that QuantumScape "will likely never achieve the performance they claim" because, in large part, he does not believe the company will be able to assemble multi-layer cells. Ex. O at 1, 3. These predictions were not only mere opinions of one (biased) commentator, the company quickly proved that his underlying assumptions were wrong. Ex. M at 2. Thus, the Seeking Alpha post did not "correct" anything, and Dr. Cain admits that he has not yet found any information in the Seeking Alpha post that could be considered "new information" or "corrective disclosure." *See* Cain Dep. 82:5-18.

The Scorpion Capital report suffers from the same fundamental problem—it presents the (biased) opinion of an author who purports to quote several unnamed former employees who predict that QuantumScape might eventually fail because, in large part, they doubt the company's ability to assemble multi-layer cells. Ex. P. The opinions of these unnamed former employees, while perhaps genuine, were wrong (Ex. M at 2) and in any event did not "correct" any of the statements challenged in the Complaint. As the Ninth Circuit has explained, the biased speculation in the Scorpion "report" is not a corrective disclosure because reasonable investors would have taken the opinions of short sellers "with a healthy grain of salt." *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795-97 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 71 (2021).

Even if the allegations of the Complaint were sufficient to state a claim, *see* Order on Motion to Dismiss, ECF No. 137, it is not sufficient at this stage for Dr. Cain to acknowledge that his hypothetical damages model will depend on a corrective disclosure while simultaneously admitting that he does not know if one actually exists. This level of uncertainty goes beyond a lack of detail regarding the proposed damages methodology and instead calls into question whether such a model is possible at all. Indeed, *Comcast* explained that "[u]nder that logic, at the class certification stage any method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 35-36; *Fort Worth Emps.'*

*Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014). ("[W]ithout assurance beyond [Plaintiff's expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis."); *Hughes v. Ester C Co.*, 317 F.R.D. 333, 354-56 (E.D.N.Y. 2016) (denying class certification where an expert's damages model could not reliably isolate damages caused by an amorphous marketing claim).[5]

Comcast clarifies that it is not enough at the class certification stage to simply "provide a method to measure and quantify damages on a class-wide basis." *Comcast*, 569 U.S. at 35-36. Here, Dr. Cain offers no methodology for measuring price inflation caused by the alleged misstatements. Although he claims he can "calculate[] damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale," Cain Rep. ¶ 81, he fails to explain how he would disaggregate the impacts on QuantumScape's stock price that is attributable to other causes. *See* Hendershott Rep. ¶ 89. For example, Dr. Cain "presents no methodology for disentangling the stock price effect of the change in short selling constraints" that began to ease on January 4, 2021. *Id.* Plaintiffs have thus failed to meet their burden of demonstrating that the results of an event study can be used as an unbiased, reliable measure of the value impact of the alleged misrepresentations. As proponents of class certification, it was Plaintiffs' burden to do so.

## II.   THE PROPOSED CLASS SHOULD NOT BE CERTIFIED BECAUSE IT DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(a)

Rule 23(a)(4) requires that the party representative fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). "Individuals are not adequate representatives of a class when 'it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs.'" *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 529 (C.D. Cal. 2011) (citation omitted). "One of this Court's duties 'is to ensure that the parties are not simply lending

---

[5] Dr. Cain's failure to identify any new information stands in stark contrast to other cases where district courts have been willing to overlook a certain lack of detail regarding loss causation. For example, in *Oracle*, Plaintiff's expert clearly delineated both the alleged misstatements made by Oracle and the facts revealed in the corrective disclosures. *See Oracle*, 2022 WL 1459567, at *7. Here, Dr. Cain cannot point to any new factual information in any alleged corrective disclosures. *See* Cain Dep. 90:20-91:2.

their names to a suit controlled entirely by the class attorney.'" *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 580 (C.D. Cal. 2010) (citation omitted), *aff'd*, 476 F. App'x 154 (9th Cir. 2021). To establish adequacy, "plaintiffs seeking certification must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145 (N.D. Tex. 2014); *see also Ravens v. Iftikar*, 174 F.R.D. 651, 661 (N.D. Cal. 1997) (PSLRA's intent was "to eliminate figurehead plaintiffs who exercise no meaningful supervision of litigation"). Furthermore, the PSLRA was enacted to "discourage frivolous litigation," H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.), assigning plaintiffs a duty to oversee the merits of any claim brought on their behalf. *In re Network Associates, Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1032 (N.D. Cal. 1999) ("The PSLRA seeks to place the lead plaintiff in charge of conduct of the litigation on behalf of the class. The lead plaintiff owes a fiduciary duty to all members of the proposed class . . . to obtain the largest recovery for the proposed class *consistent with good faith and meritorious advocacy*." (emphasis added)); *see also* S. Rep. No. 104-98, at 10 (1995) ("One way of addressing this problem is to restore lawyers and clients to their traditional roles by making it harder for lawyers to invent a suit and then attach a plaintiff.").

