# EXHIBIT F

### *EXCHANGE --- Heard on the Street: This Battery Startup Might Zap Tesla --- QuantumScape says its electric-vehicle battery will offer more power for less money*

The Wall Street Journal

January 2, 2021 Saturday

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2021 Dow Jones & Company, Inc. All Rights Reserved.

## THE WALL STREET JOURNAL.
U.S. EDITION

**Section:** Pg. B12

**Length:** 825 words

**Byline:** By Stephen Wilmot

## Body

[Financial Analysis and Commentary]

One of the wildest plotlines in the great 2020 electric-vehicle rally was the late-year rise of QuantumScape, a battery startup that has yet to report any revenue. If investors are even close to being right about its roughly $44 billion market value, they may need to worry more about the fortunes of Tesla.

QuantumScape's shares have soared since going public in November. The company revealed promising test results for a limited version of its "solid state" battery in early December, but otherwise the stock's meteoric ascent has been hard to explain.

Based in San Jose, Calif., and backed by Volkswagen and Bill Gates, the company now has a market value greater than Ford. Investors have gotten used to dizzying valuations for electric-vehicle startups positioning themselves as the next Tesla. With QuantumScape, the mania has reached potential suppliers too.

Solid-state batteries have long been seen as a way of breaking through performance limitations associated with today's electric vehicles. Like your smartphone, a Tesla or BMW i3 is powered by a battery with a liquid electrolyte that carries lithium ions back and forth between the cathode and anode during charging and discharging. These liquid electrolytes are bulky and liable to overheat. General Motors recalled almost 69,000 Chevrolet Bolt electric vehicles in November after five reported fires.

Exhibit
0013
8/12/2022
Frank Fish

EXCHANGE --- Heard on the Street: This Battery Startup Might Zap Tesla --- QuantumScape says its electric-vehicle battery will offer more power for less money

The promise of solid state is to get rid of the liquid, and with it the fire risk. Moreover, "lithium-metal" cells being developed by QuantumScape, among others, combine the lithium component with the anode, further reducing bulk and potentially delivering more power at a lower cost. This is also critical: Electric vehicles have long been held back by the relatively high cost of batteries, which makes them more expensive than combustion-engine equivalents.

Other advantages of solid state include rapid charging and longer life expectancy. QuantumScape said in December that its cell as tested could be recharged to 80% in 15 minutes and retained more than 80% of its capacity even after 800 charges. Such numbers would make owning an electric vehicle much more similar to owning a gas-powered one today.

Many in the battery industry see solid state as the most likely technology of the future. Tesla Chief Executive Elon Musk is a prominent exception. Solid state wasn't among the many developments discussed in the company's September "battery day." Mr. Musk told analysts on the third-quarter results call that removing the conventional anode "is not as great as it may sound" in terms of delivering space savings in the cell.

Tesla's skepticism may also be related to its own battery technology, which would likely make it harder than for others to adapt to solid-state electrolytes. Tesla uses cylindrical batteries formed from rolled cells, whereas its competitors typically favor so-called prismatic batteries, in which cells can be stacked. Because solid-state cells are more brittle than liquid ones, they will be much easier to stack than to roll.

Adapting most of today's electric-vehicle battery factories to the new technology won't be too disruptive, says Graeme Purdy, chief executive of Ilika, a U.K.-based solid-state company that is working with Jaguar Land Rover to ensure a smooth transition. But it might be another story for Tesla. This could be the point where the company's batteries, which have been a competitive advantage to date, turn into a competitive disadvantage.

Tesla does have time on its side, if it needs to change tack. Toyota probably has the most advanced solid-state batteries today: It planned to have them powering prototype vehicles at the 2020 Tokyo Olympics, which were postponed a year, and is targeting a mass-produced model by 2025. But the technology probably won't be cost competitive with today's batteries until the late 2020s at the very earliest.

QuantumScape's investors are playing a very long game. The business plan doesn't envisage meaningful revenues before 2026. There is also no guarantee that the company's solution will win out over those of Toyota and others. The test results QuantumScape announced last month were for single-layer battery cells. Private U.S. startup Solid Power is already producing multi-layer solid-state batteries in a factory in Louisville, Colo. "The manufacturing challenges get exponentially harder as you move to multiple layers," says Mark Newman, an analyst at brokerage Bernstein who focuses on the battery industry.

The valuations of companies like Tesla and QuantumScape require investors to look far into the future and assume mass disruption to the status quo. The wrinkle is that if QuantumScape's plan works out -- a big if -- Tesla itself could be one of the companies most disrupted. In 2020, investors bought almost anything related to electric vehicles. This year they need to become more discerning.

*License this article from Dow Jones Reprint Service*

EXCHANGE --- Heard on the Street: This Battery Startup Might Zap Tesla --- QuantumScape says its electric-vehicle battery will offer more power for less money

## Notes

page,5043;

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** January 4, 2021

End of Document

# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE QUANTUMSCAPE SECURITIES ) Case No.:

CLASS ACTION LITIGATION ) 3-21-CV-00058-WHO

)

CONFIDENTIAL

REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

MATTHEW D. CAIN, PH.D.

Chagrin Falls, Ohio (Witness' Location)

Wednesday, September 7, 2022

Reported remotely via web conference by:

LYDIA ZINN

RPR, FCRR, CSR No. 9223

Job No. SF 5418656

PAGES 1 - 240

Page 1

CONFIDENTIAL

A.   This sentence does seem to be talking about the    11:02:18

production process -- as far as I can tell.

Q.   And then -- and then the last sentence in that

paragraph:  "Real-world operation is very different

from lab-scale operation."    11:02:31

     Do you see that?

A.   I do.

Q.   And now flipping back to Dr. Morin's report,

Exhibit 6 -- do you -- do you see that Dr. Morin first

lists a number of the -- of the successes that he -- in    11:03:23

his opinion, bottom of page -- of the first page, it

says "Successes"?

A.   I see that.

Q.   And the first -- the first success he notes is the

electrolyte, a freestanding, thin solid electrolyte    11:03:38

that will sit between the anode and the cathode.

     Do you see that?

A.   Yes.

Q.   And that's the -- that's the key breakthrough that

we've seen in Exhibits 48 and 49.  Right?  The key    11:03:48

breakthrough at QuantumScape was that solid-state

separator?

A.   That -- I'm not really able to opine whether that

was the key breakthrough, but I -- I do recall us just

looking at some discussion of -- of this component in    11:04:09

Page 77

those other documents.                                           11:04:11

Q.   And then -- so that's not a -- this sentence right

here about the electrolyte, the freestanding, thin

solid electrolyte that sits between the anode and the

cathode -- it's not a corrective disclosure, is it?        11:04:29

A.   I'm sorry.  I didn't catch the end of the

question.

Q.   That's not a corrective disclosure; is it?

A.   The bullet point on electrolyte?

Q.   Yeah.                                                 11:04:40

A.   Right.  I don't -- again, you know, I've -- I've

not done an assessment of the actual corrective

disclosures; but my recollection of the Complaint's

allegations are such that I -- I don't believe that

this single bullet point here represented the alleged      11:05:03

corrective disclosure.  I would agree with you on that.

Q.   Well, I guess nothing under -- would anything

under the "Successes" column be a corrective

disclosure?

A.   Well, again, you know, I think a couple of the        11:05:40

bullet points under "Successes" -- they sort of end

with some foreshadowing of concerns that are going to

be discussed later on in -- in this.

     So I -- I don't want to rule out the possibility

that those lead into some information that could be        11:05:59

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

corrective; but you know, like I said, I've not    11:06:02

actually done, for purposes of my market efficiency

report, an assessment of the information environment to

determine whether there were corrective disclosures

that tie back to the alleged misstatements and created    11:06:18

artificial inflation.

So, really, I think you're really asking questions

that are well beyond the scope of -- of my report or

the analyses that I've done to this point.

Q.   Oh, sorry.    11:06:33

So we're talking -- we're talking under the rubric

of your other opinion that you can assess damages on a

class-wide basis.

And I got on this -- I'm asking if you can -- if

your methodology is flexible enough to segregate out    11:06:47

negative opinion of existing information versus

negative new facts.

And so to aid that discussion, I want to go

through and figure out if we can agree on what the

corrective disclosures are to see if that methodology    11:07:05

is susceptible to class-wide proof.

A.   Yeah.  So, again, I think with the end of your

question there, if you want to go through and identify

what the actual corrective disclosures are, that's --

that's not an analysis that I've done to reach any    11:07:22

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

opinions on what are the actual corrective disclosures   11:07:25

in this case.

I -- I understand that there are alleged

corrective disclosures that -- of which this is one of

the two.   11:07:36

And what I explain in terms that section of my

report is that the methodology that I explain is

capable of disaggregating components of stock price

changes, if we're really talking about an event study

that's used to estimate artificial inflation -- that   11:07:57

there are tools and techniques, such as valuation

analyses, news, analyst reports, other -- other tools

of financial econometrics that can be used to

disaggregate, if that's necessary.

But I have not actually gone through this document   11:08:13

and made any sort of assessment, at this point in time,

of whether there is information in here that -- that

needs to be disaggregated for those purposes.

Q.   Well, I want you to -- again, I'm asking about

whether or not you consider somebody's mere opinion   11:08:36

causing an impact on stock price versus actual new

information.

And I believe you told me that in your experience

that a mere opinion can constitute a corrective

disclosure, so before we have that discussion, I want   11:08:50

Page 80

CONFIDENTIAL

to see if we can agree on what is new information   11:08:53

versus what is Dr. Morin's mere opinion.

Okay?

MR. PORRITT:  I'm going to object to form.

Misstates his testimony.   11:09:01

MR. BISH:  I'm just -- I'm just explaining

where we are and where we're going.

THE WITNESS:  Yeah.  So I think in terms

of -- of where we are, that's -- that's really not

representative of the -- the previous answer I gave   11:09:13

when you asked about mere opinion versus statements of

fact.

And what I explained was that, you know, analyst

reports and short-seller reports and other types of

information disclosures do have a component to them   11:09:30

that they represent the opinions of people that are

rendering them; but those opinions are based on factual

analyses.

And so in my mind I don't really have a clear

example of somebody just coming out and -- and giving   11:09:46

their opinion about something that's sort of devoid of

new factual information.  I think when I look at, for

example, this document, there's -- this is not just

somebody who says, you know, look, it's my opinion that

the stock price is inflated.   11:10:08

Page 81

CONFIDENTIAL

But there's -- there's actually a lot of                    11:10:12

discussion about technical details and technical

aspects.

BY MR. BISH:

Q.    Yeah.  Yes.  So let's go through that together.    11:10:17

And you can point out to me where the new information

is.  Okay?

A.    No.  Like I said, I have not done an analysis of

the information environment at this point in time in

order to reach any opinions on what information was new    11:10:30

or corrective at this point in time.

      Those are questions for the merits stage for a

loss causation analysis, and those are reports that

I've done in other cases, but I have not done any sort

of assessment at this point in time of what information    11:10:45

in an alleged corrective disclosure was new and

corrective of alleged misstatements.  That's simply not

an analysis that I've done up to this point in time.

BY MR. BISH:

Q.    Okay.  Well, let's just -- bear with me, then.    11:11:02

      Let's look at "Power."  Do you see where it --

under it -- it says "Areas of Overstated Success."

Under "Power:  They have done 1,200 cycles of a

90-second OEM specified track simulation, which pulled

pulses of 6C"?                                             11:11:18

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

Do you see that?                                          11:11:20

A.    Yes, I do.

Q.    New information or existing information?

A.    It's the same answer as my previous response.

      I -- this is not an analysis that I've done at      11:11:27
this point in time.  And it's going to be the same
answer to any questions about any other statements
within the report here.  I have not done a loss
causation analysis and an analysis of the information
environment to determine what, within this report,      11:11:46
was -- was new or potentially corrective.

Q.    Well, remember we looked at that "Power" slide
together earlier; and we talked about the racetrack?
Remember that?

A.    Yes.                                               11:11:59

Q.    And that information -- that's being conveyed in
this sentence here, exactly from QuantumScape's slides.
Correct?

A.    I don't know.  I don't have -- there's a lot of
technical details even in the first sentence of this     11:12:12
bullet point that I don't have memorized, so...

      You know, if you want to flip back and forth
between those slides and this and draw those types of
comparisons, you can do that; but ultimately I don't
have any opinions about what in here represented new     11:12:25

Page 83

CONFIDENTIAL

MR. PORRITT:  Sorry.  Where are we now?  Are   11:32:27

we still in Exhibit 3?

MR. BISH:  Well, it's Exhibit 6 for

Dr. Morin; it says "Range."

MR. PORRITT:  Okay.  I'm operating on a   11:32:38

single screen, so you're going to have to bear with me

a little bit.  This is on page 2 of Exhibit 6?

MR. BISH:  It is.

MR. PORRITT:  Okay.  All right.  I'm there.

BY MR. BISH:   11:32:57

Q.   And, Dr. Cain, do you see where it says:  "In much

gentler 1C over 1C cycling at 30 degrees Celsius, the

cell makes it for 800 cycles, or 240,000 miles"?

A.   I see that.

Q.   I think that's -- if we look at slide -- I think   11:33:30

it's slide 20.  No.  Maybe not.  I think it's 19.

A.   What's the -- is the title "Battery Life"?

Q.   Yeah.  Exactly.

And then the chart says "Cycle Life"?

A.   Cycle life.  Okay.   11:34:10

Q.   And do you see now in the chart, it says

"30 degrees Celsius"?

A.   I see that.

Q.   And do you see that it's 800 cycles?  The bottom

of the chart?   11:34:31

Page 89

A.   The bottom.  800 cumulative cycles.  Okay.    11:34:32

Q.   And which -- and then below the 800 cycles, it says "240,000 miles"?

A.   I see that.

Q.   So, again, no new information here?    11:34:44

A.   I don't -- I don't think I would necessarily draw that conclusion.

Q.   Why not?

A.   Well, just looking at the bullet point in Exhibit 6, it says in much gentler 1C cycling at    11:35:04 30 degrees C, the cell makes it for 800 cycles, or 240,000 miles.  Respectable, but not better than the vehicles on the road today.

   There's just -- I mean, there are some words and information in there that are not in the slide here    11:35:22 verbatim, so I am not able to really draw a conclusion one way or another.

Q.   Well, on the first sentence, what's new information in that first sentence of "Range"?

A.   Well, again, like I said, I -- I've not reached    11:35:37 any opinions on whether any information in -- in this report was new or was not new.  So I -- like I told you before, I'm really not able to go through this point by point and draw any inferences on what was new and what was not new.  That's not any sort of analysis that I've    11:35:54

Page 90

CONFIDENTIAL

done in my market efficiency report up to this point in    11:35:59

time.

Q.   No.   I understand you haven't done it, but do you

see the 1C charged and discharged?   That's in the

slide.   Right?                                            11:36:12

A.   Well, again, before that, in the bullet point, it

says "in much gentler cycling."

     So I don't -- off the top of my head, I'm not sure

where that interpretation comes from on the cycle life

slide that you're pointing to in Exhibit 3.               11:36:29

Q.   Well, do you think that 30 degrees Celsius is a

gentler climate than 45 degrees Celsius?

A.   That's not -- not something that I have an opinion

on.

Q.   So you think the word "gentler" is new             11:36:44

information?

A.   Like I said, I have not reached any opinions on

whether any of these bullet points were new information

or not.

Q.   Well, you told me you didn't agree with my         11:36:55

question that there wasn't any new information in that

first sentence.   And can you tell me what's not new --

what's new?

A.   Um, so the -- I disagreed with -- with your

conclusion, because I said I have not drawn any         11:37:10

Page 91

conclusions about whether this was new or not.    11:37:12

Q.   Okay.  So you can't just sit here and look at
these two slides, and tell me that 1C charge and
discharge is in the QuantumScape slide and 30 degrees
is in the QuantumScape slide, and 800 cycles is in the    11:37:26
QuantumScape slide and 240,000 miles is in the
QuantumScape slide?

A.   Well, I -- I did do that, in terms of agreeing
that those numbers appear on this slide.

     But, like I explained, there's also other things    11:37:42
in the bullet points that are not necessarily in these
slides.

     So that's -- you know, I'm -- obviously, I'm doing
the best I can with you today, looking at documents
that I did not really rely on for forming the opinions    11:37:55
in my market efficiency report up to this point in
time.

Q.   Well, again, and I'm just trying to figure out
when you tell me that you can have opinions forming the
basis for a corrective disclosure, and that your    11:38:09
methodology depends on a corrective disclosure, I'm
looking for where the -- you know, what are the
opinions that -- that you say is going to be the
corrective disclosure.

          MR. PORRITT:  I'm going to object to form.  I    11:38:27

Page 92

CONFIDENTIAL

THE WITNESS:  Yeah.  Again, I do think I   11:44:50
answered your question, which is -- I think what you're
trying to get at is:  Are there statements of opinion
that had price impact that -- that moved the price, and
yet were unrelated to plaintiffs' allegations, and did   11:45:01
not reveal a portion of the -- the relevant truth?

And -- and that's what I talk about when I talk
about confounding information in this section of my
report; that that can be disaggregated.

But I've not actually gone through and conducted a   11:45:17
loss causation analysis of Exhibit 6 and -- and asked
this question of whether there is confounding
information that had price impact, that needs to be
disaggregated.

That's something that I could do at a loss   11:45:30
causation stage or a merits report; but I have not done
that for purposes of the market efficiency report, but
I've explained that the methodologies are capable of
doing that, and that it's common across investors
within a class.   11:45:46

BY MR. BISH:

Q.   Okay.  Well, you injected the word "unrelated" to
the allegations, and that wasn't part of my question.
So let me try again.  Let's take it one at a time.

You've identified a methodology that can be   11:45:57

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

applied on a class-wide basis.  Correct?                    11:45:59

A.   Yes.

Q.   What is that methodology called?

A.   The out-of-pocket methodology.

Q.   And when you apply the out-of-pocket methodology,      11:46:07
do you -- does the methodology depend on a corrective
disclosure?

A.   Yes, it does.

Q.   And can the corrective disclosure under this
methodology include mere opinion as -- as the              11:46:22
corrective disclosure?

A.   So, again, I -- I'm really vague and unclear on
what you mean when you say "mere opinion."

Q.   Okay.

     Does your out-of-pocket methodology -- is it          11:46:41
flexible enough to differentiate between opinion --
negative opinion and new negative information?  Can it
do that analysis, that segregation?

A.   So, again, I understand what you mean when you say
"new negative information"; but I'm not sure what you       11:47:01
mean when you say "mere opinion."

     And that's -- with my previous response is -- I
was doing my best to understand what you're asking by
putting it into the context of confounding information
that is unrelated.                                         11:47:17

Page 99

CONFIDENTIAL

So if -- when you say "mere opinion," if you're     11:47:19
referring to something that is unrelated to the case
but that had price impact, then the answer is yes.  The
out-of-pocket methodology provides for disaggregating
and separating out that -- that type of impact.     11:47:35

But if -- if when you refer to opinion, if that
still reveals a portion of the relevant truth that had
been concealed by alleged material omissions or
misrepresentations, then that -- that's related to the
corrective disclosure.     11:47:54

Q.   Okay.  So under your methodology, an author's
expression of opinion on existing public information
can constitute a corrective disclosure for class-wide
damages.  Is that right?

A.   Could you repeat that?     11:48:24

MR. BISH:  That was as good as I could do.

Lydia, could you read it back?

(Record read.)

MR. PORRITT:  I'll object to form.

THE WITNESS:  Well, again, pointing back to     11:48:49
my report, what I explain is that it really depends on
the specifics set of facts and circumstances in a given
case.

So I've -- I've worked on cases in which I've seen
opinions expressed by analysts, in which they're -- the     11:49:03

Page 100

determined to be efficient, if the Common Stock trades    11:55:03

in an efficient market, then derivative securities that

are priced derivatively off of those Common Stock

prices, which would be the call or put options, then by

definition of basic principles of finance, that those    11:55:19

would also be priced at efficiently.

So that's -- and that's consistent with academic

literature.  I cite some -- some other court cases that

have reached that determination as well.

And -- and that's basically my professional    11:55:39

assessment that I've employed in other cases that I've

worked on that included options trading.

BY MR. BISH:

Q.   Yeah.  So -- so -- so you're saying you can do the

same analysis in Section V of your report -- you can do    11:55:55

that same analysis in the stock options market?

A.   Yes.

Q.   Okay.  And so do I understand correctly that you

are offering the court an opinion that the market for

QuantumScape options were efficient throughout the    11:56:15

Class Period?

A.   Well, it's a little bit -- I think that it's

worded a little bit differently.  So I'm going to just

stick with the phrasing that I used in my report, which

is that, for example, in paragraph 80:  "...because    11:56:30

Page 105

options pricing is dependent on the stock price, the          11:56:34

artificial inflation caused by any misrepresentations

and omissions that affects the stock price would

translate into the value of derivative instruments,

such as call and put options on QuantumScape Common           11:56:45

Stock."

Q.   Okay.  Let's -- but can you answer my question,

which is:  Are you offering the court an opinion that

the market for QuantumScape options were efficient

throughout the Class Period?                                  11:57:01

        MR. PORRITT:  Object to form.  He's answered

that question.

        THE WITNESS:  So I was not asked to opine in

terms of that particular phrasing.  So I --

BY MR. BISH:                                                  11:57:17

Q.   Okay.

A.   I would stick with the opinions that I've stated

in my report and -- and in response to your question.

Q.   And where in your report are the -- the bases

for -- for that opinion?                                      11:57:27

A.   That -- that would be the -- the Section IV that

assesses the market efficiency of the Common Stock; and

then the Section V that explains that because the

Common Stock is efficient, that the -- that the stock

prices would also reflect information in the same way         11:57:47

Page 106

CONFIDENTIAL

that the Common Stock prices do.                              11:57:53

MR. BISH:  Okay.  Let's take a 30-minute break.

MR. PORRITT:  Okay.  We'll do -- let's go off the record and talk about how much time you're going to   11:58:17 need.

THE VIDEOGRAPHER:  Off the record at 2:58 p.m.

(Luncheon recess was taken at 2:58 p.m.)

AFTERNOON SESSION                          3:51 p.m.     11:58:24

THE VIDEOGRAPHER:  The time is 3:51 p.m. Eastern Time.  We are back on the record.

BY MR. BISH:

Q.   Welcome back, sir.

Let's shift gears and talk about market              12:51:20 efficiency.  What's your operative definition of market efficiency?

A.   I think, as a general rule, I would be pointing to semi-strong-form of market efficiency, which essentially states that widely available public           12:51:38 information is quickly incorporated into stock prices.

Q.   And when you say -- we talked about this earlier, but when you say widely disseminated, what does that mean specifically?

A.   Yeah.  That -- I think that refers to information   12:51:56

Page 107

CONFIDENTIAL

that is -- that is made available to a lot of investors    12:52:00
at any given point in time.

So I think that's -- there's a bit -- there's sort
of a spectrum of what that means in terms of widely
available.    12:52:21

So at one end of the spectrum, we could talk about
private information, which is information that's only
contained within the walls of a company; for example,
executives who may have conversations or make decisions
that could be highly value relevant for investors, but    12:52:35
have not been announced publicly and have not leaked
out in any way publicly.

So that would be one end of the spectrum where
it's private.

And at the other end of the spectrum would be    12:52:47
information that is put out in a -- in a way that is
very quickly distributed and disseminated to anybody in
the world, like making an SEC filing through the EDGAR
system, where that's posted electronically, and it's --
it goes out sort of simultaneously worldwide.    12:53:08

And then in the middle, there -- there can be
different sort of degrees of how information may -- may
leak out, but -- but generally, when I talk you about
widely available public information, that would be
information that's put out through an SEC filing or a    12:53:26

Veritext Legal Solutions
866 299-5127

over-the-counter traded companies as well.                13:16:05

Q.    Can you think of any others?

A.    I'm sorry.

Q.    Any others?

A.    I cannot think of any off the top of my head.        13:16:20

Q.    Are there any conditions where you would conclude
that a New York Stock Exchange listed company did not
trade in an efficient market?

A.    Yes.

Q.    What -- when?  What are those --                      13:16:45

A.    If my analyses of the Cammer and Krogman factors
were inconsistent with market efficiency.

Q.    And have -- have you ever found such an example?

A.    Well, again, I've looked at those types of factors
in the context of some over-the-counter stocks, as well    13:17:11
as those cannabis-related companies that I mentioned.
And I determined that they were not trading efficiently
during a relevant time period.

      So those would be the -- the examples that come to
mind.                                                       13:17:28

Q.    So what -- what analysis or factors led you to
conclude that those companies were not traded in an
efficient market?

A.    I don't recall the specific details, but at a high
level, it was -- it was the types of data that I'm          13:17:47

Page 124

looking at within the market efficiency analyses of          13:17:53

this report.  So that would include the trading volume

and the stock price behavior for a company; the analyst

coverage; institutional ownership; the market cap;

whether the stock price reacted to new value-relevant          13:18:10

information for the company; those types of things.

Q.   So for the cannabis company, which -- which of

those factors led you to consider it was not an

efficient market?

A.   My recollection is probably all of those things,          13:18:26

but I -- I don't recall the specifics off the top of my

head.

Q.   And when you say "stock price behavior," what did

you mean?

A.   Yeah.  So I think... I think that would -- that          13:18:40

would refer to the Cammer five type of analysis, where

I'm looking at disclosures of new potentially

value-relevant information for a company, and -- and

not seeing an apparent reaction to -- to that type of

information.                                                  13:19:03

Q.   So is the Cammer five-factor -- does that

essentially measure a cause and effect between the

information and the stock price?

A.   Yes.  And -- and volume also.  Price and volume.

Q.   Do you think that's the most important factor in          13:19:26

Page 125

determining market efficiency?    13:19:28

A.    Yeah.  So I guess we're -- we're kind of getting back to your -- your previous -- your earlier question.

Q.    Where I cut you off.  Sorry.

A.    Yeah.  That's fine.    13:19:39

So I think some courts have articulated that that can be considered the most important factor by some courts.

In my opinion, that's -- I typically do not place more or less weight on any one of the -- the individual    13:20:02 Cammer and Krogman factors.

I do think that -- that it is important in the context of a securities class action case that there's evidence that the stock price is reacting to information, and ultimately the revelation of the    13:20:24 relevant truth that was alleged to have been misrepresented.

But I -- I think that, in my experience, the actual Cammer five analysis within a market efficiency report -- it depends on a lot of factors that can vary    13:20:37 or differ across different companies, such as the length of the Class Period, for example.  When you've got fairly short Class Periods, you have smaller sample sizes.  You may not have a large sample of earnings announcements.  Or in a company like this, it may be a    13:20:54

Page 126

prerevenue company that does not have positive    13:20:59

earnings.

And so often I see experts end up getting into

debates about how to actually carry out a Cammer five

analysis.    13:21:09

And I -- I think for that reason that's why it's

really helpful to look at all of the other factors and

consider all of them holistically.

So -- so for those reasons, in my opinion, the

Cammer five is not necessarily the most important    13:21:23

factor.

Like I said earlier, I think, in my view, the most

important starting point is whether the stock traded on

a large, national, well-developed exchange, such as the

New York Stock Exchange or the NASDAQ.    13:21:42

Q.   Okay.  But so when you -- when you tested the

cannabis company for the Cammer five-factor, what test

did you use?

A.   I don't remember.  It was a number of years ago

when I was analyzing those companies.  You know, it was    13:22:01

a few different companies, not just one.

But I don't recall the specific nature of the --

the pricing dynamics that appeared problematic.

My -- my high-level recollection was that the

company's stock prices and trading volume did not seem    13:22:19

Page 127

represents an important piece of information for

investors, which is the company has now fully completed

the business combination and the liquidity event and

the access to the capital markets, which is going to

fund the development of the company's products.

So that's -- that's a fairly common date that I

would include in sort of this Exhibit 6 listing of news

dates for SPAC types of companies.

Q.   Okay.  Now, when doing these event studies, if

positive information is released that would indicate an

increase in -- in a company's value, you'd expect the

stock price to increase -- correct?  -- all things

being equal?

A.   If -- if the only information that released is

clearly positive, then I would generally expect the

stock price to increase.

I think the caveat is that it's -- it's extremely

common that there's actually a mix of information that

may be both positive and negative.

But back to your question, yes, if it's -- if it's

unambiguously positive information, no other

information that comes out, then I -- I do typically

expect an increase in the stock price.

Q.   And if -- if -- and if information released on a

given day clearly indicated an increase in firm value,

Page 133

but you saw a significant decrease in the stock price,   13:31:20

that would be obviously inconsistent with market

efficiency.  Is that fair?

A.   Yes.  I think if I conducted an assessment, and I

determined that the information was unambiguously   13:31:37

positive for the company, and the stock price dropped

by a significant amount, then that -- that might be

inconsistent with market efficiency.

Q.   But for purposes of your tests here, you didn't --

you didn't go that extra step of evaluating whether the   13:31:56

stock price reaction would be consistent with the

direction of -- you would expect, given the content of

the information?  Is that fair?

A.   No.

I -- I definitely reviewed all of these product   13:32:15

development news dates and earnings announcements.

And based on my review, most of these had some mix

of positive and negative information; and there was

also other, you know, potential news coming out on the

same day for some of these.   13:32:36

But based on my review, in general, overall, the

stock price tended to move in a direction that would be

consistent with market efficiency.

Q.   So that was part of your analysis?

A.   Well, it was something I looked at, but the --   13:32:53

Page 134

like I said earlier, the issue is that the majority of    13:32:56

news announcements for most companies, including this

one, have components of both positive and negative

information.  And so it's not unambiguous, as I

described in that hypothetical earlier.    13:33:10

So, for that reason, when I do my Cammer five, I'm

really just focusing on whether there was a significant

return and whether there was a significant increase

in -- in trading volume.

Q.    Yeah.    13:33:24

A.    But like I said, I do review these, and if -- if I

came across a company where the stock price tended to

move in the wrong direction, based on new information

coming out, then that is something that I would -- I

would consider in the course of forming my opinions.    13:33:38

Q.    Is there any discussion in your report about this

directionality component of your analysis?

A.    So, again, the -- the test in Exhibit 7 is not

based on directionality.

But I did, in the course of preparing all these    13:33:56

exhibits, review the underlying data and the news.  So

I think that -- you know, that review of the news and

information applies to all of the exhibits within the

report.

Q.    Okay.  But I'm not -- I'm not missing anything.    13:34:12

Page 135

Right?  There's not some discussion about the                13:34:14

directionality -- directionality component.  You're

just saying you looked at it, you considered it, but

it's not part of your actual analysis?

A.   That's -- that's not what I said.  But let me just    13:34:24

go back to my report to try to -- to try to clarify

this for you.

So I think paragraph 48 kind of describes the --

and as well as paragraph 49.  But in paragraphs 48 and

49, I explain that I analyzed earnings announcements       13:34:55

and updates pertaining to QuantumScape's product

development during this -- this period.

And I go on to describe sort of that type of

information, why this type of information could be

important.                                                 13:35:11

In paragraph 49, I explain that we would not

expect every announcement to cause a significant

movement, because it may be partially anticipated, it

could contain a mix of both positive and negative

information.  It may be more or less relevant.             13:35:25

So that's where I think I'm describing that I've,

you know, reviewed these types of information

announcements.

Q.   Yeah.  I understand you reviewed it.

I am just saying:  But there's not an actual          13:35:40

Page 136

analysis of the directionality that you ^would have    13:35:43

expect from each particular announcement; is there?

A.   Well, like I -- like I said, once I've reviewed

the information and the output of the event study,

if -- if it looks to me like the prices were typically    13:35:58

moving in the opposite direction of what I would

predict, then that would -- that would be a concern for

me and I would -- I would pause and I would not, you

know, proceed with Exhibit 7, but that wasn't the case

here.    13:36:17

     And so, really, Exhibit 7 is -- is the formal test

statistics for the Cammer five analysis.

Q.   Okay.  Now, since you're on that part of your

report, if -- in paragraph 47, you say that "... one

would only expect to observe this pattern around the    13:36:33

release of unexpected and unanticipated value-relevant

company news."

     Do you see that?

A.   I'm sorry.  Which paragraph?

Q.   Forty-seven, I believe.    13:36:57

A.   Oh, I see.

Q.   Near the bottom.

A.   Got it.  Okay.  I see that.

Q.   Yeah.  How would you determine if a piece of

information was unexpected and unanticipated?    13:37:19

Page 137

CONFIDENTIAL

A.   So that's not a particular step within the -- the   13:37:26
test here of the Cammer five.  That's -- that sentence
is just providing an explanation, really, of the
preceding sentences.

    But what it's really pointing to is the idea that   13:37:39
typically -- for example, earnings announcements, even
though the market knows that earnings announcements are
coming typically, the actual content of the
announcement is typically not fully expected, although
sometimes it is, because analysts can have, you know,   13:37:59
earnings per share expectations.  Companies may provide
guidance.  And so, to the extent that they announce
results that are consistent with the previously
announced guidance or analyst expectations, this may
not be really new value-relevant information.   13:38:20

    In contrast, if a company announces earnings that
significantly meet -- sorry -- significantly beat or
fall short of analyst expectations or the companies
previously announced guidance, then that can be new
value-relevant information.  So that's -- that's kind   13:38:35
of what it's explaining there.

