# EXHIBIT O



archive.today
webpage capture

Saved from https://seekingalpha.com/article/4397130-quantumscapes-solid-state-batteries-signifi    search    5 Jan 2021 20:01:29 UTC
no other snapshots from this url

All snapshots from host seekingalpha.com

Webpage    Screenshot    share    download .zip    report bug or abuse    donate

PRO    Search by symbol, author, keyword...

PRO    My Portfolio    My Authors    Top Stocks    Latest News    Markets    Stock Ideas    Dividends    ETFs    Investing Strategy    Watch & Listen

# QuantumScape's Solid State Batteries Have Significant Technical Hurdles To Overcome

Jan. 4, 2021 5:46 AM ET | 134 comments | 32 Likes | About: QuantumScape Corporation (QS), Includes: TSLA

**Brian Morin**
Energy, Tech, industrials, portfolio strategy
Soteria Battery Innovation Group ⧉

Follow

(357 followers)

## Summary

- QuantumScape's science is very good.

- But their batteries are small and unproven - not yet as big as an iWatch battery, and never tested outside a lab.

- There are significant risks associated with solid state batteries that have not been overcome - a list below.

- They will likely never achieve the performance they claim.

Given QuantumScape's (NASDAQ: QS) recent IPO and the subsequent runup in their stock, it is interesting to discuss both their considerable successes as well as the significant challenges that remain in order for them to achieve their stated performance. In this article, I will discuss mostly the technical aspects related to the possibility of achieving a successful product. In later articles I may revisit the possibility of QuantumScape achieving a business success, and also under what circumstances an investor can achieve a financial return. These three outcomes (working product, business success, investment return) appear completely decoupled.

## Successes

Let's start by saying that building a solid state battery that will function at the rates and temperatures needed for real world applications is hard - very, very hard. So hard, in fact, that nobody has done it. I've read many dozens of research papers where scientists have tried, and tout their ability to get one or more features to behave, but then apologize for the lack of a complete working battery, and lay out the significant challenges ahead. Much of the below is an interpretation of their technical presentation, which can be found here, and the webinar, which is stored on YouTube here. So far, they have:

- **Electrolyte:** a free standing, thin solid electrolyte that will sit between the anode and cathode. While we don't know much, it does deliver some relevant performance.

**Exhibit
0006**

8/12/2022
Frank Fish

- **Pouch Cells:** a functioning single layer pouch cell, at 70 x 85 mm, 3.2 mAh/cm2, for a total capacity of 190 mAh and 0.7 Wh. For comparison, an iWatch battery is 205 mAh, and an iPhone 12 Pro battery is 3,768 mAh. It would take 20 of these cells to power your phone, and 100,000 to power a Tesla.
- **Lithium Metal Anode:** They are using a thin lithium metal anode, which will help them achieve high energy density...someday.
- **Fast Charging:** 80% capacity in 15 minutes, which is a considerable challenge since dendrites are known to form in solid state electrolytes at fast charging rates. More on this later.

## Areas of Overstated Success

All of these areas below are described as successful, because they are much better than has been achieved with solid state batteries in the past. But they are completely unacceptable for real world field electric vehicle performance.

- **Power:** They have done 1200 cycles of a 90 second OEM specified track simulation, which pulled pulses of 6C. In this track, 9 laps is full depth of discharge, when the battery was heated to 45 degrees C (113 degrees F) and charged to 80% in 15 minutes. The cell lost about 10% of its capacity in this 130 cycle test, meaning the battery will only last for 260 cycles or about 75,000 miles of aggressive driving. There is a note on the slide that it occurs at 3.4 atm, which likely means at high pressure. I'll comment on this later.
- **Range:** In much gentler, 1C / 1C cycling at 30 degrees C, the cell makes it for 800 cycles, or 240,000 miles. Respectable, but not better than the vehicles on the road today.
- **Low Temperature Operation:** They show discharge curves at 0 to -30 degrees Celsius, achieving 90 - 130 Wh/kg. Since their battery has >400 Wh/kg, the range is from 25 - 30% of the battery capacity available in the winter, or about 75-100 miles at full capacity. Also, note that the temperature capability of solid state batteries is VERY temperature sensitive - thus the power and cycle tests at 30 and 45 degrees above would have been significantly worse if run even a few degrees lower.
- **Low Temperature Life:** They show 100 or so cycles at -10 degrees C. Respectable, except that these cycles are at C/5 charge and C/3 discharge. Thus, not 80% in 15 minutes, but rather 5% charge in 15 minutes.
- **Energy Density:** They talk about being able to get to an energy density of 400 Wh/kg, which would be great. However, they clearly have not yet, as all their graphs are normalized to 100%, not to an actual capacity. And Amprius is already making cells with 450 Wh/kg, and Tesla claimed on their Battery Day that they could achieve 350 Wh/kg. So, while nice, this energy density they hope to achieve in 2028 will not beat today's state of the art, and will not be state of the art when it is achieved.

## Other Significant Challenges

There are other challenges they do not mention, which will have to be overcome before they can put the first car in the field. Remember that they have spent $300 million so far, so these are not challenges that they didn't have the resources to address, but rather ones they have not solved yet and so remain silent about. Many of these are related, and come from the fact that they are using a brittle, ceramic electrolyte. These include:

- **Multi-layer cells:** They have been unable to make multi-layer cells. My expectation is that it is because of the unstable interface between the cathode, which expands as much as 10% on discharge, and the solid state electrolyte, which will not expand at all. They likely do their cycling under high isostatic pressure (remember the 3.4 atm mentioned earlier?), which will not flow through to inner layers. The inner layers will also be more rigidly constrained, so suffer more from the interfacial decay with cycling. Needless to say, 100,000 of their tiny pouch cells will never make a practical vehicle. It's important to mention here that, if your technology works, making a multilayer pouch cell is an easy afternoon's work.
- **Vibration and Dendrites:** The electrolyte is very, very stiff. It is well documented that dendrites will not grow through solid, single crystal garnet electrolytes. However, they grow freely at grain boundaries and defects. In their pristine, temperature and pressure controlled and vibration-free labs, they can get the cells to cycle. But in a rugged SUV or on our terrible South Carolina roads, cracks and other defects will become plentiful and dendrites will grow. This will in the best case destroy cycle life, and in the worst cause the battery to explode.
- **Lithium Metal Ignition:** They tout using lithium metal to increase energy density. But they don't mention that lithium metal auto-ignites at 179 degrees Celsius, generating 200 - 300 kJ/mol, or 30 - 40 kJ/g, a massive amount of energy - about *three times higher* than ethylene carbonate, a common component of lithium ion electrolytes. Pure lithium is the second most energetic element behind beryllium, and could be used as a component of rocket fuel (with an oxidant). In essence, they have replaced a burning separator and electrolyte for a much more flammable and energetic burning anode. There is plenty enough energy in the battery to raise the lithium to its ignition temperature, and if exposed to oxygen or water, it will likely ignite itself. There is plenty of oxygen available in the cathode materials.
- **Cost**: They claim lower cost, but are actually eliminating only one of the least expensive components - graphite. While this is true, they will have the added cost of building up their thin ceramic electrolyte and sintering it at high temperatures. My guess is that early on, their yields will be just terrible, if they can achieve production scale at all.

## Summary

Given their success so far and their access to capital, I do think QuantumScape will succeed in getting a battery to market. However:

- It will have lower energy density than Amprius has achieved today.
- It will likely first show up in watches and wearables, then maybe phones.
- It will take much longer and cost much more to scale than they think.
- It will not be able to withstand the aggressive automotive environment.
- It will be far more expensive than today's lithium ion batteries, and will likely never achieve lower cost than contemporary lithium ion batteries.
- Once a suitable cell size is made, it may not be any safer than today's lithium ion batteries.

What upside can you expect? Here are some achievable goals:

- The cells will be popular in portable electronics.

- The cells may enable urban energy storage, allowing our coastlines to stop their brown outs and weather their storms.

**Disclosure:** I am/we are long TSLA. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.

**Additional disclosure:** I've owned Tesla since 2016, and have been selling slowly for a year. However, the stock keeps going up so my holdings increase. :-)

 Like this article        32 Likes

---

### Brian Morin's ratings on QS

Latest rating:  Bearish          Very Bullish       Bullish       Neutral       Bearish       Very Bearish



**All Ratings by Brian Morin »**

---

Comments (134)                                    + Track comments Sort by    Newest ▼

### Add Your Comment

Publish

---

**dannompls**
Comments (166)  |  + Follow

Toyota doin it

05 Jan 2021, 10:16 AM                                          Like 0     Reply

> **DimaP123**
> Premium   Marketplace
> Comments (270)  |  + Follow
>
> Toyota has different tech. Not fact that it will be better what QS is doing. No one has came up with fully working solid state battery yet.
>
> 05 Jan 2021, 11:00 AM                                       Like 0     Reply

> **KHinn**
> Comments (26)  |  + Follow
>
> Agreed. Lost in the QS discussion is the awareness that many major players, including Toyota, are also working on solid state.
>
> A new EU report on the solid state space is excellent for understanding the breadth of efforts into solid state batteries.

See ati.ec.europa.eu/...

05 Jan 2021, 11:29 AM                                    Like 0    Reply

 **farmersgroup**
Comments (450)  |  + Follow

Short squeeze?

05 Jan 2021, 10:02 AM                                    Like 0    Reply

 **JeffSizemore**
Comments (1357)  |  + Follow

For all your qs bag holders I have something that might get you out of the hole.

Couv is acquiring carbon ion who in return is acquiring zap and go. Zap and go has patents for fast charging devices without the need for lithium batteries. It can charge an entire electric car in 5 minutes. It also can't catch on fire and last longer than lithium batteries. This is another route many big companies are taking to avoid lithium fires like Samsung, Toyota, fisker, etc but their batteries will come out in 3-4 years. The company is small because they are going into production this year. Big risk big reward kind of situation

But glta. Hope qs goes big but I was wondering why this company got so much attention when it made no money or won't have a product for another 3 years

05 Jan 2021, 09:36 AM                                    Like 0    Reply

 **Parture**
Comments (5)  |  + Follow

They solved the dendrite problem. Brian was not aware of this.

05 Jan 2021, 04:17 AM                                    Like 1    Reply

 **KHinn**
Comments (26)  |  + Follow

Brian is a battery industry professional. I'm beginning to lol at the traders in this thread who think they know more about dendrites and cell construction than people who actually work in battery tech.

05 Jan 2021, 11:17 AM                                    Like 1    Reply

**tcr2**
Premium
Comments (15)  |  + Follow

As demonstrated by torridgrowth a few posts below Brian did not do the math right and some of his conclusions are not valid. If he is a true professional he should at least issue a correction. Instead he doesn't even bother to respond to criticism.

05 Jan 2021, 12:43 PM                                    Like 0    Reply

 **KHinn**
Comments (26)  |  + Follow

I do not agree that torridgrowth has demonstrated that.

05 Jan 2021, 01:44 PM                                    Like 0    Reply

 **torridgrowth**
Premium
Comments (50)  |  + Follow

Regarding this statement from the above articlet:

"The cell lost about 10% of its capacity in this 130 cycle test, meaning the battery will only last for 260 cycles or about 75,000 miles of aggressive driving.

There is a note on the slide that it occurs at 3.4 atm, which likely means at high pressure. "

1. The Li-ion battery subjected to the same test lost over 20% of its capacity after only 200 laps (22 cycles). Hence this is a very aggressive test that does not in any way point to the lack of competitiveness of Quantumscape's battery design within the automotive space. The situation is quite the opposite.

2. The Quantumscape CEO has stated that 3 atm is common in the auto industry, but their tech will also work at atmospheric pressure.

05 Jan 2021, 02:58 AM                                      Like 1    Reply

**new_yorker**

Comments (43)  |  + Follow

Seems this author is QS hitman today!

05 Jan 2021, 01:18 AM                                      Like 1    Reply

 **stts1**

Comments (561)  |  + Follow

@new_yorker Nope. You didnt read much of whats been posted. The massive run up was the hitman. Profit taking. On top of that, 60 million pipe shares were green lighted for sale. That crashed the stock. This article was just a small bit of it. Maybe even none of it. It was crashing so hard that people were just fleeing. They read it now to wonder when to get back in. Hard to say as those 60 million shares will be selling as this tries to go up again. It will stall and stall and stall. Short traders will be pileing on at every hesitation for awhile. The Robin birdies may start flocking away making it even harder to rise. Then on a bad day it will likely head even lower.

05 Jan 2021, 10:39 AM                                      Like 1    Reply

 **KHinn**

Comments (26)  |  + Follow

There is also the announcement yesterday of Panasonic's extended contract with TSLA. Many traders seemed to believe, without evidence, that a QS-TSLA partnership would be pending.

05 Jan 2021, 11:09 AM                                      Like 0    Reply

 **lucycat**

Premium

Comments (2)  |  + Follow

Based on the author's claims in the article, how comfortable would the author be in participating as witness to potential claims like finance.yahoo.com/... ? My question is, sincs QS is still very much a stealth startup, so where is the author getting evidence to back up claims? Or is the pressure on QS to release more of its work data?

05 Jan 2021, 01:02 AM                                      Like 1    Reply

 **stts1**

Comments (561)  |  + Follow

@lucycat hah. Theres lawyers everywhere sueing everything. That lawsuit is ridiculous. Everybody is entitled to their opinion and its investors fault if they trade wrong on internet opinions. Bwahahaha. QS doesn't owe the world any explainations other than what public companies are required to post. And thats any news material to their stock holders. And they posted news as required. But 60 million shares were cleared for sale by the SEC. Thats what crashed the stock. This suit will never even get filed. Its just

fishing to find a whale willing to pay the suit fees. Other attorneys will advise to avoid this suit.

05 Jan 2021, 10:52 AM                                    Like 0     Reply



**ecorpnu1**
Comments (2)  |  + Follow

I found QS has a number of US Patents ([patft.uspto.gov/...](patft.uspto.gov/...)). one skilled in the art could discern more about its technology, Having a patent does not mean it is superior though. Note, I am long QS.

04 Jan 2021, 11:28 PM                                    Like 0     Reply



**stts1**
Comments (561)  |  + Follow

@ecorpnu1 Patents divulge their secrets. Its likely their best discoveries are not patented yet. Thats what VW is looking at. This is not about batteries, but patents. Robin hoodies just went bonkers on it.

05 Jan 2021, 10:55 AM                                    Like 0     Reply



**DimaP123**
Premium   Marketplace
Comments (270)  |  + Follow

The whole race (and such articles) to solid state batteries reminds me a lot of the race to vaccine. From last year's headlines:

Moderna is the best! They published that they have a prototype! No, it is all vaporware! No products! It is all fake! Novavax? Countless of others? No one has a working vaccine! Pfizer? Yes!!! Reputable company! Should be real!

And of cause, countless of online "experts" saying why this or that vaccine will not work. (edited)

04 Jan 2021, 11:25 PM                                    Like 0     Reply



**DimaP123**
Premium   Marketplace
Comments (270)  |  + Follow

Have anyone noticed, that after this sell off all of a sudden there are a lot of "analysts" are saying that there is no tech, it is all vaporware, stock should cost $15, etc. Where were they after the presentation or when the stock was climbing to $130??? It was plenty of time. Huh? Exactly... no where. Because mostly all of them know about batteries from youtube videos and I bet majority have not even heard what is Wh/kg.

04 Jan 2021, 11:17 PM                                    Like 1     Reply



**KHinn**
Comments (26)  |  + Follow

It does seem that the stock analysts don't have the technical background to appropriately evaluate things like the Quantumscape data presentation. The mistake I saw most often was reports of 400 Wh/kg and 1200 Wh/l energy densities being hailed as demonstrated data, rather than the hopeful projections they actually are.

04 Jan 2021, 11:22 PM                                    Like 0     Reply



**tcr2**
Premium
Comments (15)  |  + Follow

If you watch "Quantumscape CEO on why shares have plunged more than 40%", Singh mentions that sulfide-based electrolytes are known not to prevent dendrite

formation. He referred to Toyota's prototype, but SolidPower also "chose to work in sulfides". (Someone here mentioned Ilika, I am not sure about that one.)

04 Jan 2021, 09:50 PM                                                  Like **0**    Reply

 **torridgrowth**
Premium
Comments (50)  |  + Follow

Regarding Brian's statement:

"Low Temperature Life: They show 100 or so cycles at -10 degrees C. Respectable, except that these cycles are at C/5 charge and C/3 discharge. Thus, not 80% in 15 minutes, but rather 5% charge in 15 minutes."

Looking more closely at Quantumscape's low temperature life chart (slide 22 in their Solid State Showcase Event), the deterioration in energy density is only about 4% after 100 cycles for the worst case shown. Extrapolating this (Quantumscape indicates that testing is ongoing), you could envision 80% discharge capacity or more remaining after 500 cycles, not too far below the automotive standard of 800 cycles. Automotive standard is C/3 charge and discharge, so the rates are fairly representative. However, Quantumscape ran the cycles in this test to full discharge ("100% depth of discharge"), which greatly surpasses the automotive recommendation of 80%.

04 Jan 2021, 09:36 PM                                                  Like **2**    Reply

> **Skaterdude**
> Comments (4041)  |  + Follow
>
> It's even less than that. If you want Li-ion batteries to last, you should only use 40% of capacity: 80%->40%->80% state of charge bounds. I.e., don't discharge below 40% and don't charge to over 80%. This also works with your phone battery ...
>
> 04 Jan 2021, 11:33 PM                                            Like **0**    Reply

 **zhyf**
Comments (12)  |  + Follow

The author is wrong in saying "They show discharge curves at 0 to -30 degrees Celsius, achieving 90 - 130 Wh/kg. " From the slide, it is 90-130 mAh/g, when times 2.5 v, amounts to 225-325 Wh/kg, an excellent low temperature performance. The author's interpretation of the OEM test seems also to be hard to understand and groundless.

04 Jan 2021, 08:49 PM                                                  Like **3**    Reply

>  **KHinn**
> Comments (26)  |  + Follow
>
> @zhyf Note that that the energy density numbers in that slide were for active material (as labeled on the x-axis), NOT for the full cell. NMC611, for example, has an active capacity of about 200 mAh/g, so the QS numbers are significantly lower than would be anticipated for that cathode system (which they are rumored to be using).
>
> But IMO so much relevant information is missing from this slide that it is difficult to form any conclusions at all, other than to wonder why, if Quantumscape's results are really so good, they didn't make an effort to showcasw their energy density with clarity. And that is Quantumscape's problem, not the author's.
>
> 04 Jan 2021, 10:13 PM                                            Like **1**    Reply

 **torridgrowth**
Premium
Comments (50)  |  + Follow

Brian, I believe that you have made a critical oversight in your analysis.

You said:

"Low Temperature Operation: They show discharge curves at 0 to -30 degrees Celsius, achieving 90 - 130 Wh/kg. Since their battery has >400 Wh/kg, the range is from 25 - 30% of the battery capacity available in the winter, or about 75-100 miles at full capacity."

The information presented by Quantumscape (slide 21 of the Solid State Showcase Event) that you are quoting was actually presented in units of mAh/g, which is equivalent to Ah/kg. One must multiply this figure by the generated voltage to calculate the energy density in Wh/kg. The voltage is indicated on the same plot as the generated current (slide 21), and varies between 2.5 and 3.5 volts at the point of maximum power density. Performing the proper calculation yields the following approximate values for maximum power density versus temperature:

-30 C: 225 Wh/kg

-20 C: 315 Wh/kg

0 C: 440 Wh/kg

These numbers were scaled from a computer screen and are hence approximate. However, it is apparent that your figures for Wh/kg were too low by about a factor of about 3, and that Quantumscape's cells actually performed in an exemplary fashion during low-temperature testing.

Based on my cursory review, I have no doubt that other critical mistakes, which could possibly be characterized as misrepresentations by some, will be found in your analysis, I would suggest (for your professional sake) that you remove your article from Seeking Alpha, review it carefully, and possibly even submit it for a peer review, prior to reposting.

04 Jan 2021, 08:32 PM                                    Like 6    Reply

 **KHinn**
Comments (26)  |  + Follow

@torridgrowth @Brian Morin

It should be noted that the energy density data you refer to was from a different cell than the data in other parts of the data set. It was just 30x30mm (slightly over a quarter in size). This is relevant because no areal capacities were given that would allow the calculation of a total electrode or cell density and enable the calculations you show without very broad assumptions.

Furthermore, the units on the x-axis for the energy density slide are given in "ACTIVE capacity", i.e. for the active material only, excluding the binders, conductive aids, etc. that all electrodes require. This further obscures the calculation of any "true" energy density for the cell, and makes it impossible to know whether it supports the claim of 400 Wh/kg shown at the front of the QS presentation, which are "energy-optimized cell designs": projections, not data at all.

In my opinion the energy density and DSC ("safety") slides are the most confusing of the entire deck and serve to obfuscate, rather than illuminate, the Quantumscape claims.

04 Jan 2021, 08:58 PM                                    Like 2    Reply

 **tcr2**
Premium
Comments (15)  |  + Follow

This just proves how much basis one should put into a bearish 'technical' article published right after the SEC Effect notice.

04 Jan 2021, 09:38 PM                                          Like **0**    Reply



**KHinn**

Comments (26)  |  + Follow

@tcr2 I am more concerned about how much basis the public put into a bullish "technical" QS data presentation with many gaps and inconsistencies that was praised as a breakthrough by a set of panelists with undisclosed financial interests in Quantumscape.

04 Jan 2021, 09:51 PM                                          Like **1**    Reply



**tcr2**
  Premium
Comments (15)  |  + Follow

I agree that one should keep the eyes open.

04 Jan 2021, 10:01 PM                                          Like **0**    Reply



**stts1**

Comments (561)  |  + Follow

@KHinn I fully agree with your statement. Clearly QS is not interested in 100% transparency partly because they have proprietary tech they dont want to disclose. So its left to outside experts to extrapolate to fill in the holes of whats going on to determine if battery revolution is really about to happen. Theres nothing diobolical on either side, its just the way our tech advancements work. The author has to make assumptions based on his expertise. It gives me more confidence in my beliefs knowing the author is uniquely qualified in exactly this technology. But arguing these minute details has been made mute by the insane runup in the stock price. By any measure, this thing was a short lovers wet dream.

04 Jan 2021, 10:27 PM                                          Like **0**    Reply



**torridgrowth**
  Premium
Comments (50)  |  + Follow

I don't believe the different sizes would make that much difference in current density.

Perhaps you can give us an estimate on what fraction of the cell would be non-active material. Of course, the anode-less QS cell may require fewer binders than a conventional Li-ion cell. Perhaps it is not all that significant.

IMO, QS' disclosure is much fairer than Tesla's. Tesla touts 5x increase in energy/power for their tabless cell while not disclosing that most of that increase is due to larger diameter and length, hence no significant increase in energy density and no great breakthrough. The tabless cell is a nice innovation but grossly overstated.

It think that QS's safety (thermal stability) slide is fairly clear. The safety of the QS solid state cell versus Li-ion as the 179 deg C autoignition temperature is passed is obvious, and directly contradicts the author's assertions of the danger of QS batteries. Although a full vertical axis scale is not provided, a bar showing the magnitude of 2mw/mg is shown. Based on the author's comments, I think he may not even have noticed that slide. Not surprising given the inaccuracies presented.

04 Jan 2021, 10:42 PM                                          Like **0**    Reply



**KHinn**

Comments (26)  |  + Follow

@torridgrowth I don't agree with your comparison of QS and TSLA disclosures. The bar for claims by Quantumscape--a company without a market ready product or even a pilot plant--is appropriately much higher than that for Tesla, which has a proven record of manufacturing and production that an investor can look to when evaluating their claims.

The problem with the QS thermal stability slide is that it only included their solid separator. Their SEC filings, however, disclose the use of a "catholyte" that contains an organic liquid. In a thermal situation, it is clearly this liquid that would be a problem, not the solid separator, and indeed solid separators being thermally stable is nothing new or groundbreaking. Leaving the catholyte out of the DSC testing does not fairly represent the safety profile of their battery cell.

As to your other comment, the different cell sizes would indeed make a large difference in current density depending on the thickness of the electrodes. (edited)

04 Jan 2021, 11:10 PM                                      Like 0    Reply


**sebbybates**
Comments (3)  |  + Follow

Go Ilika!

04 Jan 2021, 05:59 PM                                      Like 0    Reply


**tcr2**
Premium
Comments (15)  |  + Follow

I believe the public (including the author) doesn't know whether the QS solid electrolyte is mono- or poly- crystalline. The author assumes it is polycrystalline, with grain boundaries that allow dendrite formation. If it is a single crystal then there are no grain boundaries and dendrite formation is not an issue.

The technology has been vouched by a Nobel laureate (the co-inventor of the Li-ion battery), I am not worried about the technical issues raised by the author of this article. The QS CEO promised multi-layer cells by the end of 2021, let's give them some time to deliver.

04 Jan 2021, 04:50 PM                                      Like 8    Reply


**KHinn**
Comments (26)  |  + Follow

Listen closely to the comments of the Nobel laureate...transcript of the panel shows that Stan Whittingham gave a hopeful but realistic statement with lots of "ifs" and then the VC moderator Danielson tried to put words in his mouth: "I think you would say from the data you've seen here that this really does represent a true breakthrough in the space, right?" to which Stanley responds to with more "If" statements. I also noticed that he referred to data he had seen "in the last three days", so apparently he wasn't given much time for review. But QS certainly wants you to think that he vouched for it.

04 Jan 2021, 07:47 PM                                      Like 1    Reply


**stts1**
Comments (561)  |  + Follow

@tcr2 They can have all the time they need but I wont be a bagger unless the price crashes back down to earth and even cheaper. Because at best its many many years before revenue generation.

04 Jan 2021, 07:49 PM                                      Like 0    Reply



**tcr2**
Premium
Comments (15)  |  + Follow

@KHinn He also said that it needs to get bigger (multi-layer) and then it's ready to go into cars..

04 Jan 2021, 07:51 PM                                                    Like 0    Reply



**tcr2**
Premium
Comments (15)  |  + Follow

@stts1 I'm in long term with half my original warrant position, i will not try to time the market. Perhaps buy back some when the warrant gets near $15

04 Jan 2021, 07:54 PM                                                    Like 0    Reply



**KHinn**
Comments (26)  |  + Follow

Exact quote is "you just have to make the cells bigger and get them in to cars." There was no ready to go statement.

04 Jan 2021, 08:35 PM                                                    Like 0    Reply



**stts1**
Comments (561)  |  + Follow

@tcr2 To each their own, but I know that the market today is not like it used to be. Young Robin hoodies are running green tech up to levels ripe for crazy crashes. It sounds like you took profit, so that was spectacular. But it is likely destined to flat line for a long spell of dead money while the green car revolution continues to be revolutionary. Ill stear clear of this till it drops and then only pick it up after a market pullback. A situation I can be sure of likely short term profit.

04 Jan 2021, 10:49 PM                                                    Like 0    Reply



**tcr2**
Premium
Comments (15)  |  + Follow

I was aware of the potential impact of float tripling and that's why I sold half my position prior to the Effect notice. The remaining is free money. My bet is that QS will reach new highs sometime in the future (maybe this year?), I could retire early if that happens after I exercise my warrants. (edited)

04 Jan 2021, 11:21 PM                                                    Like 0    Reply



**torridgrowth**
Premium
Comments (50)  |  + Follow

Stan also said " I have not seen data this good anywhere else" without any "ifs" attached

04 Jan 2021, 11:51 PM                                                    Like 1    Reply



**torridgrowth**
Premium
Comments (50)  |  + Follow

It was mentioned by the CEO that the ceramic separator is flexible partially because it has so few defects. The low defect rate is important in prohibiting dendrites. Of course, the thinking might go, that you won't be able to achieve perfection in volume manufacturing. But they have been working on the manufacturability and reduction of defects for 5 years.

05 Jan 2021, 02:31 AM                                  Like **0**    Reply



**mmdeguz1**
Comments (1)  |  + Follow

@KHinn just curious on who is/are behind this pen name and the agenda. The more I read your replies, the more it shows. Interesting

05 Jan 2021, 09:27 AM                                  Like **0**    Reply



**chinoo**
Comments (2)  |  + Follow

QS is no where near to delivering a battery in another appx. two to three years, so, I would say Mkts went into irrational exuberance by allowing such lofty valuations to QS and finally things have to come back to it`s mean reversion !

It`s very elemental, Mr Watson :)

04 Jan 2021, 04:26 PM                                  Like **5**    Reply



**Carlos Lorenzo**
Comments (4)  |  + Follow

Hi Dr. Brian,

Don't you think you additional disclosure would have been to indicate that you are a CEO of a battery related company?

"...is currently CEO of Soteria Battery Innovation Group, a company has technology to make all lithium ion batteries inherently safe, and is taking it to market through a consortium of companies who are dedicated to lithium ion battery safety"

04 Jan 2021, 03:57 PM                                  Like **11**   Reply



**stts1**
Comments (561)  |  + Follow

@Carlos Lorenzo No wonder everything he said made sense. But Im not one to measure the messenger as long as the message looks probable. Even lunatics get it right sometimes.

04 Jan 2021, 07:53 PM                                  Like **0**    Reply

**Brian Morin**
Contributor   Premium
Comments (64)  |  + Follow

Author's reply »  I did make sure to update my bio for you. :-)

04 Jan 2021, 08:24 PM                                  Like **1**    Reply



**CaptainJJack**
Comments (717)  |  + Follow

Great Article.

Thank You

04 Jan 2021, 03:41 PM                                  Like **0**    Reply



**KHinn**
Comments (26)  |  + Follow

Hi @Brian Morin ! We've met at conferences in the past. Excellent article, and thanks for writing it. Just wanted to add a few additional thoughts and concerns:

1. Great analysis of how small the $QS test cells truly are. Note further that the cell they used for their energy density data is even smaller, just 30mmx30mm (slightly over quarter-sized). Not good to use different size/formats of cells for

different data sets at their stage of the game, and since they didn't post areals on that slide, the energy of the whole cell used in that data set is unknown. They also didn't show room temp data for the energy density.

2. SEC filings disclose that Quantumscape is not solid-state; they are using a liquid in their "catholyte". This of course gives them improved rate performance. But they removed the footnote stating the presence of a liquid from their public data presentation. Meanwhile, they carefully refer to their "solid state separator" when one skilled in the art would expect to hear "solid state electrolyte". So does it even have an elyte function? Or is it "just" a separator, like say Pellion's or Soteria's? Significantly, the SEC filing also reveals that the separator is the only part they will make themselves, as the manufacture of batteries is JV'd with VW. So they're a $40B separator company? Color me confused.

3. The presence of an organic liquid electrolyte is particularly relevant to the safety question, of course. In the DSC data that CEO Singh offered as evidence "as to safety", only the solid separator is included, NOT the liquid/polymer catholyte system. We all know that solid separators (including those in today's LIBs) aren't the ignition concern, the electrolytes are. So that was a big eyeroll from me.

4. The SEC filing also reveals that they will need "over a hundred" layers to make a commercially viable cell, which CEO Singh repeatedly says "dozens". Technically true, I suppose, but why doesn't he use the same language as the filing?

5. The separator they show a picture of in the ppt appears to be MUCH thicker than the 20 um ARPA-E target for solid state viability. No actual measurement provided.

5. Finally, it has not been discussed enough that the panel singing the praises of Quantumscape's "solid state" technology at the public data showcase was composed of 7 out of 8 people with a financial interest in $QS. It pains me to say it, because there are certainly members of that panel that I like and respect. But these financial interests should have been disclosed.

Thanks for reading a long comment. I have no financial interest in $QS (or $TSLA for that matter!).

04 Jan 2021, 03:29 PM                                          Like 9    Reply

 **crawdell**
Comments (2055)  |  + Follow

@KHinn

Your level of detailed analysis is important for investors to understand the potential value of what QS has developed and how relevant it may be in the next few years.

I share concerns about just how "solid state" the company can claim to be. And they aren't the first to utilize a solid separator.

Perhaps they will own the IP on much more than just the separator and develop and license the manufacturing processes for the entire cell. One would hope so in order to justify a lofty valuation.

Still, as you point out there seems to be credible support for the QS battery tech and that may bode well for future success.

04 Jan 2021, 04:55 PM                                          Like 0    Reply

**Brian Morin**
Contributor   Premium
Comments (64)  |  + Follow

Author's reply »  @KHinn it will be good to get back to conferences again. You did a better job of reading the SEC filing--a liquid catholyte and solid lithium anode will not make a very nice combination once a cell is

damaged. Nice comments. It remains puzzling that with $300 million and 10 years, they have not been able to produce a multi-layer cell. If the tech works, it takes a day and costs $1000.

04 Jan 2021, 08:31 PM                                    Like 1    Reply



**KHinn**
Comments (26)  |  + Follow

Exactly. A multi-layer cell is well within the reach of a below-average university research group, lol! In my opinion, QS has made multi-layer cells over the last ten years; they just aren't good enough that they wish to show the data, or they haven't been able to confine their LIQUID catholyte to the cathode side in a multi-layer system.

The Quantumscape SEC filing also dances around this issue: "To date, we have only produced single-layer solid-state battery cells at the commercially required size" and "We have not yet built a multi-layer solid-state battery cell in the dimensions required for automotive applications." Doesn't preclude having made multi-layer cells in other dimensions, does it? But no multi-layer data has been disclosed, in spite of fact that the energy density data they DID show was---wait for it--from a cell not at the commercially required/automotive application size.

04 Jan 2021, 08:47 PM                                    Like 0    Reply



**torridgrowth**
  Premium
Comments (50)  |  + Follow

Regarding your point #2, Quantumscape is not only supplying separators to the JV (which the JV will pay Quantumscape for, presumably at a decent margin), but also technology. That separators are the only material being supplied to the JV does not preclude Quantumscape from starting its own battery factory later, or licensing its tech. The real value is in the tech and manufacturing patents and not in production IMO.

Regarding your point #3, if the separator does not allow dendrites to pass through, why would Quantumscape's evidence not be relevant or representative?

Regarding your point #5, the CEO has stated that the Quantumscape separator is thinner than the width of a human hair (average human hair is 100 microns). Most sources indicate that human hair can be as small as 17 microns in diameter. I would think that the Quantumscape separator may also have a coating or doping of some type, which may make comparison with ARPA-E metrics more difficult. Interestingly, Quantumscape's technology is said to have originated at ARPA-E, possibly explaining why two ARPA-E alumni were on the panel.

Regarding your second point #5 (which you probably meant to label as #6), the relationships of many of the panelists to Quantumscape was disclosed on slide #26 of the Solid State Battery Showcase presenting the panel members prior to the panel discussion. That many of the relationships had financial ties should have been assumed. Those listed as Board members of course would be expected to own stock. In fact, JB Strauble, co-founder of Tesla, bought stock in one of the offerings, which I would take as a positive.

04 Jan 2021, 11:35 PM                                    Like 0    Reply

**Skaterdude**
Comments (4041)  |  + Follow

"Significantly, the SEC filing also reveals that the separator is the only part they will make themselves, as the manufacture of batteries is JV'd

with VW. So they're a $40B separator company?"

There are fabless semiconductor companies. Are they not worth anything? Seems like the value is in the design, not necessarily in the manufacturing.

04 Jan 2021, 11:43 PM                                         Like 1      Reply

**Skaterdude**

Comments (4041)  |  + Follow

"So does it even have an elyte function? Or is it "just" a separator, like say Pellion's or Soteria's?"

I read that as the separator accomplishes both functions. It IS the electrolyte, notwithstanding the liquid in the cathode ...

04 Jan 2021, 11:45 PM                                         Like 0      Reply

 **KHinn**

Comments (26)  |  + Follow

@Skaterdude Sure! They are worth something when they ship product. :) Which Quantumscape isn't doing.

04 Jan 2021, 11:49 PM                                         Like 0      Reply

 **KHinn**

Comments (26)  |  + Follow

@Skaterdude Those skilled in the art have read this in a variety of ways. QS definitely uses the terms in a non-standard fashion, however, which is a red flag for me, especially when coupled with the fact that their "solid-state battery" is not even solid, as admitted in their SEC filings.

04 Jan 2021, 11:54 PM                                         Like 0      Reply

 **KHinn**

Comments (26)  |  + Follow

@torridgrowth We differ about the reading of #2.

As to #3, the formation of a dendrite is not the only danger to a battery. What happens to the QS battery cell when it gets hot? We don't know, because they didn't show us cell data including the organic liquid components, they only showed us separator data.

As to #5, there are obviously many more metrics for a battery than simply "not forming dendrites". The ARPA-E targets represent known requirements for mass and volume to enable commercial adoption. Separators that are too thick and/or too heavy will not be viable on a mass or volume basis. This points out the serious concern with the Quantumscape SEC filing that discloses "over one hundred layers" will be required for a commercial automotive cell. Meanwhile, their competitor SolidPower has already made an automotive sized cell with 22 layers.

SolidPower has also submitted its cells for third party review, which QuantumScape has not done. This makes it even more relevant that it be understand that the technical "validation" of the scientists on the panel was not wholly independent. I do not agree that it was clear to the public that the battery experts (with one exception) had a financial interest.

J.B. Strauble is a board member of QS, not just a stockholder. If you see big names as a marker for technical validation, fine. I do not.

05 Jan 2021, 12:10 AM                                         Like 0      Reply

 **torridgrowth**
  Premium

Comments (50)  |  + Follow

Correction to my posting above: JB owns stock that is covered by the S-1 offering, which he may or may not have paid for with his own cash.

05 Jan 2021, 01:58 AM                                    Like **0**    Reply

---



**torridgrowth**
Premium
Comments (50)  |  + Follow

Hopefully you saw my comments about the thickness of QuantumScape's separators, which are also disclosed in their filings. I don't think they (QS) will be layering the separators one on top of another, which might defeat the purpose. I guess we will have to disagree until we see what their multilayer cells look like. QS indicates in recent filings that "We are now working to develop multi-layer cells, to continue improving yield and performance and to optimize all components of the cell. We will continue to work to further develop the volume manufacturing processes to enable high volume manufacturing and minimize manufacturing costs."

As to the organic gel catholyte, they say this:

"We have an ongoing research and development investigation into inorganic catholyte that could replace the organic gel made of an organic polymer and organic liquid catholyte currently used."

05 Jan 2021, 02:13 AM                                    Like **0**    Reply

---



**KHinn**
Comments (26)  |  + Follow

@torridgrowth Your comment displays a lack of understanding of how multi-layer batteries are made.

And the quote regarding the catholyte serves to further proves my point that at present, the QS "solid-state battery" is not even solid.

05 Jan 2021, 09:21 AM                                    Like **0**    Reply

---

**Skaterdude**
Comments (4041)  |  + Follow

Multi-layer isn't one separator on top of another, it's multiple cells in one package to get a higher voltage. It's more efficient to run EV electronics at higher voltages, but a lithium cell is only around 3.2-3.5v. Putting them in series gets you to a higher output voltage with the same current. Making multi-layer cells reduces the packaging. Instead of interconnecting a bunch of cells with wires / tabs / connectors, the alternating layers are put into the same package.

05 Jan 2021, 09:42 AM                                    Like **0**    Reply

---

**Skaterdude**
Comments (4041)  |  + Follow

@KHinn patent companies don't ship any products, yet they collect money from licensees. Who knew?

05 Jan 2021, 09:43 AM                                    Like **0**    Reply

---



**KHinn**
Comments (26)  |  + Follow

@Skaterdude That is incorrect. A multilayer cell stacks or winds multiple sets of cathode-separator-anode within a single housing to achieve a desired energy within that housing. For QS batteries the housing must be a pouch cell, because the ceramic separator cannot be wound to make a

cylindrical cell like those that Tesla uses. The pouch cells are then combined in a pack to achieve a higher voltage.

05 Jan 2021, 09:50 AM                                        Like 0    Reply

**Skaterdude**
Comments (4041)  |  + Follow

The Wired article says it's a flexible ceramic separator. (edited)

05 Jan 2021, 10:19 AM                                        Like 0    Reply

 **KHinn**
Comments (26)  |  + Follow

@Skaterdude No. You don't appear to have any knowledge of battery cell construction.

05 Jan 2021, 10:24 AM                                        Like 0    Reply

 **KHinn**
Comments (26)  |  + Follow

@Skaterdude It bends, but not to a small enough radius for winding. $QS admits this in their SEC filings: they will stack, not wind, their cells. Which makes it unlikely TSLA will ever be interested because they are heavily focused on wound architectures.

05 Jan 2021, 10:27 AM                                        Like 0    Reply

**Skaterdude**
Comments (4041)  |  + Follow

Doesn't stacking require a smaller bending radius than winding, as shown in the illustrations here: patents.google.com/...

?

05 Jan 2021, 10:55 AM                                        Like 0    Reply

 **KHinn**
Comments (26)  |  + Follow

@Skaterdude In stacking, the separators are not bent at all. They are flat. Read the QS SEC filing: ""We will build our multi-layer cells by sequentially stacking separators, cathodes and current collectors rather than winding..""

05 Jan 2021, 11:25 AM                                        Like 0    Reply

**DGM01**
Comments (1089)  |  + Follow

Would the company you are the CEO of (Soteria Battery Innovation Group) be negatively impacted if QuantumScape did successfully bring a solid state battery to market?

04 Jan 2021, 01:55 PM                                        Like 10   Reply

**Brian Morin**
Contributor   Premium
Comments (64)  |  + Follow

Author's reply »   Not at all. We are cheering on anything that can help safety in the lithium ion battery industry. Part of our strategy is to set a standard of safety that any safe technology can use. Our goal is to, within 10 years, get 25% of the industry using our technology, but have 100% of the industry hitting the high safety standards we are setting. So 75% will need innovative safety technologies like solid state batteries, or others.

04 Jan 2021, 08:38 PM

Like 0    Reply

**Jere Ylianunti**
Marketplace
Comments (391)  |  + Follow

@brianmorin

"It is well documented that dendrites will not grow through solid, single crystal garnet electrolytes. However, they grow freely at grain boundaries and defects."

Is it a single crystal ceramic (I just didn't catch a reference to this in their presentation slides, not necessarily saying it isn't)? Perhaps amorphous? It appears to be quite flexible and therefore should stand up to cracking reasonably well. In any case, do you reckon it's a doped material or not? (edited)

04 Jan 2021, 01:24 PM                                    Like 0    Reply

**kbaba**
Premium    Marketplace
Comments (11975)  |  + Follow

investorplace.com/...

factors in the stock drop today

04 Jan 2021, 01:08 PM                                    Like 2    Reply

 **saplap**
Comments (4)  |  + Follow

The market makers of QS will allow the price to fall as far as they have agreed with the new investors to get 208 million. For now, this is level $50.

04 Jan 2021, 12:33 PM                                    Like 1    Reply

**kbaba**
Premium    Marketplace
Comments (11975)  |  + Follow

They have no control over the pipe holders selling up to 60 million shares. This isn't an institutional offering

04 Jan 2021, 01:09 PM                                    Like 0    Reply

 **torridgrowth**
Premium
Comments (50)  |  + Follow

There are no new investors, other than those buying on the open market today. $208 million will be received upon exercise of existing warrants, which cannot occur until these warrants are made exercisable, which might not happen until June 30.

04 Jan 2021, 03:10 PM                                    Like 0    Reply

 **Turk Malloy**
Premium
Comments (6)  |  + Follow

I think its quite interesting on the day battery (QS), elec car charging(BLNK) and fuel cell(PLUG,FCEL) are going down - the electric car companies are going up (TSLA, NIO, SOLO).

04 Jan 2021, 12:04 PM                                    Like 0    Reply

 **stts1**
Comments (561)  |  + Follow

@Turk Malloy Yup, Im on Kndi. They have already started delivering cars and its just starting to leak out. Companies selling EV cars are the green

stocks. Solo about to anounce their new factory location. Dont know why thats relevant, but its stoking excitement.

04 Jan 2021, 01:01 PM                                          Like 0    Reply

 **Galileo galileo**

Comments (16)  |  + Follow

@Turk Malloy FCEL & PLUG are profoundly different fuel cells, one fits on a forklift the other on a 1/4acre lot, I wouldn't put FCEL in any list of electric vehicle stonks

05 Jan 2021, 01:12 AM                                          Like 0    Reply

 **JoeQPublic**

Comments (17)  |  + Follow

The portable electronics market is massive. if they can penetrate this market as well, that's huge. As it stands right now everything from earbuds to laptops currently suck using lithium ion. I just returned my second pair of high end ear buds because they can't hold a charge for more than an hour. What this author fails to mention is the massive amount of false advertising currently done by product companies around lithium ion batteries, so even a small percentage gain on this technology is huge.

04 Jan 2021, 11:40 AM                                          Like 1    Reply

 **stts1**

Comments (561)  |  + Follow

@JoeQPublic The Foreign market is fraud central. Batteries in particular. I got tool batteries from china on Ebay at great price. I peeled off the label and the battery was only 60% of the size that was advertised. I demanded 40% of my money back rather than return them all. They happily agreed. So now I have satisfactory batteries at spectacular price. Did the same thing with my cell phone batteries but I only bought like $10 of those. Always check and ask for partial refund to not post bad feedback. Works most every time.

04 Jan 2021, 01:10 PM                                          Like 1    Reply

**Chris Lau**
Contributor   Premium   Marketplace Guide
Comments (13030)  |  + Follow

I guess we won't be changing our logo to the battery. seekingalpha.com/...

After today's drop, watch the selling momentum to dictate the SP. Fundamentals (production spend) won't matter in the near-term.

GLTA. Be careful out there.

04 Jan 2021, 11:32 AM                                          Like 0    Reply

 **Robertspc**

Comments (1)  |  + Follow

Interesting article. Compare with Ilika plc (IKA in London or ILKF in US). They have been in the SSB game for years and have mainly focused on developing their Stereax product for medtech and internet of things. This product is now going into mass production. Over the last few years (after working previously with Toyota) they have developed a larger Goliath product for consumer electronics and eventually EV's (c2025). They are way more conservative than QS and my sense is they have at least as good if not better tech. The shares ran up following QS and have now retreated. BUT they are valued at only c$250m ie 1/200th of QS. Someone will come knocking on their door in 2021

04 Jan 2021, 11:14 AM                                          Like 2    Reply



**KHinn**

Comments (26)  |  + Follow

Another company that has been in SSBs for sometime is SolidPower, but they are not publicly traded like ILKF. Still a good one to look at for comparisons; SP are currently shipping cells for independent review that are much larger than QS cells, and are multi-layered.

04 Jan 2021, 03:41 PM                                    Like 0    Reply



**jeffk100**
Premium   Marketplace
Comments (268)  |  + Follow

they should rename this "quantum price" since it only goes up or down in big steps.

04 Jan 2021, 11:03 AM                                    Like 1    Reply



**saplap**
Comments (4)  |  + Follow

The graph shows that in the previous month there were two similar declines and after finding a bottom, the price rose to the next even higher peak. Why do you think it's different now?

04 Jan 2021, 10:43 AM                                    Like 1    Reply

> **kbaba**
> Premium   Marketplace
> Comments (11975)  |  + Follow
>
> QS S-1 filing effective which means 60 million shares just got unlocked for sales, Share that only cost the holders $10 each. 60 million shares would Triple the float on the stock so many of those holders are expected to lock in their profits
>
> 04 Jan 2021, 12:02 PM                                    Like 1    Reply

>
>
> **stts1**
> Comments (561)  |  + Follow
>
> @kbaba Yup. Share selling creating a shelf. AMC is same way. Stuck at $2 till they sell 50 million shares. That should give them cash for a spell but theres nothing that says they wont file bankruptcy right after their stock sale. So Ill just spectate that one.
>
> 04 Jan 2021, 01:16 PM                                    Like 0    Reply

> **Chris Lau**
> Contributor   Premium   Marketplace Guide
> Comments (13030)  |  + Follow
>
> @stts1 AMC returned a double three times for traders. Holding it brought losses. I would avoid AMC (I lost on that holding).
>
> 04 Jan 2021, 02:42 PM                                    Like 2    Reply

>
>
> **stts1**
> Comments (561)  |  + Follow
>
> @Chris Lau Yea I wont hold it. They could file bankruptcy at any time. Even after this stock sale. Hertz was going to do a stock sale before bankrupcy but the SEC stopped them. If they didnt blab about it, they could have done it. A stock sale would give funds to bail out their best investors. I dont want to be stuck with that.
>
> 04 Jan 2021, 07:45 PM                                    Like 0    Reply

> **kbaba**

Premium    Marketplace
Comments (11975)  |  + Follow

"Hertz was going to do a stock sale before bankrupcy but the SEC stopped them"

Not exactly, they had already declared BK but their stock had irrationally pumped, they tried to do an offering and actually sold some shares but eventually the SEC shut them down

04 Jan 2021, 09:58 PM                                          Like **0**    Reply

---

**Growth And Value**

Comments (252)  |  + Follow

Most of the team come from the same two dot-com companies. A short glance at the long-term charts of the stocks of these companies makes one stop and think: am I looking at hats or boas that just had their elephant for breakfast.

04 Jan 2021, 10:38 AM                                          Like **0**    Reply

---

**cashchain**

Comments (1465)  |  + Follow

Is a crazy speculative bet on QS but I have done it for 3 reasons

1. current Tesla battery packs are just so dangerous, car has to be designed around 2000 pounds and 5000 cells, use case is horrible cannot charge quickly / range limited. Thus EV cars dead in water at about 1 or 2 percent of market unless something changes with battry

2. Thus a dry electrode / solid state battery sounds terrific as solves a good percentage of issues. More then anything it essentially lets anyone design and deploy and electric powered car as car goes not really need to be designed around battery

3. VW and Toyota seem to have through through real use case of EV and have made their bets to NOT mass market EV's until have a solid state battery ? VW has done their own due dilligence on QS. Toyota has massive patents and seems to be farther along with solid state batteries

So in summary the Tesla approach just not scalable and dangerous something has to fill the gap. A QS approach to bring batteries to any and all looks like the future !

will see

04 Jan 2021, 10:13 AM                                          Like **3**    Reply

> **Skaterdude**
>
> Comments (4041)  |  + Follow
>
> And yet the Model 3 got the top safety rating from IIHS: www.iihs.org/...
>
> For anyone who commutes <200 miles/day, the current range is pretty darn good. I like the Chevy Volt because it can switch to gas on long trips, but I still very rarely go more than 200 miles in one day.
>
> 04 Jan 2021, 10:29 AM                                      Like **0**    Reply

 **stts1**

Comments (561)  |  + Follow

@cashchain Its too soon. This will be a wild ride roller coaster. With bubble popers like SA standing ready to toss in grenades on any big run up. VW no doubt jumped in to get access to any patents coming out of this. Thats all this is. Even if the breakthrus are final, which looks like are not, building scalability is a hurtle in of it self. Plenty of time for more

grenade lobs at every hurtle. Selling is the best play if you can gain something to sell.

And yes Im a computer engineer. All the points in this article are tech valid. Its just too good to be true that QS has invented the first SS car battery to blow all other batteries away. It will all happen in small stages starting with watch batteries. And by the time they roll out in car batteries, all of QSs secrets could well be completely stolen by the Ruskies or Chinese. And QS left for bankruptcy. (edited)

04 Jan 2021, 10:30 AM                                          Like **2**    Reply

 **stts1**
Comments (561)  |  + Follow

I tried to short this just 10 shares when it was near $120 to see if I could get them and there were no shares available. Gave me a funny error of security is unavailable to sell. I think my broker didnt want anything to do with shorting this.

04 Jan 2021, 10:04 AM                                          Like **0**    Reply

 **arty123**
Comments (145)  |  + Follow

@stts1 go with the puts if you want to short

04 Jan 2021, 10:24 AM                                          Like **0**    Reply

 **stts1**
Comments (561)  |  + Follow

@arty123 Im rather embarased to say I have never done options. I have buddies that lost all their trading power on options. But being hamstrung on obvious crashes will soon get me moving on figuring them out. The Robin birdies are making amazing short opportunities.

04 Jan 2021, 12:41 PM                                          Like **0**    Reply

 **arty123**
Comments (145)  |  + Follow

@stts1 indeed, the premiums are quite reasonable on a lot of these bubble stocks for the out of the money puts for end of Jan/Feb expiry. Nobody thinks they'll drop until they do, and a lot of these stocks don't have a long lifespan. Some will make it most won't at these prices.

05 Jan 2021, 08:53 AM                                          Like **0**    Reply

**kbaba**
Premium   Marketplace
Comments (11975)  |  + Follow

The puts were outrageous for even Jan 15 expiry even a few days ago. The expected drop reduced the premiums drastically. I paid a $10 premium for at the money puts a few days back and after a $32 drop in the share price that premium is down to $4

05 Jan 2021, 09:31 AM                                          Like **0**    Reply

**Raymond Caron**
Comments (428)  |  + Follow

This comment you wrote

"Electrolyte: a free standing, thin solid electrolyte that will sit between the anode and cathode. While we don't know much, it does deliver some relevant performance."

Doesn't read well. You seem to be saying that you don't understand electrolytes, yet later in the article you comment on concepts that are a lot more complex. So I'm not sure what you're trying to say here.

With QS, it's the application of garnet in the battery to successfully ward off the creation of dendrites that is a breakthrough. With advances made elsewhere, a working battery with vulnerabilities addressed is possible.

QS should be worth less than $15 a share a though. You're quite right that this battery is nowhere near marketing. QS doesn't expect commercial production on a working model until 2025, which means 2027 by the earliest aggressive research standards for these type of developments, especially considering the lengthy process of safety certification. This market is insane.

If the battery works, and it's amazing, then Apple will have bought it before anyone else would be able to react. (edited)

04 Jan 2021, 09:43 AM                                                   Like 3    Reply

 **upL8N8_1**
Comments (80)  |  + Follow

@Raymond Caron Apple products are small beans in terms of potential energy demand, unless they're planning to bring a car to market soon. VW holds a sizeable investment in the company.

04 Jan 2021, 10:49 AM                                                   Like 0    Reply

**Jere Ylianunti**
Marketplace
Comments (391)  |  + Follow

@Raymond Caron

I think the author is just referring to the fact that QS doesn't like to share the details of their ceramic electrolyte material.

04 Jan 2021, 01:31 PM                                                   Like 1    Reply

**Hunter2011**
Comments (38)  |  + Follow

you wrote: "Let's start by saying that building a solid state battery that will function at the rates and temperatures needed for real world applications is hard - very, very hard. So hard, in fact, that nobody has done it.".... what about Blue Solutions, which already has supplied solid state batteries to mercedes eCitaro fully electric buses?

04 Jan 2021, 09:19 AM                                                   Like 0    Reply

 **feffernoose**
Comments (1)  |  + Follow

They are using PEO (a polymer-based solid-state separator) this material is only function at temperatures 60C or higher, it is also rate-limited due to its low conductivity - it is not as relevant to the global vehicle fleet - but works well in specification applications such as buses.

04 Jan 2021, 12:52 PM                                                   Like 2    Reply

**Brian Morin**
Contributor   Premium
Comments (64)  |  + Follow

Author's reply »  Yes, Blue Solutions battery has been working for years, but requiring 60-80 degrees C, and not at a crazy energy density either. But they haven't had any safety issues, and use lithium metal anode.

04 Jan 2021, 09:03 PM                                                   Like 0    Reply



**hrinca**
Comments (2)  |  + Follow

This an interesting article with one massive flaw. It does not even mention that Volkswagon validated the $QS technology in their own facilities, offered public testimonials, invested $300M, and is currently building the first manufacturing facility with QS. Note that VW has the best selling EV in Europe and, obviously, a team of expert automotive engineers. It is unlikely that VW would invest in a company / technology with all the challenges you enumerate without some confidence that there's a path to commercially viable solid-state EV battery.

04 Jan 2021, 08:55 AM                                    Like  14  |  Reply



**rambler1**
Comments (2904)  |  + Follow

@hrinca Well you have a wonderful opportunity then to buy it this morning.

04 Jan 2021, 09:40 AM                                    Like  3  |  Reply

**mjorde**
Comments (321)  |  + Follow

@rambler1 I did just that, loaded up whilst it's cheap :)

04 Jan 2021, 01:42 PM                                    Like  1  |  Reply

**Brian Morin**
Contributor  Premium
Comments (64)  |  + Follow

Author's reply »  @hrinca I've watched the comments from VW, and they are very thin. Nothing close to a full validation, but some weak statements about cycling at automotive rates--that is, meeting minimum electrical requirements, but not coming close to validating the claims management is making. Bosch bought Seeo, and Dyson bought Sakti3, and both of them stopped the projects and wrote off the investment. I'll keep watching for a substantial claim from VW, but until then, they are highly motivated financially to keep QS afloat.

04 Jan 2021, 09:06 PM                                    Like  1  |  Reply

**KHinn**
Comments (26)  |  + Follow

And what do these three solid state battery companies (Seeo, Sakti3, and Quantumscape) all have in common? Vinod Khosla.

05 Jan 2021, 12:35 AM                                    Like  2  |  Reply

**Skaterdude**
Comments (4041)  |  + Follow

It can only auto ignite if there is an oxidizer present. They would have to be punctured or the electrolyte would have to provide that.

04 Jan 2021, 08:38 AM                                    Like  0  |  Reply



**Brian Morin**
Contributor  Premium
Comments (64)  |  + Follow

Author's reply »  This is true for normal cells as well. There is a lot of oxygen in the cathode. Also, the batteries get punctured in almost every high speed crash. If they are pouch cells, heat will also cause the cell casing to rupture, so cell-to-cell ignition is possible.

04 Jan 2021, 09:07 PM                                    Like  1  |  Reply

**Skaterdude**

Comments (4041)  |  + Follow

I thought that Tesla, in particular, had encased the cells and separated them so that only rarely can this occur. I recall reading a recap of an accident where a vehicle ran over a piece of metal that flipped up and punctured the battery pack from underneath. I don't recall if that was a positive or negative example of the effectiveness of the casing / structure.

Aren't these battery packs actively heated / cooled to maintain conditions that prolong cell cycle life and charging / discharging capacity? I know for sure that the Chevy Volt does this. With that in mind, how much does it matter whether these cells perform well at 0 deg?

05 Jan 2021, 10:52 AM                                    Like **0**    Reply

 **saplap**

Comments (4)  |  + Follow

When the first steam locomotive was built in the early 19th century, the platform was full of skeptics shouting, "You'll see it won't work, you'll see it won't work!..." :)

04 Jan 2021, 06:54 AM                                    Like **6**    Reply

 **saplap**

Comments (4)  |  + Follow

Since no one but Seeking Alpha is currently commenting QS, even more negatively, I would like to know what is your financial interest?

04 Jan 2021, 06:45 AM                                    Like **1**    Reply

 **Carlos Lorenzo**

Comments (4)  |  + Follow

@saplap He is long TSLA!

04 Jan 2021, 10:45 AM                                    Like **1**    Reply

 **upL8N8_1**

Comments (80)  |  + Follow

@saplap Author already stated their interest. They're a Tesla investor.

04 Jan 2021, 11:08 AM                                    Like **1**    Reply

 **grgrgr**

Comments (72)  |  + Follow

Dr. Brian Morin is currently CEO of Soteria Battery Innovation Group, a company has technology to make all lithium ion batteries inherently safe, and is taking it to market through a consortium of companies who are dedicated to lithium ion battery safety

Not saying he is wrong, but If QS is successful, his Lithium Ion Technology company will be greatly impacted by the

04 Jan 2021, 01:30 PM                                    Like **3**    Reply

 **KHinn**

Comments (26)  |  + Follow

There has been significant discussion of concerns about QS amongst battery professionals on twitter and elsewhere over the last few weeks. The stock traders seem to have come late to the discussion.

04 Jan 2021, 03:32 PM                                    Like **0**    Reply

**Brian Morin**

Contributor   Premium
Comments (64)  |  + Follow

**Author's reply »**   I've been long Tesla for four years, but selling about 5% of my holdings every quarter since late 2019. The more I sell, the more what I have left is worth. :-) My company will not be affected by a QS success or failure, and for the industry's sake I hope they, and every company focusing on safety, succeeds.

04 Jan 2021, 09:09 PM                                    Like 0      Reply

**kbaba**
Premium   Marketplace
Comments (11975)  |  + Follow

Holy crap, the day has arrived. The SEC declared the S-1 Effective so 60 pipeholder shares are now unlocked for trading. This could triple the float. Look out below.

www.sec.gov/...

04 Jan 2021, 06:41 AM                                    Like 0      Reply

 **HardCore 76**
Comments (17)  |  + Follow

Wahaha!!! Quantumscam!'

04 Jan 2021, 06:41 AM                                    Like 3      Reply

 **Croogie**
Comments (2822)  |  + Follow

Some of the old boomers are remembering the "tech bubble" of the Clinton era. The end was a blood bath which only a bunch survived ...

04 Jan 2021, 06:39 AM                                    Like 2      Reply

**McMcM**
Premium
Comments (1)  |  + Follow

It would be interesting if some assessment is also made on Toyota's newly announced solid state battery that they plan to introduce in their new EV this year.

04 Jan 2021, 06:29 AM                                    Like 6      Reply

 **KHinn**
Comments (26)  |  + Follow

Agreed that would be nice! But as an established producer and manufacturer, Toyota doesn't have the same burden of proof that $QS does, IMO.

04 Jan 2021, 03:31 PM                                    Like 1      Reply

**kbaba**
Premium   Marketplace
Comments (11975)  |  + Follow

The investment narrative is also precarious as the unlocking of 60 million shares of pipe holder shares could be approved by the SEC any day, tripling the float. Those shares will be widely profitable already and the holders savvy enough to understand they are overvalued so the market expects a quick rush to the exits

04 Jan 2021, 06:19 AM                                    Like 2      Reply

**Timothy Conway**
Premium
Comments (677)  |  + Follow

@kbaba - You've mentioned today's S-1 filing in two other comments of yours here in this thread, but the S-1 filing *registers shares* but does not alter or terminate lockup agreements pertaining to those shares.

And the lockup agreement was 180 days, expiring on March 1 as i understand it from someone knowledgeable about these things.

04 Jan 2021, 02:52 PM                                    Like 0    Reply

**kbaba**
Premium    Marketplace
Comments (11975)  |  + Follow

@Timothy Conway Not true. Different types of shares registered have different restrictions. Of the hundreds of millions of shares in the S-1, the pipeholder shares have no lockup period once S-1 registration is effective which means now

Stock is down over 50% in three days for a reason

04 Jan 2021, 04:33 PM                                    Like 0    Reply

**Brian Morin**
Contributor    Premium
Comments (64)  |  + Follow

Author's reply »  It looks like >80 million shares traded hands today, which is most of the float.

04 Jan 2021, 09:21 PM                                    Like 0    Reply

**farmersgroup**
Comments (450)  |  + Follow

@Brian Morin Bought some QS yesterday and wait for someone to write an article that tells how great QS batteries are.

05 Jan 2021, 04:28 AM                                    Like 0    Reply

**hummingbird228**
Premium
Comments (254)  |  + Follow

Good info, thanks. Crazy 1999-like environment.

04 Jan 2021, 06:03 AM                                    Like 0    Reply

---

Disagree with this article? Submit your own.

To report a factual error in this article, click here.

Your feedback matters to us!

---

**More articles by Brian Morin**

QuantumScape's Solid State Batteries Have Significant Technical Hur… Mon, Jan 4

Ford's Electric Vehicle Strategy Sliced And Diced Thu, Jan 19

Insider Sales, Suits Citing Fraudulent Selling Techniques Likely To Dr… Sun, Dec 25

The Lithium Market Will Grow To 20 Times Its Current Size In The Ne… Wed, Dec 7

A Glimpse Of A Mainstream EV Market Mon, Oct 31

---

**Latest on QS**

QuantumScape clarifies yesterday's share registration Today

QuantumSpace faces routine securities-related probe by law firm Today

QuantumScape registers for sale of up to 306M shares Mon, Jan 4

QuantumScape's Solid State Batteries Have Significant Technical Hur… Mon, Jan 4

Sell QuantumScape, Be Patient For Reentry Thu, Dec 31

FuboTV shares gain, paring earlier losses after hedge fund reveals st… Mon, Dec 28

Seeking Alpha Catalyst Watch Thu, Dec 24

QuantumScape runs higher again as latest fad EV stock Tue, Dec 22

QuantumScape: A Technical Note On All-Solid-State 'Anode-Free' Lit… Sun, Dec 20

QuantumScape falls again as momentum ride stalls out Mon, Dec 14

α

Read. Decide. Invest.



RSS Feeds | Advertise with Us | Sitemap | About Us | Feed

Subscription Support: 1-347-509-6837 | Terms of Use | Privacy | Mark

# EXHIBIT P

**April 15, 2021 | Investigative report by Scorpion Capital | www.scorpioncapital.com**

# QUANTUMSCAPE (NYSE: QS)

# A Pump and Dump SPAC Scam By Silicon Valley Celebrities, That Makes Theranos Look Like Amateurs

**$15B market cap | $40.85/share | ADV 17mm shares, 3mo avg |  Short interest 4% of float** *per Capital IQ*

**Exhibit
0016**

8/12/2022
Frank Fish

# 4. Multi-layer cells: a fraudulent narrative to cover-up a failure

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# Almost all of the data QS has shown is for a single-layer cell, which experts dismiss as irrelevant, as EV batteries have 3,000 packs, each with 100+ layer cells. Plans for one-story shacks mean little for 100 story skyscrapers.

*Quantumscape's filings state that it must stack "over one hundred" layers at a time for each pack inside an EV battery.*

*"To achieve target energy density, QuantumScape needs to stack its single-layer cells in a multi-layer format, which is enclosed within a single battery package. QuantumScape's battery cell will require **over one hundred single-layer battery cells within each battery package."** - QS SEC filing, 11/10/20*



*A small single-layer pouch cell, either 70x85mm or 30x30mm in size, is the basis for Quantumscape's far-reaching claims of a breakthrough solid-state battery*

Source: https://s26.q4cdn.com/263384136/files/doc_presentation/2021/1/Data-Launch-Updated-Post-Presentation-20210107-2.pdf'

120

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# A former employee emphasizes how little it means to show single layer data, and frames the monumental task of scaling to multilayer cells comprising 200,000 layers in total: "the biggest issue that they're facing"

*The former employee used the example of a Tesla model 3, which he indicated has thousands of cells each with 50-100 layers, to indicate the massive technical challenge that awaits Quantumscape given that "What they have shown is data for one. One layer."*

"Tesla is a great example. The model three has 3700 cells in it. Each of those cells are comprised of 50 to 100 layers. That's the scale at which the battery needs to be. You need to have 50 to 100 of these layers, and the solid-state battery has a higher capacity than the lithium-ion battery, so you probably don't need 3700 of these to fuel a car; you probably need maybe only 2000, but then you need 2000 cells. If you do the math there, 50 to 100 layers, let's just say 100 on the high side for easy math—2000 cells, ==you're looking at 200,000 layers of the separator to give the energy that you need to fuel a car. That's a lot."== *– Former employee*

"==What they have shown is data for one. One layer. So, you can understand that the ability for them to scale that up is going to take some serious time and effort== because to get from just having one cell cycling to having technically 200,000 layers cycling, that's a huge scaling issue. Before we can do that, we've got to start getting the cells together or start getting these layers together, and ==that's really the biggest issue that they're facing."== *– Former employee*

Source: Scorpion Capital consultation calls with experts

121

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# Solid-state experts indicate that the reliance on single layer data is a "glaring" red flag and too little even for a VC investment: "after all the capital that has been invested, why are they only showing single layer data?"; just a double-sided cathode, not even a true battery.

*Experts indicate that "without a doubt, if there's one takeaway" it's that Quantumscape is making bold claims of a breakthrough based on a single layer prototype – which in the industry is not even considered a real battery.*

"Some of the other things that are notable about QuantumScape, and **frankly, the most glaring one is the size of the cell. It's a single-layer cell, and when people refer to single-layer cells in the industry, they usually talk about it as a double-sided cathode** because how you would make a cathode at scale is you coat both sides of a current collector. A current collector, in this case, would be aluminum. You would coat on the topside and on the bottom side; in the industry, it's called the A and B side. And they are showing data off of a true single layer, and that is, **without a doubt, if there's one takeaway, it's why after all the capital that has been invested, why are they are only showing single-layer data?"** – *Sold state expert*

"**You've got a single-layer cell, and if I was going to invest in this as a venture investor, I would want to see an awful lot more data than this.** If I was thinking about making an investment as a venture investor, I would want to see if they have to cherry-pick a good one. All I have to do is make something and get it to happen one time. What if I keep doing that -30°C? Do I end up with a dendrite on cycle 5? You wouldn't know from this." – *Solid state expert*

Source: Scorpion Capital consultation calls with experts

122

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# <u>Claiming a breakthrough off a single layer sample is like using one transistor in 1940 to say you built an Intel CPU – "It means they don't have good multilayer data"; cracked cells, short circuits from dendrites when stacked</u>

*Solid-state experts explained the step-function difficulties that arise when going from a single-layer 2-dimensional cell to a 3-dimensional format with hundreds of layers.*

*"==I think it means they don't have good multi-layer data. Let's just start with that.== They don't have good multi-layer data; that's what I would assume if I was looking at putting money in this." – Solid-state expert*

*"==I think the single transistor to integrated circuit comparison is somewhat relevant here.== They've got a single-layer. There's no lithium on the negative electrode side until you charge the battery. The dimensions of the cathode change only just a little bit, but the negative electrode side goes from nothing to all the lithium on every cycle. So, you have these dimensional changes. In their deck, you see 3.4atm, which I assume is 3.4 atmospheres of pressure, which is a little odd to refer to it that way. But ==you get this stack under pressure, and you've got everything changing dimension, and if you don't have pressure, you'd probably get dendrites, you'd probably get nonuniform plating==. Having a solid-state separator does solve some problems, but it also creates some problems." – Solid-state expert*

*"If the pressure is not uniform, for example, you don't perfectly have the same thickness of electrolyte everywhere, some of these cells, you're going to change dimension faster than others in some layers. Then you have nonuniformities in pressure. Does that drive either ==cracking of this material? Does it drive dendrite formation== in some area preferentially?" – Solid-state expert*

Source: Scorpion Capital consultation calls with experts

123

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# The CEO appears keenly aware that single layer is a low bar, and has recently begun pushing a disingenuous narrative: we've proven single-layer works and NOW - "for the first time" - we'll finally focus on multilayer cells

*In a February 25, 2021 Yahoo Finance interview, the CEO of Quantumscape laid out one of the big questions in investors' minds.*

*"And I think the big question back then was, this is great. This is a breakthrough. But can these guys take that single layer cell and make a multilayer cell out of that?" – Quantumscape CEO, 2/25/2021.*



Source: https://finance.yahoo.com/video/quantumscape-ceo-shares-two-exciting-151621348.html

124

4) Multi-layer cells: a fraudulent narrative to cover-up a failure

# On Feb 16, 2021 QS announced with fanfare that it has finally made a multilayer cell. The stock jumped 31%. However, note the telling placement of a key phrase: *"We are please to report for <span style="color:red">the first time</span> that we have made 4-layer multi-layer cells in the 30x30mm form factor…"*

*The contrived phrasing suggests that Quantumscape is trying to mislead investors into thinking that this is the first time they've made multi-layer cells, when all they're saying is that this is the first time they're talking about it.*

*Quantumscape Q4 FY2020 "Letter to Shareholders", Feb 16, 2021*

We are pleased to report for the first time that we have made 4-layer multilayer cells in the 30x30mm form factor, and we have now seen close to 800 cycles at 30°C with over 90% capacity retention at both C/3 and 1C rates – substantially similar to the single-layer cells we reported in December. We used 30x30mm cells, made from separators cut from our standard target commercial area separators, because it allowed us to effectively quadruple the number of test cells as we work to scale up our engineering line capacity.

We believe these results demonstrate that it is possible to stack our single-layer unit cells, and to do so without adversely impacting the cycle life and capacity retention performance of the cells, i.e., while maintaining performance similar to single-layer cells. The data from these tests is shown below and is generated at near-room temperature (30°C) at rates ranging from C/3 to 1C (three-hour charge/discharge to one-hour charge/discharge.)

Source: https://s26.q4cdn.com/263384136/files/doc_financials/2020/q4/QS-Shareholder-Letter-Q4-2020.pdf

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# The best way to cover up data that would blow up your SPAC is to pretend that you don't have it yet. We think the CEO's recent statements about the status/timing of multi-layer cells are not only disingenuous but constitute fraud – a ruse to pump the stock with a fake "new" milestone.

*In the Feb 25, 2021 Yahoo Finance interview we referenced a few pages earlier, the CEO states that the 4-layer cells he had just announced were a "big breakthrough" and that he won't have 8-10 layer cells until end of this year.*

> *JAGDEEP SINGH: […] "And I think what we were really pleased to see, ==as we reported last week in our earnings call, that we, in fact, had taken four layers and stacked them up== together to make a four-layer cell […] And ==that was the big breakthrough== because what that means is that we can now continue to scale this technology. ==Later on this year, we hope to have an eight to 10-layer cell. And if we hit that milestone, then we'll be on track to deliver actual sample cells to our automotive OEMs.== So that was a pretty big deal."*

> – – – – – – – – – – – – – – – – – – – – –

> *BRIAN SOZZI: "Jagdeep, that sounds very important, ==what you just mentioned, eight to 10 cells by the second half of this year==. I think a lot of folks are still getting to understand your company. And you've had, really, some big developments in many respects that come out of left field or come out of the blue. You wake up one morning. And you see, wow, the stock's up so much. ==When do you expect to reach that eight-layer cell? What's the date? Is there some timeline you can provide?"==*

> *JAGDEEP SINGH: "==Yeah, the eight to 10-layer cell, we think, is going to happen by year end. So we don't want to set expectations too high.== I mean, we've been fortunate so far that the goals we've set, we've been able to meet, the single-layer cell announcement, ==this multilayer statement was, I think, ahead of what anybody was expecting. But I think the eight to 10-layer cell, we're targeting by year end."==*

Source: Transcript of Yahoo Finance interview 2/25/2021 https://finance.yahoo.com/video/quantumscape-ceo-shares-two-exciting-151621348.html; quotes above are excerpts from the transcript, with breaks indicated by "[…]" and the dashed line.

126

4) Multi-layer cells: a fraudulent narrative to cover-up a failure

# Red flag 1: Multiple former employees indicate that QS has tried to make multilayer cells for years but flopped: "I actually helped set up the multi-layer pouch line, but it just didn't work"; "hurdle" that "they haven't overcome"

*Multiple former employees we interviewed indicated QS can't successfully make multi-layer cells.*

*Our Q&A with Former Employee #1 indicates problems in making multi-layer cells*
*Q: "Were they making multi-layer cells years ago, and they just couldn't get them to work?"*
*A: "I actually helped set up the multi-layer pouch line, but it just didn't work."*
*Q: "They couldn't get multi-layer cells to work?"*
*A: "Correct." - Former employee*

*Former employee #2 was less blunt but confirmed multi-layer as a "hurdle"; overall tone of the interview suggested the ex-employee had more damaging info but preferred to speak indirectly*
*"The biggest manufacturing hurdle that they need to overcome - that is something they haven't overcome yet, is stacking the cell…Let me just put it in a general sense - you want to get to your final product before you start stacking and layering, and I can say that there are certain things that they were doing to try to push to get to that final product and finalize what specs they were looking for before they began that process of stacking. I think there are some issues with - how do I put this? The single-layer they're trying to aim for is like the final product, and I think that final product, they've been changing what they're targeting or the specs they were trying to hit before they went to the multi-layer." – Former employee*

Source: Scorpion Capital consultation calls with experts

127

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# <u>Red flag 2: The CEO indicated in his Feb 25th Yahoo Finance interview that they've shown a 4-layer prototype now, and the next step is an 8-10 layer cell that "we're targeting by year end." Our calls with members of VW's EV battery group lead us to suspect that the "upcoming" 8-10 layer prototypes are old news and that QS has had them for some time.</u>

*If what we suspect is true, the question then becomes – where's the data? As well, are the statements below truthful?*

> <u>*CEO comments during recent interview*</u>
>
> *"Yeah, ==the eight to 10-layer cell, we think, is going to happen by year end==. So we don't want to set expectations too high. I mean, we've been fortunate so far that the goals we've set, we've been able to meet, the single-layer cell announcement, this multilayer statement was, I think, ahead of what anybody was expecting. But I think ==the eight to 10-layer cell, we're targeting by year end."==*
>
> Source: Transcript of Yahoo Finance interview 2/25/2021 https://finance.yahoo.com/video/quantumscape-ceo-shares-two-exciting-151621348.html;

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# Red flag 3: Solid-state cells expand while charging due to properties of lithium metal, dooming efforts to stack them in layers. Experts and ex-employees indicate it's basically unsolvable: "mechanical breathing," swollen cells.

*A solid-state expert explained that "lithium metal is a piston" that expands in volume as it charges, creating "extremely important" issues in stacking cells.*

> *"The mechanics are extremely important, and this is why the single-layer thing is such a big deal. **Lithium metal is a piston. That means that when it charges, it's actually expanding in volume. So, when you have 20 or 50 or 100 layers together and they're constantly going back and forth, you have mechanical breathing** that's way more than the mechanical breathing that you see in lithium-ion. So, the mechanics of this cell may be much more favorable than if you had a multi-layer cell. This is one example where I can for sure say I would love to see this in a multi-layer cell." – Solid state expert*

## Evaluation of The Electrochemo-Mechanically Induced Stress in All-Solid-State Li-Ion Batteries

"Most Li-ion battery electrode materials experience volume changes during lithiation and de-lithiation. The Li compositional inhomogeneity causes stress, which is referred to as the "diffusion-induced stress" and leads to mechanical failure of electrodes during battery cycling…With the increasing interest in all-solid-state Li-ion batteries (ASSLBs)[14]–[18] owing to their improved endurance and safety, their mechanical degradation becomes a critical and unsolved issue that impacts the performance and life of ASSLBs.[19] The mechanical degradation of ASSLBs is expected to be more severe than that of traditional Li-ion batteries, since the solid electrolyte (SE), unlike the mechanically compliant liquid electrolyte, imposes additional mechanical constraints on the deformation of electrodes."

*Paper on solid-state battery failure due to mechanical stress from lithium expansion – "a critical and unsolved issue"*

Source: Scorpion Capital consultation calls with experts; https://iopscience.iop.org/article/10.1149/1945-7111/ab8f5b

129

4) Multi-layer cells: a fraudulent narrative to cover-up a failure

# Red flag 3 (cont'd): Ex-employee explains why even a single-layer cell expands 40% - says imagine trying to sell Apple a phone battery with moving parts that gets 40% thicker during charging; "how do you package it?"

*Our Q&A with a former employee shed light on one of the most difficult and unsolved problems in making multi-layer solid state cells.*

Q:  *"What are the challenges in going from single-layer to multi-layer? What compounds the difficulty?"*

A:  *"In a conventional lithium-ion battery, the anode is like a sponge, and the lithium is absorbed into the sponge where the battery charges, but the sponge stays the same size. In a solid-state lithium metal anode, the anode is not a sponge. **The anode is just lithium, and, therefore the cell expands when it charges. So, you have moving parts inside the battery."***

Q:  *"How much does it expand the lithium anode?"*

A:  *"40%. The anode expands infinitely because the anode doesn't exist when the battery is discharged. The lithium is all in the cathode. And it plates out on the anode when you charge the battery. **The whole-cell expands 40%**. The expansion of the anode is; basically, you're dividing it by zero, the expansion is infinite."*

Q:  *"How do you stack that? How do you solve that problem by stacking it?"*

A:  *"Exactly, right? And then how do you package it? **Imagine you're trying to sell this battery to Apple**. We want you to put it in your phone, but when you charge the phone, **the battery is going to get 40% thicker."*** *– Former employee*

Source: Scorpion Capital consultation calls with experts

130

4) Multi-layer cells: a fraudulent narrative to cover-up a failure

# Red flag 3 (cont'd): The former employee continued that it's a "super-hard problem" that doesn't even have a conceptual solution today - 40% cell expansion gets even worse with 50+ stacked layers; solid-state battery in an actual electric car would expand by one foot.

*An EV battery that expands by a foot between charge and discharge strikes us dead on arrival.*

*"It's a super-hard problem. Now, let's think about that in a multi-layer concept. I stack up 50 layers of anodes and cathodes and separators, and now every other layer expands. The anodes expand, the cathodes don't, and everything moves, and I've got to connect tabs to all of those layers to get current in and out, and I've got to keep it all compressed and consolidated. Imagine that every layer moves 30 microns." – Former employee*

*"Let's say the total stack is 100 microns when it's discharged, and it charges to 130 microns, but now you stack that up to a meter in an electric vehicle battery. Now it's 30-cm. That's a foot of expansion. The percentage is still 30%. How do you deal with the fact that the terminal moved? The terminal physically moves by a foot. So, how do you absorb that? How do you come up with a concept that works there?" – Former employee*

Source: Scorpion Capital consultation calls with experts

131

4) Multi-layer cells: a fraudulent narrative to cover-up a failure

# Red flag 4: Dendrites are a fatal problem in the transition to multiple layers. Ex-employees: QS needs to stack ultra-thin solid-state separator layers for weight/energy density, but thin layers get dendrites; "it just shatters"

*A former employee explained that thin layers are needed, but thin layers "very easily get a dendrite." He described the challenges "as these things expand and contract during cycling" to the point "where it shatters." He indicated that the difficult trade-offs between separator thickness, dendrite resistance, and energy density are unsolved.*

*Former employee responds affirmatively to out question: "They're struggling with a dendrite issue in the transition from single-layer to multi-layer cells?"*
"Right. Let me explain some things about just the inner workings of these batteries. The separators are pretty thin. They could range anywhere from 5 microns to 100-200 microns in thickness. This is where it's really tough scale when it comes to ceramics processing….In a perfect world, you want to get the separator as thin as possible, to just a few microns. A few microns is smaller than your hair. But also you want it to survive all these different battery tests…Think of it on a basic conceptual level - here's something so thin, and then you have to quickly charge and discharge electricity and you can very easily get a dendrite forming, which is a spike growing on the anode side and that spike is going to end up putting a hole into that thin separator because it's just too thin."

"If it's too thin, the dendrite is going to break a hole into it. But if you make it thicker, you're losing a lot of energy density because you're consuming more space. Not only that, but as these things expand and contract during all the cycling, it'll expand to a certain point where it shatters because, at the end of the day, it's ceramic. Think of it like a ceramic pot, where you put so much force on it, it just shatters. These are two issues that you're going to have, whatever type of ceramic." *– Former employee*

Source: Scorpion Capital consultation calls with experts

132

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# Red flag 5: CEO claims multi-layer breakthrough a few weeks ago, but won't show data for most key OEM criteria: fast charge, power, low temperature, dendrites. Only 4-layer cells while QS admits 100+ layers needed.

*In conjunction with its earnings call on Feb 16 2021, QS claimed it has now made multi-layer cells – but only 4 layers thick, or about 4% of the way to the 100+ layers it needs per cell. The company made bold claims about the performance of its multi-layer prototypes, but only showed one data slide – cycle life. <u>Curiously, QS declined to show data on other key automaker criteria it showed in December for its single-layer sample:</u> fast charge in 15 minutes, automotive power profile, dendrite resistance, low temperature cycle life, and low temperature operability.*



*"4-layer Multilayer Cycle Life"*

*Company only showed one meager data slide for its 4-layer cell.*

*Where's the comparable data it showed for its single-layer cell at its Dec 2020 Battery Showcase?*

Source: https://s26.q4cdn.com/263384136/files/doc_financials/2020/q4/QS-Shareholder-Letter-Q4-2020.pdf

133

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# Red flag 6: The one scrap of data shown for its multilayer cell – cycle life – exhibits the same sleight of hand as its cycle life claims for single-layer cells. Standard "Coulombic efficiency" metric is once again missing, without which cycle life claims are meaningless

*At its Dec 8th Battery Showcase, QS showed two slides for cycle life for its single-layer cell. We noted extensive red flags for each claim – cycle life at normal operation, and under low temperature conditions. Each of those red flags applies in spades to the same claim it makes for its 4-layer prototype cell. We summarize them here.*



1) QS **hides the actual capacity the battery is charged to,** using "Discharge Energy [%]" as the Y-axis instead. Experts indicate it's a common form of cheating when making battery claims, as at low energy loadings a cell can last forever.

2) QS cell appears to be a **fraction of the capacity of a hearing aid**. Showing 1,000 cycles at a tiny energy level is easy but a gimmick given massive energy requirements of real EV batteries

3) Cycle life test used is **not industry-standard battery test**. We noted that an expert's comment the Dept of Energy doesn't even allow use of such ambiguous data by battery researchers

4) Common trick in fake cycle life claims is **scaling the Y-axis from 0-100% to hide cherry-picking and variation problems** across cells. Battery journals specifically warn against the gimmick QS uses.

5) **"Coulombic efficiency"** is a basic, essential measure of cycle life. Experts indicate it's a huge red flag that QS never discloses it. Massive variations in QS cycle life data suggest that its cells have disastrous and instable Coulombic efficiencies and cycle lives.

Source: https://s26.q4cdn.com/263384136/files/doc_financials/2020/q4/QS-Shareholder-Letter-Q4-2020.pdf

4) Multi-layer cells: a fraudulent narrative to cover-up a failure

# Red flag 7: Alarmingly, QS adds a new trick for its 4-layer prototype, buried in the fine print – testing battery life under tortoise-like 3 hour charge rates, making a mockery of its "15 minute fast charge" claim.

*We asked a solid-state researcher to analyze the "new" multi-layer data, who noted various concerns: a slower charge rate suggests struggles with dendrites; an ongoing failure to state the capacity of the cell; using a Y-axis with a non-standard, undefined measure of cell performance – all indicative of issues in scaling to multilayer prototypes.*

"This means that **charging is done for 3 hours** and discharge for 1 hour. This type of slow charging is very typical for Li metal batteries. Plating of Li is where [a] dendrite growth issue can occur. Therefore charging (plating lithium metal) is often done at slower rates." – **Solid state expert**

"During the charging of [a] multiple layer pouch, it is **extremely challenging to ensure ALL layers plate lithium uniformly. QS has to lower the rate**…I want to stress that they must clearly define what is 100% depth of discharge…if the entire lithium capacity is utilized , cycle life will suffer. Therefore, the critical question is **what is 100% depth discharge** – according the dimension they give, the cell is about 122mAh capacity. They should label their y-axis, the actual capacity cycled. They also **did not use the actual critical current density** – C rate is meaningless if the actual current density mA/cm2 is not shown." – **Solid state expert**



**Fine print indicates C/3 charge rate – which in battery-speak means a 3 hour charge**

4-Layer (30x30 mm) prototype
Zero Excess Li, 3.2mAh/cm$^2$,
C/3-C/3 and 1C-1C charge and discharge
30 °C, ~ 3.4 atm, 100% depth of discharge

135

Source: Scorpion Capital consultations with experts; https://s26.q4cdn.com/263384136/files/doc_financials/2020/q4/QS-Shareholder-Letter-Q4-2020.pdf

**4) Multi-layer cells: a fraudulent narrative to cover-up a failure**

# <u>Red flag 8: The ever-shrinking prototype cell. The single-layer cycle life test used a 70x85mm cell, while the multi-layer test used 30x30mm samples – only 15% of the square surface area. QS excuse: "because" we're still working to "scale up our engineering line capacity"</u>

*In solid-state battery development, a critical sign of progress is advancing to cells with larger surface area, given the step function difficulties that arise in each scaling step. QS appears to be going in reverse. A single electric vehicle needs flawlessly manufactured separator material measured in football-field size dimensions – yet QS is pointing to manufacturing constraints, even though its slide data suggests that they only used 4 or 5 coin-sized 30x30mm prototype specimens for the test.*



Enlargement appears to show 4 or 5 lines, suggesting 4 or 5 individual cells used, yet QS points to scaling constraints

<u>**Fine print indicates 30x30mm prototypes, in contrast to single layer cycle life test that used 70x85mm samples, i.e., 15% of the surface area (900 mm2 / 5950 mm2 = 15%)**</u>

<u>**Recent "Shareholder Letter" explains reason for smaller cells in multi-layer test**</u>
*"We used 30x30mm cells, made from separators cut from our standard target commercial area separators, because it allowed us to effectively quadruple the number of test cells as we work to scale up our engineering line capacity"*

Source: https://s26.q4cdn.com/263384136/files/doc_financials/2020/q4/QS-Shareholder-Letter-Q4-2020.pdf

136

# EXHIBIT Q





# QuantumScape Secures Campus in San Jose, California

*Expansion to three new facilities to scale advanced manufacturing capabilities*

November 08, 2021 09:00 AM Eastern Standard Time

SAN JOSE, Calif.--(BUSINESS WIRE)--QuantumScape Corporation (NYSE: QS) today announced QS Campus – the future hub of its upcoming manufacturing activities – after securing a new set of buildings in San Jose. The new campus comprises the current site of QS-0, QuantumScape's pre-pilot production line, and the adjacent three new buildings. QS Campus is a key building block of QuantumScape's multi-year strategic growth plan as it advances closer to commercializing its solid-state lithium-metal battery technology.

Much of the new space will be dedicated to manufacturing, ultimately expanding the footprint and overall capacities of its existing QS-0 and development buildings, and affords QuantumScape the necessary space to scale up manufacturing and execute on its development timeline. The company has confirmed 10-year lease agreements for the three new buildings of QS Campus.

"As we shift into the next phase of our growth trajectory, developing advanced manufacturing capabilities becomes more critical. To achieve our goals, we believe we must make progress on both development and manufacturing simultaneously," said Jagdeep Singh, co-founder and CEO of QuantumScape. "This new campus provides us with an opportunity to continue our ground-breaking innovation while laying the foundation for scaling up those innovations into production."

QuantumScape's new facilities will also house additional research and development and office space to accommodate hundreds of new employees. The company plans to continue aggressive hiring of world-class talent through 2022 and beyond. The campus is designed to encourage more natural opportunities for employees to collaborate across departments and functions. This prime location in San Jose – in the heart of Silicon Valley, near world-renowned universities and research institutions – offers access to a rich pool of talent for the company to build out its team.

"As the capital of Silicon Valley, San Jose continues to welcome the growth of innovative tech leaders like QuantumScape," said San Jose Mayor Sam Liccardo. "We are thrilled to see QuantumScape's investment in our community and their commitment to bringing advanced battery development and local manufacturing jobs to North San Jose."

The company will take possession of the new buildings and begin outfitting the facilities for specific purposes starting in January 2022. QuantumScape has been based in San Jose since its founding in 2010. The new site in North San Jose is minutes from its current location, which will retain its central role in the company's research and development activities.

**About QuantumScape Corporation**

QuantumScape is a leader in developing next-generation solid-state lithium-metal batteries for electric vehicles. The company is on a mission to revolutionize energy storage to enable a sustainable future. For more information, please visit www.quantumscape.com.

**Forward-Looking Statements**

The information in this press release includes a "forward-looking statement" within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of present or historical fact included in this press release, including, without limitation, regarding the development, timeline and performance of QuantumScape's products and technology are forward-looking statements.

These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Most of these factors are outside QuantumScape's control and are difficult to predict. Factors that may cause such differences include, but are not limited to the following: (i) QuantumScape faces significant barriers in its attempts to scale and complete development of its solid-state battery cell and related manufacturing processes, and development may not be successful, (ii) QuantumScape may encounter substantial delays in the development, manufacture, regulatory approval, and launch of QuantumScape solid-state battery cells and building out of QS-0 and the QS Campus, which could prevent QuantumScape from commercializing products on a timely basis, if at all, and (iii) QuantumScape may be unable to adequately control the costs of manufacturing its solid-state separator and battery cells. QuantumScape cautions that the foregoing list of factors is not exclusive. Additional information about factors that could materially affect QuantumScape is set forth under the "Risk Factors" section in the QuantumScape's Annual Report on Form 10-Q filed with the Securities and Exchange Commission on October 28, 2021, and available on the SEC's website at www.sec.gov.

Except as otherwise required by applicable law, QuantumScape disclaims any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this press release. Should underlying assumptions prove incorrect, actual results and projections could different materially from those expressed in any forward-looking statements.

## Contacts
**For Media**

media@quantumscape.com

# EXHIBIT R

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email:    aapton@zlk.com
Email: amccall@zlk.com
75 Broadway, Suite 202
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE QUANTUMSCAPE SECURITIES CLASS ACTION LITIGATION | Case No. 3:21-CV-00058-WHO |
| | **LEAD PLAINTIFF'S RESPONSE TO DEFENDANTS' INTERROGATORIES** |

**Exhibit 0028**

8/12/2022
Frank Fish

Lead Plaintiff Frank Fish ("Plaintiff") hereby responds to Defendant QuantumScape Corporation's ("QuantumScape") First Set of Interrogatories to Lead Plaintiff Frank Fish dated March 15, 2022, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court of the Northern District of California.

**GENERAL OBJECTIONS**

Plaintiff makes the following general and continuing objections to Defendants' Interrogatories. All general and continuing objections apply to the response to each Interrogatory, and specific reference to these objections in the particular response is intended for emphasis only. Failure to list a general and continuing objection is not intended, nor should it be construed as a waiver of that objection.

1.      Plaintiff objects to the Interrogatories to the extent they call for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

2.      Plaintiff objects to the Interrogatories insofar as they seek information related to mental impressions, legal conclusions, opinions, or theories of any attorney or other representative of Plaintiff.

3.      Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the issues of law and facts in the action nor are they proportional to the needs of the case.

4.      Plaintiff objects to the Interrogatories to the extent that they seek to require Plaintiff to produce information on behalf of, or in the custody and control of, any entity or individual over whom Plaintiff has no control.

5.      Plaintiff objects to the Interrogatories to the extent they prematurely seek information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will disclose information properly subject to expert opinion in accordance with the Federal Rules of Civil Procedure and the schedule entered by the Court.

1

6. Plaintiff reserves the right to make any use of, or introduce at any hearing and at trial, information and/or documents responsive to these Interrogatories, including, but not limited to, any such information or documents obtained in discovery.

7. Plaintiff reserves his right to challenge the competency, relevancy, materiality, and admissibility of, or to object on any grounds, to the use of any of the documents and/or information, at the trial of the action or any other action or proceeding, whether now pending or subsequently commenced.

8. In providing these objections to the Interrogatories, Plaintiffs do not in any way waive or intend to waive, but rather intends to preserve and is preserving: all objections as to competency, relevancy, materiality and admissibility; all rights to object on any ground to the use of any of the responses herein or documents in any subsequent proceedings, including the trial of this or any other action; all objections to vagueness and ambiguity; and all rights to object on any ground to any further demands or other discovery requests involving or relating to Defendants' Interrogatories.

9. Plaintiff objects to all Instructions, Definitions, and Interrogatories to the extent they purport to impose a duty or obligation to respond that is inconsistent, or in excess of, Plaintiff's responsibilities under the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, or any other applicable law.

10. Plaintiff's search for information is ongoing. Plaintiff reserves his rights to rely on any facts, documents or other evidence that may develop or come to his attention subsequent to the date of the response. Plaintiff's responses, as set forth herein, are based upon information presently known to Plaintiff and is without prejudice to his rights to assert additional objections or supplemental responses should he discover additional information or grounds for objections. Plaintiff reserves his rights to supplement, amend or modify these responses at any time prior to and including the trial of the action.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Plaintiff objects to the Defendants' Definitions and Instructions to the extent that they impose any obligations upon Plaintiff that are not imposed by law or are otherwise inconsistent with Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules.

2

2.    Plaintiff objects to Defendants' Instruction concerning information protected from disclosure on privilege grounds to the extent it calls for information outside of or not required by the parties' discovery protocol, Federal Rules of Civil Procedure, and/or the Local Rules.

3.    Plaintiff objects to Defendants' definition of the term "Describe" in so far as it interposes additional interrogatories to Plaintiff that exceed the limits on interrogatories under Federal Rule of Civil Procedure 33(a)(1) and Local Rule 33.

4.    Plaintiff objects to the definitions of "Person" and "Persons" as overly broad and unduly burdensome on Plaintiff by calling on him to respond for others and provide materials that are not in his possession, custody, or control. Plaintiff further objects to these definitions as overly broad and unduly burdensome because they include, "any individual, natural person, firm, association, organization, partnership, joint venture, business, trust, corporation, or public entity." Plaintiff further objects to these definitions to the extent that they include individuals and corporations who are unknown and unknowable by Plaintiff.

5.    Plaintiff objects to the definition of the terms "Transaction" or "Transactions" as overly broad and unduly burdensome as they include "a decision to hold QUANTUMSCAPE SECURITIES" which is not an ordinary definition of the term.

## SPECIFIC RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 1:**

Identify all stock brokerage accounts, investment firm accounts, OR online trading accounts that YOU have opened OR maintained, whether in an individual, joint, OR trustee capacity, in which QUANTUMSCAPE SECURITIES have been purchased, sold, held, OR otherwise acquired OR disposed of, including the last four digits of the account number, the identity of the institution, AND the name of the account.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects further to this Interrogatory to the extent it requires

the production of information that has already been provided in discovery and, as a result, is duplicative and unduly burdensome.

Subject to and without waiver of the foregoing objections, Plaintiff traded QuantumScape securities during the Class Period using the following brokerage account:

TD Ameritrade account XXXXXXXX5771

Frank Fish TOD

**INTERROGATORY NO. 2:**

Identify each of YOUR TRANSACTIONS in QUANTUMSCAPE SECURITIES (whether in an individual, joint, OR trustee capacity), including the DATE of each TRANSACTION, the nature of each TRANSACTION (e.g., purchase, sale, short sale, OR other acquisition OR disposition), the type of QUANTUMSCAPE SECURITIES involved in each TRANSACTION, the amount of QUANTUMSCAPE SECURITIES involved in each TRANSACTION, AND the price of the QUANTUMSCAPE SECURITY at the time of each TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that has already been provided in discovery and, as a result, is duplicative and unduly burdensome. Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory by referring Defendants to Plaintiff's brokerage statements and as follows:

| Date | Nature | Type | Amount | Price |
|------|--------|------|--------|-------|
| 12-21-2020 | Buy | QUANTUMSCAPE CORP COM CL A | 5000 | $95.00 |
| 12-22-2020 | Buy | QUANTUMSCAPE CORP COM CL A | 6000 | $110.45 |
| 12-23-2020 | Buy | QUANTUMSCAPE CORP COM CL A | 6500 | $123.25 |
| 12-24-2020 | Buy | QUANTUMSCAPE CORP COM CL A | 7000 | $124.00 |
| 12-28-2020 | Buy | QUANTUMSCAPE CORP COM CL A | 6000 | $120.51 |

| 12-29-2020 | Buy | QUANTUMSCAPE CORP COM CL A | 6500 | $112.12 |
| 12-30-2020 | Buy | QUANTUMSCAPE CORP COM CL A | 6000 | $105.76 |
| 01-15-2021 | Sell | QUANTUMSCAPE CORP COM CL A | 7000 | $55.50 |
| 01-19-2021 | Sell | QUANTUMSCAPE CORP COM CL A | 6500 | $51.25 |
| 01-20-2021 | Sell | QUANTUMSCAPE CORP COM CL A | 5000 | $51.76 |
| 01-20-2021 | Sell | QUANTUMSCAPE CORP COM CL A | 6000 | $48.00 |
| 01-21-2021 | Sell | QUANTUMSCAPE CORP COM CL A | 6000 | $45.00 |
| 01-21-2021 | Sell | QUANTUMSCAPE CORP COM CL A | 6000 | $44.54 |
| 01-22-2021 | Sell | QUANTUMSCAPE CORP COM CL A | 6500 | $48.02 |

**INTERROGATORY NO. 3:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, state with particularity the reason for YOUR decision to engage in the TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This request is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in filings in this case and, as a result, is duplicative and unduly burdensome. Plaintiff further objects on the grounds that this Interrogatory is unduly burdensome in that the phrase "the reason for YOUR decision to engage in the TRANSACTION" is vague, ambiguous, and not properly defined. Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding his response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows:

Purchases: Plaintiff reviewed public statements made by Defendants, including documents filed with the SEC, QuantumScape's December 8, 2020 "Battery Day", interviews, and articles, and reviewed the stock price of QuantumScape prior to purchasing QuantumScape Securities. Plaintiff purchased QuantumScape securities because, in reliance on the accuracy of public information incorporated into the price for QuantumScape's stock, he believed QuantumScape's stock would increase in value.

Sales: Plaintiff reviewed publicly available documents, including but not limited to Dr. Morin's report published on January 4, 2021, and the price of QuantumScape Securities prior to selling QuantumScape Securities. Plaintiff sold his QuantumScape stock because it had declined in value since his purchase. Subsequent to his sales, Plaintiff also reviewed the Scorpion Capital Report issued on April 15, 2021.

**INTERROGATORY NO. 4:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, identify each PERSON with whom YOU consulted OR conferred before engaging in the TRANSACTION, AND all information relied upon by such PERSONS.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff further objects to this Interrogatory to the extent that the phrase "consulted OR conferred" is vague and undefined. Plaintiff objects to this request as overly

broad and unduly burdensome as it calls for him to identify materials that are not in his custody or control. Subject to and without waiver of the General Objections, Plaintiff shall interpret this Interrogatory to identify individuals who provided Plaintiff with investment-related services in connection with his transactions in QuantumScape Securities.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows: Plaintiff did not receive investment-related services in connection his transactions in QuantumScape Securities.

**INTERROGATORY NO. 5:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, identify each AND every DOCUMENT OR COMMUNICATION relating to the TRANSACTION, including each DOCUMENT OR COMMUNICATION upon which YOU relied in deciding to engage in that TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein and includes his Objection to the term "Transaction." This request is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff objects to this Interrogatory as overly broad and unduly burdensome as it calls for plaintiff to "identify each AND every DOCUMENT OR COMMUNICATION" without limitation of time period.  Plaintiff further objects to this Interrogatory as overly broad and unduly burdensome to the extent it requests Plaintiff to recreate work performed years ago. Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding his response to this Interrogatory, Plaintiff reserves

the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows:

Purchases: Plaintiff reviewed public statements made by Defendants, including documents filed with the SEC, QuantumScape's December 8, 2020 "Battery Day", QuantumScape's December 8, 2020 press release, interviews, and articles, and reviewed the stock price of QuantumScape prior to purchasing QuantumScape Securities.

Sales: Plaintiff reviewed publicly available documents, including but not limited to Dr. Morin's report published on January 4, 2021, and the price of QuantumScape Securities prior to selling QuantumScape Securities. Subsequent to his sales, Plaintiff also reviewed QuantumScape's Q4 Fiscal 2020 Letter to Shareholders issued on February 16, 2021 and the Scorpion Capital Report issued on April 15, 2021.

**INTERROGATORY NO. 6:**

Identify all matters in which YOU have moved for appointment as, OR served as, a lead plaintiff, a named representative, OR a class representative (whether in an individual OR trustee capacity).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects to this Interrogatory as it is not limited by a specific time restriction or subject matter and that its scope is overbroad and not proportional to the needs of

the case. Plaintiff further objects to this Interrogatory as it seeks information that is not relevant to any of the claims or defenses of any party in this case because it seeks documents and information from other lawsuits.  Plaintiff objects to this request on the basis that it seeks attorney work product and/or attorney-client communications. Plaintiff further objects to this request as unduly burdensome to the extent that it seeks information that can be found in Court filings and are in the public domain, as such information is equally available to the Defendants.

Subject to and without waiver of the foregoing objections, Plaintiff has sought to serve or has served as a class representative in the following matters:

In this action, currently entitled: *In re QuantumScape Securities Class Action Litigation,* No. 3:21-cv-00058-WHO (N.D. Cal.)

*In re Longfin Corp. Securities Class Action Litigation*, No. 1:18-cv-02933-DLC (S.D.N.Y.)

*Chauhan v. Longfin Corp. et al.*, No. 5:18-cv-2010 (E.D.N.Y.)

*In re Solar City Corporation Securities Litigation*, No. 16-cv-04686 (N.D. Cal.)

*Fish v. Netflix, Inc. et al.,* No. 3:12-cv-01030 (N.D. Cal.)

**INTERROGATORY NO. 7:**

DESCRIBE with particularity all facts that alerted YOU to the existence of facts supporting a basis to assert YOUR claims in the above-captioned action (the "Lawsuit"), including the DATE on which YOU learned each such fact AND the source from which YOU learned it.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at

trial. Plaintiff objects to this Interrogatory as overly broad and unduly burdensome to the extent it requests Plaintiff to recreate work performed years ago. Plaintiff objects to the Interrogatories to the extent they prematurely seek information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will disclose information properly subject to expert opinion in accordance with the schedule entered by the Court. Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding his response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows: Plaintiff reviewed publicly available documents, including but not limited to Dr. Morin's report published on January 4, 2021 at or around the time it was published prior to selling QuantumScape Securities. Subsequent to his sales, Plaintiff also reviewed the Scorpion Capital Report issued on April 15, 2021 at or around the time it was published.

**INTERROGATORY NO. 8:**

DESCRIBE all understandings, agreements, AND arrangements between YOU AND any PERSON, including YOUR counsel in this Lawsuit, relating to fees, expenses, potential recovery of damages, AND YOUR receipt of anything of value in connection with YOUR service as a plaintiff, Lead Plaintiff, named representative, OR class representative in this Lawsuit.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff also objects to this request on the basis that "all understandings, agreements, AND arrangements between YOU AND any PERSON, including YOUR counsel in this Lawsuit" is vague and ambiguous. Plaintiff objects to this request to the extent that it calls for him to identify materials that are not in his custody or control. Plaintiff further objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Subject to and without waiver of the foregoing objections, Plaintiff has a retainer agreement with Levi & Korsinsky, LLP. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to representation of the class.

**INTERROGATORY NO. 9:**

DESCRIBE any business, personal, professional, AND contractual relationship OR affiliation between YOU AND Lead Counsel *other than* the relationship of attorney-client in this Lawsuit.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it asks Plaintiff to describe "any business, personal, professional, AND contractual relationship OR affiliation between YOU AND Lead Counsel."

Subject to and without waiver of the foregoing objections, Plaintiff does not have any other relationship with Lead Counsel apart his attorney-client relationship in this Lawsuit.

11

**INTERROGATORY NO. 10:**

Identify all PERSONS, including any confidential witnesses, who provided any information relating to QUANTUMSCAPE OR the facts alleged in the COMPLAINT, including the "former employees" referenced in paragraph 117, the "experts" referenced in paragraphs 120 and 138, and the Volkswagen employees referenced in paragraph 304, regardless of whether such PERSON OR matter is specifically referenced in the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, work product doctrine, or any other recognized privilege. Plaintiff also objects this interrogatory to the extent that it seeks production of or information concerning documents not in Plaintiff's possession, custody, or control. Plaintiff objects to this request as overly broad, unduly burdensome, and not seeking documents relevant to the claims or defense of any party or proportional to the needs of the case because it seeks production of or information concerning matters that are not referenced in the Complaint.

Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding his response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves

the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

| Name | Contact Information | Subject(s) |
|---|---|---|
| Dr. Paul Albertus | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Robert W. Baird & Co. | C/O CORPORATION SERVICE COMPANY 80 STATE STREET, ALBANY, NY, UNITED STATES, 12207 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Dr. Frank Blome | Berliner Ring, 38440 Wolfsburg, Germany | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Prof. Jeff Dahn | Unknown | • Information relating to QuantumScape's testing<br>• Information relating to the Scorpion Capital Report. |
| Dr. David Danielson | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Mark Delany | c/o Goldman Sachs | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Deutsche Bank AG | c/o C T CORPORATION SYSTEM 28 LIBERTY ST. NEW YORK, NY 10005 | • Information relating to Defendants' statements about their technology and the market's perception of same. |

13

| | | |
|---|---|---|
| | | • Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
| Goldman Sachs | ATTN: HEAD OF LITIGATION & REG, 200 WEST STREET NEW YORK, NY 10282 | • Information relating to Defendants' statements about their during the Class Period and the market's perception of same. |
| Benjamin Kallo | c/o Robert W. Baird & Co. | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Adam Jonas | c/o Morgan Stanley | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| JMP Securities LLC | c/o C T CORPORATION SYSTEM 28 LIBERTY ST. NEW YORK, NY, 10005 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Kir Kahlon | 308 E 72ND ST APT 6E, New York, NY 10021 | • Information relating to the allegations in Scorpion Capital's report titled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look like Amateurs."* |
| Nicolai Kempf | c/o Deutsche Bank AG | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
| Rod Lache | c/o Wolfe Research, LLC | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Christoph Laskawi | c/o Deutsche Bank AG | • Information relating to Defendants' statements about their technology and the market's perception of same. |

| | | |
|---|---|---|
| | | • Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid"* |
| Dr. Jurgen Leohold | Unknown | • Information relating to QuantumScape's December 8, 2020 presentation |
| Dr. Brian Morin | 8 NEW FOREST CT, GREENVILLE, SC 29615 | • Information relating to QuantumScape's testing<br>• Information relating to Dr. Morin's report titled "*QuantumScape's Solid State Batteries Have Significant Technical Hurdles to Overcome.*" |
| Mobile Power Solutions | 6260 SW Artic Dr. Beaverton, Oregon 97005 | • Information relating to QuantumScape's testing. |
| Morgan Stanley | C/O C T CORPORATION SYSTEM 28 LIBERTY ST. NEW YORK, NY, 10005 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Joseph Osha | c/o JMP Securities LLC | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Tim Rokossa | c/o Deutsche Bank AG | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
| Scorpion Capital | c/o C T CORPORATION SYSTEM 208 SO LASALLE ST, SUITE 814 CHICAGO, IL 60604 | • Information relating to QuantumScape's testing.<br>• Information relating to the allegations in Scorpion Capital's report titled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look like Amateurs.*" |
| JB Straubel | Unknown | • Information relating to QuantumScape's December 8, 2020 presentation. |

15

| Dr. Venkat Viswanathan | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
|---|---|---|
| Volkswagen Group of America, Inc. | c/o CORPORATION SERVICE COMPANY PRINCETON SOUTH CORPORATE CENTER 100 CHARLES EWING BLVD, SUITE 160 EWING, NJ | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Volkswagen Group of America Investments, LLC | c/o CORPORATION SERVICE COMPANY 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808 | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Dr. Stanley Whittingham | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Wolfe Research, LLC | ATTN: EDWARD M. WOLFE, 757 THIRD AVE, 6TH FLOOR, NEW YORK, NY, UNITED STATES, 10017 | • Information relating to Defendants' statements about their technology and the market's perception of same. |

**INTERROGATORY NO. 11:**

For each PERSON identified in YOUR response to Interrogatory No. 10, describe with particularity each AND every COMMUNICATION, whether orally OR in writing, between that PERSON AND YOU (OR any PERSON acting on YOUR behalf, including Lead Counsel OR

16

investigators retained by YOU OR Lead Counsel), including the DATE(S) of each COMMUNICATION AND the identity of the participants in each such COMMUNICATION.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, work product doctrine, or any other recognized privilege. Plaintiff also objects this interrogatory to the extent that it seeks production of or information concerning documents not in Plaintiff's possession, custody, or control. Plaintiff objects to this request as overly broad, unduly burdensome, and not seeking documents relevant to the claims or defense of any party or proportional to the needs of the case because it seeks production of or information concerning "each AND every Communication" without a limitation on subject matter or time period. Plaintiff also objects to this Interrogatory as overly broad, unduly burdensome, and the proper subject of an Interrogatory because it demands a catalog of documents.

Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding his response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Subject to and without waiver of the foregoing objections, Plaintiff does not have any of the information sought in this Interrogatory.

**INTERROGATORY NO. 12:**

DESCRIBE with particularity any damages, AND the basis for calculating any such damages, allegedly suffered by YOU as a result of Defendants' actions as alleged in the COMPLAINT.

17

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents relevant to the claims or defense of any party or proportional to the needs of the case because it seeks documents relating to "ANY" damages. Plaintiff further objects to this request on the basis that it seeks attorney work product and/or attorney-client communications. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff also objects to this Interrogatory as unduly burdensome to the extent that it seeks information found in documents that can be found in the pleadings or other filings with the Court. Plaintiff further objects to this Interrogatory to the extent that it calls for him to produce information that is not in his custody or control.

Subject to and without waiver of the foregoing objections, Plaintiff and the class suffered out-of-pocket losses caused by the misrepresentations and omissions of Defendants as shown by public information regarding the market for QuantumScape Securities and his brokerage statements.

**INTERROGATORY NO. 13:**

DESCRIBE with particularity all of YOUR COMMUNICATIONS relating to QUANTUMSCAPE AND QUANTUMSCAPE SECURITIES.

**RESPONSE INTERROGATORY NO. 13:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents relevant to the claims or defense of any party or proportional to the needs of the case because it purports to request Plaintiff describe or index every document or piece of information

18

concerning "Communications" relating to QuantumScape or QuantumScape Securities without any restriction on time-period. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff further objects to this Interrogatory to the extent that it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality. Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not the proper subject of an Interrogatory because it demands a catalog of documents. Plaintiff objects to this Interrogatory as premature because the parties have not yet produced documents in the litigation.

Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

This Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to his documents produced in response to Defendants' First Request for the Production of Documents.

**INTERROGATORY NO. 14:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 77 of the COMPLAINT that "Throughout the Class Period, Defendants materially misrepresented the abilities of its solid-state battery, relying on compromised tests to disseminate misleading data to the public."

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention

interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 15:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 77 of the COMPLAINT that "These statements led investors to believe that QuantumScape's battery was more advanced and capable than it was comparing to today's lithium-ion, that the 'fundamental

science risk' was resolved and, as a result, QuantumScape was ready to 'ramp[] up production' and move on to the 'final automotive qualification process.'"

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 16:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 30 of the COMPLAINT that "The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about QuantumScape materially false and misleading."

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff

22

reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 17:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 150 of the COMPLAINT that "Defendants also misrepresent the [] safety of its battery."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or

otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 18:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 152 of the COMPLAINT that "Defendants also misrepresent the current state of lithium-ion technology in order to make it appear that QuantumScape's technology is vastly superior to lithium-ion."

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively

improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 19:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 153 of the COMPLAINT that "Defendants also misrepresented the performance capabilities of lithium-ion cells in order to make QuantumScape's technology appear superior."

**RESPONSE TO INTERROGATORY NO. 19:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

25

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 20:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 42 of the COMPLAINT that "For a battery in which metallic lithium is the anode, excess lithium is required as a precaution since lithium plating directly on copper foil is problematic."

**RESPONSE TO INTERROGATORY NO. 20:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court.

26

Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 21:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 49 of the COMPLAINT that "Many lithium-ion cell designs will achieve 80% capacity in less than 40 minutes."

**RESPONSE TO INTERROGATORY NO. 21:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or

27

opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 22:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 73 of the COMPLAINT that the cell unveiled by QuantumScape has approximately 200 mAh.

**RESPONSE TO INTERROGATORY NO. 22:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in

the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 23:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 147 of the COMPLAINT that "[excess lithium] reduces cathode utilization and cell energy density."

**RESPONSE TO INTERROGATORY NO. 23:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention

interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 24:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 148 of the COMPLAINT that "QuantumScape's cathode discharge capacity results in approximately 148 mAh/gram at 20 degrees Celsius, compared to standard lithium battery cells of 180 mAh/gram at room temperature. This results in QuantumScape only using 148/180, or approximately 82% of capacity loss in its testing."

**RESPONSE TO INTERROGATORY NO. 24:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 25:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 150 of the COMPLAINT that "[QuantumScape's] 'solid-state' separator actually contains a liquid/gel as the catholyte. If that liquid/gel gets into contact with metallic lithium, the risk for volatile reactions is considerable."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including his objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff

reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

Dated: May 16, 2022                          As to objections,

**LEVI & KORSINSKY, LLP**

 /s/ Adam M. Apton
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
75 Broadway, Suite 202
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

-and-

Nicholas I. Porritt
**LEVI & KORSINSKY, LLP**
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel:    (202) 524-4290
Fax:    (212) 363-7171
Email: nporritt@zlk.com
(*to be admitted pro hac vice*)

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

33

**VERIFICATION**

I, Frank Fish, have read Defendant QuantumScape Corporation's First Set of Interrogatories to Lead Plaintiff Frank Fish and the answers to those interrogatories, which are true according to the best of my knowledge, and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed in _____, New York on May___, 2022.

_____
Frank Fish

## CERTIFICATE OF SERVICE

I, Max Weiss, certify that, on the 16th day of May 2022, I served the foregoing Lead Plaintiff Frank Fish's Responses and Objections to Defendant QuantumScape Corporation's First Set of Interrogatories to Lead Plaintiff Frank Fish by electronic mail on the following parties:

**Ignacio Evaristo Salceda**
**Rebecca Lynn Epstein**
**Dale Richard Bish**
**Andrew Frantela**
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300
Fax: (650) 565-5100
Email:Isalceda@wsgr.com
Email:Bepstein@wsgr.com
Email:Dbish@wsgr.com
Email:Afrantela@wsgr.com

*Attorneys for Defendants* QuantumScape
Corporation, Jagdeep Singh,
Kevin Hettrich, and Timothy Holme

Executed May 16, 2022.

s/ Max E. Weiss
Max E. Weiss

35

# EXHIBIT S

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email:    aapton@zlk.com
Email: amccall@zlk.com
75 Broadway, Suite 202
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

*Attorneys for Plaintiffs*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUANTUMSCAPE SECURITIES CLASS ACTION LITIGATION | Case No. 3:21-CV-00058-WHO<br><br>**PLAINTIFF KATHY STARK'S RESPONSE TO DEFENDANTS' INTERROGATORIES** |

**Exhibit
0034**

8/18/2022
Kathy Stark

Plaintiff Kathy Stark ("Plaintiff") hereby responds to Defendant QuantumScape Corporation's ("QuantumScape") First Set of Interrogatories to Plaintiff Kathy Stark dated July 15, 2022, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court of the Northern District of California.

## GENERAL OBJECTIONS

Plaintiff makes the following general and continuing objections to Defendants' Interrogatories. All general and continuing objections apply to the response to each Interrogatory, and specific reference to these objections in the particular response is intended for emphasis only. Failure to list a general and continuing objection is not intended, nor should it be construed as a waiver of that objection.

1.    Plaintiff objects to the Interrogatories to the extent they call for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

2.    Plaintiff objects to the Interrogatories insofar as they seek information related to mental impressions, legal conclusions, opinions, or theories of any attorney or other representative of Plaintiff.

3.    Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the issues of law and facts in the action nor are they proportional to the needs of the case.

4.    Plaintiff objects to the Interrogatories to the extent that they seek to require Plaintiff to produce information on behalf of, or in the custody and control of, any entity or individual over whom Plaintiff has no control.

5.    Plaintiff objects to the Interrogatories to the extent they prematurely seek information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will disclose information properly subject to expert opinion in accordance with the Federal Rules of Civil Procedure and the schedule entered by the Court.

1

6. Plaintiff reserves the right to make any use of, or introduce at any hearing and at trial, information and/or documents responsive to these Interrogatories, including, but not limited to, any such information or documents obtained in discovery.

7. Plaintiff reserves her right to challenge the competency, relevancy, materiality, and admissibility of, or to object on any grounds, to the use of any of the documents and/or information, at the trial of the action or any other action or proceeding, whether now pending or subsequently commenced.

8. In providing these objections to the Interrogatories, Plaintiffs do not in any way waive or intend to waive, but rather intends to preserve and is preserving: all objections as to competency, relevancy, materiality and admissibility; all rights to object on any ground to the use of any of the responses herein or documents in any subsequent proceedings, including the trial of this or any other action; all objections to vagueness and ambiguity; and all rights to object on any ground to any further demands or other discovery requests involving or relating to Defendants' Interrogatories.

9. Plaintiff objects to all Instructions, Definitions, and Interrogatories to the extent they purport to impose a duty or obligation to respond that is inconsistent, or in excess of, Plaintiff's responsibilities under the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, or any other applicable law.

10. Plaintiff's search for information is ongoing. Plaintiff reserves her rights to rely on any facts, documents or other evidence that may develop or come to her attention subsequent to the date of the response. Plaintiff's responses, as set forth herein, are based upon information presently known to Plaintiff and is without prejudice to her rights to assert additional objections or supplemental responses should she discover additional information or grounds for objections. Plaintiff reserves her rights to supplement, amend or modify these responses at any time prior to and including the trial of the action.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Plaintiff objects to the Defendants' Definitions and Instructions to the extent that they impose any obligations upon Plaintiff that are not imposed by law or are otherwise inconsistent with Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules.

2.      Plaintiff objects to Defendants' Instruction concerning information protected from disclosure on privilege grounds to the extent it calls for information outside of or not required by the parties' discovery protocol, Federal Rules of Civil Procedure, and/or the Local Rules.

3.      Plaintiff objects to Defendants' definition of the term "Describe" in so far as it interposes additional interrogatories to Plaintiff that exceed the limits on interrogatories under Federal Rule of Civil Procedure 33(a)(1) and Local Rule 33.

4.      Plaintiff objects to the definitions of "Person" and "Persons" as overly broad and unduly burdensome on Plaintiff by calling on her to respond for others and provide materials that are not in her possession, custody, or control. Plaintiff further objects to these definitions as overly broad and unduly burdensome because they include, "any individual, natural person, firm, association, organization, partnership, joint venture, business, trust, corporation, or public entity." Plaintiff further objects to these definitions to the extent that they include individuals and corporations who are unknown and unknowable by Plaintiff.

5.      Plaintiff objects to the definition of the terms "Transaction" or "Transactions" as overly broad and unduly burdensome as they include "a decision to hold QUANTUMSCAPE SECURITIES" which is not an ordinary definition of the term.

<u>**SPECIFIC RESPONSES AND OBJECTIONS**</u>

**INTERROGATORY NO. 1:**

Identify all stock brokerage accounts, investment firm accounts, OR online trading accounts that YOU have opened OR maintained, whether in an individual, joint, OR trustee capacity, in which QUANTUMSCAPE SECURITIES have been purchased, sold, held, OR otherwise acquired OR disposed of, including the last four digits of the account number, the identity of the institution, AND the name of the account.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that has already been provided in discovery and, as a result, is

duplicative and unduly burdensome. In addition to the above General Objections, Plaintiff objects to this Interrogatory to the extent it seeks documents or information outside of the Class Period in this Action and the statutory 90-day lookback period set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Subject to and without waiver of the foregoing objections, Plaintiff traded QuantumScape Securities during the Class Period and the statutory PSLRA 90-day lookback period using the following brokerage account:

E*TRADE Securities, LLC account XXXX-0013

Kathy L Stark

**INTERROGATORY NO. 2:**

Identify each of YOUR TRANSACTIONS in QUANTUMSCAPE SECURITIES (whether in an individual, joint, OR trustee capacity), including the DATE of each TRANSACTION, the nature of each TRANSACTION (e.g., purchase, sale, short sale, OR other acquisition OR disposition), the type of QUANTUMSCAPE SECURITIES involved in each TRANSACTION, the amount of QUANTUMSCAPE SECURITIES involved in each TRANSACTION, AND the price of the QUANTUMSCAPE SECURITY at the time of each TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that has already been provided in discovery and, as a result, is duplicative and unduly burdensome. In addition to the above General Objections, Plaintiff objects to this Interrogatory to the extent it seeks documents or information outside of the Class Period in this Action and the statutory PSLRA 90-day lookback period.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory concerning transactions within the Class Period and the statutory PSLRA 90-day lookback period by referring Defendants to Plaintiff's brokerage statements and as follows:

| Date | Nature | Type | Amount | Price |
|------|--------|------|--------|-------|
| 3-12-2021 | Bought | QUANTUMSCAPE CORPORATION CLASS A COMMON STOCK | 15 | $55.47 |

**INTERROGATORY NO. 3:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, state with particularity the reason for YOUR decision to engage in the TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This request is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in filings in this case and, as a result, is duplicative and unduly burdensome. Plaintiff further objects on the grounds that this Interrogatory is unduly burdensome in that the phrase "the reason for YOUR decision to engage in the TRANSACTION" is vague, ambiguous, and not properly defined. Plaintiff will respond to this interrogatory to the extent that her answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding her response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows:

Plaintiff reviewed one or more investment publications mentioning securities of battery manufacturers including QuantumScape, and reviewed the stock price of QuantumScape prior to purchasing QuantumScape Securities. Plaintiff purchased QuantumScape Securities because, in reliance on the accuracy of public information incorporated into the price for QuantumScape's stock, she believed QuantumScape's stock would increase in value.

**INTERROGATORY NO. 4:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, identify each PERSON with whom YOU consulted OR conferred before engaging in the TRANSACTION, AND all information relied upon by such PERSONS.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff further objects to this Interrogatory to the extent that the phrase "consulted OR conferred" is vague and undefined. Plaintiff objects to this request as overly broad and unduly burdensome as it calls for her to identify materials that are not in her custody or control. Subject to and without waiver of the General Objections, Plaintiff shall interpret this Interrogatory to identify individuals who provided Plaintiff with investment-related services in connection with her transactions in QuantumScape Securities.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows: Plaintiff did not receive investment-related services in connection her transactions in QuantumScape Securities.

**INTERROGATORY NO. 5:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, identify each AND every DOCUMENT OR COMMUNICATION relating to the TRANSACTION, including

each DOCUMENT OR COMMUNICATION upon which YOU relied in deciding to engage in that TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein and includes her Objection to the term "Transaction." This request is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff objects to this Interrogatory as overly broad and unduly burdensome as it calls for plaintiff to "identify each AND every DOCUMENT OR COMMUNICATION" without limitation of time period. Plaintiff further objects to this Interrogatory as overly broad and unduly burdensome to the extent it requests Plaintiff to recreate work performed years ago. Plaintiff will respond to this interrogatory to the extent that her answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding her response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows:

Plaintiff reviewed one or more investment publications mentioning securities of battery manufacturers including QuantumScape, and reviewed the stock price of QuantumScape prior to purchasing QuantumScape Securities.

**INTERROGATORY NO. 6:**

Identify all matters in which YOU have moved for appointment as, OR served as, a lead plaintiff, a named representative, OR a class representative (whether in an individual OR trustee capacity).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects to this Interrogatory as it is not limited by a specific time restriction or subject matter and that its scope is overbroad and not proportional to the needs of the case. Plaintiff further objects to this Interrogatory as it seeks information that is not relevant to any of the claims or defenses of any party in this case because it seeks documents and information from other lawsuits.  Plaintiff objects to this request on the basis that it seeks attorney work product and/or attorney-client communications. Plaintiff further objects to this request as unduly burdensome to the extent that it seeks information that can be found in Court filings and are in the public domain, as such information is equally available to the Defendants. Plaintiff further objects insofar as this Interrogatory is vague and ambiguous as to what constitutes a "matter."

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows: Plaintiff seeks appointment as a class representative in this Action. Plaintiff further responds that she has not moved for appointment as, or served as, a lead plaintiff, a named representative, or a class representative in any other matters.

**INTERROGATORY NO. 7:**

DESCRIBE with particularity all facts that alerted YOU to the existence of facts supporting a basis to assert YOUR claims in the above-captioned action (the "Lawsuit"), including the DATE on which YOU learned each such fact AND the source from which YOU learned it.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff objects to this Interrogatory as overly broad and unduly burdensome to the extent it requests Plaintiff to recreate work performed years ago. Plaintiff objects to the Interrogatories to the extent they prematurely seek information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will disclose information properly subject to expert opinion in accordance with the schedule entered by the Court. Plaintiff will respond to this interrogatory to the extent that her answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding her response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows: Plaintiff reviewed the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 164), the Court's Order on Motion to Dismiss (ECF No. 153), and Plaintiff reviewed the stock price of QuantumScape prior to and subsequent to purchasing QuantumScape Securities.

**INTERROGATORY NO. 8:**

DESCRIBE all understandings, agreements, AND arrangements between YOU AND any PERSON, including YOUR counsel in this Lawsuit, relating to fees, expenses, potential recovery of damages, AND YOUR receipt of anything of value in connection with YOUR service as a plaintiff, Lead Plaintiff, named representative, OR class representative in this Lawsuit.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff also objects to this request on the basis that "all understandings, agreements, AND arrangements between YOU AND any PERSON, including YOUR counsel in this Lawsuit" is vague and ambiguous. Plaintiff objects to this request to the extent that it calls for her to identify materials that are not in her custody or control. Plaintiff further objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Subject to and without waiver of the foregoing objections, Plaintiff has a retainer agreement with Levi & Korsinsky, LLP. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to representation of the class.

**INTERROGATORY NO. 9:**

DESCRIBE any business, personal, professional, AND contractual relationship OR affiliation between YOU AND Lead Counsel *other than* the relationship of attorney-client in this Lawsuit.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it asks Plaintiff to describe "any business, personal, professional, AND contractual relationship OR affiliation between YOU AND Lead Counsel."

Subject to and without waiver of the foregoing objections, Plaintiff states that Lead Counsel, as a professional courtesy, monitors her investments to identify potential claims, but that Plaintiff does not have any other relationship with Lead Counsel responsive to this Interrogatory, apart from her attorney-client relationship in this Lawsuit.

**INTERROGATORY NO. 10:**

Identify all PERSONS, including any confidential witnesses, who provided any information relating to QUANTUMSCAPE OR the facts alleged in the COMPLAINT, including the "former employees" referenced in paragraph 119, the "experts" referenced in paragraphs 122 and 140, and the Volkswagen employees referenced in paragraph 306, regardless of whether such PERSON OR matter is specifically referenced in the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26

11

and 33. Plaintiff objects to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, work product doctrine, or any other recognized privilege. Plaintiff also objects to this interrogatory to the extent that it seeks production of or information concerning documents not in Plaintiff's possession, custody, or control. Plaintiff objects to this request as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it seeks production of or information concerning matters that are not referenced in the Complaint.

Plaintiff will respond to this interrogatory to the extent that her answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding her response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent this Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

| Name | Contact Information | Subject(s) |
| --- | --- | --- |
| Dr. Paul Albertus | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Robert W. Baird & Co. | c/o<br>Bethmarie Bohn<br>In House Counsel<br>777 East Wisconsin Avenue<br>Milwaukee, WI, 53202 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Dr. Frank Blome | c/o | • Information relating to QuantumScape's testing. |

12

|  |  |  |
|---|---|---|
|  | Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Brad Buss | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Citigroup Global Markets | c/o<br>Erica Bartimmo<br>In-House Counsel<br>3800 Citigroup Center Dr.<br>Building G<br>Tampa, FL, 33610 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Cowen and Company, LLC | c/o<br>Kaydene Grinnell<br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Prof. Jeff Dahn | Unknown | • Information relating to QuantumScape's testing<br>• Information relating to the Scorpion Capital Report. |
| Dr. David Danielson | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Mark Delany | c/o Goldman Sachs | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Deutsche Bank AG | c/o<br>C T CORPORATION SYSTEM | • Information relating to Defendants' statements about |

| | 28 LIBERTY ST.<br>NEW YORK, NY 10005 | • their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
|---|---|---|
| John Doerr | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Goldman Sachs | Barry G. Sher<br>Paul Hastings<br>200 Park Avenue<br>New York, NY 10166 | • Information relating to Defendants' statements about their during the Class Period and the market's perception of same. |
| Kevin Hettrich | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Timothy Holme | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |

| | | |
|---|---|---|
| Benjamin Kallo | c/o Robert W. Baird & Co. | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Adam Jonas | c/o Morgan Stanley | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| JMP Securities LLC | c/o<br>Zac Rosenberg<br>600 Montgomery Street<br>Suite 1100<br>San Francisco, CA, 9411 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Kir Kahlon | c/o<br>David Korzenik, Esq.<br>Miller Korzenik Sommers<br>Rayman LLP<br>The Paramount Building<br>1501 Broadway, Suite 2015<br>New York, NY 10036 | • Information relating to the allegations in Scorpion Capital's report titled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look like Amateurs.*" |
| Nicolai Kempf | c/o Deutsche Bank AG | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
| Vinod Khosla | c/o<br>Wilson Sonsini Goodrich<br>Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Rod Lache | c/o Wolfe Research, LLC | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Christoph Laskawi | c/o Deutsche Bank AG | • Information relating to Defendants' statements about |

15

| | | |
|---|---|---|
| | | their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid"* |
| Dr. Jurgen Leohold | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's December 8, 2020 presentation |
| Celina Mikolajczak | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Justin Mirro | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Dr. Brian Morin | c/o<br>Joseph G. Adams, Esq.<br>Snell & Wilmer, LLP<br>One Arizona Center<br>400 E. Van Buren, Suite 1900<br>Pheonix, AZ 85005-2202 | • Information relating to QuantumScape's testing<br>• Information relating to Dr. Morin's report titled *"QuantumScape's Solid State Batteries Have Significant Technical Hurdles to Overcome."* |
| Mobile Power Solutions | c/o<br>James Molyneux-Ellion, Esq.<br>Lindsay Hart, LLP<br>1300 SW 5th Ave, Suite 3200<br>Portland OR 97201 | • Information relating to QuantumScape's testing. |
| Morgan Stanley | c/o<br>Sara Raisner | • Information relating to Defendants' statements about |

16

| | | |
|---|---|---|
| | Sherman & Sterling 599 Lexington Avenue New York, NY, 10022 | their technology and the market's perception of same. |
| Joseph Osha | c/o JMP Securities LLC | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Frank Prinz | c/o Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| QSV Operations LLC | c/o Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation |
| RBC Capital Markets, LLC | c/o Katherine Rosenberg In-House Counsel 30 Hudson Street, 27th Floor Jersey City, NJ 07302 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Tim Rokossa | c/o Deutsche Bank AG | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
| John Joseph Saager | c/o Wilson Sonsini Goodrich Rosati PC | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Dipender Saluja | c/o Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing. |

| | | |
|---|---|---|
| | | • Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Scorpion Capital | c/o<br>David Korzenik, Esq.<br>Miller Korzenik Sommers Rayman LLP<br>The Paramount Building<br>1501 Broadway, Suite 2015<br>New York, NY 10036 | • Information relating to QuantumScape's testing.<br>• Information relating to the allegations in Scorpion Capital's report titled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look like Amateurs.*" |
| Jagdeep Singh | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Stifel, Nicolaus & Co., Inc. | John Colombo<br>In-House Counsel<br>787 Seventh Ave. 6th Floor<br>New York, NY, 10019 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| JB Straubel | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's December 8, 2020 presentation. |
| Dr. Venkat Viswanathan | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Volkswagen Group of America, Inc. | c/o<br>Laura Kabler Oswell, Esq. | • Information relating to QuantumScape's testing. |

|  | Sullivan & Cromwell, LLP 1870 Embarcadero Road Palo Alto, CA 94303 | • Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| --- | --- | --- |
| Volkswagen Group of America Investments, LLC | c/o Laura Kabler Oswell, Esq. Sullivan & Cromwell, LLP 1870 Embarcadero Road Palo Alto, CA 94303 | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| UBS Financial Services, Inc. | c/o Julie Fine In-House Counsel 1285 Avenue of the Americas New York, NY, 10019 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Jens Wiese | c/o Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Dr. Stanley Whittingham | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Wolfe Research, LLC | Ed Velazquez In-House Counsel 420 Lexington Avenue Suite 648 New York, NY 10017 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| WR Securities LLC (d/b/a Wolfe Capital Markets and Advisory) | Ed Velazquez In-House Counsel 420 Lexington Avenue Suite 648 New York, NY 10017 | • Information relating to Defendants' statements about their technology and the market's perception of same. |

**INTERROGATORY NO. 11:**

For each PERSON identified in YOUR response to Interrogatory No. 10, describe with particularity each AND every COMMUNICATION, whether orally OR in writing, between that PERSON AND YOU (OR any PERSON acting on YOUR behalf, including Lead Counsel OR investigators retained by YOU OR Lead Counsel), including the DATE(S) of each COMMUNICATION AND the identity of the participants in each such COMMUNICATION.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, work product doctrine, or any other recognized privilege. Plaintiff also objects this interrogatory to the extent that it seeks production of or information concerning documents not in Plaintiff's possession, custody, or control. Plaintiff objects to this request as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it seeks production of or information concerning "each AND every Communication" without a limitation on subject matter or time period. Plaintiff also objects to this Interrogatory as overly broad, unduly burdensome, and the proper subject of an Interrogatory because it demands a catalog of documents.

Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding his response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Subject to and without waiver of the foregoing objections, Plaintiff's counsel has served subpoenas on certain individuals identified in response to Interrogatory No. 10 that Defendants have

20

been duly noticed of. Plaintiff otherwise responds that she does not have any of the information sought in this Interrogatory.

**INTERROGATORY NO. 12:**

DESCRIBE with particularity any damages, AND the basis for calculating any such damages, allegedly suffered by YOU as a result of Defendants' actions as alleged in the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it seeks a response relating to "ANY" damages. Plaintiff further objects to this request on the basis that it seeks attorney work product and/or attorney-client communications. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff also objects to this Interrogatory as unduly burdensome to the extent that it seeks information found in documents that can be found in the pleadings or other filings with the Court.  Plaintiff further objects to this Interrogatory to the extent that it calls for her to produce information that is not in her custody or control.

Subject to and without waiver of the foregoing objections, Plaintiff and the class suffered out-of-pocket losses caused by the misrepresentations and omissions of Defendants as shown by public information regarding the market for QuantumScape Securities and her brokerage statements.

**INTERROGATORY NO. 13:**

DESCRIBE with particularity all of YOUR COMMUNICATIONS relating to QUANTUMSCAPE AND QUANTUMSCAPE SECURITIES.

21

**RESPONSE INTERROGATORY NO. 13:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents relevant to the claims or defense of any party or proportional to the needs of the case because it purports to request Plaintiff describe or index every document or piece of information concerning "Communications" relating to QuantumScape or QuantumScape Securities without any restriction on time-period. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff further objects to this Interrogatory to the extent that it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality. Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not the proper subject of an Interrogatory because it demands a catalog of documents. Plaintiff objects to this Interrogatory as premature because the parties' document productions in the litigation are incomplete and ongoing.

Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

This Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to her documents produced in response to Defendant QuantumScape Corporation's First Set of Requests for Production of Documents and Electronically Stored Information to Plaintiff Kathy Stark.

**INTERROGATORY NO. 14:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 79 of the COMPLAINT that "Throughout the Class Period, Defendants materially misrepresented the abilities of its solid-state battery, relying on compromised tests to disseminate misleading data to the public."

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or

23

otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 15:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 79 of the COMPLAINT that "These statements led investors to believe that QuantumScape's battery was more advanced and capable than it was comparing to today's lithium-ion, that the 'fundamental science risk' was resolved and, as a result, QuantumScape was ready to 'ramp[] up production' and move on to the 'final automotive qualification process.'"

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus

24

of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 16:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 32 of the COMPLAINT that "The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about QuantumScape materially false and misleading."

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected

by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 17:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 152 of the COMPLAINT that "Defendants also misrepresented the safety of its battery."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and

reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 18:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 154 of the COMPLAINT that "Defendants also misrepresent the current state of lithium-ion technology in order to make it appear that QuantumScape's technology is vastly superior to lithium-ion."

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this

request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 19:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 155 of the COMPLAINT that "Defendants also misrepresented the performance capabilities of lithium-ion cells in order to make QuantumScape's technology appear superior."

**RESPONSE TO INTERROGATORY NO. 19:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention

28

interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 20:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 44 of the COMPLAINT that "For a battery in which metallic lithium is the anode, excess lithium is required as a precaution since lithium plating directly on copper foil is problematic."

29

**RESPONSE TO INTERROGATORY NO. 20:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 21:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 51 of the COMPLAINT that "Many lithium-ion cell designs will achieve 80% capacity in less than 40 minutes."

**RESPONSE TO INTERROGATORY NO. 21:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff

reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 22:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 75 of the COMPLAINT that the cell unveiled by QuantumScape has approximately 200 mAh.

**RESPONSE TO INTERROGATORY NO. 22:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the

responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 23:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 149 of the COMPLAINT that "[excess lithium] reduces cathode utilization and cell energy density."

**RESPONSE TO INTERROGATORY NO. 23:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively

33

improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 24:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 150 of the COMPLAINT that "QuantumScape's cathode discharge capacity results in approximately 148 mAh/gram at 20 degrees Celsius, compared to standard lithium battery cells of 180 mAh/gram at room temperature. This results in QuantumScape only using 148/180, or approximately 82% of capacity loss in its testing."

**RESPONSE TO INTERROGATORY NO. 24:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected

by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 25:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 152 of the COMPLAINT that "[QuantumScape's] 'solid-state' separator actually contains a liquid/gel as the catholyte. If that liquid/gel gets into contact with metallic lithium, the risk for volatile reactions is considerable."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or

35

opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

Dated: July 29, 2022                          As to objections,

                                              **LEVI & KORSINSKY, LLP**

                                               /s/ Adam M. Apton
                                              Adam M. Apton (SBN 316506)
                                              Adam C. McCall (SBN 302130)
                                              Email: aapton@zlk.com
                                              Email: amccall@zlk.com
                                              75 Broadway, Suite 202
                                              San Francisco, CA 94111
                                              Telephone: (415) 373-1671
                                              Facsimile: (415) 484-1294

                                              -and-

36

Nicholas I. Porritt
**LEVI & KORSINSKY, LLP**
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel:     (202) 524-4290
Fax:     (212) 363-7171
Email: nporritt@zlk.com
(admitted *pro hac vice*)

-and-

Shannon L. Hopkins (admitted *Pro Hac Vice*)
Gregory M. Potrepka (admitted *Pro Hac Vice*)
Michael J. Keating (admitted *Pro Hac Vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: mkeating@zlk.com

*Attorneys for Plaintiffs
and Lead Counsel for the Class*

**VERIFICATION**

I, Kathy Stark, have read Defendant QuantumScape Corporation's First Set of Interrogatories to Plaintiff Kathy Stark and the answers to those interrogatories, which are true according to the best of my knowledge, and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Eugene, Oregon on July 29, 2022.

Kathy Stark
Kathy Stark

38

## CERTIFICATE OF SERVICE

I, Shannon L. Hopkins, certify that, on the 29th day of July 2022, I served the foregoing Plaintiff Kathy Stark's Responses and Objections to Defendant QuantumScape Corporation's First Set of Interrogatories to Plaintiff Kathy Stark by electronic mail on the following parties:

**Ignacio Evaristo Salceda**
**Rebecca Lynn Epstein**
**Dale Richard Bish**
**Andrew Frantela**
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300
Fax: (650) 565-5100
Email:Isalceda@wsgr.com
Email:Bepstein@wsgr.com
Email:Dbish@wsgr.com
Email:Afrantela@wsgr.com

*Attorneys for Defendants* QuantumScape
Corporation, Jagdeep Singh,
Kevin Hettrich, and Timothy Holme

Executed July 29, 2022.

s/ *Shannon L. Hopkins*___
Shannon L. Hopkins

39

# EXHIBIT T

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email:   aapton@zlk.com
Email: amccall@zlk.com
75 Broadway, Suite 202
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

*Attorneys for Plaintiffs*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUANTUMSCAPE SECURITIES CLASS ACTION LITIGATION | Case No. 3:21-CV-00058-WHO<br><br>**PLAINTIFF MARY CRANNY'S RESPONSE TO DEFENDANTS' INTERROGATORIES** |

**Exhibit 0045**

Mary Cranny

Plaintiff Mary Cranny ("Plaintiff") hereby responds to Defendant QuantumScape Corporation's ("QuantumScape") First Set of Interrogatories to Plaintiff Mary Cranny dated July 15, 2022, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court of the Northern District of California.

## GENERAL OBJECTIONS

Plaintiff makes the following general and continuing objections to Defendants' Interrogatories. All general and continuing objections apply to the response to each Interrogatory, and specific reference to these objections in the particular response is intended for emphasis only. Failure to list a general and continuing objection is not intended, nor should it be construed as a waiver of that objection.

1.    Plaintiff objects to the Interrogatories to the extent they call for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

2.    Plaintiff objects to the Interrogatories insofar as they seek information related to mental impressions, legal conclusions, opinions, or theories of any attorney or other representative of Plaintiff.

3.    Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the issues of law and facts in the action nor are they proportional to the needs of the case.

4.    Plaintiff objects to the Interrogatories to the extent that they seek to require Plaintiff to produce information on behalf of, or in the custody and control of, any entity or individual over whom Plaintiff has no control.

5.    Plaintiff objects to the Interrogatories to the extent they prematurely seek information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will disclose information properly subject to expert opinion in accordance with the Federal Rules of Civil Procedure and the schedule entered by the Court.

1

6.    Plaintiff reserves the right to make any use of, or introduce at any hearing and at trial, information and/or documents responsive to these Interrogatories, including, but not limited to, any such information or documents obtained in discovery.

7.    Plaintiff reserves her right to challenge the competency, relevancy, materiality, and admissibility of, or to object on any grounds, to the use of any of the documents and/or information, at the trial of the action or any other action or proceeding, whether now pending or subsequently commenced.

8.    In providing these objections to the Interrogatories, Plaintiffs do not in any way waive or intend to waive, but rather intends to preserve and is preserving: all objections as to competency, relevancy, materiality and admissibility; all rights to object on any ground to the use of any of the responses herein or documents in any subsequent proceedings, including the trial of this or any other action; all objections to vagueness and ambiguity; and all rights to object on any ground to any further demands or other discovery requests involving or relating to Defendants' Interrogatories.

9.    Plaintiff objects to all Instructions, Definitions, and Interrogatories to the extent they purport to impose a duty or obligation to respond that is inconsistent, or in excess of, Plaintiff's responsibilities under the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, or any other applicable law.

10.    Plaintiff's search for information is ongoing.  Plaintiff reserves her rights to rely on any facts, documents or other evidence that may develop or come to her attention subsequent to the date of the response.  Plaintiff's responses, as set forth herein, are based upon information presently known to Plaintiff and is without prejudice to her rights to assert additional objections or supplemental responses should she discover additional information or grounds for objections. Plaintiff reserves her rights to supplement, amend or modify these responses at any time prior to and including the trial of the action.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.    Plaintiff objects to the Defendants' Definitions and Instructions to the extent that they impose any obligations upon Plaintiff that are not imposed by law or are otherwise inconsistent with Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules.

2

2.        Plaintiff objects to Defendants' Instruction concerning information protected from disclosure on privilege grounds to the extent it calls for information outside of or not required by the parties' discovery protocol, Federal Rules of Civil Procedure, and/or the Local Rules.

3.        Plaintiff objects to Defendants' definition of the term "Describe" in so far as it interposes additional interrogatories to Plaintiff that exceed the limits on interrogatories under Federal Rule of Civil Procedure 33(a)(1) and Local Rule 33.

4.        Plaintiff objects to the definitions of "Person" and "Persons" as overly broad and unduly burdensome on Plaintiff by calling on her to respond for others and provide materials that are not in her possession, custody, or control. Plaintiff further objects to these definitions as overly broad and unduly burdensome because they include, "any individual, natural person, firm, association, organization, partnership, joint venture, business, trust, corporation, or public entity." Plaintiff further objects to these definitions to the extent that they include individuals and corporations who are unknown and unknowable by Plaintiff.

5.        Plaintiff objects to the definition of the terms "Transaction" or "Transactions" as overly broad and unduly burdensome as they include "a decision to hold QUANTUMSCAPE SECURITIES" which is not an ordinary definition of the term.

<u>SPECIFIC RESPONSES AND OBJECTIONS</u>

**INTERROGATORY NO. 1:**

Identify all stock brokerage accounts, investment firm accounts, OR online trading accounts that YOU have opened OR maintained, whether in an individual, joint, OR trustee capacity, in which QUANTUMSCAPE SECURITIES have been purchased, sold, held, OR otherwise acquired OR disposed of, including the last four digits of the account number, the identity of the institution, AND the name of the account.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that has already been provided in discovery and, as a result, is

3

duplicative and unduly burdensome. In addition to the above General Objections, Plaintiff objects to this Interrogatory to the extent it seeks documents or information outside of the Class Period in this Action and the statutory 90-day lookback period set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Subject to and without waiver of the foregoing objections, Plaintiff traded QuantumScape Securities during the Class Period and the statutory PSLRA 90-day lookback period using the following brokerage account:

Ally Invest Securities account XXX-X5813

Mary E. Cranny

**INTERROGATORY NO. 2:**

Identify each of YOUR TRANSACTIONS in QUANTUMSCAPE SECURITIES (whether in an individual, joint, OR trustee capacity), including the DATE of each TRANSACTION, the nature of each TRANSACTION (e.g., purchase, sale, short sale, OR other acquisition OR disposition), the type of QUANTUMSCAPE SECURITIES involved in each TRANSACTION, the amount of QUANTUMSCAPE SECURITIES involved in each TRANSACTION, AND the price of the QUANTUMSCAPE SECURITY at the time of each TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that has already been provided in discovery and, as a result, is duplicative and unduly burdensome. In addition to the above General Objections, Plaintiff objects to this Interrogatory to the extent it seeks documents or information outside of the Class Period in this Action and the statutory PSLRA 90-day lookback period.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory concerning transactions within the Class Period and the statutory PSLRA 90-day lookback period by referring Defendants to Plaintiff's brokerage statements and as follows:

4

| Date | Nature | Type | Amount | Price |
|---|---|---|---|---|
| 3-2-2021 | Bought | QUANTUMSCAPE CORPORATION CLASS A COMMON STOCK | 10 | $59.83 |
| 3-4-2021 | Sold | QUANTUMSCAPE CORPORATION CLASS A COMMON STOCK | 10 | $43.7482 |
| 3-11-2021 | Bought | QUANTUMSCAPE CORPORATION CLASS A COMMON STOCK | 9 | $56.50 |

**INTERROGATORY NO. 3:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, state with particularity the reason for YOUR decision to engage in the TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This request is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in filings in this case and, as a result, is duplicative and unduly burdensome. Plaintiff further objects on the grounds that this Interrogatory is unduly burdensome in that the phrase "the reason for YOUR decision to engage in the TRANSACTION" is vague, ambiguous, and not properly defined. Plaintiff will respond to this interrogatory to the extent that her answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding her response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in

active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows:

Plaintiff reviewed websites concerning securities of technology manufacturers including QuantumScape, and reviewed the stock price of QuantumScape prior to purchasing QuantumScape Securities. Plaintiff purchased QuantumScape Securities because, in reliance on the accuracy of public information incorporated into the price for QuantumScape's stock, she believed QuantumScape's stock would increase in value.

**INTERROGATORY NO. 4:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, identify each PERSON with whom YOU consulted OR conferred before engaging in the TRANSACTION, AND all information relied upon by such PERSONS.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff further objects to this Interrogatory to the extent that the phrase "consulted OR conferred" is vague and undefined. Plaintiff objects to this request as overly broad and unduly burdensome as it calls for her to identify materials that are not in her custody or control. Subject to and without waiver of the General Objections, Plaintiff shall interpret this Interrogatory to identify individuals who provided Plaintiff with investment-related services in connection with her transactions in QuantumScape Securities.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows: Plaintiff did not receive investment-related services in connection her transactions in QuantumScape Securities.

6

**INTERROGATORY NO. 5:**

For each TRANSACTION identified in YOUR response to Interrogatory No. 2, identify each AND every DOCUMENT OR COMMUNICATION relating to the TRANSACTION, including each DOCUMENT OR COMMUNICATION upon which YOU relied in deciding to engage in that TRANSACTION.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein and includes her Objection to the term "Transaction." This request is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff objects to this Interrogatory as overly broad and unduly burdensome as it calls for plaintiff to "identify each AND every DOCUMENT OR COMMUNICATION" without limitation of time period.  Plaintiff further objects to this Interrogatory as overly broad and unduly burdensome to the extent it requests Plaintiff to recreate work performed years ago. Plaintiff will respond to this interrogatory to the extent that her answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding her response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows:

Plaintiff reviewed websites concerning securities of technology manufacturers including QuantumScape, and reviewed the stock price of QuantumScape prior to purchasing QuantumScape Securities.

**INTERROGATORY NO. 6:**

Identify all matters in which YOU have moved for appointment as, OR served as, a lead plaintiff, a named representative, OR a class representative (whether in an individual OR trustee capacity).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff objects to this Interrogatory as it is not limited by a specific time restriction or subject matter and that its scope is overbroad and not proportional to the needs of the case. Plaintiff further objects to this Interrogatory as it seeks information that is not relevant to any of the claims or defenses of any party in this case because it seeks documents and information from other lawsuits.  Plaintiff objects to this request on the basis that it seeks attorney work product and/or attorney-client communications. Plaintiff further objects to this request as unduly burdensome to the extent that it seeks information that can be found in Court filings and are in the public domain, as such information is equally available to the Defendants. Plaintiff further objects insofar as this Interrogatory is vague and ambiguous as to what constitutes a "matter."

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows: Plaintiff seeks appointment as a class representative in this Action. Plaintiff further responds that she has not moved for appointment as, or served as, a lead plaintiff, a named representative, or a class representative in any other matters.

**INTERROGATORY NO. 7:**

DESCRIBE with particularity all facts that alerted YOU to the existence of facts supporting a basis to assert YOUR claims in the above-captioned action (the "Lawsuit"), including the DATE on which YOU learned each such fact AND the source from which YOU learned it.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff objects to this Interrogatory as overly broad and unduly burdensome to the extent it requests Plaintiff to recreate work performed years ago. Plaintiff objects to the Interrogatories to the extent they prematurely seek information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will disclose information properly subject to expert opinion in accordance with the schedule entered by the Court. Plaintiff will respond to this interrogatory to the extent that her answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding her response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

9

Subject to and without waiver of the foregoing objections, Plaintiff responds to this Interrogatory as follows: Plaintiff reviewed Plaintiff reviewed the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 164), the Court's Order on Motion to Dismiss (ECF No. 153), and Plaintiff reviewed the stock price of QuantumScape prior to and subsequent to purchasing QuantumScape Securities.

**INTERROGATORY NO. 8:**

DESCRIBE all understandings, agreements, AND arrangements between YOU AND any PERSON, including YOUR counsel in this Lawsuit, relating to fees, expenses, potential recovery of damages, AND YOUR receipt of anything of value in connection with YOUR service as a plaintiff, Lead Plaintiff, named representative, OR class representative in this Lawsuit.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. Plaintiff also objects to this request on the basis that "all understandings, agreements, AND arrangements between YOU AND any PERSON, including YOUR counsel in this Lawsuit" is vague and ambiguous. Plaintiff objects to this request to the extent that it calls for her to identify materials that are not in her custody or control. Plaintiff further objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Subject to and without waiver of the foregoing objections, Plaintiff has a retainer agreement with Levi & Korsinsky, LLP. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to representation of the class.

**INTERROGATORY NO. 9:**

DESCRIBE any business, personal, professional, AND contractual relationship OR affiliation between YOU AND Lead Counsel *other than* the relationship of attorney-client in this Lawsuit.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it asks Plaintiff to describe "any business, personal, professional, AND contractual relationship OR affiliation between YOU AND Lead Counsel."

Subject to and without waiver of the foregoing objections, Plaintiff states that Lead Counsel, as a professional courtesy, monitors her investments to identify potential claims, but that Plaintiff does not have any other relationship with Lead Counsel responsive to this Interrogatory, apart from her attorney-client relationship in this Lawsuit.

**INTERROGATORY NO. 10:**

Identify all PERSONS, including any confidential witnesses, who provided any information relating to QUANTUMSCAPE OR the facts alleged in the COMPLAINT, including the "former employees" referenced in paragraph 119, the "experts" referenced in paragraphs 122 and 140, and the Volkswagen employees referenced in paragraph 306, regardless of whether such PERSON OR matter is specifically referenced in the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26

11

and 33. Plaintiff objects to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, work product doctrine, or any other recognized privilege. Plaintiff also objects to this interrogatory to the extent that it seeks production of or information concerning documents not in Plaintiff's possession, custody, or control. Plaintiff objects to this request as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it seeks production of or information concerning matters that are not referenced in the Complaint.

Plaintiff will respond to this interrogatory to the extent that her answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding her response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

To the extent this Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

| Name | Contact Information | Subject(s) |
|---|---|---|
| Dr. Paul Albertus | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Robert W. Baird & Co. | c/o<br>Bethmarie Bohn<br>In House Counsel<br>777 East Wisconsin Avenue<br>Milwaukee, WI, 53202 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Dr. Frank Blome | c/o | • Information relating to QuantumScape's testing. |

12

| | | |
|---|---|---|
| | Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Brad Buss | c/o Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Citigroup Global Markets | c/o Erica Bartimmo In-House Counsel 3800 Citigroup Center Dr. Building G Tampa, FL, 33610 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Cowen and Company, LLC | c/o Kaydene Grinnell Willkie Farr & Gallagher LLP 787 Seventh Avenue New York, NY 10019 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Prof. Jeff Dahn | Unknown | • Information relating to QuantumScape's testing<br>• Information relating to the Scorpion Capital Report. |
| Dr. David Danielson | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Mark Delany | c/o Goldman Sachs | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Deutsche Bank AG | c/o C T CORPORATION SYSTEM | • Information relating to Defendants' statements about |

13

| | | |
|---|---|---|
| | 28 LIBERTY ST.<br>NEW YORK, NY 10005 | their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
| John Doerr | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Goldman Sachs | Barry G. Sher<br>Paul Hastings<br>200 Park Avenue<br>New York, NY 10166 | • Information relating to Defendants' statements about their during the Class Period and the market's perception of same. |
| Kevin Hettrich | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Timothy Holme | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen. |

14

| | | |
|---|---|---|
| | | • Information relating to Volkswagen's investment in QuantumScape. |
| Benjamin Kallo | c/o Robert W. Baird & Co. | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Adam Jonas | c/o Morgan Stanley | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| JMP Securities LLC | c/o Zac Rosenberg 600 Montgomery Street Suite 1100 San Francisco, CA, 9411 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Kir Kahlon | c/o David Korzenik, Esq. Miller Korzenik Sommers Rayman LLP The Paramount Building 1501 Broadway, Suite 2015 New York, NY 10036 | • Information relating to the allegations in Scorpion Capital's report titled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look like Amateurs.*" |
| Nicolai Kempf | c/o Deutsche Bank AG | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
| Vinod Khosla | c/o Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Rod Lache | c/o Wolfe Research, LLC | • Information relating to Defendants' statements about their technology and the market's perception of same. |

15

| | | |
|---|---|---|
| Christoph Laskawi | c/o Deutsche Bank AG | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid"* |
| Dr. Jurgen Leohold | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's December 8, 2020 presentation |
| Celina Mikolajczak | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Justin Mirro | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Dr. Brian Morin | c/o<br>Joseph G. Adams, Esq.<br>Snell & Wilmer, LLP<br>One Arizona Center<br>400 E. Van Buren, Suite 1900<br>Pheonix, AZ 85005-2202 | • Information relating to QuantumScape's testing<br>• Information relating to Dr. Morin's report titled *"QuantumScape's Solid State Batteries Have Significant Technical Hurdles to Overcome."* |
| Mobile Power Solutions | c/o<br>James Molyneux-Ellion, Esq.<br>Lindsay Hart, LLP<br>1300 SW 5th Ave, Suite 3200<br>Portland OR 97201 | • Information relating to QuantumScape's testing. |

| | | |
|---|---|---|
| Morgan Stanley | c/o<br>Sara Raisner<br>Sherman & Sterling<br>599 Lexington Avenue<br>New York, NY, 10022 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Joseph Osha | c/o JMP Securities LLC | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Frank Prinz | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| QSV Operations LLC | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation |
| RBC Capital Markets, LLC | c/o<br>Katherine Rosenberg<br>In-House Counsel<br>30 Hudson Street, 27th Floor<br>Jersey City, NJ 07302 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Tim Rokossa | c/o Deutsche Bank AG | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to Deutsche Bank's analyst report titled *"'VW's battery Day' – very solid."* |
| John Joseph Saager | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Dipender Saluja | c/o | • Information relating to QuantumScape's testing. |

| | Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
|---|---|---|
| Scorpion Capital | c/o<br>David Korzenik, Esq.<br>Miller Korzenik Sommers Rayman LLP<br>The Paramount Building<br>1501 Broadway, Suite 2015<br>New York, NY 10036 | • Information relating to QuantumScape's testing.<br>• Information relating to the allegations in Scorpion Capital's report titled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look like Amateurs."* |
| Jagdeep Singh | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to Defendants' statements about their technology and the market's perception of same.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Stifel, Nicolaus & Co., Inc. | John Colombo<br>In-House Counsel<br>787 Seventh Ave. 6th Floor<br>New York, NY, 10019 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| JB Straubel | c/o<br>Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's December 8, 2020 presentation. |
| Dr. Venkat Viswanathan | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Volkswagen Group of America, Inc. | c/o<br>Laura Kabler Oswell, Esq. | • Information relating to QuantumScape's testing. |

|  |  |  |
|---|---|---|
|  | Sullivan & Cromwell, LLP 1870 Embarcadero Road Palo Alto, CA 94303 | • Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Volkswagen Group of America Investments, LLC | c/o Laura Kabler Oswell, Esq. Sullivan & Cromwell, LLP 1870 Embarcadero Road Palo Alto, CA 94303 | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| UBS Financial Services, Inc. | c/o Julie Fine In-House Counsel 1285 Avenue of the Americas New York, NY, 10019 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| Jens Wiese | c/o Wilson Sonsini Goodrich Rosati PC | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation.<br>• Information relating to QuantumScape's production partnership with Volkswagen.<br>• Information relating to Volkswagen's investment in QuantumScape. |
| Dr. Stanley Whittingham | Unknown | • Information relating to QuantumScape's testing.<br>• Information relating to QuantumScape's December 8, 2020 presentation. |
| Wolfe Research, LLC | Ed Velazquez In-House Counsel 420 Lexington Avenue Suite 648 New York, NY 10017 | • Information relating to Defendants' statements about their technology and the market's perception of same. |
| WR Securities LLC (d/b/a Wolfe Capital Markets and Advisory) | Ed Velazquez In-House Counsel 420 Lexington Avenue Suite 648 New York, NY 10017 | • Information relating to Defendants' statements about their technology and the market's perception of same. |

19

**INTERROGATORY NO. 11:**

For each PERSON identified in YOUR response to Interrogatory No. 10, describe with particularity each AND every COMMUNICATION, whether orally OR in writing, between that PERSON AND YOU (OR any PERSON acting on YOUR behalf, including Lead Counsel OR investigators retained by YOU OR Lead Counsel), including the DATE(S) of each COMMUNICATION AND the identity of the participants in each such COMMUNICATION.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein. This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, work product doctrine, or any other recognized privilege. Plaintiff also objects this interrogatory to the extent that it seeks production of or information concerning documents not in Plaintiff's possession, custody, or control. Plaintiff objects to this request as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it seeks production of or information concerning "each AND every Communication" without a limitation on subject matter or time period. Plaintiff also objects to this Interrogatory as overly broad, unduly burdensome, and the proper subject of an Interrogatory because it demands a catalog of documents.

Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding his response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Subject to and without waiver of the foregoing objections, Plaintiff's counsel has served subpoenas on certain individuals identified in response to Interrogatory No. 10 that Defendants have

20

been duly noticed of. Plaintiff otherwise responds that she does not have any of the information sought in this Interrogatory.

**INTERROGATORY NO. 12:**

DESCRIBE with particularity any damages, AND the basis for calculating any such damages, allegedly suffered by YOU as a result of Defendants' actions as alleged in the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents or information relevant to the claims or defense of any party or proportional to the needs of the case because it seeks a response relating to "ANY" damages. Plaintiff further objects to this request on the basis that it seeks attorney work product and/or attorney-client communications. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff also objects to this Interrogatory as unduly burdensome to the extent that it seeks information found in documents that can be found in the pleadings or other filings with the Court. Plaintiff further objects to this Interrogatory to the extent that it calls for her to produce information that is not in her custody or control.

Subject to and without waiver of the foregoing objections, Plaintiff and the class suffered out-of-pocket losses caused by the misrepresentations and omissions of Defendants as shown by public information regarding the market for QuantumScape Securities and her brokerage statements.

**INTERROGATORY NO. 13:**

DESCRIBE with particularity all of YOUR COMMUNICATIONS relating to QUANTUMSCAPE AND QUANTUMSCAPE SECURITIES.

**RESPONSE INTERROGATORY NO. 13:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not seeking documents relevant to the claims or defense of any party or proportional to the needs of the case because it purports to request Plaintiff describe or index every document or piece of information concerning "Communications" relating to QuantumScape or QuantumScape Securities without any restriction on time-period. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff further objects to this Interrogatory to the extent that it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality. Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, and not the proper subject of an Interrogatory because it demands a catalog of documents. Plaintiff objects to this Interrogatory as premature because the parties' document productions in the litigation are incomplete and ongoing.

Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

This Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to her documents produced in response to Defendant QuantumScape Corporation's First Set of Requests for Production of Documents and Electronically Stored Information to Plaintiff Mary Cranny. Further, Plaintiff states that in or about January 2021, Plaintiff had verbal communications with a friend, Kim Dueringer, about multiple securities of technology manufacturers including QuantumScape.

**INTERROGATORY NO. 14:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 79 of the COMPLAINT that "Throughout the Class Period, Defendants materially misrepresented the abilities of its solid-state battery, relying on compromised tests to disseminate misleading data to the public."

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or

otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 15:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 79 of the COMPLAINT that "These statements led investors to believe that QuantumScape's battery was more advanced and capable than it was comparing to today's lithium-ion, that the 'fundamental science risk' was resolved and, as a result, QuantumScape was ready to 'ramp[] up production' and move on to the 'final automotive qualification process.'"

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus

24

of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 16:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 32 of the COMPLAINT that "The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about QuantumScape materially false and misleading."

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected

25

by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 17:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 152 of the COMPLAINT that "Defendants also misrepresented the safety of its battery."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and

reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 18:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 154 of the COMPLAINT that "Defendants also misrepresent the current state of lithium-ion technology in order to make it appear that QuantumScape's technology is vastly superior to lithium-ion."

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this

request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 19:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 155 of the COMPLAINT that "Defendants also misrepresented the performance capabilities of lithium-ion cells in order to make QuantumScape's technology appear superior."

**RESPONSE TO INTERROGATORY NO. 19:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention

28

interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 20:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 44 of the COMPLAINT that "For a battery in which metallic lithium is the anode, excess lithium is required as a precaution since lithium plating directly on copper foil is problematic."

29

**RESPONSE TO INTERROGATORY NO. 20:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 21:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 51 of the COMPLAINT that "Many lithium-ion cell designs will achieve 80% capacity in less than 40 minutes."

**RESPONSE TO INTERROGATORY NO. 21:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff

31

reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 22:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 75 of the COMPLAINT that the cell unveiled by QuantumScape has approximately 200 mAh.

**RESPONSE TO INTERROGATORY NO. 22:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the

responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 23:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 149 of the COMPLAINT that "[excess lithium] reduces cathode utilization and cell energy density."

**RESPONSE TO INTERROGATORY NO. 23:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively

improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 24:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 150 of the COMPLAINT that "QuantumScape's cathode discharge capacity results in approximately 148 mAh/gram at 20 degrees Celsius, compared to standard lithium battery cells of 180 mAh/gram at room temperature. This results in QuantumScape only using 148/180, or approximately 82% of capacity loss in its testing."

**RESPONSE TO INTERROGATORY NO. 24:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected

by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

**INTERROGATORY NO. 25:**

DESCRIBE in detail all facts supporting YOUR allegation in paragraph 152 of the COMPLAINT that "[QuantumScape's] 'solid-state' separator actually contains a liquid/gel as the catholyte. If that liquid/gel gets into contact with metallic lithium, the risk for volatile reactions is considerable."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including her objection to Defendants' definition of "Describe." This Interrogatory is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff further objects to this request to the extent it prematurely seeks information related to expert(s), expert testimony, or

35

opinion at a time when no experts have been designated, or at a time before information related to experts is required to be disclosed. Plaintiff will produce documents relating to expert opinions and reports as required under the Federal Rules and the Case Management Plan entered by the Court. Plaintiff objects to this Interrogatory to the extent it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, or any other privilege or rule of confidentiality.

Plaintiff objects to this Interrogatory on the basis that it is an improper contention interrogatory as it is not designed to help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. To the extent the Interrogatory requests that Plaintiff specify material facts proving her allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, considering additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

Pursuant to the foregoing objections, Plaintiff will not be responding at this time.

Dated: July 29, 2022                    As to objections,

**LEVI & KORSINSKY, LLP**

 /s/ Adam M. Apton
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
75 Broadway, Suite 202
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

-and-

36

Nicholas I. Porritt
**LEVI & KORSINSKY, LLP**
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel:     (202) 524-4290
Fax:     (212) 363-7171
Email: nporritt@zlk.com
(admitted *pro hac vice*)

-and-

Shannon L. Hopkins (admitted *Pro Hac Vice*)
Gregory M. Potrepka (admitted *Pro Hac Vice*)
Michael J. Keating (admitted *Pro Hac Vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: mkeating@zlk.com

*Attorneys for Plaintiffs*
*and Lead Counsel for the Class*

## VERIFICATION

I, Mary Cranny, have read Defendant QuantumScape Corporation's First Set of Interrogatories to Plaintiff Mary Cranny and the answers to those interrogatories, which are true according to the best of my knowledge, and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Seattle, Washington on July 29, 2022.

_____
Mary Cranny

## CERTIFICATE OF SERVICE

I, Shannon L. Hopkins, certify that, on the 29th day of July 2022, I served the foregoing Plaintiff Mary Cranny's Responses and Objections to Defendant QuantumScape Corporation's First Set of Interrogatories to Plaintiff Mary Cranny by electronic mail on the following parties:

**Ignacio Evaristo Salceda**
**Rebecca Lynn Epstein**
**Dale Richard Bish**
**Andrew Frantela**
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300
Fax: (650) 565-5100
Email:Isalceda@wsgr.com
Email:Bepstein@wsgr.com
Email:Dbish@wsgr.com
Email:Afrantela@wsgr.com

*Attorneys for Defendants* QuantumScape Corporation, Jagdeep Singh, Kevin Hettrich, and Timothy Holme

Executed July 29, 2022.

s/ *Shannon L. Hopkins*___
Shannon L. Hopkins

39

# EXHIBIT U

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE QUANTUMSCAPE SECURITIES   ) Case No.:

CLASS ACTION LITIGATION         ) 3-21-CV-00058-WHO

                                )

CONFIDENTIAL

REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

FRANK J. FISH

New York, New York (Witness' Location)

Friday, August 12, 2022

Reported by:

LYDIA ZINN

RPR, FCRR, CSR No. 9223

Job No. SF 5353583

PAGES 1 - 166

Page 1

CONFIDENTIAL

understand that?                                      12:36:41PM

A    Yes.

Q    Okay.  And you see there's some highlighting on

the first paragraph of Exhibit 2?

A    Yes.                                             12:36:51PM

Q    Is that your highlighting?

A    Yes.

Q    And when did you -- you know, when did you apply

the highlighter to this document?

A    I do not recall the date.                        12:37:06PM

Q    When did you read or obtain Exhibit 2?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I don't recall.

BY MR. BISH:

Q    Do you see that the date of Exhibit 2 is         12:37:35PM

December 8th, 2020?

A    Yes.

Q    Wouldn't you have reviewed Exhibit 2 at or around

December 2020?

        MR. POTREPKA:  Objection to form.  Asked and  12:37:49PM

answered.

        THE WITNESS:  I do not recall.

BY MR. BISH:

Q    And do you recall how you came across Exhibit 2?

Were you searching online, or what were you doing?    12:38:10PM

Page 31

A    I do not recall.                                          12:38:26PM

Q    Have you -- have you actually read Exhibit 2?

A    Yes.

Q    Did you understand Exhibit 2?

          MR. POTREPKA:  Objection.  Form.  Vague.            12:38:39PM

          THE WITNESS:  Can you clarify "understand"?

BY MR. BISH:

Q    Can I clarify "understand"?

     All right.  Let's -- well, let's go through it

together.  Let's look at, for example, the third             12:39:01PM

paragraph.  Do you see where it says:  "QuantumScape's

newly released results, based on testing of

single-layer battery cells"?  Do you see that?

A    Yes.

Q    What is your understanding of a single-layer            12:39:17PM

battery cell?

          MR. POTREPKA:  Objection.  Foundation.

          THE WITNESS:  I cannot answer that.

BY MR. BISH:

Q    Because you don't understand what a single-layer        12:39:38PM

battery cell is?

A    That's correct.

Q    And do you know what a multilayer battery cell is?

A    No.

Q    When you read the -- this -- the -- Mr. Morin's         12:39:52PM

                                                    Page 32

CONFIDENTIAL

blog post, or the Scorpion Report, were -- were there    12:39:57PM

discussions about the single-layer battery cell test

that QuantumScape had done?

MR. POTREPKA:  Objection.  Form and

foundation.    12:40:10PM

THE WITNESS:  I don't recall.

BY MR. BISH:

Q    And do you recall -- do you recall reading

anything saying that QuantumScape would not be able to

develop multilayer cells?    12:40:17PM

MR. POTREPKA:  Same objections.

THE WITNESS:  No.

BY MR. BISH:

Q    Okay.  Do you see where, in the next paragraph, it

says these -- "the tested cells were large-area    12:40:40PM

single-layer pouch cells in the target commercial form

factor"?  Do you see that?

A    Yes.

Q    Do you understand what that's conveying?

A    No.    12:40:54PM

Q    And do you see then it talks about "...running at

rates of one-hour charge and discharge (1C charge and

1C discharge)"?  Do you know what that means?

MR. POTREPKA:  Objection.  Vague.

THE WITNESS:  No.    12:41:14PM

Page 33

CONFIDENTIAL

BY MR. BISH:                                              12:41:15PM

Q    Then do you see where it says and the tests were

being run at 30 degrees Celsius?

A    Yes.

Q    Do you have an understanding of what 30 degrees    12:41:38PM

Celsius is?

A    Yes.

Q    Is it, you know, kind of around 90 degrees

Fahrenheit?

        MR. POTREPKA:  Objection.  Form.  Foundation.    12:41:56PM

Calls for a calculator.

BY MR. BISH:

Q    Based on your experience, is 30 degrees Celsius

about 90 degrees Fahrenheit?

A    Don't know.                                        12:42:17PM

Q    And it says:  "These tests demonstrated robust

performance of these single-layer pouch cells even at

these high rates, resulting in retained capacity and

greater than 80 percent after 800 cycles (demonstrating

high coulombic efficiency of greater than              12:42:34PM

99.9 percent)"?

    Do you see that?

A    Yes.

Q    And do you understand that that is a -- a

breakthrough on battery technology?                     12:43:09PM

                                                    Page 34

men of fraud, or that you did nothing to investigate    12:47:30PM

and understand the technology that they had spent a

decade working on?

        MR. POTREPKA: Objection. Form. Foundation.

Vague. Argumentative. It mischaracterizes testimony.    12:47:39PM

        THE WITNESS: I can't talk to what's been

done over the past decade.

BY MR. BISH:

Q   I'm asking what you did to investigate to

understand the technology that these men worked hard to    12:47:50PM

develop over ten years.

        MR. POTREPKA: Same objections.

        THE WITNESS: I've investigated. I've looked

at the Morin Report and the Scorpion Capital Report.

BY MR. BISH:    12:48:15PM

Q   Yeah. So what is the technology that they spent

ten years working on?

        MR. POTREPKA: Objection. Foundation.

        THE WITNESS: Are you asking me what the

technology is?    12:48:27PM

BY MR. BISH:

Q   I'm asking you what these men spent ten years

working on, to deliver the results outlined in

Exhibit 2. Do you know what the technology is that is

behind these results?    12:48:41PM

Page 38

CONFIDENTIAL

MR. POTREPKA:  Objection.  Foundation.        12:48:44PM

Vague.  Argumentative.

        THE WITNESS:  At a very high level.

BY MR. BISH:

Q    Please tell me.                                    12:48:52PM

A    What do you want me to tell you?

Q    What your high level understanding is of -- of
what they had spent ten years developing.

A    I can't tell you what they've spent ten years
developing.                                             12:49:06PM

     The only thing I can tell you is that the
battery -- the statements made do not reflect in the
technology.

Q    Which statements?

A    In the Complaint; the false statements.           12:49:25PM

Q    I'm asking you, sitting here today, accusing these
men of committing fraud, which statements do you think
don't reflect their technology?

        MR. POTREPKA:  Objection.  Asked and
answered.                                               12:49:36PM

     He's -- he's answered that question.  Show him the
Complaint if you have a question about the statements.

        MR. BISH:  You can go ahead and object to
form, Greg.

Q    And you can answer my question, sir.              12:49:46PM

Veritext Legal Solutions
866 299-5127

A    The complaints are in the -- the fraud is in the        12:49:51PM

complaints.

Q.   I'm asking you for your understanding as the lead

plaintiff, accusing these men of fraud.  What is your

understanding?                                              12:50:02PM

          MR. POTREPKA:  Same objection.

          THE WITNESS:  That the solid-state battery,

lithium battery, was not up to par, as they said it

was.

BY MR. BISH:                                                12:50:13PM

Q    Which part?

A    The overall technology.

Q    And when you say "the overall technology," which

part?  What's the technology?

          MR. POTREPKA:  Objection.  Foundation.           12:50:25PM

          THE WITNESS:  I can't comment on the overall

technology.

BY MR. BISH:

Q    Because you have no idea.  Right?

          MR. POTREPKA:  Objection.  Argumentative.        12:50:32PM

Foundation.  And it calls for an expert opinion.

          THE WITNESS:  I am not an expert in the

technology.

BY MR. BISH:

Q    I'm not asking you to be.  I'm asking you for your     12:50:42PM

Page 40

A    No, I do not recall.                                    1:10:20PM

Q    Have you read any transcript that would have

accompanied Exhibit 3?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I do not recall.                1:10:40PM

BY MR. BISH:

Q    Well, so, for -- yeah, I'm just asking you:  Have

you ever -- Exhibit 3 is a PowerPoint.  Correct?

A    Yes.

Q    Have you ever seen or read the words that         1:10:52PM

QuantumScape delivered in connection with presenting

Exhibit 3?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  No, I do not recall.

BY MR. BISH:                                                 1:11:06PM

Q    So you don't know if QuantumScape ever provided

any additional commentary or explanation for the data

in -- listed in Exhibit 3?

        MR. POTREPKA:  Objection.  Foundation.

Mischaracterizes testimony.                                  1:11:27PM

        THE WITNESS:  I don't know.

BY MR. BISH:

Q    Now, have you had a chance to flip through

Exhibit 3?

A    No, I have not had a chance to go through today.   1:11:50PM

                                                        Page 46

CONFIDENTIAL

Q    Have you in the past?                                1:11:55PM

A    Yes.

Q    And is there anything in Exhibit 3 that you
believe to be false or misleading about QuantumScape?

        MR. POTREPKA:  Objection.  Form.  Foundation.     1:12:07PM

        THE WITNESS:  I rely upon my attorneys to
put -- put that information.

BY MR. BISH:

Q    Yeah.  I'm just asking you as a -- as a person.
Is there anything in Exhibit 3 that you believe to be     1:12:21PM
false or misleading?

        MR. POTREPKA:  Objection.  Form.  Foundation.
    Mr. Fish, make sure you have time to review the
document.

        THE WITNESS:  I don't know.                       1:14:18PM

BY MR. BISH:

Q    You don't know?

A    No.

Q    And if you -- if you look at page -- I believe
it's page 3 of Exhibit 3, see where there's a             1:14:26PM
management team?

A    Yes.

Q    Which of these men do you believe are fraudsters?

        MR. POTREPKA:  Objection.  Form.  Foundation.
Ambiguous.  Vague and argumentative.                      1:14:45PM

                                                Page 47

CONFIDENTIAL

THE WITNESS:  I rely upon my lawyers to put          1:15:06PM

that --

BY MR. BISH:

Q    I understand that, but I'm asking you, sitting

here today, which of these men do you believe to be          1:15:13PM

fraudsters?

A    Define "fraudsters."

Q    Somebody who committed fraud.

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  The CEO, the CTO, and the CFO.          1:15:39PM

BY MR. BISH:

Q    Anybody else?

A    No.

Q    You said "the CTO."  Do you mean Dr. Tim Holme?

A    Yes.                                              1:16:21PM

Q    What did Dr. Holme say that you believe was

fraudulent?

        MR. POTREPKA:  Objection.  Form.  Foundation.

Asked and answered.

        THE WITNESS:  That would be in the Complaint          1:16:34PM

filed by my attorneys.

BY MR. BISH:

Q    I'm asking you what you believe Mr. -- Dr. Holme

said that was fraudulent.

        MR. POTREPKA:  Same objections.                       1:16:46PM

Page 48

CONFIDENTIAL

THE WITNESS:  That would be in the Complaint          1:16:47PM

filed by my attorneys.

BY MR. BISH:

Q    Yeah, but I'm asking you to tell me what Dr. Holme

said that you believe to be fraudulent.                       1:16:55PM

        MR. POTREPKA:  Same objections.

        THE WITNESS:  That would be in the Complaint

filed by my attorneys.

BY MR. BISH:

Q    We can keep asking the same question until you            1:17:05PM

give an answer.  It's going to be a while.  Can you

tell me what Dr. Holme said that you believe is

fraudulent?

        MR. POTREPKA:  Same objections.

        THE WITNESS:  That would be in the Complaint          1:17:17PM

filed by my attorneys.

BY MR. POTREPKA:

BY MR. BISH:

Q    Sitting here today, you cannot tell me what

Dr. Holme said or wrote that you believe to be                1:17:25PM

fraudulent; can you?

        MR. POTREPKA:  Same objections.  And

mischaracterizes testimony.

        THE WITNESS:  That would be in the Complaint

filed by my attorneys.                                        1:17:38PM

Page 49

CONFIDENTIAL

BY MR. BISH:                                          1:17:40PM

Q    You can't tell me; can you, sir?

MR. POTREPKA:  Same objections.

THE WITNESS:  That would be in the Complaint.

BY MR. BISH:                                          1:17:50PM

Q    Think it's right that you accuse somebody of fraud without understanding what they actually said that you believe is fraudulent?

MR. POTREPKA:  Objection.  Argumentative.

BY MR. BISH:                                          1:18:00PM

Q    Do you think that's the right thing to do, sir?

MR. POTREPKA:  Objection.  Argumentative.

THE WITNESS:  That would be in the Complaint filed by my attorneys, my representatives.

BY MR. BISH:                                          1:18:15PM

Q    No.  I'm asking if you think that's the right thing to do:  to accuse a man of fraud without understanding what he actually said or wrote?

MR. POTREPKA:  This is argumentative, harassing, and borderline improper.          1:18:25PM

THE WITNESS:  That would be in the Complaint filed by my attorneys.

MR. BISH:  All right.  We're going to mark as Exhibit 4 a updated version of Exhibit 3.  I'm going to ask -- once you have it before you, I'm going to ask if    1:18:53PM

Page 50

CONFIDENTIAL

you ever saw Exhibit 4.                                    1:18:55PM

(Deposition Exhibit 4 marked for identification.)

BY MR. BISH:

Q    Sir, have you seen Exhibit 4 before today?

A    Have I seen this before?                             1:20:17PM

Q    Yeah.  Have you seen it before today?

A    It's a PowerPoint, yes.

Q    This version of the PowerPoint, as opposed to what we've just looked at in Exhibit 3?

A    No.                                                  1:20:35PM

Q    I think this version's perhaps easier to read.

     I want to draw your attention to the second page. Do you see where it says "Forward-Looking Statements"? Do you see that?

A    Yes.                                                 1:20:56PM

Q    Do you have any -- any understanding as to what a "forward-looking statement" is?

     MR. POTREPKA:  Objection.  Calls for a legal conclusion.

     THE WITNESS:  Yes, I do.                             1:22:00PM

BY MR. BISH:

Q    What's your understanding of a "forward-looking statement"?

     MR. POTREPKA:  Same objection.

     THE WITNESS:  Projection to the future.             1:22:10PM

Page 51

BY MR. BISH:                                          1:57:46PM

Q    Well, do you remember when I asked you to read the

sentence that said:  "QuantumScape faces significant

barriers in its attempt to produce a solid-state

battery and may not" --                              1:57:55PM

A    Yeah.

Q    -- "be able to successfully develop its

solid-state battery cells"?

      Do you remember reading that to me?

A    Yes.                                            1:58:03PM

Q    That was a disclosure that QuantumScape had made.

Right?

A    Yes.

Q    Before you ever bought any QuantumScape shares.

Correct?                                             1:58:13PM

          MR. POTREPKA:  Objection.  Foundation.

          THE WITNESS:  Yes.

BY MR. BISH:

Q    Now, under the fourth bullet point, Mr. Morin

writes:  "They will likely never achieve the        1:58:24PM

performance they claim."

      Do you see that?

A    Yes.

Q    Do you agree, disagree, or take no position on

that?                                               1:58:36PM

Page 67

CONFIDENTIAL

MR. POTREPKA:  Objection.  Calls for an    1:58:38PM

expert opinion.

THE WITNESS:  I -- I have no opinion on that

statement.

BY MR. BISH:    1:58:44PM

Q    Now -- so you're -- so sorry.

So you're telling me that you found Mr. Morin's

article on your own.  Right?

A    Yeah.

Q    Nobody told you to read it?    1:59:02PM

A    No.

Q    And when you read Mr. Morin's blog post, what

information was new to you that you didn't already

know?

MR. POTREPKA:  Objection.  Calls for a legal    1:59:19PM

conclusion.

THE WITNESS:  I don't know.

BY MR. BISH:

Q    Can you -- can you point me to any fact in

Exhibit 6 that wasn't already publicly disclosed?    1:59:42PM

MR. POTREPKA:  Objection.  Asked and

answered.  Foundation.  Calls for a legal conclusion.

THE WITNESS:  I can't comment on that.

BY MR. BISH:

Q    So, like, let's -- let's look, for example, at the    2:00:08PM

Page 68

page 2 of Exhibit 6, where Mr. Morin writes "Areas of    2:00:13PM

Overstated Success."

        Do you see that?

A    Yes.

Q    Did you read these areas of -- of the technology    2:00:27PM

that Mr. Morin claimed were overstated?

        MR. POTREPKA:  Are you asking him whether he

read this page?

        MR. BISH:  Yeah.

Q    Did you read these; these examples?    2:00:51PM

A    Yes.

Q    Now, when you read it, did you believe Mr. Morin

was providing new facts; or was he simply offering his

perspective on existing data that was known to the

market?    2:01:31PM

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I don't know the answer to

that --

BY MR. BISH:

Q    Well, when you -- when you read Mr. Morin's    2:01:44PM

article, for example, the paragraph on power, did any

of that data seem like new information or new facts to

you?

        MR. POTREPKA:  Objection.  Foundation.  Calls

for an expert opinion.  Asked and answered.    2:02:02PM

Page 69

THE WITNESS:  It may have.                          2:02:09PM

BY MR. BISH:

Q    Which -- which data or fact, in particular?

MR. POTREPKA:  Objection.  Form and

foundation.  Calls for an expert opinion.           2:02:22PM

THE WITNESS:  I can't point to anything

specifically.

BY MR. BISH:

Q    What about generally?

MR. POTREPKA:  Calls for speculation.        2:02:37PM

THE WITNESS:  I don't know.

BY MR. BISH:

Q    Okay.  Do you still have -- let's flip back to

Exhibit 4, if you -- if you would.

A    Okay.                                          2:03:20PM

Q    And if you look at page -- or slide 19?

MR. POTREPKA:  Is this internal 19 or 19 of

27?

MR. BISH:  Well, 19 of 27.  There's a little

"19" at the bottom of the page.                     2:03:45PM

THE WITNESS:  Okay.

BY MR. BISH:

Q    Are you with me?

A    Yes.

Q    And on the left-hand side, do you see where it  2:04:07PM

Page 70

says "Power"?                                             2:04:10PM

A    Yes.

Q    And then on the chart, do you see where the -- it
says "Commercial area (70 by 85-millimeter) prototype."
     Do you see that?                                     2:04:28PM

A    Yes.

Q    And then do you see below that, it has the
conditions of this test, including 45 degrees Celsius
and approximately 3.4 atmospheres?
     Do you see that?                                     2:04:43PM

A    Yes.

Q    And do you see in the chart above that, do you see
where it's showing the time?  Time of the test?

A    Yes.

Q    Now, if you go back to Mr. Morin's report, which    2:05:11PM
is Exhibit 6, under the "Power" paragraph, do you see
any new information that was not in QuantumScape's
data?

          MR. POTREPKA:  Objection.  Form and
foundation.  Calls for a legal conclusion and expert     2:05:38PM
opinion.

          THE WITNESS:  Do you want me to go back to 6?

BY MR. BISH:

Q    I do.

A    Okay.  Got it.                                       2:05:48PM

Page 71

I can't be coming from that, compare notes.    2:06:07PM

Q    Why not?

A    You're asking me to compare a graph with statements.  I can't.

Q    Yeah.  I'm just asking you if you see anything --    2:06:29PM you know, anything that was in Mr. Morin's report that was new information that wasn't already publicly disclosed by QuantumScape?

        MR. POTREPKA:  Objection.  Form.  Foundation. Calls for a legal conclusion and expert opinion.    2:06:43PM

        THE WITNESS:  I don't know.  I would leave that to my attorneys who put that in the Complaint.

BY MR. BISH:

Q    Right.  But when you -- when you, Mr. Fish, read Morin's blog post, you told me earlier it caused you to    2:06:59PM think that QuantumScape was a fraudulent company. Right?

        MR. POTREPKA:  Objection.  Misstates testimony.

        THE WITNESS:  His article raises a flag.    2:07:22PM

BY MR. BISH:

Q.    What flag?

A    The overall article raises a flag.

Q    What -- and what's that flag?

A    The technology wasn't going to succeed.    2:07:38PM

Page 72

Q    What's the new -- what is the new fact in                    2:07:41PM

Mr. Morin's article that raises that flag for you?

            MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal conclusion and expert opinion.

            THE WITNESS:  The whole report.                       2:07:53PM

BY MR. BISH:

Q    Yeah.  Can you please point to me -- point me to a

single fact in Mr. Morin's report that was new

information?

            MR. POTREPKA:  Same objections.  And asked            2:08:03PM

and answered.

            THE WITNESS:  I can't give you an exact fact.

I'll leave that to my attorneys who put that in the

Complaint.

BY MR. BISH:                                                      2:08:12PM

Q    Well, I'm asking you, sir, this is my turn to ask

you.  So can you point me to a single fact in

Mr. Morin's report that raised this flag that the

technology wasn't up to snuff?

            MR. POTREPKA:  Same objections.                       2:08:26PM

            THE WITNESS:  My answer is:  The whole

report.

BY MR. BISH:

Q    Show me.  Show me the new fact.

            MR. POTREPKA:  Same objections.                       2:08:38PM

Page 73

CONFIDENTIAL

THE WITNESS:  The whole report.                    2:08:43PM

BY MR. BISH:

Q    Go line by line, then, if that's the way you want
to do it.  Let's go line by line.  You tell me which
sentence -- each and every sentence in this report that       2:08:52PM
was a new fact.

         MR. POTREPKA:  Same objections.
Argumentative, harassing.  And asked and answered.

         THE WITNESS:  I can't point to an exact; and
I can't tell you what's fact versus fiction.                  2:09:08PM

BY MR. BISH:

Q    Okay.  Let's -- let's go through it.  Under
"Power" -- are you with me?  Under "Power," they have
done 1200 cycles.  They have a 90-second OEM specified
track simulation which pulled pulses of 6C.                   2:09:31PM

     Do you see that?

A    Yes.

Q    Is that new?

         MR. POTREPKA:  Objection.  Form.  Foundation.
Calls for an expert opinion and legal conclusion.            2:09:41PM
Asked and answered.

         THE WITNESS:  I don't know.

BY MR. BISH:

Q    Next sentence:  "In this track, nine laps is full
depth of discharge, when the battery was heated to           2:09:53PM

                                                 Page 74

CONFIDENTIAL

45 degrees Celsius (113 degrees Fahrenheit) and charged    2:09:56PM

to 80 percent in 15 minutes."

    Is that a new fact?

        MR. POTREPKA:  Same objections.

        THE WITNESS:  I don't know.    2:10:10PM

BY MR. BISH:

Q   "The cell lost about 10 percent of its capacity in

this 130-cycle test, meaning the battery will only last

for 260 cycles or about 75,000 miles of aggressive

driving."    2:10:23PM

    Do you see that?

A   Yes.

Q   What in that sentence is a new fact?

        MR. POTREPKA:  Same objections.

        THE WITNESS:  I don't know.    2:10:34PM

BY MR. BISH:

Q   Next sentence:  "There is a note on the slide that

it occurs at 3.4 atmospheres, which likely means at

high pressure."

    Do you see that?    2:10:45PM

A   Yes.

Q   Is that a new fact?

        MR. POTREPKA:  Same objections.

        THE WITNESS:  I don't know.

Page 75

BY MR. BISH:                                           2:10:51PM

Q    Well, you say you don't know, but you can flip back to Exhibit 4 on that "Power" slide.  And you can tell me anything on that slide that wasn't already -- you know, from what we just went through, that wasn't   2:11:11PM already disclosed by QuantumScape.

         MR. POTREPKA:  Objection.  Form.  Foundation. Calls for a legal conclusion and expert opinion.

         THE WITNESS:  I don't know.  I leave that to my attorneys who put that in the Complaint.        2:11:28PM

BY MR. BISH:

Q    Sir, QuantumScape was being transparent about the test conditions; wasn't it?

         MR. POTREPKA:  Objection.  Form.  Foundation. Argumentative.                                     2:11:38PM

         THE WITNESS:  I don't know.

BY MR. BISH:

Q    Sitting here today, can you tell me anything that QuantumScape concealed or obscured about the test conditions in January or December -- December 2020 or   2:11:53PM January 2021?

         MR. POTREPKA:  Objection.  Very much asked and answered.

         THE WITNESS:  I leave that to my attorneys who put that in the Complaint.                        2:12:11PM

                                                      Page 76

CONFIDENTIAL

BY MR. BISH:                                              2:12:13PM

Q    So you can't; can you, sir?  You can't; can you?

          MR. POTREPKA:  Same objections.

          THE WITNESS:  I -- I leave that to my

attorneys who put that in the Complaint.                 2:12:19PM

BY MR. BISH:

Q    Let's look at the next page, page 3 of Exhibit 6.

          MR. POTREPKA:  Exhibit 6?

          THE WITNESS:  Okay.

BY MR. BISH:                                             2:12:49PM

Q    See where it says "multilayer cells"?  Do you see

that paragraph?

A    Yes.

Q    Mr. -- Mr. Morin writes:  "They have been unable

to make multilayer cells."                              2:13:01PM

     Do you see that?

A    Yes.

Q    And you believe that to be true?

          MR. POTREPKA:  Objection.  Foundation.

          THE WITNESS:  I don't know.                   2:13:38PM

BY MR. BISH:

Q    You don't know if you believe that?

          MR. POTREPKA:  Objection to the form.

BY MR. BISH:

Q    Sorry.  Did you answer?                            2:14:10PM

Page 77

BY MR. BISH:                                              3:04:38PM

Q    When you were buying securities, were you trying to time the market to make a quick buck?

MR. POTREPKA:  Objection.  Foundation.
Vague.                                                   3:04:48PM

THE WITNESS:  I don't recall.

BY MR. BISH:

Q    Do you ever recall if you were -- if you were buying on the fundamentals of the prospects for GameStop Corporation?                                   3:05:12PM

MR. POTREPKA:  Objection.  Foundation.

THE WITNESS:  I don't recall.

MR. BISH:  Okay.  Let's mark as Exhibit 12 confirmation notices for your selling your shares of QuantumScape, which is Bates Number QS-PLAINTIFFS000178    3:05:56PM
-- through -- sorry -- through -191.

(Deposition Exhibit 12 marked for identification.)

BY MR. BISH:

Q    Sir, do you recognize Exhibit 12?

A    Yes.                                                 3:07:01PM

Q    What is it?

A    It's trade confirmations of my sale of QuantumScape.

Q    Now, why did you decide to start selling your shares in QuantumScape in January of 2021?         3:07:15PM

Page 101

A    To try and preserve equity.  And the stock price    3:07:31PM
was going down dramatically.

Q    Did you undertake any effort to try to understand
the reason for the stock prices decline in January of
2021?                                                      3:07:58PM

           MR. POTREPKA:  Objection.  Foundation.

           THE WITNESS:  Yes.

BY MR. BISH:

Q    And what did you do?

A    Look at the reasons why.                              3:08:35PM

Q    Where -- where did you look?

A    That would be -- my attorneys' had listed that
in -- in the Complaint.

Q    Well, yeah.  When you were trying to understand
the reason for the decline in QuantumScape's stock        3:08:52PM
price in January of 2021, what sources of information
did you consult?

A    Well, since I held the stock with TD Ameritrade
accounts, an alert would come up on the stock, that it
was going down.                                            3:09:18PM

Q    Right.  But when you undertook your investigation
to determine the reasons for the stock price decline in
January 2021, what sources of information did you
consult to learn the reasons behind the stock decline?

           MR. POTREPKA:  Objection.  Foundation.          3:09:34PM

Page 102

THE WITNESS:  I -- I used my TD Ameritrade                3:09:36PM

account.

BY MR. BISH:

Q    And what did -- did your TD Ameritrade account

point you to news articles?                               3:09:48PM

A    I don't recall.

Q    And in your -- in your investigation -- well,

aside from your TD Ameritrade account notifications,

what other sources of information did you consult to

determine the reasons for the stock price decline in      3:10:12PM

January of 2021?

         MR. POTREPKA:  Objection to form and

foundation.

         THE WITNESS:  I don't recall.

BY MR. BISH:                                              3:10:20PM

Q    Did you look at the QuantumScape website?

A    I don't recall.

Q    Did you look at any news articles?

A    I do not recall.

Q    For example, do you know if you ever looked at any   3:10:40PM

Wall Street Journal articles about QuantumScape?

A    I don't recall.

Q    Do you ever read articles from The Wall Street

Journal?

A    I don't recall.                                      3:10:57PM

Page 103

BY MR. BISH:                                              4:24:50PM

Q    Now, based on your experience, if there had been

some big fraud at QuantumScape, wouldn't you expect the

analysts to ask management about the alleged fraud?

          MR. POTREPKA:  Objection.  Form.  Foundation.   4:25:02PM

Calls for speculation.

          THE WITNESS:  I couldn't comment on that.

BY MR. BISH:

Q    Well, remember this morning when I asked things

like, you know, the basis for your understanding that   4:25:20PM

investors, other investors would believe that

QuantumScape was behind in its development activity,

and you told me that investors that were -- that had

that concern?

     Do you remember that testimony?                    4:25:35PM

          MR. POTREPKA:  Objection.  Mischaracterizes

the testimony.

          THE WITNESS:  Yes.

BY MR. BISH:

Q    And if -- if -- if, in fact, QuantumScape was      4:25:44PM

behind schedule, do you expect that the analysts would

have raised questions about that?

          MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for speculation.

          THE WITNESS:  Yeah.  I couldn't comment on --   4:26:04PM

                                                    Page 128

CONFIDENTIAL

on that.                                              4:26:06PM

BY MR. BISH:

Q    Okay.   Now, on the first page of Exhibit 17, do

you see that there's a chart?

A    Yes.                                             4:26:37PM

Q    And do you see that the chart is the stock price

versus volume?  Do you see that?

A    Yes.

Q    And do you see that in -- in early January, the

trading volume was very high for QuantumScape?        4:27:03PM

A    Yes.

Q    Do you know the reason why the volume of trading

was very high in early January of 2021 for

QuantumScape?

A    No.                                             4:27:26PM

Q    Are you familiar with something called "PIPE

investors"?

A    No.

Q    So, like, the phrase "Private Investment in Public

Equity" doesn't -- doesn't mean anything to you?      4:27:45PM

A    Did you say "type," or "private investors"?

Q    So PIPE, P-I-P-E, is an acronym for "Private

Investment in Public Equity."

A    Okay.

Q    Do you know that?                               4:28:06PM

Page 129

CONFIDENTIAL

A    No.                                                    4:28:08PM

Q    And do you know when the S-1 for QuantumScape was

declared effective --

        MR. POTREPKA:  Objection.  Foundation.

BY MR. BISH:                                               4:28:20PM

Q    -- by the SEC?

A    No.

Q    Do you know what a Form S-1 is?

A    No.

Q    So, sitting here today, you don't know, one way or    4:28:33PM

the other, if the SEC had declared the S-1 effective

for QuantumScape at the end of 2020?

        MR. POTREPKA:  Objection.  Asked and

answered.

        THE WITNESS:  No, I don't recall.                  4:28:50PM

BY MR. BISH:

Q    And that in early January, when trading opened,

that a large number of investors holding a large number

of shares were suddenly able to trade in QuantumScape?

    Did you know that?                                     4:29:02PM

        MR. POTREPKA:  Objection.  Form.  Foundation.

        THE WITNESS:  I wasn't aware of that.

BY MR. BISH:

Q    And are you aware that when all of a sudden a lot

of investors are able to trade, that can have an          4:29:19PM

Page 130

impact -- a downward impact -- on the price of a                4:29:22PM

security?

        MR. POTREPKA:  Objection.  Form.  Foundation.

Vague.  Calls for speculation.

        THE WITNESS:  I -- I don't know.                        4:29:45PM

BY MR. BISH:

Q.   And when you were investigating the causes for the

stock decline in QuantumScape securities in early

January 2021, you didn't come across information that

PIPE investors could suddenly trade their shares?               4:29:53PM

        MR. POTREPKA:  Same objections.

        THE WITNESS:  No.

BY MR. BISH:

Q    Would that be information you would have liked to

have known?                                                     4:30:02PM

A    No.

Q    No?

     Would it matter to you?

A    No.

Q    Sitting here today, do you have -- do you have a           4:30:22PM

personal belief as to the reasons for the stock drop in

early January of 2021?

        MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal conclusion and expert opinion.

        THE WITNESS:  Those reasons would be -- my              4:30:36PM

Page 131

legal attorneys would put that in the Complaint.  I     4:30:39PM

rely on them for that.

BY MR. BISH:

Q    Got it.  So you personally don't have any

understanding?                                          4:30:47PM

        MR. POTREPKA:  Same objections.

        THE WITNESS:  No, I can't comment on that.

        MR. BISH:  Okay.  I'm going to mark as

Exhibit 18 a February 25th, 2021, article titled

"QuantumScape CEO shares two exciting developments in   4:31:56PM

the works."

        MR. FRANTELA:  Sorry, guys.  My finger

slipped and I introduced that one without a stamp.

Should I re-upload?

        MR. BISH:  Yeah.                                4:32:19PM

        MR. FRANTELA:  Okay.

(Deposition Exhibit 18 marked for identification.)

        THE REPORTER:  If you have difficulty, I can

correct that at the conclusion of the depo.

        MR. FRANTELA:  Okay.                            4:32:38PM

        THE WITNESS:  So is that what we're going to

do, just proceed?  And Lydia will correct -- you'll add

the stamp later?

        THE REPORTER:  I can have Veritext Production

add that stamp later.                                   4:32:55PM

                                          Page 132

CONFIDENTIAL

MR. BISH:  Okay.                                                    4:32:57PM

Q.  Now, sir, I assume you have not seen Exhibit 18

before today?

A    No, sir.

Q    And if you look at the -- you know, from page 1 to    4:33:27PM

page 2, there's a discussion of the -- going from the

single-layer battery to the multilayer battery.

Remember we looked at earlier the announcement

that they had developed and started testing the

four-layer cells?                                                  4:33:48PM

Do you remember that?

MR. POTREPKA:  Mr. Fish, review as much of

the document as you need.

BY MR. BISH:

Q    Do you remember that discussion, sir?               4:34:12PM

A    Yes.

Q    And then if you look at the middle of the second

page, where it says: "And that was the big

breakthrough, because what that means is that we can

now continue to scale this technology.  Later on this   4:34:28PM

year, we hope to have an eight- to ten-layer cell."

Do you see that?  Do you see that, sir?

A    Yes, sir, I see it.

Q    And then he goes on.  "And if we hit that

milestone, then we'll be on track to deliver actual     4:34:59PM

Page 133

Meets Volkswagen Technical Milestone, Clearing Way For    4:38:47PM

$100 Million Investment".

(Deposition Exhibit 20 marked for identification.)

BY MR. BISH:

Q    Sir, let me know when you have Exhibit 20 before    4:39:13PM

you.

A    Okay.  I have it.

Q    And do you see in the first paragraph where it

says:  "The milestone required Volkswagen to

successfully test the latest generation of    4:39:32PM

QuantumScape's solid-state lithium-metal cells in their

labs in Germany."?

      Do you see that?

A    Yes.

Q    And in the next paragraph, it says:  "We are    4:39:47PM

pleased to report that the QuantumScape cells met the

technical milestones in our labs in Germany that we had

previously agreed upon."

      Do you see that?

A    Yes.    4:40:13PM

Q    "Achievement of this milestone is an important

step for QuantumScape, and we look forward to receiving

and testing subsequent generations of cells, with the

goal of getting solid-state technology into series

production."    4:40:29PM

Page 136

Do you see that?                                    4:40:30PM

A     Yes.

Q     So, in fact, QuantumScape did meet the technical requirements by March of 2021.  Right?

          MR. POTREPKA:  Objection.  Form.  Foundation.    4:40:48PM Calls for an expert opinion.

          THE WITNESS:  I don't know if they met their technical milestones for this.

BY MR. BISH:

Q     Well, Volkswagen publicly announced that they had.    4:40:56PM Correct?

A     They did.

Q     And so what is your basis for saying that they were behind schedule?

          MR. POTREPKA:  Same objections.                4:41:15PM

          THE WITNESS:  I leave that to my attorneys who put that in the Complaint.

BY MR. BISH:

Q.     Is -- is there a reason that you're not keeping tabs on the progress of QuantumScape?                4:41:34PM

          MR. POTREPKA:  Objection.  Form.  Foundation. Mischaracterizes testimony.

          THE WITNESS:  At this point?

BY MR. BISH:

Q     Yeah.                                        4:41:48PM

Page 137

A    Yes.                                                    4:42:00PM

Q    What is the reason why you've stopped keeping tabs

on QuantumScape?

A    At that point I was out of the stock.

        MR. BISH:  Okay.  Well, let's mark as              4:42:20PM

Exhibit 21 the Q1 fiscal '21 letter to shareholders.

(Deposition Exhibit 21 marked for identification.)

BY MR. BISH:

Q    Do you have Exhibit 21 before you?

A    Yes.                                                    4:43:46PM

Q    And if you look at page 6 of Exhibit 21, you'll

see a chart that says "Key Milestones."

A    What page is that?

Q    Page 6.

A    Okay.                                                   4:44:41PM

Q    And do you see that for 2021 there's four key

milestones listed?

A    Yes.

Q    And is it your understanding that, in fact,

QuantumScape achieved all four of the key milestones        4:44:57PM

for 2021?

        MR. POTREPKA:  Objection.  Form.  Foundation.

        THE WITNESS:  It shows three.

BY MR. BISH:

Q    Yeah.  As of May 2021, they had achieved three of      4:45:27PM

Page 138

the four.  Right?                                          4:45:30PM

MR. POTREPKA:  Objection.  Form.  Foundation.

THE WITNESS:  I can't confirm that, only

because there's two green arrows, and there's one

not-so-green arrow.                                       4:45:43PM

BY MR. BISH:

Q    Right.  Do you understand why it's -- why it's not

so green?

A    No.

MR. BISH:  Okay.  Well, let's mark as           4:45:51PM

Exhibit 22 the Q2 fiscal '21 letter to shareholders.

(Deposition Exhibit 22 marked for identification.)

BY MR. BISH:

Q    Sir, do you have Exhibit 22 in front of you?

A    Yes.                                                 4:47:18PM

Q    And if you look at page 7, you'll see that same

Key Milestones chart.

A    Yes.

Q    And do you see that the four layer full-sized cell

and the eight- to ten-layer full-sized cell milestones   4:47:41PM

have a half -- half green bubble?

A    Yes.

MR. POTREPKA:  Form.

THE WITNESS:  Yes.

MR. BISH:  And then we're going to mark as      4:48:01PM

Page 139

CONFIDENTIAL

Exhibit 23 the Q3 fiscal '21 letter to shareholders,    4:48:02PM

dated October 26, 2021.

(Deposition Exhibit 23 marked for identification.)

BY MR. BISH:

Q    Sir, do you have Exhibit 23 up?    4:48:43PM

A    Yes.

Q    If you look at page 7, you'll see the Key

Milestones chart.  Sir, do you see that now the

four-layer, full-sized cell milestone is fully checked

off?    4:49:33PM

A    Yes.

Q    And if you look at the paragraph underneath that

chart, it says:  "While our immediate focus remains on

completing our 2021 milestones and ramping up our

manufacturing and customer sampling activities, these    4:49:52PM

near-term goals should always be understood in the

context of our broader strategic vision."

    Do you see that?

A    Yes.

Q    And that the board of directors has laid out a    4:50:03PM

series of ambitious targets for the company to be

achieved over the course of the coming decade?

    Do you see that?

A    Yes.

Q    Do you understand, sir, that the -- QuantumScape    4:50:23PM

Page 140

CONFIDENTIAL

is attempting to solve problems that will take a long        4:50:28PM

time to address?

        MR. POTREPKA:  Objection.  Form.  Foundation.

BY MR. BISH:

Q    Do you understand that?                                 4:50:36PM

A    No.

        MR. POTREPKA:  Calls for speculation.

        MR. BISH:  Now I'm going to mark as

Exhibit 24 a press release dated November 16th, 2021.

The title is "QuantumScape Achieves Final 2021 Goal         4:50:46PM

Ahead Of Schedule."

(Deposition Exhibit 24 marked for identification.)

BY MR. BISH:

Q    Now, sir, were you aware that QuantumScape had, in

fact, achieved its 2021 milestones ahead of schedule?       4:52:02PM

        MR. POTREPKA:  Objection.  Form.  Foundation.

        THE WITNESS:  No.

BY MR. BISH:

Q    And do you see in the second paragraph, Mr. Singh

says:  "We're delighted to share this data on ten-layer     4:52:28PM

cell performance"?

    Do you see that?

A    Yes.

Q    Do you have any reason to believe that the data on

the ten-layer cell performance is false or misleading?      4:52:39PM

Page 141

MR. POTREPKA:  Objection.  Form.  Foundation.    4:52:46PM

THE WITNESS:  Not based on this document.

BY MR. BISH:

Q    Based on anything?

A    Again, I rely on my legal counsel to put that in    4:53:03PM
the Complaint.

Q    Well, I'm trying to understand your theory.

Is your theory that the test on the single layer
of the battery was somehow false and misleading; but
the test on the ten-layer cells was not false and    4:53:17PM
misleading?  Is that -- is that what I'm -- to
understand your theory of the fraud here?

MR. POTREPKA:  Objection.  Form.  Objection.
Form.  Foundation.  Mischaracterizes testimony.  Calls
for expert opinion and legal conclusion.    4:53:28PM

THE WITNESS:  I -- I couldn't comment on the
technology.

BY MR. BISH:

Q    I'm not asking you to comment on the technology.

I'm asking you to tell me what your theory of the    4:53:41PM
fraud is here.  Is your theory that they -- the data on
the single-cell layer was fraudulent, but the data on
the ten-layer cell is not?

MR. POTREPKA:  Same objections.

THE WITNESS:  No, I don't recall.    4:53:55PM

Page 142

CONFIDENTIAL

those results were, in fact, fraudulent?                4:59:16PM

MR. POTREPKA:  Objection.  Form.  Foundation.

Assumes facts not in evidence.  Calls for speculation.

THE WITNESS:  I couldn't comment on the

veracity of Mobile Power Solutions.                4:59:30PM

BY MR. BISH:

Q    Well, is this something you would have liked to

have known before today?

MR. POTREPKA:  Object to form.

THE WITNESS:  I just don't know.                4:59:52PM

MR. BISH:  Take a short break.  Five minutes.

THE VIDEOGRAPHER:  We're off the record at

5:00 p.m.

(Recess taken from 5:00p.m. until 5:08 p.m.)

THE VIDEOGRAPHER:  We're back on record at        5:08:02PM

5:08 p.m.

MR. BISH:  Sir, I'm going to mark as Exhibit

26 a Declaration of Frank Bish In Support Of His Motion

For Appointment As Lead Plaintiff.

THE REPORTER:  I think we're on Exhibit 27,        5:08:27PM

sir.

(Deposition Exhibit 27 marked for identification.)

MR. BISH:  I always mess up when I don't

refresh the Exhibit Share.

Q.   Sir, do you recognize Exhibit 27?                5:09:06PM

Page 145

A    Yes.                                                    5:09:30PM

Q    Is that your signature on page 3, Bates Number

-176?

A    Yes.

Q    And looking at the first page of Exhibit 27,          5:09:48PM

paragraph 4, you write:  "In deciding to invest in

QuantumScape stock, during the Class Period, I relied

on management's public statements and the price of the

company's stock."

     Do you see that?                                       5:10:09PM

A    Yes.

Q    Which management -- which public statements are

you referring to there?

        MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal conclusion.                                     5:10:18PM

        THE WITNESS:  Yes.  I rely upon my attorneys,

counsel, to reflect that in the Complaint.

BY MR. BISH:

Q    Well, when you signed this document under oath,

under penalty of perjury, what public statements did       5:10:33PM

you have in mind for paragraph 4?

        MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal conclusion.

        THE WITNESS:  Again, those were put in the

Complaint, so I rely upon my counsel.                       5:11:10PM

Page 146

BY MR. BISH:                                              5:11:15PM

Q    Okay.  Well, when you signed this document stating

under oath that you relied on management's public

statements, which public statements are you referring

to there?                                                5:11:24PM

        MR. POTREPKA:  Same objections.

        THE WITNESS:  Executive management's public

statements.

BY MR. BISH:

Q    Which ones?                                         5:11:47PM

        MR. POTREPKA:  Same objections.

        THE WITNESS:  I don't recall.

BY MR. BISH:

Q    Did you know when you -- at the -- on the date

that you signed this declaration, did you know then?     5:11:57PM

        MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal conclusion.

        THE WITNESS:  Yes.

BY MR. BISH:

Q    What can you do to refresh your recollection on      5:12:15PM

what public statements you relied on to purchase

QuantumScape stock?

A    I would refer to the Complaint that my attorneys

put forth.

Q    Sir, have you sought to be a lead plaintiff in any   5:12:33PM

Page 147

other cases?                                             5:12:37PM

A    Yes.

Q    Has a court ever found you could not serve as a
lead plaintiff because of a incorrect declaration that
you filed?                                               5:12:52PM

          MR. POTREPKA:  Objection.  Foundation.  Calls
for a legal conclusion.

          THE WITNESS:  I would have to see.  I don't
recall.

BY MR. BISH:                                             5:13:22PM

Q    You don't -- you don't recall if a federal court
ever found that you were a inappropriate lead plaintiff
for having submitted a incorrect declaration?

          MR. POTREPKA:  Objection.  Foundation.  Calls
for a legal conclusion.                                  5:13:38PM

          THE WITNESS:  I don't know what the legal
decision would be.  I'm sorry.

BY MR. BISH:

Q    So, for example, do you recall having sought to be
the lead plaintiff in a Longfin Corporation Securities   5:13:56PM
Class Action?

A    Yes.

Q    Were you appointed as lead plaintiff in that case?

A    No.

Q    Why not?                                            5:14:10PM

                                              Page 148

MR. POTREPKA:  Objection.  Foundation.  Calls    5:14:13PM
for a legal conclusion.

THE WITNESS:  That was based on a legal
decision.

BY MR. BISH:    5:14:20PM

Q    A Court Order?  Is that right?

A    I do not recall the specifics.

Q    What do you recall generally?

A    I do recall that I was not made lead plaintiff in
that case.    5:14:43PM

Q    Do you recall the reasons why -- why not?

MR. POTREPKA:  Objection.  Foundation.  Asked
and answered.  Calls for a legal conclusion.

THE WITNESS:  I do -- I do not know the legal
reasons.    5:14:54PM

BY MR. BISH:

Q    Now, sticking with Exhibit 27, I want you to look
at paragraph 7.  Do you see where you attest that by
virtue of moving for and serving as lead plaintiff in
securities class actions, I understand that a lead    5:15:26PM
plaintiff is required to direct the litigation on
behalf of the Class; stay apprised of all material
developments in the litigation and owes fiduciary
duties to the Class to act in its best interests.

Do you see that?    5:15:44PM

Page 149

CONFIDENTIAL

A    Yes.                                                    5:15:45PM

Q    Since being appointed as lead plaintiff, what

court filings have you reviewed?

A    I have reviewed quite a few documents with my

attorneys that have been submitted.                          5:16:02PM

Q    Which ones?

A    The First Amended Complaint.

Q    Okay.  What else?

A    Second Amended Complaint.

Q    Okay.  What else?                                       5:16:18PM

A    This document.

Q    Anything else?

A    I reviewed basically all documents that they

submitted to the court.

Q    Are you able to name any others besides the ones        5:17:02PM

you just listed for me?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  Not off the top of my head.

BY MR. BISH:

Q    Has your counsel issued any subpoenas in this           5:17:21PM

case?

A    Yes.

Q    To whom?

A    To QuantumScape.

Q    Anybody else?                                           5:17:42PM

Page 150

A    I don't recall which other ones.                5:17:47PM

Q    Has your counsel received any document productions from third parties?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I would rely upon my legal        5:18:07PM
counsel, but I do not recall.

BY MR. BISH:

Q    Has your counsel summarized the production of documents from any third parties for you?

        MR. POTREPKA:  Objection.  Foundation.        5:18:17PM

    And I would caution the witness not to divulge any attorney-client conversations other -- you can answer -- I think you can answer that if you have -- if you recall.

        THE WITNESS:  I don't recall the exact        5:18:53PM
document.

BY MR. BISH:

Q    Well, do you recall if your counsel summarized the production of any documents from any third parties for you?                                        5:19:01PM

        MR. POTREPKA:  Objection.  Asked and answered.

        THE WITNESS:  I do not recall.

BY MR. BISH:

Q    Does -- so -- and -- or earlier today you told me        5:19:13PM

Page 151

CONFIDENTIAL

that you did not know about Volkswagen's independent    5:19:16PM

testing of QuantumScape's technology.  Right?

        MR. POTREPKA:  Objection.  Go ahead.

        THE WITNESS:  I think the question was -- you

talked about the third party -- the testing quality of    5:19:40PM

the testing.

BY MR. BISH:

Q    No?

A    Like I said --

Q    Earlier I asked you if you were aware if    5:19:52PM

Volkswagen had independently in its own labs confirmed

the testing of QuantumScape.

    Do you recall that discussion?

A    Yes.

Q    And you were not aware of that before today.    5:20:01PM

Correct?

A    Correct.

Q    And you were not aware that an independent third

party called "Mobile Power Solutions" had also

independently verified the test results for    5:20:10PM

QuantumScape's technology.  Correct?

A    Correct.

Q    Are those the kinds of areas you would have

expected to be kept up to -- up to speed on in this

case?    5:20:23PM

Page 152

MR. POTREPKA:  Objection.  Form.  Foundation,     5:20:25PM
argumentative.  Calls for speculation.

THE WITNESS:  I don't know.

BY MR. BISH:

Q    Sir, why did you want to be a lead plaintiff in     5:20:43PM
this case?

A    I wanted to make sure that there was a judicial
service done for management making false claims, and to
make sure that the Class Members -- that we could seek
out justice for this case, as a lead plaintiff.     5:21:18PM

Q    Do you want to know the truth of what happened?

MR. POTREPKA:  I don't even know -- object to
the form.  I'm not sure even what that's asking.

BY MR. BISH:

Q.   You just said you wanted to seek out justice.  Do     5:21:36PM
you want to know what actually happened, or do you just
want revenge?

MR. POTREPKA:  Objection.  Argumentative.
Vague.  Foundation.  We're all bad.

MR. BISH:  Go ahead.     5:21:57PM

THE WITNESS:  I can't comment on your
statement.

BY MR. BISH:

Q    No?  You want to look at those independent test
results and see what actually happened?     5:22:05PM

Page 153

CONFIDENTIAL

A    That's after the fact.                                      5:22:11PM

          MR. POTREPKA:  I'll note for the record that

we have requested those in discovery and have not

received any.

BY MR. BISH:                                                    5:22:22PM

Q    Now, have you ever been convicted of a felony?

A    No.

Q    Can you describe briefly your work history?

A    Worked for IBM Corp. for various technical and

sales positions.                                               5:22:59PM

     And from there, I moved on, into property

management for a number of years, and currently work

for a private real estate firm as a property manager.

Q    And what are your duties as a project -- property

manager?                                                       5:23:26PM

A    I am director of operations to oversee all of the

portfolio in terms of operations, employment,

infrastructure.

Q    Anything else?

A    That's it.                                                5:23:49PM

Q    What did you do to prepare for today's deposition?

          MR. POTREPKA:  Objection.  Foundation.

          THE WITNESS:  I have reviewed all documents

pertaining to the case.  I have communicated and met

with counsel -- my legal counsel, Levi & Korsinsky,           5:24:48PM

Page 154

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

numerous times.                                               5:24:55PM

BY MR. BISH:

Q    How many times?

A    I can't put an exact number, but it was quite a

few times.                                                    5:25:04PM

Q    To prepare for today's deposition, in particular?

A    That, and to keep updated on the case.

Q    When's the last time you met with the lawyers at

Levi & Korsinsky?

A    In person?                                               5:25:33PM

Q    Or on video or over the phone.

A    Yesterday.

Q    For how long?

A    Approximately a little bit over three hours.

Q    Did you review documents?                               5:25:53PM

A    Yes.

Q    Did any of them refresh your recollection?

A    Yes.

Q    Which documents that you looked at yesterday

refreshed your recollection?                                 5:26:15PM

A    I can't disclose that.

Q    Why not?

A    Attorney-client privilege.

        MR. BISH:  Greg, are you going to instruct

him not to answer?                                           5:26:37PM

Page 155

CONFIDENTIAL

MR. POTREPKA:  I will instruct the witness          5:26:40PM

not to divulge the nature of any communications that we

had during our preparation session.

      You can answer the name or type of document, if

you recall, that may have refreshed your recollection.    5:26:58PM

            THE WITNESS:  So we went through the

Complaint document and basically all the documents that

I signed.

BY MR. BISH:

Q    So the documents that refreshed your recollection    5:27:27PM

were the Complaint?

A    That was one of them.

Q    And what -- what recollections did the Complaint

refresh?

A    The basis of the case.                              5:27:46PM

Q    Had you -- had you forgotten the basis of the

case?

            MR. POTREPKA:  Objection.  Argumentative.

            THE WITNESS:  No.

BY MR. BISH:                                             5:28:00PM

Q    So what -- what memory did the Complaint refresh?

A    Securities fraud.

            MR. BISH:  Okay.  We'll mark as Exhibit 28 a

document entitled "Lead Plaintiffs' Response To

Defendant's Interrogatories."                           5:28:25PM

Page 156

(Deposition Exhibit 28 marked for identification.)        5:28:26PM

BY MR. BISH:

Q    Do you have Exhibit 28 in front of you?

A    Yes.

Q    Do you recognize Exhibit 28?                         5:29:50PM

A    Yes.

Q    Did you -- did you sign -- have you been asked to
verify the information in Exhibit 28?

A    Yes.

Q    And did you -- did you carefully review it before   5:30:22PM
you verified it?

A    Yes.

Q    And everything in Exhibit 28 was true and
accurate, to the best of your knowledge?

A    To the best of my knowledge.                         5:30:40PM

Q    Did you provide any edits to Exhibit 28?

A    I don't recall.

Q    Let's look at page 6, please.  Do you see about a
third of the way down on page 6, where it says
"...Plaintiff reviewed public statements made by          5:31:51PM
defendants, including documents filed with the SEC..."?

     Do you see that?

A    Yes.

Q    What documents filed with the SEC did you review
prior to making your purchase of QuantumScape             5:32:04PM

Page 157

securities?                                                  5:32:08PM

            MR. POTREPKA:  Objection.  Foundation.

            THE WITNESS:  I do not recall.

BY MR. BISH:

Q    And then the next one says "QuantumScape's        5:32:16PM

December 8th, 2020, 'Battery Day.'"

     Do you see that?

A    Yes.

Q    Do you know what that's referring to?

A    I do not recall.                                       5:32:38PM

Q    And the next word -- it says "interviews."  Do you

see that?

A    No, I do not.

Q    You don't see where it says "interviews," on --

A    On the same page.                                      5:33:00PM

Q    -- Battery Day?

     Yep.

A    Yes, I see it.

Q    What interviews did you review before purchasing

QuantumScape securities?                                    5:33:14PM

            MR. POTREPKA:  Objection.  Foundation.

            THE WITNESS:  That, I do not recall.

BY MR. BISH:

Q    Can you recall interviews with any QuantumScape

management that you ever reviewed before today?            5:33:31PM

                                              Page 158

CONFIDENTIAL

A    Yes.                                                    5:33:51PM

Q    What?

A    Interviews with the CEO.

Q    When was -- when was an interview conducted?

A    I don't know the exact day.                            5:34:07PM

Q    Where did you see the interview or read the

interview?

A    CNBC.

Q    Oh.  Was -- was this the CNBC content that you saw

in the fall of 2020?                                        5:34:23PM

A    I don't recall if that was the one; but there were

other ones after.

Q    Right.  But you -- but do I understand your

testimony correctly that you saw interviews with

Mr. Singh before you began purchasing QuantumScape          5:34:43PM

securities on December 21st, 2020?

A    No.  You're saying did I base my interviews on the

purchase of stock?  No.

Q    No.  My question is:  Did you see the incompetent

view before you decided to purchase the QuantumScape        5:35:02PM

stock?

        MR. POTREPKA:  Objection.  Calls for a legal

conclusion.

        THE WITNESS:  I don't recall that.

                                                            Page 159

CONFIDENTIAL

BY MR. BISH:                                                5:35:11PM

Q    And then the next word, it says "articles."  What articles did you review about QuantumScape before purchasing QuantumScape securities?

A    I don't recall.                                       5:35:40PM

Q    And then it says "and reviewed the stock price of QuantumScape prior to purchasing QuantumScape securities."

     Do you see that?

A    Yes.                                                  5:35:55PM

Q    When did you review the stock price of QuantumScape?

A    Prior to the purchase.

Q    Was it the day of, the day before, the week before?                                                    5:36:12PM

          MR. POTREPKA:  Objection.  Foundation.

          THE WITNESS:  I don't recall the exact time.

BY MR. BISH:

Q    How long did you spend considering whether to purchase QuantumScape stock before you pulled the    5:36:23PM trigger?

A    I don't recall.

Q    Was it more than a day?

A    Yes.

Q    More than a week?                                     5:36:43PM

Page 160

CONFIDENTIAL

A    Yes.                                                    5:36:48PM

Q    More than a month?

A    Yes.

Q    And did you spend that month researching the

company?                                                   5:37:07PM

        MR. POTREPKA:  Objection.  Form.

        THE WITNESS:  Yes.

BY MR. BISH:

Q    And what information did you come across when

researching QuantumScape before you purchased the         5:37:26PM

securities?

A    I don't recall.

Q    And when you were -- when you spent this month

researching QuantumScape, you never came across the --

a discussion of the solid-state separator?                5:37:51PM

        MR. POTREPKA:  Objection.  Form.  Foundation.

Assumes facts not in evidence.

        THE WITNESS:  I don't recall.

        MR. BISH:  All right.  Let's take a -- take a

short break.                                               5:38:49PM

        THE VIDEOGRAPHER:  Going off record 5:38 p.m.

(Recess taken from 5:38 p.m. until 5:45 p.m.)

        THE VIDEOGRAPHER:  Back on record at

5:45 p.m.

        MR. POTREPKA:  All right.  I'd like to            5:45:58PM

                                                    Page 161

CONFIDENTIAL

tentatively designate the transcript as confidential,          5:46:00PM

pursuant to the Protective Order.

        MR. BISH:  And that's the whole thing, Greg?

        MR. POTREPKA:  Yeah, for now.

BY MR. BISH:                                                    5:46:11PM

Q     Now, sir, is there any -- any of your testimony

today that you want to correct?

A     No.

        MR. BISH:  All right.  Well, I appreciate

your time and look forward to seeing you again.               5:46:34PM

        THE WITNESS:  Okay.  Thank you.

        MR. POTREPKA:  Thank you, everybody.

        THE VIDEOGRAPHER:  Okay.  We're going off

record at 5:46 p.m.  This concludes today's testimony

given by Frank Fish.  Media will be retained by              5:46:48PM

Veritext Legal Solutions.  Thanks, everyone.

(Time noted:  5:46 p.m.)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name:   August 27, 2022.


LYDIA ZINN, RPR, FCRR

CSR No. 9223


Page 163

# EXHIBIT V

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE QUANTUMSCAPE SECURITIES    ) Case No.:

CLASS ACTION LITIGATION          ) 3-21-CV-00058-WHO

                                 )

CONFIDENTIAL

REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

MARY ELIZABETH CRANNY

Shoreline, Washington (Witness' Location)

Thursday, September 1, 2022

Reported by:

LYDIA ZINN

RPR, FCRR, CSR No. 9223

Job No. SF 5353627

PAGES 1 - 193

Page 1

CONFIDENTIAL

A     Yes, it was.                                          9:30:11AM

Q     And have you spoken to -- to Ms. Stark or Mr. Fish

since then?

A     No.

Q     So did you discuss strategic decisions with          9:30:30AM

Ms. Stark and Mr. Fish?

          MR. POTREPKA:  Objection.  Foundation.

Vague.

          THE WITNESS:  No.

BY MR. FRANTELA:                                            9:30:41AM

Q     If the three of you were unable to agree on a

course of action, what would happen?

          MR. POTREPKA:  Objection.  Foundation.  Calls

for speculation.

          THE WITNESS:  We have lawyers.                    9:30:59AM

BY MR. FRANTELA:

Q     So the lawyers would resolve the dispute?

          MR. POTREPKA:  Objection.  Foundation.

Mischaracterizes testimony.

          THE WITNESS:  Yes.                                9:31:12AM

BY MR. FRANTELA:

Q     Are you related by blood or marriage to any lawyer

representing you or the other plaintiffs in this

action?

A     No.                                                  9:31:29AM

Page 31

Q    And do you have any business or personal                9:31:33AM

relationship with any lawyer representing you or the

other plaintiffs in this action?

A    No.

Q    How do you obtain information about the status of       9:31:43AM

this lawsuit?

A    Have I obtained information?  Of course.

Q    And how do you obtain it?

A    How do I obtain it?  My lawyers send me the

information to read.                                         9:32:03AM

Q    And do you communicate with your counsel about

this lawsuit regularly?

A    Yes, I do.

Q    Approximately how many times a month?

A    I don't want to speculate how many times.              9:32:22AM

Q    Please estimate.

        MR. POTREPKA:  Objection.  Calls for

speculation.  Asked and answered.

        THE WITNESS:  As often as information comes

available to them, I suppose.                               9:32:38AM

BY MR. FRANTELA:

Q    How many updates have you received from counsel

regarding this litigation?

A    Again, you're asking me for a number.  I don't

know a number.                                              9:33:00AM

Page 32

Q    To the best of your estimation, how many updates        9:33:02AM

have you received from counsel regarding this

litigation?

        MR. POTREPKA:  Objection.  Calls for

speculation.  Asked and answered.                            9:33:09AM

        THE WITNESS:  Same answer.  I don't know.

BY MR. FRANTELA:

Q    Have you asked any questions of counsel regarding

this litigation?

A    Sure.                                                   9:33:24AM

Q    And counsel has provided answers?

A    Of course.

Q    How did you select Levi & Korsinksy as your

counsel?

A    I didn't have to select them.  They were --            9:33:52AM

they're the ones representing the plaintiff.

Q    Did Levi & Korsinksy contact you first, or did you

contact them first?

        MR. POTREPKA:  Objection.  Form.  Foundation.

        THE WITNESS:  I am not sure who contacted who       9:34:19AM

first.

BY MR. FRANTELA:

Q    You don't know whether you reached out to your

counsel first or if they reached out to you

unsolicited.  Is that right?                                 9:34:33AM

Page 33

MR. POTREPKA:  Objection.  Objection.  Form.    9:34:35AM

Foundation.  Argumentative.  Asked and answered.

THE WITNESS:  Correct.

BY MR. FRANTELA:

Q    Before we start to look at documents, I want to    9:34:53AM

try to understand the nature of the information you

learned about QuantumScape when you did your extensive

research but before joining the case.

Do you believe that the company's test results

were false, based on something you read?    9:35:04AM

MR. POTREPKA:  Objection.  Foundation.

THE WITNESS:  Will you repeat that question,

Andrew?

BY MR. FRANTELA:

Q    Do you believe that the company's test results    9:35:13AM

were false, based on something you read prior to

joining this litigation?

MR. POTREPKA:  Objection.  Foundation.

Vague.

THE WITNESS:  I believe there's reason for    9:35:23AM

suspicion, yes.

BY MR. FRANTELA:

Q    Which test results?  Suspicion about which --

suspicion about which test results?

MR. POTREPKA:  Objection.  Foundation.    9:35:37AM

Page 34

THE WITNESS:  I'm not an expert.                 9:35:39AM

BY MR. FRANTELA:

Q    I didn't ask you if you were an expert.

     Foundation -- just which test results are you referring to that you were suspicious about?        9:35:51AM

A    Well, that's a fair question, but I don't even know the language necessary of batteries.

     So which test?  I don't recall which test.  There was testing done that is suspicious.

Q    Do you recall if that testing occurred in        9:36:15AM December -- the testing results were released in December 2020?

          MR. POTREPKA:  Objection.  Foundation.

          THE WITNESS:  Those questions are in the Complaint.  And I don't have that in front of me to        9:36:27AM look at, but I don't know what time of year it was.

BY MR. FRANTELA:

Q    Do you know if the test results at issue in this lawsuit were subsequently validated by any third party?

          MR. POTREPKA:  Objection.  Foundation.        9:36:44AM

          THE WITNESS:  That would also be in the Complaint.

BY MR. FRANTELA:

Q    Right.  And I'm asking you.  Do you know if these test results were subsequently validated by any third        9:36:55AM

Page 35

MR. FRANTELA:  Apologies.  I apologize.                9:39:05AM

THE WITNESS:  I don't know if they're ahead of schedule or not.

BY MR. FRANTELA:

Q    Would that be something that you would have cared        9:39:15AM
about when you were researching QuantumScape prior to joining the lawsuit?

MR. POTREPKA:  Objection.  Vague.

THE WITNESS:  Not necessarily.

BY MR. FRANTELA:                                            9:39:25AM

Q    It wouldn't matter to you if QuantumScape was achieving its -- its goals ahead of schedule?

MR. POTREPKA:  Objection.  Vague. Mischaracterizes testimony.

THE WITNESS:  There's more to rolling out a             9:39:36AM
product than just if they're ahead of schedule.

BY MR. FRANTELA:

Q    So --

A    So would it matter?

It would be one of many things that would matter,          9:39:47AM
I'm sure.

BY MR. FRANTELA:

Q    When was this case initiated, to the best of your knowledge?

MR. POTREPKA:  Objection.  Foundation.                 9:40:05AM

Page 38

THE WITNESS:  I don't know the answer to        9:40:08AM

that.

BY MR. FRANTELA:

Q    Do you know the name of the presiding judge?

A    Orrick.                                      9:40:19AM

Q    What have you done to monitor the developments in

this case?

MR. POTREPKA:  Objection.  Vague.

THE WITNESS:  I don't monitor the

developments.                                    9:40:32AM

BY MR. FRANTELA:

Q    Can you tell me generally what's happened in this

case since it began?

MR. POTREPKA:  Objection.  Vague.

THE WITNESS:  Well, it's developed to the        9:40:55AM

point of QuantumScape's motion to dismiss being denied.

So we're now in discovery.

BY MR. FRANTELA:

Q    Please describe the claims that are alleged in

this lawsuit, to the best of your ability.        9:41:16AM

MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal opinion.

THE WITNESS:  Overinflated price.  Testing.

There's -- there's -- there's many factors that have

led to this class action suit.  False claims.     9:41:40AM

Page 39

CONFIDENTIAL

(Cross talk.)                                                9:41:46AM

THE WITNESS:  But specifically I'd have to look at the Complaint, I don't want to speculate.

(Reporter requested clarification.)

THE WITNESS:  I did.                                         9:41:59AM

BY MR. FRANTELA:

Q    Can you describe the misrepresentations that are alleged in this lawsuit?

MR. POTREPKA:  Objection.  Foundation.

THE WITNESS:  Again, I would like to see the                 9:42:11AM
Complaint instead of just trying to remember things in -- myself.

Q.    To the best of your ability, can you describe the misrepresentations that are alleged in this lawsuit?

MR. POTREPKA:  Objection.  Foundation.  Asked                9:42:26AM
and answered.

THE WITNESS:  Same answer.  I'm not going to speculate.

BY MR. FRANTELA:

Q    You can't describe the misrepresentations that are      9:42:32AM
alleged in this lawsuit?

MR. POTREPKA:  Objection.  Foundation.  Asked and answered.  Mischaracterizes testimony.

THE WITNESS:  I choose not to.  I don't want to speculate.                                              9:42:42AM

Page 40

CONFIDENTIAL

Q    That's correct.                                      9:48:43AM

A    Yeah.  Mm-hm.

        MR. POTREPKA:  There's -- I'm just -- there

should be a bar at the bottom that you can zoom in to,

if you need to see it.                                   9:48:50AM

        THE WITNESS:  Okay.  Thank you.

BY MR. FRANTELA:

Q    Yeah.  And with any exhibit, please let me know if

you're having any trouble seeing it.  We can get that

figure out.                                              9:49:01AM

A    Thank you.

Q    Of course.

    And have you seen this document before?

A    Yes.

Q    What is this document, to the best of your         9:49:10AM

knowledge?

A    So this is the document where I acknowledge that I

will serve as a plaintiff, and retain Levi & Korsinsky.

Q    And do you remember signing this document?

A    Yes, I do.                                         9:49:49AM

Q    You signed it electronically.  Right?

A    Yes.

Q    And take your time in reviewing it; but is this

declaration complete and accurate, to the best of your

knowledge?                                              9:50:00AM

Page 46

CONFIDENTIAL

A    Yes, it is.                                          9:50:00AM

Q    And you understand that a declaration is like

deposition testimony; a sworn statement under penalty

of perjury?

A    Yes.                                                9:50:10AM

Q    And you understood that at the time you signed it?

A    I did.

Q    Did you review a draft of this declaration before

you signed it?

A    I did.                                              9:50:23AM

Q    Did you suggest any changes?

A    No.

Q    Looking at paragraph 5 on page 2, it says --

A    Mm-hm.

Q    -- "I understand that a class representative is a    9:50:37AM

party who acts on behalf of other class members in

directing the litigation."

     Is that right?

A    Correct.

Q    But you said you haven't done anything yet to         9:50:47AM

direct the litigation.  Right?

          MR. POTREPKA:  Objection.  Mischaracterizes

the testimony.

          THE WITNESS:  You're saying I didn't do what?

Page 47

BY MR. FRANTELA:                                          9:50:59AM

Q    Going back to the question I asked earlier, I asked if you had done anything to direct the litigation.  And you said, no, that that was for the lawyers.                                              9:51:06AM

        Do you recall that?

            MR. POTREPKA:  Same objection.

            THE WITNESS:  I did say that.

BY MR. FRANTELA:

Q    In looking at paragraph 6, it says you have "a    9:51:12AM
duty to prosecute the case vigorously and in the best interest of all class members, which includes reviewing important filings, consulting with counsel on proposed strategies and tactics during the course of the litigation, making recommendations as to whether or not    9:51:27AM
to accept a particular settlement offer, and testifying at deposition and trial if called upon to do so."

        Do you see that?

A    I do.

Q    Well, this paragraph lists some of your duties as    9:51:37AM
class representative.  Right?

A    Correct.

Q    If you were presented with a settlement offer today, do you feel confident you'd be prepared to make a recommendation about whether or not to accept it?    9:51:51AM

Page 48

A     Do I feel prepared?                                    9:52:01AM

      I would want to consult with my attorneys on that.

Q     In paragraph 13, if you scroll down a little bit,

it says:  "Since joining this class action, I have

monitored the developments in this case by               9:52:13AM

communicating with counsel periodically."

      Right?

A     Correct.

Q     And the next paragraph says:  "I understand" --

which is 14 -- "the claims asserted in this class        9:52:24AM

action arise out of alleged violations of the federal

securities laws in connection with defendants' false

and misleading representations and omissions concerning

the state of their battery technology, including such

technology's efficacy, safety, cost, commercial         9:52:40AM

prospects, and technical capabilities."

      Did I read that right?

A     Yes.

Q     Do you agree with that statement, sitting here

today?                                                   9:52:52AM

A     I do.

Q     And is this statement based on the test results

that QuantumScape released in December 2020?

         MR. POTREPKA:  Objection.  Foundation.  Asked

and answered.                                            9:53:00AM

Page 49

Veritext Legal Solutions
866 299-5127

THE WITNESS:  I don't know whether it was                9:53:03AM

December or when it -- the things were released.

BY MR. FRANTELA:

Q    You told me that you don't feel comfortable

explaining, you know, anything about the allegedly          9:53:19AM

false and misleading representations right? -- earlier?

        MR. POTREPKA:  Objection.  Mischaracterizes

the testimony.

        THE WITNESS:  Where are you going with that?

BY MR. FRANTELA:                                            9:53:32AM

Q    Do you recall that -- that testimony?

        MR. POTREPKA:  Same objection.

        THE WITNESS:  I -- I don't -- the court

reporter knows that that's exactly what I said or not.

So I -- I don't know how to answer that question.           9:53:48AM

BY MR. FRANTELA:

Q    Paul, this paragraph says that you do "understand

the claims in this case arise out of statements

regarding these specific aspects of QuantumScape's

battery technology."  Right?                                9:53:59AM

A    It does say that.  And I totally understand the

claims written in the Complaint.  I just can't name

them all.  But I understand the assertions -- the

claims asserted in the class action.  And that's why

we're in discovery now.                                     9:54:17AM

Page 50

Q    So when I asked you to describe the                    9:54:20AM

misrepresentations, to the best of your ability,

separate from the claims, why couldn't you?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I don't want to say the wrong        9:54:30AM

thing or speculate.  I would rather see what's in the

Complaint and read that.

BY MR. FRANTELA:

Q    Well, I'm entitled to know, you know, as the

deponent here, what you understand.                        9:54:49AM

    So that's all I'm asking about, is just, you know,

your understanding of the misrepresentations.

        MR. POTREPKA:  Objection.

    Is that a question?

        MR. FRANTELA:  No.                                  9:55:03AM

Q    Please tell me what your understanding of the

misrepresentations are in this case.

        MR. POTREPKA:  Objection.  Asked and

answered.  Foundation.

        THE WITNESS:  The misrepresentations have to        9:55:30AM

do with efficacy, safety, cost, commercial prospects,

and technical capabilities.

BY MR. FRANTELA:

Q    Is there anything specific you can describe about

any of that?                                                9:55:47AM

Page 51

MR. POTREPKA:  Same objections.                    9:55:50AM

THE WITNESS:  Specifics to all of them?

No.  At this moment in time, I'm not going to speculate.

BY MR. FRANTELA:                                    9:56:07AM

Q    Can you tell me any statements in particular that are alleged to be misleading?

MR. POTREPKA:  Same objections.

THE WITNESS:  Misleading -- sure.  Claims about where they were -- where QuantumScape was at when   9:56:27AM I purchased the stock with its testing and ability to roll out a battery that was not ready.

BY MR. FRANTELA:

Q    Which statement in particular are you referring to?                                                9:56:49AM

MR. POTREPKA:  Objection.  Foundation.  Asked and answered.

THE WITNESS:  Statements about its readiness for cars.

BY MR. FRANTELA:                                    9:57:01AM

Q    What words do you believe were false?

MR. POTREPKA:  Objection.  Foundation.  Asked and answered.

THE WITNESS:  I don't want to speculate the words that I heard, because someone's going to        9:57:22AM

Page 52

A    I -- it's -- it's enough for me to question the    11:04:59AM

validity of the 30 degrees Celsius and the one-hour

charge.

And -- and that's why we have retained the law

firm and experts to find out if that is a correct claim    11:05:16AM

or not.  So my answer is, yes, I think, if I understood

your question right.  I do find reason to believe

there's problems with those statements.

Q    So my question was --

You said that -- you said that you have reason to    11:05:38AM

believe that there are issues.

And I said what reasons?  And you didn't answer

directly.

So what are the reasons you have to -- to believe

that this is false --    11:05:46AM

MR. POTREPKA:  Objection.  Foundation.

BY MR. FRANTELA:

Q    -- besides the fact that you've hired lawyers?

MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal opinion.  Calls for expert opinion.    11:05:57AM

THE WITNESS:  Again, I'm not an expert.

But the degrees listed, and the running time

rates, the one-hour charge, I have issues with.

BY MR. FRANTELA:

Q    Right.  You have issues.  And you said -- and you    11:06:10AM

Page 89

said that you have a reason for those issues.                11:06:12AM

     But you still haven't identified them.

     So what are the reasons that you have issues with

this statement and believe it to be false?

          MR. POTREPKA:  Objection.  Foundation.  Calls    11:06:23AM

for a legal conclusion.  Calls for expert conclusion.

          THE WITNESS:  That's exactly why I'm here

representing the other plaintiffs, and leaving it up to

my lawyers and the experts to -- to figure this out for

us.                                                         11:06:39AM

BY MR. FRANTELA:

Q    But that sounds like:  Sue first and ask questions

later; doesn't it?

A    No.

Q    So you can't identify the reasons why there are      11:06:45AM

issues?  You're saying that we still need to find out

the truth --

          MR. POTREPKA:  Objection.  Foundation.

BY MR. FRANTELA:

Q    -- correct?                                           11:06:54AM

          MR. POTREPKA:  Objection.  Foundation.

Mischaracterizes testimony.  Calls for speculation.

Calls for a legal conclusion.

          THE WITNESS:  Yes, Andrew.  I'm saying I need

legal counsel on this.  Correct.                            11:07:03AM

Page 90

CONFIDENTIAL

BY MR. FRANTELA:                                          11:07:07AM

Q    And without them, you can't identify a reason why

this could be false?

           MR. POTREPKA:  Same objections.  Asked and

answered.                                                11:07:13AM

           THE WITNESS:  The reasons why this could be

false -- it's false are all in the Complaint.

BY MR. FRANTELA:

Q    And in the last few minutes when we've been

talking about this, you haven't identified any to me.    11:07:21AM

Right?

A    I have identified that I'm not an expert.

Q    Which was not my question.

A    You're asking -- it doesn't -- that is not your

question.  But I cannot answer something I don't have     11:07:36AM

an answer to.

Q    Well, you told me there were reasons that you

believe that this statement is false.  So tell me the

basis for your belief that this statement is false.

A    They're all in the Complaint.                       11:07:51AM

           MR. POTREPKA:  Objection.  Foundation.

           THE WITNESS:  I'm sorry, Greg.

           MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal conclusion.  Calls for expert opinion.

Asked and answered.                                       11:08:01AM

                                                    Page 91

BY MR. FRANTELA:                                                12:11:12PM

Q    Nothing?  Nothing could change your mind?

A    No.

Q    Does that seem fair, that nothing could change

your mind about whether they committed fraud?        12:11:24PM

        MR. POTREPKA:  Objection.  Mischaracterizes

the testimony.

        THE WITNESS:  Judge Orrick will decide if

it's fair or not; not me.

BY MR. FRANTELA:                                                12:11:34PM

Q    But I'm asking you; not Judge Orrick.

        MR. POTREPKA:  Same objection.

        THE WITNESS:  I don't have an answer for you.

I'm not the Judge.

BY MR. FRANTELA:                                                12:11:41PM

Q    I didn't ask what the Judge would think.  I asked

what you would think; if that's fair, in your personal

opinion.  Nothing to do with that case.  Is it fair to

be accused of fraud, and have the person who's accusing

you say that they won't change their mind, no matter     12:11:52PM

what?

        MR. POTREPKA:  Mischaracterized the

testimony.  She said "right now."

        THE WITNESS:  Yeah.  And fraud's a big word.

    We're -- it's very, very okay to question -- to      12:12:04PM

                                                Page 116

question what someone's done or what a company -- and    12:12:11PM

that's what we're doing.  So it's not wrong to accuse

someone of fraud if you think that there was fraud

involved.

BY MR. FRANTELA:                                         12:12:27PM

Q    Right.  Which wasn't the question I asked.

     I just asked if -- if there was anything that

could change your mind.  And you said no -- right?  --

at this point?

A    Right now, no, there's nothing that would change    12:12:36PM

my point -- my point of view.

Q    Have you heard of a company called "Mobile Power

Solutions"?

A    No.

Q    Are you aware that QuantumScape's cells were         12:12:49PM

tested by an independent lab, in addition to

Volkswagen, that also verified the test results at

issue in this lawsuit?

A    I'm not aware of -- of all that Quantum's done --

QuantumScape has done.  I'm not aware of all of it.      12:13:07PM

Q    Well, I was referring to Mobile Power Solutions,

not QuantumScape there, that tested QuantumScape's

cells.

A    Yes, I don't --

     Yes, again, I'm not aware of all of the different    12:13:17PM

Page 117

CONFIDENTIAL

players that QuantumScape has allowed to test their --    12:13:20PM

their batteries.  I -- I don't know the answers to all

that.  That would take someone with more expertise than

me.

Q    Would you consider the test that they're running    12:13:33PM

through third parties, you know, important to monitor

as part of this lawsuit?

      MR. POTREPKA:  Objection.  Form.  Foundation.

Vague.

      THE WITNESS:  Of course, I would.    12:13:45PM

      MR. FRANTELA:  I'm going to introduce the

document previously marked as Exhibit 23.

(Deposition Exhibit 23 previously marked for

identification.)

      MR. FRANTELA:  Now, this is a -- I'll give    12:14:00PM

you a second to pull it up.

      THE WITNESS:  Okay.

      MR. POTREPKA:  23?  Is that what you said?

      MR. FRANTELA:  That's right.

      MR. POTREPKA:  23.  Okay.    12:14:14PM

      MR. FRANTELA:  Yep.

      THE WITNESS:  The fiscal report?

BY MR. FRANTELA:

Q    That's right.  It should say:  "Q3 Fiscal 2021

Letter to Shareholders."    12:14:22PM

Page 118

CONFIDENTIAL

and checked, as well as the "QS-0 Facility Secured,"      12:27:44PM

"4-Layer Full-Sized Cell"; but the fourth goal --

fourth milestone, is only half checked for "8 to

10-Layer Full-Sized Cell"?

A    I see that.                                          12:27:57PM

Q    Under the heading "Our Strategic Vision," it notes

that the board "laid out a series of ambitious targets

for the company to be achieved over the coming decade."

Do you see that?

A    I do.                                               12:28:10PM

Q    Would it be your understanding that QuantumScape

is attempting to solve problems that will take years to

address?

MR. POTREPKA:  Objection.  Foundation.

THE WITNESS:  Yes.  Yes.                       12:28:22PM

BY MR. FRANTELA:

Q.   And would you agree that QuantumScape has been

clear that its time line for commercialization is years

away?

A    Yes.                                                12:28:32PM

MR. FRANTELA:  Moving on to the next exhibit,

this one will be a document previously marked as

Exhibit 6.

(Deposition Exhibit 6 previously marked for

identification.)                                         12:28:50PM

Page 129

THE WITNESS:  Got it.                                    12:29:15PM

BY MR. FRANTELA:

Q    Okay.  Great.

So this is a post on seekingalpha.com, I'll
represent to you.  Do you see that the author name is      12:29:34PM
Brian Morin?

A    I see that.

Q    And you see the date is -- above his name is
January 4th, 2021?

A    I see that.                                         12:29:47PM

Q    Have you seen this article before?

Feel free to review.

A    I have not.

Q    Are you familiar with Seeking Alpha?

A    No.  I'm not familiar with it.                      12:30:01PM

Q    Have you heard of Brian Morin?

A    I have -- Brian Morin?  I have not.

Q    So you didn't rely on this document when you
joined the case.  Right?

A    Correct.                                            12:30:25PM

MR. POTREPKA:  Objection.  Objection.  Calls
for a legal conclusion.

MR. FRANTELA:  Introducing the next exhibit.
One second, please.

THE WITNESS:  Mm-hm.                                    12:31:14PM

Page 130

Veritext Legal Solutions
866 299-5127

MR. POTREPKA:  Will this be 41?                    12:31:16PM

MR. FRANTELA:  This one is going to be

Exhibit Number 7, previously marked.

(Deposition Exhibit 7 previously marked for

identification.)                                  12:31:24PM

BY MR. FRANTELA:

Q    And that should be in the Marked Exhibits folder

now.

A    Got it.

Q    Do you see Brian Morin's name at the top?      12:31:53PM

A    I do.

Q    And the same title and date that we just looked

at?

A    Mm-hm.  Yes.

Q    How, if at all, does this Seeking Alpha report   12:32:05PM

relate to your allegations in this case?

MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal conclusion.

THE WITNESS:  I -- I don't know much about

Seeking Alpha.  So I don't know how important it is.   12:32:23PM

BY MR. FRANTELA:

Q    Do you understand that a Seeking Alpha post is

alleged to have revealed fraud in this case?

MR. POTREPKA:  Objection.  Foundation.

THE WITNESS:  Well, Seeking Alpha might be      12:33:01PM

Page 131

Do you have any reason to disagree with what I    12:43:07PM
just read?

A    No, I -- I don't have any reason to disagree.

Q    Did you know whether QuantumScape, in fact,
achieved its milestones?    12:43:22PM

        MR. POTREPKA:  Objection.  Form.  Vague.

        THE WITNESS:  I don't know the answer to
that.

        MR. FRANTELA:  The next document is
Exhibit Number 16, as previously marked.    12:43:42PM

(Deposition Exhibit 16 previously marked for

identification.)

        THE WITNESS:  You said 16?

        MR. FRANTELA:  Yes, ma'am.

        THE WITNESS:  Okay.  Got it.    12:44:22PM

BY MR. FRANTELA:

Q    Okay.  Do you recognize this document?

A    I believe I've seen this.

Q    What do you recognize about this document?

A    I recognize some of the titles on the different    12:44:59PM
pages; some of the pictures.

Q    Do you recognize the name at the top of the middle
of the first page:  Scorpion Capital?

A    Yes.  I recognize the name.

Q    And are you aware whether this document is related    12:45:21PM

Page 139

CONFIDENTIAL

to your allegations in this case?                    12:45:26PM

        MR. POTREPKA:  Objection.  Vague.  Calls for

a legal opinion.

        THE WITNESS:  I am aware.

BY MR. FRANTELA:                                     12:45:35PM

Q    And it is related?

        MR. POTREPKA:  Same objection.

        THE WITNESS:  Yes.

BY MR. FRANTELA:

Q    And, to the best of your knowledge, what does this   12:45:45PM

report show?

        MR. POTREPKA:  Objection.  Calls for a legal

opinion.

        THE WITNESS:  Yeah.  Leave that to my

attorney.                                            12:45:57PM

BY MR. FRANTELA:

Q    I'm entitled to an answer.  That's not a valid

response.

A    Repeat the question, please.

Q    To the best of your knowledge, what does this   12:46:11PM

report show?

        MR. POTREPKA:  Objection.  Form.  Vague.

Calls for a legal opinion potentially.

        THE WITNESS:  It shows there's reason...  It

shows there's lots of reasons for a class-action suit.   12:46:31PM

Page 140

CONFIDENTIAL

BY MR. FRANTELA:                                              12:46:37PM

Q   You're alleging fraud in this case based on the

information in this report.  Right?

        MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal opinion.                                         12:46:48PM

        THE WITNESS:  Yes.

BY MR. FRANTELA:

Q   Do you trust this report?

        MR. POTREPKA:  Objection.  Vague.

        THE WITNESS:  Yes.                                   12:47:07PM

BY MR. FRANTELA:

Q   You find it to be credible?

        MR. POTREPKA:  Same objection.

        THE WITNESS:  Yes.

BY MR. FRANTELA:                                             12:47:19PM

Q   And you believe the report to be accurate?

        MR. POTREPKA:  Same objection.

        THE WITNESS:  Yes.

        MR. POTREPKA:  Foundation.

        THE WITNESS:  Yes.                                   12:47:30PM

BY MR. FRANTELA:

Q   And what causes you to believe in the truth of

this report?

A   Because they're bringing up questions about

solid-state batteries that I wasn't aware of --             12:47:51PM

Page 141

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

for a legal conclusion.                                      12:52:15PM

         THE WITNESS:  Yeah.  I may not say it

accurately, but it's someone who invests to see a stock

go down.

BY MR. FRANTELA:                                            12:52:26PM

Q    So short sellers make money if a stock goes down?

Is that right?

A    Well, they make -- yeah.  They just invest and

sell, invest and sell, invest and sell, yeah, I

believe.  I'm not a short seller, so I don't know that   12:52:39PM

much about them.

Q    Is Scorpion Capital a short seller?

         MR. POTREPKA:  Objection.  Foundation.

         THE WITNESS:  I have no idea.

BY MR. FRANTELA:                                            12:52:53PM

Q    You told me they investigate companies.  Right?

You told me Scorpion Capital investigates companies.

Right?

A    I believe so.

Q    Who wrote that Scorpion Capital is reputable?     12:53:41PM

A    Would you repeat that question?

Q    Who told you that Scorpion Capital is a reputable

source?

         MR. POTREPKA:  Objection.  Foundation.

Mischaracterizes the testimony.                            12:53:55PM

Page 144

CONFIDENTIAL

THE WITNESS:  No one's actually told me that    12:53:57PM

they're credible.  I mean, that conversation hasn't

come out.

They're quoted.  It's out on the Internet.  And

they've written credible articles, as far as I know.    12:54:22PM

So I -- I can't really answer that question.

BY MR. FRANTELA:

Q    Would you be able to replicate the searches you

did on Scorpion Capital to conduct the little research

that you did?    12:54:45PM

A    No.

Q    Why not?

A    Because I can't replicate it.  I mean, it happened

months ago, and when you do searches, you -- you just

start searching depending upon what you see and what    12:55:08PM

hits you at the time that seems important to you.  So I

could not possibly replicate it.

Q    You didn't actually research Scorpion Capital.

Right?

MR. POTREPKA:  Objection.  Form.    12:55:23PM

Mischaracterizes the testimony.  Argumentative.

THE WITNESS:  That's not true.

BY MR. FRANTELA:

Q    Did you google the words "Scorpion Capital"?

A    I don't remember what I googled.    12:55:43PM

Page 145

Q    You --                                                    12:55:47PM

A    I was not as interested in Scorpion as I was in

QuantumScape.  I'll tell you that much.

Q    And -- and but you did google something regarding

Scorpion Capital?                                             12:56:00PM

        MR. POTREPKA:  Objection.  Asked and

answered.

        THE WITNESS:  Yes.

BY MR. FRANTELA:

Q    And what came up?                                        12:56:08PM

A    I'm being asked about my research months ago.  I

was researching QuantumScape.

    So I'm going to retract what I said and say I

wasn't researching Scorpion to find out about Scorpion;

who they are; what they do; who's behind it; how much      12:56:40PM

money they make, or anything.

    I was doing my research on QuantumScape, and

quotes from Scorpion, Scorpion Capital -- the name came

up frequently.  But I was researching QuantumScape.

Q    What basis, if any, do you have to say that             12:57:06PM

Scorpion Capital is a credible organization?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I don't right now.

BY MR. FRANTELA:

Q    And if you scroll down to page 2, do you see the        12:57:24PM

                                                              Page 146

CONFIDENTIAL

(Recess taken from 1:55 p.m. until 2:01 p.m.)          1:55:01PM

      THE VIDEOGRAPHER:  We are back on the record.

The time is 2:01 p.m.

BY MR. FRANTELA:

Q    And, Ms. Cranny, you said you sold your shares of          2:01:10PM
QuantumScape.

    Do you recall approximately when that was?

A    The -- the first time?

Q    Your second -- your second sale.  My apologies.

A    It was last quarter sometime.          2:01:28PM

Q    In 2022?

A    Yes.

Q    Thank you.

    Do you recall those four milestones that we looked

at in that shareholder letter?  Not necessarily what          2:01:48PM

the milestones were; but the fact that we looked at

four milestones?

A    Mile -- what are you talking about with

milestones?

Q    We looked at a shareholder letter of          2:01:59PM

QuantumScape's that listed four milestones with green

checkmarks next to them.

    Do you recall that?

A    I recall.

      MR. FRANTELA:  I'm going to introduce the          2:02:08PM

Page 181

next document, which was previously marked as                    2:02:09PM

Exhibit 24.

(Deposition Exhibit 24 previously marked for

identification.)

        THE WITNESS:  Got it.                                    2:02:30PM

BY MR. FRANTELA:

Q    Okay.  Now, this is a press release dated

November 16th, 2021.  Is that right?

A    Yes.

Q    And the title says "QuantumScape Achieves Final      2:02:46PM

2021 Goal Ahead of Schedule."  Right?

A    Right.

Q    And were you aware before today that QuantumScape

had, in fact, all four of its 2021 milestones?

        MR. POTREPKA:  Object to the form.                       2:03:05PM

Foundation.

        THE WITNESS:  No.

BY MR. FRANTELA:

Q    Does it cause you to reconsider your claims of

fraud that -- given that they achieved all four of       2:03:21PM

their 2021 milestones?

        MR. POTREPKA:  Objection.  Form.  Foundation.

        THE WITNESS:  No.

BY MR. FRANTELA:

Q    Do you think there's a possibility that Scorpion     2:03:33PM

Page 182

could have been wrong in its analysis?                    2:03:38PM

          MR. POTREPKA:  Objection.  Foundation.  Calls

for speculation.

          THE WITNESS:  That will be what Judge Orrick

determines.                                               2:03:47PM

BY MR. FRANTELA:

Q    Agreed.

     But do you think there's a possibility that they

could have been wrong?

          MR. POTREPKA:  Same objections.                 2:03:55PM

          THE WITNESS:  I don't know the answer to

that.

          MR. FRANTELA:  Okay.  I'm going to introduce

the next document, which is a document that was

submitted in this case.                                   2:04:43PM

(Deposition Exhibit 45 marked for identification.)

          MR. POTREPKA:  Which number will this one be?

          MR. FRANTELA:  This number will be Number 45.

Q.   Let me know when you've got that, Ms. Cranny,

please.                                                   2:05:13PM

A    Got it.

Q    And do you recognize this document as the

interrogatories you submitted in this case?

A    I do.

Q    Could you scroll down to the bottom.  You signed   2:05:31PM

Page 183

CONFIDENTIAL

this document.  Right?  Second page from the bottom.        2:05:34PM

A    I did.

Q    Do you recall signing it?

A    I do.

Q    And it looks like you signed it by hand --        2:05:44PM
right? -- not digitally?

A    I'm still scrolling down.

     Yes, I signed it by hand.  I did.

Q    Thank you.

     And did you review this document before you signed        2:05:59PM
it?

A    Yes, I did.

Q    Did you suggest any changes to the draft you
reviewed?

A    Other than making sure that what I was saying        2:06:13PM
was -- that what I said was correct, there was no
changes that needed to be --

Q    Okay.  Okay.  And scrolling down to page 6 --
actually, let's start with 5.  And if you read --

     MR. POTREPKA:  Page 5?        2:06:37PM

     MR. FRANTELA:  Page 5, Interrogatory
Number 3.  It's on line 11.  And it says:  "For each
transaction identified in your response to
Interrogatory Number 2, state with particularity the
reason for your decision to engage in the transaction."        2:06:47PM

Page 184

Q    Do you see that?                                          2:06:51PM

A    I do.

Q    And if you scroll down to page 6, line 6, at the
end of your response to that interrogatory, you state:
"Plaintiff reviewed websites concerning securities of        2:07:03PM
technology manufacturers, including QuantumScape, and
reviewed the stock price of QuantumScape prior to
purchasing QuantumScape securities."
     So I want to focus on those websites.
     Do you recall any other particular websites that         2:07:19PM
you reviewed?

A    I don't recall which websites, no.

Q    And did you save any information from those
websites?

A    I did not.                                               2:07:30PM

Q    Sitting here today, is this complete and accurate;
or did you rely on anything else prior to purchasing
QuantumScape securities?

A    It's complete and accurate.

        MR. FRANTELA:  Okay.  We can take five.  Or           2:07:55PM
we can even take two.  I might -- we might be able to
get out of here quickly.

        MR. POTREPKA:  Sure.

        MR. FRANTELA:  Okay.  Let's take five.

        MR. POTREPKA:  Okay.                                  2:08:08PM

                                                        Page 185

MR. FRANTELA:  Okay.  Thank you, guys.                    2:08:08PM

THE VIDEOGRAPHER:  Off the record 2:08 p.m.

(Recess taken from 2:08 p.m. until 2:13 p.m.)

THE VIDEOGRAPHER:  Okay.  We are back on the

record.  The time is 2:13 p.m.                            2:13:39PM

BY MR. FRANTELA:

Q    Ms. Cranny, under what circumstances will you

direct counsel to dismiss the claims against the

defendant?

MR. POTREPKA:  Objection to form.  Calls for    2:13:52PM

speculation.  Foundation.

THE WITNESS:  Under what circumstances will I

what?

BY MR. FRANTELA:

Q    Direct counsel to dismiss the claims against the    2:14:05PM

defendant.

MR. POTREPKA:  Objection.  Calls for

speculation.  Foundation.

THE WITNESS:  I have no idea.

BY MR. FRANTELA:                                          2:14:12PM

Q    Are you able to give me any examples of a

development that would cause you to direct counsel to

dismiss these claims --

MR. POTREPKA:  Objection.

Page 186

BY MR. FRANTELA:                                     2:14:25PM

Q    -- decision?

        MR. POTREPKA:  Objection.  Calls for

speculation.  Foundation.

        THE WITNESS:  No.  I have a voice in where --   2:14:31PM

where this is going, but I haven't found anything yet

to advise my attorneys to dismiss the case.

BY MR. FRANTELA:

Q    But are you able to identify an example of a

development that would cause you to direct them to     2:14:53PM

dismiss the case?

        MR. POTREPKA:  Objection.  Foundation.  Calls

for speculation.

        THE WITNESS:  No.  I'd be making it up if I

tried to speculate.                                   2:15:02PM

        MR. FRANTELA:  Okay.  No further questions.

        MR. POTREPKA:  I don't have anything, but

we'll read and sign.

        MR. FRANTELA:  Okay.  Thank you very much for

your time today, Ms. Cranny.                          2:15:31PM

        THE WITNESS:  Thank you.

        MR. POTREPKA:  Thank you, everybody.

(Cross talk.)

        THE VIDEOGRAPHER:  Hold on.  Hold on.

Mr. Potrepka, do you need a copy of the video?        2:15:38PM

                                              Page 187

CONFIDENTIAL

MR. POTREPKA:  Oh, yes, yes.                    2:15:43PM

THE VIDEOGRAPHER:  Thank you.  All right.

MR. POTREPKA:  And the same usual

standing order.

THE VIDEOGRAPHER:  Okay.                        2:15:50PM

MR. FRANTELA:  And the same for us as well.

THE VIDEOGRAPHER:  I'm sorry.  You both have

standing orders?

MR. FRANTELA:  That's right.

MR. POTREPKA:  Yes.                             2:15:59PM

THE VIDEOGRAPHER:  Okay.  Thank you.  All

right.  This will conclude the deposition of

Mary Cranny.  The total number of media units used in

today's deposition was six, and will be retained by

Veritext Legal Solutions.  We are going off the record.    2:16:07PM

The time is 2:16 p.m.  Pacific Daylight Time.  Thank

you.

(Time noted:  2:16 p.m.)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 8, 2022

LYDIA ZINN, RPR, FCRR

CSR No. 9223

Page 190

# EXHIBIT W

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE QUANTUMSCAPE SECURITIES   ) Case No.:

CLASS ACTION LITIGATION         ) 3-21-CV-00058-WHO

                                )


CONFIDENTIAL

REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

KATHY LEA STARK

Eugene, Oregon (Witness' Location)

Thursday, August 18, 2022


Reported by:

LYDIA ZINN

RPR, FCRR, CSR No. 9223

Job No.   5353607

PAGES 1 - 206

Page 1

BY MR. FRANTELA:                                              10:04:44AM

Q    I know you're not a lawyer; but in your opinion,

what percentage of a settlement or recovery would be

fair for Levi & Korsinsky to receive?

         MR. POTREPKA:  Objection.  Form.  Foundation.    10:05:00AM

Calls for speculation.  Calls for a legal conclusion.

         THE WITNESS:  I have absolutely no idea.

BY MR. FRANTELA:

Q    Do you know when this case was initiated?

         MR. POTREPKA:  Objection.  Form.  Foundation.    10:05:18AM

Vague.

         THE WITNESS:  I do not know.

BY MR. FRANTELA:

Q    Then can you tell me generally what's happened in

this case since it started?                                 10:05:31AM

         MR. POTREPKA:  Same objections.

         THE WITNESS:  I think that's too broad a

question for me to answer.

BY MR. FRANTELA:

Q    You don't know anything about what's happened so    10:05:42AM

far in the litigation?

         MR. POTREPKA:  Objection.  Form.  Foundation.

Mischaracterizes the testimony.

         THE WITNESS:  I am not comfortable talking in

such generalities.  You can ask me specific.  I might       10:05:54AM

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

be able to answer.                                          10:05:58AM

BY MR. FRANTELA:

Q    Have you read any case filings?

A    I'm not exactly sure what case filings would be.

Q    Have you read -- are you familiar with the Second   10:06:15AM
Amended Complaint?

A    I am familiar with that.

Q    Have you read that document?

A    Not from the page -- from the beginning to end.
I'm familiar with the document.  I've read some of it.    10:06:29AM

Q    Why didn't you read the full Second Amended
Complaint?

          MR. POTREPKA:  Objection to form.

          THE WITNESS:  It was very long.  I started
reading.  I skimmed through it.  I -- there's much of      10:06:45AM
it I don't understand.  And I have to count on my legal
counsel to advise me about the contents of that.

BY MR. FRANTELA:

Q    Did you review a draft of that Second Amended
Complaint before it was filed in the case?                 10:07:09AM

A    I don't know.  Again, I'm confused by the
terminology.  I can't -- I would say I don't know.

Q    Did you review a draft of the Second Amended
Complaint?

          MR. POTREPKA:  Objection.  Asked and           10:07:30AM

Page 30

CONFIDENTIAL

answered.                                                    10:07:30AM

THE WITNESS:  I don't know.

BY MR. FRANTELA:

Q    Do you understand the nature of the claims

asserted in the Complaint?                                   10:07:41AM

MR. POTREPKA:  Objection.  Form.  Vague.

THE WITNESS:  I do, in a -- in a broad sense,

yes.

BY MR. FRANTELA:

Q    And what are they?                                      10:07:56AM

A    The Complaint basically says that a company and

its -- or its chief officers misrepresented the --

the -- the company, in terms of how far along it was

technically; and the viability of the whole project,

causing the price to be overinflated for people who          10:08:22AM

were investors or wanted to invest.

Q    Are you accusing QuantumScape of committing fraud?

A    I'm not accusing them.  I believe the document

uses that term -- the Complaint document, I believe.

Q    Who is accusing them, then, of fraud?                   10:08:44AM

MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for a legal conclusion.

THE WITNESS:  I'd have to count on my legal

counsel to tell you who is.

Page 31

CONFIDENTIAL

BY MR. FRANTELA:                                              10:08:57AM

Q    Would you agree that the claims in this lawsuit

assert fraud?

A    I -- I don't know the exact definition of "fraud"

in business.  So I -- I don't want to answer that.          10:09:10AM

Q    So it's not you; it's -- it's the lawyers that are

making the accusations in the Complaint?

          MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for a legal conclusion.  Mischaracterizes

testimony.                                                  10:09:26AM

          THE WITNESS:  Again, I don't want to -- I

don't know legally.  I would have to count on my

lawyers to answer that question.

BY MR. FRANTELA:

Q    But it's not you that --                               10:09:38AM

          MR. POTREPKA:  Objection.

BY MR. FRANTELA:

Q    -- is asserting fraud in the Complaint?

          MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for a legal conclusion.  Mischaracterizes             10:09:49AM

testimony.

          THE WITNESS:  Again, I don't wish to answer

that, because I don't know legally what I'm answering.

BY MR. FRANTELA:

Q    Do you believe personally that there was fraud at      10:10:01AM

Page 32

CONFIDENTIAL

QuantumScape?                                                10:10:03AM

        MR. POTREPKA:  Objection.  Form.  Foundation.

        THE WITNESS:  I don't wish to answer that

question.

BY MR. FRANTELA:                                            10:10:11AM

Q    On what basis?

A    Because I -- as I told you, I don't know the

terminology for fraud.  So if I said, yes, I believe

that, I think that would be something legal that I

shouldn't be answering.                                    10:10:37AM

Q    So you don't know whether or not there was fraud

at QuantumScape?

        MR. POTREPKA:  Objection.  Form.  Foundation.

Asked and answered.  Mischaracterizes testimony.  Calls

for a legal conclusion.                                     10:10:52AM

        THE WITNESS:  I don't.

BY MR. FRANTELA:

Q    And you've never asked your lawyers to explain

what fraud is?

        MR. POTREPKA:  Objection.  I... I'd caution    10:11:00AM

the witness not to divulge the nature of any

communications we've had regarding that question.

        THE WITNESS:  I don't wish to answer.

BY MR. FRANTELA:

Q    Well, that's a yes-or-no question.                     10:11:16AM

                                                           Page 33

MR. POTREPKA: Well, no; but you've inserted                 10:11:19AM

the -- the substance of communications and her

questions to counsel. That's an inappropriate

question.

BY MR. FRANTELA:                                            10:11:28AM

Q    Can you describe the misrepresentations in this

lawsuit alleged?

A    Can I -- could you repeat it one more time?

Q    Sure.

Can you describe what the alleged                           10:11:41AM

misrepresentations are in this lawsuit?

MR. POTREPKA: Objection. Foundation. Calls

for a legal conclusion.

THE WITNESS: I can't describe it

specifically.                                               10:11:53AM

BY MR. FRANTELA:

Q    And going back to my question about whether you

have ever asked your lawyers to explain what fraud is,

you're refusing to answer whether or not you asked your

lawyers that question. Right?                               10:12:15AM

MR. POTREPKA: Ah. You --

THE WITNESS: No.

MR. POTREPKA: Sorry, Kathy. Go ahead.

THE WITNESS: My answer -- did I ask them --

is no.                                                      10:12:31AM

Page 34

BY MR. FRANTELA:                                         10:12:33AM

Q    So, sitting here today, you don't know what fraud is?

              MR. POTREPKA:  Objection.  Form.  Foundation.
Calls for a legal conclusion.  Mischaracterizes          10:12:45AM
testimony.

              THE WITNESS:  I don't know what fraud is
based -- I know the meaning of the word "fraud."

       I don't know how it is used legally in legal -- in
legal representations.                                   10:13:00AM

BY MR. FRANTELA:

Q    And you never asked your lawyers to explain what
fraud means in this context?

A    That's correct.  I did not.

Q    And you don't know if you were accusing            10:13:10AM
QuantumScape of fraud?

              MR. POTREPKA:  Objection.  Form.  Foundation.
Calls for a legal conclusion.  Asked and answered.

              THE WITNESS:  I don't know if the document
specifically uses the word "fraud"; so I don't know.     10:13:27AM

BY MR. FRANTELA:

Q    And you don't know if you're accusing the
executives who are defendants in this lawsuit, who run
the company, of fraud?

              MR. POTREPKA:  Same objections.            10:13:43AM

                                                   Page 35

THE WITNESS:  Again, I don't know if that is          10:13:47AM

the specific terminology used in this lawsuit.

BY MR. FRANTELA:

Q    And you did nothing to investigate whether there

was any alleged fraud.  Is that right?          10:13:58AM

        MR. POTREPKA:  Objection.  Form.  Foundation.

Mischaracterizes testimony.

        THE WITNESS:  I did not investigate.

BY MR. FRANTELA:

Q    What is your understanding of the word "fraud"?          10:14:12AM

A    Fraud is misrepresentation of something.

Q    Anything else?

A    That would be my basic view of fraud.

Q    And are misrepresentations of something alleged in

this lawsuit?          10:14:38AM

A    Yes.

        MR. FRANTELA:  I'm going to mark the first

exhibit, which is a declaration dated July 26, 2022.

(Deposition Exhibit 29 marked for identification.)

BY MR. FRANTELA:          10:15:28AM

Q    Okay.  Let me know when you see Exhibit 29.

A    I do see it.

Q    Ms. Stark, have you seen this document before?

A    Yes, I've seen this document before.

Q    What is this document, to the best of your          10:16:14AM

Page 36

Veritext Legal Solutions
866 299-5127

knowledge?                                                  10:16:19AM

A    It's a document saying that I'm part- -- or I've

agreed to be a plaintiff in this case, and that I will

do what's -- you know, what's expected of me to serve

as a plaintiff; and that Levi & Korsinksy are the legal    10:16:39AM

team.

Q    Did you sign this document?

A    Yes, I did.

Q    Physically or electronically?

A    Electronically.                                        10:17:02AM

Q    Is this declaration complete and accurate, to the

best of your knowledge?

        MR. POTREPKA:  Review as much of the document

as you need, Kathy.

        THE WITNESS:  I do believe it's true, to the        10:17:53AM

best of my knowledge.

BY MR. FRANTELA:

Q    Did you review a draft of this before you signed

it?

        MR. POTREPKA:  Objection.  Form.  Foundation.        10:18:03AM

        THE WITNESS:  I'm not certain.

BY MR. FRANTELA:

Q    Did you review this document before you signed it?

A    Yes.  I reviewed that.

Q    Did you suggest any changes?                           10:18:21AM

Page 37

MR. POTREPKA:  Objection.  Form.                    10:18:25AM

THE WITNESS:  I did not suggest any changes.

BY MR. FRANTELA:

Q    Did you ask any questions?

MR. POTREPKA:  Objection.  Form.  Vague.           10:18:33AM

THE WITNESS:  No.  I did not.

BY MR. FRANTELA:

Q    And paragraph 3 says "I am moving to be appointed

class representative in this class action."

Right?                                             10:18:47AM

MR. POTREPKA:  Objection.  Misstates the

document.

THE WITNESS:  It does say that.

BY MR. FRANTELA:

Q    What is your understanding of a class            10:19:04AM

representative?

A    That I am a representative for the entire class of

people that may have been affected by the false claims

that were made by the company; and that I will try to

keep informed and participate in whatever needs to be     10:19:23AM

done to move this class action suit forward.

Q    And are you qualified to be a class

representative?

MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for speculation.  Calls for a legal conclusion.     10:19:39AM

Page 38

THE WITNESS:  I don't know what                10:19:45AM

qualifications there are.  I presume I'm qualified.

BY MR. FRANTELA:

Q    What have you done since joining this lawsuit to

direct the litigation?                                  10:19:56AM

A    Could you repeat that once?

Q    What have you done since joining this lawsuit to

direct the litigation?

        MR. POTREPKA:  Form.  Foundation.  Vague.

        THE WITNESS:  I don't know that I've done      10:20:12AM

anything to direct the lawsuit.

BY MR. FRANTELA:

Q    And if we look at paragraph 5 of this declaration,

it says, "I understand that a class representative is a

party who acts on behalf of other class members in     10:20:27AM

directing the litigation."  Right?

A    That's correct.

Q    Do you have any obligations or duties as a class

representative?

        MR. POTREPKA:  Objection.  Foundation.  Calls   10:20:46AM

for a legal conclusion.

        THE WITNESS:  My obligations, as I stated

before, are to represent the entire class of people,

and to be as knowledgeable and be present as much as

required to move this forward.                          10:21:04AM

Page 39

inquiries she had for counsel during our communications    10:26:59AM

regarding this -- the claims at issue in this lawsuit.

THE WITNESS:  So, upon counsel's comments, I

do not wish to answer.

BY MR. FRANTELA:                                          10:27:21AM

Q    Did you have any discussions with counsel

regarding what the federal securities laws are?

MR. POTREPKA:  Same -- I'm going to -- I'm

going to instruct the same instruction to the witness.

THE WITNESS:  Again, my answer is no.        10:27:41AM

BY MR. FRANTELA:

Q    That's just a topic.

MR. POTREPKA:  The topic would be:  Have we

discussed the claims at issue in this lawsuit?  That's

fine.                                                    10:27:55AM

You're asking her specifically now to wade into

the, you know, details and nuances of what those

discussions were.  And that's -- that's not fine.

MR. FRANTELA:  But, you know, discussions

regarding federal securities laws -- that would be       10:28:08AM

something from a privilege log.

MR. POTREPKA:  I mean, it -- it's -- is your

question about the claims at issue in this case?

That -- I mean, is that the question?

MR. FRANTELA:  The -- the securities laws      10:28:26AM

Page 44

CONFIDENTIAL

generally.  You know, were there discussions -- yes or  10:28:27AM

no -- about what the federal securities laws are?

MR. POTREPKA:  Again, I -- I'm going to

instruct the witness.

She can testify as to the -- to whether she's ever  10:28:48AM

communicated with counsel about the substance of the

claims at issue in this case.

But the details or specifics about those

communications is improper.

MR. FRANTELA:  So that's an instruction not  10:29:09AM

to answer.  Right?

MR. POTREPKA:  My -- my instruction is

plainly stated on the record.

BY MR. FRANTELA:

Q   All right.  Ms. Stark?  10:29:19AM

A   I will follow my counsel's lead, and choose not to

answer.

Q   Before joining this case, did you do any research

to substantiate the allegations against the defendants?

A   I don't believe I did.  10:29:52AM

Q   You didn't look at any sources regarding

QuantumScape at all before joining this lawsuit?

A   I did not.

Q   So you didn't look at -- you've never --

Strike that.  10:30:11AM

Page 45

Before purchasing QuantumScape shares, did you    10:30:14AM

read anything about QuantumScape?

       MR. POTREPKA:  Objection.  Form.  Foundation.

Vague.

       THE WITNESS:  I did.    10:30:23AM

BY MR. FRANTELA:

Q    And what did you do?  What did you read?  Excuse

me.

A    I -- I don't know where I read about QuantumScape,

but I read information about it.    10:30:42AM

Q    What did you find out?

       MR. POTREPKA:  Objection.  Form.  Foundation.

Vague.

       THE WITNESS:  I found out that they were

trying to produce a -- you know, for lack of a better    10:30:56AM

word -- state-of-the-art battery for electric vehicles.

BY MR. FRANTELA:

Q    And how did you arrive at the belief that the

defendants committed fraud?

       MR. POTREPKA:  Objection.  Form.  Foundation.    10:31:17AM

Mischaracterizes testimony.

       THE WITNESS:  I don't believe I've said that

they -- I -- I denied wanting to use that phrase, so I

can't answer that now.

Page 46

Q    And, sitting here today, those are the only two --   11:20:50AM

so withdrawn.

Sitting here today, the Scorpion Report and the

Seeking Alpha report -- are the only reasons your

accusing QuantumScape of fraud.  Correct?   11:21:00AM

MR. POTREPKA:  Objection.  Form.  Foundation.

Mischaracterizes testimony.

THE WITNESS:  I don't -- that is not correct.

In the Complaint filed against QuantumScape,

there's mention of other -- other people; other even   11:21:14AM

employees inside the QuantumScape company that -- I --

I guess for lack of a better word, concerns about the

misrepresentation of the progress within the company.

BY MR. FRANTELA:

Q    There's mention of other people, other employees.   11:21:41AM

So do you have -- what -- can you give me any

details about those?

A    Not without looking at the document.  It's

110 pages.  It's -- there's no way I'm going to

remember 110 pages.   11:21:59AM

Q    But you could read 110 pages.  Right?

A    I could read 110.

MR. POTREPKA:  Form.  Foundation.  Vague.

BY MR. FRANTELA:

Q    And according to the declaration we've just looked   11:22:10AM

Page 75

CONFIDENTIAL

at, you've agreed to monitor developments of this case   11:22:12AM

and review all important filings.  Right?

MR. POTREPKA:  Objection.  Form.  Foundation.

Vague as to which document you're talking about.

THE WITNESS:  I believe that, again -- once   11:22:21AM

again, I must rely on my legal counsel to tell me -- to

inform me of some of these things and to point them out

to me.  I -- I'm incapable of doing what you're asking.

Maybe not incapable, but I have not done that.

BY MR. FRANTELA:   11:22:50AM

Q   Yeah.  You'd agree you're not incapable of reading

these documents.  Right?

MR. POTREPKA:  Objection.  Form.  Foundation.

Argumentative.

THE WITNESS:  I am capable of reading   11:23:00AM

110 pages, of course.  Would I understand the

110 pages?  I don't think so.  That's why I have a --

that's why I have lawyers.

BY MR. FRANTELA:

Q   Are you familiar with Seeking Alpha?   11:23:14AM

A   I've heard that term.  And I think that is -- it

was the -- it was the name of -- I would be shooting

off the hip, but I believe it's -- it was the name of

one of those two -- you know, one of the two people;

one of -- either Scorpion or Dr. Morin, I believe, was   11:23:40AM

Page 76

CONFIDENTIAL

the name of the article, but I'm not certain.          11:23:46AM

Q    In looking at Exhibit 6, do you see -- at the

very, very top, in the box by "Saved From," do you see

http://seekingalpha.com?

A    Yeah.  Yeah.                                       11:24:02AM

Q    And do you see Brian Morin's name under the

title -- the title of the document?

A    Yes, I do.  I do.  Yeah.

Q    Do you consider Seeking Alpha to be a trustworthy

source?                                                 11:24:19AM

         MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for speculation.

         THE WITNESS:  I don't know.  I can't -- I

can't say.

BY MR. FRANTELA:                                        11:24:33AM

Q    Are you relying on this document to allege fraud

in this case?

         MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for a legal opinion.

         THE WITNESS:  Not -- that -- any claims that   11:24:55AM

I have are -- are in the document, and in the -- you

know, the document of -- with regards to complaints.

So it isn't -- I think that question is unfair.  It's

not just about me.

Veritext Legal Solutions
866 299-5127

BY MR. FRANTELA:                                    11:25:27AM

Q    You're a plaintiff in this lawsuit bringing a

claim for securities fraud.  Right?

A    That's correct.

Q    And is this document part of your claim?       11:25:43AM

MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for a legal opinion.

THE WITNESS:  It's in the document, the

complaint, so yes.

BY MR. FRANTELA:                                    11:25:57AM

Q.   You'd agree it's relevant to your claim.  Right?

MR. POTREPKA:  Objection.  Form.  Foundation,

Calls for a legal conclusion.

THE WITNESS:  I would agree.

MR. FRANTELA:  I'm going to introduce the      11:26:06AM

next exhibit, which was previously marked in this

action as Exhibit 7 [sic].  Strike that.  It was

previously marked as Exhibit 13.

(Deposition Exhibit 13 previously marked for

identification.)                                    11:26:28AM

THE WITNESS:  It's not here yet.

Okay.  Okay.  I have it open.

BY MR. FRANTELA:

Q    Okay.  This is a January 15th, 2021, Wall Street

Journal article.  Right?                            11:27:07AM

Page 78

A    It says January 2nd.                                11:27:10AM

(Shannon Hopkins rejoins the deposition.)

BY MR. FRANTELA:

Q    My apologies. January 2nd.  Thank you.

    And are you familiar with The Wall Street Journal?   11:27:26AM

A    I'm familiar with The Wall Street Journal.  Yes.

Q    Are you subscribed to The Wall Street Journal?

A    I am not.

Q    Do you consider The Wall Street Journal to be a

reputable source?                                        11:27:46AM

        MR. POTREPKA:  Objection.  Form.  Foundation.

Vague.

        THE WITNESS:  I can't answer that.  I don't

know.

BY MR. FRANTELA:                                         11:27:54AM

Q    Look at the bottom of the second page.  There's a

paragraph that starts at the second from the bottom:

"QuantumScape's investors are playing a very long game.

The business plan doesn't envisage meaningful revenues

before 2026."                                            11:28:15AM

    Do you see that?

A    I do see that.

Q    Was it your understanding of QuantumScape's

business plan when you bought your shares that you

would be playing a long game, and that no meaningful    11:28:23AM

revenues would be expected before 2026?                    11:28:27AM

MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for speculation.

THE WITNESS:  As I recall, my understanding

was it wouldn't be an immediate two-year, oh, gosh,        11:28:37AM

here's a lot of money.  It was going to be, you know,

long.  It wasn't going to be an immediate

gratification, let's say.

BY MR. FRANTELA:

Q    And how long until you expected profits at the       11:28:57AM

time you purchased QuantumScape shares?

MR. POTREPKA:  Same objections.

THE WITNESS:  I -- I don't have, you know,

a -- a year value or a month value on that.

Again, I was not expecting -- nor do I ever              11:29:13AM

expect -- immediate gratification whenever I buy a

stock.

BY MR. FRANTELA:

Q    What steps did you undertake to try to understand

QuantumScape's commercialization time line before you     11:29:31AM

invested?

MR. POTREPKA:  Objection.  Foundation.

Vague.

THE WITNESS:  I didn't take any steps.

Page 80

CONFIDENTIAL

BY MR. FRANTELA:                                          11:29:40AM

Q   Are you aware of any time lines regarding

commercialization that QuantumScape had disclosed?

          MR. POTREPKA:  Same objections.

          THE WITNESS:  I am not aware.               11:29:50AM

BY MR. FRANTELA:

Q    Is QuantumScape indeed on track to achieve revenue

by 2026, as it says here?

          MR. POTREPKA:  Objection.  Foundation.  Calls

for speculation.                                      11:30:05AM

          THE WITNESS:  I don't know that they're on

track.  This article was written over a year ago; many

things can happen between then and now.  But I don't

know, regardless.

BY MR. FRANTELA:                                      11:30:23AM

Q    Is it part of your duty as a class representative

to monitor developments about QuantumScape's business?

          MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal opinion.

          THE WITNESS:  I believe that as a class     11:30:41AM

representative I will rely on my lawyers to inform me

of my duties.

BY MR. FRANTELA:

Q    Well, we saw earlier in your declaration submitted

in support of class certification -- Exhibit 29 -- that  11:31:01AM

Page 81

you have a duty to monitor developments related to the    11:31:05AM

litigation.  Correct?

A    Yes, we saw that.

Q    Look at the last paragraph of this article, the

first sentence.  "The valuations of companies like    11:31:15AM

Tesla and QuantumScape require investors to look far

into the future and assume mass disruption to the

status quo."

     Do you see that?

A    I do see that.    11:31:28AM

Q    Do you agree that QuantumScape's valuation

requires looking far into the future?

          MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for speculation.  Calls for expert opinion.

          THE WITNESS:  I can't say.  I have no idea.    11:31:41AM

BY MR. FRANTELA:

Q    And you -- you're not aware that your lawyers have

retained an expert in this class -- in this case.

Right?

          MR. POTREPKA:  Objection.  Foundation.    11:31:52AM

          THE WITNESS:  I'm not aware.

BY MR. FRANTELA:

Q    Do you agree that QuantumScape caused a mass

disruption in the auto industry, as it notes in this

sentence?    11:32:04AM

Page 82

MR. POTREPKA:  Objection.  Foundation.  Calls    11:32:06AM
for speculation.

THE WITNESS:  I don't know about that either.

BY MR. FRANTELA:

Q    Do you consider the change from internal    11:32:20AM
combustion engine vehicles to electric vehicles to be a
disruption in the auto industry?

MR. POTREPKA:  Objection.  Foundation.  Calls
for speculation.  Calls for expert opinion.

THE WITNESS:  I guess it depends on what kind    11:32:36AM
of disruption, and, quite frankly, I -- I couldn't say.
What I might view as disruption might not be somebody
else's view of disruption.

BY MR. FRANTELA:

Q    Has QuantumScape released any milestone goals that    11:33:01AM
it expects to achieve?

MR. POTREPKA:  Objection.  Foundation.  Asked
and answered.

THE WITNESS:  I'm not aware of that.

BY MR. FRANTELA:    11:33:11AM

Q    Wouldn't you consider it important to monitor the
achievement of milestones regarding QuantumScape's
business as a class representative?

MR. POTREPKA:  Objection.  Foundation.  Calls
for speculation.  Calls for a legal opinion.    11:33:32AM

Page 83

THE WITNESS:  I would -- ask again, please.  11:33:39AM

BY MR. FRANTELA:

Q   You're supposed to be monitoring developments in this litigation as a class representative.  Right?

MR. POTREPKA:  Objection.  Foundation.  11:33:54AM

THE WITNESS:  Yes.

MR. POTREPKA:  Calls for speculation.  Calls for a legal opinion.

BY MR. FRANTELA:

Q   Do you consider the achievement or nonachievement  11:34:01AM of QuantumScape's milestones to be relevant to the development -- to this litigation?

MR. POTREPKA:  Same objections.

THE WITNESS:  I would have to rely on my lawyer and their expertise.  11:34:15AM

MR. FRANTELA:  I'm going to introduce the next document.

MR. POTREPKA:  Can we -- we've been going for a while.  Can we take a break?

MR. FRANTELA:  Sure.  11:35:00AM

THE VIDEOGRAPHER:  Going off record at 11:35 a.m.

(Recess taken from 11:35 a.m. until 11:43 a.m.)

THE VIDEOGRAPHER:  Back on record.  Eleven -- or excuse me.  11:43 a.m.  11:43:28AM

Page 84

CONFIDENTIAL

MR. POTREPKA:  Andrew, you're muted.                    11:43:37AM

THE REPORTER:  Mr. Frantela, you're muted.

MR. FRANTELA:  Thank you.

Q.    Before we broke, Ms. Stark, we were looking at

Exhibit 6.  Do you have that in front of you?           11:43:42AM

A     I do.

Q     Let's go through some of -- some of the points in

this report together.  I understand you haven't read

it, but considering it's important to the claim, I

think it's relevant.                                    11:44:05AM

A     Okay.

Q     Do you have a heading in the middle of page 2 that

says "Areas of Overstated Success"?

A     I do.

Q     In the first bullet point, "They have done 1,200   11:44:20AM

cycles of a 90-second OEM-specified track simulation,

which pulled pulses of 6C."

Do you see that?

A     I do see that.

Q     In this track, nine circuits is full depth of      11:44:33AM

discharge, after which the battery was heated to

45 degrees Celsius (113 degrees Fahrenheit) and charged

to 80 percent in 15 minutes.  The cell lost about

10 percent of its capacity in this 130,

full-depth-of-discharge cycle test, meaning that the    11:44:47AM

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

battery will only last for 260 FDOD cycles, or about    11:44:51AM

75,000 miles of aggressive driving.  There is a note on

the slide that it occurs at 3.4 atmospheres, which

likely means at high pressure.

       Is that right?                                   11:45:06AM

             MR. POTREPKA:  Objection.  Misstates the

document.

             THE WITNESS:  I do see the -- the paragraph

or section you're talking about.

BY MR. FRANTELA:                                        11:45:20AM

Q    Do you disagree -- do you agree with the -- the

statements in that paragraph?

             MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for expert opinion.

             THE WITNESS:  I can only agree that that's   11:45:35AM

what it says; I don't know what it means.

BY MR. FRANTELA:

Q    Did QuantumScape, to your knowledge, disclose any

of these -- any of this information when it disclosed

its results in December 2020?                           11:45:51AM

             MR. POTREPKA:  Objection.  Form.  Foundation.

Calls for speculation.  Calls for expert opinion.

             THE WITNESS:  I'm not aware of that.

             MR. FRANTELA:  I'm going to mark another

exhibit now.                                            11:46:05AM

Page 86

CONFIDENTIAL

MR. POTREPKA:  Ms. Skellet, you're not muted.    11:46:28AM

(Deposition Exhibit 4 previously marked for

identification.)

BY MR. FRANTELA:

Q    This document was previously marked as Fish    11:46:41AM

Exhibit 4.  Let me know when you have it up.

A    I have it up now.

Q    Okay.  Do you recognize this document?

MR. POTREPKA:  Take as much time as you need

to review the document, Kathy.    11:47:10AM

THE WITNESS:  I don't recognize the document

in total.  I do recognize some of the things.  Some of

the pages in it were in the list of complaints.

BY MR. FRANTELA:

Q    So you've never seen this document before?    11:48:00AM

A    No.

MR. POTREPKA:  Objection to form.

Foundation.  Mischaracterizes the testimony.

THE WITNESS:  I have not.

BY MR. FRANTELA:    11:48:08AM

Q    Are you aware that QuantumScape disclosed test

results in December 2020?

MR. POTREPKA:  Objection.  Form.  Foundation.

THE WITNESS:  I do believe I read that

somewhere; that they had.    11:48:26AM

Page 87

CONFIDENTIAL

BY MR. FRANTELA:                                           11:48:32AM

Q.   And are those test results relevant -- related to this lawsuit?

        MR. POTREPKA:  Objection.  Form.  Foundation. Calls for a legal conclusion.                       11:48:39AM

        THE WITNESS:  I would have to rely on my lawyers to advise me.

BY MR. FRANTELA:

Q    And you understand that your lawyers are saying this report is false?                                11:48:50AM

        MR. POTREPKA:  Objection.  Form.  Foundation.

        THE WITNESS:  I'm -- I'm not aware of that specifically.

BY MR. FRANTELA:

Q    Have you ever asked your lawyers to -- to show you  11:49:19AM the statements that they say are false?

        MR. POTREPKA:  Objection.  Form.  Foundation. Calls for attorney-client privilege.

    Kathy, I'd instruct you not to -- you can answer a question regarding if we've ever communicated about the  11:49:32AM claims, but not specifically your inquiry into the investigation or -- I think the question was too detailed.

        THE WITNESS:  So the question again was?

Veritext Legal Solutions
866 299-5127

BY MR. FRANTELA:                                          11:49:55AM

Q    Have you ever asked your lawyers to show you the statements that they say are false in this case?

          MR. POTREPKA:  And, again, I'm going to instruct the witness not to answer the question, on    11:50:05AM attorney-client privilege grounds.

BY MR. FRANTELA:

Q    And?

          THE WITNESS:  No, I will not answer.

BY MR. FRANTELA:                                          11:50:14AM

Q    Have you ever asked to see the statements in context?

          MR. POTREPKA:  Same -- same instruction.  And the same basis.

          THE WITNESS:  Again, I will not answer.    11:50:27AM

BY MR. FRANTELA:

Q    Have you ever seen -- have you seen all of the challenged statements in this case, in their full context?

A    The challenged statements, did you say?    11:50:37AM

Q    The statements that are allegedly misleading or false?

A    I'm not aware of that.

Q    So given that you've never -- withdrawn.

          Is it possible that the Complaint takes the    11:50:55AM

Page 89

like that -- I just feel like it's a question that I          12:00:35PM

really can't answer because it's too broad, because we

all know this in life:  Anything is possible.

So if I take that stand, anything's possible; but

that isn't what we're talking about.  We're talking          12:01:00PM

about this lawsuit.

BY MR. FRANTELA:

Q    In this lawsuit, can you tell me -- withdrawn.

Tell me your understanding of exactly what was

misrepresented in this lawsuit.                              12:01:13PM

MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal opinion.

THE WITNESS:  I cannot tell you exactly.  I

would have to rely on the document.  It's all -- it's

all in the document:  the claims, the claims that --         12:01:27PM

the claims of misleading over exaggerations of where

the product is at in its development.

That's all I can -- I'd have to keep referencing

the document.

BY MR. FRANTELA:                                             12:01:45PM

Q    The document -- which document is that?

A    It's the Complaint document; the Second Amended

Complaint document -- I believe is the name of it.

Q    Tell me -- can you tell me when the misleading

statements were made?                                        12:01:59PM

Page 97

CONFIDENTIAL

MR. POTREPKA:  Objection.  Foundation.                    12:02:01PM

THE WITNESS:  I can't.  I would doubt that

there was one day.  Again, I can't tell.  I can't.

BY MR. FRANTELA:

Q    Do you -- can you tell me a time frame in which       12:02:17PM

the allegedly misleading statements were made?

MR. POTREPKA:  Objection.  Foundation.  Asked

and answered.

THE WITNESS:  No.  I cannot.

BY MR. FRANTELA:                                           12:02:29PM

Q    Can you tell me who made the allegedly misleading

statements?

MR. POTREPKA:  Objection.  Foundation.

THE WITNESS:  I cannot.

BY MR. FRANTELA:                                           12:02:42PM

Q    Can you tell me where the misleading statements

were made?

MR. POTREPKA:  Objection.  Foundation.

Vague.

THE WITNESS:  I would continue to -- to             12:02:54PM

reference the document; the Complaint.  And it's --

within that will be as near -- you know, I don't know

specifically the answers to your questions, but that

would be the place you would find the answers to the

questions that you've been asking.                         12:03:13PM

Page 98

CONFIDENTIAL

BY MR. FRANTELA:                                        12:03:17PM

Q    Let's go back to Exhibit Number 6, please.

A    All right.  I'm there.

Q    So looking again at that "Power" bullet that we've

already reviewed...                                    12:04:17PM

        MR. POTREPKA:  This is on the second page?

        MR. FRANTELA:  Yeah, that's right, on the

second page.

        MR. POTREPKA:  Okay.

BY MR. FRANTELA:                                       12:04:30PM

Q    To your knowledge, in this bullet, is any of this

new information that was not previously disclosed?

        MR. POTREPKA:  Objection.  Foundation.  Calls

for expert opinion.  Calls for a legal conclusion.

        THE WITNESS:  I'm not certain.  I don't know.  12:04:43PM

BY MR. FRANTELA:

Q    It says in the paragraph that its cells were

tested at 45 degrees Celsius.  Right?

A    Yes.

        MR. POTREPKA:  Misstates document.           12:05:06PM

        THE WITNESS:  It does say when the battery

was heated to 45 degrees, yes.

BY MR. FRANTELA:

Q    And it discloses 3.4 atmospheres.  Do you see

that, too?                                            12:05:25PM

                                                      Page 99

CONFIDENTIAL

A    I do.                                                    1:15:34PM

Q    Turn to the third page.

A    Okay.

Q    And under the photo, it says:  "In December, the
Silicon Valley startup QuantumScape said it had            1:15:45PM
achieved a breakthrough, successfully testing batteries
using its solid-state material."

     Do you understand that this is referencing the
PowerPoint presentation that you contend was fraudulent
in this lawsuit?                                            1:15:58PM

          MR. POTREPKA:  Objection.  Foundation.

          THE WITNESS:  Where in -- I'm sorry.  I think
I missed where it's at.  Did you say page 3?

BY MR. FRANTELA:

Q.    That's right.  Page 3?                                1:16:10PM

A    Oh.  Under the picture.

Q    Second paragraph under the picture.

A    Okay.  I do see what you referenced.

Q    And you understand this is referencing the
PowerPoint presentation that you contend was fraudulent    1:16:36PM
in this lawsuit?

          MR. POTREPKA:  Objection.  Foundation.

          THE WITNESS:  I don't -- I don't know that
we -- I am not certain that the entire PowerPoint --
I've never known that the entire PowerPoint was            1:16:54PM

Page 127

fraudulent but -- and I'm not -- I don't know that this    1:16:56PM

is related to the PowerPoint.

BY MR. FRANTELA:

Q    Do you have any basis to think that it is not?

MR. POTREPKA:  Same objection.  Calls for    1:17:13PM

speculation.

THE WITNESS:  I don't have a feeling one way

or the other.

BY MR. FRANTELA:

Q    In the next paragraph, it says:  "In March, V.W.    1:17:26PM

said its battery scientists independently verified

QuantumScape's tests in their own lab and agreed to

invest an additional $100 million in the startup,

bringing its total investment in the company to

$300 million."    1:17:41PM

Do you see that?

A    I do.

Q    And were you aware that Volkswagen had

independently verified QuantumScape's single-layer cell

test results?    1:17:56PM

MR. POTREPKA:  Objection.

THE WITNESS:  I am not.

BY MR. FRANTELA:

Q    No one's ever brought that up to you?

A    They may have.  I don't recall it.  For some    1:18:10PM

Page 128

CONFIDENTIAL

reason, it seems like I read it in one of -- somewhere.    1:18:11PM

But I don't -- I can't say specifically.

    And I guess my question would be:  This article is

quite a long time after the period of the class action,

the class action period.    1:18:35PM

Q    What do you mean by that?

A    My understanding was that the class action -- why

we were having a class action was because it was for --

people or entities who had purchased their, you know --

or gotten shares in QuantumScape in the period from    1:19:02PM

November of 1920 [sic] to April of 1921 [sic].  So

I'm -- I'm having a hard time getting my head around

this.  Seems like a different period of time to me.

Q    And you meant 2020.  Right?  Not 1920?

A    Okay.  So I'm sorry.  Yes.  Yes.  2020.  2021.    1:19:31PM

Yes.  I'm sorry.

Q    Do you see in the sentence we just read, it says

"in March"?

A    I do.

Q    So this was referencing the time period you    1:19:49PM

just -- you just discussed.  Right?

A    Well, I -- I was -- I guess I don't have any point

of reference where this article starts, because it's

written in August of '22.  I don't know.  I don't see

the date.    1:20:16PM

Page 129

CONFIDENTIAL

answered.                                                          1:27:38PM

BY MR. FRANTELA:

Q    That means you're making these allegations.

Right?

        MR. POTREPKA:  Objection.  Asked and             1:27:54PM

answered.

        THE WITNESS:  That does mean that the

plaintiffs are making the allegations.  Yes.  Along

with the advice of their counsel.

BY MR. FRANTELA:                                                  1:28:07PM

Q    And the Class --

A    I'm sorry.  And technical, you know, experts.

Yes.

Q    And the Class isn't making these allegations.

Right?  It's you personally?                                      1:28:21PM

        MR. POTREPKA:  Objection.  Foundation.  Calls

for a legal opinion.

        THE WITNESS:  The question was?

BY MR. FRANTELA:

Q    The Class isn't making these allegations.  Right?   1:28:30PM

     You, as the plaintiff, are making them personally?

        MR. POTREPKA:  Same objections.

        THE WITNESS:  The Class.  We as plaintiffs

are part of the Class.  So the plaintiffs are, with the

advice of legal counsel.                                          1:28:48PM

                                                 Page 136

CONFIDENTIAL

BY MR. FRANTELA:                                          1:28:53PM

Q   And you can't tell me any of the specifically

alleged misleading statements.  Right?

        MR. POTREPKA:  Objection.  Foundation.  Asked

and answered.                                            1:29:07PM

        THE WITNESS:  That's correct.

BY MR. FRANTELA:

Q   Have you ever heard of a company called "Mobile

Power Solutions"?

A   I have not.                                          1:29:18PM

Q   Are you aware that QuantumScape cells were tested

by an independent lab in addition to Volkswagen that

verified the test results at issue in this lawsuit?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I am not aware.                    1:29:34PM

BY MR. FRANTELA:

Q   No one has ever told you that an independent

battery lab validated the veracity of QuantumScape's

single-layer test results?

        MR. POTREPKA:  Same objection.                   1:29:50PM

        THE WITNESS:  Not that I recall.

BY MR. FRANTELA:

Q   Does that shock you?

        MR. POTREPKA:  Objection.  Vague.

        THE WITNESS:  Does what shock me?                1:30:06PM

                                             Page 137

CONFIDENTIAL

BY MR. FRANTELA:                                          1:30:08PM

Q    Doesn't that shock you, that an independent

battery lab verified the results that are at issue in

this lawsuit?

        MR. POTREPKA:  Objection.  Foundation.          1:30:15PM

Vague.

        THE WITNESS:  I... I have no feelings for or

against.  I don't -- I'm not shocked or -- I'm not

shocked.

BY MR. FRANTELA:                                          1:30:27PM

Q    Are you shocked that no one told you about this?

        MR. POTREPKA:  Objection.  Vague.

        THE WITNESS:  I'm not.

BY MR. FRANTELA:

Q    You don't consider this germane to the lawsuit?    1:30:40PM

        MR. POTREPKA:  Objection.  Mischaracterizes

testimony.  Vague.

        THE WITNESS:  I have no idea.

BY MR. FRANTELA:

Q    I'm going to -- wouldn't you expect your lawyers   1:30:55PM

to tell you:  Hey, an individual lab validated the test

results that we're suing on?

        MR. POTREPKA:  Objection.  Foundation.  Calls

for speculation.

        THE WITNESS:  I -- again, I'm -- I have no      1:31:11PM

Page 138

CONFIDENTIAL

BY MR. FRANTELA:                                          1:43:02PM

Q    Does this cause you to reconsider your stance in

this lawsuit at all?

         MR. POTREPKA:  Objection.  Foundation.

Vague.                                                   1:43:11PM

         THE WITNESS:  It does not.

BY MR. FRANTELA:

Q    Why not?

         MR. POTREPKA:  Same objections.

         THE WITNESS:  Because -- why not is -- I        1:43:26PM

believe that there are many people -- i.e., the Class

of investors -- that were affected negatively by the

overinflated price of the product at the time in that

period of November 2020 to April 2021.

BY MR. FRANTELA:                                         1:43:57PM

Q    Do you know that -- why the stock actually dropped

in January?

         MR. POTREPKA:  Objection.  Foundation.  Calls

for expert opinion.

         THE WITNESS:  I missed --                       1:44:18PM

         MR. POTREPKA:  Calls for a legal conclusion.

         THE WITNESS:  I missed the question.

BY MR. FRANTELA:

Q.   Do you know the real reason the stock dropped in

January?                                                 1:44:23PM

Page 146

MR. POTREPKA:  Objection.  Foundation.  Calls    1:44:25PM

for expert opinion.  Calls for a legal conclusion.

THE WITNESS:  I don't know the real reason.

No.

BY MR. FRANTELA:                                  1:44:34PM

Q    Are you aware of something called "PIPE":  Public

Investment in Private Equity?

A    No, I'm not aware of that.

Q    No one's talked to you about that?

A    Not that I recall.                          1:44:50PM

Q    So you're not aware that in January a large set of

shares became sellable?

MR. POTREPKA:  Objection.  Foundation.  Asked

and answered.  Vague.

THE WITNESS:  I am not aware of that.         1:45:10PM

BY MR. FRANTELA:

Q    And that they became sellable for the first time

all at once?

MR. POTREPKA:  Same objections.

THE WITNESS:  And I'm not aware of that.      1:45:20PM

BY MR. FRANTELA:

Q    If the stock of QuantumScape -- if the price of

QuantumScape's shares dropped in January for reasons

unrelated to the lawsuit, would that cause you to

reconsider your stance?                           1:45:36PM

Page 147

MR. POTREPKA:  Objection.  Calls for                1:45:38PM
speculation.

THE WITNESS:  I -- I don't know.

I -- I believe there have been -- I still believe,
going back to the Complaint, and -- and -- and within          1:45:51PM
that, the judge that said -- Judge Orrick -- that said
this can go on -- you know, he -- he reviewed the
initial -- I don't know what you would call it; I'm not
going to be using the right legal terms.  But he -- he
was presented with this -- the -- you know, this is a          1:46:14PM
problem, whatever that is called, and said, yes, we can
go on with the class action lawsuit.

So I believe there's problems.  I believe there
was misrepresentation.

I don't believe he would have said "go on" had he          1:46:31PM
not felt it was -- if he felt it was inaccurate, he
would have not approved continuing; so following this
to conclusion.

BY MR. FRANTELA:

Q   Are you aware that in the order you read from           1:46:46PM
Judge Orrick that he assumed all of the allegations to
be true?  Are you aware of that?

MR. POTREPKA:  Objection.  Foundation.

THE WITNESS:  I'm not aware of that.

Veritext Legal Solutions
866 299-5127

BY MR. FRANTELA:                                          1:46:57PM

Q    Does that affect your view on his order?

          MR. POTREPKA:  Objection.  Foundation.  Calls

for legal opinion.  Calls for speculation.

          THE WITNESS:  It doesn't change my opinion.    1:47:05PM

BY MR. FRANTELA:

Q    It doesn't change your opinion that you don't

believe he would have let the lawsuit continue, but he

was assuming that all of the allegations in the

Complaint were true?  That doesn't change your opinion?  1:47:20PM

          MR. POTREPKA:  Objection.

          THE WITNESS:  I don't know.

          MR. POTREPKA:  Calls for legal conclusion.

Calls for speculation.

          THE WITNESS:  I don't know that -- that is     1:47:29PM

something I'm not qualified to answer.

BY MR. FRANTELA:

Q    And you're saying no one told you that in early

January 2021 a large number of shareholders could

suddenly sell their shares?                              1:47:42PM

          MR. POTREPKA:  Objection.  Asked and

answered.  Foundation.

          THE WITNESS:  I -- I'm not aware of that.

     But if I was, I don't recall it for certain.

                                                    Page 149

CONFIDENTIAL

BY MR. FRANTELA:                                          1:47:55PM

Q    Would you like your lawyers to tell you the full

picture?

          MR. POTREPKA:  Objection.  Foundation.

Argumentative.  Speculative.                             1:48:16PM

          THE WITNESS:  I trust my lawyers, and so I

think they are telling me the full picture.

BY MR. FRANTELA:

Q    As you'd want them to.  Right?

A    Correct.                                            1:48:30PM

Q    Do you think the subsequent verifications of

QuantumScape's results are part of the full picture in

this case?

          MR. POTREPKA:  Objection.  Foundation.  Calls

for speculation.  Calls for expert opinion.              1:48:53PM

          THE WITNESS:  I... again, I'm -- I don't have

the technical knowledge of these experts, expert

witnesses, or the legal knowledge to determine in

answer to what you're asking.  I -- I have to -- have

to go on what I believe and what was presented to me,   1:49:21PM

and that's what I'm doing.

BY MR. FRANTELA:

Q     Before today, you didn't know about VW's tests on

QuantumScape's cells, the independent lab's tests on

QuantumScape's cells, or the real reason for the stock   1:49:40PM

Page 150

drop in January; but you still trust that you're being          1:49:43PM

told the full picture?

        MR. POTREPKA:  Objection.  Argumentative.

Mischaracterizes testimony and vague.

        THE WITNESS:  So the question is -- what is          1:50:00PM

the question?

BY MR. FRANTELA:

Q    Before today, you didn't know about the VW tests

on QuantumScape's cells, the independent lab's tests on

QuantumScape's cells, or the real reason for the stock          1:50:09PM

drop in January; but you still trust that you're being

told the full picture.  Right?

        MR. POTREPKA:  Same objections.

        THE WITNESS:  I do trust that.

    There's -- I trust -- I trust the lawyers.  I          1:50:23PM

trust what they've told me.  And I'm well enough along

in life to know that most things can be spun different

ways.  So...

    You know, listening -- someone told me the other

day again, remember that when two people tell the same          1:50:43PM

story, the results may vary.  And so it could be

useful.  I have -- I have chosen to trust my legal

counsel and the information they've provided.

BY MR. FRANTELA:

Q    Well, you are the one making allegations of fraud          1:51:12PM

Page 151

CONFIDENTIAL

without verifying what they're telling you.  Right?          1:51:15PM

MR. POTREPKA:  Objection.  Objection.

Foundation.  Argumentative.  Assumes facts not in

evidence.  Calls for speculation.

THE WITNESS:  The complaints are in the          1:51:29PM

documents.  And, again, I don't -- if the term "fraud"

is used in the documents, then it is.

I'm not denying, yes or no.  But I -- I can't -- I

cannot get into a discussion about what does fraud mean

to me and what does it mean to you.  That would be          1:51:53PM

pointless.

MR. FRANTELA:  I'm going to mark another

exhibit now.  This one was previously marked in this

action as Fish Exhibit 16.

(Deposition Exhibit 16 previously marked for          1:52:07PM

identification.)

THE WITNESS:  Okay.  I'm there.

BY MR. FRANTELA:

Q    Okay.  Do you recognize this document?

A    I have not seen the document before.          1:52:58PM

I recognize the heading of the document, but I

have not seen the document in its entirety.

Q    Where did you see the -- the heading?

A    I don't know.  I'm guessing it was probably in the

document on complaints; but I'm -- I'm just guessing,          1:53:20PM

Page 152

so I don't know.                                         1:53:22PM

Q    And you said earlier you've never read this

document.  Right?

A    Not that I recall.

Q    But this document is part of the basis for your     1:53:41PM

claim in this case.  Right?

A    Yes.

Q    Do you trust this report?

        MR. POTREPKA:  Objection.  Foundation.

Vague.                                                   1:53:57PM

        THE WITNESS:  I have no reason to not trust

it.  But I would have to read it, to say; and even then

I probably wouldn't know.  Again, it's probably highly

technical.

BY MR. FRANTELA:                                         1:54:11PM

Q    Do you believe this report to be credible?

        MR. POTREPKA:  Objection.  Foundation.

Vague.

        THE WITNESS:  I don't know if it is highly

credible.  I -- I have, you know, looked online          1:54:24PM

regarding the company, Scorpion company.  And they seem

to be credible.

    But it's -- I believe them, but -- I guess that

would be my answer, I believe.

    Again, if I knew what the content was -- if I'd      1:54:46PM

Page 153

CONFIDENTIAL

read the content, maybe I wouldn't believe them.  But          1:54:49PM

at this point, I believe that they're a credible

company.

BY MR. FRANTELA:

Q    What made you believe they were credible?              1:55:02PM

A    I don't remember.  You know, it was -- again, I

don't read things to -- when I go look at something, I

don't read things to just, like, memorize them.

But, you know, they comment on -- online seemed

like they were a viable, credible company who did their     1:55:24PM

job to basically kind of -- this is my term; not their

term -- a watchdog kind of company to protect -- I

don't know if "protect," but make investors aware of

investments.  That's my word, so...

Q    Sorry to interrupt.  Did you have --                   1:55:50PM

A    No.

Q    -- more?

A    That's it.

Q    Do you have an understanding of what it means to

be -- short a company?                                      1:56:05PM

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I don't really know.

BY MR. FRANTELA:

Q    Do you know what a short seller is?

        MR. POTREPKA:  Same objection.                      1:56:14PM

Page 154

MR. POTREPKA:  Objection.  Foundation.    2:58:52PM

THE WITNESS:  I do remember that.

BY MR. FRANTELA:

Q    You weren't aware of any time line like that when you purchased QuantumScape shares.  Right?    2:59:02PM

MR. POTREPKA:  Objection.  Foundation.

THE WITNESS:  I was not.

BY MR. FRANTELA:

Q    Did you consider the investment to be safe when you bought QuantumScape shares?    2:59:16PM

MR. POTREPKA:  Objection.  Vague.

THE WITNESS:  It goes back to my comment about there's always a risk.  I wasn't concerned about safe or unsafe; just that awareness.

BY MR. FRANTELA:    2:59:31PM

Q    At the time of purchase, did you consider QuantumScape stock to be more or less risky than your mutual fund investments?

A    Neither.  I just considered it another investment that had, you know, always that element of risk.    2:59:53PM

BY MR. FRANTELA:

Q    So you see them as -- do you see them as the same level of risk:  those two investments?

MR. POTREPKA:  Objection.  Foundation.  Form.

THE WITNESS:  I don't know.  I don't... have    3:00:11PM

Page 194

CONFIDENTIAL

not... I don't think of things, I guess, that way, so I    3:00:15PM

don't know the answer to this.

BY MR. FRANTELA:

Q    Do you think about how likely it is that you're

going to lose money when you buy -- when you invest?    3:00:36PM

A    I would only think about that if somebody said:

Hey, go buy this; you're sure to lose your money.

Well, I wouldn't buy that.  You know, I --

For me, in my mind, buying investments when your

knowledge level is where mine is, it's probably, you    3:01:12PM

know, a glorified -- it's a little bit like gambling.

You don't know what's going to happen.

Q    And gambling is risky.  Right?

MR. POTREPKA:  Objection.  Form.  Foundation.

THE WITNESS:  I find it risky.    3:01:38PM

MR. FRANTELA:  Introducing the next document,

which are your interrogatory responses in this case.

(Deposition Exhibit 34 marked for

identification.)

MR. FRANTELA:  This will be    3:01:57PM

Exhibit Number 34.

THE WITNESS:  Did you say 24?

MR. FRANTELA:  It should be 34.

THE WITNESS:  Oh, 34.  Okay.  Okay.  I'm

there.    3:02:54PM

Page 195

CONFIDENTIAL

BY MR. FRANTELA:                                              3:02:54PM

Q    Have you seen this document before?

A    I have.

Q    And if you scroll all the way to the bottom, the

second-to-last page, you signed this document.  Right?      3:03:12PM

You verified it?

A    Did you say the last --

Q.    The second-to-last page.

A    Yes.

Q    Do you recall signing this document?                  3:03:37PM

A    I do recall.

Q    And it looks like you signed it physically.

Right?

A    That's correct.

Q    Did you provide any input on the responses in this    3:03:49PM

document?

        MR. POTREPKA:  Objection.  Foundation.

        THE WITNESS:  I -- I guess I -- yes, I

provided input because I was, you know, asked

questions.                                                  3:04:15PM

BY MR. FRANTELA:

Q    Did you make any edits once the -- once you --

once you saw a draft?

A    I don't believe I did.

Q    Could you scroll down to page 6, line 3?             3:05:02PM

Page 196

CONFIDENTIAL

Actually, first you can review on page 5,    3:05:10PM

Interrogatory Number 3, which was the request.

Do you see that?

A    I do.

Q    And then on the next page, the last paragraph of    3:05:23PM

your response, it starts with "Plaintiff reviewed one

or more investment publications mentioning securities

of battery manufacturers, including QuantumScape..."

Do you -- is that accurate?

I should add that the sentence ends with "...prior    3:06:02PM

to purchasing QuantumScape securities"?

A    Yes.  It is accurate.

Q    We talked about these a bit earlier; but could

you -- could you list any of those investment

publications that you can remember?    3:06:15PM

A    Yes.  And, again, I don't know which ones, but --

oh, gee.  Oh, man.

Like Kiplinger Report.  Kiplinger Letter.  I can't

think of the one.  BottomLine financials.  And the

other Complete Investor.    3:06:47PM

And then I also mentioned that a -- oftentimes,

I'll hear things discussed on public broadcasts.  I

can't say I did with those, those would be my four

guesses to where I might have read about it.

Page 197

CONFIDENTIAL

MR. FRANTELA:  Thank you.                          3:07:07PM

I'm introducing the next exhibit, which is

Exhibit 35, your responses to requests for production

in this case.

(Deposition Exhibit 35 marked for                  3:07:12PM

identification.)

MR. POTREPKA:  35?

MR. FRANTELA:  That's right.  It should be

Exhibit 35.

THE WITNESS:  I'm there.                           3:07:58PM

MR. FRANTELA:  You got it, Greg?

MR. POTREPKA:  Yeah, I have it.  Thank you.

BY MR. FRANTELA:

Q    Do you recognize this document, Ms. Stark?

A    I do recognize this.                          3:08:10PM

Q    And, like your interrogatories, I'm assuming you

provided input on the responses?

A    I'm looking it over right now.

Q    Please take your time.

A    So the question, again, was:  Did I provide input    3:09:32PM

to this document?  Is that --

Q    That's right.

A    I would say that I relied on my legal team for

this document.

Q    Did you complete any searches of your records to    3:09:56PM

Page 198

CONFIDENTIAL

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  8/31/2022

LYDIA ZINN, RPR, FCRR

CSR No. 9223

Page 203

Veritext Legal Solutions
866 299-5127

# EXHIBIT X

 **BERNSTEIN**

9 December 2020

**Global Energy Storage & Electric Vehicles**

## QuantumScape Corp

**Rating**

# Underperform

**Target Price**

⊜ **QS**                      **28.00 USD**

**Mark C. Newman**
+852-2918-5753
mark.newman@bernstein.com

Yan Li, CFA
+852-2918-5723
yan.li@bernstein.com

Jane Wang
+852-2918-5221
jane.wang@bernstein.com

# QuantumScape: Impressive performance data provides some answers, but opens up even more questions

*QuantumScape released performance data for its solid-state battery technology on 8th Dec as promised. The tested cells were large-area single-layer pouch cells with an anode-free design (zero excess lithium on the anode) and thick cathodes (>3mAh/cm$^2$). We recently initiated on QS with U rating, see [QuantumScape: The future is solid, but significant hurdles remain](#).*

**Performance data was impressive showing decent cycle life of 800 cycles** (vs. Auto OEM requirement typically 1000 cycles) and **fast charge capability** (15mins 80% charge, vs. 25-30mins best in class) but importantly ***these two metrics were not met at the same time***.

**During fast charge (15min 80% charge) QS batteries only lasted 120 cycles.** Furthermore, effective energy density for the cells being tested were not being shown, which opens up more questions such as "was QS using a full 80-90% depth of discharge or were they using shallow charge/discharge cycles to enhance the data?". It is entirely possible that QS used a very shallow charge / discharge cycle to make these results possible, which in reality would mean a significantly lower effective energy density and significantly higher cost per effective kWh of storage. ***Questions around operating temperature window also remain***, which although was significantly better than most solid-state battery tech out there, had significantly worse performance at lower temperatures.

Finally, all this data is only on an early stage engineering sample of a single layer pouch cell, which has ***many hurdles remaining until anywhere near ready for mass manufacturing***. Our valuation of $28/share gives QS all the benefit of the doubt that they can overcome these challenges in the next few years. We expect continued ST upside to shares given current momentum and excitement post these results, but we believe shares are grossly overvalued.

| | |
|---|---|
| Close Date | 8-Dec-2020 |
| QS Close Price (USD) | 57.90 |
| Target Price (USD) | 28.00 |
| Upside/(Downside) | (52)% |
| 52-Week Low | 9.74 |
| 52-Week High | 59.99 |
| SPX | 3,702.25 |
| FYE | |
| Indicated Div Yield | NA |
| Market Cap (USD) (M) | 16,559 |
| EV (USD) (M) | 15,431 |

| Performance | YTD | 1M | 6M | 12M |
|---|---|---|---|---|
| Absolute (%) | NA | 309.2 | NA | NA |
| SPX (%) | 14.6 | 4.3 | 15.4 | 18.1 |
| Relative (%) | NA | 304.9 | NA | NA |

 Analyst Page       Financials

 Bernstein Events       Company Page

## Investment Implications

We rate QS with Underperform rating, TP $28 based on DCF and comps analysis

| EPS Adjusted | F19A | F20E | F21E |
|---|---|---|---|
| QS (USD) | (4.69) | (0.13) | (0.11) |
| SPX | 159.93 | 135.21 | 164.86 |

| Financials | F19A | F20E | F21E | CAGR |
|---|---|---|---|---|
| Revenues (M) | | | | NA |
| EBITDA (M) | (51) | (58) | (70) | NA |
| EBIT (M) | (57) | (63) | (76) | NA |

| Valuation Metrics | F19A | F20E | F21E |
|---|---|---|---|
| P/E Reported (x) | (12.35) | (439.0) | (528.8) |
| EV/Sales (x) | | | |
| EV/EBITDA (x) | (299.9) | (266.6) | (221.1) |
| EV/EBIT (x) | (270.6) | (245.0) | (203.4) |

**See Disclosure Appendix of this report for important disclosures and analyst certifications**

www.bernsteinresearch.com

AB_QS_000027

**Mark C. Newman**   +852-2918-5753   mark.newman@bernstein.com

9 December 2020

## DETAILS

QuantumScape hosted an event for its solid-state battery technology on 8th Dec, releasing key performance data on prototype cell (70*85mm single layer cell, zero excess lithium, 3.2mAh/cm$^2$). In summary the data was impressive showing decent cycle life of 800 cycles (vs. Auto OEM requirement typically 1000 cycles) and fast charge capability (15mins 80% charge, vs. 25-30mins best in class) but importantly these two metrics were not met at the same time. In fact, during fast charge cycles QS batteries only lasted 120 cycles. Furthermore, effective energy density for the cells being tested were not being shown, which opens up more questions such as "was QS using a full 80-90% depth of discharge or were they using shallow charge/discharge cycles to enhance the data?". It is entirely possible that QS used a very shallow charge/discharge cycle to make these results possible, which in reality would mean a significantly lower effective energy density and significantly higher cost per effective kWh of storage.

In addition there are some questions around operating temperature window, which although was significantly better than most solid state battery tech out there, had significantly worse performance at lower temperatures. Finally, all this data is only on an early stage engineering sample of single layer pouch cell, which has many hurdles remaining until anywhere near ready for mass manufacturing. Our valuation of $28/share gives QS all the benefit of the doubt that they can overcome these challenges in the next few years.

**Below summarizes more details of key performance data revealed at QuantumScape's event:**

+ Fast charge (Exhibit 1)

    + <15 min 80% SOC for the prototype cells at 30°C

    + vs. ~40 min 80% SOC for C/Si anode Li-ion

+ Dendrite resistance for the separator (Exhibit 2)

    + Lithium can be plated even under 25C (2-min charge, >100mA/cm2) for Li/Li symmetric single layer cell at 45°C

+ OEM track cycle (Exhibit 3)

    + 15 min fast charge to 80% SOC (~280 mile in 15 min for 350-mile range BEV) and high-power track profile discharge can last for ~120 cycles/1200 laps with 80% capacity maintained, tested at 45°C on the prototype cells

+ Cycle life (Exhibit 4)

    + > 800 cycles / 240k miles at 1C charge and discharge at 30°C with 80% capacity maintained on the prototype cells

+ Extreme low temperature operation (Exhibits 5, 6)

    + Can reach 80% capacity even at -30°C (30*30mm single layer cell, C/3 charge at 30°C, C/3 discharge at low temp)

    + Minimal degradation for 100 cycles (still testing) with C/5 charge and C/3 discharge at -10°C on the prototype cells

+ Safety (Exhibit 7)

    + The separator has no appreciable reaction with molten lithium metal

Overall, we think the data released demonstrates valid working solid-state battery cells, but probably not particularly ahead of other leading incumbents at this stage. Being the first one releasing a full set of performance data to the public under a commercial setup in the solid-state space, the market generally viewed this as positive and the stock jumped 31% to $57.9/share last night post the announcement. We expect continued ST upside to shares given current momentum and excitement post these results, but we believe shares are grossly overvalued

AB_QS_000028

**Mark C. Newman**    +852-2918-5753   mark.newman@bernstein.com                                    9 December 2020

EXHIBIT 1:  **Fast Charging Capability**



Source: QuantumScape

EXHIBIT 2:  **Dendrite resistance for the ceramic separator**



Source: QuantumScape

AB_QS_000029

**Mark C. Newman**   +852-2918-5753   mark.newman@bernstein.com

9 December 2020

EXHIBIT 3: **OEM Track Cycle**





Source: QuantumScape

EXHIBIT 4: **Cycle life**





Source: QuantumScape

AB_QS_000030

**Mark C. Newman**   +852-2918-5753  mark.newman@bernstein.com                                    9 December 2020

EXHIBIT 5:  **Low temperature operability**





Source: QuantumScape

EXHIBIT 6:  **Cycle life under low temperature**





Source: QuantumScape

AB_QS_000031

**Mark C. Newman**   +852-2918-5753  mark.newman@bernstein.com                                                    9 December 2020

EXHIBIT 7:  **Safety performance**







Source: QuantumScape

AB_QS_000032

**Mark C. Newman**   +852-2918-5753   mark.newman@bernstein.com                                          9 December 2020

## APPENDIX - FINANCIAL FORECASTS

EXHIBIT 8:  **Income Statement**

| Income Statement (USD M) | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|
| **Revenue** | - | - | - | - | - | - | - |
| COGS | - | - | - | - | - | - | - |
| **Gross Profit** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| R&D | (36) | (46) | (51) | (62) | (77) | (94) | (106) |
| SG&A | (10) | (11) | (12) | (13) | (15) | (16) | (18) |
| **Operating Income** | **(45)** | **(57)** | **(63)** | **(76)** | **(92)** | **(110)** | **(124)** |
| Net Interest Income | 1 | 4 | 3 | 26 | 25 | 23 | 21 |
| Other Income | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Earnings Before Tax** | **(44)** | **(52)** | **(59)** | **(49)** | **(66)** | **(86)** | **(102)** |
| Income Tax/(Benefit) | - | - | - | - | - | - | - |
| **Net Income** | **(44)** | **(52)** | **(59)** | **(49)** | **(66)** | **(86)** | **(102)** |
| Attributable to the parent | (44) | (52) | (59) | (49) | (66) | (86) | (102) |
| Minority Interest | 0.005 | 0.020 | 0.020 | 0.020 | 0.020 | 0.020 | 0.020 |
| **EPS (USD)** | (3.97) | (4.69) | (0.13) | (0.11) | (0.15) | (0.19) | (0.23) |
| Share Count - Avg (mn) | 11 | 11 | 448 | 448 | 448 | 448 | 448 |
| **EBITDA** | (40) | (51) | (58) | (70) | (85) | (102) | (114) |

Source: Company, Bernstein analysis and estimates

EXHIBIT 9:  **Balance Sheet**

| Balance Sheet (USD M) | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | 31 | 23 | 1,065 | 1,013 | 944 | 950 | 1,221 |
| Marketable Securities | 148 | 107 | 67 | 67 | 67 | 67 | 67 |
| Prepaid Expenses and Other Curre | 1 | 1 | 2 | 2 | 2 | 2 | 2 |
| **Total Current Assets** | **180** | **131** | **1,134** | **1,082** | **1,013** | **1,019** | **1,290** |
| PP&E | 29 | 25 | 31 | 35 | 39 | 49 | 76 |
| Other Non-Current Assets | 3 | 16 | 14 | 13 | 12 | 10 | 9 |
| **Non-Current Assets** | **31** | **41** | **45** | **48** | **50** | **59** | **86** |
| **Total Assets** | **211** | **172** | **1,178** | **1,129** | **1,063** | **1,078** | **1,376** |
| Operating Lease Liability | - | 14 | 13 | 13 | 13 | 13 | 13 |
| Accounts Payable | 1 | 3 | 2 | 2 | 2 | 2 | 2 |
| Other Liabilities | 18 | 6 | 6 | 6 | 6 | 106 | 506 |
| **Total Liabilities** | **18** | **22** | **21** | **21** | **21** | **121** | **521** |
| Reserves | 442 | 449 | 1,510 | 1,510 | 1,510 | 1,510 | 1,510 |
| Accumulated Deficit | (246) | (296) | (355) | (404) | (470) | (555) | (657) |
| Non-controling interests | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Others | (4) | (4) | 0 | 0 | 0 | 0 | 0 |
| **Shareholder's Equity** | **193** | **150** | **1,157** | **1,108** | **1,042** | **957** | **855** |
| Attributable to parent | 191 | 149 | 1,155 | 1,106 | 1,041 | 955 | 853 |
| **Total Liabilities & Equity** | **211** | **172** | **1,178** | **1,129** | **1,063** | **1,078** | **1,376** |
| **BVPS (USD)** | 17.2 | 13.3 | 2.6 | 2.5 | 2.3 | 2.1 | 1.9 |

Source: Company, Bernstein analysis and estimates

AB_QS_000033

**Mark C. Newman**   +852-2918-5753   mark.newman@bernstein.com                                                9 December 2020

EXHIBIT 10:  **Cash Flow Statement**

| Cash Flow Statement (USD M) | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|
| Net Income | (44.1) | (51.3) | (59.0) | (49.0) | (65.9) | (85.6) | (101.7) |
| Depreciation & Amortization | 5.7 | 5.6 | 5.1 | 6.1 | 7.0 | 7.7 | 9.7 |
| Other | 2.7 | 4.0 | 0.6 | 1.2 | 1.2 | 1.2 | 1.2 |
| **CF From Operations** | **(35.7)** | **(41.7)** | **(53.4)** | **(41.7)** | **(57.7)** | **(76.7)** | **(90.8)** |
| Capex | (7.4) | (9.8) | (10.1) | (10.4) | (10.8) | (17.6) | (37.6) |
| Other | (69.9) | 40.4 | 40.6 | - | - | - | - |
| **CF From Investing** | **(77.3)** | **30.5** | **30.4** | **(10.4)** | **(10.8)** | **(17.6)** | **(37.6)** |
| **CF From Financing** | **120.8** | **0.4** | **1,064.7** | **0.0** | **0.0** | **100.0** | **400.0** |
| **Net Cash Flow** | **7.8** | **(10.8)** | **1,041.8** | **(52.1)** | **(68.5)** | **5.8** | **271.6** |
| Cash at Beginning of Period | 23.3 | 33.6 | 22.8 | 1,064.6 | 1,012.5 | 944.0 | 949.8 |
| **Cash at End of Period** | **31.1** | **22.8** | **1,064.6** | **1,012.5** | **944.0** | **949.8** | **1,221.3** |
| **Free Cash Flow** | (47.2) | (61.3) | (68.0) | (80.2) | (95.4) | (119.6) | (151.6) |

Source: Company, Bernstein analysis and estimates

DISCLOSURE APPENDIX

## BERNSTEIN TICKER TABLE

| Ticker | Rating | | 8 Dec 2020 Closing Price | Target Price | TTM Rel. Perf. | | EPS Adjusted | | | EV/EBITDA | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2019A | 2020E | 2021E | 2019A | 2020E | 2021E |
| QS | U | USD | 57.90 | 28.00 | NA | USD | (4.69) | (0.13) | (0.11) | (299.93) | (266.61) | (221.14) |
| SPX | | | 3,702.25 | | | | 159.93 | 135.21 | 164.86 | 23.15 | 27.38 | 22.46 |

O - Outperform, M - Market-Perform, U - Underperform, N – Not Rated

## VALUATION METHODOLOGY

QuantumScape Corp

Our target price of $28/share is determined based on a combination of DCF and comparable company analysis. Our TP is based on 2035 DCF, implying 8x EV/sales and 30x EV/EBITDA for 2021 discounting the 2029 sales and EBITDA back by 8 years using a 20% discount rate, which is on a par with current leading EV battery makers.

## RISKS

QuantumScape Corp

Key upside risks include better than expected battery performance data release on Dec 8th, faster/better than expected tech roll out, continued investment excitement on the EV battery tech space, etc.

AB_QS_000034

# REQUIRED REGULATORY DISCLOSURES

- References to "Bernstein" relate to Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (Canada) Limited, Sanford C. Bernstein (India) Private Limited (SEBI registration no. INH000006378) and Sanford C. Bernstein (business registration number 53193989L), a unit of AllianceBernstein (Singapore) Ltd. which is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C, collectively. On and as of April 1, 2019, AllianceBernstein L.P. acquired Autonomous Research. As a result of the acquisition, the research activities formerly conducted by Autonomous Research US LP have been assumed by Sanford C. Bernstein & Co., LLC, which will continue to publish research under the Autonomous Research US brand and the research activities formerly conducted by Autonomous Research Asia Limited have been assumed by Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, which will continue to publish research under the Autonomous Research Asia brand.

- References to "Autonomous" in these disclosures relate to Autonomous Research LLP and, with reference to dates prior to April 1, 2019, to Autonomous Research US LP and Autonomous Research Asia Limited, and, with reference to April 1, 2019 onwards, the Autonomous Research US unit and separate brand of Sanford C. Bernstein & Co., LLC and the Autonomous Research Asia unit and separate brand of Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, collectively.

- References to "Bernstein" or the "Firm" in these disclosures relate to Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (Canada) Limited, Sanford C. Bernstein (India) Private Limited (SEBI registration no. INH000006378), Sanford C. Bernstein (business registration number 53193989L), a unit of AllianceBernstein (Singapore) Ltd. which is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C and, with reference to April 1, 2019 onwards, Autonomous Research LLP, collectively.

- Bernstein and Autonomous analysts are compensated based on aggregate contributions to the research franchise as measured by account penetration, productivity and proactivity of investment ideas. No analysts are compensated based on performance in, or contributions to, generating investment banking revenues.

- Bernstein rates stocks based on forecasts of relative performance for the next 6-12 months versus the S&P 500 for stocks listed on the U.S. and Canadian exchanges, versus the MSCI Pan Europe Index for stocks listed on the European exchanges (except for Russian companies), versus the MSCI Emerging Markets Index for Russian companies and stocks listed on emerging markets exchanges outside of the Asia Pacific region, and versus the MSCI Asia Pacific ex-Japan Index for stocks listed on the Asian (ex-Japan) exchanges - unless otherwise specified. We have three categories of ratings:

    Outperform: Stock will outpace the market index by more than 15 pp in the year ahead.

    Market-Perform: Stock will perform in line with the market index to within +/-15 pp in the year ahead.

    Underperform: Stock will trail the performance of the market index by more than 15 pp in the year ahead.

    Not Rated: The stock Rating, Target Price and/or estimates (if any) have been suspended temporarily.

- For purposes of the Market Abuse Regulation (MAR) and the FINRA Rule 2241, 'Outperform' is classified as a Buy, 'Market-Perform' is classified as a Hold, and 'Underperform' is classified as a Sell

- As of 12/08/2020, Bernstein's ratings were distributed as follows: 288 Outperform - 48.3% (0.0% banking clients) ; 245 Market-Perform - 41.1% (0.0% banking clients); 63 Underperform - 10.6% (0.0% banking clients); 0 Not Rated - 0.0% (0.0% banking clients). The numbers in parentheses represent the percentage of companies in each category to whom Bernstein provided investment banking services. All figures are updated quarterly and represent the cumulative ratings over the previous 12 months. These ratings relate solely to the investment research ratings for companies covered under the Bernstein brand and do not include the investment research ratings for companies covered under the Autonomous brand. This information is provided in order to comply with Article 6 of the Commission Delegated Regulation (EU) 2016/958.

## 12-Month Bernstein Rating History as of 12/08/2020

**Ticker Rating Changes**

| | |
|---|---|
| QS | U (IC) 11/30/20 |

Rating Guide: O - Outperform, M - Market-Perform, U - Underperform, N - Not Rated
Rating Actions: IC - Initiated Coverage, DC - Dropped Coverage, RC - Rating Change

AB_QS_000035



## OTHER IMPORTANT DISCLOSURES

Bernstein produces a number of different types of research products including, among others, fundamental analysis and quantitative analysis under the "Bernstein", "Autonomous", and "Alphalytics" brands. Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, and Bernstein's affiliate, Autonomous Research LLP, each  issue research products under the "Autonomous" publishing brand independently of the "Bernstein" and "Alphalytics" publishing brands. Recommendations contained within one type of research product may differ from recommendations contained within other types of research products, whether as a result of differing time horizons, methodologies or otherwise. Furthermore, views or recommendations within a research product issued under any particular brand may differ from views or recommendations under the same type of research product issued under another brand.

Where this material contains an analysis of debt product(s), such material is intended only for institutional investors and is not subject to the independence and disclosure standards applicable to debt research prepared for retail investors. Please contact Bernstein to request that such institutional debt research not be provided.

This document may not be passed on to any person in the United Kingdom (i) who is a retail client (ii) unless that person or entity qualifies as an authorised person or exempt person within the meaning of section 19 of the UK Financial Services and Markets Act 2000 (the "Act"), or qualifies as a person to whom the financial promotion restriction imposed by the Act does not apply by virtue of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or is a person classified as an "professional client" for the purposes of the Conduct of Business Rules of the Financial Conduct Authority.

This document may not be passed onto any person in Canada unless that person qualifies as "permitted client" as defined in Section 1.1 of NI 31-103.

**To our readers in the United States:** Sanford C. Bernstein & Co., LLC, a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") and a member of the U.S. Financial Industry Regulatory Authority, Inc. ("FINRA") is distributing this publication in the United States and accepts responsibility for its contents. Any U.S. person receiving this publication and wishing to effect securities transactions in any security discussed herein should do so only through Sanford C. Bernstein & Co., LLC.  Where this report has been prepared by research analyst(s) employed by a non-US affiliate (such analyst(s), "Non-US Analyst(s)") of Sanford C. Bernstein & Co., LLC, such Non-US Analyst(s) is/are (unless otherwise expressly noted) not registered as associated persons of Sanford C. Bernstein & Co., LLC or any other SEC-registered broker-dealer and are not licensed or qualified as research analysts with FINRA or any other US regulatory authority.  Accordingly, reports prepared by Non-US Analyst(s) are not prepared in compliance with FINRA's restrictions regarding (among other things) communications by research analysts with a subject company, interactions between research analysts and investment banking personnel, participation by research analysts in solicitation and marketing activities relating to investment banking transactions, public appearances by research analysts, and trading securities held by a research analyst account.

**To our readers in the United Kingdom:** This publication has been issued or approved for issue in the United Kingdom by Sanford C. Bernstein Limited, authorised and regulated by the Financial Conduct Authority and located at 50 Berkeley Street, London W1J 8SB, +44 (0)20-7170-5000.

**To our readers in member states of the EEA (except Ireland):** This publication is being distributed in the EEA (except Ireland) by Sanford C. Bernstein Limited, which is authorised and regulated in the United Kingdom by the Financial Conduct Authority and holds a passport under the Markets in Financial Instruments Directive.

**To our readers in Ireland:** This publication is being distributed in Ireland by Sanford C. Bernstein Ireland Limited, which is authorised and regulated by the Central Bank of Ireland.

AB_QS_000036

**To our readers in Hong Kong:** This publication is being distributed in Hong Kong by Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, which is licensed and regulated by the Hong Kong Securities and Futures Commission (Central Entity No. AXC846).  This publication is solely for professional investors only, as defined in the Securities and Futures Ordinance (Cap. 571).

**To our readers in Singapore:** This publication is being distributed in Singapore by Sanford C. Bernstein, a unit of AllianceBernstein (Singapore) Ltd., only to accredited investors or institutional investors, as defined in the Securities and Futures Act (Chapter 289). Recipients in Singapore should contact AllianceBernstein (Singapore) Ltd. in respect of matters arising from, or in connection with, this publication. AllianceBernstein (Singapore) Ltd. is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C. It is regulated by the Monetary Authority of Singapore and located at One Raffles Quay, #27-11 South Tower, Singapore 048583, +65-62304600. The business name "Bernstein" is registered under business registration number 53193989L.

**To our readers in the People's Republic of China:** The securities referred to in this document are not being offered or sold and may not be offered or sold, directly or indirectly, in the People's Republic of China (for such purposes, not including the Hong Kong and Macau Special Administrative Regions or Taiwan), except as permitted by the securities laws of the People's Republic of China.

**To our readers in Japan:** This document is not delivered to you for marketing purposes, and any information provided herein should not be construed as a recommendation, solicitation or offer to buy or sell any securities or related financial products.

For the institutional client readers in Japan who have been granted access to the Bernstein website by Daiwa Securities Group Inc. ("Daiwa"), your access to this document should not be construed as meaning that Bernstein is providing you with investment advice for any purposes. Whilst Bernstein has prepared this document, your relationship is, and will remain with, Daiwa, and Bernstein has neither any contractual relationship with you nor any obligations towards you

**To our readers in Australia:** Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited and Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司 are exempt from the requirement to hold an Australian financial services licence under the Corporations Act 2001 in respect of the provision of the following financial services to wholesale clients:

- providing financial product advice;

- dealing in a financial product;

- making a market for a financial product; and

- providing a custodial or depository service.

**To our readers in Canada:** If this publication is pertaining to a Canadian domiciled company, it is being distributed in Canada by Sanford C. Bernstein (Canada) Limited, which is licensed and regulated by the Investment Industry Regulatory Organization of Canada ("IIROC"). If the publication is pertaining to a non-Canadian domiciled company, it is being distributed by Sanford C. Bernstein & Co., LLC, which is licensed and regulated by both the SEC and FINRA into Canada under the International Dealers Exemption.  This publication may not be passed onto any person in Canada unless that person qualifies as a "Permitted Client" as defined in Section 1.1 of NI 31-103.

**To our readers in India:** This publication is being distributed in India by Sanford C. Bernstein (India) Private Limited (SCB India) which is licensed and regulated by Securities and Exchange Board of India ("SEBI") as a research analyst entity under the SEBI (Research Analyst) Regulations, 2014, having registration no. INH000006378 and as a stock broker having registration no. INZ000213537. SCB India is currently engaged in the business of providing research and stock broking services.

SCB India is a private limited company incorporated under the Companies Act, 2013, on April 12, 2017 bearing corporate identification number U65999MH2017FTC293762, and registered office at Level 6, 4 North Avenue, Maker Maxity, Bandra Kurla Complex, Bandra (East), Mumbai 400051 , Maharashtra, India (Phone No: +91-22-68421401).

SCB India does not have any disciplinary history as on the date of this report.

The associates of SCB India or their relatives may have financial interest(s) in the subject company.

SCB India or its associates do not have actual/beneficial ownership of one percent or more securities of the subject company. SCB India is not engaged in any investment banking activities, as such, SCB India has not managed or co-managed a public offering in the past twelve months.  In addition, neither SCB India nor any of its associates have received any compensation for investment banking services or merchant banking services from the subject company in the past 12 months.

SCB India or its associates may have received compensation for brokerage services from the subject company in the past twelve months.

SCB India or its associates may have received compensation for products or services other than investment banking or merchant banking or brokerage services from the subject company in the past twelve months.

SCB India and its associates have not received any compensation or other benefits from the subject company or third party in connection with the research report.

The principal research analysts who prepared this report, a member of his or her team, are not (nor are any members of their household) an officer, director, employee or advisory board member of the companies covered in the report.

AB_QS_000037

SCB India and its associate company(ies) may act as a market maker in the financial instruments of the companies covered in the report.

Sanford C. Bernstein & Co., LLC., Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (Canada) Limited and AllianceBernstein (Singapore) Ltd., Sanford C. Bernstein (India) Private Limited are regulated, respectively, by the Securities and Exchange Commission under U.S. laws, by the Financial Conduct Authority under U.K. laws, by the Hong Kong Securities and Futures Commission under Hong Kong laws, by the Investment Industry Regulatory Organization of Canada, by the Monetary Authority of Singapore under Singapore laws, and Securities and Exchange Board of India, all of which differ from Australian laws.

One or more of the officers, directors, or employees of Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (India) Private Limited, Sanford C. Bernstein (Canada) Limited, Sanford C. Bernstein (business registration number 53193989L), a unit of AllianceBernstein (Singapore) Ltd. which is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C, and/or their affiliates may at any time hold, increase or decrease positions in securities of any company mentioned herein.

Bernstein or its affiliates may provide investment management or other services to the pension or profit sharing plans, or employees of any company mentioned herein, and may give advice to others as to investments in such companies. These entities may effect transactions that are similar to or different from those recommended herein.

All Bernstein branded research publications are disseminated to our clients through posting on the firm's password protected website, www.bernsteinresearch.com.  Certain, but not all, Bernstein branded research publications are also made available to clients through third-party vendors or redistributed to clients through alternate electronic means as a convenience.  For access to all available Bernstein branded research publications, please contact your sales representative or go to http://www.bernsteinresearch.com

Bernstein and/or its affiliates do and seek to do business with companies covered in its research publications. As a result, investors should be aware that Bernstein and/or its affiliates may have a conflict of interest that could affect the objectivity of this publication. Investors should consider this publication as only a single factor in making their investment decisions.

This publication has been published and distributed in accordance with Bernstein's policy for management of conflicts of interest in investment research, a copy of which is available from Sanford C. Bernstein & Co., LLC, Director of Compliance, 1345 Avenue of the Americas, New York, N.Y. 10105, Sanford C. Bernstein Limited, Director of Compliance, 50 Berkeley Street, London W1J 8SB, United Kingdom, or Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Director of Compliance, 39th Floor, One Island East, Taikoo Place, 18 Westlands Road, Quarry Bay, Hong Kong, or Sanford C. Bernstein (business registration number 53193989L) , a unit of AllianceBernstein (Singapore) Ltd. which is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C, Director of Compliance, One Raffles Quay, #27-11 South Tower, Singapore 048583, or Sanford C. Bernstein (India) Private Limited, Chief Compliance Officer, Level 6, 4 North Avenue, Maker Maxity, Bandra Kurla Complex, Bandra (East), Mumbai 400051.  Additional disclosures and information regarding Bernstein's business are available on our website www.bernsteinresearch.com.

This report has been produced by an independent analyst as defined in Article 3 (1)(34)(i) of EU 296/2014 Market Abuse Regulation ("MAR").

This publication is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of, or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or which would subject Bernstein or any of their subsidiaries or affiliates to any registration or licensing requirement within such jurisdiction. This publication is based upon public sources we believe to be reliable, but no representation is made by us that the publication is accurate or complete. We do not undertake to advise you of any change in the reported information or in the opinions herein. This publication was prepared and issued by Bernstein for distribution to eligible counterparties or professional clients. This publication is not an offer to buy or sell any security, and it does not constitute investment, legal or tax advice. The investments referred to herein may not be suitable for you. Investors must make their own investment decisions in consultation with their professional advisors in light of their specific circumstances. The value of investments may fluctuate, and investments that are denominated in foreign currencies may fluctuate in value as a result of exposure to exchange rate movements. Information about past performance of an investment is not necessarily a guide to, indicator of, or assurance of, future performance.

## CERTIFICATIONS

- I/(we), Mark C. Newman, Senior Analyst(s)/Analyst(s), certify that all of the views expressed in this publication accurately reflect my/(our) personal views about any and all of the subject securities or issuers and that no part of my/(our) compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views in this publication.

*Approved By: COS*

Copyright 2020, Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, Autonomous Research LLP, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (India) Private Limited and AllianceBernstein (Singapore) Ltd., subsidiaries of AllianceBernstein L.P. ~1345 Avenue of the Americas ~ NY, NY 10105 ~212/756-4400.  All rights reserved.

AB_QS_000038

[AHEAD OF TOMORROW]

AB_QS_000039

# EXHIBIT Y



**Q4 FISCAL 2021**
LETTER TO SHAREHOLDERS

FEBRUARY 16, 2022

**Exhibit**
**0025**
8/12/2022
Frank Fish

Dear shareholders,

The past quarter marked the close of our first full year as a public company. At the beginning of 2021, we announced our essential goals for the year: complete a technical milestone for cells delivered to Volkswagen; demonstrate multilayer cells with both 4- and 10-layer cells capable of delivering over 800 cycles under what we refer to as our *gold-standard* test conditions;[1] and secure space and begin the buildout for QS-0, our pre-pilot production line.

**We are proud that we completed all 2021 milestones on schedule:**

**Meeting the technical milestone jointly set with Volkswagen** demonstrated important progress toward our final commercial design and in addition, successfully completing the milestone unlocked a $100 million investment from Volkswagen.

Having shown the capabilities of the core single-layer chemistry, our next key goal was to **demonstrate the ability to make multilayer cells with similar cycling performance**. We showed 4-layer cells meeting our gold-standard test conditions in August 2021, and our first 10-layer cell hit the mark in November. We've replicated this excellent performance with additional 10-layer cells, as illustrated on the following chart.

### Energy Retention vs Cycle Count

| | |
|---|---|
| **Charge/Discharge Rate** | 1C-1C avg |
| **Cathode Thickness** | 3.1-3.2 mAh/cm$^2$ |
| **Current Density** | 3.1-3.2 mA/cm$^2$ |
| **Temperature** | 25-30°C |
| **Anode** | Anode-free Li metal |
| **Depth of Discharge** | 100% |
| **Area**[†] | Commercially relevant |
| **Pressure** | ~3.4 atm |
| **Layers** | 1, 4, or 10 |

1-layer
3rd-party; 1-layer
4-layer
10-layer

†Commercially relevant dimensions may vary from 60x75mm to 70x85mm depending on cell format

Importantly, this data demonstrates that cycling performance remains fundamentally similar when single-layer cells are stacked together in a multilayer cell, reinforcing our confidence that with good design, single-layer performance can be successfully scaled up to a multilayer format. This chart also includes newer 10-layer cells with a commercially relevant separator area of 66x81 mm; we expect these dimensions will continue to evolve based on customer preferences and packaging considerations.

---

[1] By "gold-standard" test conditions we mean: average charge/discharge rates of 1C or faster, temperatures of 25 °C, 100% depth of discharge, and externally applied pressure of no more than 3.4 atmospheres, simultaneously. For a more detailed discussion of why these parameters are important, please read CTO Tim Holme's blog on the subject.

**Securing space and beginning construction on QS-0, our pre-pilot facility**, was a key step in our manufacturing progress. We secured a building for the QS-0 line itself and surrounding structures to establish QS Campus. **Tool delivery and QS Campus buildout will ramp up substantially this year**, with the start of pre-pilot production at QS-0 targeted for 2023.

## Technical Progress Update

**We are excited to announce that we have built our first 16-layer cells, at the amp-hour scale.** While we generally do not expect first prototypes to demonstrate cycling results that match more mature designs, we were pleased that the very first cell we put on our cycle life test showed early energy retention and cycling behavior substantially similar to that of our single-, 4-, and 10-layer cells and achieved over 20 cycles, providing a solid basis upon which we expect to rapidly iterate and improve in the coming weeks and months.

### Early Cycle Energy Retention vs Cycle Count



Our technical progress is driven by our development approach, which occurs concurrently on three distinct levels: the single-layer building block, multilayer cells and manufacturing.

### QS Development Approach



Using our single-layer platform, we pursue material and process innovations and prove the fundamental entitlements of our chemistry. The single-layer cell consists of one cathode and one separator as manufactured, with an anode layer of pure lithium metal formed in-situ during the first charge from the lithium in the cathode. Improvements to energy density, fast charging, and longevity flow directly from the capabilities of this single-layer system.

Once new features are proven on the single-layer platform, they are passed along to the multilayer development workstream. Technical development of multilayer cells involves increasing the number of layers and optimizing the cells' electrical performance, mechanical behavior and packaging design. When complete, cell developments are integrated into our production process engineering flow. **Multilayer cell performance is ultimately dependent on what is achievable at the single-layer level.**

We recently made several important single-layer announcements. At the December 2021 Advanced Automotive Battery Conference, CTO Tim Holme presented preliminary data on our full-area single-layer cells achieving 400 cycles with no externally applied pressure. **We are pleased to report new data on our zero external pressure efforts**: 70x85 mm single-layer cells have reached 800 cycles with energy retention above 80%, under our gold-standard test conditions – 100% depth of discharge, 25 °C and 1C average charge/discharge rates.

To our knowledge, **demonstrating long cycle life with zero externally applied pressure represents a world-first for lithium-metal battery technology**. Many groups over the decades have published papers suggesting pressure is intrinsically required to make lithium-metal anodes work, whether using liquid or solid electrolytes, so we see this as a scientific breakthrough. Although we believe that our standard applied pressure, 3.4 atmospheres, is practical for automotive applications, lower levels of pressure offer compelling benefits. For automotive applications, it allows for simpler and lower-cost pack-level designs, and applications such as consumer electronics require zero externally applied pressure since there is no space for a pressure-applying apparatus.

### Cycling with Zero Externally Applied Pressure



We revealed another promising single-layer result in a January 27 webinar, demonstrating cells capable of fast charging from 10% to 80% in under 15 minutes over 400 consecutive cycles.

We are unaware of any other high-energy capable EV battery architecture demonstrating this extreme fast charging over hundreds of cycles without prohibitive battery capacity losses. Having demonstrated the ability of the core chemistry to perform at this level in single-layer cells, we plan to integrate it into our future multilayer cells. Please watch our fast-charge webinar and read our white paper for a more in-depth discussion of these results.

### 15-Minute Fast Charge Cycling Data



## Scale Up Progress

The technical achievements recorded in 2021 were supported by increases in our production scale. A key metric of the scale of our manufacturing capability is film starts, which measures the capacity of our separator production. In 2022, our more extensive Phase 2 engineering line should allow us to further increase our start rate, as shown in the chart below.

### Weekly Film Starts - Q4'21 vs Q4'22 Target



Q4'21 reflects a historical average; Q4'22 reflects peak starts during the quarter

Tooling has represented one of the constraints on our manufacturing scale, although we expect this to ease over the next year. This increase in scale will support expanded customer sampling and continue to accelerate our R&D cycle. This year, we will also take delivery of equipment for QS-0 that should enable a step-change increase in 2023.

Scale is about machines, processes, and people, and in 2021 we welcomed an outstanding cohort of new colleagues. We began 2021 with around 270 team members and closed the year with over 550. To support our manufacturing scale up, we have attracted professionals and leaders who have worked on the floors of some of the largest battery factories in the world. We believe we're able to attract great talent because of the opportunity we offer to work on disruptive technology with the potential for global impact in an environment and culture that is intensely mission-driven.

We recently announced new members to our Board of Directors: Jeneanne Hanley, former president of E-systems at Lear Corporation; Gena Lovett, former vice president of operations for defense, space and security at Boeing; and Susan Huppertz, chief manufacturing and supply chain officer at Hubbell Inc. They bring decades of experience from a broad cross-section of relevant industries, including automotive, aviation and manufacturing. We believe their backgrounds and experience will be invaluable additions to our world-class board.

6

This quarter, we also bid farewell to our longtime director, John Doerr, who retired from our board after serving since our founding in 2010. Although he's most widely known for his many visionary and industry-changing investments, he is also an uncommonly kind and generous human being. He's provided invaluable guidance as a director and has inspired many on our team. We will miss John and we wish him the best as he continues to serve as a leading voice for action on climate change.

## Customer Engagement

In 2021, **we announced collaborations with two additional automotive OEMs** – a top-10 global manufacturer and an international luxury automotive company – both with well-known brands. The agreements anticipate testing collaboration and validating QuantumScape cells with the ultimate goal of including them in series production vehicles. We have now signed customer sampling agreements with three automakers, which collectively represent more than 15% of global automotive sales revenue in 2020.

Although our core focus remains on electric vehicles, **on January 13, we announced a new strategic relationship with Fluence**, a global leader in stationary energy storage products and services. The deal reserves capacity from QS-0, our pre-pilot production line, for Fluence's testing and validation, with the goal to eventually supply cells for its proprietary energy storage solutions. The stationary storage market is growing rapidly, with some projections forecasting a 41% CAGR this decade, a multi-hundred-billion-dollar opportunity.

We believe our announcements of **three new customer sampling agreements in just the last six months** demonstrate a level of interest across different applications and indicate a broader market understanding of our battery technology's disruptive potential.

## 2022 Financial Outlook

For full-year 2021, we spent $279M in cash opex and capex, in line with guidance of $265M to $325M, supporting investment in our Phase 1 and 2 engineering lines as well as our larger QS Campus with the QS-0 line and its long-lead equipment. Cash opex of $152M was within guidance of $130M to $160M. Capex spend of $127M was below the guidance of $135M to $165M due to payment timing unrelated to scale up schedule; QS-0 remains on track for 2023 start of pre-pilot production.

In 2021, we strengthened our balance sheet through a variety of sources. In March, in response to strong inbound customer interest in samples from QS-0, we completed a follow-on offering. In April, successful completion of our cell testing milestone unlocked an investment from Volkswagen. We also received proceeds from the exercise and redemption of warrants related to our business combination with Kensington. As a result of these inflows, we ended 2021 with $450M more in liquidity than we started, and we entered 2022 with well over $1.4B of liquidity.

Our 2022 plan makes significant investments into cell development and scalable production: continuous-flow processes featuring increasing levels of automation, high throughput metrology systems, and scalable digital architecture. This investment will allow us to create the manufacturing blueprint for our QS-1 joint venture with Volkswagen and separator production facilities. Our $325M to $375M capital investment plan can be broken down by line and objective:

- Approximately $52M or 15% will flow into our Phase 1 engineering line to support R&D, process development, pre-A sample customer sampling, and additional projects including our R&D center in Japan

- Approximately $85M or 25% will go toward our Phase 2 engineering line that supports process development, A sample production, and manufacturing of our solid-state separators in medium-size continuous kilns with automated handling. This investment is intended to enable an order-of-magnitude increase in film starts compared with current capacity.

- Approximately $215M or 60% for QS-0 and our larger QS Campus will support process development, film production in large continuous kilns with automated handling, and automated cell assembly. The primary QS-0 building is in an advanced stage of construction; we've already taken occupancy, and early tool installation is underway.



Continuous-flow processing tool installed into the Phase 1 engineering line

Looking at target weekly film starts as a function of total line facility and equipment capex, we expect to see a greater than 4X improvement in efficiency between our Phase 1 and Phase 2 lines, with a similar improvement between our targeted capacities for Phase 2 and QS-0 lines. Achieving the planned cell starts at these investment levels will be an important first step in demonstrating the cost improvement necessary to reach our QS-1 production targets. We continue to believe that, at scale, our anode-free design can deliver competitive economics relative to conventional lithium-ion batteries, and our QS-0 line allows us to develop and de-risk scalable manufacturing processes while serving our customer sampling objectives.



Robotic automated loading station for the continuous processing tool

In line with previous guidance, 2021 and 2022 represent the substantial majority of investment related to our engineering and QS-0 lines. In 2023, we expect capital spending related to our engineering and QS-0 lines to decline significantly. We expect that by the end of 2022, our engineering lines will have achieved their goals of producing A samples, and we will have received the majority of equipment for QS-0, tracking to our 2023 start of QS-0 pre-pilot production goal.

We expect our 2022 cash operating expenses will be between $225M and $275M to support growth in hiring and production volumes associated with our 2022 product development, customer sampling, and scalable manufacturing process development objectives. While cash opex will grow steadily throughout the year, we expect capex to peak mid-year and then decline thereafter. We anticipate Q1'22 capex to be in the range of $30M to $60M, with higher spend in Q2'22 and Q3'22 as the bulk of spend takes place. The timing of spend is based on several factors, including lead times and payment schedules, which vary by supplier. We will continue to update our capex guidance throughout the year.

Based on these estimates, we expect to enter 2023 with over $800M in liquidity—which we believe will be sufficient to fund cash opex, final residual investment in QS-0, and the initial setup of the QS-1 production facilities: the joint venture for cell manufacturing as well as the facility to supply separators, which we will retain full ownership of.

9

## Goals for 2022

As we look at the year ahead, we have outlined four main milestones for 2022:

1. **Demonstrate proprietary cell format**
   Our architecture uniquely enables the use of a lithium-metal anode in a cell that is manufactured anode-free. As we have extensively discussed, this architecture – enabled by our proprietary ceramic solid-state separator – unlocks a host of potential benefits, such as improvements to energy density, charging speed, cycle life, safety and cost. However, any lithium-metal cell design must deliver these benefits while also accounting for the unique challenges of lithium metal, such as increased volume expansion compared to conventional lithium-ion batteries. The design must also be capable of being manufactured rapidly, cost-effectively, and at scale using automated processes. A major development milestone for 2022 is to demonstrate our proprietary cell format in preparation for large-scale customer sampling and, eventually, commercial production.

2. **Deliver A sample prototype cells**
   A significant milestone in our progress toward commercialization is delivering A samples using our proprietary cell format to at least one prospective customer. The A sample represents a significant step toward finalizing the physical and performance specifications of our commercial product. Since every customer has somewhat different requirements, the precise specifications of an A sample are likely to vary between customers and across various applications.

   We expect to produce these A samples on our Phase 2 engineering line and deliver to customers for validation and testing. Subsequently, in 2023 we plan to produce the next stage of prototypes on our QS-0 line – the candidate B sample – taking advantage of the developments and insights from the A-sample process.

3. **Scale up film starts to 8,000 per week**
   Demonstrating the feasibility of our scale up schedule requires increasing our start rate substantially this year. By the end of 2022, we plan to achieve a peak of 8,000 film starts per week – up from an average of approximately 1,800 films per week in Q4'21. While our separator is designed to use scalable continuous-flow processes, thus far, one of the bottlenecks to production scale has been equipment availability due to long lead times for much of the necessary tooling. As the tools on our Phase 2 engineering line arrive and are commissioned, we believe increasing start rates will translate to more layers, more cells, and an accelerated pace of technological development.

4. **Take delivery of QS-0 equipment and maintain deadlines for start of QS-0 pre-pilot production in 2023**
   Our customer sampling roadmap calls for substantial growth in the number and qualitative technical maturity of samples delivered in 2023. In 2022, we plan to take delivery of most equipment for QS-0, the initial pre-pilot line, to keep next year's roadmap on track.

   We also plan to receive and calibrate high-throughput metrology equipment, allowing us to generate feedback to develop our mass-manufacturing processes rapidly. To maximize the value of these sophisticated metrology systems, we also expect to deploy a highly scalable digital architecture throughout our pre-pilot line. This manufacturing execution system will allow us to record and track individual parts with high precision. A well-developed data pipeline is a prerequisite for using artificial intelligence and machine learning techniques for quality control. The QS-0 line has been planned from the ground up to enable this.

10

## Key Milestones



### Strategic Outlook

Our company's success is premised on four fundamental propositions:

1. Battery electric powertrains will replace combustion engines
2. The anode-free lithium-metal platform we have demonstrated enables compelling improvements over current lithium-ion batteries
3. We can scale up our cells to many layers without compromising performance
4. We can mass-manufacture our cells while achieving competitive economics

The first proposition now seems relatively uncontroversial. The transition to battery electric vehicles (BEVs) is happening and, at this point, appears unstoppable. Last year, some major automakers saw triple-digit growth in year-over-year BEV sales, and automakers across the industry have announced investments in BEV manufacturing totaling hundreds of billions of dollars. BEV penetration in key global markets has reached double-digit percentages, and there are few reasons to believe this trend will reverse. The transition now seems inevitable.

When it comes to the second point, we believe that the single-layer data we've released should leave no doubt that QuantumScape's technology enables a compelling value proposition for EV drivers when compared to both current lithium-ion technology as well as other next-generation lithium-metal efforts. We've demonstrated long cycle life under our gold-standard test conditions, impressive fast-charging capability, and shown an anode-free lithium-metal solid-state architecture with the potential to improve energy density and safety while also offering the potential for cost reduction.

11

In 2021, we made significant strides toward demonstrating the third premise, including showing 4- and 10-layer cells successfully tested under our gold-standard conditions. We start 2022 with further evidence validating this premise, with early cycling data from our first 16-layer cells also showing consistent energy retention performance with previously published data. We believe delivery of our A sample will check the box on this premise.

We intend to show that the last premise is also true as we execute on our scale up milestones. Our 2022 goals aim to show manufacturing progress by demonstrating our production-intent cell format, delivering A samples, dramatically ramping film starts, and keeping QS-0 on track for first production in 2023. Longer-term, we plan to produce candidate B samples in 2023, targeting commercialization in the 2024/2025 timeframe. These milestones are designed to increase confidence in our ability to scale up. We look forward to sharing more details on our continuous-flow mass-manufacturing model over the year.

As we continue to validate these premises, we believe QuantumScape's opportunity becomes increasingly compelling. The company has a rare opportunity to significantly impact greenhouse gas emissions while simultaneously creating substantial value for our investors. We look forward to reporting our progress on these goals in the coming quarters.

Jagdeep Singh
Founder, CEO & Chairman

Kevin Hettrich
CFO

**QuantumScape Corporation**
**Consolidated Balance Sheets**
*(In Thousands, Except per Share Amounts)*

| | December 31, | | |
|---|---|---|---|
| | 2021 | | 2020 |
| **Assets** | | | |
| Current assets | | | |
| Cash and cash equivalents ($3,382 and $3,406 as of December 31, 2021 and 2020, respectively, for joint venture) | $  320,700 | $ | 113,216 |
| Marketable securities | 1,126,975 | | 884,336 |
| Prepaid expenses and other current assets | 15,757 | | 11,616 |
| Total current assets | 1,463,432 | | 1,009,168 |
| Property and equipment, net | 166,183 | | 43,696 |
| Right-of-use assets - finance lease | 30,886 | | — |
| Right-of-use assets - operating lease | 36,913 | | 11,712 |
| Other assets | 18,234 | | 2,193 |
| Total assets | $  1,715,648 | $ | 1,066,769 |
| **Liabilities, redeemable non-controlling interest and stockholders' equity** | | | |
| Current liabilities | | | |
| Accounts payable | $  14,182 | $ | 5,383 |
| Accrued liabilities | 6,078 | | 3,356 |
| Accrued compensation and benefits | 9,119 | | 2,391 |
| Operating lease liability, short-term | 1,209 | | 1,220 |
| Finance lease liability, short-term | 19 | | — |
| Total current liabilities | 30,607 | | 12,350 |
| Operating lease liability, long-term | 36,760 | | 11,244 |
| Finance lease liability, long-term | 39,378 | | — |
| Other liabilities | 315 | | — |
| Assumed common stock warrant liabilities | — | | 689,699 |
| Total liabilities | 107,060 | | 713,293 |
| Redeemable non-controlling interest | 1,693 | | 1,704 |
| Stockholders' equity | | | |
| Preferred stock- $0.0001 par value; 100,000 shares authorized, none issued and outstanding at December 31, 2021 and 2020 | — | | — |
| Common stock - $0.0001 par value; 1,250,000 shares authorized (1,000,000 Class A and 250,000 Class B);332,870 Class A and 95,450 Class B shares issued and outstanding at December 31, 2021, 207,769 Class A and 156,225 Class B shares issued and outstanding at December 31, 2020 | 43 | | 36 |
| Additional paid-in-capital | 3,634,665 | | 2,329,406 |
| Accumulated other comprehensive loss | (4,208) | | (31) |
| Accumulated deficit | (2,023,605) | | (1,977,639) |
| Total stockholders' equity | 1,606,895 | | 351,772 |
| Total liabilities, redeemable non-controlling interest and stockholders' equity | $  1,715,648 | $ | 1,066,769 |

13

**QuantumScape Corporation**
**Consolidated Statements of Operations and Comprehensive Loss**
*(In Thousands, Except per Share Amounts)*

| | Three Months Ended December 31, | | | Twelve Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2021 | 2020 | 2019 |
| Operating expenses: | | | | | | |
| Research and development | $ 46,788 | $ 22,730 | $ 12,860 | $ 151,496 | $ 65,103 | $ 45,944 |
| General and administrative | 20,349 | 7,458 | 2,237 | 63,770 | 15,918 | 9,874 |
| Total operating expenses | 67,137 | 30,188 | 15,097 | 215,266 | 81,021 | 55,818 |
| Loss from operations | (67,137) | (30,188) | (15,097) | (215,266) | (81,021) | (55,818) |
| Other (expense) income, net: | | | | | | |
| Interest expense | (822) | (11,818) | (93) | (1,419) | (20,765) | (94) |
| Interest income | 682 | 131 | 683 | 1,883 | 1,093 | 3,608 |
| Change in fair value of assumed common stock warrant liabilities | — | (581,863) | — | 168,674 | (581,863) | — |
| Change in fair value of Series F convertible preferred stock tranche liabilities | — | (652,867) | — | — | (999,987) | — |
| Other income | 50 | — | 224 | 151 | 760 | 1,041 |
| Total other (expense) income, net | (90) | (1,246,417) | 814 | 169,289 | (1,600,762) | 4,555 |
| Net loss | (67,227) | (1,276,605) | (14,283) | (45,977) | (1,681,783) | (51,263) |
| Less: Net loss attributable to non-controlling interest, net of tax of $0 | (1) | — | 5 | (11) | (6) | 20 |
| Net loss attributable to common stockholders | $ (67,226) | $ (1,276,605) | $ (14,288) | $ (45,966) | $ (1,681,777) | $ (51,283) |
| Net income (loss) | $ (67,227) | $ (1,276,605) | $ (14,283) | $ (45,977) | $ (1,681,783) | $ (51,263) |
| Other comprehensive income (loss): | | | | | | |
| Unrealized gain (loss) on marketable securities | (3,579) | (71) | (4) | (4,177) | (121) | 121 |
| Total comprehensive loss | (70,806) | (1,276,676) | (14,287) | (50,154) | (1,681,904) | (51,142) |
| Less: Comprehensive loss attributable to non-controlling | (1) | — | 5 | (11) | (6) | 20 |
| Comprehensive loss attributable to common stockholders | $ (70,805) | $ (1,276,676) | $ (14,292) | $ (50,143) | $ (1,681,898) | $ (51,162) |
| | | | | | | |
| Net loss per share of common stock attributable to common stockholders | | | | | | |
| Basic | $ (0.16) | $ (4.42) | $ (0.06) | $ (0.11) | $ (6.67) | $ (0.21) |
| Diluted | $ (0.16) | $ (4.42) | $ (0.06) | $ (0.52) | $ (6.67) | $ (0.21) |
| Weighted-average shares used in computing net loss per share of common stock | | | | | | |
| Basic | 424,704 | 288,793 | 239,733 | 404,259 | 252,144 | 239,636 |
| Diluted | 424,704 | 288,793 | 239,733 | 409,509 | 252,144 | 239,636 |

**QuantumScape Corporation**
**Consolidated Statements of Cash Flows**
*(In Thousands)*

| | Three Months Ended December 31, | | | Twelve Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2021 | 2020 | 2019 |
| **Operating activities** | | | | | | |
| Net loss | $ (67,227) | $ (1,276,605) | $ (14,283) | $ (45,977) | $ (1,681,783) | $ (51,263) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | | | |
| Depreciation and amortization | 3,575 | 2,135 | 1,541 | 11,207 | 6,851 | 4,704 |
| Amortization of right-of-use assets | 902 | 314 | 296 | 3,492 | 1,229 | 1,159 |
| Amortization of premiums and accretion of discounts on marketable securities | 2,790 | 989 | (149) | 11,845 | 1,201 | (1,964) |
| Stock-based compensation expense | 16,165 | 7,771 | 1,994 | 52,175 | 17,024 | 6,811 |
| Change in fair value of convertible preferred stock warrant liabilities | — | 11,818 | 94 | — | 20,765 | 94 |
| Change in fair value of convertible preferred stock tranche liabilities | — | 652,745 | — | — | 999,865 | — |
| Change in fair value of assumed common stock warrant liabilities | — | 581,863 | — | (168,674) | 581,863 | — |
| Other | 675 | 3 | (90) | 899 | 3 | (90) |
| Changes in operating assets and liabilities: | | | | | | |
| Prepaid expenses and other current assets | (7,271) | (9,157) | 208 | (4,852) | (9,648) | (550) |
| Accounts payable, accrued liabilities and accrued compensation | 5,817 | 1,253 | (510) | 13,178 | 2,447 | 319 |
| Operating lease liability | (34) | (279) | (245) | (1,202) | (1,080) | (951) |
| Net cash used in operating activities | (44,608) | (27,150) | (11,144) | (127,909) | (61,263) | (41,731) |
| **Investing activities** | | | | | | |
| Purchases of property and equipment, net | (44,782) | (10,181) | (4,180) | (127,178) | (24,093) | (9,846) |
| Proceeds from maturities of marketable securities | 283,220 | 11,000 | 42,500 | 894,225 | 99,000 | 239,500 |
| Proceeds from sales of marketable securities | 51,765 | 14,006 | — | 224,058 | 14,006 | — |
| Purchases of marketable securities | (270,772) | (840,928) | (31,142) | (1,376,939) | (891,561) | (196,353) |
| Net cash (used in) provided by investing activities | 19,431 | (826,103) | 7,178 | (385,834) | (802,648) | 33,301 |
| **Financing activities** | | | | | | |
| Proceeds from exercise of stock options and employee stock purchase plan | 6,447 | 279 | 128 | 17,779 | 599 | 394 |
| Proceeds from exercise of warrants | — | — | — | 151,431 | — | — |
| Proceeds from issuance of common stock, net of issuance costs paid | — | — | — | 462,926 | — | — |
| Proceeds from issuance of Series F preferred stock, net of issuance costs | — | 176,670 | — | — | 176,462 | — |
| Proceeds from issuance of Class A Common Stock pursuant to Legacy QuantumScape Series F Preferred Stock Purchase Agreement, net of issuance costs | — | 99,800 | — | 99,930 | 99,800 | — |
| Business Combination, net of issuance costs paid | — | 679,147 | — | (1,016) | 676,863 | — |
| Proceeds from finance lease, net of principal payment | 297 | — | — | 5,507 | — | — |
| Net cash provided by financing activities | 6,744 | 955,896 | 128 | 736,557 | 953,724 | 394 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | (18,433) | 102,643 | (3,838) | 222,814 | 89,813 | (8,036) |
| Cash, cash equivalents and restricted cash at beginning of period | 356,656 | 12,766 | 29,434 | 115,409 | 25,596 | 33,632 |
| Cash, cash equivalents and restricted cash at end of period | $ 338,223 | $ 115,409 | $ 25,596 | $ 338,223 | $ 115,409 | $ 25,596 |
| **Supplemental disclosure of cash flow information** | | | | | | |
| Cash paid for interest | $ 92 | $ — | $ — | $ 330 | $ — | $ — |
| Fair value of assumed common stock warrants exercised | $ — | $ — | $ — | $ 521,025 | $ — | $ — |
| Purchases of property and equipment, not yet paid | $ 11,073 | $ 4,170 | $ 2,547 | $ 11,073 | $ 4,170 | $ 2,547 |
| Business Combination transaction costs, accrued but not paid | $ — | $ 1,016 | $ — | $ — | $ 1,016 | $ — |
| Net assets assumed from Business Combination | $ — | $ 592 | $ — | $ — | $ 592 | $ — |

14

## Net Loss to Adjusted EBITDA

Adjusted EBITDA is a non-GAAP supplemental measure of operating performance that does not represent and should not be considered an alternative to operating loss or cash flow from operations, as determined by GAAP. Adjusted EBITDA is defined as net loss before interest expense, non-controlling interest, revaluations, stock-based compensation and depreciation and amortization expense. We use Adjusted EBITDA to measure the operating performance of our business, excluding specifically identified items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations. Adjusted EBITDA may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of Adjusted EBITDA to net loss is as follows:

| ($ in Thousands) | Three Months Ended December 31, | | | Twelve Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2021 | 2020 | 2019 |
| GAAP net loss attributable to Common Stockholders | $ (67,226) | $ (1,276,605) | $ (14,288) | $ (45,966) | $ (1,681,777) | $ (51,283) |
| Interest expense (income), net (1) | 140 | 11,687 | (590) | (464) | 19,672 | (3,514) |
| Other expense, net | (50) | — | (224) | (151) | (760) | (1,041) |
| Change in fair value of assumed common stock warrant liabilities | — | 581,863 | — | (168,674) | 581,863 | — |
| Change in fair value of Series F convertible preferred stock tranche liabilities | — | 652,867 | — | — | 999,987 | — |
| Net gain (loss) attributable to non-controlling interests | (1) | — | 5 | (11) | (6) | 20 |
| Stock-based compensation | 16,165 | 7,771 | 1,994 | 52,175 | 17,024 | 6,811 |
| Non-GAAP operating loss | $ (50,972) | $ (22,417) | $ (13,103) | $ (163,091) | $ (63,997) | $ (49,007) |
| Depreciation and amortization expense | 3,575 | 2,135 | 1,541 | 11,207 | 6,851 | 4,704 |
| Adjusted EBITDA | $ (47,397) | $ (20,282) | $ (11,562) | $ (151,884) | $ (57,146) | $ (44,303) |

(1) Includes non-cash fair value adjustment related to the convertible preferred stock warrant liability of $11.8 million and $20.8 million, for the three months and twelve months ended December 31, 2020, respectively and $0.1 million for the three months and twelve months ended December 31, 2019. There were no such adjustments for the three months and twelve months ended December 31, 2021.

## Management's Use of Non-GAAP Financial Measures

This letter includes certain non-GAAP financial measures as defined by SEC rules. These non-GAAP financial measures are in addition to, and not a substitute for or superior to, measures of financial performance prepared in accordance with U.S. GAAP. There are a number of limitations related to the use of these non-GAAP financial measures versus their nearest GAAP equivalents. For example, other companies may calculate non-GAAP financial measures differently or may use other measures to evaluate their performance, all of which could reduce the usefulness of our non-GAAP financial measures as tools for comparison. We urge you to review the reconciliations of our non-GAAP financial measures to the most directly comparable U.S. GAAP financial measures set forth in this letter, and not to rely on any single financial measure to evaluate our business.

## Forward-Looking Statements

This current report contains forward-looking statements within the meaning of the federal securities laws and information based on management's current expectations as of the date of this current report. All statements other than statements of historical fact contained in this current report, including statements regarding the future development of the Company's battery technology, the anticipated benefits of the Company's technologies and the performance of its batteries, plans and objectives for future operations, forecasted cash usage, including spending and investment, are forward-looking statements. When used in this current report, the words "may," "will," "estimate," "pro forma," "expect," "plan," "believe," "potential," "predict," "target," "should," "would," "could," "continue," "believe," "project," "intend," "anticipates," "seek," "working toward," "embarking" the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. These forward-looking statements are based on management's current expectations, assumptions, hopes, beliefs, intentions, and strategies regarding future events and are based on currently available information as to the outcome and timing of future events.

15

These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Many of these factors are outside the Company's control and are difficult to predict. Factors that may cause such differences include, but are not limited to ones listed here.  The Company faces significant barriers in its attempts to produce a solid-state battery cell and may not be able to successfully develop its solid-state battery cell. Building high volumes of multilayer cells in commercially relevant area and with higher layer count requires substantial development effort. The Company could encounter significant delays and/or technical challenges in replicating the performance seen in its single-layer and early multilayer cells and in achieving the high quality, consistency and throughput required for commercial production and sale. The Company may encounter delays and other obstacles in acquiring, installing and operating new manufacturing equipment for automated and/or continuous-flow processes, including vendor delays (which we have already experienced) and challenges optimizing complex manufacturing processes. The Company may encounter delays in hiring the engineers it needs to expand its development and production efforts, delays in building out QS-0, and delays caused by the COVID-19 pandemic. Delays in increasing production of engineering samples would slow the Company's development efforts. The Company may be unable to adequately control the costs associated with its operations and the components necessary to build its solid-state battery cells at competitive prices. The Company's spending may be higher than currently anticipated. The Company may not be successful in competing in the battery market industry or establishing and maintaining confidence in its long-term business prospectus among current and future partners and customers. The Company cautions that the foregoing list of factors is not exclusive. The Company cautions readers not to place undue reliance upon any forward-looking statements, which speak only as of the date made.

Except as otherwise required by applicable law, the Company disclaims any duty to update any forward-looking statements. Should underlying assumptions prove incorrect, actual results and projections could differ materially from those expressed in any forward-looking statements. Additional information concerning these and other factors that could materially affect the Company's actual results can be found in the Company's periodic filings with the SEC. The Company's SEC filings are available publicly on the SEC's website at www.sec.gov.

16

# EXHIBIT Z

Exhibit
0054
9/7/2022
Matthew Cain

§3

S3 Short Interest and Securities Finance Data and Analytics

**Click for 10 Day Complimentary Access to Bloomberg/S3 Black App Pro**

**S3 Analytics: Get Ready for a QuantumScape Short Squeeze    December 9, 2020**

Lithium metal battery producer QuantumScape Corp (QS) is up over +26% in mid-morning trading after it announced positive technical results for its solid-state batteries. The need of a fast charging, safe and powerful battery is one of the most important components for the Electric Vehicle industry. QS short interest is $110 million; 1.90 million shares, 9.55% short interest % of float; 8.72% S3 short interest % float (which includes "synthetic longs" created by short sales); 109.08% stock borrow fee which is trending over the 175% fee level in recent trading.

QS is the 12th largest short in the Auto Parts & Equipment sector with short selling relatively flat over the last month primarily due to a lack to stock loan supply. Over the last month shares shorted increased by 162 thousand shares, worth $9.4 million, a +9% increase as its stock price rose +347%. Over the last week we saw shares shorted stay relatively flat, only down fifteen hundred shares, as QS's stock price rose +63%.

|  | Auto Parts & Equip Sector | Ticker | SI % Float | S3 SI % Float | Fee | Short Interest | 30D Shares Shorted | 7D Shares Shorted |
|---|---|---|---|---|---|---|---|---|
| 1 | WORKHORSE GROUP INC | WKHS | 33.79% | 25.25% | 7.83% | $785,996,287 | $1,055,799 | ($28,641,026) |
| 2 | APTIV PLC | APTV | 1.44% | 1.42% | 0.30% | $476,942,032 | ($56,710,791) | ($13,791,470) |
| 3 | BORGWARNER INC | BWA | 4.31% | 4.13% | 0.30% | $412,438,447 | ($10,488,400) | ($78,933,621) |
| 4 | VEONEER INC | VNE | 9.66% | 8.81% | 0.70% | $241,965,982 | ($10,545,815) | ($2,782,095) |
| 5 | FOX FACTORY HLDG | FOXF | 5.99% | 5.65% | 0.30% | $241,772,255 | ($7,357,603) | ($5,633,749) |
| 6 | VISTEON CORP | VC | 5.27% | 5.00% | 0.30% | $189,617,980 | ($31,870,735) | ($15,414,599) |
| 7 | CONTINENTAL AG | CTTAF | 1.17% | 1.15% | 0.30% | $171,098,387 | $6,387,562 | $0 |
| 8 | GENTEX CORP | GNTX | 1.67% | 1.64% | 0.30% | $137,105,377 | $11,778,634 | ($3,026,380) |
| 9 | ADIENT PLC | ADNT | 3.97% | 3.82% | 0.30% | $136,394,563 | ($16,275,725) | ($6,309,874) |
| 10 | LEAR CORP | LEA | 1.43% | 1.41% | 0.30% | $136,009,779 | $98,528 | ($1,289,462) |
| 11 | MAGNA INTL | MGA | 0.75% | 0.75% | 0.30% | $130,956,170 | ($14,187,998) | ($5,743,778) |
| 12 | QUANTUMSCAPE CORP | QS | 9.55% | 8.72% | 109.08% | $110,175,478 | $9,394,657 | ($91,077) |
| 13 | LCI INDUSTRIES | LCII | 3.05% | 2.96% | 0.30% | $96,749,449 | $10,316,200 | ($2,577,751) |
| 14 | AUTOLIV INC | ALV | 1.06% | 1.05% | 0.30% | $85,978,205 | ($10,325,301) | ($7,038,012) |
| 15 | DORMAN  PRODUCTS | DORM | 3.15% | 3.05% | 0.30% | $81,179,782 | ($4,940,821) | ($84,910) |
| 16 | KANDI TECHNOLOGIES GRP | KNDI | 13.26% | 11.71% | 13.08% | $67,318,997 | ($1,257,952) | ($337,389) |
| 17 | PATRICK INDS INC | PATK | 4.25% | 4.08% | 0.30% | $62,575,219 | ($741,181) | ($1,409,128) |
| 18 | AMERICAN AXLE & MFG | AXL | 6.39% | 6.01% | 0.30% | $57,685,513 | ($5,942,898) | ($1,890,536) |
| 19 | MOTORCAR PARTS OF US | MPAA | 12.95% | 11.47% | 0.30% | $57,495,158 | ($1,978,105) | ($223,750) |
| 20 | TENNECO  INC | TEN | 8.49% | 7.82% | 0.30% | $53,014,057 | ($1,296,164) | ($1,388,682) |
|  |  |  |  |  |  |  |  |  |
|  | **Total Sector** |  | **9.97%** | **8.09%** | **5.00%** | **$4,028,818,816** | **($168,306,050)** | **($182,428,937)** |

QS short selling was very active in October and November as stock borrows were still available and QS's stock price was trending slightly downward. Shorts increased their shares shorted by +384%, with shares shorted increasing from 405 thousand to 1.55 million shares. Over this time period stock borrow rates ranged between 7% and 10%. Short financing expense grew from $1,630/day to $10,388/day, a large increase in two months, but still palatable to short sellers looking for QS stock price to continue the downtrend trend they saw from September to late October.



In December, QS's stock borrow fees have exploded to the upside with rates increasing from 7.58% fee on November 29th to 109.08% fee presently. This sudden and extreme increase is due to stock borrow pressure from additional short selling demand virtually cleaning out stock loan shares available to borrow and lenders now being able to charge a large premium to continue borrowing shares.

On average, in order for stocks with over $100 million of short interest to have stock loan fees over 10% the S3 short interest $ of float would have to be over 20%, but QC only has a S3 short interest % float of 8.72%. The primary reason for this anomaly is that the large majority of QS long shareholders are insiders. With so little stock in the hands of traditional stock lenders such as mutual funds, ETF's, and hedge funds the overall SQ stock lending pool is comparatively small and therefore a spike in short selling demand can have an outsized effect on stock borrow

rates. This spike in stock borrow fees has increased financing costs for short sellers. Shorts are now paying just over $350 thousand/day in stock borrow financing expenses.



QS's recent stock price rally has turned a profitable short trade into a losing short trade. QS short sellers were up +$6.5 million in net-of-financing mark-to-market profits at the end of October, but -$65 million of losses in November and -$52 million of losses so far in December (including -$30 million in mark-to-market losses today) has turned the trade into a -$110 million losing proposition.

These losses, coupled with alpha devouring stock borrow fees, has turned QS into a high level short squeeze candidate. We should see short sellers with less conviction to start closing out their positions in the face of red P\L numbers and expensive stock borrow costs. If SQ's stock price continues to climb and stock loan fees continue to trend towards 200% we expect a larger rush for the exits and the size of buy-to-covers to positively affect its stock price.

Looking at short selling trends over time provides insight into overall market sentiment as well as the strength of bearish conviction in individual equities. Our Blacklight SaaS platform and Black APP provides an up to date view of short selling and short covering on an equity, sector, index, or country-wide basis allowing investors\traders to better manage their existing long and short positions.

Research Note written by Ihor Dusaniwsky, Managing Director of Predictive Analytics, S3 Partners, LLC

For deeper insight into short side data and analysis contact me at  Ihor.Dusaniwsky@S3Partners.com

For short side data and access to our research reports go to https://shortsight.com/ .


## Click for 10 Day Complimentary Access to Bloomberg/S3 Black App Pro

The information herein (some of which has been obtained from third party sources without verification) is believed by S3 Partners, LLC ("S3 Partners") to be reliable and accurate.  Neither S3 Partners nor any of its affiliates makes any representation as to the accuracy or completeness of the information herein or accepts liability arising from its use.  Prior to making any decisions based on the information herein, you should determine, without reliance upon S3 Partners, the economic risks, and merits, as well as the legal, tax, accounting, and investment consequences, of such decisions.