# EXHIBIT "6"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE QUANTUMSCAPE SECURITIES CLASS ACTION LITIGATION | Case No. 3:21-cv-00058-WHO <u>CLASS ACTION</u> |

EXPERT REPLY REPORT OF MATTHEW D. CAIN, PHD

November 10, 2022

## Table of Contents

I.   Introduction and Summary of Opinions ................................................................. 3

II.  The Fraud-on-the-Market Theory and Stock Prices ............................................... 5

III. Market Efficiency of QuantumScape Common Stock Early in the Class Period ..... 8

    A.  Analyst Coverage of QuantumScape ............................................................... 9

    B.  Short Selling Activity in QuantumScape Common Stock ............................... 13

    C.  Dr. Hendershott's Flawed Assessment of *Cammer* Factor 5 ........................ 16

        1.  Statistical Power of the Tests .................................................................. 19

        2.  Evidence from Stock Price Movements ................................................... 21

IV.  The QuantumScape Option Prices Considered by Dr. Hendershott Reflect the Same Information as the Common Stock ..................................................................... 26

V.   Dr. Hendershott's Opinions are Based on an Incorrect Application of Statistics .................. 30

VI.  Dr. Hendershott's Concerns Related to Damages are Flawed and Premature ....................... 33

Appendix A ................................................................................................................ 36

Appendix B ................................................................................................................ 41

Exhibits ..................................................................................................................... 43

## I.    Introduction and Summary of Opinions

1.    On July 22, 2022, I submitted an expert report on market efficiency in this matter ("Efficiency Report"), in which I concluded that: a) the market for shares of QuantumScape Common Stock was efficient throughout the Class Period; b) the value impact of any alleged misstatements or omissions would be reflected in QuantumScape's Options prices because their pricing is derivative of and dependent upon QuantumScape's Common Stock prices; and c) damages in this matter can be calculated on a class-wide basis subject to a common methodology.[1]

2.    Following the submission of my Efficiency Report, Counsel provided me with the October 6, 2022 Rebuttal Report of Dr. Terrence Hendershott ("Hendershott Report"). I have been asked to review, evaluate, and respond to the opinions in that report.

3.    My qualifications and rate of compensation for work in this matter were identified in my Efficiency Report and I do not repeat them here. I have attached an updated version of my curriculum vitae as **Appendix A**. I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

4.    In formulating my opinions set forth in this Expert Rebuttal Reply Report, I have relied upon the analyses already described in my Efficiency Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. I also performed additional research to evaluate certain assertions made in the Hendershott Report. All of the materials I considered in forming

---

[1] *See* Efficiency Report, ¶¶ 10, 11, 88. I continue to hold the opinions expressed in my Efficiency Report and reiterate them here. Capitalized terms in this report have the same meaning as in my Efficiency Report.

my opinions are identified in **Appendix B** to this report in addition to the similar Appendix to my Efficiency Report.

5.    Dr. Hendershott does not dispute the widely-held presumption that "markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on them."[2] Furthermore, he does not dispute my assessment that "[t]he fact that QuantumScape's Common Stock traded in such a well-developed market (under the trading symbol "QS" on the NYSE) leads to a strong presumption of market efficiency."[3]

6.    Dr. Hendershott does not render an opinion that QuantumScape's Common Stock or Options traded in *inefficient* markets during the Class Period.

7.    In my Efficiency Report, I also tested QuantumScape's Common Stock market efficiency by evaluating 11 separate factors (including the *Cammer* and *Krogman* factors). Dr. Hendershott does not dispute my analyses of nine out of these 11 factors.[4] Rather, he opines, without basis, that these nine undisputed factors, which have been employed by financial economists in hundreds of market efficiency reports, and accepted by numerous courts, do "not provide a reliable basis to conclude that QuantumScape's stock traded in an efficient market throughout the Putative Class Period."[5] He provides no support for this claim, and he ignores the fact that these factors are regularly relied upon to assess market efficiency, including in cases that I have opined on and which have been recently certified.[6]

---

[2] Efficiency Report, ¶ 21.
[3] Efficiency Report, ¶ 21.
[4] Dr. Hendershott takes issue with two factors (i.e., analyst coverage and price reaction to new information, *Cammer* Factor 2 and *Cammer* Factor 5, respectively).
[5] Hendershott Report, ¶ 60.
[6] *See* Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation.*

8.       Rather, Dr. Hendershott proposes a novel theory: that QuantumScape Common Stock exhibited indicia of market inefficiency during the first several weeks of the Class Period that I supposedly ignored. He attempts to support this theory by mischaracterizing my Efficiency Report analyses and testimony, ignoring my analyses of 11 factors that support market efficiency throughout the Class Period, insinuating that QuantumScape fell victim to a purported "short squeeze," and conducting his own subjective and flawed assessment of QuantumScape's Common Stock price movements on a handful of trading days during the first several weeks of the Class Period.

9.       Dr. Hendershott opines that I have failed to articulate a reliable class-wide methodology for the calculation of damages because he disputes my market efficiency opinions. For the reasons discussed throughout this reply report, his opinions regarding market efficiency are flawed and thus his conclusion related to damages is irrelevant.

10.       Nothing in the Hendershott Report disturbs the opinions expressed in my Efficiency Report. In the following sections I address each of Dr. Hendershott's purported criticisms of my Efficiency Report.

**II. The Fraud-on-the-Market Theory and Stock Prices**

11.       In my Efficiency Report, I explained how the fraud-on-the-market theory relates directly to the prices of a given security.[7] This theory posits that if a company's stock prices reflect all publicly-available information, then all purchasers of that company's stock are induced into reliance on any misrepresentations or omissions because those statements or omissions have distorted the value of each investor's purchase price. I further explained how the fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to

---

[7] Efficiency Report, ¶¶ 18-20.

Section 10(b) claims and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its *Halliburton II* decision.

12.     I analyzed the *Cammer*, *Krogman*, and other relevant factors relating to QuantumScape's common stock in my Efficiency Report, and I ultimately found that these factors support a conclusion of market efficiency.[8] I then explained how QuantumScape's options prices were derivative of its Common Stock prices during the Class Period.[9] As a result, if an alleged misstatement or omission created or maintained artificial inflation in QuantumScape's Common Stock, then it would also translate into the value of derivative instruments such as call and put Options on QuantumScape Common Stock. The fraud-on-the-market theory thus implies that investors would be induced into reliance on such misstatements or omissions in the same manner, regardless of whether those investors purchased QuantumScape Common Stock or Options.

13.     Dr. Hendershott does not discuss the relevance of the fraud-on-the-market theory to security prices in his report. In fact, his analyses are broadly designed to abstract away from the impact of information on real-world security prices and instead focus on theoretical and hypothetical examples and other analyses that are not directly relevant to the key question regarding investors' reliance on alleged misstatements or omissions *via* their impacts on security prices. In short, Dr. Hendershott's analyses are irrelevant to the question of whether alleged misstatements or omissions would be reflected in the prices of QuantumScape's Common Stock and Options.

14.     Dr. Hendershott suggests that my *Cammer* Factor 5 analysis of a cause and effect relationship between new company information and QuantumScape Common Stock prices is the

---

[8] Efficiency Report, ¶¶ 28-75.
[9] Efficiency Report, ¶¶ 76-80.

6

only analysis that directly tests market efficiency.[10] However, in making this claim, Dr.

Hendershott inappropriately dismisses the ten other efficiency factors I analyzed in my report.

Dr. Hendershott does not dispute that nine of these ten other factors *support* a finding of market

efficiency throughout the entire Class Period.[11] Since there is not one unequivocal test for

efficiency, it is important to consider the identified efficiency factors as a whole because none of

the individual tests or metrics is determinative as to whether a particular market is efficient.

Taken together, the factors I analyzed in my report provide strong economic evidence that

QuantumScape Common Stock traded in an efficient market throughout the entire Class Period.

Furthermore, Dr. Hendershott does not dispute the presumption of market efficiency for

QuantumScape resulting from the fact that it traded on the New York Stock Exchange

throughout the Class Period. He simply suggests that based on his subjective review of certain

dates during the first five weeks of the Class Period, purported evidence inconsistent with

efficiency exists.[12] In the following sections, I explain the multiple flaws in his subjective

opinions.

---

[10] Hendershott Report, ¶ 25.

[11] Dr. Hendershott makes additional arguments related to short interest and analyst coverage, which I address below in Section III.

