# EXHIBIT "9"

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


------------------------------x
                              ) Master File No.:
IN RE QUANTUMSCAPE SECURITIES ) 3:21-cv-00058-WHO
CLASS ACTION LITIGATION       )
------------------------------x







REMOTE VIDEOTAPED DEPOSITION OF

TERRENCE HENDERSHOTT, PhD

TUESDAY, NOVEMBER 1, 2022

9:11 A.M. PACIFIC DAYLIGHT TIME











Job No.: 219152

Pages: 1 - 244

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

A P P E A R A N C E S


ON BEHALF OF PLAINTIFFS:

NICHOLAS PORRITT, ESQ.
KATHY VALDIVIESO, ESQ.
LEVI & KORSINSKY
1101 30th Street NW
Washington, DC 20007


ON BEHALF OF DEFENDANTS:

REBECCA EPSTEIN, ESQ.
LARISSA LEE, ESQ.
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California 94304


ALSO PRESENT:

ALEX SKELLET (QuantumScape in-house counsel)

JOHN M. REIDT, Videographer

Then this marks the beginning of media unit number 1 in the video-recorded deposition of Dr. Terrence Hendershott, In Re QuantumScape Securities Class Action Litigation, in the United States District Court, Northern District of California.  The case file number is 3:21-cv-00058-WHO.

This deposition is being held remotely via Zoom on this 1st day of November 2022.

Again, my name is John Reidt, and I am the legal video specialist for TSG Reporting, Incorporated, headquartered at 228 East 45th Street, Suite 810, New York, New York 10017.

The court reporter is Leslie Todd, also in association with TSG Reporting.

All those present will be noted on the transcript.

The court reporter will now swear in the witness, and you may proceed.

TERRENCE HENDERSHOTT, PhD,

and having been first duly sworn,

was examined and testified as follows:

THE REPORTER:  All right, Counsel.

MR. PORRITT:  Thank you, Leslie.

***

to offer in this case?

A     Well, it's a summary of the opinions. There may be additional opinions that are -- you know, one tries to keep the summary shorter than the report, so there are undoubtedly things that come later that may not be listed here, but this is a summary of them.

Q     Okay.  So you lay out -- as far as I can tell, they're not numbered here.

Well, I guess turning to paragraph 11, you state:  "Dr. Cain fails to demonstrate the QuantumScape stock and options traded in efficient markets throughout the Putative Class Period."

Do you see that?

A     Yes.

Q     Is it your opinion that the market for QuantumScape -- QuantumScape's stock and options was inefficient during the putative class period?

A     I think there's, you know, a lot of evidence that is stated in the following paragraphs and throughout the report that shows lots of factors that suggest that the market was not very efficient.

I did not reach a summary opinion about whether or not it was efficient -- whether or not it was inefficient because that's not what I was asked to do.  I was asked to review Dr. Cain's report and whether or not he provided evidence that the stock and options traded in an efficient market throughout the class period.

Q      Did you reach any opinion, summary or otherwise, that the market for QuantumScape's stock and options was inefficient during the putative class period?

A      So I'm not a hundred percent sure what that means, right.  I mean, to the extent that we think of, you know, borrowing as -- borrowing and being able to short sell as an important part of arbitrage, which is well established in the literature, then there's certainly opinions that the barriers to doing that were some of the most extreme.  You know, in paragraph 10 it lists it as the 99.99 percentile of borrowing costs.  And that's from an SEC document that's cited later to figure out where the percentile is.

So, I mean, that's -- short selling was very difficult for parts of the class period.

And so that was a single stock.  And he did some comparison to things from this MRK -- what he refers to as the MRK paper.  And so it depends on what you mean by analysis.  In terms of the actual event study that he ran, it was on QuantumScape stock as shown in Exhibit 1.

Q     So is it your opinion that the market for a security which takes two days to incorporate information is not an efficient market?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  Categorically, in every instant, I wouldn't necessarily do that.  It depends upon what you mean by days as well.  And if you do a daily event study, and an announcement comes out at 3:59 right before the close, that would be somewhat different than something coming out before the open.

So we'd have to -- you'd have to look at the facts and circumstances of the case -- or the stock, the security.

BY MR. PORRITT:

Q     In any of the -- of your prior reports dealing with market efficiency, have you considered whether a two-day event window is

BY MR. PORRITT:

Q       So when looking for or when evaluating the market efficiency for what became QuantumScape stock following the de-SPAC closing, you believe it would be appropriate to examine the price for that security prior to the de-SPAC closing?