Here, the proposed representatives are figurehead plaintiffs merely furnishing their names and disregarding their duty to supervise the litigation. *Network Associates*, 76 F. Supp. 2d at 1032 (explaining lead plaintiff has a duty to "keep itself fully informed at all times on the progress and status of the case, the strengths and weaknesses of the case, the prospects for settlement, and the resources invested in the suit or proposed to be invested"). The named plaintiffs demonstrated their inadequacy throughout their depositions, when it became clear they (1) are unable to define with any coherence what the claims in this case are; (2) do not know what the core defenses are, including the independent verification of QuantumScape's test results or that the availability of new shares after SEC effectiveness on December 31, 2020 caused the drop in QuantumScape's stock price; (3) are signing documents without reviewing or understanding them, and (4) defer to counsel to direct the litigation.

None of the Plaintiffs were able to describe the claims alleged in this lawsuit. Lead plaintiff Frank Fish was unable to describe a single alleged misleading statement and would only point to the Complaint as containing "the false statements." Fish Dep. 39:7-15. Kathy Stark could not describe the misrepresentations alleged in the lawsuit, and later submitted an erratum stating "I can't describe specifically." Stark Dep. 34:6-15. Mary Cranny was similarly unable to describe a single alleged misrepresentation. Cranny Dep. 51:1-7.

Likewise, none of the Plaintiffs are familiar with the defenses in this case, including that the December 2020 test results (which they are challenging as false) were subsequently verified by third-parties, or that QuantumScape has been able to create multi-layer cells. Fish Dep. 141:14-17, 152:10-22; Stark Dep. 88:2-7, 128:18-22, 137:8-15; Cranny Dep. 117:12-20, 145:8-25, 182:10-17. In addition, Plaintiffs were unaware, after SEC effectiveness, of the sudden availability of millions of shares held by PIPE investors that became freely tradeable, unrestricted securities for the first time. *E.g.*, Fish Dep. 129:16-130:1; Stark Dep. 147:6-20.

Moreover, although Plaintiffs avowed in declarations (required by the PSLRA) to stay informed and read the documents in this lawsuit, they testified otherwise in their depositions. Stark has never read the Complaint in its entirety, explaining that "[i]t was very long. I started reading. I skimmed through it. . . . I have to count on my legal counsel to advise me about the contents of that." Stark Dep. 30:11-17. She never asked questions about or edited her declaration or interrogatory responses. *Id.* at 37:25-38:6. Ms. Cranny similarly never edited her declaration or interrogatory responses. Cranny Dep. 47:11-12, 184:13-17. Despite statements to the contrary in his declaration, Fish "doesn't recall" what statements he relied on in deciding to purchase his shares so, instead, he deferred to counsel to decide what to put in the complaint. Fish Depo 146:5-17; *see also id.* at 147:2-24. In light of this testimony, Plaintiffs' declarations "carry little weight" (*Kosmos*, 299 F.R.D. at 146) in determining whether they are fulfilling their statutory duties.

Finally, throughout their depositions Plaintiffs repeatedly stated they have been and will continue deferring to counsel to direct the litigation. Mr. Fish deferred to counsel to identify: any allegedly misleading statements Defendants made (and to put those in the Complaint), why the stock price dropped in January 2021, why he believed QuantumScape was behind schedule, what

claims he has brought, and which parties have been subpoenaed. Fish Dep. 47:3-7, 48:16-49:25, 50:6-22, 72:5-12, 73:7-14, 76:2-10, 76:18-25, 102:3-13, 137:13-17, 146:12-17, 150:20-151:1. Ms. Stark relies on her counsel to tell her what is in the Complaint, because she has only "skimmed" it, has not done any independent research on the case and did not know her lawyers hired an expert. Stark Dep. 30:5-17, 45:18-20, 81:16-22, 82:17-21, 84:10-15, 196:22-24. Despite recently joining this lawsuit, Ms. Cranny could not say whether her counsel solicited her or she reached out to them. Cranny Dep. 33:23-34:3. She is "leaving it up to [her] lawyers" to say why she believes the alleged misstatements are false, to monitor developments in this action ("I don't monitor the developments"), and to identify under what circumstances she would direct counsel to dismiss claims against defendants. *Id.* at 39:6-10, 90:3-10, 186:21-187:15.

Not only does this testimony stand in stark contrast to the requirements of the PSLRA, this "'cart before the horse' approach to litigation is not the proper mechanism for the vindication of legal rights." *Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, at *2 (N.D. Cal. Apr. 25, 2007); *see also Meyer v. Paradigm Med. Indus.*, 225 F.R.D. 678, 683 (D. Utah 2004) ("Congress intended that the lead plaintiff should seek the lawyers, rather than having the lawyers seek a lead plaintiff, *especially at the eleventh-hour*." (emphasis added)). Plaintiffs have not met their burden under Rule 23(a) of affirmatively demonstrating they are adequate representatives of the proposed class and that the class "meets the requirements of Rule 23." *Stromberg*, 14 F.4th at 1066 (citation omitted). Class certification should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

Dated: October 6, 2022

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ Ignacio E. Salceda
　　　Ignacio E. Salceda

*Attorneys for Defendants*