    But when I do the Cammer five analysis, I don't go
back through every earnings announcement and evaluate
the information environment for all of the months
leading up to an earnings announcement to form an   13:38:50

Page 138

ex-ante prediction of everything that was ultimately    13:38:52

announced in an earnings announcement.  But this is,

rather, just an explanation of why we may sometimes

observe significant price reactions to earnings

announcements, and other times, we may not.    13:39:05

Q.    Yeah.  So sorry.  Again, long answer.

So, just to be clear, for any of the news days

that you identified, you did not actually go look if

the alleged news was unanticipated or unexpected

information; did you?    13:39:23

A.    Not on -- not on an ex-ante basis.

On an ex-post basis, looking at those, I would say

that they often did appear to contain information that

was not previously available; but that's not part of

the Cammer five test for me to actually sort of form an    13:39:44

ex-ante prediction around each one of these.

Q.    Yeah.  I thought you told me earlier that you

hadn't done that kind of survey of all of the

information available in the market that -- that would

have allowed you to do that kind of test.  Is that    13:40:01

fair?

A.    Right.  That's -- exactly.  That's not part of --

Q.    Yeah.

A.    -- the actual test here.

Q.    Okay.  All right.    13:40:08

Page 139

CONFIDENTIAL

But in your -- in your test, you -- you compare   13:40:10

returns and trading volume on 12 -- "Product

Development and Earnings Announcement Dates," on the

one hand, to the 13 "Least News Trading Days," on the

other hand.  Is that right?   13:40:25

A.   Yes.

Q.   How did you pick those 13 "Least News Trading

Days"?

A.   Those are the dates that -- as the -- as the title

sort of implies -- are days within the Class Period or   13:40:35

the Analysis Period here that had the least amount of

potential -- potentially new information.

And so those are days that did not have any news

headlines from the Factiva news search; they did not

have any analyst reports, based on my identification of   13:40:52

what analyst reports I had access to at this point in

time; and no SEC filings during this time period.

Q.   Okay.  Now, you just -- I think you just used two

phrases.

You used the Class Period and Analysis Period.   13:41:09

How many of your least news days were from the Class

Period?

A.   That's not broken out in Exhibit 7.

Q.   Can you estimate?

A.   No, I'd have to go back to the underlying data in   13:41:22

Page 140

order to -- to look at that.                              13:41:24

Q.    Would you expect there to be at least a handful of least news days in the Class Period?

A.    I would expect that, yes.

Q.    Okay.  And what's the kind of objective criteria     13:41:41 that you used to determine what constitutes a product-development date?

A.    Yeah.  So in paragraph 48 I explain that these are -- are dates when QuantumScape issued press releases or announced either test results or -- or new     13:42:13 data or information that was related to the potential future success of QuantumScape's product, including the announcement of the completion of the business combination.

     And then in footnote 51, I give a few examples of     13:42:30 some press releases or news articles that I did not consider to be part of those product development dates.

Q.    Right.  Right.

     Well, so what peer review academic study helps you select what constitutes a product-development date?        13:42:49

A.    Sure.  I think that's -- that's -- that's based -- well, it's based, in part, on my own professional experience as a research analyst and also as a finance expert.

     But I think footnote 52 gives one example of -- of     13:43:09

CONFIDENTIAL

this from my own research, which is just that                    13:43:16

information about a company's product development tends

to be highly relevant for investors in a given company.

So in terms of actually then carrying that out --

it's -- it's really based on a review of the                     13:43:37

information environment to identify those types of

dates that would fall within that description during

the Analysis Period.

Q.   So the academic -- the academic literature that

you're using for this test is in footnote 52?               13:43:54

A.   No.  That's -- that's not what I said; but I

pointed to that as one example of how academic research

shows that product development is important for

companies, and it's particularly important for

early-stage companies or prerevenue,                        13:44:12

high-growth-emerging types of companies.

Q.   Yeah.  My question was:  What peer-reviewed

academic study selects product development dates using

the same criteria that you've used here?

A.   Yeah.  I -- I'm not aware of any peer-reviewed        13:44:35

studies that actually conduct a Cammer five analysis

for purposes of the peer-reviewed academic study.

So this Cammer five analysis really comes out of,

I think, the guidance from the Cammer Court as an

instruction to conduct sort of a cause-and-effect          13:44:56

Page 142

CONFIDENTIAL

Q.   Okay.  Now, I think earlier you were talking about   14:20:44
the -- one of the examples of -- of a private -- of a
private company having -- as being one limit to
arbitrage.  Is that because -- are you assuming there's
no ability to short that stock?   14:21:04

A.   Well, that's -- I mean, that's -- that's part of
it.

But part of it is just that, in that example,
there's really no ability to -- for an average investor
to trade in any direction in that --   14:21:23

Q.   Right.

A.   -- kind of stock.

Q.   Are there limits to -- what about limits to
short-selling for publicly listed companies?

A.   I -- I think there's some academic literature that   14:21:38
has looked at certain examples of when short-selling
was banned or prohibited entirely; that, in those
cases, there may have been some instances in which it
allowed mispricings to persist in -- in those
securities.   14:22:02

Q.   And what about if, say, costs to borrow are too
high so that short-selling becomes prohibitive?

A.   You know, I'd have to go back and -- and review
the actual literature.

I think it probably depends on the particular   14:22:19

Page 158

CONFIDENTIAL

company; the nature of the company.  Even when it -- I think there are examples.  Even when it can be a stock that might be listed on the hard-to-borrow list of stocks or it's -- it's costly, there may still be other ways.

In order to -- to try to generate profits, if -- if you view the prices as being overpriced, you could buy put options.  You could sell call options.  You may still be able to short on the exchange.  You could set up off-exchange trades.  Institutional investors quite frequently trade off exchange, and that's part of the reason that one of the -- the considerations in the efficiency report is to look at institutional trading, because they have access to a variety of trades, such as swaps and options and derivatives and other things that can be done on off exchange that may allow them to circumvent or get around a lack of shares available for going short in the stock.  So I think it depends on the particular company.

Q.   Okay.  Okay.  All right.  So we were talking about your Cammer five-factor test.

And I asked if you knew how many of your least trading days occurred in a Class Period.  I think you said you did not know.  Is that fair?

A.   Yes.

Page 159

CONFIDENTIAL

Q.   If it was -- if -- if there was only one out of   14:23:57
the 13, and that one day was the last day of the Class
Period, would that surprise you?

A.   Like I said, I don't know.  I'd have to go back
and look at the data to -- to see what it looks like.   14:24:08

Q.   And how does a test that primarily compares news
and least news days after the Class Period provide
reliable evidence of market efficiency during the Class
Period?

A.   Well, I guess I would start out by saying that   14:24:26
that description is -- is not accurate in terms of my
Cammer five test.

So if you look back at Exhibit 6, where I list out
the product development and the earnings announcements
dates, the first three -- actually, the first four   14:24:40
dates within this list are all during the Class Period.

And three out of four of those are statistically
significant at the 95 percent level or the 99 percent
level.

And, like I explained earlier, when you're   14:24:58
actually looking at that statistical significance, on
that day, you're comparing it to a number of other days
before or, in this case, during the Class Period,
because the -- the first day is November 27th.

So it's a fixed regression estimation that   14:25:19

Veritext Legal Solutions
866 299-5127

actually takes place over, I think, about three months.   14:25:22

So it's -- it takes place over a good chunk of the

Class Period.

So when you look at the abnormal returns on those

first four rows in Exhibit 6, it's actually comparing   14:25:36

the return on that news day to the returns on all of

the other trading days, other than product development

and earnings announcement days or alleged corrective

disclosures dates.

So it's actually comparing it to a large number   14:25:53

of -- of days that are within the Class Period, and so

I would -- I would actually say that just looking at

the first four rows, it's a very high percentage of

statistically significant returns around the Product

Development and Earnings Announcement Dates, which   14:26:10

is -- is very supportive of that cause-and-effect

relationship.

Q.   4 out of -- 4 out of 12.  Right?

A.   No, no.

It's 3 out of -- I'm just talking about the Class   14:26:22

Period, because your question was really about the

Class Period, not the Analysis Period.  So getting back

to your --

Q.   Well, let me ask a better question then.

A.   Okay.   14:26:32

Page 161

CONFIDENTIAL

in the Class Period, would that be a large enough    14:29:01

sample size to -- for a reliable test?

A.    Yeah.  I think that that would still be

informative.

My preference is to have a larger sample size than    14:29:12

that.  But even if we just look at four news days,

that's still a fairly large sample size when you also

consider that those event studies have -- each of those

four event studies has 60 -- roughly -- roughly 60

observations within it.    14:29:31

So each single firm event study on each row --

one, two, three, four -- of Exhibit 6 represents the

output of an event study that was estimated over a

sample size of approximately 60 trading days.  So

that's, I think, a fairly robust sample size when    14:29:48

you're thinking about an event study output.

But like I said, for purposes of Exhibit 7, my

preference is to have a larger sample.

If I were to limit myself only to those first four

rows, the statistics in that first column of Exhibit 7    14:30:03

would -- would be only higher than what they actually

are.

Q.    Switching gears, what's GlobalData?

A.    Can you -- are you -- can you point me to a

particular part of my report?    14:30:29

Page 164

CONFIDENTIAL

Q.   Are you familiar with a company called                14:30:32

"GlobalData"?

A.   I'm blanking a little bit at the moment; but if

you can point me to my report, I can take a look.

Q.   Its Exhibit 3, row 2.                                   14:30:50

A.   Okay.  Okay.  Yeah.  So this looks like it's -- it

is one of the analyst reports that's listed within that

broad search for analyst coverage.

Q.   So what's GlobalData?  What's the company?

A.   I'm not particularly familiar with GlobalData.       14:31:20

Q.   Have you looked at the -- this alleged analyst

report from GlobalData?

A.   I'd have to go back and -- and review.  I don't

have a recollection at the moment.

        MR. BISH:  Let's -- I think we're up to            14:31:46

Exhibit 50, which is Tab E.

(Deposition Exhibit 50 marked for identification.)

        THE WITNESS:  Okay.

BY MR. BISH:

Q.   Have you seen Exhibit 50 before today?               14:32:13

A.   Yes.  Now that I see it, I do recall looking at a

couple of these.

Q.   Is GlobalData a -- analyst?

A.   Like I said before, I'm -- I'm not familiar with

GlobalData.                                                14:32:33

Page 165

CONFIDENTIAL

Q.   Does GlobalData -- does GlobalData assess recent    14:32:38
company developments in its reports?

A.   I don't know off the top of my head.

Q.   Does GlobalData analyze historical financial
performance in its reports?    14:32:52

A.   They do seem to have historical financial
information, yes.

Q.   Do they just report it, or do they analyze it?

A.   Can you explain what you mean by that
differentiation?    14:33:09

Q.   Sure.  Are they just repeating what QuantumScape
released publicly, or are they doing their own
independent analysis of QuantumScape's financial
performance?

A.   Well, it's sort of difficult to see.  If I'm    14:33:21
scrolling through some of the charts, it says, for
example, there's a chart on page 10 that's reporting
number of mergers-and-acquisitions deals, capital
raises and alliances.  It says the above data is
extracted from GlobalData's deals and alliances    14:33:47
Profile.  So -- and it says that on the table below; it
says that for a lot of these other tables.

     So it's -- I'd have to -- you know, it looks like
from some of their footnotes that they do have some
sort of proprietary data.  But if you're asking about    14:34:06

Page 166

CONFIDENTIAL

whether this report -- at least the one you've put up    14:34:12

in front of me -- contains, like, the type of

opinionated commentary that you typically see in

analyst reports, I see them copying and pasting a lot

of information towards the end.    14:34:32

But beyond that, I -- I don't see -- I don't see

sort of that opinionated discussion and analysis that

you see in the more -- the more standard analyst

reports from companies like Goldman Sachs or

Morgan Stanley, Callan; these types of companies.    14:34:56

Q.   Does GlobalData provide forecasts for future

periods?

A.   I don't see any in this report.

Q.   Okay.  Does GlobalData provide or make investment

recommendations?    14:35:35

A.   I don't see any investment recommendations in this

report.

MR. BISH:  Okay.  If we can pull up what was

previously marked as Exhibit 13.

(Deposition Exhibit 13 previously marked for    14:36:13

identification.)

THE WITNESS:  Okay.

BY MR. BISH:

Q.   And Exhibit 13 is a January 2nd, 2021, Wall Street

Journal article.  Do you see that?    14:36:45

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

A.    I do.                                                    14:36:48

Q.    Have you seen Exhibit 13 before today?

A.    It -- it seems familiar, but I don't recall

specifically, one way or another, off the top of my

head.                                                          14:37:01

Q.    Now, I'm going to direct your attention to the

second paragraph, where it says:  "QuantumScape's

shares have soared since going public in November."

      Do you see that?

A.    Yes, I do.                                               14:37:15

Q.    It says:  "The company revealed promising test

results for a limited version of its solid-state

battery in early December, but otherwise the stock's

meteoric ascent has been hard to explain."

      Do you see that?                                         14:37:29

A.    Yes.

Q.    Do you agree that the meteoric ascent of

QuantumScape's shares in December 2020 is hard to

explain?

A.    I have not conducted an analysis of QuantumScape's       14:37:39

stock price changes during December of 2020, so I -- I

don't have an opinion, one way or another, on whether

the pricing changes were either hard or easy to

explain.

Q.    Yeah.  So sitting here today, you don't have an         14:38:03

Page 168

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

Q.    I understand, but you -- you took a look at the        14:41:36

Factiva headlines.   Right?

A.    I briefly reviewed those, and I looked in more

detail at other ones that were for purposes of my

Cammer five analysis; but I -- the purpose was not        14:41:48

to -- to look at those in the context of trying to

explain stock price changes during December 2020.

        MR. BISH:   Okay.   Well, let's just go ahead

and mark the output of your Factiva search as

Exhibit 51 and 52.   I think there's two different ones.   14:42:09

(Deposition Exhibits 51 and 52 were marked for

identification.)

BY MR. BISH:

Q.    Exhibit 51 is the output for the Class Period.   Is

that right?                                               14:42:32

A.    Yes.

Q.    And how many entries -- if you scroll down to

about row 85?

A.    Okay.

Q.    And row 85 is December 14th.   Do you see that?     14:43:08

A.    I do.

Q.    2020?

A.    Yeah.

Q.    And how many -- how many Factiva news headlines

were there for QuantumScape between December 14th and    14:43:18

Page 171

December 22nd?                                                        14:43:24

A.    Inclusive?

Q.    Yeah.

A.    It looks like about 35.

Q.    And looking at these headlines, do you see any --    14:43:48

any news events that appear notable to you?

A.    What do you mean by "notable"?

Q.    That could -- that could explain a 135 percent

increase in the stock price?

A.    That's -- that's not the type of analysis that I    14:44:11

undertake in order to attempt to explain stock price

changes.  I don't just look at some headlines from a

Factiva search.

Q.    Well, right.

      So we're going to go through all of the different    14:44:25

factors that could have -- that could explain the

increase.

      And I just want to see if there's anything in

these news articles that would make you think that the

news -- some news event caused a 135 percent increase    14:44:35

in the stock price.

          MR. PORRITT:  Object to form.

          THE WITNESS:  Well, there -- there could be

things contained in the articles that would be

consistent with that; but I have not done that type of    14:44:48

CONFIDENTIAL

analysis.                                                    14:44:50

BY MR. BISH:

Q.   So were there any press releases issued by the company between December 14th and December 22nd?

A.   I don't know.                                           14:45:06

Q.   Were there any new product launches between December 14th and December 22nd?

A.   For QuantumScape or --

Q.   QuantumScape.

A.   I -- yeah.  I don't know.                               14:45:18

I mean, obviously, it -- I think it's important to, you know, keep in mind that this Factiva news search was limited in scope to QuantumScape's company tag.

It does not include more general industry             14:45:36
articles.  It does not include articles about Volkswagen, for example.  And I know that over this time period, at least during the Class Period, there was important information related to Volkswagen and QuantumScape.                                                14:45:53

But, yeah, beyond that, that's -- that's not the type of analysis -- that's not the purpose of this Factiva news search.  It was not an attempt to produce an exhaustive list of potentially value-relevant information that -- that could explain QuantumScape's   14:46:07

Page 173

CONFIDENTIAL

stock price change over the course of a couple of weeks   14:46:13

in December 2020.

Q.   And in Exhibit 6 to your report, there's no

product development or earnings announcement dates

between December 14th and December 22nd.  Is that   14:46:25

correct?

A.   That is correct.

Q.   Can you think of any other economic reason to

explain the 135 percent increase during this time

period?   14:46:38

MR. PORRITT:  Object to form.

THE WITNESS:  Well, like I -- I said, I have

not done an analysis; so I cannot really give an

explanation of an analysis that I have not done.

But if -- if the question is just at a general   14:46:51

level, what are the types of economic explanations for

stock price changes of companies, that can include

investors revising their valuation of a company;

investors revising their expectations of success;

investors who are following a general industry or other   14:47:10

competitors or other potential customers of a company,

and revising their -- their views and expectations of

the -- the potential scope of a product market and

potential customer base, or the size of the customer

base.  It could involve investors looking at the   14:47:33

Page 174

availability of raw materials, minerals, chemicals, 14:47:37

things that might be in limited supply revising their

expectations about the availability of inputs to the

production process.

So there's a wide variety of types of information 14:47:51

that investors may be paying attention to, and

ultimately revising their -- their expectations

regarding -- regarding a company.

So these are the types -- some of the types of

economic explanations for why stock prices can -- can 14:48:09

change.

BY MR. BISH:

Q.   Are there any factors that could explain a

135 percent stock price that would be associated with

an inefficient market? 14:48:22

A.   You said 135 percent stock price?  Did you mean a

stock price at $135 or...

Q.   Increase.

A.   So any factors that could explain 135 percent

increase in a stock price that would be consistent with 14:48:43

inefficient markets?

Q.   Yeah.

A.   Yeah.  I've seen that -- those types of swings in

over-the-counter thinly traded stocks of -- of

companies that have very low trading volume, very 14:48:59

Page 175

on very short intervals, that can increase the bid-ask    14:54:04

spread, for example.

    And so those studies that would conclude that

that's a reduction in market efficiency -- that might

mean something in the context of bid-ask spreads; but    14:54:17

it may not necessarily be applicable or comparable to

our discussion of market efficiency analyses in a -- a

class certification case like this.

Q.   Well, do you -- do you -- setting aside a complete

ban, if there are restrictions on short-selling, does    14:54:45

that generally make markets less efficient?

A.   I think that those restrictions can have

implications for market structure, like bid-ask spread.

    But it's -- it's not necessarily going to reduce

the value of -- or reduce the extent of market    14:55:07

efficiency in the context of really what we're talking

about in a report like mine, which is really getting at

this question of:  Is information impounded into stock

prices?

    So, again, I think it really is important to -- to    14:55:25

keep in mind that I define market efficiency, as we've

discussed earlier today -- I define that in my report;

and my report is really speaking to that definition of

market efficiency, whereas a lot of market

microstructure academic studies that look at    14:55:44

Veritext Legal Solutions
866 299-5127

short-selling and other types of restrictions -- when   14:55:46

they talk about market efficiency, they're really

talking about liquidity, bid-ask spreads; market depth,

things like that, which are really different from the

type of market efficiency we're discussing in my   14:56:01

report.

Q.   Have you -- have you looked to see if there was

any limits on short-selling at any point in the Class

Period for QuantumScape?

A.   No, I have not.   14:56:12

Q.   So you don't know if there was limited lending

supply for QuantumScape shares at any point during the

Class Period?

A.   I do know there was some degree of short-selling

activity.  I think that's shown in -- I think it's   14:56:24

Exhibit 10 of my report.

But beyond that, I don't know if -- if certain

investors were complaining about any difficulty in

shorting the stock.

Q.   Is it possible for the -- a market for a company's   14:56:42

stock to be efficient at some point in time and

inefficient at other points in time?

A.   Yes.

Q.   And are you, Dr. Cain, able to analyze whether a

stock is subject to short-selling constraints for a   14:57:06

Page 180

particular time period?                                    14:57:08

A.    Am I able to...

      I believe I would be able to, if I was asked to --

to do so.  That's not a factor -- that's not a Cammer

factor, for purposes of market efficiency report, but I    14:57:27

believe that that type of data is -- is available.

Q.    Have you ever done that kind of analysis?

A.    No.

Q.    What's in a short squeeze?

A.    I'm sorry.  Can you repeat?                           14:57:44

Q.    What's a short squeeze?

A.    I believe a short squeeze refers to a situation

when some investors have shorted a company's stock; and

then when they go out to obtain the shares to cover the

short, there's a -- sort of a liquidity shortage or a      14:58:10

difficulty in obtaining shares to deliver on a short

sell.

      And so when they are forced to cover it, it

triggers buying activity by the investors who had a

negative view of the stock, and that buying activity       14:58:30

pushes the stock price up.  And so under short squeeze,

the stock price can increase even though investors

are -- or at least certain investors are betting that

the stock price would decrease; but it actually

increases partly in relation to their shorting            14:58:48

Veritext Legal Solutions
866 299-5127

activity.                                                    14:58:50

Q.    And what's a gamma squeeze?

A.    I think it's a similar dynamic; but involving

options.

Q.    And what's a delta hedge?                             14:59:14

A.    I think that's an option hedging strategy that's

based on some aspect of the expected volatility; but

I'd have to go back and review my old textbooks to look

it up.

Q.    All right.  Did you test to see if QuantumScape      14:59:39

was subject to a short squeeze at any point during the

Class Period?

A.    No.

Q.    Did you see any articles discussing that

QuantumScape was subject to a short squeeze during the   14:59:50

Class Period?

A.    I don't recall, one way or another, off the top of

my head.

Q.    How -- how, if at all, would that impact your

market efficiency opinions?                              15:00:09

A.    It -- I don't think it would.  When -- when you

look at my report, there are a number of factors that

the courts have articulated are relevant for an

analysis of market efficiency.

    Those factors include the Cammer and Krogman         15:00:26

Page 182

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

factors, as well as the fact that it was traded on a        15:00:30

large, liquid stock exchange, and I've analyzed those

factors.

So short-selling activities is not -- to the best

of my knowledge, it's not one of the factors that was       15:00:46

articulated within the Cammer or Krogman Court

decisions.

Q.    What's a short ratio?

A.    What is QuantumScape's short ratio or --

Q.    No, no.  What -- what is a short ratio?             15:00:59

A.    I think it's the number of shares that are

shorted, divided by some other denominator, such as

either shares outstanding or float or something like

that.

Q.    When there's a high short ratio, is it riskier to    15:01:15

maintain a short position?

A.    That -- I don't have an opinion.  That's not

something I formed an opinion on.

Q.    Have you ever researched that -- that issue?

A.    No, I haven't.                                       15:01:32

Q.    Now, so do you know, one way or the other, if in

general short sellers get uncomfortable when short

ratios exceed 10 percent?

A.    Off the top of my head, I don't know.

Q.    As short ratios increase, can there be a rush to    15:01:52

Page 183

CONFIDENTIAL

exit positions?                                    15:01:57

A.   I think it would -- it could really depend on the particular company.  I would assume that there's significant variation from company to company.

Q.   And if short sellers are in a rush to exit their    15:02:13
position, would that have the effect of driving up stock price?

A.   Again, I think it would really depend on the particular company.

Q.   Now, what do you consider to be high stock    15:02:27
borrowing rates?

A.   That's not something I formed an opinion on.

Q.   Do you have a general view about what a high stock borrowing rate is?

A.   Off the top of my head, no.    15:02:41

Q.   Have you ever researched or written anything about what constitutes a high borrowing rate?

A.   No.

Q.   So you wouldn't know if 15 percent is an extraordinarily high borrowing rate?    15:02:55

A.   I wouldn't have an opinion on whether that's high relative to some sort of rule of thumb or benchmark.

Q.   And do you know what the borrowing rate for QuantumScape was during the Class Period?

A.   No, I don't.    15:03:14

Page 184

CONFIDENTIAL

Q.   Do you know if the borrowing rates for                    15:03:15

QuantumScape stock was ever above 6 percent?

A.   No.

Q.   Do you know if the borrowing rates for

QuantumScape stock was ever above 15 percent?                  15:03:25

A.   No.

Q.   Okay.  I think we've been going for about an hour.

Am I right?

A.   Yep.

        MR. BISH:  All right.  Let's take a fiver.          15:03:36

        THE VIDEOGRAPHER:  Off the record 6:03 p.m.

(Recess taken from 6:03 p.m. until 6:17 p.m.)

        THE VIDEOGRAPHER:  We are back on the record

at 6:17 p.m.  Go ahead.

BY MR. BISH:                                                    15:17:39

Q.   Welcome back, Dr. Cain.  I understand after the

break there's an answer you want to supplement.

A.   Yes.  Thank you.

     Yeah.  Before the break, you asked me if I had

ever done any -- any sort of study or research on -- on    15:17:48

short-selling or squeezes; things like that.

     And I said "no," which I think is accurate; but I

just wanted to point out for clarity that I did sign

a -- I think it was a white paper that was sent to the

SEC in relation to its -- the SEC had put out some sort    15:18:09

Page 185

CONFIDENTIAL

of report on GameStop and an assessment of whether   15:18:14

there was a short squeeze in GameStop.

And so I signed -- I reviewed and provided some

editorial comments on that white paper.

I did not do any of the analysis or the study on   15:18:29

it, but just wanted to clarify to make sure that my

previous response was -- was not misleading in any way.

Q.   Now, you previously worked for the SEC.  Correct?

A.   Yes, I did.

Q.   Now, you, of course, would not sign your name to   15:18:43

any submission to the SEC that you didn't agree with.

Correct?

A.   No.  I think that's -- I think that's fair.  But

again, I did not do the -- the study or the actual

analysis of the -- of the data involved in GameStop;   15:19:02

so, like I said, my review of -- of that was -- was

more editorial in nature.

MR. BISH:  So let's mark as Exhibit 53 a

report by the ad hoc academic committee on equity and

options market structure conditions in early 2021.   15:19:22

(Deposition Exhibit 53 marked for identification.)

BY MR. BISH:

Q.   See if this is the report -- the white paper

you're talking about.

A.   And there it is.   15:19:35

Page 186

CONFIDENTIAL

Q.   And if you look at page 2 of Exhibit 53, we see   15:19:36
your name is the fourth name down.

A.   Correct.

Q.   And you're a member of this ad hoc academic
committee?   15:19:52

A.   You know, this was really just the people who
signed this white paper, so I don't think there's
really any ongoing committee to speak of, as far as I'm
aware.

Q.   But at the time, were you a member of the ad hoc   15:20:05
academic committee?

A.   I suppose so, for -- for purposes of putting our
names on this.  Yes.

Q.   And if we -- if we look at -- page 24,
paragraph 72...   15:20:36

Do you see where it says:  "A large body of
literature shows how short-selling constraints
undermine the efficiency and liquidity of the
securities markets"?  Do you see that?

A.   Yes, I do.   15:21:08

Q.   Accurate statement?

A.   Yes.  So I -- I do think that's accurate.

And that's, you know, something I was trying to
explain previously, which is when this talks about
efficiency, it's really talking about -- it's even   15:21:24

Page 187

CONFIDENTIAL

actually in the sentence here:  liquidity.                    15:21:28

It's really typically talking about the liquidity

of trading, in a -- in sort of a microstructure

framework:  bid-ask spreads type of a framework.

And I think that these academic studies, when      15:21:46

they're talking about efficiency, are not tied in to

the type of market efficiency that I've defined for

purposes of this QuantumScape report.

Q.   And if we look at paragraph 6 on page 5...

A.   Okay.                                                    15:22:19

Q.   Do you see the -- near the bottom, where it says:

"One short seller said, 'We get really uncomfortable if

one of our shorts has a 10 percent short ratio.' With

such a high short ratio, it becomes riskier to maintain

a short position, since a rush to exit positions may      15:22:31

drive up the price."

Do you see that?

A.   Yes, I do.

Q.   It's an accurate statement?

A.   Yeah.  I think it -- it can be accurate.               15:22:42

It -- like I said earlier, it depends on the

individual company and the -- the circumstances.

I think that the preceding sentence talks about a

short ratio fluctuating between 50 percent and

100 percent.                                                15:22:55

Veritext Legal Solutions
866 299-5127

So this is just a quote following that of -- of

one short seller relating to a 10 percent ratio.

But, yeah, I do agree with the last sentence of

paragraph 6, is that when there is a very large degree

of short interest, it can become riskier for those --

those short sellers in certain situations.

Q.   Well, doesn't your market efficiency analysis

include liquidity factors like trading volume and

bid-ask spread?

A.   Absolutely.  And I think, you know, I would go on

to just add to that, that -- that, you know, there's

a -- it's actually valuable that -- that we look at

those in a market efficiency report.

Because if there is a reduction -- if there is an

impact to market efficiency, due to short-selling

activity or constraints or any other factors, then we

would typically expect that to show up in some of the

factors that are analyzed and assessed in a market

efficiency report.

And so to the extent that I've studied trading

volume and bid-ask spreads and all these other factors,

I think these are informative of -- really very

informative to this question of whether the Common

Stock traded in an efficient market during the Class

Period.

15:22:58

15:23:18

15:23:43

15:24:15

15:24:31

15:24:51

Page 189

CONFIDENTIAL

Q.    Okay.  And sorry to make you flip back.  Page 23,          15:24:57

paragraph 69.

A.    Okay.

Q.    And do you see that discussion of delta hedging?

A.    I do.                                                      15:25:23

Q.    And do you see the last sentence:  "Because

dealers can suffer substantial losses, delta hedging

can often lead to a rapid and sharp increase to share

price, exacerbating short-seller losses"?

      Do you see that?                                          15:25:51

A.    Yes, I do.

Q.    Did you perform any analysis for QuantumScape

about whether dealers were forced to purchase

QuantumScape to delta hedge their risk exposure?

A.    No, I did not.                                            15:26:00

Q.    And if you look at paragraph 67, do you see where

it says:  "As vividly illustrated by the events in

early 2021 involving GameStop -- GameStop and other

meme stock securities, short sellers faced an

additional risk when heavy options trading drives up         15:26:25

the price of a security by forcing dealers to purchase

the security to the delta hedge their risk exposure"?

A.    Yes, I do.

Q.    Do you agree with that?

A.    I -- yeah, I think generally I would agree that          15:26:49

Page 190

that can be a potential risk to short sellers.                    15:26:52

Q.    In looking at -- now let's go back to paragraph 62
on page 21.

A.    Okay.

Q.    Do you see discussion over stock borrowing rates?    15:27:08

A.    I see that.

Q.    And the footnote 134 that says an intrinsic rate
of 6 percent would be extraordinarily high.  Do you see
that?

A.    Yes, I do.                                               15:27:39

Q.    And do you agree with that statement?

A.    I don't have an opinion on that statement.

Q.    But certainly you wouldn't have signed your name
to a report to the SEC if you didn't agree with the
conclusions.  Right?                                          15:27:57

A.    Right.  I think if I disagreed with the overall
conclusions, then I would not have signed my name, but
like I explained earlier, I did not actually conduct
the analyses on here, so I don't have any personal
knowledge of whether an intrinsic rate of 6 percent is       15:28:11
high or -- or low relative to any sort of benchmark.

Q.    And what would you conclude if QuantumScape's
stock borrowing rates were above 6 percent?

      Would that affect your assessment of market
efficiency?                                                   15:28:33

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

A.    Well, if -- if that had an effect on the actual    15:28:34

trading volume and bid-ask spreads or Cammer five

price-impact analyses, the various types of analyses

that I've carried out in my report, then I would -- I

would certainly evaluate my conclusions in the light of    15:28:58

any analyses that could be affected, as I think -- as

we read through some of the statements in this white

paper, these things are all interconnected; they don't

exist in a vacuum.

So, to the extent that there was a significant    15:29:22

reduction in the market efficiency for QuantumScape,

due to any sort of short-selling bans or constraints,

if that actually had an effect on the market efficiency

then I would expect that to show up in the metrics that

I've analyzed and assessed in this market efficiency    15:29:42

report.

Q.    Well, is it -- is it possible that these market

conditions impacted the stock price in -- in the middle

of December 2020?

A.    Is it possible?  Is it -- is it possible that what    15:29:57

impacted QuantumScape's stock price?

Q.    As you just explained, a lot of these factors were

interconnected.  Right?

A.    Right.  Right.

Q.    Constraints on short sellers?    15:30:10

Page 192

CONFIDENTIAL

A.    Mm-hm.                                                  15:30:12

Q.    Delta hedging, high borrowing rates, et cetera.

Right?

A.    Yes.  So, again, these things are interconnected

along with the -- the other variables that I've          15:30:21

assessed in the market efficiency report.

     And I don't see those metrics exhibiting any

problematic characteristics in my market efficiency

analyses of QuantumScape.

     So that leads me to conclude that the market was      15:30:37

efficient during the Class Period.

Q.    But -- so what -- what -- what test or analysis

had you done in December of 2020 to rule out the

possibility that these market conditions were impacting

QuantumScape?                                             15:30:55

A.    Yeah.  Well, again, my tests are not asking about

some general question of market conditions involving

delta hedging or gamma hedging; but rather, my tests

are oriented around the question of was the market

efficient during the Class Period.                       15:31:15

     But as I kind of flipped through the exhibits,

many of these exhibits cover that time period, and you

can look at that time period to ask whether that time

period appears to be inefficient for a given factor

involving QuantumScape.                                   15:31:34

Page 193

For example, Exhibit 2, average weekly trading   15:31:36
volume is a percentage of shares outstanding in
December of 2020; it was very much in line with the
rest of the Class Period.