[12] Dr. Hendershott also objects to my comparison of various efficiency tests on QuantumScape to the MRK Study, including his objection that the study analyzed a large sample of firms over the period 1984 through 2008 (Hendershott Report, ¶ 61). This time period overlaps with the time period considered within the original *Cammer* court decision in 1989 and *Krogman* court decision in 2001, and thus represents a reasonable benchmark for consideration of these factors. If a given level of trading volume, bid-ask spread, analyst coverage, market making, etc. indicated market efficiency at the time of the *Cammer* and *Krogman* court decisions, then that level would also indicate efficiency today. The fundamental question of whether public information is reflected in securities' prices remains constant over time. Moreover, as I explained in my Efficiency Report, the MRK Study analyzes samples of firms in the context of the same factors as those considered by the *Cammer* and *Krogman* courts and thus provides a reliable source for comparison (Efficiency Report, ¶¶ 24-26). Dr. Hendershott does not propose any alternative benchmarks to the MRK Study, but rather opines without basis that the factors other than *Cammer* Factor 5 do not provide a reliable basis upon which to assess market efficiency. Moreover, he contradicts his own assertion by pointing to short time periods in relation to several of these other factors (Hendershott Report, ¶¶ 63-65 [*Cammer* Factor 2: analyst coverage]; ¶¶ 49, 78 [*Krogman* Factor: bid-ask spread]). In short, Dr. Hendershott attempts to dismiss these other factors when they are consistent with market efficiency, but attempts to rely on them when he purports that they indicate inefficiency (though as I explain below, here, they are all consistent with market efficiency).

**III. Market Efficiency of QuantumScape Common Stock Early in the Class Period**

15.     Dr. Hendershott questions the efficiency of the market for QuantumScape Common Stock during a short window of approximately five weeks early in the Class Period: November 27, 2020 through January 4, 2021.[13] Yet he does not analyze each of the efficiency factors over the full Class Period or the three and a half month portion of the Class Period after January 4, 2021. Rather, he forms subjective opinions about QuantumScape's Common Stock by presenting and misinterpreting ad hoc evidence over the early weeks during the Class Period.

16.     Dr. Hendershott motivates his focus on only a subset of the Class Period by mischaracterizing my Efficiency Report analyses and my September 7, 2022 testimony ("Cain Deposition"). He takes out of context my response to a deposition question of whether a company's stock can be efficient at some points in time and inefficient at others.[14] I have not opined that my efficiency conclusions extend before or after the time period that I have evaluated. However, both my report and my testimony make clear that my efficiency analyses of QuantumScape's Common Stock demonstrate that it was efficient ***throughout*** the Class Period.[15] As a result, Dr. Hendershott's failure to address my efficiency analyses over the full Class Period renders his opinions regarding the early weeks of the Class Period irrelevant.

17.     He also claims that, during the initial weeks of the Class Period, QuantumScape lacked sufficient analyst coverage (*Cammer* Factor 2), suffered from short-selling constraints,

---

[13] Hendershott Report, ¶¶ 12, 13, 34, 50, 53, 57, 63, 67, 89.
[14] Hendershott Report, ¶ 38 and fn. 48.
[15] Efficiency Report, ¶¶ 30, 31, 35, 40, 64, 69, 74, 88. Cain Deposition, 29:5-23; 189:14-25; 192:1-16: "Well, if -- if that had an effect on the actual trading volume and bid-ask spreads or Cammer five price-impact analyses, the various types of analyses that I've carried out in my report, then I would -- I would certainly evaluate my conclusions in the light of any analyses that could be affected, as I think -- as we read through some of the statements in this white paper, these things are all interconnected; they don't exist in a vacuum. So, to the extent that there was a significant reduction in the market efficiency for QuantumScape, due to any sort of shortselling bans or constraints, if that actually had an effect on the market efficiency then I would expect that to show up in the metrics that I've analyzed and assessed in this market efficiency report."

and exhibited stock price behavior inconsistent with market efficiency (*Cammer* Factor 5). I address the flaws in each of his opinions in the following sections.

### A. Analyst Coverage of QuantumScape

18.    Analyst coverage is a useful indicator for a firm's information environment, and as such, is considered in market efficiency analyses under *Cammer* Factor 2. As the MRK Study concluded, "analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock."[16] As such, evidence that analysts reported on a company during a Class Period helps to demonstrate that professionals and individual investors had access to timely information about the company.

19.    In my Efficiency Report, I documented extensive involvement of research analysts in covering QuantumScape during the Class Period. This included multiple research analysts at various investment banks and outside firms such as Goldman Sachs, Morgan Stanley, Robert W. Baird, Bernstein, Cowen & Co., and Deutsche Bank. It further included analyst coverage back to the beginning of the Class Period, including a Bernstein report issued on November 30, 2020 and a GlobalData report on December 14, 2020. Moreover, as I explained in my report, this count "represent[s] a lower bound of the analyst coverage of QuantumScape because many analyst reports are provided directly to investors but are not captured by third-party data vendors such as Investext."[17] I also noted that investors could access information from additional sources, such as the SEC's online EDGAR database, Factiva, SeekingAlpha, and press

---

[16] MRK Study, at p. 667.
[17] Efficiency Report, ¶ 35 and fn. 29.

and news articles from sources such as "Dow Jones Newswires, PR Newswires, The Wall Street Journal, Reuters, MarketWatch, Investor's Business Daily, and numerous other outlets."[18]

20.     I interpreted this as "a substantial degree of analyst coverage which served to disseminate important new publicly-available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations."[19] I then concluded that "the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about QuantumScape supports the conclusion that QuantumScape Common Stock traded in a well-developed and informationally efficient market during the Class Period."[20]

21.     First and foremost, Dr. Hendershott never claims that the level of analyst coverage of QuantumScape renders the markets for QuantumScape Common Stock or Options inefficient and he does not dispute my assessment of the aggregate level of analyst coverage of QuantumScape over the full Class Period. However, he notes that there was "minimal" coverage prior to February 2021 and that there was only one analyst covering QuantumScape for the majority of the Class Period, including the period from November 27, 2020 to January 4, 2021.[21] He further dismisses my opinion that Deutsche Bank "disseminated further information and assessments regarding QuantumScape due to Volkswagen's investment and relationship with QuantumScape as a potential future battery supplier."[22] Rather, he claims that Deutsche Bank merely "mentions" QuantumScape in a December 9, 2020 analyst report on Volkswagen.[23]

---

[18] Efficiency Report, ¶¶ 36-37.
[19] Efficiency Report, ¶ 34.
[20] Efficiency Report, ¶ 37.
[21] Hendershott Report, ¶¶ 63-65.
[22] Efficiency Report, ¶ 34.
[23] Hendershott Report, ¶ 65.

22.     Dr. Hendershott is simply wrong. There is ample evidence that analysts helped to disseminate information about QuantumScape, not only over the full Class Period, but also during the early weeks of the Class Period. Deutsche Bank did not merely "mention" QuantumScape on December 9, 2020. Deutsche Bank repeatedly discussed QuantumScape and even went so far as to hold a conference call with QuantumScape management and investors to disseminate information on solid state battery technology.[24]

23.     For example, on November 30, 2020 a Deutsche Bank industry report included discussion of QuantumScape:

> Last week, Volkswagen-backed solid-state battery supplier QuantumScape went public through a reverse merger with Kensington Capital Acquisition Corp (a publicly listed acquisition company). The merger valued QuantumScape at $3.3bn and provided about $1bn in proceeds, with VW having contributed over $300m alone. VW has also agreed to form a joint venture with the newly formed company to produce solid-state battery cells beginning in 2024 for its upcoming EV lineup. The batteries developed by QuantumScape replace the usual graphite/silicon anode with a lithium-metal anode, allowing for faster recharging ability (up to 80% capacity in ~15 mins) and come with an increased energy density of >400Wh/kg, compared with current industry leaders at 250Wh/kg. QuantumScape began trading on the NYSE under the ticker "QS", and climbed nearly 50% in the first day of trading.[25]

24.     And on December 11, 2020 Deutsche Bank reported:

> QuantumScape is a pioneer in solid-state batteries. These have a higher energy density (~2x that of the current Li-ion battery according to QuantumScape), which directly translate into an increased range. Charging could also be faster (QuantumScape expects 0-80% charging in less than 15mins) and the manufacturing costs would be lower as the anode host material is eliminated and they can have a longer lifetime. Perhaps the largest benefit is its safety, as it is nonflammable and noncombustible, in contrast to a flammable liquid electrolyte. This could surely be a game-changer for EVs, even though there are still some challenges to overcome. The company expects first batteries in the market by 2024/2025.Given that the battery is the single largest cost item within a BEV, the importance of the battery and technology updates cannot be underestimated. VW has been working with the company since 2012 and has invested ~$300m up to now in it and

---

[24] "That was the week," *Deutsche Bank*, December 11, 2020. ("We are hosting a call with VW's battery partner QuantumScape as we consider it crucial to understand the solid state battery technology for BEV adoption chances in general but specifically also for VW's BEV strategy. We will host the call with Jagdeep Singh (Co-founder, CEO and Chairman) and Kevin Hettrich (CFO) on Monday 14th Dec at 4pm UK/5pm CET.")
[25] "Monthly sales preview, GM banking charter, Tesla int'l updates," *Deutsche Bank,* November 30, 2020.