A       It depends upon what you mean.  I cited in page -- on page 18, footnote 52, a way it could be relevant.  I don't -- it's not obvious to me how relevant it would be for other things because I haven't really seen it.  Obviously, it was -- the Kensington SPAC was a different firm until the merger occurred.

Q       So I guess the fact that the Kensington stock was trading at 23.50 the day before the de-SPAC closed, what conclusions, if any, do you draw from that fact?

A       The conclusion that is on -- that is at the end of footnote 52:  "This price differential is reflective of high market confidence that the de-SPAC transaction will close."

Q       Okay.  That's if the market for Kensington securities was efficient.

MS. EPSTEIN: Objection. Form.

THE WITNESS: Well, so this -- yes, I think so.

BY MR. PORRITT:

Q Okay. So have you reached any conclusion as to whether the Kensington stock on -- before November 27, 2020, was the -- was efficient or not?

A Well, often we talk about efficiency with respect to particular types of information. I don't recall Dr. Cain doing any analysis of the Kensington stock before the de-SPAC occurred, so I haven't -- I don't recall having done any analysis beyond, you know, wanting to understand what the price was before the close occurred to get an understanding of what the market's perception may have been about the likelihood of the de-SPAC closing.

Q So my question was directed to what you have done. You have not done any work determining whether the market for Kensington stock immediately prior to November 27th, 2020, was efficient or not, correct?

MS. EPSTEIN: Objection. Form.

THE WITNESS: And my response was,

page 4 of Appendix B of my report.  "Market Efficiency and Limits to Arbitrage:  Evidence from Volkswagen Short Squeeze."

Q    Okay.  And that paper concludes that the market for Volkswagen stock was -- was not efficient in any sense during the short squeeze?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  I don't think I would characterize it that way.  So, I mean, the paper looks at price dynamics and trading dynamics around there, and there was an enormous run-up and then decline, which is similar to what happened in some of the mean stocks as well, which GameStop was one, and talks about how the shorting constraints affected the efficiency of the market.

I don't know that it explicitly states that the market was inefficient, but it is highlighting pretty extreme price behavior and shorting constraints, and these, if I'm recalling correctly, occur with high volume and low bid-ask spreads.

So it's not clear that -- well, in that instance, I think it's relatively clear that there were serious constraints to market efficiency in the presence of high volume and low

bid-ask spreads.

BY MR. PORRITT:

Q       You said it was generally accepted for the Volkswagen stock was -- the market for Volkswagen stock was inefficient during the short squeeze, and now you said that it didn't -- this study didn't conclude that it was inefficient.

A       Yes.  I think I started with talking about the -- I thought there were criminal convictions in the case related to market manipulation, and the statement that a manipulated market is not an efficient one.

Q       Okay.  Is there any -- are there any convictions of market manipulation in connection with QuantumScape stock?

A       I'm not aware -- but, you know, that's -- I was -- you were asking me about my conclusion about it being generally accepted as opposed to the -- that you would necessarily need that for the market to be inefficient.

Q       Have you looked here for any -- well, strike that.

First of all, what is evidence of market manipulation?

A       Oh, in general?  I mean, that hasn't

is cited -- I think it's -- did I say it was cited in footnote 52?  Let's see how well I remember.

No, that's a different one.

But the -- on VW there's some text in my report that talks about how they describe, you know, shorting constraints and a short squeeze.

And then there's the -- so S3, there are a number of reports that are cited.  S3 Partners being a company that provides data on shorting or on borrow- -- stock lending and borrowing that there is -- they refer to it as a short squeeze.

But in general, I haven't come up with a precise definition for "short squeeze." Other people called it a short squeeze, what was happening in QuantumScape.  It wasn't particularly important for my opinion whether or not I reached that conclusion.  It had a lot of the characteristics of a short squeeze as they were written about in the Volkswagen paper.

Q    All right.  So you have not reached any -- you have not -- it is not your opinion that a short squeeze occurred for QuantumScape stock at any time during the purported class

period; is that correct?

A       So there were very large shorting constraints, and by the borrowing class were quite high, and -- let me find the exact quote from the Volkswagen paper that I think it fits within, and I made reference to the reports by other people calling it a short squeeze.

But whether or not it was a short squeeze wasn't -- whether or not to use that exact terminology was not important for my opinions, so I didn't reach a final conclusion on that one way or the other.

Q       Why was it not important for your opinion?

A       Well, the large shorting -- why was it not?  You know, large shorting constraints, whether or not one uses the exact term "short squeeze" is not important for whether or not the -- there were serious impediments to arbitrage, and these were associated with very unusual price movements.

Q       Impediments, to use your word, to shorting a stock, does that mean that information is not being incorporated at all into the stock price at that point in time?