Exhibit 3, you know, its coverage was similar to   15:31:49
the early part of the Class Period.

Exhibit 6 shows, for example, that December 8th,
2020, there was a statistically significant stock
return on the Cammer five analysis around the
product-development date.   15:32:08

Exhibit 8, the market cap of QuantumScape was --
was high.  And that's one of the factors that weighs in
favor of market efficiency.

Exhibit 9, the bid-ask spread, while a little bit
higher during December, was still largely in line with   15:32:28
the range of bid-ask spreads and well below the
reference benchmark range of bid-ask spreads that I
compare to.

Exhibit 10, in December of 2020, there was
institutional share holdings, there was short interest   15:32:44
in the stock.  There was public float available for
trading.

And Exhibit 11, for autocorrelation, there was not
a statistically significant autocorrelation coefficient
during the fourth quarter of 2020, which is really just   15:33:00

Page 194

CONFIDENTIAL

the last few days of November and all of December 2020.    15:33:03

So, like I said, these things are all tied together. They're interconnected. And ultimately the -- December 2020 is part of the time period that I've evaluated. And I've concluded that the stock was    15:33:17 trading efficiently during that time period, and the -- all the time periods within the Class Period.

Q.    Okay. Long answer. We can go through it one by one if you want. But you have -- sitting here today, you have no explanation for the 135 percent stock    15:33:35 increase between December 14th and December 22nd. Correct?

MR. PORRITT:  Object to form.

THE WITNESS:  Like I said earlier, that's not a question that I was asked to form an opinion on --    15:33:49

BY MR. BISH:

Q.    So the -- the answer is no. Correct?

A.    No. That's -- I don't think that's correct.

Because you're -- you're asking me essentially am I looking at this stock, and I'm completely dumbfounded    15:33:59 as to why the stock price increased in December of 2020.

And, as I explained earlier, that's just not the case. There are a lot of economic explanations for why stock prices increase and then decrease. And those are    15:34:14

Page 195

CONFIDENTIAL

premised upon investor expectations about product                15:34:16

development; future growth; future success; the scope

of our customer base; the inputs to production.  All

these things can be highly relevant.

     And investors can have changing expectations over           15:34:29

time for any of these factors, which can drive

significant changes in stock prices for companies.

Q.   I'm not asking you to speculate.

     I'm saying:  Sitting here today, you have no

opinion to explain the 135 percent increase in the               15:34:44

stock price between December 14th and December 22nd.

Correct?

               MR. PORRITT:  Object to form.

               THE WITNESS:  That's the same answer as my

previous two answers to that question.                           15:34:55

BY MR. BISH:

Q.   All right.  So you have no opinion.  Correct?

A.   Yeah.  That's -- that's correct.  I have not been

asked to form an opinion; and I've -- I've not done an

analysis in order to attempt to form an opinion on the           15:35:08

stock price in December 2020.

Q.   Now let's look at paragraph 25 of your report to

the SEC for GameStop.

A.   Okay.

Q.   Do you see -- do you see that the description that           15:35:41

Page 196

CONFIDENTIAL

GameStop's share price traded up 131 percent over the    15:35:43

past two weeks, despite no major news released by the

company?  Do you see that?

A.   I do.

        MR. PORRITT:  Sorry.  Which -- Dale, which    15:35:53

paragraph are you at?  Sorry.  I've obviously got the

wrong number.

        MR. BISH:  Twenty-five.

        MR. PORRITT:  Twenty -- twenty-five?

        MR. BISH:  Yes.                              15:36:02

        MR. PORRITT:  All right.  I don't -- this is

in Exhibit 53?

        MR. BISH:  Yes.

        MR. PORRITT:  All right.  I don't -- that

doesn't -- paragraph 25 on Exhibit 53 doesn't seem to    15:36:11

say that.  So I'm not saying it doesn't say it

somewhere in this document.  I think you just got the

wrong -- oh, I see.  Okay.  Come on.  I see it.  All

right.  Yeah, sorry.  I was in -- go ahead.

BY MR. BISH:                                         15:36:26

Q.   And would you agree that a stock-price increase of

131 percent in two weeks with no news would be unusual?

A.   For -- for GameStop or for another company?

Q.   For any company.

A.   I -- I think that would be unusual for GameStop,    15:36:50

Page 197

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

based on my recollection.                          15:36:53

As I explained earlier, I've seen that type of

volatility for over-the-counter stocks that are not

appearing to be trading efficiently.

But I've also seen significant stock volatility   15:37:06

for other companies that are trading quite efficiently.

So it's -- in particular prerevenue companies,

early stage, development stage companies --

But again, I guess the caveat is what do we mean

when we say there's -- there's no major news for a    15:37:29

given company?

As -- as we looked at QuantumScape earlier, there

actually was significant news released in December

of -- of 2020.  So I don't think that that question is

really relevant to QuantumScape.  But I guess -- like I    15:37:44

said, it really depends on the company.

Q.   Oh.  Oh.  So it's your testimony there was major

news for QuantumScape between December 14th and

December 22nd?

A.   No.  So, again, you're talking about a two-week    15:37:56

time period, which I -- I think earlier you had asked

back to December 8th.

And, like I said earlier, I have not conducted an

assessment of the information environment.

Q.   Oh --                                         15:38:09

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

A.    But I did note in Exhibit 86 that on December 8th    15:38:09

there was news relating to product development for

QuantumScape, and I think as we looked at the Factiva

news search, I think we counted up about 35 news

articles in the -- in the following couple of weeks.    15:38:22

Q.    Yeah.

A.    Yeah.

Q.    Okay.  So you anticipate that you're -- when you

come back on the merits, you're going to explain that

those headlines on those -- in Factiva, between    15:38:33

December 14th and December 22nd, are going to explain

the increase of $56 to $131?  Do you think that's

realistic, sir?

MR. PORRITT:  I'm going to object to form.

Now you're just arguing and badgering the witness,    15:38:46

Dale.  This is like totally not on.

But anyway, the witness can argue -- can answer or

argue back.  It's up to you, Dr. Cain, how you choose

to answer.

THE WITNESS:  I -- at this point in time, I    15:38:57

don't have any expectations of the opinions that I'll

be asked to form at the merits stage.  So it's really

quite difficult for me to answer your question.

MR. BISH:  Yeah.  I'll look forward to that

conversation.    15:39:13

Page 199

CONFIDENTIAL

So let's mark as -- I think we're up to          15:39:13

Exhibit 54.  Tab O, Andrew.

(Deposition Exhibit 54 marked for identification.)

BY MR. BISH:

Q.    A December 9th, 2020 publication from          15:39:31

S3 Analytics.  Are you familiar with S3 Analytics?

A.    Sorry.  I'm still trying to refresh.  Did you put

a document in?

Q.    Yes, sir.

A.    Oh, okay.  I see it.  Okay.  I see the document.          15:39:48

Q.    And do you know what S3 Analytics is?

A.    No.

Q.    Now, the first line reads: "Lithium metal battery

producer QuantumScape Corp. is up over 26 percent in

midmorning trading after it announced positive          15:40:35

technical results for its solid-state batteries."

      Do you see that?

A.    Yes.

Q.    And that's obviously referencing the December 8th

data that we looked at this morning.  Correct?          15:40:46

A.    That's what it looks like.

Q.    And if you look at the next paragraph, do you see

where it says:  "QuantumScape is the 12th largest short

in the auto parts and equipment sector, with

short-selling relatively flat for the last month          15:41:02

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

A.   I -- I don't think I would necessarily agree with   16:16:19
all of the conclusions in those articles.

It's -- I'd say it's fairly rare that I would
agree with everything that's stated in any article.

And that could include -- you know, I think when   16:16:32
you work with other coauthors, there's a give-and-take
relationship, where different coauthors want to put
different things into a study, or a journal editor or
referee wants to see something.

So there are times that you just have to kind of   16:16:48
deal with that even in your own research.

But I think I would point to those studies for the
conclusion that I drew from them, which is that
numerous studies have evaluated the potential for
arbitrage profits to be earned from persistent   16:17:03
mispricing opportunities between Common Stock and
options prices, and have concluded that such
opportunities do not persist in general due to the
efficiency of option pricing.

Q.   Anything else?   16:17:20

A.   I mean, I guess there's other studies talked about
in footnote 81 that just refer to options prices
quickly beginning to impound and reflect new
information, which is also a conclusion that I would
draw from -- from these studies.   16:17:38

Page 220

CONFIDENTIAL

Q.   Do you agree with the following statement:  In an   16:17:41
efficient options market, no costless arbitrage
opportunities can exist?

A.   Well, again, I -- I think I would -- I would
really qualify that as a question of -- over some sort   16:17:59
of time period.

     So you could easily observe within the data some
sort of mispricing on any given day.  Right?

     And there can be a variety of reasons for that,
but the question is really:  Do these types of   16:18:19
mispricings persist over a long period of time?

     And if so, then that would be evidence against
market efficiency.

Q.   Okay.  Do you still have your Exhibit 53 in front
of you?   16:18:59

A.   I can pull it up.

Q.   Thank you.

A.   Okay.

Q.   Looking at paragraph 3, talking about a Reddit
user by the name of u/Jeffamazon posted a DD.  Do you   16:19:13
see that?

A.   Yes.

Q.   Are you familiar with the phrase "DD"?

A.   No.

Q.   It says "due diligence in the parlance of the Wall   16:19:26

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

StreetBets subreddit."  Do you see that?                16:19:28

A.    I see that.

Q.    Are you familiar with Wall StreetBets?

A.    No.

Q.    Are you familiar with Reddit?                     16:19:38

A.    Generally not -- I don't use it, but I'm generally familiar with it.

Q.    And then if you look at paragraph 15...

A.    Okay.

Q.    Talking about a different -- a different Reddit   16:19:58 user, C.P.T. Hubbard.  And, again, this is -- with the SEC.  You see where it says:  "It ultimately received considerable attention amongst other quality DDs posted to Wall StreetBets around this time."?

      Do you see that?                                   16:20:15

A.    Yes.

Q.    Do you have -- how do you determine what is a quality DD?

A.    That's not a determination that I make.

Q.    So when you were editing and reviewing the        16:20:26 submissions for the SEC, did you undertake to understand what a DD is?

A.    No, I -- I didn't.

Q.    Now, some of the -- I believe some of the news events listed on your Factiva export referenced          16:21:06

Page 222

CONFIDENTIAL

possible short squeezes with QuantumScape.            16:21:11

　　　Do you recall seeing any of those headlines?

A.   Not off the top of my head, I don't.

　　　But -- which -- which exhibit?  What number was

this?  51 or 52?                                      16:21:25

Q.   Correct.

A.   All right.

Q.   So, for example, look at row 91.

A.   Yep.

Q.   And the headline is:  "QuantumScape, Kodak Among  16:21:49
Analyst's Top Short Squeeze Candidates."

　　　Do you see that?

A.   I do.

Q.   And, again, I think I asked you this earlier, but
whether or not QuantumScape was subject to a short    16:22:04
squeeze -- that would not impact your market efficiency
opinion?

A.   Well, like I explained earlier, I -- I do think
all of these things are tied together and -- in terms
of the impact on market integrity for a given company. 16:22:21

　　　So if QuantumScape was subject to a short squeeze
that had a significant impact on market efficiency of
the Common Stock, then I would expect to -- to see that
impact into various factors that I've analyzed in my
market efficiency report.                             16:22:41

Page 223

Q.   Okay.  Now, are you familiar with whether or not    16:24:05

there were any PIPE investors in QuantumScape prior to

January 2021?

A.   Sorry.  I missed the -- the type of investors --

Q.   PIPE.                                               16:24:21

A.   -- that you had.

     Oh, PIPE.  PIPE.

Q.   Yeah.

A.   All right.  So am I familiar with PIPE?

Q.   With the PIPE investors in QuantumScape prior to    16:24:30

January 2021.

A.   My recollection is that there may have been like

an S-1 filing around the beginning of January 2021 that

related to a PIPE offering.

Q.   Did you know when -- when that -- when the S-1 was   16:24:55

declared effective?

A.   I feel like it was maybe like a after-hours on a

Friday or over the weekend, but before January 4th.

But I don't have that fresh at the top of my head.

          MR. BISH:  Well, we'll introduce as            16:25:31

Exhibit 57 -- it's tab ^R, Andrew, yeah, tab -- hold

on -- a post on Reddit.  I'm not going to read the

title.

(Deposition Exhibit 57 marked for identification.)

          THE WITNESS:  Okay.                            16:26:14

Page 224

CONFIDENTIAL

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 19, 2022

_____

LYDIA ZINN, RPR, FCRR

CSR No. 9223

Page 237

# EXHIBIT H

# A Report by the *Ad Hoc* Academic Committee on Equity and Options Market Structure Conditions in Early 2021

Revised

July 2, 2022

**Exhibit**
**0053**
9/7/2022
Matthew Cain

1

Electronic copy available at: https://ssrn.com/abstract=4030179

# Members of the *Ad Hoc* Academic Committee

Joshua Mitts, *Chair*
Professor of Law
Columbia Law School

Robert Battalio
Professor and the William and Cassie Daley Department Chair, Finance
Mendoza College of Business, University of Notre Dame

Jonathan Brogaard
Professor of Finance
David Eccles School of Business, University of Utah

Matthew Cain, Ph.D.
Senior Fellow, Berkeley Law School
Visiting Scholar, Vanderbilt Law School

Lawrence Glosten
S. Sloan Colt Professor of Banking and International Finance
Columbia Business School

Brent Kochuba
Founder, SpotGamma

2

Electronic copy available at: https://ssrn.com/abstract=4030179

Gary Gensler, Chair
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Dear Chair Gensler:

On October 18, 2021, your staff released a long-awaited report on equity and options trading in connection with the meteoritic rise of GameStop's share price in January 2021. The staff report addressed several issues surrounding the GameStop episode, but one of the most widely reported was the conclusion that neither a short squeeze nor a gamma squeeze caused the increase in GameStop's share price. Rather, staff concluded, "*it was the positive sentiment, not the buying-to-cover, that sustained the weeks-long price appreciation of GameStop stock.*"[1]

In this report, we show that additional data has come to light which suggest that GameStop's shares may have been subject to a short squeeze and gamma squeeze. ***First***, by extending the sample and considering securities lending transactions, we find evidence suggesting that a nontrivial fraction of the trading volume in GameStop's stock consisted of purchases by short sellers covering their positions. ***Second***, we show that staff's analysis of a gamma squeeze can be extended to include delta-hedging by put and call options market makers to better approximate the contribution of options positions to the increase in GameStop's share price.

To be sure, without access to the sort of nonpublic, deanonymized data available to the Commission and its staff, we are unable to pin down the magnitude of a short squeeze or gamma squeeze in GameStop's shares, much less identify the actors involved in or responsible for such trading. We hope that our analysis can helpfully guide the Commission and its staff in identifying additional data which might shed light on the extent to which the increase in GameStop's share price may have been the product of a short squeeze and gamma squeeze. We are ready and willing to provide any assistance to the Commission and staff in that effort.

Sincerely,

Joshua Mitts, Ph.D.
Chair, *Ad Hoc* Academic Committee on Equity and Options Market Structure Conditions in Early 2021
Associate Professor of Law & Milton Handler Fellow, Columbia Law School

---

[1] SEC. & EXCH. COMM'N, *Staff Report on Equity and Options Market Structure Conditions in Early 2021*, at *26, https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf .

3

Electronic copy available at: https://ssrn.com/abstract=4030179

## I.    Factual Background

1.    We begin by briefly surveying the factual background leading up to the events of January 2021.  In our view, it is helpful to understand the events of January 2021 in light of what occurred throughout the prior year.

2.    On May 15, 2020, Melvin Capital filed a Form 13-F revealing 28,000 put option contracts in GameStop's shares, worth approximately $9.8 million.[2]  On August 14, Melvin Capital filed an updated Form 13-F revealing 34,000 GameStop put options, worth approximately $14.8 million.[3]  Fourteen days later on August 28, Ryan Cohen, former CEO of Chewy, Inc., filed a Form 13-D revealing a position of 5.8 million shares in GameStop's stock.[4] On August 31, he amended his Form 13-D to reflect a 6.2 million share position in GameStop,[5] which amounted to a roughly 9.6% stake in the company.

3.    On September 8, 2020, a Reddit user by the name of u/Jeffamazon posted a "*DD*" (due diligence in the parlance of the WallStreetBets subreddit) calling for a short squeeze in GameStop's shares.[6]  The post received over one thousand comments, and thousands more upvotes.  Nonetheless, on September 10, GameStop's share price declined 10% following the release of its earnings report after the close of trading on September 9.[7]  Analysts at Bank of America reiterated their "*bearish thesis*" on the company,[8] and Credit Suisse took a similar negative outlook, maintaining its "*sell*" rating.[9]  A few days later, GameStop's share price increased by 11% after Jefferies and Telsey Advisory Group upgraded their GameStop ratings on September 14.[10]  Nonetheless, it was reported that "*incredibly short interest on GameStop is still listed at more than 100% of public float*."[11]

4.    On September 22, news reports noted that "*GameStop jumps to 52-week high as shorts get anxious*."[12]  Shares of GameStop traded in the double digits for the first time that year, and

---

[2]https://www.sec.gov/Archives/edgar/data/0001628110/000090571820000457/0000905718-20-000457-index.html

[3]https://www.sec.gov/Archives/edgar/data/0001628110/000090571820000859/0000905718-20-000859-index.html

[4] https://www.sec.gov/Archives/edgar/data/0001822844/000101359420000670/rc13d-082820.htm

[5] https://www.sec.gov/Archives/edgar/data/0001822844/000101359420000673/rc13da1-083120.htm

[6] https://www.reddit.com/r/wallstreetbets/comments/ip6jnv/the_real_greatest_short_burn_of_the_century/

[7]https://seekingalpha.com/news/3612853-gamestop-minus-10-percent-in-post-earnings-swoon-bofa-stays-bearish

[8]https://seekingalpha.com/news/3612853-gamestop-minus-10-percent-in-post-earnings-swoon-bofa-stays-bearish

[9] https://www.analystratings.com/articles/credit-suisse-keeps-their-sell-rating-on-gamestop-gme/

[10] https://www.benzinga.com/stock/gme/ratings

[11]https://seekingalpha.com/news/3613604-gamestop-plus-11-percent-after-catching-pair-of-wall-street-upgrades

[12] https://seekingalpha.com/news/3616266-gamestop-jumps-to-52-week-high-shorts-get-anxious

4

Electronic copy available at: https://ssrn.com/abstract=4030179

on September 21, Cohen again amended his Form 13-D to reflect 6.5 million shares of GameStop, or approximately a 9.98% stake.[13]

5.   On November 16, Dr. Michael Burry, known for being one of the first investors to foresee and profit from the subprime mortgage crisis of 2007-2010, amended his own Form 13-F to reveal he had reduced his position in GameStop by approximately 1.1 million shares sometime between June 30 and September 30.[14]  His remaining 1,703,400 shares were worth approximately $17.4 million.[15]

6.   Around the same time, Melvin Capital filed a Form 13-F revealing 54,000 put options, worth around $55.1 million.[16]  In its previous Form 13-F filed on August 14, Melvin Capital had revealed 91 positions, including in GameStop.[17]  This bet was "*hardly remarkable*" according to the Financial Times considering that Wall Street analysts "*had sell ratings on the stock, and the retailer's prospects looked grim*."[18]  More interesting was that GameStop had a short interest ratio (*i.e.*, ratio of open short positions to daily trading volume) fluctuating between 50% and 100% during the first half of the year.  One short seller said, "*we get really uncomfortable if one of our shorts has a 10 percent short ratio*."[19]  With such a high short ratio, it becomes riskier to maintain a short position, since a rush to exit positions may drive up the price.

7.   On October 8, it was reported that GameStop had entered into a partnership with Microsoft, sending share prices of GameStop to around $11.90.[20]  At the time, short interest on GameStop exceeded 100% of the company's total float (*i.e.*, tradable shares).[21]  Seeking Alpha reported that "*investors like the deal, but several Wall Street firms are exuding caution*."[22]  One analyst wrote, "*we believe the substance in the press release was hollow; the stock was halted, $0 deal math was offered and there was no investor conference call...*

---

[13] https://www.sec.gov/Archives/edgar/data/0001822844/000101359420000699/rc13da2-091820.htm

[14] Dr. Burry's GameStop holdings as of June 30, 2020 were 2,750,000 shares based on his Form 13-F filed on August 14, 2020.
https://www.sec.gov/Archives/edgar/data/1649339/000156761920015233/xslForm13F_X01/form13fInfoTable.xml
His holdings as of September 30, 2020 were 1,703,400 shares based on his Form 13-F filed on November 16, 2020.
https://www.sec.gov/Archives/edgar/data/1649339/000156761920019679/xslForm13F_X01/form13fInfoTable.xml.

[15] https://www.sec.gov/Archives/edgar/data/1649339/000156761920019679/xslForm13F_X01/form13fInfoTable.xml

[16] https://www.sec.gov/Archives/edgar/data/0001628110/000090571820001111/0000905718-20-001111-index.html

[17] https://www.sec.gov/Archives/edgar/data/1628110/000090571820000859/xslForm13F_X01/infotable.xml

[18] https://www.ft.com/content/3f6b47f9-70c7-4839-8bb4-6a62f1bd39e0

[19] https://www.ft.com/content/3f6b47f9-70c7-4839-8bb4-6a62f1bd39e0

[20] https://seekingalpha.com/news/3620910-gamestop-jumps-21-percent-after-microsoft-partnership-agreement

[21] https://seekingalpha.com/news/3620910-gamestop-jumps-21-percent-after-microsoft-partnership-agreement

[22] https://seekingalpha.com/news/3620910-gamestop-jumps-21-percent-after-microsoft-partnership-agreement

5

Electronic copy available at: https://ssrn.com/abstract=4030179

> *We suspect Microsoft is taking advantage of GameStop's desperation, forcing them to share in subscription sales as their core market evaporates...We do not believe sharing in revenue from a game-subscription model will offset the loss of physical.*"[23]

8.    On October 27, a Reddit user named u/stonksflyingup posted a short video on the WallStreetBets subreddit titled "*GME Squeeze and the Demise of Melvin Capital*."[24] Posts about Melvin became more frequent, as Reddit users promised to drive the price of GameStop "*to the moon*."[25]

9.    While investors from Melvin Capital to Michael Burry were shorting GameStop, buying puts, or otherwise selling, some investors were buying, and not just Reddit users. Hedge fund Senvest Management began buying shares in September.[26]  Senvest was impressed with management as well as Ryan Cohen, despite analysts labeling the company a "*hold*" or "*sell*."  By the end of October, Senvest had purchased over 5% of GameStop, paying less than $10 per share for the bulk of their purchase.[27]

10.   At the end of October, when GameStop's shares were trading in the teens, the *Wall Street Journal* published an article about retail stocks "*being hot heading into the holiday season*."[28]  The article noted that GameStop's share price had doubled from March lows, but did not discuss short positions or discussions on Reddit. Instead, the *WSJ* noted that the company had cut salaries for executives and slashed capital spending.[29]

11.   On November 10, GameStop announced that it would redeem $125 million in principal amount of its 6.75% Senior Notes due in 2021 on December 11.[30] This voluntary early redemption would cover approximately 63% of the company's outstanding notes.

12.   On November 16, Ryan Cohen sent a message to GameStop's board, essentially stating that the business should conduct a thorough review, and that he was capable of transforming it from a brick-and-mortar retailer into a modern e-commerce gaming business.[31]  As reported in the *WSJ*, Cohen's letter stated, "*GameStop is one of the most*

---

[23] https://seekingalpha.com/news/3621264-blockbuster-bull-vs-bear-battle-setting-up-on-gamestop

[24] https://www.reddit.com/r/wallstreetbets/comments/jjctxg/gme_squeeze_and_the_demise_of_melvin_capital/

[25] https://www.ft.com/content/3f6b47f9-70c7-4839-8bb4-6a62f1bd39e0

[26] https://www.wsj.com/articles/this-hedge-fund-made-700-million-on-gamestop-11612390687

[27] https://www.wsj.com/articles/this-hedge-fund-made-700-million-on-gamestop-11612390687

[28] https://www.wsj.com/articles/retail-stocks-are-hot-heading-into-the-holiday-season-11603634400?mod=Searchresults_pos9&page=7

[29] https://www.wsj.com/articles/retail-stocks-are-hot-heading-into-the-holiday-season-11603634400?mod=Searchresults_pos9&page=7

[30] https://news.gamestop.com/news-releases/news-release-details/gamestop-announces-voluntary-early-redemption-senior-notes

[31] https://www.sec.gov/Archives/edgar/data/1326380/000101359420000821/rc13da3-111620.pdf

6

Electronic copy available at: https://ssrn.com/abstract=4030179

*shorted stocks in the entire market, which speaks volumes about investors' lack of confidence in the current leadership's approach.*"[32] Mr. Cohen recommended ending leases at underperforming stores and closing nonessential operations in Europe and Australia to pay for tech improvements, such as revamping GameStop's online store, according to the letter sent to the board.[33] The next time the *Wall Street Journal* mentioned GameStop was not until November 27, when it noted that customers were lining up outside stores to buy the new PlayStation console.[34]

13.    On December 5, a prominent Reddit poster on WallStreetBets posted a follow up post in which he observed that GameStop uses sequential order numbers which can be used to infer the company's sales figures.[35] In vulgar terms, the user predicted that "*GameStop would crush Wall Street's estimates in 4Q2020.*"[36]

14.    On December 8, GameStop shares fell 9% following a disappointing earnings report in which sales and EBITDA "*fell short*" of expectations.[37]  GameStop reported that e-commerce sales rose 257% in the third quarter, which partially offset softer store traffic.[38] Still, total comparable store sales were down 24.6%, which was larger than estimates calling for such sales to drop 20.5%.[39] Impacting these results was the unplanned shift of software titles later into Q4 2020 and, in some cases, into FY21.[40] GameStop received mixed reviews from analysts, with Bank of America rating it "*underperform,*" Benchmark rating it "*sell,*" and Telsey Advisory Group rating it "*outperform.*"[41]  The following day, the *Wall Street Journal* reported on GameStop's disappointing earnings, stating that "*investors binged too early on a complicated recovery story.*"[42]  The article briefly noted

---

[32]https://www.wsj.com/articles/gamestops-new-billionaire-investor-calls-for-tech-centric-makeover-11605565458?mod=Searchresults_pos7&page=7

[33]https://www.wsj.com/articles/gamestops-new-billionaire-investor-calls-for-tech-centric-makeover-11605565458?mod=Searchresults_pos7&page=7

[34]https://www.wsj.com/articles/black-friday-deals-become-tamer-as-covid-19-alters-sales-strategies-11606473001?mod=Searchresults_pos5&page=7

[35]https://www.reddit.com/r/wallstreetbets/comments/k7jp7f/gme_4q_bottom_up_ecommerce_financial_model/

[36]https://www.reddit.com/r/wallstreetbets/comments/k7jp7f/gme_4q_bottom_up_ecommerce_financial_model/

[37] https://seekingalpha.com/news/3642665-gamestop-drops-9-percent-after-sales-ebitda-fall-short

[38] https://news.gamestop.com/news-releases/news-release-details/gamestop-reports-third-quarter-results-positive-start-fourth

[39] https://www.barrons.com/articles/gamestop-stock-sinks-after-sales-dip-what-to-know-about-its-earnings-51607467741; https://seekingalpha.com/news/3642665-gamestop-drops-9-percent-after-sales-ebitda-fall-short

[40] https://seekingalpha.com/news/3642665-gamestop-drops-9-percent-after-sales-ebitda-fall-short

[41] https://seekingalpha.com/news/3642914-gamestop-sized-up-on-wall-street-after-earnings-bruising

[42]https://www.wsj.com/articles/gamestops-high-score-got-run-up-too-soon-11607531939?mod=Searchresults_pos2&page=7

7

Electronic copy available at: https://ssrn.com/abstract=4030179

that GameStop's share price had nearly tripled for the year, and that the company was a favorite of short sellers, but largely focused on aspects of the company's retail business.[43]

15.    On December 10, 2020, Reddit user u/CPTHubbard posted a DD on the WallStreetBets subreddit.  This DD made the case that Ryan Cohen had the vision and resources needed to transform GameStop, even if it involved a hostile takeover.[44]  It ultimately received considerable attention amongst other quality DDs posted to WallStreetBets around this time, and may have influenced others to buy GameStop shares.

16.    A week later, on December 17, Ryan Cohen amended his Form 13-D to reveal a position of 9 million shares of GameStop's common stock, amounting to a roughly 12.9% stake in the company.[45]

17.    On December 19, S&P Global Ratings downgraded GameStop's credit rating, "*GameStop recently reported weak operating performance as it continues to face risks from the elongation in the launch of new consoles, increasing competitive challenges, and long-term structural technological shifts. We lowered the ratings on the company. . . on both near-term performance volatility and long-term competitive uncertainties. The negative outlook reflects our expectation that intense competition from online and traditional retailers, economic uncertainty, and the lengthening of the console cycle could result in further deterioration for operating prospects*."[46]

18.    On December 22, GameStop jumped to a new 2020 high, trading at $19.74 per share.[47]  A Seeking Alpha report noted, "*As always with big GameStop spikes, there is the threat that more shorts will be pressured to cover their positions.*"[48]  The next day, investment research firm Hedgeye added GameStop to its "*Best Ideas*" list as a long trade.  One of Hedgeye's analysts stated, "*If the company can execute a turnaround strategy to make GameStop the leading store and online destination for the gaming community, you could have a stock at $50+.*"[49]  The stock price subsequently climbed to a new high of $22.30.

---

[43]https://www.wsj.com/articles/gamestops-high-score-got-run-up-too-soon-11607531939?mod=Searchresults_pos2&page=7

[44]https://www.reddit.com/r/wallstreetbets/comments/kakxrm/gme_tribe_a_story_about_how_ryan_cohen_is_about/

[45]https://www.sec.gov/Archives/edgar/data/0001822844/000119380520001571/e620151_sc13da-gamestop.htm

[46] https://news.futunn.com/en/post/4667323

[47] https://seekingalpha.com/news/3646725-gamestop-rally-gains-steam-2021

[48] https://seekingalpha.com/news/3646725-gamestop-rally-gains-steam-2021

[49] https://seekingalpha.com/news/3647009-gamestop-rips-higher-hedgeye-pitches-long-side-of-trade

8

Electronic copy available at: https://ssrn.com/abstract=4030179

19.    On February 16, 2021, Dr. Burry amended his Form 13-F to reveal that he had closed out his GameStop position sometime between September 30 and December 31, 2020.[50]

20.    On January 8, 2021 Credit Suisse reiterated its "*sell*" rating for GameStop. In a report issued on January 8, Seth Sigman from Credit Suisse maintained a "*sell rating*" on GameStop.[51]

21.    On January 11, Ryan Cohen and two former Chewy, Inc., executives were given seats on the board.[52]  GameStop shares rallied 7% following news of this agreement.[53]  As the rally continued, Seeking Alpha reported that the high level of short interest on GameStop "*as a percentage of total float landed it on [Seeking Alpha's] Catalyst Watch for the week*."[54]

22.    On January 13, the Wall Street Journal reported on Cohen's addition to the board, noting that the announcement (as part of GameStop's general recovery) had fueled a short squeeze "*according to some analysts*."[55]  The article, the first the WSJ published mentioning the short squeeze, stated, "*As of the end of last year, short interest in the stock—expressed as a percentage of GameStop shares available for trading—exceeded 138%, making it the second-most shorted company by that metric with a market value of at least $1 billion, according to data from FactSet*."[56]

23.    On January 14, the Wall Street Journal reported that shares of GameStop had doubled in the past two days, noting the activity on the WallStreetBets Reddit page. The WSJ noted that some Reddit users had predicted that "*stock might rapidly rise if short sellers had to cover their bets by buying back shares should the stock suddenly increase in value*."[57]  This of course is precisely what happened.  A research analyst at Wedbush securities, Michael Pachter, said, "*the shorts are freaking out…meanwhile the Robinhood message boards are*

---

[50]https://www.sec.gov/Archives/edgar/data/1649339/000156761921003819/xslForm13F_X01/form13fInfoTable.xml

[51] In a report issued on January 8, Seth Sigman from Credit Suisse maintained a "*sell*" rating on GameStop. https://www.analystratings.com/articles/gamestop-gme-receives-a-s.