has also formed a JV to enable industrial-level production of solid-state batteries with the target of establishing a large-scale production line by 2025. QuantumScape targets a battery capacity of 91 GWh by 2028, which could be sufficient for 910k BEVs assuming 100 kWh batteries or even 1.3m BEV by assuming 70 kWh batteries.[26]

25.     Dr. Hendershott ignores this and other evidence of analyst coverage of QuantumScape from the beginning of the Class Period. Not only was QuantumScape covered by the analyst firms listed in Exhibit 3 of my Efficiency Report during the Class Period, it was reported on by additional analyst firms throughout the Class Period via industry reports. For example, a January 29, 2021 industry report published by J.P. Morgan detailed the responses to 16 questions from a call that J.P. Morgan hosted with QuantumScape's CEO and CFO during the preceding two weeks.[27] Wolfe Research provided coverage of QuantumScape via its industry reports as early as September 4, 2020 – *well before the start of the Class Period*.[28] This coverage continued during the Class Period, with Wolfe Research summarizing and commenting on QuantumScape's battery performance data in a December 9, 2020 industry report.[29] UBS also provided its views on QuantumScape in an industry report published on December 9, 2020.[30]

26.     Dr. Hendershott also ignores the significant information dissemination roles served by analysts separate and apart from their buy/sell recommendations and price targets. Analyst coverage does not begin on the date of the first recommendation. For example, multiple analysts engaged in questions and discussion with QuantumScape management during the Company's earnings call on February 16, 2021, despite the fact that they had not yet issued formal research reports. This included multiple questions from analysts at each of Wolfe Research, Robert W. Baird, and JMP Securities.[31] Academic research has clearly established that

---

[26] "That was the week," *Deutsche Bank*, December 11, 2020.
[27] "Solid-State Battery," *J.P. Morgan*, January 29, 2021.
[28] "Wolfe Research Auto Daily," *Wolfe Research*, September 4, 2020.
[29] "Wolfe Research Auto Daily," *Wolfe Research*, December 9, 2020.
[30] "Pole Position," *UBS*, December 9, 2020.
[31] "FQ4 2020 Earnings Call Transcripts," *S&P Capital IQ,* February 16, 2021.

these types of meetings, informal discussions, and production of soft information represents a valuable information dissemination role by analysts.[32]

27.     In summary, the substantial analyst coverage of QuantumScape, both throughout the entire Class Period, and during the early weeks of the Class Period, easily satisfies Cammer Factor 2 and supports my conclusion that QuantumScape Common Stock traded in an efficient market throughout the Class Period.

28.     Moreover, as noted above, Dr. Hendershott does not dispute any of my other *Cammer* and *Krogman* factor analyses apart from *Cammer* Factor 5. It is my understanding that courts have dispensed with the fifth *Cammer* factor when other factors support a finding of market efficiency.[33] As a result, the substantial analyst coverage of QuantumScape plus all of the other undisputed factors can be relied upon to demonstrate market efficiency of QuantumScape Common Stock even without considering Dr. Hendershott's other critiques. Nonetheless, below I explain the flaws in Dr. Hendershott's other opinions regarding QuantumScape Common Stock.

## B.  Short Selling Activity in QuantumScape Common Stock

29.     Dr. Hendershott opines that "substantial short selling constraints occurred during the Putative Class Period, and during the period November 27, 2020 to January 4, 2021 in particular, which is inconsistent with Dr. Cain's opinion that the market for QuantumScape stock was efficient throughout the Putative Class Period."[34] He supports this claim by documenting the fees charged for borrowing stock during this time period,[35] the appearance of QuantumScape on

---

[32] *See, e.g.,* Marcus P. Kirk and Stanimir Markov, 2016, "Come on Over: Analyst/Investor Days as a Disclosure Medium," *The Accounting Review* 91.

[33] *See, e.g., Waggoner v. Barclays*, No. 16-161912-cv, p. 51-54 (finding that, when other *Cammer* and *Krogman* factors weighed in favor of market efficiency, district court need not rely on evidence of price impact) and *In Re Allergan PLC Securities Litigation*, 2021 U.S. Dist. LEXIS 170310, p. 19 (S.D.N.Y. 2021) (citation omitted) ("[T]hese factors so strongly support a presumption of market efficiency, that it obviates the need to examine the empirical evidence necessary to evaluate the fifth *Cammer* factor.").

[34] Hendershott Report, ¶ 50.

[35] Hendershott Report, ¶¶ 51-55.

the NYSE Threshold Securities list during the last two weeks of December 2020,[36] and by pointing to certain stock price movements which he purports are inconsistent with market efficiency.[37] First and foremost, Dr. Hendershott does not affirmatively opine that any of these factors rendered the markets for QuantumScape Common Stock or Options inefficient during the Class Period. Second, his arguments are unreliable. Within this section, I address Dr. Hendershott's flawed opinions relating to short selling constraints. I explain the flaws in Dr. Hendershott's last point related to stock price movements in Section III.C below because it is also part of Dr. Hendershott's critique of my *Cammer* Factor 5 analysis of stock price movements.

30.     First, as a theoretical matter, the ability to engage in short selling of a security is not a prerequisite for that security to trade in an efficient market. Courts have certified classes of securities without documenting any ability to engage in short selling activity.[38] Second, as I explain below, QuantumScape Common Stock was actually subject to short selling activity in increasing amounts over the Class Period.

31.     Third, Dr. Hendershott insinuates that QuantumScape Common Stock may have been affected by a short squeeze during the Class Period,[39] yet he does not directly examine the reported short selling interest to investigate this conjecture. Rather, he points only to tangential data – for example, the cost to borrow shares, the brief inclusion of QuantumScape on the NYSE Threshold Securities list, and the bid-ask spread. He also cites to a December 9, 2020 online post

---

[36] Hendershott Report, ¶ 56.
[37] Hendershott Report, ¶¶ 57-59.
[38] *See, e.g., In Re NII Holdings, Inc. Securities Litigation,* No. 1:14-cv-00227-LMB-JFA (E.D. Vir., Nov. 17, 2015) and *In Re Washington Mutual, Inc. Securities Litigation,* No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP (W.D. Wash., Oct. 12, 2010).
[39] Hendershott Report, ¶ 51: "As short selling constraints increase, and costs to borrow increase, a short squeeze can ensue in which stock prices rise as short sellers find it difficult to acquire the securities needed to cover their short positions."

14

by S3 Partners that speculated about an impending short squeeze of QuantumScape, titled "Get

Ready for a QuantumScape Short Squeeze."[40] Yet Dr. Hendershott failed to quote this article's

main conclusion and speculative prediction:

> "These losses, coupled with alpha devouring stock borrow fees, has turned QS into a high level short squeeze candidate. We should see short sellers with less conviction to start closing out their positions in the face of red P\L numbers and expensive stock borrow costs. If [QS's] stock price continues to climb and stock loan fees continue to trend towards 200% we expect a larger rush for the exits and the size of buy-to-covers to positively affect its stock price."[41]

32.     During my deposition testimony, I explained that the data underlying my

Efficiency Report includes short interest, and that this data indicates that QuantumScape did not

experience a short squeeze during this relevant time period:

> Q. Okay. So your backup data is roughly equivalent to the information from S3 Analytics. Correct?
> A. Yes. But you know, I think that my backup data really contradicts the entire thesis of the S3 Analytics opinions that you've been showing me, which is this idea that all the shorts are going to have to run for the exits, because of this. If you actually scroll down the "Short Interest" column, you see it jumps up to 8 million; and then it goes up to 11 million; and then 16; and 20 million; then 30 million; 33 million; 36 million. So, you know, 42 million, into the 40s. 45 million by the end of the -- the time period. So this is actually what I was, you know, referring back to, is -- is that I actually think what the -- this person in this S3 Analytics document is saying just is not valid. Like, the shorts did not run for the exits. The short interest increased significantly over -- over time.[42]

33.     As I previously testified, the shorts were not forced to "rush for the exits" as the

S3 Analytics post had speculatively predicted.[43] I also testified that "if QuantumScape was

subject to a short squeeze that had a significant impact on market efficiency of the Common

Stock, then I would expect to - - to see that impact into various factors that I've analyzed in my

---

[40] Hendershott Report, ¶ 53.

[41] Cain Deposition, Exhibit 54: "Get Ready for a QuantumScape Short Squeeze," *S3 Partners*, December 9, 2020.

[42] Cain Deposition, 207:22-208:16.

[43] Dr. Hendershott attempts to deflect from this reality by claiming that examining the total short interest is "uninformative" (Hendershott Report, fn. 98). Yet this represents the most direct evidence of whether the shorts were forced to "rush for the exits" as predicted by the S3 Analytics post.

market efficiency report."[44] As shown in my Efficiency Report, these factors – which I evaluated both over the full Class Period, as well as throughout this subperiod which Dr. Hendershott is focused on – are consistent with market efficiency for QuantumScape Common Stock.