A       It's a barrier to arbitrageurs being able to try and incorporate information.  Does it mean no information was never incorporated?  I don't know that one can say that, but the -- it's certainly an impediment to market efficiency.

Q       Well, I mean, explain to me what you mean by an "impediment to market efficiency."

A       Sorry.  The -- by that -- so market efficiency generally relies upon arbitrageurs and other people to ensure that information is rapidly and fully incorporated into prices.  And once an important set of arbitrageurs have -- short sellers have significant constraints placed on them, there's certainly -- that's a barrier to or an impediment to market efficiency.

Q       You mean that the information cannot be fully incorporated into the price as rapidly as without those constraints?

A       It's difficult for -- the literature certainly finds that, as all the things cited in my report show, that short selling is a constraint to -- short selling constraints are an impediment to market efficiency.

Q       Okay.  And that -- I'm just trying, once again, to understand what you mean by that.

opposite way to what you expect following the

Bernstein report on November 30.

And at that point in time, did you

look at what the borrowing costs were on

November 30?

MS. EPSTEIN:  Objection.  Form --

sorry, Nick.

Objection.  Form.

THE WITNESS:  So if we look at

Exhibit 6A of my report, that contains the

borrowing costs.  And it wasn't just me who

characterized the -- the movement of prices around

the release of the Bernstein report as surprising.

I think that's the word someone used, but I'd have

to look at the exact quote I have in my report.

If you look at Exhibit 6A again, it

lists the borrowing costs on the different days.

It's hard for me to pick out the exact -- what it

was on November 30th, but -- and it started to

increase very rapidly at that time.

BY MR. PORRITT:

Q     All right.  Well, let's stick -- we

will come back to November 30 in a moment, but on

the one side -- well, accepting your comment

about high borrowing costs, do you agree that as

Cammer Factor 1 says, that in general, high volume of trading supports market efficiency?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  As a general matter, high volume -- trading volume can support -- can occur in an efficient market.  In some cases it's used.  I would incorporate my further -- my earlier answer about why I don't think that's appropriate in this case, because we have clear examples of where high volume occurred in markets that were -- that certainly did not appear very efficient.

BY MR. PORRITT:

Q     Well, so what are you referring to, markets that do not appear to be very efficient?

A     I was trying to not repeat my entire earlier answer, but this was -- the examples that came out I stated earlier were GameStop and Volkswagen where there certainly were severe borrowing constraints, there were very unusual price movements, and there was high trading volume.

Q     Right.  But I think we discussed you don't recall the academic analysis of the Volkswagen circumstances as concluding the market

THE WITNESS:  I mean, so the -- I think the high borrowing costs are related to that.

BY MR. PORRITT:

Q     But the fact that it costs them money to do that does not mean they were not doing it, correct?

A     Well, it costs them an enormous amount to do.  I mean, 500 percent, I don't know that I -- I can't think -- I can't -- sorry, 400 percent was its peak, and that's a very unusual amount.  So it was very costly for them to do so.

So there was certainly an impediment to doing it.  The fact that some people did short, and, you know, during -- they were shorting as the borrowing costs increased a lot and as prices went up, which made it a very risky and costly endeavor.

Q     All right.  But short -- as you observed, short interest increased during the class period, correct, or during this period in the class period, December 2020.  Isn't that correct?

A     Short interest.  I don't recall a graph of short interest.

Page 59

Q      Is that something you looked at as part of your work?

A      I mean, there's a discussion of -- so looking at short interest, when there was a big change in the supply, such as when the PIPE shares were registered, I mean one has to think very carefully about that.

Looking at the lending fees is a much cleaner way -- certainly lending fees can be affected by the increase in supply of shares, but there's sort of a consistent way of looking at it over time.  So I thought borrowing fees or lending fees are a better measure of that.

Q      Did you look at the actual number of shares being borrowed and returned during this period?

A      The number of shares being borrowed and returned.  You know, actually, understanding when shares are returned requires pretty granular data.

What I looked at was the -- what S3 reports both in terms of the sort of average price and the -- or average rate or lending fee of a loan, and the most recent one.  And I don't remember if S3 -- I don't know that S3 reports

returns.

Q       All right.  But that information is available to you, correct?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  Sorry, I don't know that S3 provides that data.

BY MR. PORRITT:

Q       But it's available from other sources, even if it's not available from S3, correct?

A       Returns?  Not that I'm aware of.

Q       You've never heard of an entity called FIS?

A       If I -- the name sounds vaguely familiar.  If I'm remembering, it's possible Dr. Cain cited them in a white paper that he did on GameStop.