[52]https://news.gamestop.com/news-releases/news-release-details/gamestop-announces-additional-board-refreshment-accelerate

[53] https://seekingalpha.com/news/3647009-gamestop-rips-higher-hedgeye-pitches-long-side-of-trade

[54] https://seekingalpha.com/news/3651108-gamestop-rally-extends-chewy-influence-touted

[55]https://www.wsj.com/articles/gamestop-shares-surge-after-traders-shift-bets-board-gets-makeover-11610563910?mod=Searchresults_pos19&page=6

[56]https://www.wsj.com/articles/gamestop-shares-surge-after-traders-shift-bets-board-gets-makeover-11610563910?mod=Searchresults_pos19&page=6

[57]https://www.wsj.com/articles/gamestop-stock-soars-and-social-media-traders-claim-victory-11610653679?mod=Searchresults_pos16&page=6

9

Electronic copy available at: https://ssrn.com/abstract=4030179

*bragging.*"[58]  The possibility that GameStop's shares were subject to a short squeeze also drew attention from more traditional news sources, including CNBC's Jim Cramer, who stated, "*Like it or not, right now we've got a bull market in short busting, and I bet you'll see more stories like GameStop.*"[59]

24.  On January 19, 2021, Citron Research announced they would hold a livestream to discuss five reasons that GameStop's share price would decline.[60]  The tweet announcing the stream belittled the intelligence of retail investors and predicted the price per share would go down to $20, drawing ire from said investors.[61]  Large amounts of OTM puts were purchased just prior to each tweet.[62]  On January 21, Citron tweeted, "*Too many people hacking Citron twitter, will record and post later today.  $GME going to $20 buy at your own risk.*"[63]

25.  On January 21, Citron's Andrew Left went on a YouTube-based podcast to repeat his bearish thesis on GameStop.  He argued the stock was "*in terminal decline*" and would be back down to $20 per share.[64]  His prediction came as GameStop's share price traded up 131% over the past two weeks despite no major news released by the company.

26.  On January 22, Reddit user and YouTube personality Keith Gill posted an update on his holdings in GameStop.  He held 50,000 shares and 1,000 4/16/2021 $12 calls.  His account balance, including cash and realized & unrealized gains, totaled $11.2 million.[65]  On the same day, ETRADE raised its long margin requirements for GameStop shares to 100%.[66]  On January 25, Keith Gill posted again.  He sold 200 4/16/2021 $12 call options to realize $2.25 million in gains.  He still held 50,000 shares and 800,000 4/16/2021 $12 calls.  His new account balance, including cash and realized & unrealized gains, totaled $13.9 million.

---

[58]https://www.wsj.com/articles/gamestop-stock-soars-and-social-media-traders-claim-victory-11610653679?mod=Searchresults_pos16&page=6

[59]https://www.cnbc.com/2021/01/14/jim-cramer-gamestop-bed-bath-beyond-are-surging-on-short-busting.html

[60] https://twitter.com/CitronResearch/status/1351544479547760642

[61] https://www.thestreet.com/investing/gamestop-climbs-as-citron-says-stock-will-go-back-to-20

[62]https://www.reddit.com/r/wallstreetbets/comments/l1tg88/gme_how_shorts_manipulated_you_and_how_you_can_be/

[63] https://twitter.com/CitronResearch/status/1352297677086605312

[64]https://www.benzinga.com/analyst-ratings/analyst-color/21/01/19261270/citrons-andrew-left-says-gamestop-is-pretty-much-in-terminal-decline

[65] https://www.reddit.com/r/wallstreetbets/comments/l2x7he/gme_yolo_update_jan_22_2021/

[66]https://www.reddit.com/r/wallstreetbets/comments/l2v5u5/etrade_increases_margin_requirement_on_gme_to_100/

Electronic copy available at: https://ssrn.com/abstract=4030179

27.    The same day, January 25, Citadel and Point72 invested $2.75 billion into Melvin Capital, which had an urgent need for liquidity due to the very real possibility of a margin call.[67] GameStop's share price proved to be extremely volatile that day as well, surging as much as 145% Monday morning, from $96.73 to $159.18, before sinking below Friday's close, only to bounce back up again by Monday's close to $76.79, up 18%. The volatility prompted the New York Stock Exchange to briefly halt trading nine times. About 175.5 million shares changed hands Monday, the second-largest one-day total on record, according to Dow Jones Market Data. That compares with the 30-day average of approximately 29.8 million shares.[68]

28.    On January 26, after previously closing at $76.79 per share, GameStop's share price gapped-up during after-hours trading to open at $88.56 per share.[69]  It closed at $147.98 per share after Elon Musk tweeted "*Gamestonk!!*" and linked to Reddit's WallStreetBets forum, which was followed by a large buying spree.[70]

29.    On January 27, Keith Gill posted another update on WallStreetBets. He sold 300 4/16/2021 $12 call options to realize approximately $9 million in gains.  He still held 50,000 shares and 500 4/16/2021 $12 call options.  His account balance, including cash and realized & unrealized gains, now totaled approximately $48 million.[71]  The same day, Bank of America securities reiterated their "*underperform*" rating of GameStop.[72]

30.    Also that day, Citron Research updated followers about a "*personal situation*" and claimed to have exited its short position at a significant loss.[73]  Melvin Capital also claimed to have closed its short position in GameStop on Tuesday afternoon after taking a huge loss, Melvin fund manager Gabe Plotkin told CNBC's Andrew Ross Sorkin.[74]  Finally, Discord banned the WallStreetBets server, and the subreddit temporarily went private.[75]

31.    January 28 was a busy day as well for all things GameStop.  To start, Jon Stewart created a Twitter account, and his first tweet was about WallStreetBets users.[76]  NASDAQ CEO

---

[67]https://www.bloomberg.com/news/articles/2021-01-25/citadel-point72-to-invest-275-billion-in-melvin-capital

[68]https://www.wsj.com/articles/gamestop-shares-surge-toward-fresh-record-ahead-of-opening-bell-11611579224

[69]https://www.marketwatch.com/investing/stock/GME/download-data?startDate=01/26/2021&endDate=01/27/2021

[70] https://twitter.com/elonmusk/status/1354174279894642703

[71]https://www.reddit.com/r/wallstreetbets/comments/l6ekdz/gme_yolo_update_jan_27_2021_guess_i_need_102/

[72] https://markets.businessinsider.com/analysts-opinions/gamestop-corp-new-a-underperform-748681

[73] https://twitter.com/CitronResearch/status/1354395523940196354;
https://www.youtube.com/watch?v=yS4yPsmaDDQ

[74] https://www.cnbc.com/video/2021/01/27/melvin-capital-sells-out-of-gamestop.html

[75] https://www.theverge.com/2021/1/27/22253251/discord-bans-the-r-wallstreetbets-server;
https://www.reddit.com/r/wallstreetbets/comments/l6j4r9/where_do_we_go_from_here_and_who_is_going_to_step/

[76] https://twitter.com/jonstewart/status/1354901018564321287

Electronic copy available at: https://ssrn.com/abstract=4030179

Adena Friedman said in remarks that the exchange would halt trading in a stock if they linked unusual activity to social media chatter.[77]  Some Robinhood users reported selling fractional shares in the range of  hundreds to thousands of dollars per share while GameStop was hovering around $260 per share.[78]  Additionally, some users reported that their GameStop shares were forcibly sold by Robinhood.[79]  A class action lawsuit was filed against Robinhood over trading restrictions.[80]

32.    The same day, Interactive Brokers prohibited trading GameStop options, noting in a statement that this suspension was *"due to the extraordinary volatility in the markets."* That meant customers could not currently place new options trades.  Interactive Brokers also said that long positions on GameStop—a bet that GameStop stock would rise—would require 100% margin, and short positions would require 300% margin *"until further notice."*[81] A number of other broker-dealers halted or prohibited trading as well, including Trading Republic, Trading 212, ETRADE, eToro, Revolut, Stake, DriveWealth, and Merrill Edge. Ultimately, Robinhood also prohibited buying GameStop shares.[82]

33.    Also on January 28, the National Securities Clearing Corporation ("*NSCC*") waived the capital premium charge for all clearing members.  While NSCC removed the premium charge, the value-at-risk (VaR) rate was still 100%, totaling $1.4 billion (up from only $282 million the prior day), which imposed massive collateral requirements on clearing members.[83]  The NSCC also increased deposit requirements on GameStop's shares from 2% to 100%.[84]  GameStop's share price reached a high of $483 per share, climbing over 1000% since opening at $42.59 the previous Friday.[85]

---

[77]https://markets.businessinsider.com/news/stocks/nasdaq-monitors-social-media-halts-unusual-trading-friedman-market-manipulation-2021-1-1030011156

[78]https://www.reddit.com/r/wallstreetbets/comments/l7em07/coworker_had_a_limit_executed_of_a_little_over/gl71agb?utm_source=share&utm_medium=web2x&context=3

[79] https://blog.robinhood.com/news/2021/1/28/keeping-customers-informed-through-market-volatility; https://www.reddit.com/r/wallstreetbets/comments/l759be/robinhood_closing_out_positions_for_gme_insane/

[80] https://www.courtlistener.com/recap/gov.uscourts.nysd.553175/gov.uscourts.nysd.553175.1.0.pdf

[81]https://www.investors.com/news/gamestop-stock-reddit-short-busting-curbs-spark-double-standard-cries/;https://www.cnbc.com/2021/01/28/interactive-brokers-restricted-gamestop-trading-to-protect-the-market-says-chairman-peterffy.html

[82]https://seekingalpha.com/news/3655535-watch-gamestop-amc-as-robinhood-reportedly-locking-out-traders; https://blog.robinhood.com/news/2021/1/28/keeping-customers-informed-through-market-volatility; https://www.bloombergquint.com/quicktakes/what-s-the-dtcc-and-how-did-it-stop-gamestop-mania-quicktake

[83] https://www.dtcc.com/-/media/Files/PDFs/DTCC-Statement-February-2021-Mike-Bodson.pdf; https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf; https://www.risk.net/our-take/7817696/games-of-hazard-nsccs-margin-waiver-sets-bad-precedent

[84]https://fortune.com/2021/02/02/robinhood-gamestop-restricted-trading-meme-stocks-gme-amc-vlad-tenev-nscc/

[85]https://www.gamesindustry.biz/articles/2021-01-28-hedge-fund-melvin-capital-pulls-out-of-gamestop-trading

12

Electronic copy available at: https://ssrn.com/abstract=4030179

34.    On January 29, the Wall Street Journal published an article titled, "*GameStop, Bitcoin and QAnon: How the Wisdom of Crowds Became the Anarchy of the Mob*."[86]  It noted that "*thousands of Americans are being mobilized by social-media algorithms that amplify fringe ideas...the results have real-world impact*."[87]

35.    The same day, S3 Partners claimed that there was a 113.31% short interest in GameStop, disputing CNBC's claim that shorts were covering.[88]  Citron Research also discontinued short selling research, and announced they would no longer publish short selling reports.[89]  Point72's CEO Steven Cohen tweeted, "*I'm not feeling the love on this site today...trading is a tough game*."[90]  This angered many users, considering Point72 and Citadel had just bailed out Melvin Capital, while Robinhood and other brokers had cut off the buy side from retail trading.

36.    On January 29, a class action lawsuit was filed in Colorado against Robinhood.[91] The lawsuit concerned the restrictions Robinhood placed on GameStop's shares, allowing only sell orders.[92]  The Attorney General of Texas also launched an investigation into Robinhood, again concerning the sell-only restrictions related to GameStop.[93]  Robinhood had limited the buying of 23 stocks. The company only allowed users to purchase additional shares in the stocks if they would not exceed a newly announced maximum number of shares per account.[94]  The company also raised an additional $1 billion in credit. The new credit was needed to handle additional liquidity demands due to NSCC's increase in collateral requirements to clear purchases of GameStop's shares.[95]

37.    On January 30, the Washington Post published an opinion piece seemingly arguing that the hedge funds and short sellers were the "*good guys*."[96]  Unsurprisingly, this elicited

---

[86]https://www.wsj.com/articles/gamestop-bitcoin-and-qanon-how-the-wisdom-of-crowds-became-the-anarchy-of-the-mob-11611928823

[87]https://www.wsj.com/articles/gamestop-bitcoin-and-qanon-how-the-wisdom-of-crowds-became-the-anarchy-of-the-mob-11611928823

[88] https://twitter.com/S3Partners/status/1355248815264182283

[89] https://twitter.com/CitronResearch/status/1355152873487798274

[90] https://twitter.com/StevenACohen2/status/1354864321134735360

[91] https://www.denverpost.com/2021/01/29/colorado-lawsuit-robinhood-schwab-stocks-gamestop/

[92]https://www.9news.com/article/money/markets/coloradan-sues-robinhood-td-ameritrade-over-game-stock-stock-shutout/73-423321e0-1877-46ad-b7f9-29f59d7dc3a3

[93] https://twitter.com/KenPaxtonTX/status/1355248165394509824

[94] https://blog.robinhood.com/news/2021/1/28/an-update-on-market-volatility

[95] https://daringfireball.net/linked/2021/01/29/robinhood-cash-injection

[96]https://www.washingtonpost.com/opinions/2021/01/30/good-guys-gamestop-story-its-hedge-funds-short-sellers/

13

Electronic copy available at: https://ssrn.com/abstract=4030179

thousands of strong reactions on Reddit.[97]  The same day, MarketWatch published an opinion piece comparing GameStop traders to QAnon.[98]  While not as widely viewed, it too generated strong feelings on the WallStreetBets subreddit.[99]

38.  On January 31, Elon Musk interviewed Robinhood CEO, Vlad Tenev, on Clubhouse. Tenev denied any wrongdoing related to the restrictions around stocks, including GameStop.[100]  On February 1, YouTuber Keith Gill posted an update on Reddit.  He saw around $10.2 million in unrealized gains disappear, but still held 50,000 shares and 500 4/16/2021 $12 call options.  His account balance, including cash and realized & unrealized gains, totaled around $35.8 million.[101]  Also that day, the Wall Street Journal reported, "*Despite record stock surge, GameStop is still struggling to stay afloat.*"[102]  The article noted that despite the surge in its stock price, the company closed over 1000 stores since 2019, as sales have fallen 10% over the last 11 quarters, and recent earnings reports have been disappointing.[103]  Elsewhere, a Degiro article reported that GameStop was the most heavily traded security in January in Europe.[104]  On February 2, Mark Cuban held an "*AMA*" (Ask Me Anything) forum on Reddit, in which he encouraged users to hold onto their GameStop shares.[105]

39.  On February 3, GameStop announced several new leadership appointments.  They hired a new CTO, VP of Fulfillment, and VP of Customer Care.

40.  On February 4, Treasury Secretary Janet Yellen met with financial regulators to discuss the craze around GameStop, and its impact on investors and the broader market.[106]  That day, GameStop's share price plunged more than 41% from the day before, dropping from $91.19 to $53.50.[107]

---

[97] https://www.reddit.com/r/Superstonk/comments/o0zk5h/never_forget_back_from_13021/

[98] https://www.marketwatch.com/story/gamestops-stock-surge-and-qanon-couldnt-seem-more-different-yet-they-have-this-trait-in-common-11611950457

[99] https://www.reddit.com/r/wallstreetbets/comments/l95laf/omg_stop_with_the_qanon_marketwatch/

[100] https://edition.cnn.com/2021/02/01/investing/robinhood-gamestop-vlad-tenev

[101] https://www.reddit.com/r/wallstreetbets/comments/lae6j0/gme_yolo_update_feb_1_2021/

[102] https://www.washingtonpost.com/business/2021/02/01/gamestop-retail-stores/

[103] https://www.washingtonpost.com/business/2021/02/01/gamestop-retail-stores/

[104] https://www.degiro.co.uk/knowledge/blog/most-traded-stocks-january-2021

[105] https://www.reddit.com/r/wallstreetbets/comments/lawubt/hey_everyone_its_mark_cuban_jumping_on_to_do_an/

[106] https://www.cbsnews.com/news/gamestop-gme-stock-down-reddit-2021-02-04/

[107] https://fortune.com/2021/02/05/gamestop-stock-gme-shares-robinhood-trade-restrictions-lifted-latest-update/

14

Electronic copy available at: https://ssrn.com/abstract=4030179

41.    On February 5, amid the lifting of trading restrictions late the previous evening by Robinhood and renewed interest on Reddit, GameStop shares jumped by more than 54%.[108]

## II.    Short Selling, Short Squeezes and Gamma Squeezes

A.    *Overview of Short Selling*

42.    In general, there are two types of transactions in the securities markets: purchases and sales.[109]  The terms "*long*" and "*short*" are ordinarily used to refer to the economic exposure of a market participant associated with purchases and sales of a security.  A market participant who buys a security to which they had no prior economic exposure is ordinarily said to have opened a *long position* in that security—otherwise known as a *long purchase*.

43.    A long position is a form of economic exposure which is positively correlated with the security's market value.  That is, the value of a long position increases as the market value of the security increases, and it decreases as the market value of the security decreases.  Market participants can sell a security they previously purchased in a *long sale*, which eliminates ("*closes*") the existing long position.

44.    Alternatively, market participants can sell a security they have not previously purchased in a *short sale*.[110]  This yields a *short position* in the security—a form of economic exposure which is negatively correlated with the security's market value.  That is, the value of a short position decreases as the market value of the security increases, and it increases as the market value of the security decreases.

45.    Market participants ordinarily open long positions when they believe a security's market value is more likely to increase than decrease.  Conversely, market participants ordinarily open short positions when they believe a security's market value is more likely to decrease than increase.

46.    A short seller may believe that the market value of a publicly traded company's common stock may decrease for a variety of reasons.  These reasons may be specific to the company itself (*e.g.*, idiosyncratic production constraints or potential fraud), relate to the company's industry (*e.g.*, technological shifts leading to reduced sector-wide profitability), or reflect market-wide predictions (*e.g.*, belief that global macroeconomic growth will decline).

47.    Upon the execution of a short sale, a short seller has a binding contractual obligation to deliver the security to the buyer by the time of settlement. In U.S. securities markets, settlement is currently two business days after the transaction.  One way to satisfy this delivery obligation is for the short seller to purchase the securities on the open market *after* the short sale transaction and deliver them to its counterparty *prior* to settlement.  This is

---

[108]https://fortune.com/2021/02/05/gamestop-stock-gme-shares-robinhood-trade-restrictions-lifted-latest-update/

[109] The discussion in this section of our report draws on prior research and testimony by Professor Mitts.

[110] ROBERT L. MCDONALD, DERIVATIVES MARKETS p.16 (2012)

15

Electronic copy available at: https://ssrn.com/abstract=4030179

often referred to as *naked* short selling, which reflects how the seller sold a security it neither owned nor was contracted to purchase at the time of the sale.

48.     Another way to satisfy this delivery obligation is by borrowing the securities from a lender, then delivering the borrowed securities to the counterparty-buyer. This is known as *covered* short selling.[111] To return borrowed securities to the lender (*i.e.*, *cover* the short position), a short seller ordinarily purchases the same quantity and type of securities on the open market.

B.     *Securities Lending and the Mechanics of Short Selling*

49.     Under U.S. securities law, broker-dealers are generally obligated to locate a security for borrowing prior to executing a short sale.[112] When promulgating this requirement in Regulation SHO, the Securities and Exchange Commission ("*SEC*") pointed to the negative effects of naked short selling,[113] including mispricing,[114] distortion of voting rights,[115] excessive leverage,[116] and "*death spiral[s]*."[117]

---

[111] Securities lending is a type of collateralized loan which involves a short-term loan of securities in exchange for cash or sometimes noncash collateral. A securities lending agreement transaction is economically similar to a repurchase agreement ("*repo*") transaction, where a party sells a security to a counterparty with a promise to repurchase the security at a later date and at an agreed upon price. Viktoria Baklanova et al., *Staff Report No. 740: Reference Guide to U.S. Repo and Securities Lending Markets* 1 (Fed. Rsrv. Bank Rep. No. 740, 2015), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr740.pdf.

[112] Rule 203(b)(1) ("*locate requirement*") of Regulation SHO provides that "*[a] broker or dealer may not accept a short sale order in an equity security for its own account, unless the broker or dealer has: (i) Borrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) Reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) Documented compliance with this paragraph (b)(1).*" 17 C.F.R. § 242.203(b)(1) (2020).

[113] In proposing Regulation SHO, the SEC noted that naked short selling can have negative effects on the market since there is a potential in such a transaction that sellers "*fail to deliver*" securities to the buyer. The negative effects are particularly strong when the fails to deliver are large in volume and persist over extended an extended period of time. Proposed Rule: Regulation SHO, Exchange Act Release No. 34-48709, 68 Fed. Reg. 62972 (Oct. 28, 2003).

[114] When a short seller fails to deliver, she is in effect "*unilaterally convert[ing] a securities contract (which should settle in three days after the trade date) into an undated futures-type contract, which the buyer might not have agreed to or that would have been priced differently*." Proposed Rule: Regulation SHO, Exchange Act Release No. 34-48709, 68 Fed. Reg. 62972 (Oct. 28, 2003).

[115] A short seller's failure to deliver may also infringe on certain rights of the buyer that are linked to possession of the security, such as the right to vote. *Id.*

[116] A naked short seller may "*enjoy greater leverage than if they were required to borrow securities and deliver within a reasonable time period, and they may use this additional leverage to engage in trading activities that deliberately depress the price of a security*." Proposed Rule: Regulation SHO, Exchange Act Release No. 34-48709, 68 Fed. Reg. 62972 (Oct. 28, 2003).

[117] Naked short selling may permit a type of manipulative scheme called a "*death spiral*." In a death spiral, a party provides financing in the form of convertible debentures to a public company that is unable to obtain more conventional financing due to their perilous financial condition. Crucially, the conversion ratio is tied to the market price of the stock at the time of conversion rather than a fixed price per share, so the lower the market price of the

16

Electronic copy available at: https://ssrn.com/abstract=4030179

50.     Borrowing securities allows a short seller to maintain a short position far longer than if the short seller were required to purchase securities prior to the time of settlement. For lenders, lending securities entails a certain risk—namely, that the borrower will default on the loan agreement by failing to return the securities upon termination of the loan. Lenders often transfer this counterparty credit risk to third-party lending agents through indemnification. Agents, in turn, mitigate this risk by dealing with reputable prime brokers and requiring borrowers to post collateral equal to the market value of the securities on loan.[118]

51.     Some of these measures are not only economically prudent but legally required when a securities lender is a registered management company under the Investment Company Act of 1940 (known as a "*mutual fund*"). In recent decades, with the growth of 401(k) plans as a vehicle for retirement savings, mutual fund holdings have increased substantially. Today, the four largest mutual fund managers—BlackRock, Vanguard, State Street, and Fidelity—hold a collective $25.6 trillion in assets under management ("*AUM*").[119]

52.     Many of these are "*passive index funds*": rather than actively following an investment strategy at the discretion of the portfolio manager, these funds simply invest their assets in securities so as to replicate a broadly recognized index like the S&P 500 index.[120] Passive index funds are often keen on lending their securities because they are unlikely to liquidate

stock, the more shares are received upon conversion. The financer will then engage in extensive naked short selling geared towards driving down the stock price, and then convert the debentures to cover the short sales. Proposed Rule: Regulation SHO, Exchange Act Release No. 34-48709, 68 Fed. Reg. 62972 (Oct. 28, 2003).

[118] For instance, BlackRock's securities lending brochure requires that the value of the collateral is "*at least equal to the market value of the loaned stock*" when BlackRock serves as lending agent. BLACKROCK, BLACKROCK SECURITIES LENDING: UNLOCKING THE POTENTIAL OF PORTFOLIOS 1 (2021), https://www.blackrock.com/us/individual/literature/brochure/us-retail-securities-lending-brochure.pdf.

[119] As of Q2 2021, BlackRock holds $9.5 trillion in AUM, *see* Saqib Iqbal Ahmed and Sohini Podder, *BlackRock profit beats as assets grow to a record $9.5 trillion*, REUTERS (July 14, 2021), https://www.reuters.com/business/blackrock-quarterly-profit-jumps-28-2021-07-14/, Vanguard holds $8.0 trillion, *see Vanguard to Lower Investor Costs by an Estimated $190 Million through Enhancements to its Target Retirement Series*, VANGUARD (Sept. 28, 2021), https://pressroom.vanguard.com/news/Press-Release-Vanguard-to-Lower-Investor-Costs-by-an-Estimated-190M-Through-Enhancements-to-TRFs-092821.html, Fidelity holds $4.2 trillion, *see Fidelity by the Numbers: Asset Management*, FIDELITY (2021), https://www.fidelity.com/about-fidelity/our-company/asset-management, and State Street holds $3.9 trillion. *See* STATE ST. CORP., EARNINGS RELEASE ADDENDUM 13 (June 30, 2021), https://s26.q4cdn.com/446391466/files/doc_financials/2021/q2/STT-2Q21-Earnings-Release-Addendum.pdf.

[120] A large literature finds that so-called passive index funds tend to outperform actively managed funds on a fee-adjusted basis. *See, e.g.*, Michael C. Jensen, *Problems in Selection of Security Portfolios: The Performance of Mutual Funds in the Period 1945-1964*, 23 J. FIN. 389, 415 (1968). *See also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transactions Costs, and Expenses*, 55 J. FIN. 1655, 1655 (2000) (finding that although *stocks* held by actively managed funds outperform the market by 1.3% per year on average, actively managed funds still underperform the market after adjusting for expenses and transaction costs). *But see* Adriana Z. Robertson, *Passive in Name Only: Delegated Management and "Index" Investing*, 36 YALE J. REGUL. 795, 843-45 (2019) (finding that index investing is not truly "*passive*" since even the "*most mechanical indices—those that follow strict quantitative rules—allow for some discretion on the part of the index committee.*" As such, index investing is best understood as a form of "*delegated management*" whereby investors delegate management decisions to the index committee rather than fund managers.).

17

Electronic copy available at: https://ssrn.com/abstract=4030179

an entire portfolio position at short notice and the revenue from securities lending can augment low management fees, delivering even greater value to shareholders.[121]

53.     While the Investment Company Act of 1940 requires that mutual funds place securities in the custody of a bank or other authorized custodian,[122] the SEC long ago interpreted the Act as allowing mutual funds to loan portfolio securities so long as:

*(1) the fund receives 100 percent cash collateral from the borrower; (2) the borrower adds to such collateral whenever the price of the securities rises (i.e., mark to market on a daily basis); (3) the fund may terminate the loan at any time; (4) the fund receives reasonable interest on such a loan, any dividends, interest or other distributions on the loaned securities, and any increase in the market value of such securities; (5) the fund is not required to pay any service, placement or other fees in connection with such a loan; and (6) the fund retains voting rights on the loaned securities.*[123]

54.     The SEC later modified some of these requirements, including to provide that voting rights may pass with loaned securities.  But the SEC emphasized that securities lending "*does not relieve the directors of a fund of their fiduciary obligation to vote proxies. If the fund management has knowledge that a material event will occur affecting an investment on loan, the directors would be obligated to call such loan in time to vote the proxies.*"[124]

55.     That is, when lending shares of public company stock, mutual funds must retain the ability to recall those shares for voting.  Otherwise, fund directors would be unable to fulfill their

---

[121] For example, BlackRock in Q1 2021 was able to offset 79% of the management fee for its iShares Russell 2000 Growth ETF via income from securities lending. BLACKROCK, UNLOCK THE POTENTIAL OF YOUR PORTFOLIOS: iSHARES SECURITIES LENDING 3 (2021), https://www.ishares.com/us/literature/brochure/securities-lending-unlocking-portfolios-en-us.pdf.

[122] 15 U.S.C. § 80a–17(f)(1).

[123] State Street Bank and Trust Company, SEC No Action Letter (Dec. 17, 1971) (on file with SEC). For further discussion of the SEC's interpretation, *see* Joshua Mitts, *Passive Exit* 8-10 (Colum. L. & Econ., Working Paper No. 638, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3716249 (SEC Rule 17-f(2)(c), promulgated under the Investment Company Act of 1940, "*allows mutual funds to lend shares so long as the shares are collateralized to the extent of their full market value*," with the intent being to "*ensure that investors are made whole in the event of default by the borrower.*"). *See also* Edwin Hu et al., *The Index-Fund Dilemma: An Empirical Study of the Lending-Voting Tradeoff* 10 (Colum. L. & Econ., Working Paper No. 647, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3673531 ("*In 1971, the SEC made clear that the ICA would not be read to prohibit share-lending programs so long as such programs met certain conditions.*)"

[124] Salomon Brothers, SEC No Action Letter (May 23, 1972) (on file with SEC).

18

Electronic copy available at: https://ssrn.com/abstract=4030179

fiduciary duty to vote proxies in a way that furthers clients' interests.[125]  Similar fiduciary duties apply to mutual fund advisers under the Investment Advisers Act of 1940.[126]

56.    Today, there are two types of collateral which may be posted for a securities lending transaction.  The first is *cash collateral*, in which the borrower supplies the lender cash, often 102% of the market value of the securities on loan, adjusted daily with fluctuations in the market value of the securities, which the lender reinvests in money market funds, repos or even riskier assets.[127]  In a cash collateral transaction, the lender's compensation consists of the expected return to reinvestment of the cash collateral, less a fraction paid back to borrowers and their agents.  The essence of a cash collateral loan is an exchange of securities for cash, which can be reinvested in the capital markets to receive a return concomitant with the risk of such reinvestments.

57.    By providing a lender with cash, a borrower compensates a lender with an additional return on capital.  This additional return is typically split between the lender and borrowers (and their agents), and the portion paid to the latter is known as the "*rebate rate*."  The rebate rate in a cash collateralized loan is thus an inverse measure of the "*price*" of lending a security: a lower rebate implies that the lender keeps a greater share of the reinvestment profits.  Specifically, the so-called "*intrinsic rate*" (*i.e.*, the effective interest rate) received by the lender is the difference between the collateral reinvestment rate and the rebate rate.

58.    The second kind of collateral is non-cash.[128]  A borrower may supply a lender U.S. treasuries and agency securities backed by the federal government, again at 102% of the underlying value of the securities and marked-to-market daily.  In principle, any yield on the deposited collateral belongs to the borrower.  However, borrowers pay lenders a daily premium, often an annual percentage of the market value of the securities on loan.  For a non-cash collateral loan, this daily premium is the intrinsic rate of the loan.

---

[125] This is a point that the literature on "*empty voting*," characterized as voting decoupled from economic ownership, has explored in detail. *See* Henry T. Hu and Bernard Black, *The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership*, 79 S. CAL. L. REV. 811, 812, 833 (2006) (Share borrowing is an "*easy route to empty voting*," since the borrowers have full voting rights associated with the share but not full market exposure. Because empty voters lack market exposure, they may have an incentive to vote in value-destroying ways. Therefore, fund managers who fail to recall shares for voting may be going against clients' interests.). *See also supra* Mitts, note 123, at *10; *supra* Hu et al., note 123, at *9-13.

[126] *Supra* Hu et al., note 123, at *10-11 (The Investment Advisers Act "*requires that … votes be cast in the best interest of the client*," and before 2019 "*the prevailing view among practitioners [even following the marginal loosening of required voting requirements by the SEC in 2014] was that federal fiduciary obligations required funds to be able to recall shares to cast votes on behalf of investors*.").

[127] Frank M. Keane, *Securities Loans Collateralized by Cash: Reinvestment Risk, Run Risk, and Incentive Issues*, 19 FED. RSRV. BANK CURRENT ISSUES ECON. & FIN. 1, 2 (2013) ("*The cash collateral is most often invested in safe and liquid products, such as money market funds, repos, or deposits, but it can also be invested in products with substantial price risk and/or limited liquidity, such as residential mortgage-backed securities of various credit qualities.*").

[128] This structure was originally proposed to the SEC by the Salomon Brothers in a request for no-action relief dated November 4, 1974. Salomon Brothers, SEC No Action Letter (Nov. 7, 1974) (on file with author).

19

Electronic copy available at: https://ssrn.com/abstract=4030179

C.    *The Costs of Short Selling*

59.    The steps taken by securities lenders to mitigate counterparty credit risk and fulfill their fiduciary duties under the Investment Company Act of 1940—requiring cash or non-cash collateral at 102% of the value of the position, collecting an intrinsic rate (either by reducing the rebate rate or requiring a direct payment from borrower to lender), and recalling shares when necessary—impose nontrivial costs on short sellers borrowing those securities.[129]

60.    **Cost #1: Collateral**.  Suppose a market participant wishes to borrow $10 million worth of securities to open a short position.  To meet the 102% collateral requirement, the short seller must provide the lender with $200,000 in addition to the $10 million proceeds received from the short sale.  If the market value of the securities increases, the borrower must post additional collateral.  For example, suppose the market value of the securities rises to $12 million.  Then the borrower must post an additional $40,000 worth of collateral. This is true even if the price of the security rises only for a few days.  As a result, short sellers may be forced to hold additional funds in reserve to post collateral in the event of unexpected share-price volatility, reducing their return on invested capital.[130]

61.    Closely related to collateral is margin.  The term "*margin*" refers to the extension of credit by a broker-dealer to a customer.  Under Regulation T, the initial margin requirement for short positions opened by U.S. broker-dealers is 50%.[131]  In the prior example, a market participant must post $5 million of cash to open a short position worth $10 million. Moreover, as the share price fluctuates, the short seller must comply with FINRA's maintenance margin requirement of 30%, or face a margin call whereby the broker will forcibly close the position if the customer does not deposit sufficient cash or marginable securities to meet the minimum maintenance requirement.[132]  Sophisticated short sellers may be able to bypass U.S. margin requirements by holding securities in overseas

---

[129] For an overview of short selling costs, *see, e.g.*, Paul Schulz, *What Makes Short Selling Risky: Other Short Sellers* (Working Paper, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3715524.

[130] *Cf.* Robert F. Stambaugh et al., *Arbitrage Asymmetry and the Idiosyncratic Volatility Puzzle*, 70 J. Fin. 1903, 1910-11 (2015) (finding that a rise in shorted stock prices "*can force capital-constrained investors to reduce their position before realizing profits that would ultimately result from corrections of mispricing.*" One empirical study on short positions found that short sellers "*typically reduce their positions following adverse price moves, particularly if the short selling appears to be aimed at profiting from overpricing.*").