34.    For example, QuantumScape's Common Stock trading volume did not suffer any apparent liquidity constraints over this subperiod. The average weekly trading volume was 55%, far higher than the *Cammer* Factor 1 average weekly trading volume benchmark of 1-2%.[45] This level also exceeded the volume during the subsequent subperiod from January 5, 2021 through the end of the Class Period.[46] The Common Stock trading volume during this time period further supports my conclusion that QuantumScape's Common Stock traded in an efficient market throughout the Class Period

35.    Dr. Hendershott points to QuantumScape's relatively higher average closing bid-ask spread during the period Nov. 27, 2020 through Jan. 4, 2021.[47] Yet he fails to recognize that the Common Stock's bid-ask spread during this time was remarkably low – averaging less than 0.06% per month.[48] This is only a small fraction – ***less than one twentieth*** – of the benchmarks to which I compared QuantumScape's bid-ask spreads in my Efficiency Report.[49] Thus, QuantumScape's bid-ask spread throughout this subperiod further supports my conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### C.  Dr. Hendershott's Flawed Assessment of *Cammer* Factor 5

36.    One of the factors I considered in my Efficiency Report was the *Cammer* Factor 5 analysis of a cause-and-effect relationship between new company information and resulting

---

[44] Cain Deposition, 223:21-25. *See also*: Cain Deposition, 189:14-25; 192:1-16.
[45] Cain Deposition, Exhibit 56 – Import Data. (Daily average of 11.07% multiplied by five trading days per week.)
[46] *Id*. (Daily average of 7.87% multiplied by five trading days per week.)
[47] Hendershott Report, ¶ 49.
[48] Efficiency Report, Exhibit 9.
[49] Efficiency Report, ¶ 67.

QuantumScape Common stock price movements. I tested this within a sample constructed using an objective set of criteria: QuantumScape's Product Development and Earnings Announcement Dates, as listed in Exhibit 6 of my Efficiency Report. As I explained in my report, "[o]ne would not expect every announcement to cause a significant stock price movement for a company since investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information."[50] I then considered whether, in general, the resulting stock price movement was directionally consistent with the information released, as summarized in Exhibit 6 of my Efficiency Report, and multiple test statistics summarized in Exhibit 7 of my Efficiency Report: the proportion of statistically significant stock price movements, the average absolute abnormal return, the average trading volume, and the statistical differences between these three variables and those of a comparison sample of Least News Trading Days.[51]

37.    All of these tests within my *Cammer* Factor 5 analysis support a conclusion of market efficiency for QuantumScape Common Stock: QuantumScape's stock prices tended to move in a direction consistent with the information released, many of the resulting price movements were statistically significant, they resulted in high absolute abnormal returns, they produced high trading volumes, and these statistics were all greater than those in a comparison sample of Least News Trading Days by a statistically significant margin.[52]

---

[50] Efficiency Report, ¶ 49.
[51] Efficiency Report, ¶¶ 48-62, Exhibits 6-7; Cain Deposition, 136:24-137:12: "Q. Yeah. I understand you reviewed it. I am just saying: But there's not an actual analysis of the directionality that you ^would have expect [*sic.*] from each particular announcement; is there? A. Well, like I -- like I said, once I've reviewed the information and the output of the event study, if -- if it looks to me like the prices were typically moving in the opposite direction of what I would predict, then that would -- that would be a concern for me and I would -- I would pause and I would not, you know, proceed with Exhibit 7, but that wasn't the case here. And so, really, Exhibit 7 is -- is the formal test statistics for the Cammer five analysis."
[52] *Id.*

38. Dr. Hendershott makes a number of critiques about my *Cammer* Factor 5 analysis. Some of these critiques reflect a fundamental lack of understanding regarding event studies, regression analysis, and hypothesis testing. I address these flaws in **Section V** below. I conducted the *Cammer* Factor 5 analysis over a longer Analysis Period that extends one calendar year beyond the Class Period, due to the relatively short Class Period in this matter. Dr. Hendershott does not raise any objections to evaluating an Analysis Period that extends beyond a Class Period. To be clear, my *Cammer* Factor 5 conclusion of efficiency over the Analysis Period is also valid at all points within that period, including the full Class Period and all points in time throughout the Class Period.

39. Dr. Hendershott objects to my evaluation of QuantumScape Common Stock returns and trading volume within a "news – least news" type of comparative analysis.[53] However, this represents only one of the components of my *Cammer* Factor 5 analyses described above. Moreover, it has been regularly relied upon to assess market efficiency, including in cases that I have opined on and which have been recently certified.[54] Furthermore, Dr. Hendershott attempts to conduct his own altered versions of my *Cammer* Factor 5 analysis in which he adopts and relies on this same "news – least news" analysis for drawing inferences (which, as I explain below are incorrect). As a result, his criticism of this component of my *Cammer* Factor 5 analysis is irrelevant.

40. In the following subsections, I address his other criticisms and demonstrate that my conclusions are robust to the issues he presents.

---

[53] Hendershott Report, ¶ 37: "From the perspective of an economist, this type of 'news – least news' analysis is a threshold test at best and is not sufficient to determine whether the market for a security is efficient."
[54] *See* Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*.

### 1.   Statistical Power of the Tests

41.     Dr. Hendershott criticizes my event study regression model because, in his opinion, it does not adequately explain QuantumScape's Common Stock price movements based on the overall market and industry movements each day during the Class Period.[55] As I explain in **Section V** below, Dr. Hendershott misunderstands the purpose of an event study regression model in this context. The purpose is not to explain a company's stock returns using only market and industry movements. Rather, the purpose is to evaluate whether a company's stock price responds to new, value-relevant company-specific information after controlling for market and industry movements on a given day. The fact that QuantumScape's Common Stock exhibited returns that are unexplained by market or industry movements during the Class Period is consistent with market efficiency because this demonstrates that the Company's Common Stock prices rapidly responded to new, value-relevant information specific to QuantumScape.

42.     Moreover, Dr. Hendershott does not offer an alternative regression model or event study framework. In fact, he adopts and relies on my regression model and event study framework in order to conduct his own version of my *Cammer* Factor 5 analysis of abnormal stock returns, from which he attempts to draw conclusions.[56] As I explain below, while I do not adopt his version of this analysis, it nonetheless is fully supportive of market efficiency when interpreted properly.

43.     Dr. Hendershott also criticizes my *t*-tests of statistical significance for differences in the average absolute abnormal returns and average trading volume for the Common Stock on Product Development and Earnings Announcement Dates versus Least News Trading Days, claiming that "differences in means analysis using a t-test is discouraged for small samples (e.g.,

---

[55] Hendershott Report, ¶¶ 30-35.
[56] Hendershott Report, ¶¶ 40-41.

19

less than 30 observations) and when the observations are drawn from samples with different variances."[57] In **Section V** below, I explain that Dr. Hendershott's primary citation for this claim actually refers to a different statistical test (a *z-score*, not a *t*-test). But even focusing on my comparison between samples, he does not dispute the economic magnitude of the differences I find (14.3% vs. 2.2% average abnormal return and 19.8 million vs. 9.0 million traded shares).[58] Rather, he simply questions an underlying assumption regarding how to compute the degree of statistical significance that should be attached to these results. As described below, my use of the pooled variance (*i.e.*, equal variance) is the standard approach and entirely justified.

44.     The unequal variance assumption advocated by Dr. Hendershott is at odds with the methodology employed in every event study of a single stock that I have observed in either the literature or in the context of securities litigation. In an event study of the kind I performed here, the exercise is to formulate a hypothesis, called the "null hypothesis," and test statistically to determine whether there is sufficient statistical evidence to reject that hypothesis. In this case, the null hypothesis I tested is that there was no difference in the return-generating process (and thus the distribution of returns) on the Product Development and Earnings Announcement Dates versus the Least News Trading Days.

45.     Dr. Hendershott's argument assumes that the relevant test being performed is on two samples that are being drawn from two separate distributions. There are many research settings where that may occur.[59] But here, where the returns are being drawn from a single distribution (the expected return for a single stock), his approach is at odds with decades of

---

[57] Hendershott Report, ¶ 42.

[58] Efficiency Report, Exhibit 7. He does argue that different dates should be included or excluded from this *Cammer* Factor 5 analysis. I address this argument separately in Section III.C.2 of this report.

[59] For example, if the question were whether the returns for ***two*** different stocks responded similarly to a certain type of event, then there would be two different return generating processes: one for each stock.

research and precedent. Moreover, Dr. Hendershott's Exhibit 3B demonstrates that all of the abnormal returns fall along one line from a single return-generating process on QuantumScape Common Stock, and that both the Product Development Dates and Earnings Announcement Dates and the Least News Trading Days occur during the time period of lower volatility that he is concerned with. His critique is thus inappropriate and erroneous in this context.