Q       Are you aware that FIS makes available daily securities lending data, volume of returned shares versus volume of borrowed shares, and volume of borrowed shares?

A       No.  I would want to look at exactly how FIS calculates that, because, right, I mean, typically shares being returned, that would be from the short seller to the broker.  So either

the short seller would have to report that it returned it or the bank that was providing the shares would have to report it.  And I would have to look at the FIS data to be sure that it actually characterizes returns in the way that I would.

Q    Would you agree that that data would more directly indicate the level of shorting occurring during a particular period?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  I would have -- that data hasn't been introduced in this case.  I would have to look at it.

But in general, right, we're talking about the impediment to shorting, and the cost is how much you pay basically on a daily basis to have your -- to borrow the shares to be able to maintain your short position.

So there could be shorting going on, and there's also -- it's extremely expensive.  So it makes it expensive and risky for someone to try and correct mispricing.  Even if they're trying to do some of it, it's still a large impediment.

BY MR. PORRITT:

Q    Well, if there were large borrowing

Page 70

THE WITNESS:  So if I understand the question correctly, it's a question of -- so a borrowing fee is a cost that an existing short seller faces, and a -- someone who -- a new short seller or an existing short seller wanting to expand their position that -- that they currently have, and that both of those would be costly, and they would be costly and risky based on what the lending and borrowing fees are.

And that -- so existing short sellers have traded on that, but the real question is, well, you know, what are the impediments to them fully trading on the information they have, and that is the fees that they pay and the risks that the fees may change.

BY MR. PORRITT:

Q     Right.  And your assumption is an increase in borrowing costs leads to less short selling transactions entered into by existing short sellers and new short sellers.

A     So the actual quantity that they borrow depends upon the demand they have to borrow shares, which may depend upon the market price.

So for example, the -- if you have

high borrowing costs and prices go up, more people may want to short.

So let's take a hypothetical where borrowing costs are high, and then prices go up, and now people may think the short sellers -- potential short sellers may think the price is overvalued, and they may short it, but, you know, they -- they still face these same fees as they try and do it.

So the fact that more people short it does not necessarily mean that the price has become more efficient.  Right.  Because people may be shorting because they think the price is inefficient.  They just can't or choose not to fully incorporate all of their information because it's so costly and risky for them to do so.

Q    But they can only not -- how would they not fully incorporate information because it's too costly, by shorting fewer shares?

A    By shorting fewer shares than they would if the lending -- the borrowing fees or lending fees were lower.

Q    Okay.  So your assumption is that, as a result of high borrowing costs, short sellers

recall the VW article, or that the VW involved market manipulation, or you don't recall the analysis showing an actual short squeeze occurring, although you keep stating that.

MS. EPSTEIN:  Objection to form.

THE WITNESS:  The title of the paper says "Volkswagen Short Squeeze."

BY MR. PORRITT:

Q       If you look here on the middle of page 17 of Exhibit 46, you say -- there's a quote from the Cammer court which says:  "We think that at a minimum, there should be a presumption, probably conditional for class determination, that certain markets are developed and efficient for virtually all the securities traded there." And then it lists the New York Stock Exchange as one of -- as one of those markets.

Do you see that?

A       This is the indented quote that ends in footnote 39?

Q       Yes, correct.

A       Yes, I see that.

Q       Okay.  Do you -- so do I take it from your testimony that you disagree with this statement?

A    Well, this is a statement about the presumption, and so it may be that in general securities that trade on the New York Stock Exchange are efficient. That's not the same as every security at all times being efficient on the New York Stock Exchange.

Q    Okay. Are you aware of any stock trading on the New York Stock Exchange absent market manipulation that was trading inefficiently?

A    We had an earlier discussion about GameStop and maybe -- I don't know that we talked about AMC. So there's certainly some question about whether or not large shorting constraints can cause inefficiency on NYSE-listed stocks.

Q    Okay. But again, you're not aware of any analysis concluding that the shares for either AMC or GameStop were inefficient at any particular point in time, correct?

A    I would have to review the literature. A number of papers have been written about GameStop, and my general recollection is that their emphasis is on the market not looking efficient during these instances.

Q    Once again, you keep using the term

"not looking efficient."  Is that a financial term of art?

A       So I'm trying to characterize a broad body of literature.  And so again, when I say "not looking efficient," that is trying to describe where we might lie on the continuum.

I think, in general, the literature has concluded that instances like GameStop are cases where the market was looking or tending towards the inefficient side, and these are relatively extreme examples.

Q       If I can point you to the following section, Section D, beginning on page 18, going on to the top of page 20 of Exhibit 46.

A       43 through 45, those three paragraphs?

Q       Yes.