[131] 12 C.F.R. § 220.12I(1) (2020) (requiring a margin of "*150 percent of the current market value*" of each stock "*short*" in a margin account. Of this margin, 100 percent can come from the proceeds of the short sale, and the customer must deposit the additional margin requirement of 50 percent.).

[132] FINRA, Rule 4210(c)(2)-(3). Note that FINRA poses modified margin maintenance requirements for short positions taken out on low-value stocks. Rule 4210 requires a maintenance margin that is the greater of $2.50 per share or 100 percent of the current market value for stock selling at less than $5.00 per share, and a margin that is the greater of greater of $5.00 per share or 30 percent of the current market value for stock selling at or above $5.00 per share. Effectively, the maintenance margin requirement is greater than 30 percent for any stock that is worth less than $16.67 per share.

Electronic copy available at: https://ssrn.com/abstract=4030179

brokerage accounts and trading through a non-U.S. prime broker.[133]  However, they are unable to circumvent collateral requirements imposed by a securities lender.

62.    **Cost #2: Intrinsic Rate**.  The intrinsic rate demanded by lenders foists additional costs on short sellers, especially those holding short positions for an extended period of time in securities which face high shorting demand relative to the available supply.  Suppose that a short seller believes a security's price is likely to decline by 5% over the following year, and that an expected profit of 5% would adequately compensate the short seller for the cost of holding the position open over that year.  Now consider what might happen if the intrinsic rate to borrow the security were 6% over that year.[134]  The short seller would lose the entirety of its expected profit, making the short position no longer economically viable.

63.    **Cost #3: Recall**.  The possibility that securities may be recalled by lenders selling the securities or fulfilling their fiduciary duties by voting in a corporate election is an additional cost that short sellers face.  Upon recall, a short seller must identify an alternative lender or the position will be closed involuntarily by the short seller's broker, who will purchase the securities in the open market and deliver those to the lender.  If a recall occurs when the security's price is increasing—for example, if the lender uses a price increase as an opportunity to sell the security—a short seller may find that the forced purchase occurs at a price higher than that at which the short position was opened, foisting losses on the short seller.  Moreover, it will be more difficult for the borrower to open a new short position if the purchaser does not make those securities available for borrowing.[135]

64.    In addition to these costs arising from the securities lending market, short sellers face at least three additional costs inherent to short positions in equity securities.

65.    **Cost #4: Unlimited Losses**.  In general, the share price of an equity security cannot decline below zero because shareholders are not responsible for debts of the corporation.[136]  For this reason, losses on a long position generally cannot exceed 100%.  By contrast, because

---

[133] 12 C.F.R. § 220.1(b)(3)(iv) (2020) ("*This part does not apply to . . . [f]inancial relations between a foreign branch of a creditor and a foreign person involving foreign securities.*").  *See also* Schulz, *supra* note 129, at *4.

[134] Note that an intrinsic rate of 6% would be extraordinarily high but not unheard of. Borrowing rates are extremely long-tailed, with dramatic changes in the underlying stock price and supply of loanable shares effecting dramatic changes in rates. In a survey of a large subsection of NYSE-listed shares, the median indicative lending rate was .38%, the 90th-percentile rate was .63%, and the 99th-percentile rate was 15%. Muravyev et al., *Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options,* J. FIN. (forthcoming 2021) (manuscript at tbl.1), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2799315.

[135] For example, market makers or arbitrageurs may not engage in securities lending because they hold their positions briefly.  Some empirical literature has found that "*it may be difficult to find another source of shares if a loan is recalled*."  Schulz, *supra* note 129, at *9.

[136] *But see generally* Jonathan R. Macey & Joshua Mitts, *Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 CORNELL L. REV. 99 (2014) (discussing the doctrine of "*veil-piercing*," in which courts hold shareholders liable for debts of the firm in specific situations).  It is exceedingly rare for courts to pierce the veil of a publicly traded corporation and impose liability on equity shareholders for the firm's debts. David Million, *Piercing the Corporate Veil, Financial Responsibility, and the Limits of Limited Liability* 56 EMORY L. J. 1305, 1326 (2007).

21

Electronic copy available at: https://ssrn.com/abstract=4030179

short sellers are obligated to purchase securities in the future—either to return to the lender or simply to deliver to their counterparty—short sellers' losses are not limited to 100% of their initial position.[137]    Suppose a short seller opens a short position in publicly traded security at a price of $10 per share.  If the share price rises to $30 at the time of purchasing the shares, the short seller has lost $20 per share, *i.e.*, double the initial position.[138]

66.    **Cost #5: Equity Risk Premium**.  It is a fundamental principle of finance that stock prices rise over the long run because even fully diversified investors demand compensation for taking on the risk of investing in equity securities.[139]  The *equity risk premium* is the long-run expected return to investing in equity securities over risk-free bonds.  It has recently been estimated as 5.5% for U.S. stocks,[140] though estimates vary widely and over time. [141] The Capital Asset Pricing Model ("*CAPM*") provides that the expected return to a given security is simply a multiple of the equity risk premium—a multiple known as the *beta* of the security.  On average then, a short seller who holds a position in a security can expect to lose, in annualized terms, the equity risk premium multiplied by the security's beta.  For a stock with a beta of .9, a short seller can expect to lose 5.5% * .9 = 4.95% per year.  Short sellers may hedge this risk by holding a long position in a diversified basket of securities

---

[137] Note that a short seller can limit downside risk by purchasing with call options, which provide the right to buy an underlying security prior to a given expiration date at a given price. However, the premium (cost) of these call options would of course reduce the short seller's expected returns.

[138] One example of this sort of risk mitigation might be purchasing an out-of-the-money call option which caps the short seller's losses above a certain threshold.  The cost of purchasing these options—known as the option *premium*—will reduce the short seller's investment returns.

[139] *See* Aswath Damodaran, *Equity Risk Premiums (ERP): Determinants, Estimation, and Implications-The 2021 Edition* (2021) (manuscript at 6-7), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3825823 ("*The equity risk premium is the premium that* [risk-averse] *investors demand for the average risk investment.*" The assumption is that investors should be "*rewarded*" for taking on market risk that is present even in a well-diversified portfolio.); *The equity premium*, FED. RSRV. ECON. DATA (July 28, 2016), https://fredblog.stlouisfed.org/2016/07/the-equity-premium/ ("*Typically, [the equity risk premium] is positive—meaning stock returns are higher—although it can be negative when the stock market goes through some rough times. Over the long run, it's definitely positive because bonds are senior to stocks in any liquidation: Bonds carry less risk and, therefore, less yield.*").

[140] *See, e.g.*, Roger Grabowski et al., *Duff & Phelps Recommended U.S. Equity Risk Premium and Corresponding Risk-Free Rates to be Used in Computing Cost of Capital: January 2008 – Present*, https://www.duffandphelps.com/insights/publications/cost-of-capital/recommended-us-equity-risk-premium-and-corresponding-risk-free-rates ("*Duff & Phelps Recommended U.S. Equity Risk Premium Decreased from 6.0% to 5.5%, Effective December 9, 2020.*").

[141] *See* Aswath Damodaran, *Equity Risk Premiums (ERP): Determinants, Estimation, and Implications-The 2021 Edition* (2021) (manuscript at 143), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3825823 (reporting an equity risk premium of 4.72% for U.S. stocks in 2020, a forward-looking estimate which was "*computed based on the index level at the end of each year and the expected cash flows on the index for the future.*").  Note that estimates of the equity risk premium may diverge greatly from one another, even when based on the same historical data, due to models using "*different time periods for estimation, differences in riskfree rates and market indices and differences in the way in which returns are averaged over time.*" *Id* at 30-31.

22

Electronic copy available at: https://ssrn.com/abstract=4030179

which yields the equity risk premium, but that requires additional capital, further reducing investment returns.[142]

67.     **Cost #6: Options Hedging**.  As vividly illustrated by the events in early 2021 involving GameStop and other "*meme stock*" securities,[143] short sellers face an additional risk when heavy options trading drives up the price of a security by forcing dealers to purchase the security to "*delta-hedge*" their risk exposure.

68.     "*Delta-hedging*" is one way option dealers can minimize their losses upon an increase in the price of the underlying security.  The first way is to collect an up-front premium which compensates dealers for their expected losses.  For a simplified example, suppose a dealer believes there is a 10% chance of a $100 loss.  The dealer will charge the holder a premium of $10 ($100 x 10% = $10) in exchange for writing the option.  But dealers also recognize that these probability estimates are uncertain and may turn out to be incorrect—unexpected risks may materialize.  To minimize losses when that occurs, dealers will take additional actions to reduce their economic exposure to price declines in the underlying security.

69.     One such action is to buy the underlying security at the lowest possible price—*i.e.*, as soon as it becomes apparent that an unexpected price increase may occur.  Reducing the economic exposure of selling a call option by buying the underlying stock becomes more necessary as the prospect of mounting losses rises.  This dynamic adjustment is known as "*delta-hedging*," and is described in standard textbooks.[144]  The term "*delta*" in "*delta-hedging*" refers to the probability and degree to which the option will expire in the money (sometimes known as the "*risk-neutral probability*"), which in this context means the likelihood and extent of an increase in the price of the underlying security.  Because dealers can suffer substantial losses upon such an increase, delta-hedging can often lead to a rapid and sharp increase in the share price, exacerbating short seller losses.

---

[142] Consider the example where a short seller expects to lose $4.95 per year on every $100 in short positions due to the equity risk premium.  To offset that loss, the short seller must invest $90 in a diversified basket of securities which yields the equity risk premium of 5.5%.  Suppose the short seller believes the share price of a company which currently trades at $100 per share will decline, net of the equity risk premium, to $95 per share.  With the hedging long position in place, the short seller's return would be a $5 gain on invested capital of $190 per share—the $100 per share short position plus the $90 per share of capital invested in the diversified long position—yielding a return of 2.6%.  That return may be too small to compensate the short seller for the risk of opening the short position.  While the short seller could use margin lending to finance some of these positions, certain forms of unexpected volatility may lead to margin calls, because the short seller will not necessarily be perfectly hedged in every scenario.  *See supra* Mitts, note 123, at *7 ("*[Rising stock prices] imposes a cost on short selling above and beyond the intrinsic interest rate paid to borrow shares*."); Barbara A. Bliss et al., *Negative Activism*, 97 WASH. UNIV. L. REV. 1333, 1377 n.169 (2020) (*"[T]he asset pricing literature suggests that long positions in equity earn a risk premium over time. The short seller, therefore, starts from behind and must overcome the expected market rate of return before expecting a profit on the shorted sales."*).

[143] *See* discussion *supra* Section I.

[144] *See, e.g.*, ROBERT L. MCDONALD, DERIVATIVES MARKETS 381-408 (Donna Battista et al., eds. 3rd ed. 2012) (defining delta-hedging as when a market-maker "*computes the option delta and takes an offsetting position in shares*.").

23

Electronic copy available at: https://ssrn.com/abstract=4030179

70.    While the events in early 2021 received significant media attention, short sellers have always faced the risk that large options positions may drive up the price of a security by inducing hedging by options dealers.[145]  The risk of options hedging—even if small in magnitude—is another cost to opening a short position.[146]

D.    *Short Sale Constraints and Market Efficiency*

71.    These costs make it challenging to maintain a short position in any security, but especially in publicly traded shares of common stock.  U.S. securities law historically imposed various restrictions and limitations on short selling in publicly traded securities.  Section 10(a) of the Securities Exchange Act of 1934 grants the SEC plenary power to regulate short selling.[147]  For decades, the SEC utilized its authority under Section 10(a) to impose a "*tick test*," whereby short selling was prohibited if it would occur at a price below the last sale price. [148]  The purpose of the tick test was to encourage short selling while the share price was increasing, while "*eliminating short selling as a tool for driving the market down and preventing short sellers from accelerating a declining market.*"[149]  The SEC ultimately eliminated the tick test in Rule 201 of Regulation SHO, adopted on June 28, 2007.[150]

72.    These regulatory changes reflected a widespread recognition that short selling is a vitally important institution.  A large body of literature shows how short selling constraints undermine the efficiency and liquidity of the securities markets.[151]  One study found that

---

[145] Indeed, as discussed in academic work on social media and short activism, the link between social media and trading behavior was well-established prior to 2018, so short sellers may have had costs like these in mind even if they had not yet matured to the extent visible throughout much of 2021. *See generally* Joshua Mitts, *A Legal Perspective on Technology and the Capital Markets: Social Media, Short Activism and the Algorithmic Revolution* (Colum. L. & Econ., Working Paper No. 638, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3447235 (examining the contribution of social media platforms to price movements in the capital markets).

[146] When options dealers hold a large short position to hedge against option contracts they have sold, they may be forced to hedge that exposure by purchasing a large volume of shares to avoid heavy losses as the share price rises. *See, e.g.*, Guido Baltussen, et al., *Hedging Demand and Market Intraday Momentum*, 142 J. Fin. Econ. 377, 388 (2021 (option market makers that are "*net short gamma*" need to "*trade in the direction of the market to rebalance their delta hedge.*").

[147] 15 U.S.C. § 78j(a)(1).

[148] The 2007 edition of the Code of Federal Regulations contained a provision establishing that "*[n]o person shall, for his own account or for the account of any other person, effect on a national securities exchange a short sale of any security not covered by paragraph (a) of this rule, (1) below the price at which the last sale thereof, regular way, was effected on such exchange, or (2) at such price unless such price is above the next preceding different price at which a sale of such security, regular way, was effected on such exchange.*" 17 C.F.R. § 240.10a–1(b) (2007).

[149] Proposed Rule: Regulation SHO, Exchange Act Release No. 34-48709, 68 Fed. Reg. 62972 (Oct. 28, 2003).

[150] Final Rule: Regulation SHO and Rule 10a-1, Exchange Act Release No. 34-55970, 72 Fed. Reg. 36348 (June 28, 2007) (removing Rule 10a-1 and adding Rule 201 of Regulation SHO to provide that "*no price test, including any price test by any SRO, shall apply to short selling in any security.*")

[151] *See infra* notes 152–160 and accompanying text.

24

Electronic copy available at: https://ssrn.com/abstract=4030179

stocks with limited lending supply are associated with lower price efficiency.[152]  More lending supply is associated with a greater degree of negative price skewness and fewer extreme price increases but not extreme price decreases.  In fact, the decrease in skewness is the result of less-frequent extreme positive returns, consistent with the view that arbitrageurs cannot correct overvaluation as easily when short selling constraints are tighter.  Moreover, limited lending supply does not affect downside risk and total volatility.  These findings are inconsistent with the view that short selling destabilizes prices and suggest that short-sale restrictions generally make markets less efficient.

73.    Another study used proprietary NYSE order data to find that heavily shorted stocks underperform lightly shorted stocks by a risk-adjusted average of 1.16% over the following 20 trading days (15.6% annualized).  These data indicate that on average, short sellers are important contributors to informed and efficient stock prices.[153]  Another study analyzed 46 equity markets around the world and found evidence that short sales restrictions were negatively linked to price discovery at the individual security level.[154]

74.    Apart from price discovery, there is a strong consensus in the academic literature that short selling improves market liquidity.  One study examined short selling constraints imposed after the 2007-09 financial crisis and concluded that restricting short selling led to lower liquidity, as measured by a greater price impact of trading, and greater transaction costs in the form of wider bid-ask spreads.[155]  Another study found that short sellers enhance liquidity by selling against the upward post-earnings-announcement drift,[156] which reduces the demand-side imbalance that can follow an earnings announcement.[157]  The liquidity-enhancing benefits of short selling are concentrated in contrarian trading, *i.e.*, selling while the price is rising, rather than selling while the price is declining.[158]

75.    Other literature has identified a strong link between short selling and financial misconduct.  One study found that abnormal short interest increases in the 19 months before a material misrepresentation is publicly revealed, particularly when the misconduct is severe.[159]  Short selling is associated with a faster time-to-discovery of misconduct and dampens the price

---

[152] Pedro A. C. Saffi & Kari Sigurdsson, *Price Efficiency and Short Selling*, 24 REV. FIN. STUD. 821, 822 (2011).

[153] Ekkehart Boehmer et al., *Which Shorts Are Informed?*, 63 J. FIN. 491, 524-25 (2008).

[154] Arturo Bris et al., *Efficiency and the Bear: Short Sales and Markets around the World*, 62 J. FIN. 1029, 1072 (2007).

[155] Alessandro Beber & Marco Pagano, *Short-Selling Bans Around the World: Evidence from the 2007–09 Crisis*, 68 J. FIN. 343, 355-72 (2012).

[156] Post-earnings-announcement drift ("*PEAD*") is the tendency for a company's share price to remain mispriced in the direction of an earnings surprise for weeks or even months after the announcement.

[157] Ekkehart Boehmer & Juan (Julie) Wu, *Short Selling and the Price Discovery Process,* 26 REV. FIN. STUD. 287, 303-09 (2013).

[158] Comerton-Forde et al., *Shorting at Close Range: A Tale of Two Types,* 121 J. FIN. ECON. 546, 547-48 (2016).

[159] Jonathan M. Karpoff & Xiaoxia Lou, *Short Sellers and Financial Misconduct*, 5 J. FIN. 1879, 1879 (2010).

25

Electronic copy available at: https://ssrn.com/abstract=4030179

inflation arising from earnings misstatements.  These results indicate that short sellers anticipate the discovery and severity of financial misconduct.  Another study found that short selling reduces earnings management, increases the likelihood of detecting fraud and improves price efficiency, even among firms not charged with financial misconduct.[160]

E.    *Manipulative versus Sustained Short Selling*

76.    The fact that short selling enhances the efficiency of the securities markets does not imply that every trading strategy involving short selling is equally beneficial.  Just as long positions can play a role in "*pump and dump*" schemes—whereby stock promoters encourage market participants to buy stock while secretly trading against those buyers— short positions can also play a role in fraudulent or manipulative trading schemes.

77.    The possibility of short-side market manipulation has long been recognized in academic literature.[161]   Academic research has found that attack articles on public companies authored by pseudonymous short sellers are followed by stock price declines and sharp reversals.[162]  Manipulative short selling is troubling for several reasons.  Regardless of the merits of a short seller's allegations, it may take time for a company to rebuild shareholder confidence when published allegations are accompanied by a substantial share-price decline.[163]  An engineered price crash can serve as a kind of artificial validation of a short seller's thesis, even if that thesis is inaccurate.[164]  While temporary mispricing is likely to

---

[160] Vivian W. Fang et al., *Short Selling and Earnings Management: A Controlled Experiment*, 71 J. FIN. 1251, 1251 (2016).

[161] *See, e.g.*, Itay Goldstein and Alexander Guembel, *Manipulation and the Allocational Role of Prices*, 75 REV. ECON. STUD. 133 (2008); Robert A. Jarrow, *Market Manipulation, Bubbles, Corners, and Short Squeezes*, 27 J. FIN. QUANTITATIVE ANALYSIS 311 (1992); Thomas M. J. Mollers, *Market Manipulation Through Short Selling Attacks and Misleading Financial Analyses*, 53 INT'L L. 91 (2020); *see also* H.R. REP. NO. 101-414, pt. 1, at 1 (1991) (Discussing the impact of short selling and acknowledging the complaints posed against insufficient regulation of short selling that "*permitted substantial abuses to develop*.")

[162] Joshua Mitts, *Short and Distort*, 49 J. LEG. STUD. 287, 288-89 (2020).

[163] *Id*. at 288, 296, 330 (explaining that pseudonymous authors exploit investors' trust and discussing the subsequent widening of bid-ask spread in response to their price manipulation, which imposes social costs). *See also* Joshua Mitts, Columbia Business School, *Short and Distort*, YOUTUBE (June 11, 2019), https://youtu.be/bfTtO2ZZkSs (discussing the social harms to transitory price manipulation, which may not be transitory for small-cap firms whose investors glean information through share prices due to limited public information about the firms); Jeff Katz and Annie Hancock, *Short Activism: The Rise in Anonymous Online Short Attacks*, HARV. L. SCH. F. CORP. GOV. (Nov. 27, 2017), https://corpgov.law.harvard.edu/2017/11/27/short-activism-the-rise-in-anonymous-online-short-attacks/ (highlighting the need for companies to prepare against anonymous short sellers by providing examples of companies whose stock price suffered long-term damage after an online attack).

[164] *See, e.g.*, Complaint at pp. 1-2, *Farmland Partners Inc. v. Fortunae*, No. 18-cv-02351-KLM (D. Colo. July 23, 2021), https://storage.courtlistener.com/recap/gov.uscourts.cod.183088/gov.uscourts.cod.183088.3.0.pdf.  Plaintiff Farmland Partners Inc. ("*FPI*") alleged that defendant Rota Fortunae wrote and published a defamatory post ("*Rota Fortunae Posting*") about FPI on Seeking Alpha, a prominent investment-related blog, as part of a "*short and distort*" campaign to "*profit from trades with legitimate investors as they digested the falsehoods disseminated by [Rota Fortunae]*."  The Rota Fortunae Posting was titled "*Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk of Insolvency – Shares Uninvestible.*" Sinéad Carew, *Farmland Partners shares skid on short seller report; CEO disputes findings*, REUTERS (July 11, 2018), https://www.reuters.com/article/us-farmland-

26

Electronic copy available at: https://ssrn.com/abstract=4030179

quickly reverse for securities trading in a liquid, efficient market, it may take longer for those trading in inefficient markets, like unlisted stocks trading over the counter.[165]

78.   Like other forms of market manipulation, manipulative short selling is often characterized by rapidly closing a short position and thereby inducing at least a partial "V"-shaped price response.  In this respect, manipulation is a kind of short selling "*in name only*": rapidly covering the position effectively means the stock is only subject to short selling for a brief period.  For this reason, proposals to deter manipulative short selling have focused on the duration that a short position is open.[166]

79.   For these reasons, the presence of large short positions sustained over a long period of time is not an indicator of manipulative short selling.  To profit from an artificial depression in a share price, it is necessary to close a short position before the share-price decline reverses.  An indicator of manipulation is thus the closing of a short position at a temporary trough in the share price, not opening and maintaining a large short position.[167]

80.   By contrast, large short positions sustained over a long period of time are likely to weigh down a company's share price, which may prove frustrating to corporate executives who believe the company is being unfairly maligned.  Some executives also ascribe negative fundamental performance, such as consumer demand, to shorting activity and its effect on

---

prtnrs-stock/farmland-partners-shares-skid-on-short-seller-report-ceo-disputes-findings-idUSKBN1K12LA.  In settling this case, Rota Fortunae, a/k/a Quinton Mathews, agreed to pay FPI a multiple of the profits he made when the Rota Fortunae Posting drove the price of FPI stock down by 39%.  *"Rota Fortunae," Author of July 2018 Attack on Farmland Partners, Retracts Short and Distort Article, Admits Article's Falsity, and Returns Multiples of Trading Profits He Gained From Attack*, PR NEWSWIRE (June 21, 2021), https://www.prnewswire.com/news-releases/rota-fortunae-author-of-july-2018-attack-on-farmland-partners-retracts-short-and-distort-article-admits-articles-falsity-and-returns-multiples-of-trading-profits-he-gained-from-attack-301316131.html.  Mathews later admitted, in a settlement press release, that "*many of the key statements in that article were incorrect*." Rota Fortunae, *Matthews Settlement Press Release*, SEEKING ALPHA (June 20, 2021, 10:54 PM), https://seekingalpha.com/instablog/47800059-rota-fortunae/5605955-mathews-settlement-press-release.

[165] Moreover, downward price manipulation may lead to litigation over an alleged misstatement in which loss causation is lacking between the misstatement and investor losses, the costs of which are likely to fall disproportionately on smaller firms trading in less liquid markets.

[166] In February 2020, scholars submitted a rulemaking petition to the SEC regarding manipulative short selling. SEC Rulemaking Petition on Short and Distort, Feb. 12, 2020, https://www.sec.gov/rules/petitions/2020/petn4-758.pdf (co-drafted by John C. Coffee, Jr. & Joshua Mitts).  First, precisely because there is no duty to disclose one's short position, the petition asks the SEC to impose a duty to update promptly a voluntary short position disclosure which no longer reflects current holdings or trading intention.  Second, the petition asks the SEC to clarify that rapidly closing a short position after publishing (or commissioning) a report, without having specifically disclosed intent to do so, can constitute fraudulent *scalping* in violation of Rule 10b-5.  Scalping schemes involve making statements that lead to investors to purchase or sell a stock, while failing to disclose a position or an intent to trade in the opposite direction of one's recommendation.  *See, e.g.*, James Cox, *Insider Trading Regulation and the Production of Information: Theory and Evidence*, 64 Wash. U. L. Q. 475 (1986).  The petition proposes a safe harbor to allow for closing a position at a price equal to or lower than a valuation stated, expressly or impliedly, by a short seller.

[167] *See* Joshua Mitts, *A Legal Perspective on Technology and the Capital Markets: Social Media, Short Activism and the Algorithmic Revolution* 14-15 (Colum. L. Econ., Working Paper No. 615, 2019) (discussing why rapidly closing a position is, at the very least, weakly suggestive of manipulative intent).

27

Electronic copy available at: https://ssrn.com/abstract=4030179

public sentiment.[168]  However, before concluding that ordinary market mechanisms have failed at correcting mispricing in the capital markets, it is necessary to identify a specific reason why that might be the case.

81.    For example, if a company that is worth $20 per share finds its share price trading at $15 per share due to immense short selling pressure, hedge funds and other sophisticated investors with access to substantial capital will find it profitable to purchase the stock at the discounted price of $15 per share.  When the price eventually rises back up to $20 per share, these funds will make a profit of 33%.  As this example illustrates, there is a powerful incentive for sophisticated market participants to purchase shares of a stock trading at an incorrectly low price due to sustained short selling, particularly in light of the costs of short selling discussed previously, which give additional incentives to close a short position.

82.    One reason why ordinary market mechanisms might fail at correcting mispricing is that manipulative short selling may lead to a price crash which undercuts confidence in an issuer whose securities trade in inefficient markets, like unlisted securities trading infrequently over the counter with few market makers.  Attempts to manipulate down the share price of a highly liquid security trading in an efficient market are likely to lead to "V"-shaped price reversals which are brief and transitory in nature.[169]  In an efficient market, market participants have a powerful incentive to purchase shares of stock at temporarily depressed prices, knowing that the share price will quickly reverse.  In fact, these purchases would contribute to that share-price increase by conveying positive information about the impending price reversal to the market.[170]

---

[168] Naturally, the adversarial dynamic between short sellers and long-oriented stakeholders, including management, can at times reach a belligerent pitch.  One paper found 175 instances of negative commentary from management regarding short sellers, with public allegations ranging from ignorance to public deception.  Owen A. Lamont, *Go Down Fighting: Short Sellers vs. Firms,* 2 REV. ASSET PRICING STUD. 1, 10-13, 18-21 (2012).  One famous example is the "war" between two investment icons: Carl Icahn and Bill Ackman, who respectively had hefty short and long positions in Herbalife, with Ackman branding Herbalife a "*well-run pyramid scheme*." Brian Sozzi, *How Herbalife's CEO is trying to pick up the pieces from Bill Ackman's failed short-selling attack*, YAHOO! FINANCE (Oct. 31, 2018), https://finance.yahoo.com/news/herbalifes-ceo-trying-pick-pieces-bill-ackmans-failed-short-selling-attack-161457359.html.  After several volatile years and hefty losses for Ackman, he finally retreated, closing his roughly six year-old, billion-dollar short position.  Herbalife's stock price soared 75% that year.  Following the battle's conclusion, CEO Richard Goudis commented, "*I will leave the public markets to Bill [Ackman] and Carl [Icahn] to figure out. But for us it's about operating a nutrition company. Maybe sometimes our company is misunderstood — maybe sometimes on purpose, maybe sometimes by accident*." Rick Smith, CEO of Tazer (now Axon), claims that short sellers launched a coordinated attack on his company in 2004, nearly driving it to bankruptcy. He said the firm's success led to a high share price, but also "*drew over $1 billion in short positions and led to a highly coordinated public relations and legal campaign against our company*," which "*alarmed both our shareholders and customers, causing real damage*." Rick Smith, *After What Short Sellers Did To My Company, I'm Cheering on WallStreetBets*, MEDIUM (Feb. 3, 2021), https://marker.medium.com/i-run-a-public-company-5b6347fc0b1f.

[169] For this reason, manipulative short selling has been measured using these V-shaped price reversals in academic research.  *See, e.g.*, Mitts, *supra* note 162, at 307-10.

[170] The market microstructure literature has long examined information transmission in prices.  Albert Kyle's classical 1985 study described how private information can quickly flow into liquid markets, and that traders with inside information prefer to trade in more efficient, liquid markets.  Albert. S. Kyle, *Continuous Auctions and Insider Trading*, 53 ECONOMETRICA 1315 (1985).  In contemporary work, Larry Glosten and Paul Milgrom modeled the incorporation of private information through the decisions of the market maker and uninformed traders, both of

28

Electronic copy available at: https://ssrn.com/abstract=4030179

83.     Thus, absent evidence indicating that a share-price decline is the product of market manipulation, attempts by corporate executives to drive up a share price or otherwise inflict losses on short sellers are likely to be harmful to share-price accuracy and the liquidity and efficiency of the securities markets more generally. This is particularly so when the costs of short selling are heightened, *e.g.*, when the intrinsic rate is elevated or a short position has been open for some time, both of which reduce the short seller's expected profits.

84.     A large body of research shows that corporate executives are motivated to and in fact engage in attempts to harm short sellers by inflating share prices. One example is Jack Butler, the CEO of Solv-Ex, a now-defunct oil and gas company. In 1996, following a 30% fall in the company's share price driven by heavy short selling, Butler sent an advisory notice to shareholders, recommending they "*request delivery of the Solv-Ex certificates from [their] broker [i.e., recall shares on loan to short sellers] as soon as possible… to help [them] control the value of [their] investment on a steady basis*." The company was found guilty of fraud two years later for issuing false news releases to inflate its price.[171]

85.     One study systematically examined efforts by corporate executives to fight back against short sellers, concluding that while management's attacks on shorts made shorting costlier in the near term, those companies underperformed the market in the long term.[172] These tactics included threatening to sue short sellers, encouraging investors to recall loaned shares and refrain from lending new ones, pursuing stock splits or distributions designed to harm a short position, and simply boosting the price through false announcements. The author concluded that while firms had mixed success in reducing short positions, they may have been able to slow the growth of those positions. The study also found that firms which attacked short sellers significantly underperformed the market, consistent with literature finding that short selling constraints reduce price efficiency.

86.     A powerful incentive for CEOs to take actions against short sellers is the concentrated stock position that executives tend to have in the companies they run. This incentive is heighted by potential feedback loops between the share price, investor sentiment, and fundamental

---

whom want to reduce their losses relative to informed traders. These decisions cause price increases to serially correlate (price increase in one period effects a price increase in the next), pushing the market price toward fundamental value. Lawrence R. Glosten and Paul R. Milgrom, *Bid, Ask and Transaction Prices in a Specialist Market With Heterogeneously Informed Traders*, 14 J. FIN. ECON. 71 (1985). Recent work published in the *Journal of Finance* analyzes the impact of randomly timed early distributions of SEC information to a small number of traders, due to a technical glitch in the SEC's online file distribution system. The dataset, a novel experiment in trading on private information with a random time to public revelation, demonstrated that traders aggressively buy shares on positive private information. This is particularly so when the market is highly liquid, there is a large discrepancy between share price and fundamental value, and when the expected delay in the market processing this information is low. Aggressive trading in turn moves the share price closer to the fundamental value before the broader market can digest it. Mohammadreza Bolandnazar, Robert J. Jackson Jr., Wei Jiang & Joshua Mitts, *Trading Against the Random Expiration of Private Information: A Natural Experiment*, 75 J. FIN. 5 (2020).

[171] Gary Weiss, *The Secret World of Short Sellers*, BUSINESS WEEK, Aug. 5, 1996, at 62.

[172] *See* Owen A. Lamont, *Go Down Fighting: Short Sellers vs. Firms*, 2 REV. ASSET PRICING STUD. 1, 10-13, 18-21 (2012).

29

Electronic copy available at: https://ssrn.com/abstract=4030179

performance.[173]  One study found that following the reduction in short-selling constraints under Regulation SHO, firms increased equity-linked compensation for corporate executives.  The authors concluded this additional compensation strengthened the incentive to drive up the share price against the expected increase in short selling.[174]

87.  The literature has identified an additional incentive for an issuer to boost its share price, and thereby counteract short selling: the positive correlation between a company's share price (*i.e.*, its market value) and its ability to raise capital.  One study found that firms tend to disclose positive earnings forecasts more frequently when they need to access the capital markets, suggesting that there is a powerful incentive to bolster the share price before debt or equity financing to decrease the cost of capital.[175]

---

[173] Emre Ozdenoren and Kathy Yuan, *Feedback Effects and Asset Prices*, 63 J. FIN. 1939, 1939-43 (2008).

[174] Using data from the Regulation SHO Pilot Program, Angelis et. al found that following the removal of shorting constraints, firms quickly increased manager stock compensation, and concludes that the measure is taken to protect against price movement driven by short selling. David De Angelis et al., *The Effects of Short-Selling Threats on Incentive Contracts: Evidence from an Experiment*, 30 REV. FIN. STUD. 1627, 1627 (2017).