## 2. Evidence from Stock Price Movements

46.     As described above and in my Efficiency Report, I evaluated a number of Product Development and Earnings Announcement Dates throughout the Class Period, which were selected based on an objective set of criteria on an *ex ante* basis (*i.e.*, before considering the resulting stock price impacts).[60] Dr. Hendershott does not dispute my conclusion that QuantumScape's Common Stock prices responded in a statistically significant manner to many of these news events. Rather, he performs a subjective review on an *ex post* basis by looking for trading days in which QuantumScape had a certain stock price movement, and then attempting to abstract away from the prevailing information environment to conclude that a given stock price movement, or lack thereof, is inconsistent with market efficiency. This is precisely the type of subjective, *ex post* analysis that I warned against in my testimony:

> Q. Okay. So in other words, you had selected your sample of comparison days to be -- to only be days where there was no stock price movement notable enough for journalists to discuss QuantumScape. Is that fair?
> A. No, that's absolutely not correct.
> Q. Why not?
> A. Because I've really constructed two samples. One is -- well, I guess just to back up, what you just described would be some sort of an ex-post rationalization of stock price movements, and then constructing a sample based on those price movements. In contrast to that, what I've done is an ex-ante construction of two samples, based on the news day sample, whether QuantumScape announced earnings or product development news; and then a sample of least news days which was associated with -- with those criteria that we've been discussing, regarding no Factiva headlines, no SEC filings, no analyst reports. So those criteria for constructing these two samples do not take into consideration in any

---

[60] Efficiency Report, ¶¶ 48-62; Exhibits 6-7.

way what the stock price behavior of QuantumScape was. So, back to your question, you know, you could have articles talking about price movements or lack of price movement. Right? I'm being completely objective. I'm not being subjective and going through and reading those articles, and then looking at the stock price movement, and then deciding whether or not I want to include or exclude those. I'm being completely objective in constructing these two samples.[61]

47.      As a result, Dr. Hendershott's analysis of the Common Stock price movements on a handful of trading days is subjective and irrelevant. Nonetheless, below I explain that he ignores evidence within the information environment around those days that demonstrates that the price movements are consistent with market efficiency.

48.      To begin, Dr. Hendershott misrepresents my Efficiency Report analyses and testimony, claiming that "Dr. Cain provides headlines from a *Factiva* search, but does not appear to have reviewed any of the underlying articles."[62] He points to no evidence for this speculative and false claim. Separately, he makes a more narrow assertion that "Dr. Cain's *Factiva* search file contained 11 headlines for November 30, 2020, but Dr. Cain does not appear to have reviewed the underlying articles."[63] For this additional speculative and false claim, he cites to my testimony, which does not support his claim:

> Q. Yeah. So between December 14th -- you know, like the next week, and December 22nd, when the stock price really shot up, you hadn't seen any factors or any news headlines that would provide you an explanation for that behavior?
> A. Well -- well, like I said, I have not done that sort of review of the information environment to -- to make any sort of assessments one way or another.
> Q. But you ran your Factiva headline search. Right?
> A. I did. But, like I said, that was not for the purposes of -- of trying to conduct an assessment of stock price changes during this time period.
> Q. I understand, but you -- you took a look at the Factiva headlines. Right?
> A. I briefly reviewed those, and I looked in more detail at other ones that were for purposes of my Cammer five analysis; but I -- the purpose was not to -- to look at those in the context of trying to explain stock price changes during December 2020.[64]

---

[61] Cain Deposition, 151:10-152:15.
[62] Hendershott Report, ¶ 59.
[63] Hendershott Report, ¶ 44.
[64] Cain Deposition, 170:14-171:7.

49.    Both my Efficiency Report and my testimony make clear that I did, in fact, review the Factiva news articles for their content to the extent that they pertained to the information environment I evaluated for purposes of my objective *Cammer* Factor 5 analysis.[65] In contrast, Dr. Hendershott attempts to conduct an *ex post* evaluation of QuantumScape's Common Stock returns on a handful of dates by performing a subjective and flawed assessment of the information environment. I summarize these dates in chronological order below.

50.    November 27, 2020: Dr. Hendershott asserts that this date "does not appear to contain new product development information for QuantumScape."[66] I explained some of the information on this date in my testimony, which included product information discussed by QuantumScape's CEO during a CNBC interview, as well as the important information for investors relating to the completion of a de-SPAC merger.[67] Dr. Hendershott incorrectly asserts that "Dr. Cain's test results are not robust to the exclusion of November 27, 2020."[68] In his Exhibit 4A, Dr. Hendershott relies on my *Cammer* Factor 5 methodology but excludes this date.[69] I disagree with his exclusion of this date, but even if I had decided to omit this date, all three of the hypothesis tests are statistically significant at the 90% level or better, consistent with market efficiency. In his Exhibit 4B, Dr. Hendershott conducts a novel analysis by relying on my methodology but limiting the test to only four news days and one least news day. He contradicts his assertions elsewhere in his report that a valid statistical test should have at least 30 observations. While I disagree with that assertion, I would not rely on these statistical tests for a sample size of only five observations. Nonetheless, I note that in his Exhibit 4B, 75% of the

---

[65] *Id*. *See also* Efficiency Report, ¶ 48; fn. 51; Exhibit 6.
[66] Hendershott Report, ¶ 39.
[67] Cain Deposition, 118:25-119:16, 131:12-133:8.
[68] Hendershott Report, ¶ 40.
[69] Hendershott Report, Exhibit 4A.

news days are statistically significant, which is a rate that exceeds that in my own *Cammer* Factor 5 analysis, which is consistent with market efficiency.[70]

51.    November 30, 2020: Dr. Hendershott argues that the initiation of analyst coverage by Bernstein with an "Underperform" rating on this date represented new negative information, and that QuantumScape's positive and statistically significant return on this date is thus inconsistent with market efficiency.[71] First, as I explain in Section V below, a single positive stock return in the absence of new positive information would not refute market efficiency because statistical theory predicts that, for example, 5% of daily returns will be statistically significant even in the absence of new information. Moreover, Dr. Hendershott does not identify any new company-specific information within this analyst report beyond the rating. In reality, the Common Stock return is consistent with the positive information I discussed above on the preceding trading day, November 27, 2020. I routinely consider one or two follow-on trading days for the complete and full incorporation of new information into stock prices.[72] Thus, a positive return on November 27, 2020 followed by a continued reaction on the next trading day would not be inconsistent in any way with market efficiency.

52.    December 21 and 22, 2020 (and December 14-22, 2020): Dr. Hendershott notes that QuantumScape's stock price increased significantly over the six-trading-day period of December 14-22, 2020, with statistically significant returns on December 21 and 22, 2020, and he claims that I did not identify any new value-relevant information that could explain this

---

[70] Hendershott Report, Exhibit 4B.
[71] Hendershott Report, ¶¶ 12, 13, 44.
[72] This is consistent with academic research and my testimony in this matter. *See* Cain Deposition, 113:8-14 ("But I think a lot of academic studies -- a very high proportion of academic studies, when they conduct an event study, they'll often use a window around the event of maybe three trading days or five trading days. So that's pretty common. I've used those types of windows, like a three-trading-day window, in a number of my event studies in my academic research.")

increase.[73] As discussed above, he misrepresents my testimony, as I did not attempt such an analysis. Nonetheless, I note that QuantumScape's price increase during this time period coincided with rumors, speculation, and discussions revolving around the possibility of Apple developing a self-driving car that could be powered by a battery with a description matching QuantumScape's claims, and commenting on the large positive impact that these rumors were having on QuantumScape's stock price.[74] Dr. Hendershott attempts to refute this connection by pointing to one *Barron's* news story that appeared unaware of these rumors,[75] and by claiming that most of QuantumScape's price increase on December 21, 2020 occurred prior to the first article he was able to identify that discussed these rumors.[76] However, rumors and stock price runups routinely precede the first identifiable publication commenting on such rumors.[77] As a result, QuantumScape's stock price increase during this time period is consistent with market efficiency.

53.      March 22, 2021: Dr. Hendershott claims that I should have included this date in my *Cammer* Factor 5 analysis because it represents the announcement of a proposed stock

---

[73] Hendershott Report, ¶¶ 12, 35, 59.

[74] *See, for example*: "Velodyne, Luminar, QuantumScape stocks soar on news about Apple's self-driving car," *San Francisco Business Times*, December 22, 2020: "Shares of three of Silicon Valley lidar and advanced battery companies that went public in recent months through 'blank check' mergers soared to new heights on Monday on news that Apple Inc. may start selling self-driving electric vehicles in 2024….The Reuters report on Monday said that an advanced battery will be a key part of Apple's EV, saying that it charges faster and extends driving range. That description exactly matches claims that QuantumScape makes about the solid state lithium batteries it is developing."