A       Okay.

Q       Again, if I can refer you to paragraph 45 towards the bottom of page 19, it shows there Dr. Cain states there:  "QuantumScape made all required filings with the SEC on a timely manner during the class period."

Do you see that there?

A       Yes.

discussed below, are consistent with the conclusion that the common stock traded in an efficient manner during the class period."

Do you see that?

A     Yes.

Q     Do you disagree that its market capitalization is consistent with its stock trading in an efficient market during the class period?  "It" being QuantumScape.  Sorry.

A     So I think in general the literature has found some evidence that larger stocks may on average trade in a more efficient market, but, you know, that's a very indirect measure of -- it's not looking at trading.  It's not looking at arbitrage constraints and all.

So on average, larger market capitalization stocks, I think there's support for in the literature they would be more efficient.  That's not telling us a lot about any specific firm, but the literature says what it says.

Q     Do you think indirect factors such as market capitalization should not be considered when analyzing whether a market for a security is efficient or not?

Page 83

MS. EPSTEIN:  Objection to form.

THE WITNESS:  They can certainly be considered, but again, they are -- you know, the more direct the factors are in terms of the market actually responding to new information and being able to measure arbitrage barriers and impediments, those are the -- financial economic literature focuses on those much more.

Now, those may on average have an association with some of the indirect factors, but if you can measure arbitrage constraints more generally, you would prefer that to some indirect measure that's based on averages and can give false conclusions and examples, like I talked about with regard to Volkswagen.

BY MR. PORRITT:

Q    And what about shares outstanding available for trading, would you agree that the greater number of shares outstanding available for trading would be consistent with a more efficient market for a security?

A    I could imagine that -- I'd have to think about this, right.  I mean, shares outstanding and market capitalization, the only difference between them is the price.  So if you

hold the price the same, I -- I would answer the question in a similar way to how I did with market capitalization.

Q    Okay.  And is that also the case for -- regarding float?  Is that really just three ways of saying the same thing?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  I don't -- well, so I would have to look at exactly how Dr. Cain differentiated between float and shares outstanding.

But in general, if we think about the trading conditions, one could imagine float being more important, but we'd have to look at a specific instance and talk about it precisely.

BY MR. PORRITT:

Q    Okay.  Well, Exhibit 10 to -- Exhibit 10 to Exhibit 46, if you know what I mean, Exhibit 46 being the report and Exhibit 10 being Exhibit 10 to that report, it's on page 59 of our Exhibit 46, contains the calculation of the public float.

MS. EPSTEIN:  Nick, I can't tell if you are frozen or not, but there --

MR. PORRITT:  No, I'm just waiting for

straightforward answer.

I don't think your report purports to evaluate all the Cammer and Krogman factors together collectively, does it?

MS. EPSTEIN: Objection to form.

THE WITNESS: I did not discuss all of them. I think the factors that are listed in my report are sufficient to establish that Dr. Cain fails to demonstrate that QuantumScape stock and options traded in an efficient market throughout the class period. Right.

The burden is on him and his report, and he didn't analyze all of these important things. And so -- you know, we -- but the weights we might place on these other ones, he didn't analyze the important things that are the most important factors in the context of this case.

MR. PORRITT: All right. I think we got there eventually.

All right. Let's take a break. So it's -- it's 11:30.

THE VIDEOGRAPHER: Going off the record. The time is 11:32.

(Recess.)

THE VIDEOGRAPHER: We're going back on

QuantumScape.

Q     And so assuming it wasn't 100 percent, the stock price you would expect -- all other things being equal, I understand that's, you know, not an accurate assumption, but nonetheless, it's the assumption we're working with -- you would expect the stock price to go up, correct, when the de-SPAC transaction closed?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  Well, you expect it to go up if you think the stock -- you think QuantumScape is worth more than the price of Kensington.

BY MR. PORRITT:

Q     Right.  But you say the price of Kensington incorporated all the news about -- public news about QuantumScape's business as well as some understanding of the likelihood of the deal of the de-SPAC actually closing, correct? Isn't that what you just said?

A     I would expect that the Kensington price incorporated those factors.

Q     Right.  So when the -- when the risk, if you like, or uncertainty about the de-SPAC transaction closing is eliminated, all you're

I don't know if he has a longer time period.  So, no, I haven't looked at -- oh, wait a minute.

So in Exhibit 1 of Dr. Cain's report, he shows volume going through April 29th, 2022.

BY MR. PORRITT:

Q     Okay.  And how does it compare, the class period?