[175] Richard Frankel, Maureen McNichols & G. Peter Wilson, *Discretionary Disclosure and External Financing,* 70 ACCTG. REV. 135 (1995).

Electronic copy available at: https://ssrn.com/abstract=4030179

### III.    Critique of the Staff's Analysis of a Short Squeeze

*A.    Background and Overview*

88.    Many commentators suggested that a chief cause of the meteoritic rise in GameStop's share price was a short squeeze, where short sellers were forced to close their positions as share prices rose.  As discussed in Section I *supra*, in January 2021 users of the subreddit *r/wallstreetbets* sought to trigger a short squeeze of GameStop's stock ("*GME*"), causing the price of GME to soar.[176]  This led to major, sometimes crippling, losses at hedge funds that were shorting GME.[177]  As a result of these losses, many hedge funds reduced their short positions, with some completely abandoning short selling as a strategy.[178]

89.    While staff acknowledged that "*the run-up in GME stock price coincided with buying by those with short positions*," staff nonetheless concluded that the data showed that "*such buying was a small fraction of overall buy volume*."[179]  Key evidence for the staff's conclusion is found in Figure 6 of the staff report, entitled *Buying Activity of Traders With Large Short Positions in GameStop, Jan 19 – Feb. 5, 2021*:

---

[176] We recognize that the term "*short squeeze*" is subject to differing interpretations.  Some may use the term to refer to coordinated, intentional episodes of extreme, short-lived price increases which appear to be entirely the product of temporary distortions in supply and demand and thus rapidly reverse direction, like the short squeeze in Volkswagen's shares in 2008.  We are using the term to refer to any situation where short sellers are compelled to return shares due to unexpected increases in the share price, even if some of that the price increase may reflect positive sentiment as opposed to an intentional effort to manipulate the share price upward.  In our view, an appropriate policy response to the events of January 2021 begins with an accurate assessment of the costs faced by short sellers during this period.

[177] *See* Danny Vena, *WallStreetBets Declares Victory as GameStop Stock Soars over 50%*, The Motley Fool (Jan. 22, 2021), https://www.fool.com/investing/2021/01/22/wallstreetbets-declares-victory-as-gamestop-stock/; Timothy Collins, *GameStop and the Dangerous Game of Gamma Squeezes*, The Street. (Jan. 22, 2021), https://realmoney.thestreet.com/investing/stocks/gamestop-and-the-dangerous-game-of-gamma-squeezes-15546125; Robin Wigglesworth, *"Weaponised" options trading turbocharges GameStop's dizzying rally,* Financial Times (Jan. 27, 2021), https://www.ft.com/content/ae1ecff4-9019-4a2a-97ea-55a3cd15c36a; Alexander Osipovich, *GameStop Stock Frenzy: What You Need to Know*, The Wall Street Journal (Jan. 27, 2021), https://www.wsj.com/articles/how-gamestops-reddit-and-options-fueled-stock-rally-happened-11611743400.

[178] *See* Justina Lee et al., *'No one wants their head ripped off': Hedge funds abandon shorts in droves*, Fortune (Apr. 20, 2021), https://fortune.com/2021/04/20/head-ripped-off-hedge-funds-abandon-shorts-in-droves/ ("*Hedge funds in both the U.S. and Europe have rushed to cover their shorts, with little appetite to add fresh bearish wagers on the newly underperforming parts of the market like growth equities.*"); @CitronResearch, Twitter (Jan. 29, 2021, 8:46 AM), https://twitter.com/citronresearch/status/1355152873487798274?lang=en ("*After 20 years of publishing Citron will no longer publish 'short reports.'*").

[179] SEC. & EXCH. COMM'N, *Staff Report on Equity and Options Market Structure Conditions in Early 2021*, at *26, https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf .

31

Electronic copy available at: https://ssrn.com/abstract=4030179

**Figure 1: Copy of Figure 6 in SEC Staff Report**

The below image is a copy of Figure 6 of the staff report, entitled *Buying Activity of Traders With Large Short Positions in GameStop, Jan 19 – Feb. 5, 2021*:



90.    Staff describes this figure in footnote 78 of the report:

> *This figure shows the total buy volume during half-hour intervals from January 19 to February 5, 2021, of traders identified as having a large short position in GME, along with total buy volume and the value-weighted average stock price, using data from CAT. We identify traders with large short positions by first calculating traders' average inventory positions as of January 15, 2021, and isolating the Firm Designated IDs ("FDIDs") with an average negative position, excluding market makers and high frequency traders (i.e., identified as traders that offset their trades within a day). We then isolate the FDIDs with negative inventories below (i.e., more negative than) the median as our sample of heavily shorted traders. We then identify the buy trades initiated by these FDIDs over the next two weeks (January 19 – February 5). **Note that since the CAT sample only begins on December 24, 2020, we are not able to include FDIDs' inventory positions accumulated prior to this date.**[180]*

91.    This sample selection process is troubling for three reasons. ***First***, the Firm Designated ID (FDID) is a problematic way to identify unique customers. CAT NMS LLC, the entity

---

[180] *Id.* at 28 n.78.

Electronic copy available at: https://ssrn.com/abstract=4030179

responsible for developing the consolidated audit trail ("*CAT*") system, makes clear that the FDID designation represents trading accounts; however, it also states: "*A customer can have more than one trading account, and a trading account can have more than one customer.*"[181]   The guide is clear that the FDID is broker-specific, and need only remain constant across vendors used by that broker.[182]   While FDIDs may be positively correlated with individual customer accounts in some sense, it is problematic to use FDIDs to both (a) establish a group of large short sellers by considering below-median short positions by individual FDIDs, and (b) compare aggregate purchase volume to the volume of shares sold by that group.

92.    For a simple illustration, suppose that the short side of the market consists of (a) a large short seller who had accumulated a 2,000-share short position in five brokerage accounts, *i.e.*, each holding 400 shares, and (b) a smaller short seller who sold 500 shares.  Further suppose that all of these short sellers closed their positions during the relevant period, and no other market participants purchased during that period.  Each of these brokerage accounts would report the large short seller's position under a different FDID, so the median position would be 400 shares.  The only short seller with a position below the median is the smaller short seller with 500 shares; by the staff's methodology, those cover purchases would only constitute 500 / 2,500 = 20% of the purchase volume.  But in this example, 100% of the purchase volume consisted of covering by short sellers.

93.    ***Second***, by limiting the sample of "*heavily shorted traders*" to those below the median, staff potentially omitted a large volume of cover purchases by market participants who had a net short position in GameStop's shares in a volume above the median.  Staff's conclusion that purchases by short sellers were "*a small fraction of overall buy volume*" is thus flawed because it is based on an incomplete sample, *i.e.*, only those short sellers whose position was below the median short position.

94.    ***Third***, staff's inability to include data prior to December 24 when calculating inventory positions is likely to materially distort their conclusions.  Rather than utilizing a "*stock*" measure of each market participant's short position as of January 15, staff is apparently inferring that short position by calculating the net trading "*flows*" from December 24 to January 14.  Staff's justification for this approach is the availability of data from the CAT, which begins on December 24.  While that makes sense from an operational standpoint, December 24 is a relatively late date to begin a calculation of inventory positions based on trading flows.  A consequence of the staff's sampling procedure is that, per this methodology, there were zero short positions on December 23, 2020.  But as we described previously, there were both anecdotal reports that short sellers had opened large short positions earlier in December, and as we discuss below, publicly available data on securities lending positions that is consistent with those reports.[183]

---

[181] https://catnmsplan.com/sites/default/files/2020-01/FDID-Guidance-April-2019.pdf

[182] *Id.* at 6.

[183] *See supra* Section I.

Electronic copy available at: https://ssrn.com/abstract=4030179

95.   To examine whether staff's sampling procedure might have distorted its estimates of the magnitude of the short position opened in GameStop's shares, we examine publicly available securities lending data reported by FIS Global, which reports daily securities lending positions and loan availability for over 45,000 global fixed income and equity securities. The data begins in mid-2013 and extends through the present date, with increasing coverage of more securities over time.  For each security, we observe a series of daily statistics that FIS obtains from lending agents as to both borrowers and lenders.[184]

96.   On the lender side, FIS obtains the total volume of shares made available for borrowing by institutional investors in their securities lending programs (referred to as "*available*" shares), as well as the volume of shares reported by lenders as out on borrow (referred to as "*utilized*" shares).  The latter is typically expressed as a fraction of available shares, sometimes referred to as the "*utilization percentage*."

97.   The volume of shares made available by lenders may be less than total short interest because securities may be relent multiple times in a single short sale transaction.[185] Moreover, the securities lending market is relatively opaque because transactions are negotiated over the counter between brokers and lending agents.  Thus, it is possible that FIS Global was only able to measure a subset of the available shares on loan.  However, because the share lending market is characterized by competition between lenders (at least to some extent[186]), it is unlikely that utilization rates among lenders in FIS Global's data differed dramatically from utilization rates reported by other lenders.  Otherwise, those lenders could offer a lower intrinsic rate (a function of supply and demand), attracting new borrowing, and utilization rates would equilibrate with the rest of the market.

98.   On the borrower side, FIS obtains the volume of outstanding shares on loan as of a given date, the volume of new shares borrowed that date, and the volume of shares returned that date.[187]  In addition, for each of these categories—outstanding, new, returned loans—FIS

---

[184] FIS does not disclose specifics concerning which broker-dealers and lending agents are included in its data beyond a general reference to "*major global custodians and banks*."  FIS Securities Lending Data, NASDAQ DATA LINK, https://data.nasdaq.com/databases/SLD/documentation?anchor=column-definitions (last visited Oct. 23, 2021)..  As FIS advertises its intraday data to hedge funds and other investment management professionals, there is no reason to think that the data are systematically missing certain borrowers or lenders.  However, the high correlation between FIS lending utilization data and published FINRA data on short interest strongly suggests that FIS's coverage is comprehensive.

[185] For example, suppose A borrows 100 shares from L to short sell to B, who purchases the shares.  B then loans those 100 shares to C, who short sells to D.  L's 100 shares have been borrowed twice: once by A and again by C.  In this example, total short interest would be 200 shares but only 100 shares were available for lending.

[186] Other academic work has shown that share lenders with market power capture most of the surplus arising from an anticipated share-price decline.  Specifically, when an active mutual fund exits a portfolio firm, passive index funds belonging to the same fund family raise the cost of borrowing the firm's shares for short selling.  To identify supply-side shifts, this work exploits changes in the identity of active managers exogenous to within-portfolio variation in the informational sensitivity of share lending costs.  The exercise of market power is pronounced in value lending programs targeting hard-to-borrow securities.  Joshua Mitts, *Passive Exit* (Colum. L. & Econ., Working Paper No. 638, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3716249

[187] The volume of outstanding, new and returned loans are not centrally transmitted to market participants but rather reported to FIS by broker-dealers and lending agents.  While the volume of outstanding shares on loan on a given

34

Electronic copy available at: https://ssrn.com/abstract=4030179

reports the mean, standard deviation, minimum, and maximum intrinsic rate paid by short seller-borrowers on a given date. Recall that the intrinsic rate is the effective interest rate paid by a borrower across both cash and non-cash collateral loans—"*a blended weighted average of (a) fees on non-cash loans and (b) spreads between rebate rates on cash loans and the prevailing overnight interest rate for the currency*."[188] In general, bi-weekly short interest reported by FINRA and FIS Global position totals are very highly correlated.

99.    Figure 2 shows the share volume of outstanding short positions in GameStop, as measured by shares on loan, from August 1, 2020 to January 15, 2021, the ending date in the SEC's sample for measuring inventory accumulations. The beginning date of the SEC's sample employed to estimate inventory using flows (December 24) is indicated with a dashed line. As the figure shows, the SEC's sample selection methodology appears to fail to capture most short positions opened in GameStop's stock.

---

date is highly correlated with short interest, the volume of new and returned loans is more prone to inherent error. In response to an inquiry on this point, FIS wrote to me: "*We classify everything that is "new" to us as NEW trades and have done so for more than 16 years of publishing this data to the satisfaction of our global client base of professionals. Where we can uniquely track the history of a transaction from one day to the next, such as by the publication of a unique trade reference from the submitting client, we can assert that this trade is ongoing. The provision of such UTIs is rare, however, so we use internal processes to track trades where possible. This can be very difficult when you consider a lending agent might complete a borrow of 100,000 shares using ten different underlying clients which may be reallocated or rebooked on a daily or intraday basis. Intraday we may receive such reallocations but of course, no shares are being returned, they are being moved from one underlying client to another with no net difference in the market. Without any link to the underlying trade, this can appear as a "new" trade and, contrary to any evidence otherwise, must be reported as such. Also, where a trade changes its status in some way, such as an increase or decrease in share amounts, it is also classified as a "new" event and the incremental shares are quoted as "new" or "returns."*" To correct these inherent errors, we exploit the following identity, which must hold true at the daily level:

*Daily Change in Outstanding Shares on Loan = New Shares on Loan – Returned Shares*

Because the greatest inherent error is likely to occur with "*Returned Shares*", we redefine "*Returned Shares*" as follows:

*Returned Shares = New Shares on Loan – Daily Change in Outstanding Shares on Loan*

In general, qualitative conclusions regarding the magnitude and costs of short selling GameStop's stock would hold without this adjustment, but this adjustment maximizes the accuracy of the quantitative calculations.

[188] FIS Securities Lending Data, NASDAQ DATA LINK, https://data.nasdaq.com/databases/SLD/documentation?anchor=column-definitions (last visited Oct. 23, 2021).

35

Electronic copy available at: https://ssrn.com/abstract=4030179

**Figure 2: Share Volume of Open Short Positions, August 1 to December 31, 2020**
This figure shows the share volume of outstanding short positions in GameStop, as measured by shares on loan, from August 1, 2020 to January 15, 2021, the ending date in the SEC's sample for measuring inventory accumulations. The beginning date of the SEC's sample for inventory accumulations (December 24) is indicated with a dashed line. As the figure shows, the SEC's sample appears to fail to capture most short positions opened in GameStop's stock.



100.    The figure shows that nearly 20 million shares in short positions (corresponding to hundreds of millions of dollars) were opened in GameStop's stock from August 1, 2020 to December 24, 2020. By contrast, the overall volume of short positions in GameStop's stock remained largely unchanged from December 24, 2020 to January 15, 2021. Thus, ***by beginning the inventory calculation on December 24, staff likely excluded the bulk of short positions potentially subject to a short squeeze***.

101.    Moreover, data from the Chicago Board Options Exchange show that a small number of market participants amassed large put option positions on December 11, 18 and 22—all before December 24, the beginning of staff's sample. While these publicly available data do not permit identifying the broker dealer responsible for the transaction, a block trade is,

36

Electronic copy available at: https://ssrn.com/abstract=4030179

by definition, executed by one market participant.  Table 1 shows block trades in GameStop of 10,000 contracts or more per trade.

**Table 1: Large Options Transactions Prior to Sample Period of Staff Report**

| Trade Date | Sequence Number | Type | Strike Price | Expiry Date | Exchange | Trade Size (Contracts) | Market Price |
|---|---|---|---|---|---|---|---|
| 2020-12-11 | 394631859 | Put | $ 15.00 | 2021-07-16 | PHLX | 38,500 | $ 6.50 |
| 2020-12-22 | 146903235 | Put | $ 20.00 | 2021-01-15 | PHLX | 31,000 | $ 3.60 |
| 2020-12-22 | 146903241 | Put | $ 17.00 | 2021-01-15 | PHLX | 30,000 | $ 1.63 |
| 2020-12-22 | 146903227 | Put | $ 15.00 | 2021-01-22 | PHLX | 25,000 | $ 0.85 |
| 2020-12-11 | 394631863 | Put | $ 15.00 | 2021-01-22 | PHLX | 24,120 | $ 3.90 |
| 2020-12-18 | 573079404 | Put | $ 17.00 | 2021-01-15 | ARCA | 20,000 | $ 2.92 |
| 2020-12-18 | 600797829 | Put | $ 17.00 | 2021-01-15 | ARCA | 20,000 | $ 2.92 |
| 2020-12-11 | 496285209 | Put | $ 15.00 | 2021-07-16 | PHLX | 15,500 | $ 6.40 |
| 2020-12-11 | 496285210 | Put | $ 15.00 | 2021-01-22 | PHLX | 10,000 | $ 3.70 |

102.    As each option contract corresponds to 100 shares, each of these transactions individually reflects millions of dollars in potential short positions (*i.e.*, short positions which would hedge market makers if the put were in-the-money).  For example, the transaction for 38,500 put contracts on December 11, 2020 when GameStop's share price was $6.50 reflected a potential short position in excess of $25 million at the time it was opened.

103.    Note that almost all of these put option trades were *short-dated*, *i.e.*, expiring in the immediate term.  Because short-dated options have greater gamma than long-dated ones, these options were more likely to elicit substantial hedging by market makers, driving up the share price.  Moreover, there is a tremendous spoke in options volume which coincides with the expiration of January monthly options on January 22, and share volume data confirm that date had the highest trading volume in GME's shares ever.

104.    In the context of a short squeeze, these put options play a role that is functionally equivalent to a short position.  In fact, an options market maker typically will hedge an options position like this by opening a short position.  The staff's exclusion of positions by market makers thus excludes the hedging trades indirectly opened by market participants who had opened large put option positions in GameStop prior to December 24, 2020.  It seems likely that when large amounts of puts expired on 1/22, it sparked a short cover rally as market makers covered short stocks which were held as hedges against short put positions.

105.    Based on contemporaneous quotes, some of these transactions appear to have been purchases opening new options contracts with market makers, while others may have been sales to close existing contracts and purchases of new contracts, *i.e.*, "*rolling over*" a given market participant's options exposure from one expiration date to another or otherwise partially reducing such exposure.  Regardless, these transactions led to a sharp increase in the total open interest in GameStop's put options exposure prior to the beginning of the

37

Electronic copy available at: https://ssrn.com/abstract=4030179

SEC's sample. Figure 3 shows the change in the total dollar value of shares underlying GameStop put options from November 1, 2020 to January 10, 2021:

**Figure 3: Change in Dollar Value of Options-Implied Short Positions**
This figure shows the change in the total dollar value of shares underlying GameStop put options from November 1, 2020 to January 10, 2021 (just before GameStop's share price began to increase dramatically).



106. As the figure shows, the change in the total dollar value of shares underlying put options peaks on December 24, the *beginning* of the inventory accumulations used by SEC staff to build its sample of short sellers, and remains consistently at that level through early January. Calculating inventory positions using a sample period *beginning* on December 24, as the staff did, omits this massive accumulation in November and December, during which market participants accumulated put options reflecting potential short positions in excess of $1.1 billion in market value.

107. This evidence indicates that staff's decision to begin measuring short position inventory on December 24, 2020, along with the exclusion of short positions held by market makers and thus the failure to measure short positions established via put options, likely further biased

38

Electronic copy available at: https://ssrn.com/abstract=4030179

estimates of short positions in GameStop's shares. As the magnitude of those positions reflected in Figure 6 of the staff report gave rise to staff's conclusion that GameStop's share-price increase was not driven by a short squeeze, this conclusion is suspect.

B.    *Estimating Covering Activity by Short Sellers*

108.    We now use publicly available data to reach an approximate estimate of the share of purchase volume on these days by short sellers. To be sure, without the sort of deanonymized trading data at the customer level provided by the CAT, we cannot precisely estimate the extent of this trading. To estimate an approximate order of magnitude, we employ publicly available securities lending data to obtain a rough proxy for the volume of shares purchased by short sellers. When a short seller covers a short position, they return borrowed shares to the lender. The volume of shares returned to lenders is thus a rough proxy for the volume of purchases by short sellers. Despite the limitation of publicly disclosed share lending data, even daily totals can shed light on the extent to which purchases were driven by short sellers covering short positions.

109.    At the outset, we have some concerns with both the "*numerator*" and the "*denominator*" of the staff's calculation in Figure 6. The staff writes in footnote 78 of the report that Figure 6 "*shows the total buy volume during half-hour intervals from January 19 to February 5, 2021, of traders identified as having a large short position in GME, along with total buy volume and the value-weighted average stock price, using data from CAT.*" By definition, every trade has a buyer and seller; it is thus nonsensical to refer to "*buy volume*" without specifying how exactly "*buy*" vs "*sell*" volume is determined. For example, a short seller could submit a non-marketable purchase order which would eventually match against an incoming sell order. By the staff's reasoning, it is unclear to us whether that sort of situation would be considered "*buy*" or "*sell*" volume.

110.    One possibility is that staff measured "*buy volume*" as the execution of marketable orders, *i.e.*, those priced at the best offer. If so, this is likely to substantially underestimate the volume of purchases by short sellers covering their positions, as well as the impact of those purchases on GME's share price. There is both theoretical and empirical support for the proposition that marketable orders, non-marketable orders within the NBBO and non-marketable orders at the market have price impact.[189] It is possible that non-marketable orders may represent a rather large number of the short-covering transactions. After all, much of the significant shorting likely was performed by sophisticated market participants who employ trading algorithms that cross the bid-ask spread only as a last resort.

111.    To account for the possibility that short sellers covered through non-marketable buy orders, we simply compare the total volume of shares returned by short sellers to the total share

---

[189] *See, e.g.*, Merritt B. Fox, Lawrence R. Glosten & Sue Guan, *Spoofing and Its Regulation*, COLUM. BUS. L. REV. (forthcoming, 2022), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4002696. While there appears to be little theoretical basis for price impact from non-marketable orders away from the market, and the academic empirical support is weak at best, prosecuted spoofing and layering cases often involve orders away from the market and hence we have some "empirical" support for this proposition.

39

Electronic copy available at: https://ssrn.com/abstract=4030179

volume on each date.  In Figure 4, we plot our estimate of the purchase volume by short sellers as a fraction of total share volume.

**Figure 4: Estimated Share of Total Volume by Short Sellers**
This figure plots the fraction of volume attributable to short sellers, obtained by dividing the volume of shares returned to lenders by the total share volume, a conservative baseline which incorporates non-marketable buy orders matching against marketable sell orders.  The right-side axis plots the volume weighted average price over those days.



112.    Two points emerge from Figure 4.  The first is that our estimate of the fraction of trading volume potentially attributable to short selling at the end of January is higher than the staff's estimate.  Second, the correlation between the fraction of trading volume attributable to short selling and GameStop's share price is high: over this window, the Pearson correlation between these two is 78.7%.  And the correlation between daily changes in the fraction of purchase volume attributable to short selling and changes in GameStop's daily share price (*i.e.*, daily returns) is fairly high as well: 48.5%.

40

Electronic copy available at: https://ssrn.com/abstract=4030179

113.   This analysis uses contemporary buy-to-cover volume and trading volume. Under ordinary conditions, short sellers may not be able to return covered shares immediately because settlement occurs on a t+2 basis. There are exceptions to this ordinary rule which may apply when conditions in the securities lending market are especially tight. For example, brokers may return shares in inventory immediately in response to lender recalls and forced buy-ins. And the DTCC offers same-day settlement, which is employed for institutional and broker-to-broker transactions, in addition to securities lending.[190]

114.   There is reason to doubt that short sellers were required to wait two trading days before returning their shares over this period. With such a sharp increase in the share price, it is likely that short sellers were facing buy-ins and recalls, which would occur with same-day settlement. In fact, the correlation between daily returns and a two-day lag of daily changes in the fraction of purchase volume attributable to short selling and daily returns is lower— 27.3%—than the contemporaneous correlation of 48.5%.

115.   Nonetheless, to adjust for the possibility that some short sellers may have been forced to wait two trading days before returning their shares due to *t+2* settlement, Figure 5 plots the three-day rolling sum of the fraction of volume attributable to short sellers, obtained by dividing the volume of shares returned to lenders by the total share volume, a conservative baseline which incorporates non-marketable buy orders matching against marketable sell orders. The right-side axis plots the volume-weighted average price over those days.

116.   The estimated daily fraction of short selling volume is similar between Figure 4 and Figure 5. It is thus reasonable to conclude that our findings do not depend on whether short sellers waited two trading days to return borrowed shares or returned those shares immediately.

---

[190] Michele Hillery, *Ask the Expert: Same Day, Every Day – How Same Day Settlement Works at DTCC*, DTCC, Apr. 19, 2021 ("More than one million same-day transactions are introduced and processed at DTC every day.")

Electronic copy available at: https://ssrn.com/abstract=4030179

**Figure 5: Estimated Share of Total Volume by Short Sellers (Three-Day Rolling Sum)**
This figure plots the three-day rolling sum of the fraction of volume attributable to short sellers, obtained by dividing the volume of shares returned to lenders by the total share volume, a conservative baseline which incorporates non-marketable buy orders matching against marketable sell orders. The right-side axis plots the volume-weighted average price over those days. The three-day rolling sum adjusts for the possibility that some short sellers may have been forced to wait two trading days before returning their shares due to *t+2* settlement.



117.   To be clear, these data do not imply that purchase of shares by short sellers necessarily *caused* the increase in GameStop's share price. A high correlation could simply reflect a common shock affecting buyers, short sellers and non-short sellers alike. And the causality could run the other way, *e.g.*, intense retail buying drove up the share price, which in turn forced short sellers to cover their positions. But this evidence does cast doubt on staff's conclusion that purchases by short sellers were "*a small fraction of overall buy volume.*"

## IV.   Gamma Squeeze

118.   In addition, SEC staff examined the possibility that GameStop's shares were subject to a gamma squeeze. On this point, staff wrote:

42

Electronic copy available at: https://ssrn.com/abstract=4030179

*Another possible explanation could be a "gamma squeeze," which occurs when market makers purchase a stock to hedge the risk associated with writing call options on that stock, in turn putting further upward pressure on the underlying stock price. As noted above, though, staff did not find evidence of a gamma squeeze in GME during January 2021. One of the main drivers of a gamma squeeze is an influx of call option purchases, which causes market makers to hedge their writing of the call options by purchasing the underlying stock, driving up the stock price in the process. While staff did find GME options trading volume from individual customers increased substantially, from only $58.5 million on January 21 to $563.4 million on January 22 until peaking at $2.4 billion on January 27, this increase in options trading volume was mostly driven by an increase in the buying of put, rather than call, options. Further, data show that market-makers were buying, rather than writing, call options. These observations by themselves are not consistent with a gamma squeeze.*[191]

119.    As a preliminary matter, there are internal inconsistencies in the staff report on this question.  In this paragraph, staff concludes that the "*increase in options trading volume was mostly driven by an increase in the buying of put, rather than call, options.*"  However, later on in the report, staff writes that "*Based on dollar volumes, the increased [options] trading concentrated heavily in call options, a large percentage of which were short-dated.*"[192]  Staff presents a figure which seems to indicate that call options trading volume dwarfed put options trading, contrary to the statement that the "*increase in options trading volume was mostly driven by an increase in the buying of put, rather than call, options*":[193]

---

[191] *Id.* at *29.

[192] *Id.* at *42.

[193] This point is discussed at greater length by Brent Kochuba of SpotGamma in a YouTube video analyzing the GameStop episode: https://www.youtube.com/watch?v=OB37WbukDkQ .

43

Electronic copy available at: https://ssrn.com/abstract=4030179

**Figure 6: Reproduction of Figure 11 in SEC Staff Report**

The below image reproduces Figure 11 of the staff report, entitled "GME Options Dollar Volume 2020 – January 2021."

**Figure 11**



120.    Turning to the substance, we begin with staff's contention that a gamma squeeze "***is an influx of call option purchases.***" It is true that an influx of call option purchases is *one way* to trigger hedging consisting of "*purchasing the underlying stock, driving up the stock price in the process.*" But it is not the only way to trigger that sort of buy-side hedging. In general, when market makers engage in *delta-hedging*, they purchase or sell a volume of securities corresponding to the delta of the options contract. Changes in option delta will lead to changes in delta hedging. If we adopt the standard convention giving put options negative deltas and call options positive deltas, so long as the delta of an option increases (in a signed sense), a delta-hedged market maker ordinarily will purchase shares of stock.

121.    There are three ways to induce market makers to hedge options exposure by purchasing shares of the underlying security.

122.    ***First,*** one may purchase put options from a market marker prior to an increase in the underlying share price. The market maker will initially hedge its exposure by shorting shares of the underlying security. As the share price increases, the delta of the put options increases (in a signed sense), ordinarily leading the market maker to purchase shares.

123.    For a simple example, suppose that the share price is currently $10 and a market participant purchases 100 put options with a delta of -0.5. A market maker seeking to delta-hedge that exposure ordinarily would hedge by taking on exposure equal to 100 put options x 100

44

Electronic copy available at: https://ssrn.com/abstract=4030179

shares per option x delta of -0.5 = -$5,000 of dollar volume or, equivalently, shorting 500 shares at $10 per share. Now suppose the share price increases to $20 such that the put option delta increases (in a signed sense) to -0.2. To remain delta hedged, the market maker will seek to have exposure of 100 put options x 100 shares per option x -0.2 = -$2,000 dollar volume or, equivalently, shorting 100 shares at $20 per share. To obtain this exposure, the market maker will partially cover its short position by purchasing 400 shares.

124.    This example shows how purchases of put options can ultimately induce market makers to purchase shares of stock to rebalance prior short-side hedges. It is thus incorrect to conclude, as the staff wrote, that a gamma squeeze requires "*an influx of call option purchases.*" To be sure, this type of gamma squeeze—covering short positions opened to hedge the sale of put options—is already captured by our prior analysis of covering by short sellers. One might view it as a kind of short squeeze. However, the following two types of options transactions are not captured by our prior analysis.

125.    ***Second***, one may sell put options to a market maker (*i.e.*, open a short position in put options). The sale of put options to a market maker will ordinarily induce that market maker to hedge their exposure to those put options by purchasing the underlying security.

126.    For simplicity, modify the prior example by supposing that the market participant were to sell 100 put options to a market maker with a delta of -0.5. Unlike the prior example, the market maker's long options position has a negative delta, which is hedged by purchasing shares of stock. A market maker seeking to delta-hedge that exposure ordinarily would hedge by taking on exposure equal to 100 put options x 100 shares per option x delta of 0.5 = $5,000 of dollar volume or, equivalently, purchasing 500 shares at $10 per share.

127.    To be sure, in this case, if the share price were to increase, the market maker would rebalance its hedge by selling shares (and if the share price were to decrease, the market maker here would purchase shares, whereas the market maker in the prior example would sell shares in that case). Of course, the hedging activity arising from *simultaneously* purchasing and selling the same volume of put options would be equal and opposite, offsetting each other (and indeed, a market maker could hedge its short or long exposure to put options simply by purchasing or selling, respectively, the same number of options). But the hedging induced by purchasing and selling put options may still have a substantial effect on the share price when occurring at *different points in time.*

128.    For example, market participants might initially short sell put options, causing market makers to hedge by buying shares and driving the share price up as a result. Due to that increase in the share price, other market makers might buy shares to rebalance preexisting short positions in the underlying shares opened to hedge purchases of put options. Taken together, these actions would apply upward pressure to the share price, at least temporarily, until the first group eventually rebalances its hedging by selling shares of stock, which would in turn apply downward pressure on the share price.

129.    It is thus entirely plausible for the purchase and sale of put options to induce a sharp upward pressure on the share price, wholly apart from the effect of call options. Of course, hedging induced by market participants buying call options are a ***third*** way that options transactions

45

Electronic copy available at: https://ssrn.com/abstract=4030179

can apply upward pressure on the share price. Just like buying a put, a market maker selling a call option will delta-hedge by buying shares.

130. In fact, as this discussion illustrates, what matters is not the type of option at issue—put or call—but rather the direction of the hedging induced by the (a) initial transaction and (b) subsequent share price movement. This is a direct consequence of *put-call parity*, which holds that the value of a put option is mathematically equivalent to the value of a call option, after adding the strike price and subtracting the future price of the security:

$$put\ price = call\ price + strike\ price - future\ stock\ price$$

131. While put-call parity does not hold as a mathematical identity for American options (like the single-stock options written on GameStop), it is generally true that the hedging activity induced by an options position does not depend on the *type* of option employed (put or call), as staff incorrectly implies, but rather by the initial position (long or short) and any subsequent share-price change. It is worth noting that when options expire, dealers need to quickly unwind their exposure; otherwise, they will have unhedged exposure because the contract is no longer valid. In this respect, dealers are sometimes "forced" to purchase or sell shares in illiquid and active market conditions.

132. We now proceed to re-estimate the extent to which trading volume in GameStop's shares over the period January 21 – 29 may have consisted of hedging by options market makers. To be sure, our ability to precisely estimate the direction of options exposure is limited by the unavailability of deanonymized counterparty and directional trade information in publicly available data.

133. A critical issue when estimating hedging activity is the extent to which such activity is *netted* at various points in time. For a simple example, consider the following sequence of events. At 9:30am, a market participant purchases one call option from a market maker with a delta of 0.5. At 2:30pm, another market participant sells one call option with the same delta of 0.5 to the same market maker.

134. There are at least two ways to account for hedging activity arising from this sequence of options transactions. The first is to suppose that the market maker hedged its short call option exposure immediately by purchasing 50 shares (*i.e.*, the 100 shares underlying the call option multiplied by a delta of 0.5). After the second options transaction, the market maker hedged its long call option exposure by selling 50 shares. On this view, the two options transactions yielded a purchase of 50 shares and a sale of 50 shares—the first shortly after 9:30am and the latter shortly after 2:30pm.