[75] Hendershott Report, ¶ 59.

[76] Hendershott Report, fn. 117.

[77] I have evaluated such rumors and their impact on stock prices, returns, and trading volume in my academic teaching and in several expert reports involving mergers and acquisitions. Academic literature also studies these impacts of merger rumors; *see, e.g.*, Gregg A. Jarrell and Annette B. Poulsen, 1989, "Stock Trading Before the Announcement of Tender Offers: Insider Trading or Market Anticipation?" *Journal of Law, Economics, and Organization* 5; G. William Schwert, 1996, "Markup pricing in merger and acquisitions," *Journal of Financial Economics* 41; John Pound and Richard Zecckhauser, 1990, "Clearly Heard on the Street: The Effect of Takeover Rumors on Stock Prices," *Journal of Business* 63; Lisa K. Meulbroek, 1992, "An Empirical Analysis of Illegal Insider Trading," *The Journal of Finance* 47; Ralph W. Sanders, Jr., and John S. Zdanowicz, 1992, "Target Firm Abnormal Returns and Trading Volume around the Initiation of Change in Control Transactions," *Journal of Financial and Quantitative Analysis* 27.

offering, which he claims is a similar liquidity event as the closing of the de-SPAC transaction on November 27, 2020.[78] He is obviously wrong – a ***proposed*** stock offering does not represent any conclusive realization of a liquidity event in the way that the completion of a de-SPAC transaction does. Nonetheless, he also misrepresents the conclusions that could be drawn from his version of the analysis including this date, as the three test statistics in his Exhibit 4C all appear to be statistically significant at the 90% level or better.[79]

54.    In summary, Dr. Hendershott's *ex post* analysis of QuantumScape's Common Stock price movements on certain trading dates is ad hoc, subjective, and flawed, rendering his conclusions irrelevant. Proper consideration of the information environment around these dates demonstrates that my original *Cammer* Factor 5 analysis is robust and reliable, and that the Common Stock returns are consistent with market efficiency throughout the Class Period.

## IV. The QuantumScape Option Prices Considered by Dr. Hendershott Reflect the Same Information as the Common Stock

55.    In my Efficiency Report, I concluded that "the artificial inflation caused by any misrepresentations and omissions that affects the stock price would translate into the value of derivative instruments such as call and put Options on QuantumScape Common Stock."[80] Dr. Hendershott disagrees, arguing that "the relevant question is not whether *theoretical values* of a particular QuantumScape option series depended upon the stock price, but rather whether *transaction prices* of the option series fully reflected all publicly available information, including information about the stock price. This empirical question cannot be resolved on a theoretical basis."[81] Yet in his report, Dr. Hendershott *does not analyze any transaction prices* for any

---

[78] Hendershott Report, ¶ 41.
[79] Hendershott Report, Exhibit 4C.
[80] Efficiency Report, ¶ 80.
[81] Hendershott Report, ¶ 69 (emphasis in original).

QuantumScape Options. Rather, he conducts a purely theoretical analysis of put-call parity, which as I explain below, is not only flawed but also does not disturb my conclusion regarding the QuantumScape Options. I further demonstrate that the prices of the QuantumScape Options considered by Dr. Hendershott did, in fact, respond to new information in a manner consistent with the QuantumScape Common Stock price movements, consistent with market efficiency.

56.    Dr. Hendershott claims that, overall, QuantumScape Options had relatively little daily trading volume (Exhibit 8A), relatively high bid-ask spreads (Exhibit 8B), and frequent violations of put-call parity (Exhibit 9).[82] I have examined the data underlying these analyses, and I note that many of the observations include far out-of-the-money options and trading days in which there was zero open interest or volume for the given option series.[83] In other words, no investors held many of the given option series on these days because none had yet been sold into the market; the quoted bid-ask spreads were purely theoretical. Dr. Hendershott's conclusions regarding the QuantumScape Options are irrelevant for this reason alone.

57.    However, Dr. Hendershott conducts one analysis of put-call parity that focuses on Options that were closer to being in-the-money, had open interest and thus were not merely theoretical, and were more activity traded – the put-call pairs in his Exhibits 10A and 10B.[84] He identifies put-call parity violations during the first five weeks of the Class Period – November 27, 2020 through January 4, 2021 – implying that QuantumScape's Common Stock was overvalued by about 15% to 22.5% during this period.[85] He concludes that these violations were persistent and are inconsistent with an efficient market.[86] Below, I explain the flaws in Dr.

---

[82] Hendershott Report, ¶¶ 67-82; Exhibits 8A, 8B, and 9.
[83] Dr. Hendershott merely requires that a given option eventually has positive trading volume on at least one day during the Class Period (Hendershott Report, ¶ 68; fn. 134, 165; Exhibits 7, 8A, 8B, and 9).
[84] Hendershott Report, ¶ 83; Exhibits 10A and 10B.
[85] *Id.*
[86] *Id.*

Hendershott's analysis and I provide affirmative evidence of these Options' price movements that is consistent with market efficiency.

58.    First, Dr. Hendershott's analysis does not establish that these put-call parity violations were "persistent." Rather, they appear to have been fleeting and disappeared after a few brief weeks. I explained in my report and testimony that these types of anomalies often show up as random patterns in data and are thus not evidence of inefficiency if they are not persistent.[87] Dr. Hendershott disputes this assertion, claiming that he is unaware of academic support for this requirement and that "[a]utocorrelations are also hard to precisely measure over short horizons."[88] Yet his assertion is contradicted by the academic literature I pointed to in my Efficiency Report, as well as the study he relies on for his put-call parity test: Ofek et al. (2004) measured the persistence of put-call parity violations using an autocorrelation test.[89]

59.    Second, the study Dr. Hendershott relies on for his put-call parity test helpfully explains that violations can occur within efficient markets for various reasons. For example:

> Finally, fluctuations in the value of the control rights associated with the equity, but not with the synthetic position in the options market, might also generate put-call parity violations under specific circumstances. This control rights effect also acts like a dividend if the value declines prior to option expiration. Moreover, there is anecdotal evidence that stocks go special during corporate events associated with changes in control, such as takeovers.[90]

60.    This explanation is consistent with QuantumScape's Common Stock price exceeding the synthetic stock price calculated by Dr. Hendershott using the Options' prices in the weeks following QuantumScape's new public listing. This pattern in Dr. Hendershott's Exhibits 10A and 10B would be consistent with investors placing a higher value on the control

---

[87] Efficiency Report, ¶¶ 22, 72; Cain Deposition at 213:5-214:17.
[88] Hendershott Report, fn. 171.
[89] Eli Ofek, Matthew Richardson, and Robert F. Whitelaw, 2004, "Limited arbitrage and short sales restrictions: Evidence from the options markets," *Journal of Financial Economics* 74, at p. 326.
[90] *Id*., at p. 328.

rights associated with the Common Stock when they traded in the pre-SPAC shares leading up to the SPAC vote and transaction closing, and then slowly placing less value on the control rights over time post-closing.

61.    Third, I reviewed the QuantumScape Options contained in Dr. Hendershott's put-call parity test (Exhibit 10A), to evaluate whether they tended to reflect the same information in their prices as would be expected based upon QuantumScape's Common Stock price movements. One would expect that if the Common Stock price increases [decreases] by a large amount, that a call option that was previously close to being at-the-money (a strike price close to the stock price) would also increase [decrease] in price. Conversely, a put option's price should generally move in the opposite direction, though with some attenuation due to the offsetting impact of volatility.[91]

62.    In **Exhibit 1**, I summarize the daily return of each option pair from his analysis, along with the daily return on the Common Stock, for any trading days during the Class Period in which the Common Stock exhibited a statistically significant return.[92] I report the returns for both the call and put Option used in Dr. Hendershott's report, from one trading day prior to each return date. These are the options he identified as having a strike price that "is closest to the current price of the QuantumScape's stock."[93] As can be seen in this analysis, QuantumScape's call Option prices tended to move in the same direction, and the put Options tended to move in the opposite direction, as the Common Stock when large price changes occurred. These directional movements occurred in 17 out of 18 observations, or 94% of the time. For the call

---

[91] Both call and put option valuations increase with an increase in the underlying stock volatility. Therefore, either a decrease or an increase in stock price could result in an increase in a corresponding put price due to an increase in the stock's underlying volatility. *See, e.g.*: "Black-Scholes Option Valuation" in Zvi Bodie, Alex Kane, and Alan J. Marcus, 2021, *Investments*, 12th ed., New York: NY: McGraw-Hill Education, pp. 716-724.

[92] As reported in my event study regression output in the Efficiency Report, using statistical significance at the 95% level.

[93] Hendershott Report, Exhibit 10A.