A     Oh, I -- I'd have to look at it.  So, right, because -- I mean, this -- we often think of volume as a fraction of shares outstanding, and I haven't really, you know, carefully looked at any other capital raising they did, if it's in millions -- I'm not sure if it's in millions of shares, so we might want to adjust for the stock price.  I mean, we can look at it and look at whether or not the bars are higher or lower, but I haven't analyzed it enough to really say much.

Q     So in your opinion, what news days should Dr. Cain have looked at for conducting a news/no news analysis?

A     Well, so I've criticized the -- you know, his selection, particularly November 27th, and I've criticized that he -- many of his no news days are outside of the class period, but I never reached an affirmative opinion about

exactly what he should have done.

Q   Okay.  So you have no alternative, instead of news/no news days, that you've either conducted this volatility analysis or you believe that Dr. Cain should do.

A   Well, I mean, it depends upon what exactly that question means, because to the extent that, you know, one usually -- and in this case, right, I tried to -- you know, even though I don't like his methodology, I'm like, Well, let's look at how well his methodology performs if, you know, we do things in a way that are consistent with some of my criticisms, right?

So you can look at Exhibit 4.  So we've got Exhibit 4A, which excludes November 27th as -- you know, it's not really a product development day.

And then we talked about, well, okay, so if you -- or if you want to include that, then you should include the March 23rd, which is Exhibit 4C.

So you could think of I've done some things that show -- that really -- criticisms of his analysis, and I try and do things related to it to show that, you know, his conclusions aren't

Page 155

A        Well, so you certainly want a, you know, replicatable way of selecting days.

Q        So again, I'll ask, you haven't identified any news days within this period, 11/27/20 to 4/14/21, that you think should have been included in this analysis?

MS. EPSTEIN:  Objection.  Form and asked and answered.

THE WITNESS:  No, I was -- right.  My assignment is to comment on Dr. Cain's analysis, and it's true that the -- if you foresee, it talks about another news day that, you know, if we're including capital raising days, that Dr. Cain hasn't provided any sort of coherent and replicatable way why you include November 27th and don't include March 23rd.

So that's an example of another day that, you know, as far as I can tell, by Dr. Cain's methodology, or at least the way he described his inclusion of November 27th in his deposition, you know, could have or should have been included.

BY MR. PORRITT:

Q        And then if you can turn to Exhibit 4C, I think I understand what you've done here.

is, I would expect that it would be incorporated.

Q    Okay.  That's your expectation.

Do you have an opinion whether it was incorporated or not?

A    Well, I could state that as an opinion.  If the market was efficient, then it -- it should be incorporated.

Q    Well, no, that's not -- the question is, did the stock price -- my question to you is, do you have an opinion whether the stock price for QuantumScape stock as of close of trading on November 7 -- November 27, 2020, incorporated this information contained in Statement 1?

A    And I'm not sure I have an opinion, and I was trying to answer the question in a way that I thought was relevant for the case, which is, you know, what would it mean -- because I'm here to discuss the -- what my assignment was, which was Dr. Cain's report, where he reaches the conclusion that the market was trading in an efficient market -- sorry, the stock was trading in an efficient market throughout the class period.  And I'm saying under Dr. Cain's conclusions, it would be.

Am I sure that November 27th, the

stock was trading in an efficient market?  No, I'm not sure, because, you know, I don't think Dr. Cain has reliably established that.

Q       All right.  But you -- you don't have an opinion that it was inefficient on November 27, 2020, as we discussed, right?

A       I would have to look at -- if we're going to go day by day, right, my opinions are generally about Dr. Cain's conclusions throughout the class period.  Any individual day is a somewhat different exercise.  And Dr. Cain hasn't, as far as I can tell, done a day-by-day thing, so I don't have an opinion on that.

Q       So is it your testimony that the information contained in Statement 1 was not included -- not incorporated in QuantumScape's stock price as of the close of trading on November 27th, 2020?

A       I think we've covered that a number of times.  I don't really have much more to add. I would incorporate my prior answers here.

        This really turns on whether or not the market was efficient, and I tried to answer it in a way that was adopting Dr. Cain's conclusions, which I disagree with, and then in

violation of it would be there must be some

reason -- presumably there's some reason why an

arbitrageur isn't taking advantage of it.

Q      Okay.  And what would some of those

reasons be, other than market inefficiency?

A      Sorry, it's -- market inefficiency,

right?  Other than limits to arbitrage, you know,

if there are costs that aren't included in that,

like borrowing costs, then, you know, that's one

natural one.

Q      Okay.  Can you think of any others?

A      I -- I'd have to look at my report

really carefully to see if I cited any other

ones, but -- right?  So we're -- I'm describing a

market participant looking at these prices in

sort of real time.