135. A second way to account for this sequence of transactions is to suppose that the market maker did not hedge its short call option exposure just after 9:30am, remaining unhedged from 9:30am until 2:30pm. At 2:30pm, the market maker effectively closed out its short call option position by purchasing the call option from the market participant, yielding the market maker with no exposure in either direction. On this view, the two options transactions yielded no hedging activity whatsoever.

46

Electronic copy available at: https://ssrn.com/abstract=4030179

136.   Peer-review literature examining hedging activity by options market makers has supposed that imbalanced options order flow is hedged at the daily interval.[194] To develop a baseline, we begin with the first method, *i.e.*, assume that every options transaction yielded an immediate hedging trade in the stock market. Recall that Figure 6 of the staff report plots total buy volume, which does not "*net out*" selling volume on the same day. While Figure 6 examines short covering activity, the staff's discussion of a gamma squeeze appears immediately after that and thus most naturally relates to the analysis of the composition of purchases of GameStop shares. Moreover, because we seek to estimate the extent to which a gamma squeeze might have applied upward pressure to GameStop's share price, it is important to identify how hedging activity consisting of purchases might have affected the share price, wholly apart from any subsequent effect of hedging activity consisting of sales.

137.   However, because the first method may lead to an overestimate of option-induced purchase volume—as many market makers may have netted exposure before hedging on the same day—we then conduct a kind of "*sensitivity analysis*" which considers how our estimates might vary if some fraction of purchases were netted by the market maker rather than hedged immediately into the open market. In fact, because the scenario of zero netting is clearly unrealistic, we focus on reasonable ranges of netting, *e.g.*, from 25% to 75% of purchase volume. While different netting assumptions yields different precise magnitudes of the estimated hedging activity, our conclusion is similar: option hedging activity likely accounted for a substantial fraction of purchase volume in GameStop's shares.

138.   For each trading date over this period, we begin by estimating the market maker's *initial* delta hedge for the daily trading in each option in GameStop's shares, *i.e.*, each unique combination of option type, expiration date and strike price, as follows:

$$initial\ daily\ delta\ hedge = trade\ size * |trade\ delta| * 100$$

where *trade size* is the number of contracts traded in that transaction, which is multiplied by 100 because each contract corresponds to 100 shares of GameStop's stock; and *trade delta* is the delta of the option at the time of the trade, as estimated by the CBOE.

139.   This yields an estimate of the total initial daily delta hedge for an option position traded on any given date. In keeping with our preference to avoid netting hedging trades at this stage, we sum the total initial daily hedge separately for *bearish* and *bullish* trades, where a *bearish* trade is a long put or short call and a *bullish* trade is a long call or short put.

140.   Next, for each option traded on each date, we compute the approximate delta hedge for *subsequent dates*. To do so, we take every unique combination of option type, expiration date and strike price and merge the open interest and option delta (provided by the CBOE as of 3:45pm) for the subsequent dates (up to January 29). For each subsequent date, we again calculate that day's delta hedge for each trade on the initial date as follows:

---

[194] *See, e.g.*, Jianfeng Hu, *Does Option Trading Convey Stock Price Information?*, 111 J. FIN. ECON. 625 (2014) (aggregating signed order flow from options hedging by weighting each option by its delta exposure and using this measure to estimate the stock order imbalance induced by option trading).

47

Electronic copy available at: https://ssrn.com/abstract=4030179

$$subsequent\ daily\ delta\ hedge = initial\ trade\ size * |daily\ delta| * 100$$

where *initial trade size* is defined as before by the trade on the initial date and *daily delta* is computed as of the subsequent date. In effect, for each trade we are computing the estimated delta hedge required for that position on each subsequent date.

141. Next, for each option on each subsequent date, we calculate the daily *difference* in the subsequent daily delta hedge, which is defined as the difference between the total net initial daily delta hedge and the subsequent daily delta hedge for the first subsequent day, and the difference from the prior day's daily delta hedge for every other subsequent day. As before, we compute this difference separately for increases and decreases in the daily delta hedge, to distinguish between hedging trades consisting of purchases and sales on the same day.[195]

142. This calculation yields an estimate of the purchases and sales required to hedge option positions over subsequent days during the period. For each day during the period January 21 to 29, we add the volume of purchases to rebalance hedges of prior options exposure to the volume of purchases required to hedge initial positions opened on that day, which yields an estimate of the *total purchases* to hedge options positions on each trading day.

143. Using this method, we plot the fraction of total share volume on each day during the period January 21 to 29 which we estimate may be attributable to hedging options positions. To examine how robust these findings are to the degree of assumed netting, Figure 7 compares how our estimate might vary if 25%, 50% and 75% of the delta-hedged purchase volume were netted.

---

[195] The astute reader will notice that while we calculate changes in a hedging position separately using increases and decreases to distinguish between purchase and sale activity on a given day, we calculate the *direction* of the hedging change—*i.e.*, whether a purchase or sale is needed—by comparing the *net* daily delta hedge in the initial position to the daily delta hedge on a subsequent day. To give a simple example, suppose 2 put options with a delta of 0.5 are sold to a market maker on a given day and 1 put option with the same delta is purchased from the market maker. We suppose the market maker hedges the long put exposure by purchasing 50*2=100 shares of stock and sells 50 shares of stock, and count those purchases and sales separately. However, if the put delta decreases to 0.4 the next day, we simply suppose the market maker sells 10 shares of stock. That is, we compare the next day's hedge (40 shares) to the market maker's *net* exposure (50 shares), *i.e.*, supposing that the market maker hedges new exposure immediately but only rebalances hedging exposure on any given day by comparing to the *net* exposure of prior days.

48

Electronic copy available at: https://ssrn.com/abstract=4030179

**Figure 7: Estimated Share Volume by Options Hedging (25%, 50% and 75% Netting)**
This figure plots the fraction of share volume we estimate to be attributable to options hedging over January 21 – 29 if 25%, 50% and 75% of the options hedging activity were netted, as described in the text. The right-side axis plots the volume weighted average price over those days.



144.    As the figure shows, even at relatively high levels of assumed netting, our sensitivity analysis suggests that a large volume of trading volume in GameStop's shares consisted of options hedging. This evidence calls into question the basis for the conclusion that "*staff did not find evidence of a gamma squeeze in GME during January 2021.*"

49

Electronic copy available at: https://ssrn.com/abstract=4030179

**V.      Conclusion**

145.    In this report, we show that additional data has come to light which suggest that GameStop's shares may have been subject to a short squeeze and gamma squeeze.

146.    *First*, by extending the sample and considering securities lending transactions, we find evidence suggesting that a nontrivial fraction of the trading volume in GameStop's stock consisted of purchases by short sellers covering their positions.

147.    *Second*, we show that staff's analysis of a gamma squeeze can be extended to include delta-hedging by put and call options market makers to better approximate the contribution of options positions to the increase in GameStop's share price.

148.    We reiterate that without access to the sort of nonpublic, deanonymized data available to the Commission and its staff, we are unable to pin down the magnitude of any short or gamma squeeze in GameStop's shares, much less identify the actors involved in or responsible for the rapid volatility.

149.    We hope that our analysis can helpfully guide the Commission and its staff in identifying additional data which might shed light on the extent to which the increase in GameStop's share price may have been the product of a short squeeze and gamma squeeze.  We are ready and willing to provide any assistance to the Commission and staff in that effort.

50

Electronic copy available at: https://ssrn.com/abstract=4030179

**APPENDIX: ALTERNATIVE ESTIMATION USING MARKETABLE BUY VOLUME**

150.    In the Appendix, we show how our conclusions might vary if we were to apply a version of the Lee and Ready (1991) method, which classifies a trade as a "*purchase*" if it is above the midpoint of the national best bid and best offer.  We modify this method by classifying a purchase if it is within 0.025% of the best offer, which we find empirically most closely approximates the staff's plot of total buy volume at half-hour intervals.

51

Electronic copy available at: https://ssrn.com/abstract=4030179

**Figure 8: Validating Estimate of Buy Volume**

The green lines in the first figure below show the staff's estimate of total buy volume using CAT data. Immediately below, we present our estimate of total buy volume using a variation of the Lee and Ready method: we classify a trade as a purchase if it is within 0.025% of the best offer. As the figure shows, while our estimate does not exactly match staff's deanonymized data, it appears to be relatively close and within an order of magnitude.



52

Electronic copy available at: https://ssrn.com/abstract=4030179

151.    As the figure shows, while our estimate of the magnitude of buy volume differs from the SEC's, it appears to be close and within an order of magnitude.  Moreover, to the extent it errs, it tends to estimate a greater fraction of purchase volume, which would bias our estimate of the share of short selling activity downward.  We use this method to calculate an approximate daily total buy volume to compare against the approximate daily total of purchases by short sellers.  We present the results in Figure 9, which essentially replicates Figure 6 of the SEC staff report on the daily level using these approximations.

**Figure 9: Replication of Figure 6 in SEC Staff Report Using Daily Data and Full Sample**
This figure shows the volume of shares purchased by short sellers (i.e., the volume of shares returned to lenders) and total buy volume, which is determined using the trade classification method described in the text: a variant of the Lee and Ready method which seems to most closely approximate the half-hour buy volume reported by the SEC.



152.    Our Figure 9 shows a markedly different picture than Figure 6 of the staff report.  Our approximation suggests that the volume of shares purchased by short sellers makes up a much greater share of total purchase volume on the days when the share price was highest.  An easier way to visualize this is to plot our approximate estimate of the purchase volume by short sellers as a fraction of total buy volume, as shown in Figure 10:

53

Electronic copy available at: https://ssrn.com/abstract=4030179

**Figure 10: Estimated Share of Purchase Volume by Short Sellers**
This figure plots the fraction of purchase volume attributable to short sellers, obtained by dividing the volume of shares returned to lenders by the total daily volume of purchases using the Lee and Ready method. The right-side axis plots the volume weighted average price over those days.



54

Electronic copy available at: https://ssrn.com/abstract=4030179

# EXHIBIT I

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/volkswagen-ford-other-big-auto-makers-push-to-make-solid-state-batteries-the-next-big-thing-for-evs-11632858485

BUSINESS AUTOS & TRANSPORTATION AUTOS INDUSTRY

# Volkswagen, Ford, Other Big Auto Makers Push to Make Solid-State Batteries the Next Big Thing for EVs

Hurdles remain in effort to replace lithium-ion batteries, which are considered flammable

*By William Boston*
Sept. 28, 2021 3:48 pm ET

In the race to build a cheaper and longer-range electric car, auto companies are pouring more money into a technology long considered a moonshot: solid-state batteries.

Today, most electric vehicles use lithium-ion batteries, which have become more powerful and affordable over the years but have limitations, including the risks of catching fire.

The configuration has the potential to deliver faster charging times and make the packs safer by eliminating the flammable electrolyte solution used in lithium-ion batteries, auto executives and analysts say.

Still, the technology remains costly and relatively unproven in real-world applications, a hurdle that is expected to take years to solve for the mass market.

Toyota Motor Corp. is pursuing in-house development of solid-state battery cells. Earlier this month, the Japanese auto maker said it needed more time to develop the technology for fully electric cars, though it would use smaller solid-state batteries in hybrid vehicles for now.

Other major car companies, such as Volkswagen AG, Ford Motor Co. and Bayerische Motoren Werke AG have invested in solid-state battery startups to help them perfect the technology and make it ready for mass production.

A number of leading battery startups have so far received around $2 billion in investment from auto makers and financial investors, the consulting firm AlixPartners LLP estimated, with half of that going to QuantumScape Corp., whose investors include Bill Gates and Volkswagen AG.

**Exhibit
0015**

8/12/2022
Frank Fish

Case 3:21-cv-00058-WHO Document 175-4 Filed 10/06/22 Page 138 of 179



The pressure to build a better battery has grown in recent years with car companies betting big on electric vehicles. Investment globally in plug-in models has increased 40% over the past year, said John Loehr, managing director of automotive at consulting firm AlixPartners.

Solid-state technology remains a longer-term endeavor. Mr. Loehr said it could be close to a decade before such batteries are ready for mass production, but auto makers are investing now to gain expertise and ready their manufacturing operations, he added.

"They don't want to get caught where everybody else has this technology and they don't," Mr. Loehr said.

Advances in lithium-ion battery technology in the 1980s and 1990s gave birth to Tesla Inc., the first commercially successful electric car maker. Since then, lithium-ion batteries using a liquid electrolyte have improved in the travel range they can deliver between charges and are significantly cheaper than when they first appeared.

But the lithium-ion batteries also have drawbacks. General Motors Co. recently recalled about 142,000 Chevrolet Bolt electric cars to fix a manufacturing defect linked to battery fires. Some car companies

Case 3:21-cv-00058-WHO   Document 175-4   Filed 10/06/22   Page 139 of 179

have had to recall electric vehicles because of fire concerns involving the battery and warn customers not to fully charge their cars or park them in garages until the problem was fixed.

Industry executives and analysts say that using solid-state technology would make the batteries safer, because the core material is less likely to be combustible.

One big hurdle with the lithium-ion batteries is that as the energy density rises, the risk of catching fire increases, said Tim Bush, a battery technology analyst with UBS Research.

"If we get rid of electrolyte and replace it with solid material, we no longer have a safety risk, and energy density could go to twice as much as what we have today," Mr. Bush said.



No one has yet succeeded in building solid-state batteries that can be mass produced and plugged into millions of cars. But some startups are hopeful they can achieve that goal by teaming up with auto manufacturers who have more than a century of mass production experience.

In December, the Silicon Valley startup QuantumScape said it had achieved a breakthrough, successfully testing batteries using its solid-state material.

In March, VW said its battery scientists independently verified QuantumScape's tests in their own lab and agreed to invest an additional $100 million in the startup, bringing its total investment in the company to $300 million. QuantumScape has a market value of roughly $10.5 billion.

VW also agreed in principle to build a pilot facility to make EV-ready solid-state batteries using QuantumScape technology. Final approval of the pilot line is still outstanding, awaiting a decision from the German government on whether it will financially aid the project.

"Solid-state technology is the game-changer," Frank Blome, who leads battery development at VW, said in March.

Following the QuantumScape news, BMW and Ford announced in May they were investing $130 million in Solid Power Inc., which is developing a solid-state battery.

Case 3:21-cv-00058-WHO Document 175-4 Filed 10/06/22 Page 140 of 179

Solid Power CEO Doug Campbell said the company would build a pilot line to begin building "automotive scale" solid-state batteries next year.

"We believe if the next technology comes it will be solid state," Oliver Zipse, chief executive of luxury car maker BMW, told reporters on the sidelines of the Munich auto show in September.

Although a believer in the technology, Mr. Zipse is skeptical about how fast it could be ready for mass production, because of unknowns about the costs of manufacturing and its ability to work safely in extreme hot and cold climates.

"What's not solved yet is the cost," he said. "An electric car and the battery have to function in a very wide band of temperatures," he added.

Toyota last year built a prototype vehicle using solid-state batteries and ran it through a range of tests. Masahiko Maeda, Toyota's chief technology officer, said this month that the tests showed that these batteries had higher output than conventional lithium-ion ones. But it also found that they had a short service life.

"To solve this and other issues, we need to continue development, mainly of solid electrolyte materials," Mr. Maeda told reporters at the company's technology event.

**Write to** William Boston at william.boston@wsj.com

*Appeared in the September 29, 2021, print edition as 'Auto Makers Seek Solid-State Batteries As the Next Big Thing for Electric Cars'.*

# EXHIBIT J

Case 3:21-cv-00058-WHO    Document 175-4    Filed 10/06/22    Page 142 of 179





Exhibit
**0024**
8/12/2022
Frank Fish

# QuantumScape Achieves Final 2021 Goal Ahead of Schedule

NOVEMBER 16, 2021

SAN JOSE, Calif.—(BUSINESS WIRE)— QuantumScape Corporation (NYSE: QS) today released 10-layer battery cell testing data showing 800 cycles at better than one-hour charge rates at 25 °C, achieving the goal it had laid out for 2021. With this achievement, QuantumScape has now met all the milestones it laid out at the beginning of the year.

"We are delighted to share this data on 10-layer cell performance," said Jagdeep Singh, co-founder and CEO of QuantumScape. "This demonstrates that we continue to successfully execute on the objectives we established to scale up our technology and manufacturing efforts. These are groundbreaking results, as we believe no other player has demonstrated equivalent performance with solid-state or lithium-metal battery technology."

The results confirm that the company achieved the goal, which was to demonstrate a 10-layer cell capable of at least 800 cycles with energy retention greater than 80%; a 1C-1C charge and discharge rate; at 25°C, 3.4 atmospheres of pressure, and 100% depth of discharge.

The company now intends to focus on its goals for 2022 and 2023, including further increasing the quality, consistency and layer counts for the cells, delivering customer prototypes and continuing to build out its QS-0 pre-pilot production line.

## About QuantumScape Corporation

QuantumScape is a leader in developing next-generation solid-state lithium-metal batteries for electric vehicles. The company is on a mission to revolutionize energy storage to enable a sustainable future. For more information, please visit www.quantumscape.com (https://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Fwww.quantumscape.com&esheet=52532198&newsitemid=20211116005970&lan=en-US&anchor=www.quantumscape.com&index=1&md5=9ae1554889ecc858736a8443103babff).

## Forward-Looking Statements

The information in this press release includes "forward-looking statements" within the meaning of Section 27A of the

Case 3:21-cv-00058-WHO      Document 175-4      Filed 10/06/22      Page 143 of 179

Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of present or historical fact included in this press release, including, without limitation, regarding the development, timeline and performance of QuantumScape's products and technology are forward-looking statements.

These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Most of these factors are outside QuantumScape's control and are difficult to predict. Information about factors that could materially affect QuantumScape is set forth under the "Risk Factors" section in QuantumScape's most recent quarterly report on Form 10-Q filed with the Securities and Exchange Commission on July 29, 2021 and available on the SEC's website at www.sec.gov (http://www.sec.gov).

Except as otherwise required by applicable law, QuantumScape disclaims any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this press release. Should underlying assumptions prove incorrect, actual results and projections could different materially from those expressed in any forward-looking statements.

---

**Share on**



| **TECHNOLOGY** (/technology/) | **RESOURCES** (/resources/) | **COMPANY** (/company/) |
| --- | --- | --- |
| **ADVANTAGES** (/technology/#advantages) | **NEWSROOM** (/newsroom/) | **INVESTORS** (https://ir.quantumscape.com/) |
| **SOLID-STATE FAQS** (/technology/#faqs) | **QS BLOG** (/resources/blog) | **CAREERS** (/careers/) |

Privacy Policy (/privacy-policy/) | Terms of Use (/terms-of-use/)

© 2022 QuantumScape Corporation

1730 Technology Drive, San Jose, CA 95110

(htt
ps:/
ps:/
ww
li

info@quantumscape.com (mailto:info@quantumscape.com)

(https://twitter.com/QuantumScapeCo)

(https://www.linkedin.com/company/quantumscape/)

# EXHIBIT K

Case 3:21-cv-00058-WHO    Document 175-4    Filed 10/06/22    Page 146 of 179



HOME    SEC FILINGS    **RESOURCES**    GOVERNANCE

**News Details**

**VIEW ALL NEWS** ⟶

# QuantumScape Meets Volkswagen Technical Milestone, Clearing Way for $100M Investment

03/31/2021

SAN JOSE, Calif.--(BUSINESS WIRE)-- QuantumScape Corporation (NYSE: QS) ("QuantumScape") today announced it has successfully met the technical milestone that was a condition to close for the investment of an additional $100 million by Volkswagen Group of America Investments, LLC ("VW") into QuantumScape. The milestone required Volkswagen to successfully test the latest generation of QuantumScape's solid-state lithium-metal cells in their labs in Germany. This will be the second and final closing under the May 14, 2020 stock purchase agreement between VW and QuantumScape that provided for a total $200 million investment. The closing will occur following expiration of the waiting period or other clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"We are pleased to report that the QuantumScape cells met the technical milestones in our labs in Germany that we had previously agreed upon," said Frank Blome, head of the Volkswagen Group's Center of Excellence Battery Cell. "Achievement of this milestone is an important step for QuantumScape and we look forward to receiving and testing subsequent generations of cells, with the goal of getting solid-state technology into series production."

"We are delighted to have met this technical milestone with Volkswagen, and we look forward to working jointly to bring solid-state lithium-metal battery technology into industrialized mass-production," said Jagdeep Singh, co-founder and CEO of QuantumScape.

**About QuantumScape Corporation**

QuantumScape is a leader in the development of next generation solid-state lithium-metal batteries for use in electric vehicles. The company's mission is to revolutionize energy storage to enable a sustainable future.

View source version on businesswire.com: https://www.businesswire.com/news/home/20210331005943/en/

**For Investors**

ir@quantumscape.com

**For Media**

media@quantumscape.com

Source: QuantumScape Corporation

**VIEW ALL NEWS** ⟶

Skip to main content

```
┌─────────────────────┐
│     Exhibit          │
│       0020           │
│    8/12/2022         │
│    Frank Fish        │
└─────────────────────┘
```





Privacy Policy | Terms of Use

© 2022 QuantumScape Corporation

1730 Technology Dr, San Jose, CA 95110

info@quantumscape.com

Powered By Q4 Inc. 5.74.0.1

# EXHIBIT L



**Exhibit 0026**

8/12/2022
Frank Fish

 [/]

# QuantumScape Releases Third-Party Test Results

OCTOBER 27, 2021

SAN JOSE, Calif.— QuantumScape Corporation (NYSE: QS), a leader in the development of next-generation solid-state lithium-metal batteries for use in electric vehicles, today announced the release of an independent third-party laboratory testing report on the performance of its solid-state lithium-metal battery cells.

QuantumScape's single-layer cells were tested by Mobile Power Solutions, an independent battery lab, and met automotive-relevant conditions: over 800 cycles at 25 °C, 1C (one hour) charge/discharge rates, 100% depth of discharge and under 3.4 atmospheres of pressure. We believe that the results from the tests, covering a group of three single-layer cells, are consistent with those initially reported by QuantumScape in its December 2020 Battery Showcase presentation (https://cts.businesswire.com/ct/CT?id=smartlink&url=https%3A%2F%2Fwww.quantumscape.com%2Fwp-content%2Fuploads%2F2021%2F02%2FData-Launch-Updated-Post-Presentation-20210107-2.pdf&esheet=52516894&newsitemid=20211027006112&lan=en-US&anchor=Battery+Showcase+presentation&index=1&md5=433261ab1be38133ac2f5fa8efd5ff58).

"We are happy that these independent test results substantially replicate the cycling performance we reported at our December 2020 Battery Showcase," said Jagdeep Singh, CEO and co-founder of QuantumScape. "With the publication of this report, we will continue to focus on our product roadmap goals and delivering cells to our customers."

The test performed on QuantumScape's cells reflects a complete cycle-life test that demonstrates how well the cell chemistry performs under extended high-performance usage and various commercially relevant conditions for EVs. These conditions, which we believe must be met simultaneously, include:

- **800 cycles** — roughly equivalent to 240,000 miles driven for a 300-mile range vehicle and demonstrates the battery technology's ability to perform over a vehicle's expected lifetime
- **25 °C** — operating at room temperature, as opposed to elevated temperatures (e.g., 60-80 °C), shows the robustness of a battery's power capability
- **1C charge/discharge rates** — indicate that the battery can operate at continuously high charge and discharge rates with minimal degradation (with energy retention maintained at more than 80%) over a long period (800 cycles in this case)

- **100% depth of discharge** — the battery was fully charged and discharged every cycle of testing, which is typically more strenuous on the battery than shallower charge and discharge cycles
- **3.4 atmospheres of pressure** — this amount of pressure is sufficiently low for automotive applications

Mobile Power Solutions (https://cts.businesswire.com/ct/CT?id=smartlink&url=https%3A%2F%2Fmobilepowersolutions.com%2F&esheet=52516894&newsitemid=20211027006112&lan=en-US&anchor=Mobile+Power+Solutions&index=2&md5=6893bc5aedc2d3bf05c606136a2cca66) is an independent battery laboratory, ANAB accredited to ISO/IEC 17025:2017, based in Beaverton, Oregon.

The full cycle life test report from Mobile Power Solutions is available on our website (https://cts.businesswire.com/ct/CT?id=smartlink&url=https%3A%2F%2Fwww.quantumscape.com%2Fwp-content%2Fuploads%2F2021%2F10%2FFINAL-20211027-Q1-1695-Cell-Cycle-Life.pdf&esheet=52516894&newsitemid=20211027006112&lan=en-US&anchor=available+on+our+website&index=3&md5=9d9d6eb1644aa9617e5dd5fa100e09b8).

## About QuantumScape Corporation

QuantumScape is a leader in developing next-generation solid-state lithium-metal batteries for electric vehicles. The company is on a mission to revolutionize energy storage to enable a sustainable future. For more information, please visit www.quantumscape.com (https://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Fwww.quantumscape.com%2F&esheet=52516894&newsitemid=20211027006112&lan=en-US&anchor=www.quantumscape.com&index=4&md5=cdecfa8565db230828f9cb34e088967f).

---

### Forward-Looking Statements

The information in this press release includes "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of present or historical fact included in this press release, including, without limitation, regarding the development, timeline and performance of QuantumScape's products and technology are forward-looking statements.

These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Most of these factors are outside QuantumScape's control and are difficult to predict. Information about factors that could materially affect QuantumScape is set forth under the "Risk Factors" section in QuantumScape's most recent quarterly report on Form 10-Q filed with the Securities and Exchange Commission on July 29, 2021 and available on the SEC's website at www.sec.gov (http://www.sec.gov).

Except as otherwise required by applicable law, QuantumScape disclaims any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this press release. Should underlying assumptions prove incorrect, actual results and projections could different materially from those expressed in any forward-looking statements.

---

**Share on**    🐦 🔗



**TECHNOLOGY
(/technology/)**
ADVANTAGES
(/technology/#advantages)
SOLID–STATE FAQS
(/technology/#faqs)

**RESOURCES
(/resources/)**
NEWSROOM
(/newsroom/)
QS BLOG
(/resources/blog)

**COMPANY
(/company/)**
INVESTORS
(https://ir.quantumscape.com/)
CAREERS
(/careers/)

Privacy Policy (/privacy-policy/) | Terms of Use (/terms-of-use/)

© 2022 QuantumScape Corporation

1730 Technology Drive, San Jose, CA 95110

info@quantumscape.com (mailto:info@quantumscape.com)

(https://twitter.co m/ QuantumScapeCo )

(https:// w.li oke din. co m/c om pan y/q uan tum sca pe/)

# EXHIBIT M



**Q1 FISCAL 2021**
LETTER TO SHAREHOLDERS

MAY 11, 2021

**Exhibit
0021**

8/12/2022
Frank Fish

Dear Shareholders,

Today, we are pleased to share our Q1 2021 results with you.

As mentioned in our Q4 2020 Shareholder letter, our general reporting approach will be to publish a quarterly shareholder letter detailing the results for the quarter, followed by an investor call to briefly review the main highlights and focus on Q&A.

We saw strong technical and business progress during the quarter. In particular, the following results were noteworthy:

## Volkswagen Milestone

At the end of the quarter, we were pleased to report that we met a contractually committed milestone with Volkswagen, which resulted in an additional $100M investment into QuantumScape in April. The milestone required that we deliver, and VW test in their labs in Germany by the end of the quarter to confirm, cells with separator thickness and area near production targets that would operate at predetermined rates of power and temperatures for a specified number of cycles. Meeting this key technical milestone demonstrates our ability to make separators with near production-intent thickness and area, a critical step toward industrialization.

The cells we delivered to VW were among the best we have ever made, reflecting continued progress on the engineering and process fronts. We would like to take a moment to thank the QuantumScape engineering team for their consistent execution on our customer commitments, especially considering the limitations imposed by pandemic-related shutdowns.

## Multilayer Progress

On our last earnings call, we reported the first successful test results from multilayer cells with four-stacked-unit layers. As a reminder, each unit layer consists of a cathode, a solid-state separator, and an in-situ formed lithium-metal anode. We reported that the cycle life and capacity retention of these multilayer cells were comparable to those published for our single-layer cells in December. As we stated at the time, to address capacity constraints, we made these multilayer cells by cutting our standard separators (70x85mm) into four smaller separators (30x30mm). We set a goal for later this year to demonstrate similar four-layer cells with large-area commercially relevant (70x85mm) separators.

**We are pleased to report that the team has made four-layer cells in the larger form factor.** The data from initial testing looks promising, showing ~450 cycles with excellent capacity retention, with the cells continuing to cycle, as shown in the figure below.

2



The data from initial cell testing confirms that the cycling performance of these full-sized four-layer cells is similar to that of the 30x30mm four-layer cells we reported on our last earnings call, which was similar to the single-layer data reported in December.

We believe that the successful build of these four-layer commercially relevant-area (70x85mm) cells demonstrates our continued success at executing on our goals, and reaffirms our belief that we are on track to meet our 8-10-layer cell milestone by year end and commercially relevant prototype samples by 2022. This progress also reflects the success of the team's efforts to both increase the throughput of our engineering line and design the multilayer cell.



This specific multilayer package contains our four-layer stack and will also house our 8-10-layer cells. This does not represent the final form design.

## Zero Externally Applied Pressure

In another promising development, we report today testing data of our cells with zero externally applied pressure (i.e., one atmosphere of total pressure) in coin-sized cells. This is noteworthy because other solid-state lithium-metal efforts that we are aware of have generally required externally applied pressure to cycle. Pressure often is used to ensure good interfacial contact between the layers that make up the cell, without which the cell would have unacceptably high resistance and poor power performance. However, delivering very high pressures, as some solid-state cells require, adds cost and complexity to the system. **As the data below shows, the cells achieved over 1,000 cycles with good capacity retention, even with zero externally applied pressure.** Testing was conducted at 1C/1C, 30 °C and 100% depth of discharge, with a Li-free anode. The fact that these cells cycled with zero externally applied pressure *and* zero lithium on the anode as manufactured makes these results even more significant. We did this work in coin-sized cells, which is the platform we use for early research developments. While there is more work to be done to replicate these results in larger-area cells, achieving these results in this form factor is an important first step toward introducing this capability into larger cells.

We believe that being able to manufacture cells that require zero externally applied pressure could enable us to address markets beyond automotive, such as consumer electronics, where applying pressure is impractical due to size constraints, and while not necessary for automotive applications, could simplify automotive module and pack design in the future.



## QS-0 Momentum

Since the announcement of QS-0, our planned pre-pilot line, we have continued to see strong inbound interest in our technology from multiple prospective customers. To serve this increased interest, we decided to double the initial planned capacity of QS-0 to over 200,000 cells annually, corresponding to hundreds of test cars per year. QS-0 is designed to use continuous-flow manufacturing tools consistent with those we expect to use in commercial production. Supporting this expansion was one reason for the equity offering in March, which raised $478M in gross proceeds, of which approximately half will be used to fund the expansion of QS-0. Additional capital from the equity offering will be applied to fund the buildout of QS-1, our joint venture with VW, which will target commercial production in the 2024-2025 timeframe.

Last month, we signed a new long-term lease on an approximately 197,000-square-foot facility near our headquarters that will house the QS-0 line as well as other R&D activity. We plan to move into this new facility in the fourth quarter of this year.



Our newest facility located in San Jose, CA will house our QS-0 pre-pilot line

## 2021 Outlook

With the expansion of our QS-0 line and the associated equity offering, we plan to increase spending in 2021 to continue our momentum. Based on our new projections, we expect cash spend on operations and capex for the full year to be between $260M and $320M to support our development activities and the higher capacity QS-0 line. Net of financing proceeds from our follow-on equity offering, VW investment, and public warrant exercises, we expect to enter 2022 with greater than $1.3B in liquidity, reflecting a net increase of more than $300M compared to our liquidity entering the year. We believe this capital fully funds QuantumScape through initial QS-1 production and additionally contributes to the subsequent QS-1 expansion.

We have already accomplished two of the four previously announced milestones for 2021 and have made strong progress toward the third, as illustrated on the chart below. We satisfied the VW technical milestone, secured the facility that will house our QS-0 line, and demonstrated the performance of the initial builds of the four-layer commercially relevant area battery cells. Our remaining stated milestones for the year are to complete the development and testing of the four-layer commercially relevant area cells and then to build 8-10-layer full-sized battery cells that meet our test criteria.

Looking forward, we aim to deliver prototype samples in commercially relevant form factors to auto OEMs from our engineering line in 2022; provide cells for R&D test cars from QS-0 in 2023; and enter commercial production in the 2024-2025 timeframe.



## Summary

In summary, we are pleased with our progress this quarter. Since going public in November, we have advanced our technology considerably and hit our key technical goals, as demonstrated in the technical performance data we have released. We have deepened engagements with prospective customers. We have strengthened our cash position. And by embarking on the buildout of our QS-0 pre-pilot line, we will be better prepared to take on the challenges of high-volume production scaling.

We are also mindful of the great amount of work to be done. As we have previously stated, there remain many development tasks ahead, including increasing the throughput, yield, reliability, uniformity, and layer count of our cells, installing and optimizing higher-volume manufacturing equipment, designing and engineering our cell and its packaging to meet rigorous automotive specifications (e.g., calendar life, mechanical and abuse testing), and developing the final manufacturing processes.