Options where the directional prediction is most clear, the movements were consistent 100% of the time. This consistent pricing movement of the Options not only occurred throughout the Class Period, but also during the first five weeks on which Dr. Hendershott focuses his analyses. This evidence is consistent with market efficiency, further supporting my Efficiency Report conclusion regarding the QuantumScape Options.

### V. Dr. Hendershott's Opinions are Based on an Incorrect Application of Statistics

63.  Dr. Hendershott's opinions are largely based upon an incorrect understanding and application of statistics, regression analysis, event studies, and hypothesis testing.

64.  As one example, Dr. Hendershott opines that "differences in means analysis using a t-test is discouraged for small samples (e.g., less than 30 observations) and when the observations are drawn from samples with different variances."[94] However, his primary citation for this opinion refers to a different test statistic: a z-score, not a t-test.[95] Dr. Hendershott's quoted support for this opinion is taken from a text box titled "Testing the difference between population means using large independent samples," which discusses use of a z-score, not a t-test. T-tests are commonly employed in sample sizes smaller than 30 observations, and textbooks report the critical values for the *t* distribution for sample sizes much smaller than 30.[96] Also, as I explained in **Section III.C** above, my t-test observations were not drawn from different independent distributions with differing variances, but rather from the same return-generating processes of a single firm event study.

---

[94] Hendershott Report, ¶ 42.
[95] Hendershott Report, fn. 60: "*See* Kenkel, James L., *Introductory Statistics for Management and Economics*, 4th edition, 1996, p. 478 ("If the population variations are unknown but the sample sizes n1 and n2 are large (say, 30 or more), then, to a good approximation, tests for the difference between population means can be performed by replacing the population variances by the observed sample variances…")."
[96] *See, e.g.*, Jeffrey M. Wooldridge, 2019, *Introductory Econometrics: A Modern Approach* 7th ed., Boston, MA: Cengage.

65.     As another example, Dr. Hendershott misinterprets my event study regressions in several ways. First, he misinterprets the 1.6% intercept of one regression estimate as predicting a 400% annualized return for QuantumScape.[97] My rolling event study models are designed to estimate the regression coefficients within a given sample period and then use those estimates to predict ***a single day's stock return for the next trading day***. In order to predict an annual return, one would need to design an entirely different type of model. Moreover, this particular regression model which Dr. Hendershott criticizes did, in fact, accurately estimate and predict QuantumScape's Common Stock return during its estimation window.[98]

66.     Second, Dr. Hendershott fails to understand that statistically significant abnormal stock returns do regularly occur in the absence of new company-specific information. He claims that QuantumScape's positive and significant stock returns on two dates did not reflect any new, value-relevant information.[99] He suggests that this implies market inefficiency and is "consistent with short selling constraints."[100] As I explained in **Section III.C** above, QuantumScape's positive returns on these dates are consistent with value-relevant information and rumors circulating during that time period. However, even if there were no information, Dr. Hendershott fails to understand that every event study regression has a known error rate, consistent with the *Daubert* standard of admissibility.[101] On any given date, in the absence of new value-relevant information, there is a 10% chance that an abnormal return will be statistically significant at the

---

[97] Hendershott Report, ¶¶ 12, 32.
[98] Dr. Hendershott focuses on the regression estimation window of Nov. 25, 2020 through Feb. 23, 2021. The prediction error of my event study regression is the daily abnormal return. Compounding these prediction errors, or daily abnormal returns, over this time period results in a compounded error of -0.4% as of Feb. 23, 2021. Thus, this event study regression model accurately predicted QuantumScape's Common Stock returns to within 1% of the Company's actual compounded return over this time period.
[99] Hendershott Report, ¶ 59; fn. 43.
[100] *Id.*
[101] *Daubert v. Merrell Dow Pharmaceuticals* (92-102), 509 U.S. 579 (1993). ("Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error…")

90% level, a 5% chance that an abnormal return will be statistically significant at the 95% level, etc. Thus, even if there were no information causing QuantumScape's stock returns on these two dates (and there was), Dr. Hendershott's opinions reflect a misunderstanding of statistics, regression analysis, and hypothesis testing.

67.    Third, Dr. Hendershott claims that my event study models did not reliably explain any of the variation in QuantumScape's Common Stock returns during the majority of the Class Period.[102] He fails to consider that my event study regression models in fact explain between 2.7% and 12.6% of this variation. But his criticism is misguided: my event study models are not meant to explain all of QuantumScape's stock returns via the market and industry returns. If this were the case (with an $R^2$ value of 100%), it would indicate that QuantumScape's stock returns would only respond to general market and industry news, and would not respond at all to any new company-specific information. This would be inconsistent with market efficiency. Rather, my event study models are meant to evaluate the price response to new company-specific information after controlling for general market and industry movements.[103] Dr. Hendershott's focus on $R^2$ or adjusted $R^2$ in reaching his opinion is also contradicted by standard textbooks. For example, in *Introductory Econometrics*, Wooldridge writes:

> [Whether or not an equation represents a good estimate of the relationship between variables] does *not* depend directly on the size of *R*-squared. Students who are first learning econometrics tend to put too much weight on the size of the *R*-squared in

---

[102] Hendershott Report, ¶¶ 12, 31: "Consistent with this finding, the adjusted R-squared, which measures the fraction of the variation in QuantumScape's stock return explained by the Market Index and Industry Index, is *negative* for the regression models for November 27, 2020 to February 26, 2021, and very low for March 1, 2021 to March 22, 2021 (ranging from 0.04% to 4.23%). In other words, Dr. Cain's regression models over this period have no explanatory power."

[103] Efficiency Report, ¶ 51: "By subtracting the predicted return from the actual return, an economist can calculate the 'abnormal' return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news." At ¶ 55: "This allowed me to predict the expected daily return of the Company on a date, once I controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the 'abnormal' return, which represented the component of the return that is not attributable to market-wide or industry-wide movements."

evaluating regression equations. For now, be aware that using *R*-squared as the main gauge of success for an econometrics analysis can lead to trouble.[104]

The adjusted *R*-squared is sometimes called the *corrected R-squared*, but this is not a good name because it implies that [adjusted *R*-squared] is somehow better than [*R*-squared] as an estimator of the population *R*-squared. Unfortunately, [adjusted *R*-squared] is *not* generally known to be a better estimator.[105]

68.     In summary, Dr. Hendershott's opinions are largely based upon an incorrect understanding and application of statistics, regression analysis, event studies, and hypothesis testing, rendering his conclusions irrelevant.

## VI. Dr. Hendershott's Concerns Related to Damages are Flawed and Premature

69.     In my Efficiency Report, I described that the "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act.[106] Importantly, Dr. Hendershott does not dispute this. However, Dr. Hendershott takes issue with my opinions related to damages by claiming:

Dr. Cain fails to present a methodology that is capable of measuring price inflation attributable only to the allegedly misrepresented or omitted information given the highly unusual circumstances of this case. In particular, he fails to demonstrate that an event study analysis could be reliably used to model inflation in light of his failure to demonstrate that QuantumScape's stock and options traded in efficient markets throughout the Putative Class Period. He also has not demonstrated that unspecified valuation "tools and techniques" can be used to disaggregate the price effects of short selling constraints on the alleged corrective disclosure dates and throughout the Putative Class Period.[107]

70.     First, as discussed at length above, Dr. Hendershott's opinions related to market efficiency are flawed and do not disturb my opinions. Thus, his opinions related to damages that flow from his flawed market efficiency claims are irrelevant.

---

[104] Jeffrey M. Wooldridge, 2019, *Introductory Econometrics: A Modern Approach* 7th ed., Boston, MA: Cengage, at p. 35 (emphasis in original).
[105] *Id.*, at p. 196 (emphasis in original).
[106] Efficiency Report, ¶ 81.
[107] Hendershott Report, ¶ 15.

71.    Second, specifying an approach to determine artificial inflation per share throughout the Class Period is dependent on a detailed loss causation analysis, which I understand is not required at this stage of the litigation.[108] Dr. Hendershott appears to agree. Indeed, he explicitly states: "I understand that Plaintiffs are not required to analyze loss causation or calculate per-share damages at the class certification stage."[109] Even still, Dr. Hendershott is concerned with my use of an event study to quantify artificial inflation. While I disagree with Dr. Hendershott's criticisms of my event study as discussed above, he nonetheless is making a premature argument that is irrelevant at the class certification stage. Whether I employ an event study, which I note is widely used to calculate artificial inflation, or some other valuation technique, the specific method used to quantify artificial inflation will be dependent on a thorough loss causation analysis. Furthermore, the exact technique used to quantify artificial inflation can be applied on a class-wide basis. For example, whether I employ an event study or another technique, the resulting inflation per share for each day during the Class Period will apply to all Class members.