I don't know, I guess if there was

some question about whether or not they could

actually execute against these prices, but I'm

really starting to speculate here.

You know, this was -- the put-call

parity violations lined up consistently with the

borrowing costs, so I mostly focused on borrowing

costs being the impediment to put-call parity.

Q      If -- let's continue back to

Page 186

Q    You're saying that the evidence suggests that the QuantumScape stock price is not incorporating information during the class period?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  There is -- there is evidence that that's true.  We've talked about the Bernstein report several times.

BY MR. PORRITT:

Q    Any other examples, or is it just the Bernstein report?

A    That's a pretty big one.  I didn't feel the need to point out very more -- very many more.  So I'd have to look through my report to see if there were any other ones.  That was the most obvious one.

Q    Do you recall any other pieces of news where the market -- the price for QuantumScape's stock reacted in a way that was contrary to the way you would expect, in a direction contrary to what you would expect?

A    So I'm looking at page 21 of my report, and that is -- I think Exhibit 59.  And this talks about that one specific example.  Let's see.  It only talks about that one day.

Provides all the reasons that we would expect the movement. That this was really negative information.

Then there are other ones that are -- I make other statements about other days, but I don't know that they identify specific news that was in the wrong direction. There's certainly lots of evidence of prices going up without Dr. Cain having identified value-relevant information. But that's, I think, a little bit different than what you're asking. So this is the specific example I picked.

Sitting here today, can I think of other ones? Not that come to me, but I would want to review my report carefully.

Q   All right. And then so if I refer you to -- I think this is one example of what you've just been referring to -- I think it's footnote 117.

THE WITNESS: So we've been going a little more -- we've been going, I think, more than an hour. So when -- I'm happy to answer this question or a few more, but then I'd like to take a break.

MR. PORRITT: Sure. No, absolutely.

that the movements on the 21st and 22nd did not

seem to make sense.

And I haven't seen much -- the

value-relevant news that came out that caused

these dramatic price increases.

Q      Well, why wouldn't it make sense to

increase on this news from Apple in connection

with battery technology?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  So if Apple was using a

different supplier -- so if you look at some of

the other people mentioned in that, right,

QuantumScape was -- had its relationship with

Volkswagen.  And I mean, I haven't done a careful

analysis of this or anything, but if Apple was

going to enter the market to Volkswagen -- use a

different battery supplier, and this would be to

the detriment of Volkswagen, this could be bad for

QuantumScape.

BY MR. PORRITT:

Q      All right.  Why couldn't it be good

for QuantumScape in the sense that this is

drawing attention to the industry, to the

technology, QuantumScape might be a potential

target to be acquired by Apple if they need the

technology?  Aren't all those things possibilities?

A     Oh, there are many possibilities.  If I remember, Velodyne or Luminar may have been mentioned.  I'd have to go review the article. And if they were more closely associated with Apple -- and that this, you know, was also a reason why I looked at what happened on the 22nd and what happened prior to the rumor for QuantumScape, what happened to QuantumScape's stock price prior to the rumor being published in Reuters.

MS. EPSTEIN:  Nick, we're now quite a few questions past the request for a break.

MR. PORRITT:  Yeah, I'm sorry.  All right.  Let's take a break now, and then --

THE VIDEOGRAPHER:  We're going off the record.  The time is 2:20.

(Recess.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 2:36.

BY MR. PORRITT:

Q     So before we took a break, Doctor, we were looking at your paragraph 59 and footnote 117.

Q      Okay.  Well, what analysis did you do, apart from reading the Barron's article, to determine -- to determine that you agreed with it?

A      I reviewed all of the Factiva news that Dr. Cain -- that his search identified.

Q      Did you look at any other news regarding QuantumScape or this Apple announcement or Apple rumor on December 21st and December 22nd, 2020?

A      No, I focused on the Factiva search that Dr. Cain did.

Q      So you reached this conclusion that you agreed that the price increase doesn't make sense, but you did that without looking at all the information or commentary that was publicly available in December about QuantumScape, on December 21st and December 22nd, correct?

MS. EPSTEIN:  Objection.  Form.

THE WITNESS:  I believe I stated what I did in terms of a Factiva search.

BY MR. PORRITT:

Q      Did you --

MR. PORRITT:  Kathy, could you bring over the Observer article, please.  This will be

Do you see that?

A    I did see that.

So is this an article that was in the Factiva search that Dr. Cain did?

Q    I don't know.  I was going to ask you, do you recall reviewing this article?

A    The Factiva search, I got it from Factiva.  So it was in -- I mean, this is produced -- I believe it was produced by my report.  It's a 900-page PDF file, and so it would be a little harder for me to remember, you know, given that's in a different format and we have different pictures, but I'm happy to open that up and try and search for it to see if it's there.