We remain focused on execution and bringing our technology into mass production. We believe that increasing the penetration of electric vehicles requires making EVs that people want to buy, which requires a breakthrough in battery technology of the type we are pioneering here at QuantumScape. The progress detailed above shows we are making steady progress toward this ambitious goal. We look forward to continued execution on our goals as we work to create a more sustainable future.

Jagdeep Singh
Founder, CEO & Chairman

Kevin Hettrich
CFO

7

## QuantumScape Corporation
Consolidated Balance Sheets
(In Thousands, Except Share and per Share Amounts)

| | | March 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents ($3,381 and $3,406 as of March 31, 2021 and December 31, 2020, respectively, for joint venture) | $ | 762,341 | $ | 113,216 |
| Marketable securities | | 771,101 | | 884,336 |
| Prepaid expenses and other current assets | | 8,502 | | 11,616 |
| Total current assets | | 1,541,944 | | 1,009,168 |
| Property and equipment, net | | 59,533 | | 43,696 |
| Right-of-use lease asset | | 12,031 | | 11,712 |
| Other assets | | 2,829 | | 2,193 |
| Total assets | $ | 1,616,337 | $ | 1,066,769 |
| **Liabilities, redeemable non-controlling interest and stockholders' equity** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 9,871 | $ | 5,383 |
| Accrued liabilities | | 4,160 | | 2,701 |
| Accrued compensation | | 5,355 | | 2,391 |
| Operating lease liability, short-term | | 1,465 | | 1,220 |
| Strategic premium, short-term | | 503 | | 655 |
| Total current liabilities | | 21,354 | | 12,350 |
| Operating lease liability, long-term | | 11,344 | | 11,244 |
| Assumed common stock warrant liabilities | | 288,039 | | 689,699 |
| Total liabilities | | 320,737 | | 713,293 |
| | | | | |
| Redeemable non-controlling interest | | 1,694 | | 1,704 |
| Stockholders' equity | | | | |
| Preferred stock- $0.0001 par value; 100,000,000 shares authorized, none issued and outstanding as of March 31, 2021 and December 31, 2020 | | — | | — |
| Common stock - $0.0001 par value; 1,250,000,000 shares authorized (1,000,000,000 Class A and 250,000,000 Class B); 233,610,488 Class A and 156,161,849 Class B shares issued and outstanding as of March 31, 2021, 207,769,091 Class A and 156,224,614 Class B shares issued and outstanding as of December 31, 2020 | | 39 | | 36 |
| Additional paid-in-capital | | 3,346,442 | | 2,329,406 |
| Accumulated other comprehensive (loss) income | | 143 | | (31) |
| Accumulated deficit | | (2,052,718) | | (1,977,639) |
| Total stockholders' equity | | 1,293,906 | | 351,772 |
| Total liabilities, redeemable non-controlling interest and stockholders' equity | $ | 1,616,337 | $ | 1,066,769 |

8

## QuantumScape Corporation
Consolidated Statements of Operations and Comprehensive Loss
(In Thousands, Except Share and per Share Amounts)

| | Three Months Ended March 31, | |
| | 2021 | 2020 |
| --- | ---: | ---: |
| Operating expenses: | | |
| Research and development | $ 29,465 | $ 13,347 |
| General and administrative | 15,210 | 2,569 |
| Total operating expenses | 44,675 | 15,916 |
| Loss from operations | (44,675) | (15,916) |
| Other (expense) income: | | |
| Interest income | 247 | 538 |
| Change in fair value of assumed common stock warrant liabilities | (30,764) | — |
| Other income | 103 | — |
| Total other (expense) income | (30,414) | 538 |
| Net loss | (75,089) | (15,378) |
| Less: Net (loss) income attributable to non-controlling interest, net of tax of $0 for the three months ended March 31, 2021 and 2020 | (10) | (4) |
| Net loss attributable to common stockholders | $ (75,079) | $ (15,374) |
| Net loss | $ (75,089) | $ (15,378) |
| Other comprehensive (loss) income: | | |
| Unrealized gain on marketable securities | 174 | 315 |
| Total comprehensive loss | (74,915) | (15,063) |
| Less: Comprehensive (loss) income attributable to non-controlling interest | (10) | (4) |
| Comprehensive loss attributable to common stockholders | $ (74,905) | $ (15,059) |
| Basic and Diluted net loss per share | $ (0.20) | $ (0.06) |
| Basic and Diluted weighted-average common shares outstanding | 368,783,516 | 239,792,967 |

**QuantumScape Corporation**
Consolidated Statements of Cash Flows
(In Thousands)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2021 | 2020 |
| **Operating activities** | | |
| Net loss | $ (75,089) | $ (15,378) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 2,201 | 1,442 |
| Amortization of right-of-use assets | 371 | 300 |
| Amortization of premiums and accretion of discounts on marketable securities | 2,410 | (53) |
| Amortization of strategic premium | (151) | (164) |
| Gain on property and equipment disposals | (104) | — |
| Stock-based compensation expense | 11,676 | 2,197 |
| Change in fair value of assumed common stock warrant liabilities | 30,764 | — |
| Changes in operating assets and liabilities: | | |
| Prepaid expenses and other current assets | 2,479 | (165) |
| Accounts payable, accrued liabilities and accrued compensation | 4,252 | 600 |
| Operating lease liability | (345) | (260) |
| Net cash used in operating activities | (21,536) | (11,481) |
| **Investing activities** | | |
| Purchases of property and equipment | (13,269) | (4,934) |
| Proceeds from disposal of property and equipment | 108 | — |
| Proceeds from maturities of marketable securities | 111,000 | 32,000 |
| Net cash (used in) provided by investing activities | 97,839 | 27,066 |
| **Financing activities** | | |
| Proceeds from exercise of stock options | 880 | 13 |
| Proceeds from exercise of warrants | 109,133 | — |
| Payment of Business Combination share issuance costs | (1,016) | — |
| Proceeds from issuance of common stock, net of issuance costs paid | 463,825 | — |
| Net cash provided by financing activities | 572,822 | 13 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 649,125 | 15,598 |
| Cash, cash equivalents and restricted cash at beginning of period | 115,409 | 25,596 |
| Cash, cash equivalents and restricted cash at end of period | $ 764,534 | $ 41,194 |
| **Supplemental disclosure of cash flow information** | | |
| Purchases of property and equipment, accrued but not paid | $ 8,944 | $ 1,423 |
| Common stock issuance costs, accrued but not paid | $ 899 | $ — |
| Fair value of assumed common stock warrants exercised | $ 432,424 | $ — |

10

## Net Loss to Adjusted EBITDA

Adjusted EBITDA is a non-GAAP supplemental measure of operating performance that does not represent and should not be considered an alternative to operating loss or cash flow from operations, as determined by GAAP. Adjusted EBITDA is defined as net income (loss) before interest expense, non-controlling interest, revaluations, stock-based compensation and depreciation and amortization expense. We use Adjusted EBITDA to measure the operating performance of our business, excluding specifically identified items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations. Adjusted EBITDA may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of Adjusted EBITDA to net loss is as follows:

| ($ in Thousands) | | Three Months Ended March 31, | | |
|---|---|---|---|---|
| | | 2021 | | 2020 |
| GAAP net loss attributable to QuantumScape | $ | (75,079) | $ | (15,374) |
| Interest expense (income), net | | (247) | | (538) |
| Other expense (income), net | | (103) | | - |
| Change in fair value of assumed common stock warrant liabilities | | 30,764 | | - |
| Net gain (loss) attributable to non-controlling interests | | (10) | | (4) |
| Stock-based compensation | | 11,676 | | 2,197 |
| Non-GAAP operating loss | $ | (32,999) | $ | (13,719) |
| Depreciation and amortization expense | | 2,050 | | 1,278 |
| Adjusted EBITDA | $ | (30,949) | $ | (12,441) |

## Management's Use of Non-GAAP Financial Measures

This letter includes certain non-GAAP financial measures as defined by SEC rules. These non-GAAP financial measures are in addition to, and not a substitute for or superior to, measures of financial performance prepared in accordance with U.S. GAAP. There are a number of limitations related to the use of these non-GAAP financial measures versus their nearest GAAP equivalents. For example, other companies may calculate non-GAAP financial measures differently or may use other measures to evaluate their performance, all of which could reduce the usefulness of our non-GAAP financial measures as tools for comparison. We urge you to review the reconciliations of our non-GAAP financial measures to the most directly comparable U.S. GAAP financial measures set forth in this letter, and not to rely on any single financial measure to evaluate our business.

## Forward-Looking Statements

This current report contains forward-looking statements within the meaning of the federal securities laws and information based on management's current expectations as of the date of this current report. All statements other than statements of historical fact contained in this current report, including statements regarding the future development of the Company's battery technology, the anticipated benefits of the Company's technologies and the performance of its batteries, plans and objectives for future operations, forecasted cash usage, including spending and investment, are forward-looking statements. When used in this current report, the words "may," "will," "estimate," "pro forma," "expect," "plan," "believe," "potential," "predict," "target," "should," "would," "could," "continue," "believe," "project," "intend," "anticipates" the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. These forward-looking statements are based on management's current expectations, assumptions, hopes, beliefs, intentions, and strategies regarding future events and are based on currently available information as to the outcome and timing of future events.

These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Many of these factors are outside the Company's control and are difficult to predict. Factors that may cause such differences include, but are not limited to ones listed here.  The Company faces significant barriers in its attempts to produce a solid-state battery cell and may not be able to successfully develop its solid-state battery cell.  Building high volumes of multi-layer cells in the commercial form factor and with higher layer count requires substantial development effort.  The Company could encounter significant delays and/or technical challenges in replicating the performance seen in its single-layer cells and early tests of the smaller form factor four-layer cells and in achieving the high yield, reliability, uniformity and performance targets required for commercial production and sale.  The Company may encounter delays and other obstacles in acquiring, installing and operating new manufacturing equipment for automated and/or continuous-flow processes, including vendor delays (which we have already experienced) and challenges optimizing complex manufacturing processes. The Company may encounter delays in hiring the engineers it needs to expand its development and production efforts, delays in acquiring the facility for QS-0, and delays caused by the COVID-19 pandemic. Delays in increasing production of engineering samples would slow the Company's development efforts.   The Company may be unable to adequately control the costs associated with its operations and the components necessary to build its solid-state battery cells at competitive prices. The Company's spending may be higher than currently anticipated. The final closing under the Company's financing agreement with VW may not occur if the Company does not achieve certain interim technical targets by the end of the quarter. The Company may not be successful in competing in the battery market industry or establishing and maintaining confidence in its long-term business prospectus among current and future partners and customers and the duration and impact of the COVID-19 pandemic on the Company's business. The Company cautions that the foregoing list of factors is not exclusive. The Company cautions readers not to place undue reliance upon any forward-looking statements, which speak only as of the date made.

Except as otherwise required by applicable law, the Company disclaims any duty to update any forward-looking statements. Should underlying assumptions prove incorrect, actual results and projections could differ materially from those expressed in any forward-looking statements. Additional information concerning these and other factors that could materially affect the Company's actual results can be found in the Company's periodic filings with the SEC. The Company's SEC filings are available publicly on the SEC's website at www.sec.gov.

# EXHIBIT N

**Exhibit 99.1**



**Q2 FISCAL 2022**
**LETTER TO SHAREHOLDERS**



**JULY 27, 2022**

Dear shareholders,

With the first half of 2022 behind us, we are pleased to provide an update on our progress over the past quarter.

## 24-layer Cells

In 2020, we showed our first single-layer cell; in 2021, we showed four- and 10-layer cells, and earlier this year we showed our first 16-layer cells. **Building on this momentum, we are pleased to report we have now made our first prototype 24-layer cells and put them on test.** The cells on the chart below show similar early capacity retention behavior to our single-, four-, 10- and 16-layer cells.



Cycle energy retention vs cycle count for early 24-layer prototype cells

This is an important result because, as we have previously indicated, 24-layer cells represent A sample candidates for some automotive OEMs. While the precise definition of an A sample will vary by customer, delivering any such cell to an automotive customer is a high bar and remains one of our key goals for the year. Doing so requires that we make cells with sufficient performance and quality to meet our standards, and in sufficient quantities to complete our validation process and ship to a customer.

During the quarter, we encountered a number of challenges related to the quality and throughput of our production processes. These challenges ranged from discovery of a contaminant in our material to identifying defects introduced during the production process. While we have successfully addressed a number of these, we continue to work through others. We are encouraged by the fact that despite these challenges, our team has been able to make progress on 24-layer prototype cells.

The 24-layer prototype cells we've made were packaged in a variety of formats, including early variants of the proprietary format we are developing, designed to accommodate the expansion and contraction characteristic of lithium-metal batteries during charge and discharge (resulting from plating and stripping of lithium metal). As part of our development work, we have built and tested many cells of varying layer counts in this new format, including some that have achieved over 600 cycles and are still cycling. However, more work remains to complete development of this design.

Delivery of the A sample represents the beginning of the automotive qualification process, which involves several major delivery milestones — A, B and C samples — followed by the start of production. Each major sampling stage may consist of several generations of increasingly mature prototypes. We are currently targeting approximately 18 months between the A sample and prototype B-sample cells, which may use some low-volume processes. We anticipate a similar timeframe to go from B samples to C samples. Of course, these timelines involve uncertainty and will be influenced by a number of factors, including product and process development risks; the specification, ordering, and qualification of production tooling; other supply chain dynamics; and OEM validation timeframes.

## Quality Improvements

While we have already published data on single- and multilayer cells demonstrating industry-leading performance, to continue scaling up our layer counts and production throughput, we are also working to further improve the quality distribution of our films and cells. For any given quality metric, performance falls on a spectrum, and improving the quality distribution means moving the entire spectrum toward higher quality.

To achieve this goal, we are working to implement a variety of quality improvements to our processes and materials, including advances in separator manufacturing and the implementation of our second-generation catholyte.

One recent improvement we have made to our separator manufacturing process is a change that results in higher uniformity, as illustrated in the following images. The image on the left is a separator made using our baseline process, which is already very good — it is the process that has delivered the industry-leading performance results we've shown to date, such as 800 cycles under gold-standard testing conditions and repeated 15-minute fast charging at 25 °C. However, we believe that improved uniformity translates to even better performance, reliability, and scalability, and as the image on the right illustrates, **the new process results in even better uniformity**.



False-color signal-processed image of separators made using the baseline process (left) and new process (right). The pink represents non-uniformities generally not visible to the naked eye.

------------------------

[1] By "gold-standard" test conditions we mean: average charge/discharge rates of 1C or faster, temperatures of 25 °C, 100% depth of discharge, and externally applied pressure of no more than 3.4 atmospheres, simultaneously. For a more detailed discussion of why these parameters are important, please read CTO Tim Holme's blog on the subject.

We have also been pursuing improvements to the ion conductor in the cathode of our cells (the *catholyte*). In conventional lithium-ion cells, the electrolyte makes contact with both the cathode, where the voltage is high, and the anode, where the voltage is low, and therefore must be stable at both high and low voltage. In contrast, low-voltage stability is not required for the catholyte in our cells because our ceramic separator isolates the cathode from the anode, allowing us to use catholyte materials that are incompatible with other systems.

Our second-generation catholyte has a set of properties that we believe offers better low-pressure performance, improved low-temperature behavior, better high-rate support, and improved cell reliability compared to our first-generation catholyte. The compelling single-layer results we presented earlier this year showing zero applied pressure and repeated 15-minute fast charging performance were obtained with this new catholyte. As the following chart shows, cells made with this catholyte are also capable of discharging at ultralow temperatures of -30 °C with good capacity retention.



Discharge capacity vs voltage as a function of temperature using our second-generation catholyte

This quarter, we incorporated the second-generation catholyte into our baseline process, and are preparing to baseline improvements to the separator manufacturing process. Once fully implemented, we believe these improvements will have a positive impact on the quality distribution of our cells.

## Manufacturing Scale Up

Our cell manufacturing process has many similarities to conventional lithium-ion cell manufacturing. The parts that are proprietary can largely be grouped into two main tasks: separator production and cell assembly. A key ongoing goal of our Phase 1 engineering line is to improve the quality, consistency, and throughput of our separator production, and the first goal of our Phase 2 engineering line is to do the same for cell assembly.

**We are pleased to report that our Phase 2 engineering line is now operational and cell assembly has transitioned to this line.** Located at QS Campus, the Phase 2 line benefits from six times more floorspace for cell assembly, increasing flexibility to iterate on our process, expand automation and in-line metrology, and add more cell assembly lines as we continue to scale production.

As part of bringing Phase 2 online, this quarter we took delivery and completed qualification of several key tools. Notably, we have completed site acceptance testing on our first-generation automatic cell stacker, which automates the first step of the cell build process. This new tool is designed to improve throughput; a step that previously took more than five minutes can now be accomplished in approximately 30 seconds. Consistency is another benefit of automation; a properly configured and maintained piece of automated equipment can perform the same operation repeatedly with low variation from run to run, which can improve cell quality.

While we are pleased with this progress, further work is required for us to achieve our goals. For example, we will need additional stacker tools to automate subsequent steps in the cell stacking and assembly process.



First-generation automatic cell stacking tool on our Phase 2 engineering line

This quarter, we achieved a peak of greater than 5,000 weekly separator film starts. To improve the quality distribution of our cells, we have been using much of our separator production capacity to baseline the quality improvements already discussed. While we don't expect linear increases in starts each quarter, we retain our goal of achieving peak weekly starts of 8,000 before the end of the year.

## Customer Engagement

We continue to collaborate closely with Volkswagen Group as we work to bring our technology to market. Volkswagen Group brings not only decades of experience in high-volume, high-quality manufacturing, but has also become a hub of battery excellence, and recently announced the creation of PowerCo, its in-house battery manufacturing arm. Our collaboration with Volkswagen Group's engineering teams has intensified in recent months, with regular technical and product development meetings; their expertise has proved especially valuable as we build competence in mass manufacturing.

In addition to Volkswagen Group and our previously announced deals, **we are pleased to report two additional customer sampling agreements with automotive OEMs.** We have now announced agreements with six prospective automotive customers — from global top-10 manufacturers by revenue to premium performance and luxury automakers, encompassing both pure EV and conventional OEMs. We have engaged with companies we believe provide us with a strategic mix across geographic footprints and vehicle segments. This breadth of customer engagement gives us confidence that demand for next-generation solid-state lithium-metal batteries remains robust across the automotive industry, and if we can accomplish our goals, the scope of the opportunity ahead of us remains compelling.

## Financial

In Q2, cash operating expenses, defined as operating expenses less stock-based compensation and depreciation, were $59.7M, in-line with our expectations. Capital expenditures of $27.6M were below our guidance of $35M to $65M. We are actively working to prioritize investment into critical milestones while conserving cash to maintain flexibility through the current difficult macroeconomic environment.

Drivers of lower capex spend varied by project and included deliberate postponement to refine equipment specifications, delays imposed by supply chain factors or technical challenges (as covered earlier), realized cost savings, and improved visibility into order times. As an example of realized savings, facility capex to support our Phase 2 engineering line came in below budget as a result of value engineering that helped reduce our construction spending. During Q2, we also started insourcing some construction activities to our facilities department.

A significant portion of our Q2 capital investment included payments toward our Phase 2 engineering line, including facility buildout, cell assembly and testing equipment, and metrology tooling. The remainder of our capex was primarily related to the QS-0 line and QS Campus buildouts. We continued construction on the facilities that will house QS-0, our quality lab, test center, and warehouse, and made progress payments on continuous kiln tooling and coating equipment.

While we reiterate our cash opex guidance of $225M to $275M for FY'22, we now estimate our capital expenditures to be between $175M and $225M for FY'22 (versus our prior guidance of $325M to $375M) as the drivers of lower Q2 spend also impact full year capex projections. We believe most of the reduction in our forecasted 2022 capex spend will now be pushed into 2023.

Despite the lower capex spend in 2022, we remain focused on achieving our goals for the year, including delivery of an A-sample prototype cell to a customer, demonstration of a cell format designed to accommodate lithium plating and stripping, scale up of peak film starts to 8,000 per week, and taking delivery of the majority of QS-0 equipment toward a 2023 line start. We note that on the last goal, there is a distinction between equipment sufficient to allow us to make the first cells on the pre-pilot line and equipment required to make significantly higher volumes. We believe we remain on track with respect to the former, but expect some of the tools required for the latter to be received in 2023.

Based on these projections — primarily due to the pushout of capex spend from FY'22 into FY'23 — we now expect to exit the year with more than $950M in liquidity, an increase from the greater than $800M in year-end liquidity referenced in the Q1'22 shareholder letter.

## Strategic Outlook

We have made significant strides in cell development, manufacturing and customer engagement, despite facing the hurdles discussed earlier. We are grateful for the exceptional focus and discipline our team has shown through the challenges of delivering on a never-before-realized technology, and the commitment of our automotive partners to help us bring this technology to market. We remain focused on our key goal of delivering a 24-layer A sample to an automotive customer this year and look forward to reporting on our continued progress in the coming months.

Jagdeep Singh
Founder, CEO & Chairman

Kevin Hettrich
CFO

**QuantumScape Corporation**
**Condensed Consolidated Balance Sheets (Unaudited)**
(In Thousands)

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents ($3,365 and $3,382 as of June 30, 2022 and December 31, 2021, respectively, for joint venture) | $ | 343,368 | $ | 320,700 |
| Marketable securities | | 924,752 | | 1,126,975 |
| Prepaid expenses and other current assets | | 10,328 | | 15,757 |
| Total current assets | | 1,278,448 | | 1,463,432 |
| Property and equipment, net | | 233,778 | | 166,183 |
| Right-of-use assets - finance lease | | 29,450 | | 30,886 |
| Right-of-use assets - operating lease | | 63,494 | | 36,913 |
| Other assets | | 18,425 | | 18,234 |
| Total assets | $ | 1,623,595 | $ | 1,715,648 |
| **Liabilities, redeemable non-controlling interest and stockholders' equity** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 23,105 | $ | 14,182 |
| Accrued liabilities | | 4,948 | | 6,078 |
| Accrued compensation and benefits | | 8,724 | | 9,119 |
| Operating lease liability, short-term | | 2,577 | | 1,209 |
| Finance lease liability, short-term | | 461 | | 19 |
| Total current liabilities | | 39,815 | | 30,607 |
| Operating lease liability, long-term | | 64,753 | | 36,760 |
| Finance lease liability, long-term | | 39,337 | | 39,378 |
| Other liabilities | | 6,855 | | 315 |
| Total liabilities | | 150,760 | | 107,060 |
| Redeemable non-controlling interest | | 1,684 | | 1,693 |
| Total stockholders' equity | | 1,471,151 | | 1,606,895 |
| Total liabilities, redeemable non-controlling interest and stockholders' equity | $ | 1,623,595 | $ | 1,715,648 |

**QuantumScape Corporation**
**Condensed Consolidated Statements of Operations and Comprehensive Loss (Unaudited)**
(In Thousands, Except per Share Amounts)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Operating expenses: | | | | |
| Research and development | $ 65,133 | $ 35,776 | $ 126,478 | $ 65,241 |
| General and administrative | 30,740 | 13,846 | 60,052 | $ 29,056 |
| Total operating expenses | 95,873 | 49,622 | 186,530 | 94,297 |
| Loss from operations | (95,873) | (49,622) | (186,530) | (94,297) |
| Other (loss) income: | | | | |
| Interest expense | (607) | (238) | (1,207) | $ (238) |
| Interest income | 1,510 | 349 | 2,326 | $ 596 |
| Change in fair value of assumed common stock warrant liabilities | — | 130,504 | — | $ 99,740 |
| Other (expense) income | 133 | (5) | 221 | $ 98 |
| Total other income | 1,036 | 130,610 | 1,340 | 100,196 |
| Net Income (loss) | (94,837) | 80,988 | (185,190) | 5,899 |
| Less: Net loss attributable to non-controlling interest, net of tax of $0 for the three and six months ended June 2022 and 2021 | (8) | — | (9) | $ (10) |
| Net income (loss) attributable to common stockholders | $ (94,829) | $ 80,988 | $ (185,181) | $ 5,909 |
| Net income (loss) | $ (94,837) | $ 80,988 | $ (185,190) | $ 5,899 |
| Other comprehensive income (loss): | | | | |
| Unrealized loss on marketable securities | (3,321) | (837) | (14,937) | $ (663) |
| Total comprehensive income (loss) | (98,158) | 80,151 | (200,127) | 5,236 |
| Less: Comprehensive loss attributable to non-controlling interest | (8) | — | (9) | $ (10) |
| Comprehensive income (loss) attributable to common stockholders | $ (98,150) | $ 80,151 | $ (200,118) | $ 5,246 |
| Net income (loss) per share of common stock attributable to common stockholders | | | | |
| Basic | $ (0.22) | $ 0.20 | $ (0.43) | $ 0.02 |
| Diluted | $ (0.22) | $ (0.12) | $ (0.43) | $ (0.24) |
| Weighted-average shares used in computing net income (loss) per share of common stock | | | | |
| Basic | 431,523 | 404,957 | 430,435 | 386,970 |
| Diluted | 431,523 | 410,372 | 430,435 | 396,059 |

**QuantumScape Corporation**
**Condensed Consolidated Statements of Cash Flows (Unaudited)**
(In Thousands)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| **Operating activities** | | | | |
| Net income (loss) | $ (94,837) | $ 80,988 | $ (185,190) | $ 5,899 |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | | | |
| Depreciation and amortization | 5,782 | 2,803 | 10,506 | 4,853 |
| Amortization of right-of-use assets and non-cash lease expense | 1,906 | 900 | 3,698 | 1,271 |
| Amortization of premiums and accretion of discounts on marketable securities | 1,528 | 3,022 | 3,713 | 5,432 |
| Stock-based compensation expense | 30,926 | 11,607 | 59,407 | 23,283 |
| Change in fair value of assumed common stock warrant liabilities | — | (130,504) | — | (99,740) |
| Other | 48 | (9) | 608 | (113) |
| Changes in operating assets and liabilities: | | | | |
| Prepaid expenses and other current assets | 3,156 | (2,011) | 5,238 | 468 |
| Accounts payable, accrued liabilities and accrued compensation | (1,967) | 765 | 701 | 5,016 |
| Other long-term liabilities | 2,100 | — | 2,100 | — |
| Operating lease liability | 26 | (459) | 486 | (804) |
| Net cash used in operating activities | (51,332) | (32,898) | (98,733) | (54,435) |
| **Investing activities** | | | | |
| Purchases of property and equipment | (27,631) | (30,494) | (66,925) | (43,655) |
| Proceeds from maturities of marketable securities | 200,740 | 300,000 | 419,240 | 411,000 |
| Proceeds from sales of marketable securities | 1,992 | 121,455 | 15,105 | 121,455 |
| Purchases of marketable securities | (66,895) | (819,339) | (250,787) | (819,339) |
| Net cash (used in) provided by investing activities | 108,206 | (428,378) | 116,633 | (330,539) |
| **Financing activities** | | | | |
| Proceeds from exercise of stock options and employee stock purchase plan | 3,680 | 8,572 | 4,967 | 9,452 |
| Proceeds from exercise of warrants | — | 3,185 | — | 112,318 |
| Payment of Business Combination share issuance costs | — | — | — | (1,016) |
| Proceeds from issuance of common stock, net of issuance costs paid | — | (899) | — | 462,926 |
| Proceeds from issuance of Class A Common Stock pursuant to Legacy QuantumScape Series F Preferred Stock Purchase Agreement, net of issuance costs | — | 99,930 | — | 99,930 |
| Principal payment for finance lease, net of credit | (199) | 38 | (199) | 38 |
| Net cash provided by financing activities | 3,481 | 110,826 | 4,768 | 683,648 |
| Net increase in cash, cash equivalents and restricted cash | 60,355 | (350,450) | 22,668 | 298,674 |
| Cash, cash equivalents and restricted cash at beginning of period | 300,536 | 764,534 | 338,223 | 115,410 |
| Cash, cash equivalents and restricted cash at end of period | $ 360,891 | $ 414,084 | $ 360,891 | $ 414,084 |
| **Supplemental disclosure of cash flow information** | | | | |
| Cash paid for interest | $ 607 | $ 238 | $ 607 | $ 238 |
| Purchases of property and equipment, not yet paid | $ 17,871 | $ 13,090 | $ 17,871 | $ 13,090 |
| Fair value of assumed common stock warrants exercised | $ — | $ 9,080 | $ — | $ 441,504 |

## Net Loss to Adjusted EBITDA

Adjusted EBITDA is a non-GAAP supplemental measure of operating performance that does not represent and should not be considered an alternative to operating loss or cash flow from operations, as determined by GAAP. Adjusted EBITDA is defined as net income (loss) before interest expense, non-controlling interest, revaluations, stock-based compensation and depreciation and amortization expense. We use Adjusted EBITDA to measure the operating performance of our business, excluding specifically identified items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations. Adjusted EBITDA may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of Adjusted EBITDA to net loss is as follows:

| ($ in Thousands) | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2022 | | 2021 |
| GAAP net income (loss) attributable to Common Stockholders | $ | (94,829) | $ | 80,988 | $ | (185,181) | $ | 5,909 |
| Interest expense (income), net | | (903) | | (111) | | (1,119) | | (358) |
| Other expense (income), net | | (133) | | 5 | | (221) | | (98) |
| Change in fair value of assumed common stock warrant liabilities | | — | | (130,504) | | - | | (99,740) |
| Net loss attributable to non-controlling interests | | (8) | | — | | (9) | | (10) |
| Stock-based compensation | | 30,926 | | 11,607 | | 59,407 | | 23,283 |
| Non-GAAP operating loss | $ | (64,947) | $ | (38,015) | $ | (127,123) | $ | (71,014) |
| Depreciation and amortization expense | | 5,782 | | 2,803 | | 10,506 | | 4,853 |
| Adjusted EBITDA | $ | (59,165) | $ | (35,212) | $ | (116,617) | $ | (66,161) |

## Management's Use of Non-GAAP Financial Measures

This letter includes certain non-GAAP financial measures as defined by SEC rules. These non-GAAP financial measures are in addition to, and not a substitute for or superior to, measures of financial performance prepared in accordance with U.S. GAAP. There are a number of limitations related to the use of these non-GAAP financial measures versus their nearest GAAP equivalents. For example, other companies may calculate non-GAAP financial measures differently or may use other measures to evaluate their performance, all of which could reduce the usefulness of our non-GAAP financial measures as tools for comparison. We urge you to review the reconciliations of our non-GAAP financial measures to the most directly comparable U.S. GAAP financial measures set forth in this letter, and not to rely on any single financial measure to evaluate our business.

## Forward-Looking Statements

This current report contains forward-looking statements within the meaning of the federal securities laws and information based on management's current expectations as of the date of this current report. All statements other than statements of historical fact contained in this current report, including statements regarding the future development of the Company's battery technology, the anticipated benefits of the Company's technologies and the performance of its batteries, plans and objectives for future operations, forecasted cash usage, including spending and investment, are forward-looking statements. When used in this current report, the words "may," "will," "estimate," "pro forma," "expect," "plan," "believe," "potential," "predict," "target," "should," "would," "could," "continue," "believe," "project," "intend," "anticipates," "seek," "working toward," "embarking" the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. These forward-looking statements are based on management's current expectations, assumptions, hopes, beliefs, intentions, and strategies regarding future events and are based on currently available information as to the outcome and timing of future events.

These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Many of these factors are outside the Company's control and are difficult to predict. Factors that may cause such differences include, but are not limited to ones listed here. The Company faces significant barriers in its attempts to produce a solid-state battery cell and may not be able to successfully develop its solid-state battery cell. Building high volumes of multilayer cells in commercially relevant area and with higher layer count requires substantial development effort. The Company could encounter significant delays and/or technical challenges in replicating the performance seen in its single-layer and early multilayer cells and in achieving the high quality, consistency and throughput required for commercial production and sale (e.g., unanticipated contamination issues). The Company has encountered delays and other obstacles in acquiring, installing and operating new manufacturing equipment for automated and/or continuous-flow processes, including vendor delays (which we have already experienced) and other supply chain disruptions and challenges optimizing complex manufacturing processes. The Company may encounter delays in hiring the engineers it needs to expand its development and production efforts, delays in building out QS-0, and delays caused by the COVID-19 pandemic. Delays in increasing production of engineering samples have slowed the Company's development efforts. These or other sources of delay could delay our delivery of A-samples and B-samples. Delays or difficulties in meeting technical milestones could cause prospective JV partners not to purchase cells from our pre-production line or not to proceed with a manufacturing joint venture. The Company may be unable to adequately control the costs associated with its operations and the components necessary to build its solid-state battery cells at competitive prices. The Company's spending may be higher than currently anticipated. The Company may not be successful in competing in the battery market industry or establishing and maintaining confidence in its long-term business prospectus among current and future partners and customers. The Company cautions that the foregoing list of factors is not exclusive. The Company cautions readers not to place undue reliance upon any forward-looking statements, which speak only as of the date made.

Except as otherwise required by applicable law, the Company disclaims any duty to update any forward-looking statements. Should underlying assumptions prove incorrect, actual results and projections could differ materially from those expressed in any forward-looking statements. Additional information concerning these and other factors that could materially affect the Company's actual results can be found in the Company's periodic filings with the SEC. The Company's SEC filings are available publicly on the SEC's website at www.sec.gov.