72.    Third, Dr. Hendershott's final argument related to the disaggregation of supposed short selling constraints is irrelevant at the class certification stage. Indeed, in many cases there is a dispute about whether the newly released information that is alleged to be corrective is confounded by other information unrelated to the fraud, and if so, how to reasonably estimate the value of that potentially confounding information. Although I addressed Dr. Hendershott's flawed arguments related to short selling constraints above, whether this factor or any other information needs to be accounted for in the calculation of artificial inflation will be dependent on a detailed loss causation analysis. And again, if such disaggregation is necessary, this will

---

[108] Efficiency Report, ¶ 83.
[109] Hendershott Report, ¶ 85.

apply on a class-wide basis. That is, if it is determined that artificial inflation needs to be adjusted due to the impact of any factor unrelated to the fraud, the resulting inflation per share for each day during the Class Period will apply to all Class members.

73.     Dr. Hendershott's only criticisms of the damages methodology I presented in my Efficiency Report hinge on his flawed market efficiency opinions or premature loss causation arguments. Thus, his claims do not disturb my opinion that QuantumScape Common Stock and Options damages in this case can be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

74.     I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 10, 2022

Matthew D. Cain

35

**Appendix A**

## Matthew D. Cain, Ph.D.                                    November 2022

E-mail: mdcain@outlook.com                                                    Homepage
Mobile: 574-485-8065                                                             SSRN

### Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).


## Presentations

Purdue University, 2021
Arizona State University College of Law, 2020
U.C. Berkeley School of Law, 2019; 2018
Vanderbilt University Law School, 2019
Berkeley Center for Law and Business, 2018
Cornerstone Research, 2018
Cornell University, 2016; 2015
Oxera, London, 2016
Institute for Law and Economics, University of Pennsylvania, 2015
U.C. Berkeley M&A Roundtable, New York, 2015
American Bar Association, Business Law, Private Equity M&A Subcommittee meeting, 2015
Virginia Commonwealth University, 2015
American Finance Association, annual meeting, 2015
Argentum Centre for Private Equity Symposium, Bergen, Norway, 2014
U.S. Securities and Exchange Commission, 2014
American Law and Economics Association, University of Chicago, 2014

The Brattle Group, 2013
U.S. Securities and Exchange Commission, 2013
Institute for Law and Economics, University of Pennsylvania, 2013
All Indiana Conference, 2013; 2010; 2009
American Law and Economics Association, Stanford Law School, 2012
George Washington University Law School, 2012
American Finance Association, annual meeting, 2012
Ohio State, 2011
Ohio University, 2011
Conference on Empirical Legal Studies, Yale Law School, 2010
Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden, 2010
Purdue Alumni Conference, 2010
American Finance Association, annual meeting, 2008
Indiana University, 2008
Penn State, 2008
University of Arizona, 2008
University of Colorado, 2008
University of Florida, 2008
University of North Carolina at Chapel Hill, 2008
University of Notre Dame, 2008
University of Oregon, 2008
University of Pittsburgh, 2008
Virginia Tech, 2008
Financial Management Association, annual meeting, 2007
University of Georgia, 2007
University of Kentucky, 2007
Western Finance Association, annual meeting, 2006


**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*


## Teaching Experience

UC Berkeley School of Law

    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022

    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2022


University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. Ny). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. Ny). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. Ny). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

**Documents Considered**

**Court Documents:**
- Expert Report of Matthew D. Cain, Ph.D, dated July 22, 2022, *In Re QuantumScape Securities Class Action Litigation*, No. 3:21-cv-00058-WHO.
- Deposition of Matthew D. Cain, Ph.D., dated September 7, 2022, *In Re QuantumScape Securities Class Action Litigation*, No. 3:21-cv-00058-WHO.
- Expert Report of Terrence Hendershott, Ph.D., dated October 6, 2022, *In Re QuantumScape Securities Class Action Litigation*, No. 3:21-cv-00058-WHO.

**Court Decisions and Securities Law:**
- *Daubert v. Merrell Dow Pharmaceuticals* (92-102), 509 U.S. 579 (1993)
- *In Re Allergan PLC Securities Litigation*, 2021 U.S. Dist. LEXIS 170310
- *In Re NII Holdings, Inc. Securities Litigation*, No. 1:14-cv-00227-LMB-JFA (E.D. Vir., Nov. 17, 2015)
- *In Re Washington Mutual, Inc. Securities Litigation,* No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP (W.D. Wash., Oct. 12, 2010)
- Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*
- *Waggoner v. Barclays*, No. 16-161912-cv

**Academic Literature:**
- Eli Ofek, Matthew Richardson, and Robert F. Whitelaw, 2004, "Limited arbitrage and short sales restrictions: Evidence from the options markets," *Journal of Financial Economics* 74
- G. William Schwert, 1996, "Markup pricing in merger and acquisitions," *Journal of Financial Economics* 41
- Gregg A. Jarrell and Annette B. Poulsen, 1989, "Stock Trading Before the Announcement of Tender Offers: Insider Trading or Market Anticipation?" *Journal of Law, Economics, and Organization* 5
- Jeffrey M. Wooldridge, 2019, *Introductory Econometrics: A Modern Approach* 7th ed., Boston, MA: Cengage
- John Pound and Richard Zecckhauser, 1990, "Clearly Heard on the Street: The Effect of Takeover Rumors on Stock Prices," *Journal of Business* 63
- Kenkel, James L., *Introductory Statistics for Management and Economics*, 4th edition, 1996
- Lisa K. Meulbroek, 1992, "An Empirical Analysis of Illegal Insider Trading," *The Journal of Finance* 47
- Marcus P. Kirk and Stanimir Markov, 2016, Come on Over: Analyst/Investor Days as a Disclosure Medium, *The Accounting Review* 91

41

- Ralph W. Sanders, Jr., and John S. Zdanowicz, 1992, "Target Firm Abnormal Returns and Trading Volume around the Initiation of Change in Control Transactions," *Journal of Financial and Quantitative Analysis* 27
- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *Accounting Review* 88
- Zvi Bodie, Alex Kane, and Alan J. Marcus, 2021, *Investments*, 12th ed., New York: NY: McGraw-Hill Education

**Analyst Reports:**

- "Monthly sales preview, GM banking charter, Tesla int'l update," *Deutsche Bank,* November 30, 2020.
- "Pole Position," *UBS*, December 9, 2020.
- "That was the week," *Deutsche Bank*, December 11, 2020.
- "Solid-State Battery," *J.P. Morgan*, January 29, 2021.
- "Wolfe Research Auto Daily," *Wolfe Research*, September 4, 2020.
- "Wolfe Research Auto Daily," *Wolfe Research*, December 9, 2020.

**Call Transcripts:**

- "FQ4 2020 Earnings Call Transcripts," *S&P Capital IQ,* February 16, 2021.

**News:**

- "Get Ready for a QuantumScape Short Squeeze," *S3 Partners*, December 9, 2020
- "Velodyne, Luminar, QuantumScape stocks soar on news about Apple's self-driving car," *San Francisco Business Times*, December 22, 2020

**Exhibit 1. QuantumScape Option Price Movements**

| Date | Common Stock Raw Return | Option in Hendershott Report, Exhibit 10A (1 Day Prior) | Call Option Return | Same Direction as Common? | Put Option Return | Opposite Direction of Common? |
|---|---|---|---|---|---|---|
| 11/27/2020 | 57% | N/A | N/A | N/A | N/A | N/A |
| 11/30/2020 | 27% | $35 Strike, Expiring 1/15/2021 | 78% | Yes | 12% | No |
| 12/1/2020 | -25% | $45 Strike, Expiring 1/15/2021 | -61% | Yes | 8% | Yes |
| 12/8/2020 | 31% | $45 Strike, Expiring 1/8/2021 | 199% | Yes | -30% | Yes |
| 12/9/2020 | 30% | $57.5 Strike, Expiring 1/8/2021 | 140% | Yes | -31% | Yes |
| 12/21/2020 | 29% | $73.5 Strike, Expiring 1/22/2021 | 263% | Yes | -24% | Yes |
| 12/22/2020 | 39% | $95 Strike, Expiring 1/22/2021 | 189% | Yes | -39% | Yes |
| 1/4/2021 | -41% | $85 Strike, Expiring 2/5/2021 | -66% | Yes | 47% | Yes |
| 2/17/2021 | 31% | $50 Strike, Expiring 5/21/2021 | 77% | Yes | -37% | Yes |
| 3/24/2021 | -17% | $57 Strike, Expiring 4/23/2021 | -53% | Yes | 87% | Yes |

Note: Dates included are Class Period trading days with QuantumScape Common Stock returns that are statistically significant at the 95% level, using the event study regression in the Cain Efficiency Report. Options shown are from the Hendershott Report, Exhibit 10A underlying data and codes, from one trading day prior to the Date. Returns are calculated for each call and put option using the Hendershott Report underlying data (filename ivol_qs), as the percentage change in the closing bid-ask midpoint from the prior trading day to the Date for each call and put option indicated.