Q    No, if you don't recall reviewing it, that's fine.

Does this commentary here provide an explanation, in your opinion, as to why the stock price of QuantumScape may be increasing in response to the purported rumor regarding Apple and its battery technology?

A    Not particularly.  I mean, so you have a competitor who is -- I mean, this would seem to be an announcement of someone else who is

a competitor to QuantumScape potentially entering the market, which is -- generally more competition, especially for similar technology, is not a good thing for companies.

Q    Okay.  So if you were -- if this was included in your analysis about directional news, you would expect this to draw the stock price down?

A    I haven't thought about it to that extent.  I'd want to go back and carefully review, you know, everything that was happening that day to understand the informational environment.

I think the question was more, you know, does -- does this provide an explanation for why the stock price would go up, and I provided an answer that it's -- having more competitors is usually not a good thing for firms.  So I would have to think about it more carefully.

Q    But you don't really know whether this would be viewed positively or negatively just looking at it on its face, correct?

A    I just gave my answer, which is that to the extent that one interprets this as

Page 241

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me remotely via Zoom videoconferencing at the time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  November 3, 2022.


_Leslie Todd_

LESLIE A. TODD, CSR, RPR

Certificate No. 5129


(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

**ERRATA SHEET FOR THE DEPOSITION TRANSCRIPT OF DR. TERRENCE HENDERSHOTT**

**Case Name:** *In re QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO

**Deposition Date:** November 1, 2022

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 9 | 4 | BATs | BATS | Transcription Error |
| 9 | 24 | BATs | BATS | Transcription Error |
| 10 | 10 | Lancing | Lansing | Transcription Error |
| 10 | 11 | BATs | BATS | Transcription Error |
| 13 | 6 | efficient | inefficient | Transcription Error |
| 25 | 15 | stock | de-SPAC | Transcription Error |
| 29 | 13 | instant | instance | Transcription Error |
| 30 | 9 | Lancing | Lansing | Transcription Error |
| 40 | 13 | mean | meme | Transcription Error |
| 41 | 13 | mean | meme | Transcription Error |
| 42 | 10 | convictions in the case | cases | Clarification |
| 45 | 3 | class | costs | Transcription Error |
| 51 | 6 | inefficient | efficient | Transcription Error |
| 72 | 25 | December 19th | December 9th | Clarification |
| 74 | 19 | Exhibit 6 | Exhibit 6A | Clarification |
| 92 | 25 | Exhibits 9 | Exhibit 9 | Transcription error |
| 94 | 9 | deck | end | Transcription Error |
| 97 | 2 | can markets add and subtract | "Can the Market Add and Subtract?" | Transcription Error |
| 104 | 1 | residual return | residual returns | Transcription Error |
| 105 | 9 | largely | larger than | Transcription Error |
| 108 | 6 | no news | least news | Clarification |
| 120 | 12 | Exhibit A | Appendix A | Clarification |

1

| Pg. | No. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 120 | 14 | Exhibit A | Appendix A | Clarification |
| 124 | 23 | prices changed don't | price changes doesn't | Transcription Error |
| 131 | 25 | strong and | semi-strong form | Transcription Error |
| 149 | 3 | Exhibit 14 | Exhibit 4A | Transcription Error |
| 151 | 11 | variants | variance | Transcription Error |
| 151 | 21 | -- (Zoom cut out) -- | calculations | Clarification |
| 155 | 11 | if you foresee | look at Exhibit 4C | Transcription Error |
| 157 | 25 | after March 22nd | after market hours on March 22nd | Clarification |
| 166 | 24 | there | that | Transcription Error |
| 170 | 1 | interday | intraday | Transcription Error |
| 180 | 23 | option ask price | call option ask price | Clarification |
| 207 | 10 | then | when | Transcription Error |
| 210 | 15 | standing | expanding | Transcription Error |
| 229 | 6 | raffling | reflecting | Transcription Error |
| 230 | 4 | and the money | at-the-money | Transcription Error |
| 232 | 3 | call bid price | put bid price | Clarification |
| 232 | 3 | for my volatility | from iVolatility | Transcription Error |
| 233 | 16 | high volatility | iVolatility | Transcription Error |

## ACKNOWLEDGEMENT OF DEPONENT

I, Terrence Hendershott, do hereby certify that I have read the foregoing pages, 1-240, of my deposition transcript of November 1, 2022, and the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance noted in the above Errata Sheet.

Date: November 8, 2022

_____

TERRENCE HENDERSHOTT

2